UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| CATHARINA TEUNISSEN, individually, and as surviving Parent and personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and | Civil No. _____ |
| NERISSA SCHANSMAN, individually, and as surviving Sibling of QUINN LUCAS SCHANSMAN, | |
| Plaintiffs, | |
| -against- | |
| SBERBANK OF RUSSIA PJSC, THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., MONEYGRAM INTERNATIONAL, INC., MONEYGRAM PAYMENT SYSTEMS, INC., and VTB BANK PJSC | |
| Defendants. | |

Plaintiffs Thomas Schansman, individually, as surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of minor plaintiff X.S.; Catharina Teunissen, individually, and as surviving parent and personal representative of the Estate of Quinn Lucas Schansman; and Nerissa Schansman, individually, and as surviving sibling of Quinn Lucas Schansman, by and through their attorneys, allege upon knowledge as to themselves and their own actions and upon and information belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1.      On July 17, 2014, the Donetsk People's Republic ("DPR"), a terrorist group operating in eastern Ukraine, launched a surface-to-air missile from territory that it acquired and controlled through brute force, intimidation, and violent acts.  The DPR fired that missile at Malaysia Airlines Flight 17 ("MH17"), a civilian passenger plane traveling from Amsterdam to Kuala Lumpur, killing all 298 passengers onboard including 80 children, and murdering Quinn Lucas Schansman ("Quinn"), a young American.

2.      Quinn's family, the Plaintiffs in this action, bring this lawsuit to hold accountable those who provided material support and financing to the murderers of their son and brother.

3.      Defendants are corporate entities that provided ongoing and essential financial support to the DPR from around the world, including the United States, for the explicit purpose of purchasing lethal military equipment that was necessary (1) for the DPR to acquire and maintain control over the territory from which it launched the missile that took down the MH17 passenger plane, and (2) to carry out its terrorist activities, including the missile attack on MH17.

4.      Defendants provided their services to members and representatives of the DPR who were unambiguous about their intent:  to help arm and equip the DPR to carry out terrorist acts in service of undermining the Government of Ukraine, intimidating and coercing the Ukrainian civilian population, increasing the Russian Federation's control over territory in eastern Ukraine, and ultimately advancing a political and ideological agenda to reestablish the "Russian Empire" through the creation of "Novorossiya" (New Russia).[1]

---

[1] Novorossiya (or "Novorossia") refers both to an aspirational geographical territory (akin to the Islamic State's ("ISIS") aspirational "Caliphate") as well as a violent extremist political

5.       Defendants provided banking and money transfer services for the DPR while the world's governments and media were intently focused on the DPR's horrific and systematic abuses perpetrated in the name of advancing its vision of Novorossiya.  In the months leading up to the MH17 attack, the DPR's occupation of, and killing and torture of civilians in, eastern Ukraine constituted perhaps the most significant international news event in the world.  It was the subject of nearly constant commentary by highly-visible officials including the President of the United States, the Prime Minister of the United Kingdom, the President of France, the Chancellor of Germany, and nearly every major media outlet in the world.

6.       The DPR's campaign of terror in eastern Ukraine fundamentally changed the regional order and constituted a major challenge to international security.  Despite this sea change in circumstances for governments around the world and civilians in the region, Defendants Sberbank, Western Union, MoneyGram, and VTB Bank continued to go about their profit-making activities, even when it was clear that they were actively funneling critical financial resources to a terrorist group (the DPR) for the explicit purpose of buying lethal equipment—equipment that was ultimately used to carry out the attack that killed Quinn.

7.       Plaintiffs are the parents and siblings of Quinn, a United States citizen, who was killed when he was just eighteen years old as he was traveling aboard MH17 to meet his parents for a family vacation.  Quinn's parents, Thomas and Catharina, both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the senseless

---

movement.  The term is today associated with an effort to create a pro-Russia confederated state through the forceful acquisition of power and control in eastern Ukraine and re-establish a Russian Empire in the area north of the Black Sea in what is now much of southern and eastern Ukraine.

murder of their son.  Quinn's siblings, Nerissa and X.S., both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the murder of their brother.

8.      Defendants are companies that knew, or exhibited deliberate indifference to the fact, that they provided material support to the fundraising arm of the DPR—a group that openly engaged in terrorist activity and was condemned by governments around the world—and that the support they provided to the DPR would be used to finance the DPR's terrorist actions.

9.      The support Defendants provided to the DPR allowed the DPR to acquire lethal equipment, which was used to commit violent acts that endangered human life and appeared intended to intimidate or coerce Ukrainian civilians and influence the Ukrainian government.

10.      Defendants' provision of material support to the DPR was a substantial factor in the DPR's ability to launch a missile from territory it controlled—an attack that killed Quinn and 297 other innocent victims.

11.      By this lawsuit, Plaintiffs challenge Defendants' actions under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA"), which Congress enacted in 1992 in response to the terrorist hijacking of the cruise ship Achille Lauro as well as the bombing of Pan Am Flight 103 over Lockerbie, Scotland in 1988.

12.      In adopting the ATA, Congress recognized that "reluctant courts and . . . jurisdictional hurdles" had often stymied the ability of victims of international terrorism to obtain redress for their injuries.  (136 Cong. Rec. S4568-01 (1990)).

13.      According to the ATA's legislative history, "By its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism," the Act was intended to "interrupt, or at least imperil, the flow of

money" to groups engaged in acts of international terrorism that injure American citizens. (S. Rep. No. 102-342, at 22 (1992)).

14.     As stated by Senator Charles Grassley, Congress enacted the ATA to strike at "the resource that keeps [international terrorists] in business – their money." (138 Cong. Rec. S17252- 04 (1992) (statement of Sen. Grassley)).

15.     Defendants are companies that deliberately ignored what the rest of the world, including the President of the United States, was deeply intent on addressing. Defendants made this choice in order to continue to profit from the provision of banking and money transfer services to terrorists like the DPR.

16.     The ATA does not permit companies such as Defendants to hide behind invocations of neutrality in their provision of banking and money transfer services in an effort to abdicate responsibility for their role in causing acts of terror.

17.     The aim of this lawsuit is to ensure that, as Congress intended, the companies whose conduct resulted in the death of an innocent American at the hands of terrorists are held responsible for their actions.

## JURISDICTION AND VENUE

18.     This is a civil action under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2333(a) as a civil action brought by the estate, survivors, or heirs of a United States citizen injured by reason of an act of international terrorism.

20.     Venue is also proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 18 U.S.C. § 2334(a) because Defendants conduct significant business operations in the State of New York and within the Southern District of New York, are subject to the personal

jurisdiction of the courts in the Southern District of New York, and/or have agents within the Southern District of New York.

21.     Defendant The Western Union Company maintains a corporate office in Manhattan, New York. Defendants The Western Union Company, Western Union Financial Services, Inc., MoneyGram International, Inc., and MoneyGram Payment Systems, Inc. maintain numerous agent locations that provide global money transfer services within the Southern District of New York.

22.     Defendants Sberbank of Russia PJSC ("Sberbank") and VTB Bank PJSC ("VTB Bank") maintain offices through their subsidiaries in Manhattan, New York.  At all relevant times, Defendants Sberbank and VTB Bank deliberately and repeatedly routed U.S. dollar-denominated transactions through correspondent bank accounts located in Manhattan, New York.

## THE PARTIES

23.     Plaintiff Thomas Schansman is Quinn's father.  His son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  He is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.  He brings this action on behalf of himself, as a surviving parent of his son, Quinn, a United States citizen.

24.     Plaintiff Catharina Teunissen is Quinn's mother.  Her son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as a surviving parent, and as personal representative of the estate of her son, Quinn, a United States citizen.

25.      Plaintiff Nerissa Schansman is Quinn's sister.  Her brother was killed by the DPR, a violent terrorist group that received material support and financing from Defendants. She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as the surviving sibling of her brother, Quinn, a United States citizen.

26.      Plaintiff Thomas Schansman is also a plaintiff on behalf of his minor child, X.S, Quinn's half-brother.  X.S. is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.

27.      Defendant Sberbank is a Russian banking institution with offices and branches worldwide.

28.      At all relevant times, Sberbank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations.

29.      Sberbank operates in the United States and New York through its subsidiary Sberbank CIB USA Inc. ("Sberbank CIB"), which is located at 152 W. 57th Street, 46 Floor, New York, New York 10019.

30.      Sberbank advertises itself as an international "Group" covering 20 countries with more than 11 million customers outside of Russia, and identifies Sberbank CIB as "the Group's corporate and investment banking business," listing its New York office as a means of contacting the Sberbank Group.

31.      Sberbank also offers alternative depositary receipts which trade on U.S. over-the-counter markets. In an April 2018 interview with the *Financial Times*, Herman Gref, the Chairman of Sberbank's executive board, boasted that at least 25 percent of Sberbank's shareholders are located in the United States, claiming that its American ownership was so

substantial that "[w]e don't need lobbyists. Our American shareholders do that for us." This makes Americans the single largest group of Sberbank shareholders other than the Government of the Russian Federation, which owns 51% of the bank.

32.       In recent years, according to public reports, Sberbank spent hundreds of thousands of dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to address sanctions relief."

33.       Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having done so as recently as 2014.

34.       Defendant VTB Bank is a Russian banking institution with offices and branches worldwide.  VTB Bank operates a retail bank under the name VTB24.

35.       At all relevant times, VTB Bank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was critical to VTB Bank's combined corporate structure and operations.

36.       Until in or about August of 2018, VTB Bank operated in the United States and New York through its subsidiary VTB Capital, located at 452 Fifth Avenue, 23rd Floor, New York, NY 10018. In or about August 2018, VTB Capital was sold to its management and renamed Xtellus Capital Partners, although they continue to operate out of the same offices and provide the exact same services for VTB Bank.

37.       In September 2018, VTB Bank stated that it had signed an agreement with Xtellus Capital Partners for Xtellus Capital Partners to serve as "a US chaperoning broker for the VTB Group" in order to allow VTB to "continue working with our Russian and international clients" and ensure that "[t]here will be no change to VTB product offering or level of client service on equity and fixed income markets" as a result of the change.

38.     VTB Bank purposefully avails itself of the courts of New York to resolve its disputes, having done so as recently as 2017.

39.     At all relevant times, Defendants Sberbank and VTB Bank provided banking and money transfer services that allow individuals to send and/or receive money via wire transfers, including wire transfers sent from or through the United States, either to specified accounts at Sberbank or VTB Bank or cards issued by Sberbank or VTB Bank.

40.     The cards issued by Defendants Sberbank and VTB Bank, sometimes known as payment cards or bank cards, allow for the transfer of funds from one card to another or from funds in a bank account to a card.  Defendants' banking services therefore allow individuals to provide funds, typically through an online process, to another individual's card issued by Sberbank or VTB Bank.

41.     Defendants Sberbank and VTB Bank profit by charging fees for certain banking services, as well a percentage fee for international money transfers.  They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

42.     Sberbank and VTB Bank each maintain correspondent bank accounts in this district in order to deliberately and repeatedly effectuate the transfer of funds in United States dollars:

> a) Sberbank has maintained correspondent bank accounts with JPMorgan Chase Bank, Citibank N.A., Bank of America, The Bank of New York Mellon, and Deutsche Bank Trust Company Americas in New York City;

b) VTB Bank has maintained correspondent bank accounts with JPMorgan Chase Bank, Bank of America, and Citibank, N.A., amongst other banks in New York City.

43.    In January 2014, Sberbank's website stated that its "Main correspondent bank for client payments in US dollars" was Deutsche Bank Trust Company Americas in "New York, NY" and that its "Principal correspondent bank for client payments and treasury operations in US dollars" was The Bank of New York Mellon in "New York, NY."

44.    On June 6, 2013, Sberbank announced that Deutsche Bank presented the "2012 USD STP Excellence Award" to Sberbank "for excellence in formatting payments routed through Sberbank's Nostro correspondent accounts with Deutsche Bank Trust Company Americas (USA)," which are located at 60 Wall St, New York, New York.[2]

45.    On its website, Sberbank continues to promote the "advantages" of its "correspondent banking relations…for the performance of conversions with many leading world banks," which "enable Sberbank of Russia to offer its clients the best price conditions on the money market." Its website further advertises that "Sberbank of Russia makes conversions with more than 20 currencies," including "US dollar (USD)."

46.    Sberbank also advertises partnerships, discounts, and promotions on its website through its partnerships with several U.S. credit and consumer companies.

47.    Like Sberbank, VTB Bank advertises on its website that it "offers settlement and cash services" including "[o]pening and maintaining loro correspondent accounts in all

---

[2] A nostro correspondent account is an account that one bank holds in a foreign currency in another bank.

international key currencies, Russian roubles, currencies of the CIS and Baltic states and clearing currencies."[3]

48.     VTB Bank further advertises on its website that it "organises partner banks' access to international card payment networks as a sponsor bank."  Among the listed benefits of this program include "transaction services in three currencies: Russian roubles, US dollars and euros" and "full reimbursement of interbank fees set by payment processing systems." To execute these advertised U.S. dollar services, VTB Bank routinely and systematically relies on its U.S. correspondent accounts located in this district.

49.     VTB Bank advertises on its website that it facilitates "cashless foreign exchange transactions" from "USD to RUB" daily. To execute these advertised U.S. dollar services, VTB Bank systematically relies on its U.S. correspondent accounts located in this district.

50.     Sberbank and VTB Bank's United States correspondent bank accounts have been prominently advertised by the fundraising arm of the DPR as channels for providing direct funding to the DPR using foreign currencies, such as United States dollars.  For example, one DPR fundraiser's webpage includes instructions that "[m]oney transfer[s], carried out in any currency, other than the account [currency], will be converted into the currency of the VTB 24 (JSC) [on] the date of transfer."  (Veche, "Military-humanitarian assistance to the MEP Veche," *available at* http://veche-info.ru/projects/4261).[4] Another DPR fundraiser's webpage stated in June 2014 that "For transfers in USD [United States dollars]," funds need to be sent through a

_____

[3] A loro correspondent account is an account held on behalf of a foreign credit institution. Payments through correspondents are executed through reciprocal nostro and loro accounts.
[4] Throughout this Complaint, documents and source material originally written in Russian have been translated to English for ease of comprehension.

correspondent account in New York.  (Coordination Center for New Russia, "Requisites" as of

June 23, 2014, *available at* https://web.archive.org/web/20140623133432/http://kcpn.info/help).

51.     Sberbank and VTB Bank's correspondent accounts in New York were

repeatedly used to send financial support to the DPR for the explicit purposes of carrying out

violent and lethal activities intended to intimidate or coerce the Ukrainian civilian population and

influence the Ukrainian government.

52.     For example, one prominent DPR fundraiser, the Coordination Center for

New Russia ("Center for New Russia"), reported that between June 23 and July 27, 2014—

which encompasses the time during which the DPR planned and executed the attack on MH17—

its account with Defendant VTB Bank received "1,673.55" in "transfers in dollars."  At that time,

Center for New Russia consistently advertised the account number of Defendant VTB Bank's

correspondent bank in New York City, Deutsche Bank Trust Company Americas, as the

appropriate channel through which to send "transfers in USD."

53.     The DPR's fundraising representatives published many webpages featuring

the same wire transfer instructions for over four years, from 2014 through the present.  Thus,

despite years of open and notorious advertising, Sberbank and VTB Bank knowingly permitted

the DPR to continue fundraising through these accounts.

54.     Defendant The Western Union Company is a corporation incorporated under

the laws of Delaware with its principal place of business in Colorado.  The Western Union

Company operates in this district through a corporate office located at 505 Fifth Avenue, New

York, New York 10017.  Defendant Western Union Financial Services, Inc. is a corporation

incorporated under the laws of Delaware with its principal place of business in Colorado.

Western Union Financial Services Inc. has a registered agent for service of process in the

Southern District of New York.  The Western Union Company, operating directly and through its subsidiary, Western Union Financial Services, Inc. (together, "Western Union"), is a global provider of money transfer services.   Western Union maintains hundreds of agent locations within the Southern District of New York that facilitate global money transfers.

55.     Defendant MoneyGram International, Inc., is a corporation incorporated under the laws of Delaware with its principal place of business in Texas.  Defendant MoneyGram Payment Systems, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Minnesota.  MoneyGram Payment Systems, Inc. has a registered agent for service of process in the Southern District of New York.  MoneyGram International, Inc., operating directly and through its subsidiary, MoneyGram Payment Systems, Inc. (together, "MoneyGram"), is a global provider of money transfer services.  MoneyGram maintains dozens of agent locations within this district that facilitate global money transfers.

56.     At all relevant times, Defendants Western Union and MoneyGram provided money transfer services that allow identified individuals to send money to other identified individuals anywhere in the world either online or through in-person payment at a Western Union or MoneyGram agent location.  The sender provides the funds either in cash or via payment from their bank account, debit card, or credit card.  The recipient of the money transfer receives the money either directly to their bank account, or can retrieve the money in-person at any Western Union or MoneyGram agent location around the globe.

57.     Defendants Western Union and MoneyGram profit by charging a fee based on the money transfer amount and the recipient's location.  They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

58.     Western Union and MoneyGram were repeatedly used to send financial support to the DPR for the explicit purposes of carrying out violent and lethal activities intended to intimidate or coerce the Ukrainian civilian population and influence the Ukrainian government. From 2014 through the present, the DPR's fundraising representatives widely advertised instructions on how to transfer funds to the DPR using Western Union and MoneyGram. Thus, despite years of open and notorious advertising, Western Union and MoneyGram knowingly permitted the DPR to continue fundraising for their violent acts through their money transfer services.

59.     Each Defendant's business model requires their knowing the identity of their account holders and/or the sender and recipient for each transaction they process. As such, Defendants knowingly allowed supporters of the DPR to send and transfer money to individuals and groups that constitute the fundraising arm of the DPR. These DPR fundraising representatives advertised (in many cases for years) that the money would be used to purchase lethal equipment to support the DPR's efforts to intimidate or coerce civilians and the Ukrainian government through violent acts or acts dangerous to human life.

60.     Defendants provided these services despite their knowledge that the DPR engaged in terrorist activity and that the material support and financing Defendants provided to the DPR would be used in the commission of terrorist acts.

## FACTUAL ALLEGATIONS

### I.     The Murder of Quinn Lucas Schansman

61.     Quinn Lucas Schansman was born on November 30, 1995 in New York City. Quinn had dual citizenship in both the United States and the Netherlands.

62.     At the time of his death, Quinn was an eighteen-year-old college student at the Amsterdam School of International Business. Quinn was also a minor league soccer player who played with the team Olympia '25 in the Netherlands.

63.     Quinn was a proud American citizen.  Quinn saw and planned his future in the United States, which was one of the primary reasons he conducted his college studies in English.



64.     On July 17, 2014, Quinn boarded an airplane from Amsterdam to Kuala Lumpur to join his family on vacation in Surabaya, Indonesia.  Quinn's grandfather was born in Indonesia, a former Dutch colony, and his family had planned a vacation there to learn about their Indonesian roots.

65.     Quinn's plane left Amsterdam's Schiphol Airport at 10:31 GMT on July 17, 2014 and was due to arrive at Kuala Lumpur International Airport at 22:10 GMT.

66.     As Quinn and the other 297 passengers (including 15 crew members) onboard flew over eastern Ukraine, their plane was shot down by a surface-to-air missile launched from territory controlled by the DPR through brute force, intimidation, and violence.  The missile caused the plane to break up in mid-air, killing all 298 passengers, including Quinn and 80 children.

67.     The missile exploded to the left of the cockpit and caused the plane to break up in stages.  The forward section of the plane was penetrated by hundreds of high-velocity fragments from the warhead, killing the three crew members in the cockpit immediately.  The cockpit then broke away, but the plane continued its flight.  A short while later, the wingtips came off and the rear of the plane broke away, with the tail section then separating further.  The main body of the plane then crashed into the ground upside down.  Investigators believe that it was between 60 and 90 seconds after the cockpit broke away that the rest of the aircraft hit the ground.

68.     Roughly 35 minutes after the plane crashed to the ground, the self-described "Commander-in-Chief" of the DPR, Igor Ivanovich Strelkov, also known as Igor Girkin, posted on the Russian social media site VKontakte:  "In the vicinity of Torez, we just downed a plane . . . .  We have video confirming."  ("Ukraine Separatist Social Media Site Claims Plane Downing," *Radio Free Europe* (July 17, 2014), *available at* https://www.rferl.org/a/ukraine-separatist-leader-boasts-downing-plane/25460930.html).

69.     Immediately after the attack, the DPR blocked recovery workers from the crash site, removing evidence before it could be examined by international forensic inspectors. Armed members of the DPR forced Ukrainian emergency workers, at gunpoint, to hand over bodies that they had pulled from the rubble of the plane.

70.     After blowing up the civilian airliner, the DPR leadership sought to profit. Igor Strelkov reportedly issued an order demanding that jewelry, watches, and other valuables be taken from the victims' bodies and turned over to the DPR.

71.     As Malaysian and Dutch officials pleaded to be allowed to recover their dead nationals, the victims' bodies lay uncovered in a field—still controlled by the DPR—and had begun to decompose in the summer heat.

72.     It took several days before the DPR allowed investigators to examine the bodies and begin the recovery process, further exacerbating the grief of the victims' families, including Plaintiffs.

73.     On July 22, 2014, following a unanimous vote of the United Nations Security Council to demand immediate international access to the crash site, the DPR finally allowed international investigators access to the crash site and to the flight data recorders that had been taken from the downed plane.

74.     Plaintiffs Thomas Schansman, Catharina Teunissen, minor child X.S., and Nerissa Schansman, suffered and continue to suffer severe physical and mental anguish and extreme emotional distress from the terrorist attack that killed their son and brother, Quinn, and the horrific looting and treatment of his corpse.

75.     Amongst other harms, in the days and weeks after Quinn's murder, Plaintiffs were uncertain whether Quinn's body would ever be returned to them.  As a result, Plaintiffs were forced to plan and participate in a funeral service without Quinn's body, instead burying a photograph of Quinn.  Quinn's remains were finally returned to Plaintiffs a month after his death, at which point Plaintiffs planned and held a second funeral for Quinn.

76.     Plaintiffs each endured extraordinary emotional distress and anguish in the aftermath of Quinn's murder, and Quinn's siblings continue to struggle with feelings of intense anxiety when either they or their parents travel by plane.

## II.     The DPR's Violent Campaign of Intimidation and Coercion Against Civilians and the Ukrainian Government

77.     Like other terrorist groups, such as the Islamic State ("ISIS"), the DPR and its affiliates seek to advance an ideological agenda of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine acquired through acts of intimidation and coercion.

78.     Since the dissolution of the Soviet Union in 1991, there have been periodic attempts by ideological extremists to recreate Novorossiya as a separate state, often buoyed by support from former Soviet and current Russian officials.  In 2005, Russian President Vladimir Putin famously described the breakup of the Soviet Union as the "greatest geopolitical catastrophe of the 20th century."

79.     The Novorossiya movement failed to gain much traction until a popular protest movement managed to unseat then-Ukrainian President Viktor Yanukovych, causing Russia to seek to expand its influence in Ukraine.

80.     On or about March 16, 2014, Russia purportedly annexed the Ukrainian region of Crimea.  Beginning in March 2014, after the purported Russian annexation of Crimea, demonstrations by pro-Russian and anti-Ukrainian government groups spread to the Donetsk and Luhansk regions in eastern Ukraine.  Together, those regions are commonly referred to as the "Donbass."

81.     On April 7, 2014, a group of pro-Russia armed militants, who were occupying the Donetsk City Hall and Regional State Administration buildings, declared the creation of the DPR.

82.     Roughly contemporaneous with the creation of the DPR, pro-Russia armed militants in the Luhansk region formed the Luhansk People's Republic ("LPR").

83.     The DPR and the LPR, along with other similar groups, formed a cartel that terrorized—and continues to terrorize—civilians to advance the violent agenda of the Novorossiya political movement.  The DPR and its affiliated groups are dedicated to using violent means to achieve their goal of rebuilding the Russian Empire.

84.     From its inception, the DPR and its affiliates, including the LPR and other groups, have exhibited a pattern and practice of attacking and intimidating civilians in eastern Ukraine.  The DPR engaged (and continues to engage) in violent acts of intimidation against the civilian population and operated (and continues to operate) with no regard for civilian life, often murdering and torturing civilians.

85.     For example, on April 17, 2014 the DPR abducted, tortured, and murdered Volodymyr Rybak, a town councilor from Horlivka, after he attempted to raise the Ukrainian flag outside of town hall.  Igor Bezler, a high ranking DPR "commander", ordered the abduction, and Igor Strelkov ordered the disposal of the body.  Mr. Rybak's body was eventually found by a river, alongside the body of Yuriy Propavko, a 19 year-old student and activist from Kyiv.  ("'In Cold Blood' in Ukraine," *The Daily Beast* (May 3, 2014), *available at* https://www.thedailybeast.com/in-cold-blood-in-ukraine).

86.     Almost immediately after the DPR's creation, the DPR's reign of terror became a prominent international crisis.  In the months that followed, international monitors and human rights organizations attributed thousands of civilian deaths and injuries as well as widespread human rights abuses to the DPR and its affiliated groups.

A. Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by the International Media

87.     Since April 2014, the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians.  The terrorist acts perpetrated by the DPR and its affiliates were widely reported on and discussed by nearly every government in the world, as well as by international media, multilateral entities, and human rights organizations.  The DPR's pattern and practice of carrying out terrorist attacks on civilians was therefore notorious and well-known to Defendants and the general public.

88.     For example, a May 14, 2014 article in *The Independent* reported on a series of civilian abductions perpetrated by the DPR and its affiliates in the Donbass, including dozens of political prisoners kept in terrorist strongholds and used as media propaganda.  The May 14, 2014 article includes references to, and pictures of, the DPR possessing military equipment, including masks, "combat uniforms," and "Kalashnikov [rifles]."  These are among the types of equipment that the DPR expressly solicited funds to purchase with Defendants' material support.

89.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with the Defendants' material support was being utilized to purchase military equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce the Ukrainian civilian population and influence the Ukrainian government.

90.     A June 18, 2014 article in *The Telegraph* reported that the DPR was persecuting clergy members who did not follow the Russian Orthodox Church.  The article recounted how one priest was interrogated and repeatedly assaulted "with clubs and whips."  The DPR also "threatened to break the priest's fingers with a hammer."  Another priest was "kidnapped in broad daylight" and interrogated, after which he fled Ukraine.  The June 18, 2014

article includes references to, and pictures of, the DPR possessing the types of equipment—including combat uniforms, guns, and rifle scopes—which the DPR solicited funds to purchase with Defendants' material support.

91.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase lethal equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce the Ukrainian civilian population and influence the Ukrainian government.

92.     A June 29, 2014 article in *Al-Jazeera America* reported that the DPR's "tactics have included hostage taking, storming and barricading buildings, and using civilians, such as international observers from the Organization for Security and Cooperation in Europe, as human shields." The June 29, 2014 article includes references to the DPR possessing the types of equipment, including Kalashnikov rifles, which the DPR solicited funds to purchase with Defendants' material support.

93.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase military equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce the Ukrainian civilian population and influence the Ukrainian government.

94.     It was also well known that the DPR's activities had a "strident anti-American tone," (U.S. Department of State, "Ukraine Travel Warning, March 21, 2014," *available at* https://web.archive.org/web/20140328011053/http://travel.state.gov/content/passports/english/al ertswarnings/ukraine-travel-warning.html), prompting the United States Department of State to

repeatedly and emphatically warn U.S. citizens to defer all travel to Donetsk because of the activities of "armed separatists groups….[which] have established illegal checkpoints and have threatened, detained, or kidnapped individuals, including U.S. citizens, for hours or days," (U.S. Department of State, "Ukraine Travel Warning, June 5, 2014," *available at* https://web.archive.org/web/20140704184225/http://travel.state.gov/content/passports/english/al ertswarnings/ukraine-travel-warning.html).

B. Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by Governments and Intergovernmental Organizations

95.     The human rights abuses and terrorist acts perpetrated by the DPR were also widely reported on by governmental entities and intergovernmental organizations.   At all relevant times, this information was available to Defendants and the public at large.

96.     On March 21, 2014, the Organization for Security and Co-operation in Europe ("OSCE") deployed a Special Monitoring Mission to Ukraine following a request from Ukraine and a consensus decision by all 57 participating OSCE countries.   The OSCE is the largest regional security organization in the world and is comprised of 57 participating countries from Europe, Central Asia, and North America, including the United States.

97.     The reports of the OSCE monitors in Ukraine were and are widely disseminated and publicly available on its website at www.osce.org, including daily reports on the situation and condition in most major Ukrainian cities in three languages (English, Ukrainian, and Russian).   At all relevant times, this information was available to Defendants and the public at large and regularly reported in international media.   The OSCE reports include, among other things, detailed reports of the terrorist activities carried out by the DPR and its affiliates.

98.      In March 2014, the Office of the United Nations High Commissioner for Human Rights deployed a Human Rights Monitoring Mission (the "United Nations" or "UN") to evaluate and report on the human rights situation in Ukraine and to provide support to the Ukrainian Government in the promotion and protection of human rights.

99.      As part of its work, the UN prepared (and continues to prepare) monthly reports describing the human rights situation in Ukraine.  These reports were and are widely disseminated and publicly available on the United Nations in Ukraine website at www.un.org.ua and the website of the Office of the United Nations High Commissioner for Human Rights at www.ohchr.org in English, Ukrainian, and Russian.

100.      Eight human rights monitoring reports were released by the UN in 2014, beginning in April 2014.  At all relevant times, this information was available to Defendants and the general public.  They also featured prominently in open meetings of the United Nations Security Council and garnered regular and extensive media attention across the globe.

101.      The UN reported that the DPR and its affiliates operated with impunity, terrorizing the civilian population in areas under their control, pursuing killings, abductions, torture, ill-treatment, and other serious human rights abuses, including the destruction of housing and seizure of property.

102.      In a report issued on May 15, 2014, the UN detailed specific instances of terrorist activity in the Donbass, including an April 28, 2014 attack by the DPR on participants of a peaceful rally, which led to "dozens wounded, and five participants of the rally (reportedly students) [being] abducted."  At all relevant times, this information was available to Defendants and the public at large.

103.     In a report issued on June 15, 2014, the UN stated that, in the spring of 2014, the DPR and its affiliates had committed "an increasing number of acts of intimidation and violence . . ., targeting 'ordinary' people who support Ukrainian unity or who openly oppose" the so-called "people's republics."   At all relevant times, this information was available to Defendants and the public at large.

104.     In a report issued on July 15, 2014, two days before the attack on MH17, the UN stated that "[e]gregious human rights abuses have been committed in the Donetsk and Luhansk regions," controlled by the DPR and the LPR, including "hundreds of abductions with many victims tortured.  Increasing numbers of civilians have been killed."  At all relevant times, this information was available to Defendants and the public at large.

105.     According to the Ukraine 2014 Human Rights Report issued by the U.S. Department of State, the DPR and its affiliates had "launched violent attacks to establish their authority against the Ukrainian government," and "engaged in unlawful killings, abductions, physical abuse, torture, and unlawful detention" aimed at the civilian population in the Donbass. At all relevant times, this information was available to Defendants and the public at large.

106.     Additionally, the nongovernmental organization Human Rights Watch issued periodic reports in 2014 of attacks on civilians committed in the Donbass region by the DPR and its affiliates.   These reports were widely disseminated and available to Defendants and the general public.

107.     A May 23, 2014 news article on the Human Rights Watch website detailed a series of terrorist attacks perpetrated by the DPR and its affiliates to intimidate and coerce the civilian population.   The article described one instance on May 8, 2014 where DPR forces "broke into the home of a pro-Ukraine activist and terrorized and beat him and his father."   The

article included references to the DPR possessing the types of equipment the DPR had solicited funds to purchase with Defendants' material support, including "sawed-off Kalashnikovs" used by the terrorists to shoot up the home of their victims. At all relevant times, this information was available to Defendants and the public at large.

108.    In May 2014, the Ukrainian General Prosecutor Office formally and publicly classified the DPR and its affiliate, the LPR, as "terrorist organizations." First Deputy Prosecutor General in Ukraine Mykola Holomsha stated: "Facts of the persecution of the civilians in eastern Ukraine have been registered. . . . The purpose of the creation of these organizations is to deliberately propagate violence, seize hostages, carry out subversive activity, assassination and intimidation of citizens." This information was available to Defendants and the general public and was reported on by the media at the time.

109.    On January 27, 2015, the Ukrainian parliament followed suit and also formally declared the DPR and the LPR to be terrorist organizations.

C.    Prior to the DPR's Terrorist Attack on MH17, the United States Government Expressly Sought to Stop the Flow of Material Support to the DPR and Its Affiliated Terrorist Groups

110.    On June 20, 2014, in response to the terrorist acts perpetrated by the DPR and its affiliates, the United States Treasury Department sanctioned seven individuals connected to the DPR, the LPR, or other affiliated groups. Among the individuals targeted for sanctions were Igor Strelkov (Girkin), along with Denis Pushilin and Andrey Purgin, two other DPR "leaders". The Treasury Department described Girkin as "the self-described 'commander-in-chief of the Donetsk People's Republic' . . . ."

111.    In announcing these sanctions, David Cohen, the Treasury Department's Under Secretary for Terrorism and Financial Intelligence, stated: "These individuals have all

contributed to attempts to illegally undermine the legitimate government in Kyiv, notably by falsely proclaiming leadership positions and fomenting violent unrest."

112.     On July 16, 2014, the Treasury Department imposed sanctions on the DPR and LPR as entities, along with Aleksandr Borodai, the self-declared "prime minister" of the DPR.  The Treasury Department stated that the DPR had illegitimately "asserted governmental authority over a part or region of Ukraine without the authorization of the Government of Ukraine."  The Treasury Department also specifically singled out Igor Strelkov (Girkin) as "the leader of the militia of the Donetsk People's Republic."

113.     In a further response to the situation in eastern Ukraine, on July 29, 2014, the Treasury Department announced sanctions on VTB Bank OAO, an affiliate of Defendant VTB Bank, in an effort to stem the flow of financial support to the DPR and its affiliates.

114.     On September 12, 2014, the Treasury Department announced sanctions on Defendant Sberbank in an effort to stem the flow of financial support to the DPR and its affiliates.

III.    **The DPR Relies on a Global Supply Chain Facilitated by Defendants to Fund Terrorism in the Donbass Region**

115.     Upon its formation in April 2014, the DPR immediately tried to capitalize on the appeal of its fervent Russian-nationalist views to some members of the Russian diaspora, which consists of tens of millions of ethnic Russians who live outside the present-day Russian Federation.   The world's largest overseas community of ethnic Russians, estimated at approximately three million, is in the United States.

116.     In an effort to tap into this diaspora and further their common cause of establishing a Novorossiya state, the DPR and its fundraising representatives raised funds for

26

their terrorist acts through an online campaign accessible to anyone around the world, including in the United States.

117.     The DPR and its fundraising representatives relied on Defendants' services to efficiently raise funds that enabled them to carry out their violent campaign of intimidation and coercion in eastern Ukraine.

118.     Through numerous websites, the DPR and its fundraising representatives brazenly advertised ways to donate to their efforts, including through sending money to accounts with, or bank cards issued by, Defendants Sberbank and VTB Bank.   The DPR and its fundraising representatives also openly and notoriously detailed ways to donate to the DPR using the money transfer services of Defendants MoneyGram and Western Union.

119.     The DPR relied on Defendants' services and material support to access funds that were essential for its procurement of weapons, ammunition, and other instruments of violence, which the DPR used to intimidate and coerce the Ukrainian government and civilian population, and to acquire and control territory, including the territory from which the DPR launched the missile that brought down the MH17 airplane.

120.     The material support provided by Defendants created a diversified global supply chain of funding essential for the DPR's terrorist activities.   In addition to providing direct financial support to carry out terrorist attacks, the nature of the Defendants' support allowed the DPR to ensure both the sustainability of their tactical operations (in that Defendants' support facilitated a diversity of funders) and the ability to obfuscate the identity of other funding sources.   Without that global supply chain, and the benefits that came with it, the DPR's ability to carry out lethal tactical activities, including the attack on the MH17, would be substantially compromised.

121.     By enabling the DPR to solicit funds from the Russian diaspora around the world, including the three million members of the Russian diaspora located in the United States, Defendants provided the DPR with a steady flow of funding essential to the DPR's terrorist activities, including the purchase of lethal equipment and other supplies necessary for them.

A.   Prior to the DPR's Terrorist Attack on MH17, the International Media Began Reporting on Defendants' Provision of Material Support and Financing to the DPR

122.     In April 2014, three months before the missile attack that killed Quinn and 297 other victims, media outlets reported on how this global supply chain, created and operated by Defendants, was providing funding and support necessary for the DPR and its affiliates to carry out their terrorist activities.

123.     An April 19, 2014 article in *Forbes* discussed allegations from Ukraine's Attorney General that Defendant Sberbank was facilitating payments to Ukrainian soldiers "to join Russian separatists in east Ukraine."  The article noted that the Ukraine State Security Service "showcased to the media some items it seized from captured Russian spies and Ukrainian double-agents.  Sberbank payment cards were among the items."

124.     An April 19, 2014 article in the *Kyiv Post* reported that "in recent months many social network groups have been calling for funds to support causes related to separatist movements in different regions of the country.  For example, to transfer aid to the DPR and its affiliates, a specified account of the Ukrainian subsidiary of Sberbank of Russia and remittance systems . . . are given."

125.     The *Kyiv Post* article further reported that Defendant VTB Bank was also under investigation by Ukrainian authorities for violating the law on "crime and terrorist financing" by providing banking services to terrorist groups in the Donbass.

126.     By June 2015, the *New York Times* reported that the DPR and its affiliates had raised millions of dollars through these online fundraising efforts in support of their terrorist activities.  Specifically, the *New York Times* reported that, beginning in May 2014, more than a dozen groups had "solicited funds from abroad using large American and European financial institutions, including banks and companies like Western Union."  The article explained that one such group listed instructions on its website for "how to wire dollars or euros into [an] account at Sberbank using correspondent accounts at Citibank, JPMorgan Chase," amongst other banks in New York City.

127.     The *New York Times* further reported that a representative from an unnamed international bank confirmed that U.S. dollars had passed through the bank to Veche Interregional Public Organization ("Veche"), which is part of the DPR's fundraising arm.  Veche has openly advertised VTB Bank correspondent accounts with JPMorgan Chase Bank, amongst other banks located in New York City, to handle U.S. dollar transactions.  As reported by the *New York Times*, Veche has also provided instructions online for how to send funds to a Sberbank account using correspondent accounts at Citibank and JPMorgan Chase Bank, amongst other banks in New York City.

B.  <u>Defendants Provided Material Support and Financing to DPR Fundraising Agents That Openly and Notoriously Advertised That They Supplied "Non-Humanitarian Assistance" to the DPR and Its Leader, Igor Strelkov</u>

128.     Many of the groups that constitute the DPR's fundraising arm, such as Veche, provide on their websites an explanation of how to wire U.S. dollars from abroad into accounts held by the DPR at Russian banks, such as Defendants Sberbank or VTB Bank, using correspondent accounts in New York.  The websites of DPR's fundraising representatives brazenly advertise their account numbers with Sberbank, VTB Bank, and the correspondent

banks in New York, as well as account holder and email address information for money transfers through Western Union and MoneyGram.

129.    For example, the Center for New Russia has solicited and continues to solicit funds on its website (http://kcpn.info) to purchase military equipment for the DPR and its affiliated groups dedicated to the Novorossiya cause.  Center for New Russia constitutes part of the DPR's fundraising arm, and its exclusive purpose was and is to raise funds for the violent terrorist activities of the DPR and its affiliates.

130.    At all relevant times, Center for New Russia openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

131.    As of July 11, 2014, Center for New Russia's website stated: "Due to the fact that fund-raising activities to purchase the necessary military equipment for Novorossia militia have outgrown the scope of one-time action . . . we decided to establish the Coordination Center for Novorossia (KCPN), which further will be engaged in all organizational activities to raise funds, purchase and forwarding of goods." (Center for New Russia, https://web.archive.org/web/20140711024026/http://kcpn.info).

132.    As of May, 2014, the Center for New Russia website stated that solicited funds had been used to purchase communications equipment (including those used with armored vehicles), telescopes, binoculars, navigational equipment, body armor, and helmets for DPR terrorists.

133.    As of July 14, 2014, the Center for New Russia website stated that "We are NOT engaged in humanitarian assistance.  We are engaged in non-humanitarian assistance." The Center for New Russia website further explained that the supplies the DPR and its affiliates

needed for their efforts "requires money," and that financial support was essential to "support the struggle of our brothers in Novorossiya."

134.    For all relevant periods of this Complaint and to this day, the Center for New Russia website expressly solicits funds to purchase bulletproof vests, helmets, uniforms, rifle scopes, night vision devices, and walkie-talkies for terrorist forces, noting that:   "Without constant assistance with military equipment, the guys simply cannot stand."  The Center for New Russia website also directly appeals for volunteers willing to assist the DPR.

135.    In the weeks before the terrorist attack on MH17, the Center for New Russia website openly detailed transfers of money directly to the DPR's "Commander-in-Chief", Igor Strelkov.

136.    A May 20, 2014 post on the Center for New Russia website recounted—and showed pictures of—the specific military equipment provided to the DPR and its affiliates, including "45 bulletproof vests and helmets," as well as accessories for AK rifles.  (Center for New Russia, "Reports," *available at* http://kcpn.info/reports?page=4).



137.    Another post that day provided a "Financial Report for May 10-19" 2014. This Financial Report broke down in detail the sources and uses of Center for New Russia's recent funding, including a list of the funds transferred to and withdrawn from Center for New

Russia's Sberbank account, resulting in a "356, 555, 064" ruble "balance of money on the account."

138.     The May 20, 2014 Financial Report further stated that Center for New Russia had received "$1000" in cash "from Sergey from the USA to Western Union," along with 215 euros sent via Western Union from Germany.

*See* English translation of excerpts from the Center for New Russia Financial Report for May 10-19, 2014, *available at* http://kcpn.info/reports?page=4 (highlighting added).



devices." The Center for New Russia website included numerous pictures documenting the delivery of these supplies to the DPR and its affiliates. (Center for New Russia, "Reports," *available at* http://kcpn.info/reports?page=3).





140.     A Financial Report posted on June 5, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "211,000" ruble "payment for uniforms . . . and camouflage."   The June 5, 2014 Financial Report further described six different donations sent to Center for New Russia through Defendant Western Union, including three sent in U.S. dollars:   "$1,500.00 from Anton V.," "$200.00 from Inna Sablina," and "$100.00 from Olga Levine," resulting in a cash balance of $2,800 U.S. Dollars. The Financial Report also reflects money transfers during this period to Center for New Russia using Western Union that totaled approximately 39,300 rubles.   *See* English translation of excerpts from the Center for New Russia Financial Report for May 20–June 5, 2014, *available at* http://kcpn.info/reports?page=3 (highlighting added).

## Financial report for May 20 - June 5

Posted on Thu, 05/06/2014 - 15:35 by RedRat

---

**Cash:**

```
+ 297,061 + $ 1,000 + 1,050 € - cash balance as of May 20
+ 1 645 000 - withdrawn in cash from the account in the Savings Bank
+ 100 000 - from Elena
+ 50 000 - from Cyril
+ 32 000 - from Kostik
+ 20 300 - from Victoria Bucen by Western Union
+ 18 000.16 - from Magda Bucen by Western Union
+ 999.84 - from Inna Andersson to Western Union
+ 5 500 - from Svetlana Shevchenko to Kolibri
+ 1 000 - someone via mobile
+ $ 1,500.00 - from Anton V. by Western Union
+ $ 200.00 - from Inna Sablina to Western Union
+ $ 100,00 - from Olga Levine by Western Union

- 689 500 - translation into "musical instruments" of the orchestra of Stakhanov
- 3 619.50 - transfer commission
- 500 000 - 100 pcs. flak jackets
```

141.    A Financial Report posted on June 25, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "100,000" ruble "payment for body armor."  The June 25, 2014 Financial Report further described four different donations sent to Center for New Russia through Western Union, including three sent in U.S. dollars:  "$1,500 from Anton V.," "$200 from vikru," and "$109 from Ilya Kupchenko."  (Center for New Russia, "Reports," *available at* http://kcpn.info/reports?page=3).

142.    The June 25, 2014 Financial Report stated that Center for New Russia maintained an account with VTB Bank that had received transfers of "56,011.17" rubles. (Center for New Russia, "Reports," *available at* http://kcpn.info/reports?page=3).

143.    A Financial Report posted on July 27, 2014, for the period "June 23 – July 27"—which encompasses the time during which the DPR planned and executed the attack on MH17—described a series of transfers into and withdrawals from Center for New Russia's

accounts with Defendants VTB Bank and Sberbank.  With respect to Sberbank, the Financial Report stated that funds were used for "bulletproof vests" and "helmets" among other items.

144.     The Financial Report stated that its account with VTB Bank had received "1,673.55" in "transfers in dollars," followed by a withdrawal of $1,600 in cash.

145.     The July 27, 2014 Financial Report included a separate section just for "Cash dollars," which stated that Center for New Russia had a balance of $4,809 as of June 24, 2014, and which listed six U.S. dollar donations to Center for New Russia, including five through Defendant Western Union.  As of July 27, 2014, Center for New Russia reported a U.S. dollar balance in its accounts of $3,289.

146.     The July 27, 2014 Financial Report also reflects that over 50,000 rubles were sent to Center for New Russia through Western Union during this period as part of five different money transfers.

147.     The July 27, 2014 Financial Report specifically documents two monetary transfers directly to the DPR leader, Igor Strelkov.  Under a section titled "Euro cash," it lists "10,000 – transferred in cash to Strelkov in Donetsk."  The "Cash dollars" section further stated that Center for New Russia had transferred $5,000 "in cash to [Igor] Strelkov."

## Report for June 23 - July 27

**Cash dollars:**

```
+ 4 809 - balance in dollars as of June 24
+ 1 600 - withdrawn from the account in VTB 24
+ 200 - from Valeria J. by Western Union
+ 200 - from Inna S. to Western Union
+ 980 - from Yuriy S. to Western Union
+ 200 - from Sergey Sh. (Byelorussia) to Western Union
+ 300 - from Valeria
+ 200 - from Valeria J. by Western Union
- 5 000 - transferred in cash to Strelkov in Slavyansk
- 200 - transferred to the operation for the daughter of the militiaman
= 3,289 - cash balance as of July 27
```

148.     Following the Financial Report posted on July 27, 2014, the Center for New Russia website included a note thanking "Dmitry P. and Anton V. from the United States, as well as dozens of other people whose help to the militia of Novorossia … is invaluable.  Thank you friends,  for  your  support!"     (Center  for  New  Russia,  "Reports,"  *available  at* http://kcpn.info/reports?page=3).

149.     As of June 23, 2014, the Center for New Russia website indicated that "For Moscow residents, the most convenient means of transferring money is Sberbank."  The Center for New Russia openly and publicly provided its bank account and card numbers with Sberbank on its website.

150.     As of June 23, 2014, the Center for New Russia website also openly and publicly listed an account number with VTB Bank, including New York correspondent bank information "for transfers in USD."  The Center for New Russia website noted that "For holders of VTB 24 bank cards and foreign citizens a special multicurrency account is established."

151.     As of June 23, 2014, the Center for New Russia website openly and publicly provided the name, email address, and telephone number for an individual who could receive money transfers via Western Union.  The Center for New Russia website stated:  "Western Union transfers continue to be popular."  The Center for New Russia website further stated that Western Union was the "only" option "if you need to transfer cash currency."

152.     The Center for New Russia website currently indicates that funds can be transferred to the organization through Sberbank and VTB.

153.     Just like Center for New Russia, Veche has raised and raises funds on its website (http://veche-info.ru) for the DPR.  The Veche website expressly states that since April 2014, Veche "took an active part in the provision of detachments of the people's militia."

(http://web.archive.org/web/20140108093452/http://veche-info.ru/index.php?option=com_content&view=article&id=251&Itemid=69). Veche openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates. According to the Veche website, solicited funds have been used to provide the DPR with military uniforms and equipment, and to purchase vehicles and modern combat supplies.

154.     As early as January 2014, the Veche website indicated that funds could be transferred to the organization to its bank account at VTB Bank.

155.     The Veche website subsequently indicated that funds could be transferred to individuals associated with Veche through Western Union and MoneyGram, or to Veche's Sberbank card account. The Veche website also explained that international transfers of funds could be routed through the organization's correspondent accounts at JPMorgan Chase Bank, amongst others in New York City, to its bank account at VTB Bank. Its account numbers with VTB Bank and the correspondent banks are openly and publicly listed on Veche's website.

156.     The Rospisatel group, which has close ties to Veche, has solicited and solicits funds on its website (http://www.rospisatel.ru/pjv.htm) to purchase "self-defense" equipment for the DPR and other affiliated groups dedicated to the Novorossiya cause. As of June 29, 2014, the Rospisatel website openly and publicly listed Veche's account number with VTB Bank, along with correspondent bank information for international money transfers. (http://web.archive.org/web/20140629034138/http://www.rospisatel.ru/pjv.htm). Rospisatel constitutes part of the DPR's fundraising arm, and Rospisatel openly and notoriously advertised that the ultimate beneficiary of funds sent to Veche's accounts would be the DPR and its affiliates.

157.    World Crisis, a group with close ties to Veche, has solicited and solicits funds on its website (http://www.worldcrisis.ru/crisis/1547372) to purchase equipment for the DPR and other affiliated groups dedicated to the Novorossiya cause.  World Crisis constitutes part of the DPR's fundraising arm, and World Crisis openly and notoriously advertised that the ultimate beneficiary of funds sent to Veche's accounts would be the DPR and its affiliates.  World Crisis specifically advertised that funds sent to its Sberbank card account would be provided to the Commander-in-Chief of the DPR, Igor Strelkov, who boasted about downing MH17 and then looted the decaying bodies of his victims.

158.    As of June 25, 2014, the World Crisis website openly and publicly listed Veche's VTB Bank account information, along with correspondent bank information for international money transfers. (http://web.archive.org/web/20140625074715/http://worldcrisis.ru/crisis/1547372).  The World Crisis website subsequently provided the account number for a Sberbank card "for the transfer of funds directly to Igor Ivanovich Strelkov."

159.    Another group, The Essence of Time ("EOT"), has solicited and solicits funds on its website (http://eot61.su) for the DPR and its affiliates in the Donbass region.  As of June 26, 2014, the EOT website stated that the aid to be provided includes military uniforms, tactical gear (such as helmets and body armor), binoculars, rifle scopes, and thermal imaging equipment. (http://web.archive.org/web/20140626041043/http://eot61.su:80/fa2014).   EOT constitutes part of the DPR's fundraising arm, and EOT openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

160.    EOT has openly and publicly received material support from Americans, including Russell Bentley, who indicated that "From January to June 2015, I was a soldier in the

Essence of Time combat unit of the Novorussian Armed Forces (NAF). I served at the Donetsk airport and Spartak as a rifleman and RPG [rocket propelled grenade] gunner.""" (http://www.russelltexasbentley.com/p/about.html). The *Houston Chronicle* reported that Bentley raised more than $2,000 to support his activities in the Donbass.

161.     The EOT website indicates that funds can be transferred directly to its account at or bank card with Sberbank, or to individuals associated with the EOT through Western Union and MoneyGram. The EOT website explicitly states that donors should not specify the reason for the transfer of funds, but simply indicate that it is for "charity."

162.     As of June 26, 2014, the EOT website openly and publicly listed its account numbers with Sberbank, along with its Sberbank bank card number. The EOT website also openly and publicly listed the name and email address required to send money via Western Union.

163.     The Aid Fund for Novorossia and Donbass (a.k.a. "Save Donbass") has solicited and solicits funds on its website (http://spasidonbass.ru) to deliver lethal support directly to the DPR. Save Donbass constitutes part of the DPR's fundraising arm, and Save Donbass openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates. Save Donbass specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov. As of July 10, 2014, the Save Donbass website stated that its "main mission" was to deliver support directly into the hands of "Igor Strelkov" and other DPR leaders. (http://web.archive.org/web/20140710041531/http://spasidonbass.ru).

164.     The goods requested by Save Donbass include military equipment, such as ammunition for AK automatic rifles, ammunition belts, laser range finders, optical sights for AK

automatic rifles, thermal imaging scopes, night vision scopes, and radio equipment.  As of July

10, 2014, the Save Donbass website referred to these items as the "List of Strelkov," and noted

that the list was "made only with the agreement of the commander of the militia of the Donetsk

People's Republic Igor Strelkov" and that "Procurement of goods occurs only after a meeting

with Igor Strelkov."  *See* English translation of the Save Donbass "List of Strelkov," *available at*

http://web.archive.org/web/20140710041531/http://spasidonbass.ru/#strelkov (highlighting

added).



165.    Throughout June and July 2014, the Save Donbass website provided detailed reports of transfers into and withdrawals from its accounts with Defendant Sberbank, along with a description of money transferred through Defendant Western Union.  ("Our Reports," https://web.archive.org/web/20140707035228/http://spasidonbass.ru:80/reports).

166.    For example, a July 3, 2014 report for the period June 27 through July 3, 2014 stated that Save Donbass had received donations of 647,531 rubles, and purchased supplies for the DPR and its affiliates costing 204,484 rubles.  A report from July 15, 2014 for the period July 4 through July 14, 2014 states that Save Donbass received 17,000 rubles in donations sent through Western Union.

167.    The July 15, 2014 also listed the cost of purchased military supplies, including "Prepayment for armored vehicles," and included videos documenting that "The cargo was delivered.  Confirmation from Igor Strelkov . . . ."  (Save Donbass, "Our Reports," *available at* https://web.archive.org/web/20140721081134/http://spasidonbass.ru/reports/).

168.    As of July 10, 2014, the Save Donbass website openly and publicly provided the recipient name and card number for its Sberbank card, noting that "Sberbank cardholders are requested to make direct payments to our card number."  The Save Donbass website also openly and publicly listed the recipient name and email information for money transfers to be sent through Western Union or MoneyGram.

169.    The Save Donbass website currently states that money donations can be sent through Defendants Sberbank and Western Union.

170.    ICORPUS has solicited and solicits funds on its website (http://www.icorpus.ru/otkryt-officialnyj-schet-opolcheniya-v-slavyanske/) to purchase military equipment for the DPR and its affiliate groups dedicated to the Novorossiya cause.  As of July 4,

2014, the ICORPUS website expressly solicited funds to purchase guns, thermal imaging scopes, helmets, and body armor.  (http://web.archive.org/web/20140704011043/http://icorpus.ru/otkryt-oficialnyj-schet-opolcheniya-v-slavyanske).  ICORPUS constitutes part of the DPR's fundraising arm, and ICORPUS openly and  notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.  ICORPUS specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

171.    As of July 4, 2014, the ICORPUS website openly and publicly listed a Sberbank card number, stating that "An official account was opened to raise funds for the needs of the militia . . . under the command of I. Strelkov."

172.    The Voice of Sevastopol has solicited and solicits funds on its website (http://voicesevas.ru/video/37146-rekvizity-dlya-okazaniya-voenno-gumanitarnoy-pomoschi-donbassu.html) for "military" assistance for the DPR and its affiliate groups in the Donbass.  The website includes a report of its "Gifts for Donbass," which includes pictures and descriptions of "armor, helmets, glasses, optics, thermal imagery, knives" and other military equipment purchased to support terrorists in the Donbass.  (https://centercigr.livejournal.com/95618.html).  Voice of Sevastopol constitutes part of the DPR's fundraising arm, and Voice of Sevastopol openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

173.    Voice of Sevastopol's website states that money can be transferred through Defendants Western Union or MoneyGram, and openly and publicly provides recipient and/or email account information for these transfers.  The website also provides instructions for money transfers to Veche's accounts at Defendant VTB Bank, including for international transfers

through New York correspondent accounts.  In addition, the website provides the name and card number for a VTB Bank bank card where funds can be sent.

174.    In addition to soliciting funds via dedicated websites, groups affiliated with the DPR also raised and continue to raise funds via postings on social media and similar online sites.

175.    For example, a May 13, 2014 LiveJournal post from a user named "Colonel Cassad" (https://colonelcassad.livehournal.com/1476905.html), also known as Boris Alexandrovich Rozhin, solicited donations in support of the DPR and its affiliates.  Rozhin, a prominent international fundraiser for the DPR, regularly posted reports and photos of weapons and other equipment he supplied to the DPR.

176.    The May 13, 2014 LiveJournal post openly and publicly provided the VTB Bank banking account information, including correspondent account information, necessary to donate to the DPR through Veche.  Rozhin openly and notoriously advertised that the ultimate beneficiary of funds sent to these accounts would be the DPR and its affiliates.

177.    A June 26, 2014 post on the Russian social media site VKontakte by a user named Alexander Zhuchkovsky (https://vk.com/wall151630709_2122) expressly solicited funds in support of the DPR and its Commander-in-Chief, Igor Strelkov.  Zhuchkovsky wrote: "Thanks to Igor Strelkov for the last delivery of our cargo."  On June 27, 2014, Zhuchkovsky wrote that he is "NOT a humanitarian aid activist but a person who organizes volunteers and, let's say, NON-humanitarian supplies."

178.    Zhuchkovsky was a prominent international fundraiser for the DPR who openly reported on using the funds raised to supply equipment that included man-portable surface to air missile systems, as well as armored vehicles.  In total, he claimed to have shipped

300 million rubles of such supplies from 2014-17, with the majority delivered in the first year. Zhuchkovsky's June 26, 2014 VKontakte post stated that in the last few days, "our accounts have received more than 1 million rubles" in funding.

179.     Zhuchkovsky's June 26, 2014 post stated that funds for the DPR could be sent through a transfer to a Sberbank card, and the post openly and publicly provided the Sberbank card number.  Zhuchkovsky further wrote that "From abroad, a transfer can be made … via Western Union."

180.     A June 23, 2014 VKontakte post from the organization "Summaries from the militia of Novorossia" stated:  "Today, Colonel Igor Strelkov thanked Alexander Zhuchkovsky" and others "for raising funds and purchasing equipment and hardware" for the DPR.  "Sending money to Alexander's accounts, you do not send them to abstract militia, but to the militia of STRELKOV."  The post then listed a Sberbank card account number to which funds should be sent.

181.     Zhuchkovsky also raised funds for the DPR through a group called "Sputnik & Pogrom."  Sputnik & Pogrom constitutes part of the DPR's fundraising arm, and Sputnik & Pogrom openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.  The exclusive purpose of Sputnik & Pogrom was to raise funds for the violent terrorist activities of the DPR and its affiliates.  Sputnik & Pogrom specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

182.     A June 24, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,485,000 rubles worth of supplies to the DPR and its affiliates.  Zhuchkovsky wrote that Igor Strelkov

"thanked all the donors" and provided a link to a video of Strelkov "confirm[ing] the arrival of the cargo."

183.     A July 2, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,320,000 rubles worth of supplies to the DPR and its affiliates.  Zhuchkovsky wrote that remaining funds "will be used to purchase everything needed for the militia.  Including telescopes for observing the starry night sky; This time we did not buy them, because there were difficulties with their transportation."  ("What is your help to the Slavyansk militia?  (fresh report)", *available at* https://web.archive.org/web/20140719204122/http://sputnikipogrom.com/russia/novorossiya/152 98/slavyansk-reports-2/).  On information and belief, "telescopes for observing the starry night sky" referred to surface-to-air missile systems.

184.     A July 2, 2014 post on Sputnik & Pogrom's VKontakte page stated that funds could be sent to a Sberbank card, and the post openly and publicly provided a Sberbank card number.  In the same post, Zhuchkovsky wrote that money transfers "[f]rom abroad" should be sent "via Western Union."

185.     In early September 2014, a California-based donor boasted on Sputnik & Pogrom of donating USD $100,000 to fund the DPR's operations through Zhuchkovsky. (Sputnik & Pogrom, "100 000 dollars for the army of Novorossia:  why did I donate this money," https://web.archive.org/web/20141007062311/http://sputnikipogrom.com/russia/novorossiya/198 05/100000-for-novorossia-army).   At that time, Zhuchkovsky's primary means of accepting donations was through a widely-publicized Sberbank bank card or via Western Union.

186.     The DPR fundraising representatives described herein were not the exclusive means by which Defendants provided material support to the DPR.  The DPR also relied upon

and received material support from Defendants to additional representatives of the DPR's fundraising arm.

C.  <u>The Material Support and Financing Defendants Provided to the DPR Were Essential to the DPR's Violent Campaign of Terror and Intimidation</u>

187.   The DPR and its affiliates were able to receive substantial and essential donated funds through Defendants' provision of banking and money transfer services to them.

188.   For example, Rozhin's May 13, 2014 LiveJournal post stated that "more than 1,500,000 rubles have already been transferred and more than 2,200,000 rubles are ready for shipment" as part of the fundraising effort led by Veche and other DPR supporters, relying upon the services of Defendant VTB Bank, including identifying the use of correspondent bank accounts in New York City as the proper channel through which to contribute U.S. Dollars.

189.   A June 13, 2014 VKontakte post from "Summaries from the militia of Novorossia" quoted Zhuchkovsky as stating:  "today we spent more than half a million rubles on means necessary for the Russian militia in Novorossia," followed by a plea for more money to be sent to a designated card account with Defendant Sberbank.

190.   A June 26, 2014 VKontakte post from Zhuchkovsky stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, including through Defendants Sberbank and Western Union.

191.   Save Donbass claimed, in May 2015, to have raised approximately $1.3 million in funding sent either to its account with Defendant Sberbank or using money transfer providers, including Defendant Western Union.

192.   EOT claimed to have raised 4,240,000 rubles in funding as of June 30, 2015, including through money sent to its bank card with Defendant Sberbank or sent using money transfer providers, including Defendant Western Union.

193.     On July 27, 2014, Center for New Russia reported raising over 2 million rubles, and thousands of dollars and euros, in the period between June 23 and July 27, 2014, including through wire transfers to its accounts with Defendants VTB Bank and Sberbank, and donations sent via Defendant Western Union.  Center for New Russia consistently advertised the account number of Defendant VTB Bank's correspondent bank Deutsche Bank Trust Company Americas in New York as the appropriate channel through which to send "transfers in USD."

## IV.     Defendants' Provision Of Material Support And Financing To The DPR Constitute Acts Of International Terrorism

194.     Since at least April 2014, Defendants have provided extensive banking and money transfer services to the DPR and its affiliates.  The material support and financing provided by Defendants to the DPR caused, enabled, and facilitated their terrorist activities, including launching, and controlling the territory necessary to launch, the missile attack on the MH17 passenger plane that killed Quinn and 297 others.

195.     But for Defendants' provision of banking and money transfer services to the DPR and its affiliates, the DPR's ability to raise funds from individual supporters in order to conduct terrorist operations would substantially cease.

196.     By their own public statements, between April 2014 and July 17, 2014 (and subsequently), representatives of  the DPR's fundraising arm made and received wire transfers or money transfers via Defendants, including through the use of correspondent bank accounts in this district.

197.     During the relevant period, representatives of the DPR's fundraising arm maintained bank accounts at Defendants Sberbank and VTB Bank, and used those banks to facilitate wire transfers or bank card transfers to the DPR's accounts, including—but not limited to—as follows:

a) Center for New Russia maintained accounts with Sberbank with bank account numbers ending in 1988 and 0503, and card account numbers ending in 9248 and 9778, and requested on its website that funds be transferred directly to those accounts. Center for New Russia also maintained accounts with VTB Bank with bank account numbers ending in 0677 and 4888. Center for New Russia requested that transfers in U.S. dollars be transferred through Defendant VTB Bank's correspondent account at Deutsche Bank Trust Company Americas in New York City with account number ending in 3603.

b) Veche maintained a bank account at Defendant VTB Bank with account number ending in 3521 and requested on its website that international funds, including U.S. dollar funds, be transferred to that VTB Bank account through correspondent bank accounts, including an account at JP Morgan Chase in this district with account number ending in 8618, amongst other accounts in this district. Veche also maintained a Sberbank card account with account number ending in 6872.

c) EOT maintained several accounts with Sberbank with bank account numbers ending in 2621 and 0225 and card numbers ending in 0212 and 4786. EOT's website requested that funds be transferred directly to these accounts.

d) Save Donbass maintained accounts with Sberbank with bank account numbers ending in 0018 and 0241 and card number ending in 1893. Save Donbass's website requested that funds be transferred directly to these accounts.

e) ICORPUS maintained an account at Sberbank with card number ending in 2310, and requested on its website that funds be transferred directly to that account.

f)  The Voice of Sevastopol maintained an account at VTB Bank with card number ending in 8507, and accounts at Sberbank with card numbers ending in 2368 and 6872, and requested on its website that funds be transferred directly to these accounts.

g)  World Crisis maintained an account at Sberbank with card number ending in 4065, which was for "the transfer of funds directly to Igor Ivanovich Strelkov."  As of June 26, 2014, Zhuchkovsky solicited donations to the same Sberbank card account listed by World Crisis.

198.    Defendants Sberbank and VTB Bank also provided bank accounts and banking services to additional representatives of the DPR's fundraising arm.

199.    During the relevant period, representatives of the DPR's fundraising arm also solicited and received funds via Defendants MoneyGram and Western Union, including—but not limited to—as follows:

a)  Center for New Russia's website provided instructions on donating funds via Western Union, and expressly documented numerous donations received using the services of Western Union.

b)  Veche's website provided instructions on donating funds via Western Union or MoneyGram.

c)  EOT's website provided instructions on donating funds via Western Union or MoneyGram.

d)  Save Donbass's website provided instructions on donating funds via Western Union or MoneyGram.

e)  The Voice of Sevastopol's website provided instructions on donating funds via Western Union or MoneyGram.

f) Zhuchkovsky's social media posts provided instructions on donating funds via Western Union.

200.     Defendants MoneyGram and Western Union also provided money transfer services to additional representatives of the DPR's fundraising arm.

201.     At all times, the bank and/or money transfer accounts described above belonged to the DPR's fundraising representatives.

202.     At all times, all of the funds in those accounts belonged to the DPR's fundraising representatives and were under their control.

203.     At all times, all of the transactions carried out in the accounts were carried out by the DPR's fundraising representatives or at their direction.

204.     At all times, the funds raised through these accounts were for the explicit purpose of purchasing military or lethal equipment that the DPR used to commit violent acts that endangered human life and appeared intended to intimidate or coerce Ukrainian civilians and influence the Ukrainian government.

## V.     Defendants Had Knowledge of the DPR's Terrorist Activities

205.     Defendants, like the rest of the world, knew that the DPR and its affiliates were routinely perpetrating acts of terrorism against civilians.

206.     At all relevant times, the DPR's policy and practice of carrying out terrorist attacks on civilians was notorious and well-known to Defendants and to the public at large, including as described in Paragraphs 87-114, above.

207.     From its inception, the DPR exhibited a pattern and practice of attacking and intimidating civilians, and operated with no regard for civilian life, often murdering and torturing

civilians.   Between April 2014 and July 17, 2014, the DPR openly, publicly, and repeatedly carried out multiple acts of terrorism on civilians.

208.      The reputation of the DPR and its affiliates as violent organizations that engaged in and continues to engage in terrorist acts was and is widespread and has been extensively reported in the international news media.  Prior to the missile attack that killed Quinn and 297 others, the international media and human rights organizations reported numerous incidents of abduction, hostage-taking, torture, and murder of civilians by the DPR, including as described in Paragraphs 87-114, above.

209.      The classification of the DPR in May 2014 as a terrorist organization by the Ukrainian Prosecutor General's Office was public information and was reported in the world news media.  This information was known or had to be known to the Defendants.

210.      At all relevant times, Defendants knew or had to know that the DPR and its affiliates were violent organizations that engaged in terrorist activity.  The terrorist acts carried out by the DPR were widely known and constituted one of the highest profile international news stories at the time.  International media reports and broadcasts at the time were replete with daily coverage of the acts of terrorism committed by the DPR, including as described in Paragraphs 87-94, above.

211.      Despite knowing that the DPR engaged in acts of terrorism, Defendants nevertheless provided material support and financing, including banking and money transfer services, to the DPR, its members, and affiliated groups.

212.      At the time Defendants provided this material support and financing to the DPR and its affiliates, Defendants knew precisely the type of groups they were aiding and

supporting.   The DPR was already presiding over a campaign of terror in eastern Ukraine, including the murder and torture of civilians who supported Ukrainian unity.

213.      Defendants knew and/or deliberately disregarded the fact that the DPR would use the material support and financing provided by Defendants to facilitate, enable, and carry out terrorist attacks in a manner consistent with the DPR's previous pattern of disregard for civilian life, including the downing of an airplane with 298 civilians onboard.

**VI.      Defendants Knew Or Were Deliberately Indifferent That Their Conduct Would Result In Terrorism**

214.      At all relevant times, the DPR and its affiliates enjoyed and enjoy extensive support from the government of the Russian Federation.

215.      At all relevant times, as a matter of official policy, Russian state-owned Defendants Sberbank and VTB Bank continuously supported and support the DPR and its affiliates in their efforts to create a Novorossiya state.

216.      At all relevant times, upon information and belief, Defendants Sberbank and VTB Bank provided banking and money transfer services to the DPR and its affiliates as a matter of official policy, in order to assist and advance the DPR's terrorist activities in eastern Ukraine, in order to assist and advance the DPR's goal of using terrorism to establish a Novorossiya state, and in order to assist and advance the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and civilian population.

217.      At all relevant times, Defendants knew or had to know that the DPR was a violent organization that had carried out numerous terrorist acts on civilians, and that planned and intended to carry out additional terrorist acts.

218.      At all relevant times, Defendants knew or had to know that terrorist organizations such as the DPR require banking and money transfer services in order to operate

and in order to plan, prepare for, and carry out terrorist attacks, and that providing banking and money transfer services to the DPR and its representatives would enable the DPR to plan, prepare for, and carry out terrorist attacks, because such knowledge is notorious and known to the public at large.

219.    At all relevant times, Defendants continuously supported the DPR and their violent goals and activities against the Ukrainian government and the civilian population, or were deliberately indifferent to those violent goals and activities, consciously disregarding the strong possibility that the banking and money transfer services they provided to the DPR and its representatives would be used to further the DPR's terrorist activities and their campaign to intimidate or coerce the Ukrainian civilian population and influence the Ukrainian government by intimidation or coercion.

220.    At all relevant times, Defendants supported or were deliberately indifferent to the DPR's terrorist acts against civilians and the DPR's goal of using terrorism to coerce, intimidate, and influence the Ukrainian government and the civilian population.

221.    At all relevant times, Defendants provided banking services to the DPR and its representatives and executed the money transfers that funded the DPR with knowledge or deliberate indifference that those money transfers assisted and advanced the DPR's terrorist acts against civilians and assisted and advanced the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and the civilian population.

222.    At all relevant times, Defendants Sberbank and VTB knew or had to know that the accounts at issue were owned and controlled by fundraising agents of the DPR, and that the DPR and its affiliates were the ultimate beneficiaries of those accounts.

223.     At all relevant times, Defendants Western Union and MoneyGram knew or had to know that the money transfers to the groups that constituted the DPR's fundraising arm were being directed to the DPR to support their terrorist acts and campaign of intimidation and coercion.

224.     The DPR's involvement in terrorist acts in the Donbass was notorious public knowledge in 2014, and was widely reported on by the international news media, including as described in Paragraphs 87-94, above.

225.     At all times, the DPR's fundraising agents openly, publicly, and repeatedly acknowledged on their websites that they were raising money for the DPR and provided their account numbers with Defendants, including as described in Paragraphs 128-186, above.

226.     At all times, a simple internet search would have informed Defendants that they were providing banking and money transfer services to the DPR and its affiliates, and specifically that the DPR was relying upon these banking and money transfer services to purchase lethal equipment and other supplies necessary for its violent terrorist activities in the Donbass.

227.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because those facts were notorious and public knowledge.

228.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had statutory and legal duties to know their customers, perform due diligence, and refuse to provide banking and financial services to terrorist organizations such as the DPR.

229.     By providing banking services to the DPR and executing the money transfers that funded the DPR, Defendants breached their statutory and legal duties under the Uniting and

Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, and other related statutes, rules and regulations, to know their customers and perform due diligence and refuse to provide banking and money transfer services to violent terrorist organizations such as the DPR and its affiliates.

230.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had and have statutory and legal duties to monitor, report, and refuse to execute illegal, suspicious, and/or irregular banking and financial transactions.  The money transfers to the groups that constituted the DPR's fundraising arm were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

231.     When executing money transfers into bank accounts controlled by fundraising agents of the DPR and its affiliates, Defendants were and are at all times provided with and were aware of the names of all parties to the money transfers, including the names of the originator and of the intended beneficiaries and recipients of each such money transfer.  Thus, Defendants knew in real time that each of the money transfers were made to, from, and/or between accounts belonging to fundraising agents of the DPR or their affiliates, and Defendants had the technical and practical ability to block and refuse to carry out the money transfers.

232.     Moreover, as described in Paragraphs 128-186, above, the DPR's fundraising agents publicly listed their account information with Defendants on their websites, which were visible to anyone worldwide, including Defendants.

233.     Defendants' provision of material support and financing to the DPR is consistent with the fact that several Defendants, including MoneyGram and Western Union, have

been previously sanctioned for facilitating money laundering, wire fraud schemes, and/or terrorism financing.

234.     In November 2012, MoneyGram admitted, via a deferred prosecution agreement ("DPA") with the United States Department of Justice ("DOJ"), to money laundering and wire fraud violations.  MoneyGram's services were used in mass marketing and consumer phishing scams that defrauded thousands of victims in the United States.  As part of the settlement, MoneyGram created a $100 million victim compensation fund and retained a corporate monitor to regularly report to the DOJ for an initial five-year period.

235.     During the course of the 2012 DPA, MoneyGram experienced significant weaknesses in its AML and anti-fraud program, inadequately disclosed these weaknesses to the government, and failed to complete all of the DPA's required enhanced compliance undertakings.  As a result of its failures, MoneyGram processed at least $125 million in additional consumer fraud transactions between April 2015 and October 2016.

236.     On November 8, 2018, MoneyGram agreed to extend by 30 months its 2012 DPA and forfeit $125 million due to significant weaknesses in its anti-fraud and anti-money laundering ("AML") program, which resulted in a breach of MoneyGram's 2012 DPA.  MoneyGram further agreed to enhance its anti-fraud and AML compliance programs.

237.     In January 2017, Western Union admitted to wire fraud violations and agreed to pay $586 million for turning a blind eye as criminals used its services for money laundering and fraud.  Between 2004 and 2012, Western Union knew of the fraudulent transactions, but failed to investigate hundreds of thousands of consumer complaints.  Fraudsters had engaged in various advance fee scams, including offering fake jobs and lottery prizes, and processed the transactions through Western Union.  Western Union was also utilized to make payments to

human smugglers.  As part of the settlement, Western Union was required to maintain records of the recipients of money transfers and implement a comprehensive anti-fraud program.

## VII.   Plaintiffs' Injuries Are the Proximate Result of Defendants' Conduct and Actions

238.     Terrorist organizations, such as the DPR, need to transfer and receive funds in order to operate, and in order to plan, prepare for, and carry out terrorist acts.

239.     The provision of banking and money transfer services to the DPR and its affiliates enables them to plan, prepare for, and carry out terrorist acts, and enhances their ability to implement such acts.

240.     The DPR used the banking and money transfer services provided by Defendants to transfer and receive funds necessary for planning, preparing, and carrying out terrorist activity, including shelling in civilian areas, controlling territory from which it launched assaults like the downing of MH17, and using surface-to-air missiles to bring down planes, in particular MH17.The banking and money transfer services provided by Defendants substantially increased and facilitated the DPR's ability to plan, prepare for, and carry out terrorist acts on civilians, including the downing of the MH17 airplane.  The DPR planned, made the necessary preparations, and carried out the missile attack on the plane, including through acquiring and controlling the territory from which it launched the missile, utilizing (a) funds held by them in bank accounts with Defendants; (b) funds received by them as part of money transfers provided by Defendants; and/or (c) funds that were freed up or otherwise made available to the DPR as a result of the money transfers provided by Defendants.

241.     The ongoing maintenance of these bank accounts and the processing of these money transfers was enabled, facilitated, and carried out by Defendants' conduct and actions described herein.

242.     By providing the DPR with access to funds, and a diverse array of global financial supporters, in the days and weeks leading up to and immediately following the attack on MH17, Defendants' conduct and actions were a substantial factor in the DPR's ability to launch a surface-to-air missile and to control territory, including the territory necessary to set-up, operate, and ultimately launch the missile system that brought down MH17; the DPR controlled this territory utilizing weapons, military equipment, and ammunition procured with the material support of Defendants.

243.     By providing the DPR with access to critical funds in the days and weeks leading up to the attack on MH17, it was reasonably foreseeable that Defendants' provision of material support to the DPR would make possible the DPR's well-documented ongoing terrorist attacks, including ultimately the attack on MH17.

244.     The downing of the airplane carrying Quinn and 297 other innocent victims was therefore enabled, facilitated, and proximately caused by Defendants' conduct and actions described herein.

245.     Plaintiffs' injuries and Quinn's death are thus the direct and proximate result of Defendants' conduct and actions.

### CLAIM I – PROVISION OF MATERIAL SUPPORT TO TERRORISTS

246.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 245 as if fully set forth herein.

247.     The actions of Defendants in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

248.     As required by 18 U.S.C. § 2331, the actions of Defendants in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339A, which prohibits the provision of material support to terrorists.

249.     As required by 18 U.S.C. § 2331, Defendants' actions in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or military equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims to continue such acts of terror.

250.     As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities.  Defendants' actions in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

251.     Defendants knowingly and intentionally provided banking services to the DPR and its affiliates and/or executed the money transfers that funded the DPR when they knew or were deliberately indifferent to the fact that the DPR and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and to intimidate and coerce the civilian population.

252.     As a direct and proximate result of Defendants' provision of banking services to the DPR and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

253.     Defendants reasonably would have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

254.     Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## CLAIM II – FINANCING OF TERRORISM

255.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 245 as if fully set forth herein.

256.     The actions of Defendants in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

257.     As required by 18 U.S.C. § 2331, the actions of Defendants in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339C, which prohibits the financing of terrorism.

258.     As required by 18 U.S.C. § 2331, Defendants' actions in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or military equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims to continue such acts of terror.

259.     As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities.  Defendants' actions in providing banking services to the DPR and its affiliates and/or executing the money transfers that funded the DPR also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

260.     Defendants knowingly and intentionally provided banking services to the DPR and its affiliates and/or executed the money transfers that funded the DPR when they knew or were deliberately indifferent to the fact that the DPR and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and to intimidate and coerce the civilian population.

261.     As a direct and proximate result of Defendants' provision of banking services to the DPR and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

262.     Defendants reasonably would have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

263.     Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

a.     awarding Plaintiffs compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

b.     awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 2333;

c.     awarding Plaintiffs the costs of suit as incurred in this action and attorneys' fees pursuant to 18 U.S.C. § 2333;

d.     awarding Plaintiffs any equitable relief to which they may be entitled;

e.     awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowable by law; and

f.     all other relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.


Dated:  April 4, 2019


Respectfully submitted,

BOIES SCHILLER FLEXNER LLP


By:   s/ David Pressman

David Pressman
Lee S. Wolosky
55 Hudson Yards
New York, NY  10001
Telephone:  (212) 446-2300
Fax:  (212) 446-2350
dpressman@bsfllp.com

Stephen N. Zack
100 SE Second Street, Suite 2800
Miami, FL 33131
Telephone:  (305) 539-8400
Fax:  (305) 539-1307

*Attorneys for Plaintiffs Thomas Schansman, individually, as the surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of X.S., a minor, Catharina Teunissen, individually, and as the surviving parent and personal representative of the Estate of Quinn Lucas Schansman, and Nerissa Schansman, individually and as the surviving sibling of Quinn Lucas Schansman*