UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS SCHANSMAN, individually, as surviving
Parent of QUINN LUCAS SCHANSMAN, and as
legal guardian on behalf of X.S., a minor, and

CATHARINA TEUNISSEN, individually, and as
surviving Parent and personal representative of the
ESTATE OF QUINN LUCAS SCHANSMAN, and

NERISSA SCHANSMAN, individually, and as
surviving Sibling of QUINN LUCAS
SCHANSMAN,

                        Plaintiffs,

               -against-

SBERBANK OF RUSSIA PJSC, THE WESTERN
UNION COMPANY, WESTERN UNION
FINANCIAL SERVICES, INC., MONEYGRAM
INTERNATIONAL, INC., MONEYGRAM
PAYMENT SYSTEMS, INC., and VTB BANK
PJSC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Index No. 1:19-CV-02985
(ALC) (GWG)

Hon. Andrew L. Carter, Jr.

**ORAL ARGUMENT
REQUESTED**

# MEMORANDUM IN SUPPORT OF MOTION BY SBERBANK OF RUSSIA TO DISMISS THE COMPLAINT

John S. Kiernan
William H. Taft V
Román J. Rodriguez
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

*Counsel for Defendant Sberbank of
Russia*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ................................................................................................3

I.      Sberbank's Contacts With New York ...................................................................3

II.     The Donetsk People's Republic's Supporters .....................................................4

III.    The U.S. Response To DPR ..................................................................................6

ARGUMENT ....................................................................................................................6

I.      The Court Lacks Personal Jurisdiction over Sberbank .......................................6

        A.      The Complaint Does Not Establish General Jurisdiction Over Sberbank ..............7

        B.      The Complaint Does Not Establish Specific Jurisdiction Over Sberbank ...........10

                1.      The Scope of Amenability to Personal Jurisdiction Based on
                        Correspondent Accounts in New York is Limited ...............................11

                2.      The Complaint's Pleadings Do Not Establish Personal Jurisdiction ...................13

                3.      The Complaint's Allegations are Constitutionally Insufficient to Impose
                        Personal Jurisdiction ..............................................................15

II.     The Complaint Should Be Dismissed for Failure To Plead Legally Sufficient
        Claims Under the Anti-Terrorism Act ...............................................................16

        A.      The Complaint Does Not Allege Sberbank's Legally Culpable Knowledge
                or Intent To Support Terrorist Acts or Sberbank's Breach of a Legal Duty
                To Investigate Its Customers Sufficiently to Learn Their Purposes .................18

                1.      The Obligation to Plead Facts Showing Knowledge or Intent ............................18

                2.      The Absence of Breach of an Asserted Duty to Investigate................................21

        B.      The Complaint Does Not Sustainably Allege Sberbank's Intent to Violate
                Section 2331 ...........................................................................24

        CONCLUSION.............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ahmad v. Christian Friends of Israeli Communities*, No. 13 Civ. 3376(JMF), 2014 WL 1796322 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) .......................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................18

*Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698 (2d Cir. 2007)...........................................11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................18

*Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773 (2017) .................................................................................................10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .........................................................11, 16

*Daimler AG v. Bauman*, 571 U.S. 117 (2014).........................................................................8, 9

*DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018) .......................................7

*DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405 (S.D.N.Y. 2010) ...................12

*Freeman v. HSBC Holdings PLC*, 1:14-cv-06601-PKC-CLP, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ..................................................................................13, 25

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)...................................................22

*Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915 (2011) .......................................8, 10

*Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149 (D. Nev. 2001) ...............................9

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) ..........................................................8

*Hatfield v. Asphalt International, Inc.*, No. 03 Civ. 1372 DAB, 2004 WL 287680 (S.D.N.Y. Feb. 11, 2004).......................................................................................10

*Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)........................................12

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)...........................................................17

*Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017) .....................................................................19, 21, 22

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005)..................................................7

*In re Terrorist Attacks on Sept. 11, 2001,* 718 F. Supp. 2d 456 (S.D.N.Y. 2010).........................19

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995)...................................12

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)..........................................................8, 15

*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011)............................................11

*JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-CV-3844 (CS), 2019 WL 2578306 (S.D.N.Y. June 24, 2019)..................................................................9

*Kemper v. Deutsche Bank*, 911 F.3d 383 (7th Cir. 2018) ...........................................18

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991).................................10

*Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327 (2012) .........................................13

*Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ................................11

*Linde v. Arab Bank*, 882 F.3d 314 (2d Cir. 2018) ......................................... 18, 19, 24

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) ........................................12

*O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ................................................................... 18, 25

*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016) .........................................................11

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ...........................................................21

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014).............................7

*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018) ............................................7

*Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006)...................................................................................24

*United States v. Davidson*, 175 F. App'x 399 (2d Cir. 2006) .......................................3

*Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016)..........................................................7

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)..............................15

## STATUTES

18 U.S.C. § 2331.................................................................................................*passim*

18 U.S.C. § 2333.............................................................................................. 16, 18

18 U.S.C. § 2337 ..................................................................................................................21

18 U.S.C. §§ 2339A .......................................................................................1, 17, 18, 19, 24

18 U.S.C. § 2339B ..........................................................................................................17, 19

18 U.S.C. § 2339C .........................................................................................1, 17, 18, 19, 24

28 U.S.C. § 1605 ..................................................................................................................21

31 U.S.C. § 5318 ..................................................................................................................23

CPLR § 301 ..........................................................................................................................10

CPLR § 302 ....................................................................................................................10, 11

**OTHER AUTHORITIES**

31 C.F.R. § 1010.610 ...........................................................................................................23

79 Fed. Reg. 46,302 (Aug. 7, 2014)......................................................................................6

79 Fed. Reg. 63,021 (Oct. 21, 2014)......................................................................................6

Dept. of the Treasury, OFAC, OFAC FAQs (Jan. 15, 2015) ..............................................23

Fed. R. Civ. P. 12(b)(2)..........................................................................................................1

Fed. R. Civ. P. 12(b)(6)...................................................................................................1, 18

Federal Financial Institutions Examination Council, Bank Secrecy Act (BSA)/Anti-
    Money Laundering (AML) Examination Manual (Feb. 27, 2015)........................23

Restatement (Third) of Torts (2010)....................................................................................22

Defendant Sberbank of Russia (misnamed "Sberbank of Russia PJSC" in the Complaint) ("Sberbank") submits this memorandum in support of its motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to plead legally sustainable claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*

## PRELIMINARY STATEMENT

This case involves a grieving family's effort to hold Sberbank legally responsible for the death of Quinn Lucas Schansman, an eighteen year-old American and Dutch citizen who was killed on July 17, 2014 when Malaysia Airlines Flight 17 ("MH17") was shot down over eastern Ukraine.  Plaintiffs seek to hold Sberbank responsible on the basis that it provided banking services for individuals and entities that purportedly raised funds for the Donetsk People's Republic ("DPR"), a pro-Russia separatist group that allegedly claimed responsibility for downing MH17.  The Complaint is predicated on the contention that these banking services constituted knowing support for terrorist acts in violation of U.S. criminal law.

Sberbank joins in the other Defendants' submissions in support of dismissal of the Complaint.  In particular, Sberbank joins (1) VTB Bank's argument regarding absence of personal jurisdiction, and (2) Western Union's and MoneyGram's joint arguments that (A) the Complaint fails to plead the required causal link between Defendants' alleged conduct and Plaintiffs' harm, (B) Defendant's acts were not acts of "international terrorism" within the meaning of 18 U.S.C. § 2331(1)(A) and (C) Plaintiffs' claims fall within the "act of war" exception to the ATA.  Sberbank submits this separate brief to address particularly the absence of personal jurisdiction over Sberbank, and the Complaint's failure to allege sustainably that Sberbank had the knowledge or intent required to commit the crime of supporting a terrorist act under 18 U.S.C. §§ 2339A or 2339C, the predicates for Plaintiffs' ATA claim.

1

Plaintiffs' Complaint does not establish general or specific personal jurisdiction over Sberbank, which does not reside in New York and took no actions relevant to this dispute in New York. Plaintiffs cannot establish general jurisdiction over Sberbank because Sberbank is not "at home" in New York, and the Complaint's claim of specific jurisdiction should be rejected for failure to plead facts supporting a finding that Plaintiffs' claims arise from conduct by Sberbank in New York. While the Complaint tries to predicate specific jurisdiction on the existence of Sberbank's correspondent accounts at U.S. banks, which can be used to transfer funds from the United States to accounts held by Sberbank's customers in Russia, the Complaint does not identify any transfer made from such a U.S. correspondent account to an account identified as belonging to DPR or any DPR supporter at any time, let alone prior to the downing of MH17.

In addition, the Complaint's allegations about Sberbank's provision of routine banking services in Russia to customers alleged to have been fundraising supporters of DPR cannot establish the requisite knowledge or intent on Sberbank's part—criminal *mens rea*—to sustain an ATA claim based on Sberbank's purported involvement in criminal predicate acts under the ATA. None of the named customers has ever been designated in any U.S. listing of terrorists or supporters of terrorism that should not receive banking services. Plaintiffs' claim that Sberbank had a duty under the USA PATRIOT Act and related regulations to discover that these customers were supporters of terrorist acts, because a full enough investigation of those customers would have revealed their support for DPR, mischaracterizes the scope of Sberbank's obligations of inquiry under both U.S. banking law and the operative scienter standard, which requires a showing of Sberbank's knowledge or intent to commit a crime. That showing is absent when the United States has never designated DPR a Foreign Terrorist Organization, only listed DPR as a

Specially Designated National the day before MH17 was downed, and has never identified *on any list* any of the entities the Complaint alleges were DPR supporters.

## STATEMENT OF FACTS

**I.    Sberbank's Contacts With New York**

Sberbank is a Russian-headquartered international bank with a single alleged U.S. subsidiary, Sberbank CIB USA Inc., a broker-dealer which engages in corporate and investment banking and is not alleged to have engaged (or, indeed, is capable of engaging) in any banking activities related to the downing of MH17 over Eastern Ukraine. Compl. ¶¶ 27, 29. Sberbank's alleged consumer banking activity relevant to the Complaint in the United States consists solely of holding correspondent accounts at a number of U.S. banks to facilitate transfers of funds back and forth between the U.S. and customers abroad, including in Russia. *See* Compl. ¶ 42-43.

A U.S. sender that wants to transfer dollars to a Sberbank account in Russia can request a transfer from any U.S. bank where the sender has funds. That bank will accomplish the transfer through either (1) the sending U.S. bank's correspondent account in Russia, through which the money will be transferred to Sberbank, or (2) a Sberbank correspondent account in the United States. In the second scenario, Sberbank acts as an account-holding customer of the U.S. bank where Sberbank has a correspondent account, and then as the bank to an account-holding customer in Russia to whom the funds are transferred, forming a bridge between the banking systems in the two countries. *See generally United States v. Davidson*, 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (explaining purposes of correspondent banking); Compl. ¶¶ 43-45. Sberbank and the U.S. banks at which it holds correspondent accounts allow customers and U.S. banks to use these accounts to effectuate banking transactions between U.S. and Russian parties.

## II.    The Donetsk People's Republic's Supporters

On April 7, 2014, pro-Russian Ukrainian groups declared the establishment of DPR, after they took control of government buildings in Donetsk following Russia's March 16, 2014 annexation of the Crimea, a region of Ukraine.  Compl. ¶¶ 80-81.  From DPR's formation until July 17, 2014, DPR's activities were exclusively directed to Russian nationalist actions in Ukraine.  *See* Compl. ¶¶ 84-86, 88, 91.  On July 17, a surface-to-air missile shot down MH17, a commercial passenger airliner flying over Eastern Ukraine en route from Amsterdam to Kuala Lumpur, killing all 298 people on board, including Quinn Schansman.  Compl. ¶ 1.  The missile originated from territory controlled by DPR.  Compl. ¶ 66.  As explained more fully in Western Union's and MoneyGram's joint brief, DPR's statement claiming responsibility for this act (partially quoted in the Complaint, ¶ 68) indicated that DPR believed it had hit a military target, with no civilian casualties.

The Complaint does not allege that Sberbank has facilitated any funding directly to DPR from abroad.  Instead, the Complaint identifies a number of individuals and groups ("DPR Supporters") that it alleges were fundraisers for DPR and solicited donations to support DPR's activities from individuals in Russia and abroad after DPR's founding in April 2014.  *See, e.g.*, Compl. ¶¶ 116-18, 120, 128-29.  The Complaint alleges that these supporters operated websites identifying their support for DPR, and listed on their websites accounts where donations could be sent, including at Defendants Sberbank and VTB Bank, as well as other means to contribute, including via Defendants Western Union and MoneyGram.  Compl. ¶ 118.  The Complaint does not identify which of these groups it claims were founded and soliciting contributions before July 17, 2014, and does not allege the DPR Supporters owned the accounts on the websites or that any funds flowed to these supporters directly rather than through further intermediaries.

Some DPR Supporters' websites allegedly included information on how to donate to DPR Supporters from outside Russia or Ukraine. *See e.g.*, Compl. ¶ 179. The Complaint identifies no website that provided information about any Sberbank correspondent account in the United States or other mechanisms for U.S.-based individuals to donate to DPR Supporters using Sberbank accounts in New York or elsewhere in the United States. The Complaint also identifies no transfers to any Sberbank account for any DPR Supporter via any Sberbank U.S. correspondent account. *See* Compl. ¶¶ 128-93.

The Complaint's allegations regarding the Center for New Russia are illustrative. The Center for New Russia is alleged to have fundraised on behalf of DPR and used its website to raise money for the Novorossia nationalist political movement and the "Novorossia militia." Compl. ¶¶ 129-31. As with the Complaint's discussion of the fundraising efforts of other alleged DPR Supporters, the Complaint identifies no instance where any of the Center's fundraising communications mentioned, much less instructed donors to use, Sberbank U.S. correspondent accounts. *See* Compl. ¶¶ 137-52. The Complaint presents no allegations about U.S.-related activity by Sberbank regarding the Center, but merely alleges that Sberbank processed transfers or withdrawals in rubles for the Center as a customer within Russia. Compl. ¶ 149. For "transfers in USD," the Center's website listed the routing information for a different bank's New York correspondent account or suggested use of Western Union. Compl. ¶¶ 150-51.

Although the Complaint cites numerous websites of DPR Supporters that provided instructions on how to contribute to those groups, it does not identify even a single website or communication from DPR or a DPR Supporter providing information on use of Sberbank's U.S. correspondent accounts, does not identify any transfer through a Sberbank correspondent account in the U.S. to an account of a DPR Supporter at any time before the MH17 crash, and does not

identify any step taken by Sberbank to encourage or facilitate any U.S.-based transactions for the purpose of advancing DPR's interests.

## III.    The U.S. Response To DPR

The U.S. Treasury's Office of Foreign Asset Control ("OFAC"), which maintains lists of entities and individuals who should not receive banking services under U.S. law, took its first official action regarding DPR on July 16, 2014, one day before the MH17 incident, listing DPR as a Specially Designated National ("SDN").  Compl. ¶ 112.  This designation was less severe than the available alternatives of designating DPR as a Specially Designated Global Terrorist or a Foreign Terrorist Organization (an "FTO"), but still meant that U.S. banks must thereafter block attempts at transfers to DPR.  *See* Sanctions Actions Pursuant to Exec. Orders 13660, 13661 and 13662, 79 Fed. Reg. 63,021 (Oct. 21, 2014).  OFAC did not list or sanction any individuals related to DPR until June 20, 2014, and their names were not published in the Federal Register until August 7, 2014.  Compl. ¶ 110; *see* Designation of Individuals and Entities Pursuant to Exec. Order 13660 or Exec. Order 13661, 79 Fed. Reg. 46,302 (Aug. 7, 2014).  DPR has never been elevated to a higher designation than SDN, and *none* of the alleged DPR Supporters named in the Complaint—the actual alleged recipients of criminally wrongful support from Defendants—is alleged to have ever been on any published U.S. list of sensitive persons or entities or under any U.S. sanctions regime, either before or after MH17 was downed.

## ARGUMENT

## I.    The Court Lacks Personal Jurisdiction over Sberbank

The Complaint should be dismissed for failure to establish personal jurisdiction over Sberbank.  This action arises from conduct that took place in Ukraine, and the Complaint does not sustainably justify haling Sberbank into court in New York.  Sberbank's presence in New York is far too limited to support general jurisdiction over it, and the Complaint does not

sustainably allege activities in New York by Sberbank from which Plaintiffs' claim that Sberbank should be held responsible for Quinn Schansman's death arises. Amid allegations of purported Sberbank accounts in Russia for alleged DPR Supporters and citations to instances where DPR Supporters' websites listed other U.S.-based mechanisms for U.S.-based contributions to DPR Supporters, the Complaint does not identify a single instance where any DPR Supporter, or any contributor to a DPR Supporter, engaged in a banking transaction with Sberbank in the U.S. or with a Sberbank correspondent bank account in New York.

Plaintiffs bear the burden of establishing personal jurisdiction. *In re Parmalat Sec. Litig*., 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005). To survive a motion to dismiss, a plaintiff must make a prima facie showing of jurisdiction that includes "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342-43 (2d Cir. 2018) (internal quotes and citation omitted). "Conclusory non-fact-specific jurisdictional allegations or legal conclusions couched as a factual allegation will not establish a prima facie showing of jurisdiction." *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (internal quotes and citation omitted).

The Complaint must plead facts that establish either (1) general jurisdiction—that Sberbank is "at home" in New York or (2) specific jurisdiction—that Sberbank not only operates substantially in New York but also engaged in New York conduct from which the Plaintiffs' claim of harm arises. *See Waldman v. PLO*, 835 F.3d 317, 331 (2d Cir. 2016).

## A.    The Complaint Does Not Establish General Jurisdiction Over Sberbank

General jurisdiction, which renders a defendant amenable to suit in the forum on any cause of action, requires satisfaction of a federal Constitutional test of being "at home" in New York as well as New York's "doing business" test for corporate presence. *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 n.2 (2d Cir. 2014).

The exercise of general jurisdiction over a foreign defendant is constitutionally permissible only in the "exceptional case" when defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State," *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 & n.19 (2014). "[A] corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business." *Gucci Am. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014) (citing *Daimler*, 571 U.S. at 139 & n.19). Here, where Sberbank is "a Russian banking institution with offices and branches worldwide," Compl. ¶ 27, and where Sberbank's alleged contacts with New York are insignificant compared to its worldwide operations, Sberbank is "at home" in Russia, not New York.

The Complaint does not establish general jurisdiction over Sberbank by alleging that: (1) Sberbank offers American depository receipts ("ADRs") "which trade on U.S. over-the-counter markets;" (2) the "Sberbank Group" "operates" in the U.S. "through its subsidiary Sberbank CIB USA Inc." ("CIB"); (3) Sberbank has spent money "lobbying the U.S. government… for… assessing… sanctions relief;" or (4) Sberbank previously litigated a matter in this Circuit. Compl. ¶¶ 29-33. These allegations fall short of the "continuous and systematic" contacts sufficient to render Sberbank "at home" in New York. *See Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 916 (2011) ("A corporation's continuous activity of some sorts within a state… is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

Plaintiffs' allegation that Sberbank ADRs trade in U.S. markets does not render Sberbank "at home" in New York, even if that activity were carried on continuously. "Prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock

exchanges and to take the steps necessary to facilitate those listings (such as… designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences." *JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-CV-3844 (CS), 2019 WL 2578306, at *5 (S.D.N.Y. June 24, 2019) (internal quotation omitted).

Although CIB—which the Complaint describes as "the Group's corporate and investment banking business,"[1] recognizing it has no involvement with commercial or consumer banking or bank accounts, Compl. ¶ 30—is allegedly present in New York, the Complaint contains no allegations that CIB is an agent or alter ego of Sberbank such that its activities can be imputed to Sberbank. Even if CIB's activities in New York *were* imputed to Sberbank, those activities would not render Sberbank "at home" in New York. *See Daimler*, 571 U.S. at 139 n.20 (finding no jurisdiction over foreign defendant based on activities of its in-state subsidiary, and explaining that a foreign defendant's contacts must be assessed "in their entirety, nationwide and worldwide," because a "corporation that operates in many places can scarcely be deemed at home in all of them.").

Allegations that Sberbank has spent money lobbying the U.S. Government are also insufficient to establish general jurisdiction. The Complaint does not specify if Sberbank pursued this alleged lobbying in New York or elsewhere, and in any event, "personal jurisdiction may not be founded upon any kind of lobbying or government contacts such as getting information from or giving information to the government, or getting the government's permission to do something." *Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149, 1153 (D. Nev. 2001) ("[i]t would chill constitutionally protected rights of free speech and

---

[1]    This characterization, quoted from the "About Us" page on Sberbank's website, refers to "JSC Sberbank CIB" and *not* to the U.S. broker-dealer entity identified in the Complaint, Sberbank CIB USA Inc. *See About Us*, Sberbank, https://www.sberbank.com/about.

governmental contacts to expose every person who addressed a state legislature or public official to jurisdiction over claims that did not arise out of such conduct") (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991)).

The unelaborated allegation that Sberbank litigated an unspecified matter within this Circuit on a prior occasion similarly does not support finding a continuous and systematic presence in the forum supporting the exercise of general jurisdiction.  *See Hatfield v. Asphalt International, Inc.*, No. 03 Civ. 1372 DAB, 2004 WL 287680, at *3 (S.D.N.Y. Feb. 11, 2004) (Under CPLR § 301, allegation that defendants sporadically engaged in litigation in New York was insufficient "to establish continuous, permanent and substantial activity in New York on the part of Defendants.").

**B.    The Complaint Does Not Establish Specific Jurisdiction Over Sberbank**

In the absence of general jurisdiction, the Complaint must allege facts sufficient to establish specific jurisdiction.  Specific or "conduct-linked" personal jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (internal quotations omitted).  When the "relevant plaintiffs are not [forum] residents and do not claim to have suffered harm in that State… [and] all the conduct giving rise to the nonresidents' claims occurred elsewhere[,] [i]t follows that the [forum] courts cannot claim specific jurisdiction."  *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1782 (2017).

A claim of specific jurisdiction must satisfy a twofold inquiry under New York's long-arm statute, CPLR § 302(a)(1): "Under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the

claims must arise from the transactions." *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016); *Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007).

Additionally, even if jurisdiction is proper under CPLR § 302(a)(1), the case should be dismissed if an exercise of specific jurisdiction would not be consistent with the Federal Due Process Clause. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884-885 (2011); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985). "Section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive." *Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).

Because the Complaint does not properly allege ways that its claim arises from specific actions in New York by Sberbank, the Court lacks jurisdiction over Sberbank under both the CPLR and the Constitution.

### 1. The Scope of Amenability to Personal Jurisdiction Based on Correspondent Accounts in New York is Limited

New York's Court of Appeals has given substantial guidance on addressing claims of specific jurisdiction under the two prongs of CPLR § 302(a)(1) based on a foreign bank's holding of a correspondent account at a New York bank. The first prong of transacting business requires a "course of dealing" by the foreign bank, namely "repeatedly approv[ing] deposits and the movement of funds through that account for the benefit of its customer" in a different jurisdiction. *Rushaid*, 28 N.Y.3d at 328-29. The second prong requires that the cause of action arise from the correspondent banking transaction, and is satisfied only by alleging an "articulable nexus…or substantial relationship… between the business transaction and the claim asserted." *Id.* at 329 (internal quotes and citations omitted).

While the required nexus is "merely a relatedness between the transaction and the legal claim," *id.* (internal quotation and citation omitted), passage of funds through the correspondent

account must in some way relate to or facilitate the complained-of wrong. *See, e.g.*, *Hau Yin To v. HSBC Holdings PLC,* No. 15-CV-3590-LTS-SN, 2017 WL 816136, at n.7 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (no personal jurisdiction based on transactions through the foreign bank's U.S. correspondent accounts where any instances of "the passage of money through the U.S. bank accounts were merely incidental and not *specifically directed by any of the [bank] entities to facilitate the [] scheme*") (emphasis added); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 423-24 (S.D.N.Y. 2010) (when use of a New York bank account is not alleged to have caused the harm, the account cannot support jurisdiction).

The Complaint does not identify even a single alleged transaction flowing to a DPR Supporter through a New York correspondent account of Sberbank, let alone such a transaction prior to the downing of MH17, or any purposeful action by Sberbank in New York to facilitate material contributions that could support holding Sberbank responsible under the ATA for Quinn Schansman's death. While the Complaint identifies multiple websites of alleged DPR Supporters, it identifies no website providing Sberbank's correspondent account information, much less any U.S.-based transaction following from such an identification.[2] The Complaint's allegations that U.S. transfers occurred via *other* entities and that DPR Supporters' websites identified the routing information for *other* correspondent accounts as a way to donate are plainly

---

[2]       The content of the cited websites should be treated as incorporated by reference into the Complaint. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (noting that incorporation by reference "generally occurs when the material considered… contain[s] obligations upon which the plaintiff's complaint stands or falls, but which for some reason— usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."); *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("The complaint is deemed to include any statements… incorporated in it by reference. Moreover, when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotes and citations omitted).

insufficient to meet the "nexus" requirement for Sberbank, not only because instructions by third parties do not by themselves support an inference of actual transactions but also because instructions about other mechanisms for contribution possess no connection with Sberbank activities in the U.S. *See Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 340 (2012) (the "transaction-of-business" prong [] confer[s] jurisdiction only over those claims in some way arguably connected to the *transaction*.") (emphasis added); *Freeman v. HSBC Holdings PLC*, 1:14-cv-06601-PKC-CLP, 2019 WL 4452364, at *7 (E.D.N.Y. Sept. 16, 2019) (dismissing ATA cause of action for lack of personal jurisdiction when "[n]one of the transactions [the bank] allegedly executed for the [terror-supporting group] were processed through the United States banking system or banks in New York.").

### 2.     The Complaint's Pleadings Do Not Establish Personal Jurisdiction

Plaintiffs' Pre-Motion Response Letter cited several paragraphs in the Complaint as "alleg[ing] the overt use of correspondent accounts" and "alleg[ing] Sberbank['s] New York correspondent accounts were intentionally and repeatedly used to transfer funds to the DPR and its affiliates."  Dkt. No. 85 at 1-2.  A review of those cited paragraphs confirms that the Complaint identifies no examples of any such conduct:

- Paragraphs 22, 39 and 42-45 allege the existence of Sberbank's U.S. correspondent accounts, but present no allegation of any transfer to a DPR Supporter account through any of those correspondent accounts.  Similarly, paragraphs 115-117 and 119-121 provide conclusory summaries of alleged fundraising by DPR Supporters and DPR, without mentioning U.S. correspondent accounts.

- Paragraph 118 states that "[t]hrough numerous websites, the DPR and its fundraising representatives brazenly advertised ways to donate… including through sending money to accounts with, or bank cards issued by… Sberbank" in Russia, but makes no mention of use of Sberbank's U.S. correspondent accounts.

- Paragraphs 139 and 143 describe reports posted by the Center for New Russia, including of its financial expenditures. These paragraphs, and the cited webpages,[3] make no reference to transfers via a Sberbank U.S. correspondent account. *See* Kiernan Decl. Exs. 1-2.

- Paragraph 50 begins with the allegation "Sberbank and VTB Bank's United States correspondent bank accounts have been prominently advertised" by DPR Supporters. Yet the webpages of two DPR Supporters that paragraph 50 cites as examples contain no references to any U.S. Sberbank correspondent account. *See* Kiernan Decl. Exs. 3-4.[4] Similarly, paragraph 128 states that DPR Supporters' webpages provided correspondent banking information, again without citing any examples of posted Sberbank information or actual transactions through Sberbank's U.S. correspondent accounts.

- Paragraphs 126-127 cite a *New York Times* article from June 2015,[5] nearly a year after the MH17 crash. The Complaint cites the article as a second-hand source stating that "one… group," noted in the article to be the "Humanitarian Battalion of Novorossiya,"—a group not mentioned anywhere in the Complaint—provided instructions on how to donate via "Sberbank using correspondent accounts at Citibank, JPMorgan Chase and Deutsche Bank in New York, among others." The article continues, "[s]o did the separatist group Veche." Neither the Complaint nor the article identifies any website containing these asserted instructions, nor provides any basis for inferring that these asserted instructions were posted in the short period between the establishment of DPR and the MH17 crash, much less indicates whether any donations *ever* flowed to DPR via a Sberbank U.S. account. While Paragraph 127 cites the Veche website to support its allegation that the website identified *another* bank's U.S. correspondent account, the Complaint notably cites only the *Times* article for the statement that Veche disclosed Sberbank's information, presumably because Plaintiffs were readily able to see when citing the Veche website that it actually contained no information about Sberbank. *See* Compl. ¶ 155 ("The Veche website also explained that international transfers of funds could be routed… to its bank account at VTB Bank."). *See* Kiernan Decl. Ex. 5.

- The financial report of the Center for New Russia cited in paragraph 140 shows 100,000 rubles "transferred from Citibank account." *See* Kiernan Decl. Ex. 1. The immediately preceding chart in the cited report lists activity in the Center for New Russia's Citibank

---

[3]    As many of the websites cited in the Complaint have been taken down since 2014, the Complaint relies, *see, e.g.* Compl. ¶ 156, on archived pages available on Archive.org. The accompanying Kiernan Declaration ("Kiernan Decl.") provides copies of the archived webpages cited in this memorandum, in versions translated by Google Translate. Certified translations will be provided if the Court so requests.

[4]    The "correspondent account" discussed on the cited Coordination Center for New Russia page (Kiernan Decl. Ex. 4) is Sberbank's correspondent account at the Bank of Russia, held in Russia to facilitate transfers among Russian banks. *See* Sberbank, "Bank Details," https://www.sberbank.ru/en/about/about_sberbank/details.

[5]    Jo Becker & Steven Lee Myers, *Russian Groups Crowdfund War in Ukraine*, N.Y. Times, June 11, 2015, https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html.

account, including "-100,000 transferred to the account of Sberbank" and (among others) "-60 linking to a ruble PayPal account." These entries reflect Center for New Russia managing its resources across its own Russian-held accounts at Citibank, not a transfer from a U.S. donor to Center for New Russia's Sberbank account via a Sberbank U.S. correspondent account.

- Paragraph 185 discusses a donor to alleged DPR Supporter Sputnik & Pogrom who claimed to have donated $100,000 "to fund the DPR" via a fundraiser named Alexander Zhuchovsky. *See* Compl. ¶ 181. The Complaint does not allege (and the cited webpage contains no mention of) the means of donation or whether the alleged donation took place prior to the downing of MH17. *See* Kiernan Decl. Ex. 6. The Complaint also acknowledges "Zhuchovsky's primary means of accepting donations was through a widely publicized Sberbank bank card or via Western Union," noting also that "Sputnik & Pogrom's website explicitly states "that money transfers '[f]rom abroad' should be sent 'via Western Union.'" Compl. ¶ 184. These facts cannot support an inference that this or any other alleged donation was made via a Sberbank U.S. correspondent account—for which the Complaint nowhere identifies any webpage providing any information, much less information in relation to this donation or alleged DPR Supporter.

### 3. The Complaint's Allegations are Constitutionally Insufficient to Impose Personal Jurisdiction

The Complaint presents no facts supporting a conclusion that Sberbank—which is not properly alleged to have undertaken or directed any activity in New York or engaged in any transactions involving U.S. dollars relevant to the alleged harm—could have reasonably assumed it would be subjected to jurisdiction in New York for a claim relating to the downing of MH17.

The Complaint does not assert the contacts between relevant Sberbank activity and New York that are required for the assertion of personal jurisdiction to comport with "fair play and substantial justice" and to satisfy minimum requirements of constitutional due process. *Int'l Shoe Co.,* 326 U.S. at 316. Foreseeability is a critical consideration of the due process inquiry: the defendant's "conduct and connection with the forum state" must be such that it "should reasonably anticipate being haled into court" in New York to face the claims asserted. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). To find that Sberbank could reasonably anticipate being brought into court in New York on the facts alleged would be coextensive with concluding it could reasonably anticipate being brought into any court

15

anywhere in the world where it maintains a correspondent account—regardless of the account's absence of relationship to the alleged harm. Jurisdiction is constitutionally appropriate only when "the litigation results from alleged injuries that arise out of or relate to those activities" in the forum. *See Burger King*, 471 U.S. at 472.

While the Complaint contains many references to instructions for facilitating donations to DPR Supporters from the U.S., Plaintiffs' careful drafting cannot conceal that it has no such information to provide about Sberbank. To plead the required "nexus" between Sberbank's actions with its New York correspondent accounts and the alleged harm, the Complaint must go beyond alleging instructions about how to use those accounts and allege facilitation by Sberbank of material use of U.S. accounts to support terrorist acts before the downing of MH17. The absence of well-pleaded allegations of these facts should lead to dismissal of Sberbank for lack of personal jurisdiction.

## II.    The Complaint Should Be Dismissed for Failure To Plead Legally Sufficient Claims Under the Anti-Terrorism Act

Even if personal jurisdiction existed over Sberbank, the Complaint should be dismissed for failure to state a claim under the ATA. The other Defendants' submissions identify multiple respects in which the Complaint's allegations are insufficient; this submission focuses on failure to allege the requisite knowledge or intent to commit the predicate crime of providing support or funding for a terrorist act.

The ATA defines liability through a series of statutory incorporations. 18 U.S.C. § 2333(a) establishes liability in tort for anyone who commits the crime of injuring a national of the United States "by reason of an act of international terrorism," defined in 18 U.S.C. § 2331(1) (as is relevant here) to require (1) "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" and (2) apparent intent to "intimidate or

coerce a civilian population" or "influence the policy of a government by intimidation or coercion." The Complaint alleges that Sberbank's acts "in violation of" U.S. criminal law were its violations of 18 U.S.C. §§ 2339A and 2339C. Compl. ¶¶ 248, 257. Section § 2339A(a) prohibits providing material support "knowing or intending [the material support is] to be used in preparation for, or in carrying out," one of several enumerated criminal acts. Section 2339C(a)(1) similarly requires that funds be provided or collected "with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" an act intended to cause civilian death or serious injury while trying to intimidate a population or compel a government.

Significantly, the Complaint does not and cannot assert as an ATA predicate a violation of 18 U.S.C. § 2339B, which criminalizes provision of material support for entities designated as FTOs, because DPR and the DPR Supporters have never been designated as FTOs by the U.S. Government. The principal difference between the predicate statutes on which Plaintiffs rely and § 2339B is that the latter statute criminalizes support for terrorist organizations, while the ones relied on by Plaintiffs criminalize only support for specific terrorist acts (which must be identified and linked to the support to establish liability) and *not* for organizations generally. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (interpreting §§ 2339A and 2339C as "refer[ring] to intent to further terrorist activity" while observing that "Congress did not import the intent language of those provisions into § 2339B"); *Ahmad v. Christian Friends of Israeli Communities*, No. 13 Civ. 3376(JMF), 2014 WL 1796322, at *3-4 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) (dismissing complaint relying on §§ 2339A and 2339C because allegations that defendants donated to groups who thereafter committed terrorist attacks were legally insufficient to establish linkage between the donations and attacks).

The Complaint must plead facts that satisfy the elements of each statute in the ATA structure. *Linde v. Arab Bank*, 882 F.3d 314, 325-28 (2d Cir. 2018) (error for jury instruction to assume that satisfaction of the elements of predicate act statute automatically satisfied § 2331(1)(A)'s definition of "international terrorism."). The ATA establishes a tort claim, as to which basic principles of "fault, state of mind, causation and foreseeability must be satisfied." *Kemper v. Deutsche Bank*, 911 F.3d 383, 389 (7th Cir. 2018). Additionally, since the predicate of Sberbank's asserted tort liability is its commission of a crime, the elements of the underlying crimes Sberbank is alleged to have committed must also be sustainably pleaded.

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content plead [sic] that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*, at *4 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Complaint should be dismissed for failure to plead facts supporting a finding of Sberbank's criminal knowledge or intent to provide material support or funding for a terrorist act under §§ 2339A or 2339C, or Sberbank's intent to violate § 2331(1)(b).

### A.    The Complaint Does Not Allege Sberbank's Legally Culpable Knowledge or Intent To Support Terrorist Acts or Sberbank's Breach of a Legal Duty To Investigate Its Customers Sufficiently to Learn Their Purposes

### 1.    The Obligation to Plead Facts Showing Knowledge or Intent

Because the ATA provides for treble damages, § 2333(a), the Complaint must plead "intentional misconduct" by the Defendants, which may include reckless indifference but is not established by showing mere negligence. *Kemper*, 911 F.3d at 390. Under the criminal statutes

that underlie this tort statute, moreover, the pleading and proof must further establish criminal *mens rea,* which cannot be satisfied merely by alleging negligent unawareness as to the nature of the group receiving the funds. Rather, the Complaint must sustainably plead that Sberbank was "deliberately indifferent to whether or not the organization" to which it has provided material support would use that support *to engage in terrorist acts. Linde v. Arab Bank, PLC*, 882 F.3d 314, 329-30 & n.11 (2d Cir. 2018) (while the *mens rea* required to establish a violation of § 2339B is only "knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities," establishing violation of § 2339A more rigorously requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes," and § 2339C similarly requires "proof of unlawful and willful collection or provision of funds with knowledge funds are to be used, at least in part, to carry out terrorist activities"); *see also Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017).

Allegations of laxity in enforcing anti-money laundering policies and "know your customer" procedures on the part of a financial services company do not state a legally sufficient claim for willful blindness or reckless indifference amounting to knowledge or intent to support terrorist acts. *See Hussein*, 230 F. Supp. 3d at 177-78. A claim of knowing or intentional support is "generally implausible when the only allegations are that the defendants provided routine banking services unaccompanied by any allegations tending to show that the defendants had reason to believe that their customers were terrorists or were assisting terrorists." *Id.* at 176 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010)).

The Complaint does not satisfy its obligations to plead criminal *mens rea* under the ATA or the predicate statutes through its assertions that Sberbank was on notice of DPR's terroristic nature by virtue of "public knowledge" of DPR's activities or government investigations and actions regarding DPR before July 17, 2014.  Compl. ¶ 224.  Until the day before the MH17 crash, when OFAC first designated DPR an SDN, this asserted "public knowledge" did not include recognition by U.S. regulators that DPR was an undesirable recipient of funds.  The Complaint identifies no publically available information from before the incident that presented reasons to anticipate a DPR act like the downing of MH17 (as to which the purpose indicated by DPR's contemporaneous communiqué, partially cited in the Complaint, appears to have been military rather than terroristic, as explained in Western Union's and MoneyGram's joint brief).  Nor can the Ukrainian government's alleged investigation of DPR, *see* Compl. ¶¶ 108-09, establish criminal *mens rea*.  Sberbank is not alleged to have had actual knowledge of such an investigation, and in any event it would have had no necessary reason to be governed by characterizations of DPR by a government in armed conflict with DPR.

Even if concerns about DPR's alleged activities could cognizably be imputed to Sberbank under a statute that requires criminal knowledge or intent to support a terrorist act, imputed knowledge about DPR would not support the Complaint's theory of liability, which is based on Sberbank's asserted provision of banking services to DPR Supporters—not DPR itself.  *See* Compl. ¶¶ 88-92, 95-112 (media and government reporting concerning DPR, not DPR Supporters).  The Complaint does not allege that any U.S., Ukrainian, Russian or other authority had listed any identified DPR Supporter as an SDN or as any kind of terrorist or supporter of terrorist acts at any time, let alone prior to the MH17 crash.  The Complaint presents no basis for

inferring Sberbank's knowledge or intent that a transfer to an account of one of those DPR Supporters before July 2014 would constitute criminally wrongful support for a terrorist act.[6]

### 2. The Absence of Breach of an Asserted Duty to Investigate

The Complaint does not remedy its inability to allege that Sberbank knew or intended that transfers to any account of a DPR Supporter would constitute support of a terrorist act by contending that (1) Sberbank could have discovered the relevant entities' purposes through further investigation, or (2) Sberbank breached a legal duty to accomplish such an investigation under the USA PATRIOT Act. Those theories misconstrue the nature of Sberbank's duties and Plaintiffs' obligation to allege plausible facts supporting a finding that Sberbank knew or intended to support a terrorist act. No U.S. legal authority suggests that providing conventional banking services in the ordinary course amounts to willful blindness or reckless indifference of a customer's purpose to support terrorist acts. Similarly, no authority supports Plaintiffs' claim that Sberbank is properly chargeable with holding criminal-level knowledge and intent to support a terrorist act in violation of the ATA to the extent it has not undertaken substantial, continuous investigations of all of its customers' purposes to ensure they had no connection to terrorist acts.

The Complaint contains no allegations of "red flags" supporting an inference that Sberbank's processing of transfers to alleged DPR Supporters—not identified by any U.S. authority as improperly supporting DPR, and at a time before even DPR was listed as an SDN—amounted to knowing or intentional support for terrorist acts. *See Hussein*, 230 F. Supp. 3d at

---

[6]    Plaintiffs also allege Sberbank is directly majority-owned by the Russian Federation and that as such Sberbank's alleged actions "as a matter of official policy… continuously supported and support the DPR and its affiliates in their efforts to create a Novorossiya state," Compl. ¶¶ 31, 215—apparently an attempt to assert Sberbank is an instrumentality of Russia. If these false allegations were true, dismissal would be mandated for lack of subject matter jurisdiction over Sberbank as an instrumentality of a foreign government engaged in acts not based on ordinary commercial activity, under 18 U.S.C. § 2337(2) and the Foreign Sovereign Immunities Act, specifically 28 U.S.C. § 1605(a)(2). *See Saudi Arabia v. Nelson*, 507 F.S. 349, 361-62 (1993).

176-77.  Red flags could include openly providing services to sanctioned individuals or entities, actual notice of government investigation of those entities, clearing large and suspicious transfers without apparent business purpose or "providing unusual services that are not part of the defendant's ordinary course of business."  *Id.* at 176.  Lacking these indications, the Complaint seeks to charge Sberbank with knowledge or intent to support terrorist acts on the basis that it did not conduct sufficient internet searches or other investigations of entities now alleged to be DPR Supporters to learn their purposes, all at a time before the MH17 crash.  *See* Compl. ¶ 226.

To plead a sustainable claim for willful blindness or reckless indifference in the ATA context, though, Plaintiffs must show Defendants' "conscious[ness] of the risk of harm created by [defendant's] conduct while the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the [defendant's] failure to adopt the precaution a demonstration of the [defendant's] indifference to the risk."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 557 (E.D.N.Y. 2012) (Weinstein, J.) (citing Restatement (Third) of Torts § 2 (2010)).  The Complaint fails to plead Sberbank was aware of the potential harm of processing transactions involving these entities, and even if Sberbank was aware, the allegedly required precaution of investigating customers to determine whether they were DPR Supporters would have posed significant (and legally unrequired) burdens without having any likelihood of preventing the MH17 crash.

The Complaint's allegation that Sberbank had a duty under the USA PATRIOT Act to conduct investigations of its customers to discover their alleged terrorist connections, Compl. ¶¶ 228-230, mischaracterizes that statute and related regulations.   No provision of the USA PATRIOT Act places any "know your customer" or customer diligence obligations on Sberbank as a foreign bank with a U.S. correspondent account.  Rather, the Act places certain diligence

obligations, not directly relevant or alleged to have been breached here, only on the U.S. financial institutions that maintain correspondent accounts for non-U.S. banks and as such are responsible for sending funds outside the U.S. *See* 31 U.S.C. § 5318(i)(1) ("[e]ach financial institution that establishes, maintains, administers, or manages a private banking account or a correspondent account in the United States for a non-United States person… shall establish appropriate, specific, and where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts."); *see also* 31 C.F.R. § 1010.610(a) (same).  Even for those U.S. banks, the rules do not contemplate an obligation of investigation of customers sufficient to discover whether ultimate recipients of funds *not* on the Treasury Department's SDN List are engaged in terrorist acts or supporting terrorist acts.  *See e.g.*, Federal Financial Institutions Examination Council, Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual 143 (Feb. 27, 2015) ("In general, the regulations that OFAC administers require banks to do the following: Block accounts and other property of *specified* countries, entities, and individuals.  Prohibit or reject unlicensed trade and financial transactions with *specified* countries, entities, and individuals.") (emphasis added).[7]

The Complaint contains no allegation that any U.S. bank flagged any transaction related to the Complaint as suspicious, or faced any criminal or civil liability for allowing the alleged transfers to take place.  The Complaint's allegations of Sberbank's duty to investigate are legally

---

[7]    *See also* Dept. of the Treasury, OFAC, OFAC FAQs: Sanctions Compliance #116 (Jan. 15, 2015) (When the U.S. bank hosting a correspondent account "does not know or have reason to know the [ultimate recipient] entity's ownership or other information demonstrating the blocked status of the entity's property… OFAC would not expect the bank to research the non-account parties listed in the wire transfer that do not appear on the SDN List and, accordingly, would not pursue an enforcement action against the bank for having processed such a transaction."), treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#116.

unsupportable, and Plaintiffs have established no legal basis for imposing a higher duty to investigate transactions on a foreign bank than on its U.S. host.

**B.    The Complaint Does Not Sustainably Allege Sberbank's Intent to Violate Section 2331**

In addition to the obligation to plead knowledge and intent to provide material support to terrorist acts under the predicate criminal statutes, §§ 2339A and 2339C, Plaintiffs are also required to allege facts supporting a finding of intent to "intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion" under Section 2331(1)(B). "The provision of material support to a terrorist organization does not invariably equate to an act of international terrorism." *Linde*, 882 F.3d at 326. While "providing financial services to a known terrorist organization may" violate a predicate statute for purposes of § 2331(1)(A), such support may still "not involve violence or endanger human life and [] not manifest the apparent intent required by § 2331(1)(B)," because banking services are not automatically dangerous to human life or intended to coerce. *Id.*

Plaintiffs do not allege facts supporting an inference that Sberbank knew money flowing through its systems before July 17, 2014 was going through DPR Supporters to DPR to serve ends that would be violent or life-threatening to civilians. The absence of plausible allegations of such knowledge represents another incurable defect of the Complaint, because Sberbank's provision of financial services in the ordinary course cannot amount to intent to coerce, intimidate or influence civilians or a government. *See Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *2-3 (E.D.N.Y. June 30, 2006) (rejecting claims that banks violated the ATA by issuing letters of credit to companies that sold chemicals to Iraq which were used in chemical weapons, because the allegations did not demonstrate that the banks' "actions [were] designed to coerce civilians or government entities as required under § 2331").

When "factual allegations delineating relationships between [] services and the terrorist attacks are so attenuated," a complaint cannot satisfy § 2331(1)'s intent requirements. *O'Sullivan*, 2019 WL 1409446, at *8. The relationship between Sberbank's non-violent and mechanical provision of financial services to the alleged DPR Supporters and the downing of MH17 is similarly over-attenuated. *See Freeman*, 2019 WL 4452364, at *16 (contrasting support for an FTO proxy with support for "intervening actors… whose independent actions break [the] inferential chain."). The gap cannot be bridged simply by speculation—not pleaded in the Complaint—of a known or intended link between transfers of unspecified funds and ultimate DPR expenditures on the missile that downed MH17.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint as to Sberbank.

Dated: New York, New York
       September 19, 2019

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: */s/ John S. Kiernan*
        John S. Kiernan
        William H. Taft V
        Román J. Rodriguez
        jskiernan@debevoise.com
        whtaft@debevoise.com
        rjrodriguez@debevoise.com

        919 Third Avenue
        New York, New York 10022
        (212) 909-6000

        *Counsel for Defendant Sberbank of Russia*

25