UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THOMAS SCHANSMAN, individually, as surviving    :
Parent of QUINN LUCAS SCHANSMAN, and as         :
legal guardian on behalf of X.S., a minor, and   :
                                                 :
CATHARINA TEUNISSEN, individually, and as        :
surviving Parent and personal representative of the  :
ESTATE OF QUINN LUCAS SCHANSMAN, and             :
                                                 :
NERISSA SCHANSMAN, individually, and as          :
surviving Sibling of QUINN LUCAS                 :
SCHANSMAN,                                       :
                                                 :
                        Plaintiffs,              :
                                                 :
        -against-                                :
                                                 :
SBERBANK OF RUSSIA PJSC, THE WESTERN            :
UNION COMPANY, WESTERN UNION                     :
FINANCIAL SERVICES, INC., MONEYGRAM             :
INTERNATIONAL, INC., MONEYGRAM                   :
PAYMENT SYSTEMS, INC., and VTB BANK             :
PJSC,                                            :
                                                 :
                        Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 1:19-CV-02985
(ALC) (GWG)

Hon. Andrew L. Carter, Jr.

**ORAL ARGUMENT
REQUESTED**

# MEMORANDUM IN SUPPORT OF MOTION BY SBERBANK OF RUSSIA TO DISMISS THE FIRST AMENDED COMPLAINT

John S. Kiernan
William H. Taft V
Román J. Rodriguez
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

*Counsel for Defendant Sberbank of
Russia*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ................................................................................................3

I.     Sberbank's Contacts With New York .........................................................................3

II.    The Donetsk People's Republic's Supporters..............................................................4

III.   The U.S. Response To DPR...........................................................................................5

ARGUMENT ....................................................................................................................6

I.     The Court Lacks Personal Jurisdiction over Sberbank..............................................6

       A.    The AC Does Not Establish General Jurisdiction Over Sberbank ...........................7

       B.    The AC Does Not Establish Specific Jurisdiction Over Sberbank............................9

             1.    The Scope of Amenability to Personal Jurisdiction Based on
                   Correspondent Accounts in New York is Limited................................................10

             2.    The AC's Pleadings Do Not Establish Personal Jurisdiction..............................11

             3.    The AC's Allegations Are Constitutionally Insufficient To Impose
                   Personal Jurisdiction ..........................................................................................15

II.    The AC Should Be Dismissed for Failure To Plead Legally Sufficient Claims Under
       the Anti-Terrorism Act ................................................................................................15

       A.    The AC Does Not Allege Sberbank's Legally Culpable Knowledge or Intent
             To Support Terrorist Acts or Sberbank's Breach of a Legal Duty To
             Investigate Its Customers Sufficiently to Learn Their Purposes..............................18

             1.    The Obligation to Plead Facts Showing Knowledge or Intent ............................18

             2.    The Absence of Breach of an Asserted Duty to Investigate................................21

       B.    The AC Does Not Allege That Sberbank Is Liable Under Section 2333 ..................24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

CASES

*Ahmad v. Christian Friends of Israeli Communities*, No. 13 Civ. 3376(JMF), 2014 WL 1796322 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) .................16-17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................17

*Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698 (2d Cir. 2007) .............................10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................17

*Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773 (2017) ............................................................................................................................10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..........................................10, 15

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................................................7, 9

*DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018) .........................7

*DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405 (S.D.N.Y. 2010) ....................11

*Freeman v. HSBC Holdings PLC*, 1:14-cv-06601-PKC-CLP, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ....................................................................................... 14, 25

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012) ....................................22

*Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915 (2011) .....................8, 9-10

*Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149 (D. Nev. 2001) ................9

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) ............................................7

*Hatfield v. Asphalt International, Inc.*, No. 03 Civ. 1372 DAB, 2004 WL 287680 (S.D.N.Y. Feb. 11, 2004) ................................................................................................9

*Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) ...............................11

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..............................................16

*Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017) ....................................................................... 18, 19, 22

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005) ..................................7

*In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010) ........19

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995)...................................12

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)...............................................................8, 15

*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011).........................................................10

*JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-CV-3844 (CS), 2019 WL
    2578306 (S.D.N.Y. June 24, 2019).......................................................................................8

*Kaplan v. Lebanese Canadian Bank, SAL*, No. 08 Civ. 7253 (GBD), 2019 WL 4869617
    (S.D.N.Y. Sept. 20, 2019)............................................................................... 19, 22, 24, 25

*Kemper v. Deutsche Bank*, 911 F.3d 383 (7th Cir. 2018)......................................................17, 18

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)..................................................9

*Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327 (2012)........................................................14

*Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)...............................................10

*Linde v. Arab Bank*, 882 F.3d 314 (2d Cir. 2018) .................................................. 17, 18, 24, 25

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) ......................................................11

*O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446
    (S.D.N.Y. Mar. 28, 2019)......................................................................................... 17, 22, 25

*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016) ................................................................ 10, 11

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ..........................................................................21

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014).............................7

*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018) ............................................................7

*Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y.
    June 30, 2006)....................................................................................................................25

*United States v. Davidson*, 175 F. App'x 399 (2d Cir. 2006) .......................................................3

*Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016).........................................................................7

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).............................................15

*Zapata v. HSBC Holdings PLC*, 17 Civ. 6645 (NGG)(CLP), 2019 WL 4918626
    (S.D.N.Y. Sept. 30, 2019)..................................................................................................18-19

STATUTES

18 U.S.C. § 2331 .................................................................................................*passim*

18 U.S.C. § 2333 .................................................................................................*passim*

18 U.S.C. § 2337 ........................................................................................................21

18 U.S.C. § 2339A ..............................................................................................*passim*

18 U.S.C. § 2339B .................................................................................................16, 18

18 U.S.C. § 2339C ..............................................................................................*passim*

28 U.S.C. § 1605 ........................................................................................................21

31 U.S.C. § 5318 ........................................................................................................23

CPLR § 301 ..................................................................................................................9

CPLR § 302 ................................................................................................................10

OTHER AUTHORITIES

31 C.F.R. § 1010.610 .................................................................................................23

79 Fed. Reg. 46,302 (Aug. 7, 2014) .............................................................................5

79 Fed. Reg. 63,021 (Oct. 21, 2014) ............................................................................5

80 Fed. Reg. 6,797 (Feb. 6, 2015) ................................................................................6

80 Fed. Reg. 13,957 (Mar. 17, 2015) ...........................................................................6

Dept. of the Treasury, OFAC, OFAC FAQs (Jan. 15, 2015) ................................23-24

Fed. R. Civ. P. 12 ...................................................................................................1, 17

Federal Financial Institutions Examination Council, Bank Secrecy Act (BSA)/Anti-
    Money Laundering (AML) Examination Manual (Feb. 27, 2015) ........................23

Restatement (Third) of Torts (2010) ..........................................................................22

Defendant Sberbank of Russia (misnamed "Sberbank of Russia PJSC") ("Sberbank") submits this memorandum in support of its motion to dismiss the First Amended Complaint (the "AC") pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to plead legally sustainable claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*

## PRELIMINARY STATEMENT

This case involves a grieving family's effort to hold Sberbank legally responsible for the tragic death of Quinn Lucas Schansman, an eighteen-year-old American and Dutch citizen who was killed on July 17, 2014 when Malaysia Airlines Flight 17 ("MH17") was shot down over eastern Ukraine.   Plaintiffs seek to hold Sberbank responsible on the basis that it provided banking services for individuals and entities that purportedly raised funds for the Donetsk People's Republic ("DPR"), a pro-Russia separatist group that allegedly claimed responsibility for downing MH17.   The AC is predicated on the contention that these banking services constituted knowing support for terrorist acts in violation of U.S. criminal law and the ATA.

Sberbank submits this brief to address particularly the absence of personal jurisdiction over Sberbank, and the AC's failure to allege (1) that Sberbank had the knowledge or intent required to commit the crime of supporting a terrorist act under 18 U.S.C. §§ 2339A or 2339C, the statutory predicates for Plaintiffs' ATA claim, or (2) Sberbank's alleged acts were sufficient to establish a violation of 18 U.S.C. § 2333(a).   Sberbank joins in the other Defendants' submissions in support of dismissal of the AC, and in particular (1) VTB Bank's argument regarding absence of personal jurisdiction, and (2) Western Union's and MoneyGram's joint arguments that (A) the AC fails to plead the required causal link between Defendants' alleged conduct and Plaintiffs' harm, (B) Defendants' acts were not acts of "international terrorism"

within the meaning of 18 U.S.C. § 2331(1)(A), and (C) Plaintiffs' claims fall within the "act of war" exception to the ATA.

Plaintiffs' AC does not establish general or specific personal jurisdiction over Sberbank, which does not reside in New York and took no actions relevant to this dispute in New York. Plaintiffs cannot establish general jurisdiction over Sberbank because Sberbank is not "at home" in New York, and the AC's claim of specific jurisdiction should be rejected for failure to plead facts supporting a finding that Plaintiffs' claims arise from conduct by Sberbank in New York. While the AC tries to predicate specific jurisdiction on the existence of Sberbank's correspondent accounts at U.S. banks, which can be used to transfer funds from the United States to accounts held by Sberbank's customers in Russia, the AC does not identify any transfer made from such a U.S. correspondent account to an account identified as belonging to DPR or any DPR supporter at any time, let alone prior to the downing of MH17, rendering these New York correspondent accounts legally irrelevant for personal jurisdiction purposes.

The AC's allegations about Sberbank's provision of routine banking services in Russia to customers alleged to have been fundraising supporters of DPR cannot establish either (1) the requisite knowledge or intent on Sberbank's part—criminal *mens rea*—to sustain an ATA claim based on Sberbank's purported involvement in criminal predicate acts required under the ATA or (2) the elements for primary liability for Sberbank under the ATA's core provision, § 2333(a), namely a violent act with intent to intimidate a civilian population.  None of the named customers was designated prior to July 17, 2014 in any U.S. listing of terrorists or supporters of terrorism that should not receive banking services.  Plaintiffs' claim that Sberbank had a duty under the USA PATRIOT Act and related regulations to discover that these customers were supporters of terrorist acts, because an investigation of those customers not required by any law

would have revealed their support for DPR, mischaracterizes the scope of Sberbank's obligations of inquiry under both U.S. banking law and the operative scienter standard, which requires a showing of Sberbank's knowledge or intent to commit a crime. That showing is absent when the United States has never designated DPR a Foreign Terrorist Organization, only listed DPR as a Specially Designated National *the day before* MH17 was downed, and has never identified *on any list* any of the entities the AC alleges were supporters of DPR prior to July 17, 2014.

## STATEMENT OF FACTS

### I.    Sberbank's Contacts With New York

Sberbank is a Russian-headquartered international bank with a single alleged U.S. subsidiary, Sberbank CIB USA Inc., a broker-dealer neither licensed nor alleged to have engaged (or alleged to have been capable of engaging) in any banking activities related to the downing of MH17 over Eastern Ukraine. AC ¶¶ 33-35. Sberbank's alleged consumer banking activity relevant to the AC in the United States consists solely of holding correspondent accounts at a number of U.S. banks to facilitate transfers of funds between the U.S. and customers abroad, including in Russia. *See* AC ¶¶ 48, 60.

A U.S. sender that wants to transfer funds to a Sberbank account in Russia can request a transfer from any U.S. bank where the sender has funds. That bank will accomplish the transfer through either (1) the sending U.S. bank's correspondent account in Russia, through which the money will be transferred to Sberbank, or (2) a Sberbank correspondent account in the United States. In the second scenario, Sberbank acts as an account-holding customer of the U.S. bank where Sberbank has a correspondent account, and then as the bank to an account-holding customer in Russia to whom the funds are transferred, forming a bridge between the banking systems in the two countries. *See generally United States v. Davidson*, 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (explaining purposes of correspondent banking); AC ¶¶ 49-51. Sberbank and

3

the U.S. banks at which it holds correspondent accounts allow customers and U.S. banks to use these accounts to effectuate banking transactions between U.S. and Russian parties.

## II.    The Donetsk People's Republic's Supporters

In 2014, in the wake of public demonstrations, pro-Russian Ukrainian groups took control of government buildings in Donetsk, declaring the establishment of DPR.  AC ¶¶ 91-93. From DPR's formation until July 17, 2014, DPR's activities were exclusively directed to Russian nationalist and separatist actions in Ukraine.  *See e.g.* AC ¶¶ 102, 106, 108, 121, 124, 126.  On July 17, 2014, a surface-to-air missile shot down MH17, a commercial passenger airliner flying over Eastern Ukraine *en route* from Amsterdam to Kuala Lumpur, killing all 298 people on board, including Quinn Schansman.  AC ¶ 1.  The missile originated from territory controlled by DPR.  AC ¶ 75.  As explained more fully in Western Union's and MoneyGram's joint brief, DPR's statement claiming responsibility for this act (partially and selectively quoted at AC ¶ 77) indicated that DPR believed it had hit a Ukrainian military target, with no civilian casualties.

The AC does not allege that Sberbank has facilitated any funding directly to DPR from abroad.  AC ¶ 148.  Instead, the AC identifies a number of individuals and groups ("DPR Supporters") that it alleges were fundraisers for DPR and solicited donations to support DPR's activities from individuals in Russia and abroad after DPR's founding.  *See, e.g.,* AC ¶ 7.  The AC alleges that these supporters operated websites identifying their support for DPR, and listed on their websites accounts where donations could be sent, including at Defendants Sberbank and VTB Bank, as well as other means to contribute, including via Defendants Western Union and MoneyGram.  AC ¶ 149.  The AC does not allege that the identified DPR Supporters held the accounts listed on the websites in their names or that any funds flowed to these supporters directly rather than through further intermediaries unnamed in the AC.

4

Some DPR Supporters' websites allegedly included information on how to donate to DPR Supporters from outside Russia or Ukraine. *See e.g.*, AC ¶ 300. The AC cites only two internet postings of alleged fundraisers (both on social media pages, not "official" DPR Supporter websites) providing Sberbank's U.S. correspondent account information—and one fundraiser purports to raise funds for the Luhansk People's Republic, *not* even for DPR. AC ¶¶ 58, 281, 292. Although the AC cites websites of DPR Supporters recording in copious detail the receipt and use of funds, *see* AC ¶¶ 162-339, the AC does not identify a single website or communication from DPR or a DPR Supporter reporting any transfer through a Sberbank correspondent account in the U.S. to an account of a DPR Supporter *at any time*, let alone prior to the MH17 crash, and does not identify any act by Sberbank to encourage or facilitate any U.S.-based transactions to advance DPR's interests.

## III.    The U.S. Response To DPR

The U.S. Treasury's Office of Foreign Asset Control ("OFAC"), which maintains lists of entities and individuals who should not receive banking services under U.S. law, took its first official action regarding DPR on July 16, 2014, one day before the MH17 incident, sanctioning DPR by blocking its property and interests in property and listing DPR as a Specially Designated National ("SDN") on OFAC's master list (the "SDN List"). AC ¶ 134. This sanction was less severe than the available alternatives of designating DPR as a Specially Designated Global Terrorist or a Foreign Terrorist Organization (an "FTO"), but still meant that U.S. banks must thereafter block attempts at transfers to DPR. *See* Sanctions Actions Pursuant to Exec. Orders 13660, 13661 and 13662, 79 Fed. Reg. 63,021 (Oct. 21, 2014). OFAC did not list or sanction any individuals related to DPR until June 20, 2014, and their names were not published in the Federal Register until August 7, 2014. AC ¶ 131; *see* Designation of Individuals and Entities Pursuant to Exec. Order 13660 or Exec. Order 13661, 79 Fed. Reg. 46,302 (Aug. 7, 2014). Even

5

alleged DPR leaders and DPR fundraisers Pavel Gubarev and Ekaterina Gubareva were not sanctioned until December 12, 2014 and March 11, 2015, respectively.[1]  AC ¶¶ 94, 137; *see* Designation of Individuals and Entities Pursuant to Executive Order 13660, 80 Fed. Reg. 6,797 (Feb. 6, 2015); Sanctions Actions Pursuant to Executive Orders 13660 and 13685, 80 Fed. Reg. 13,957 (Mar. 17, 2015).  DPR has never been subject to sanction beyond the blocking of assets described above, and *none* of the alleged actual recipients of criminal support from Defendants was placed on any published U.S. list of sensitive persons or entities or under any U.S. sanctions regime before MH17 was downed.

## ARGUMENT

### I.    The Court Lacks Personal Jurisdiction over Sberbank

The AC should be dismissed for failure to establish personal jurisdiction over Sberbank. This action arises from conduct that took place in Ukraine, and the AC does not justify haling Sberbank into court in New York.  Sberbank's presence in New York is far too limited to support general jurisdiction over it, and the AC does not allege how Sberbank's asserted responsibility for Quinn Schansman's death arises from Sberbank activities in New York.  Amid allegations of purported Sberbank accounts in Russia for alleged DPR Supporters and citations to instances where DPR Supporters' websites listed other U.S.-based mechanisms to contribute to DPR Supporters, the AC does not identify a single instance where any DPR Supporter, or any contributor to a DPR Supporter, engaged in a banking transaction with Sberbank in the U.S. or with a Sberbank correspondent bank account in New York.

---

[1]    According to the U.S. Government, Pavel Gubarev was detained in March 2014 by the Ukrainian government, and was in custody at the time of the U.S. Treasury's announcement of sanctions.  Any assertion of Gubarev's involvement in the events at issue in the AC is therefore implausible or impossible.  *See* U.S. Dept. of the Treasury, Press Release "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities" (Dec. 12, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx.

Plaintiffs bear the burden of establishing personal jurisdiction. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005). To survive a motion to dismiss, a plaintiff must make a prima facie showing of jurisdiction that includes "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342-43 (2d Cir. 2018) (internal quotes and citation omitted). "Conclusory non-fact-specific jurisdictional allegations or legal conclusions couched as a factual allegation will not establish a prima facie showing of jurisdiction." *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (internal quotes and citation omitted).

The AC must plead facts that establish either (1) general jurisdiction—that Sberbank is "at home" in New York or (2) specific jurisdiction—that Sberbank not only operates substantially in New York but also engaged in conduct in New York from which the Plaintiffs' claim of harm arises. *See Waldman v. PLO*, 835 F.3d 317, 331 (2d Cir. 2016).

## A.    The AC Does Not Establish General Jurisdiction Over Sberbank

General jurisdiction, which renders a defendant amenable to suit in the forum on any cause of action, requires satisfaction of a federal Constitutional test of being "at home" in New York as well as New York's "doing business" test for corporate presence. *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 n.2 (2d Cir. 2014).

The exercise of general jurisdiction over a foreign defendant is constitutionally permissible only in the "exceptional case" when defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State," *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 & n.19 (2014). "[A] corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business." *Gucci Am. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014) (citing *Daimler*, 571 U.S. at 139 & n.19). Here, where Sberbank is a

Russian bank with "offices and branches worldwide," AC ¶ 33, and where Sberbank's alleged contacts with New York are insignificant compared to its worldwide operations, Sberbank is "at home" in Russia, not New York.

The AC does not establish general jurisdiction over Sberbank by alleging that: (1) Sberbank offers American depository receipts ("ADRs") "that trade on U.S. over-the-counter markets;" (2) Sberbank "operates" in the U.S. "through its subsidiary Sberbank CIB USA Inc." ("CIB"); (3) Sberbank has spent money "lobbying the U.S. government... for... assessing... sanctions relief;" or (4) Sberbank previously litigated a matter in this Circuit. AC ¶¶ 33-39. These allegations fall short of the "continuous and systematic" contacts sufficient to render Sberbank "at home" in New York. *See Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 916 (2011) ("A corporation's continuous activity of some sorts within a state... is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

Plaintiffs' allegation that Sberbank ADRs trade in U.S. markets does not render Sberbank "at home" in New York, even if that activity were carried on continuously. "Prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings (such as... designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences." *JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-CV-3844 (CS), 2019 WL 2578306, at *5 (S.D.N.Y. June 24, 2019) (internal quotation omitted).

Although CIB is allegedly present in New York, the AC contains no allegations that CIB is an agent or alter ego of Sberbank such that its activities can be imputed to Sberbank. AC ¶¶ 34-35. Even if CIB's activities in New York *were* imputed to Sberbank, those activities would

not render Sberbank "at home" in New York.  *See Daimler*, 571 U.S. at 139 n.20 (no jurisdiction over foreign defendant based on activities of its in-state subsidiary, and explaining that a foreign defendant's contacts must be assessed "in their entirety, nationwide and worldwide," because a "corporation that operates in many places can scarcely be deemed at home in all of them.").

Allegations that Sberbank has spent money lobbying the U.S. Government are also insufficient to establish general jurisdiction.  The AC does not specify if Sberbank pursued this alleged lobbying in New York, and "personal jurisdiction may not be founded upon any kind of lobbying or government contacts such as getting information from or giving information to the government, or getting the government's permission to do something."  *Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149, 1153 (D. Nev. 2001) ("[i]t would chill constitutionally protected rights of free speech and governmental contacts to expose every person who addressed a state legislature or public official to jurisdiction over claims that did not arise out of such conduct") (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991)).

The unelaborated allegation that Sberbank litigated an unspecified prior matter within this Circuit similarly does not support finding a continuous and systematic presence supporting the exercise of general jurisdiction.  *See Hatfield v. Asphalt International, Inc*., No. 03 Civ. 1372 DAB, 2004 WL 287680, at *3 (S.D.N.Y. Feb. 11, 2004) (Under CPLR § 301, allegation that defendants sporadically engaged in litigation in New York was insufficient "to establish continuous, permanent and substantial activity in New York on the part of Defendants.").

B.    **The AC Does Not Establish Specific Jurisdiction Over Sberbank**

In the absence of general jurisdiction, the AC must allege facts sufficient to establish specific jurisdiction.   Specific or "conduct-linked" personal jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."

*Goodyear*, 564 U.S. at 919 (internal quotations omitted).  When the "relevant plaintiffs are not [forum] residents and do not claim to have suffered harm in that State… [and] all the conduct giving rise to the nonresidents' claims occurred elsewhere[,] [i]t follows that the [forum] courts cannot claim specific jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1782 (2017).

A claim of specific jurisdiction must satisfy a twofold inquiry under New York's long-arm statute, CPLR § 302(a)(1): "Under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions." *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016); *Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007).

Additionally, even if jurisdiction is proper under CPLR § 302(a)(1), the case should be dismissed if an exercise of specific jurisdiction would not be consistent with the federal Due Process Clause. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884-885 (2011); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985).  "Section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive." *Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).  Because the AC does not properly allege ways that its claim arises from specific actions in New York by Sberbank, the Court lacks jurisdiction over Sberbank under both the CPLR and the Constitution.

### 1.    The Scope of Amenability to Personal Jurisdiction Based on Correspondent Accounts in New York is Limited

New York's Court of Appeals has given substantial guidance on addressing claims of specific jurisdiction under the two prongs of CPLR § 302(a)(1) based on a foreign bank's holding of a correspondent account at a New York bank.  The first prong of transacting business requires a "course of dealing" by the foreign bank, namely "repeatedly approv[ing] deposits and

the movement of funds through that account for the benefit of its customer" in a different jurisdiction. *Rushaid*, 28 N.Y.3d at 328-29. The second prong requires that the cause of action arise from the correspondent banking transaction, and is satisfied only by alleging an "articulable nexus…or substantial relationship… between the business transaction and the claim asserted." *Id.* at 329 (internal quotes and citations omitted).

To establish the required nexus, passage of funds through the correspondent account must in some way relate to or facilitate the complained-of wrong. *See, e.g.*, *Hau Yin To v. HSBC Holdings PLC,* No. 15-CV-3590-LTS-SN, 2017 WL 816136, at n.7 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (no personal jurisdiction based on transactions through the foreign bank's U.S. correspondent accounts where any instances of "the passage of money through the U.S. bank accounts were merely incidental and not *specifically directed by any of the [bank] entities to facilitate the* [] *scheme*") (emphasis added); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 423-24 (S.D.N.Y. 2010) (when use of a New York bank account is not alleged to have caused the harm, the account cannot support jurisdiction).

### 2.    The AC's Pleadings Do Not Establish Personal Jurisdiction

The AC does not identify even a single alleged transaction flowing to a DPR Supporter through a New York correspondent account of Sberbank, let alone such a transaction prior to the downing of MH17, or any purposeful action by Sberbank in New York to facilitate material contributions responsible for Quinn Schansman's death. While the AC identifies multiple websites of alleged DPR Supporters, it identifies no website or other evidence of a U.S.-based transaction via Sberbank, in contrast to allegations of U.S. transfers via *other* entities.[2]

---

[2]    The content of the cited websites should be treated as incorporated by reference into the Amended Complaint. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (incorporation by reference "generally occurs when the material considered… contain[s] obligations upon which the plaintiff's complaint stands or falls, but which for some reason—

The AC cites only two social media postings where Sberbank's U.S. correspondent account information was publically displayed. One of the postings, attributed to the "People's Militia of New Russia" (a group mentioned in no other context other than this posting in the AC), claims it is fundraising for the Luhansk People's Republic, *not* DPR. Kiernan Decl. Ex. 1. The AC does not allege any transfer to the group took place, let alone a transaction via Sberbank's U.S. correspondent accounts, or allege a plausible connection to MH17. *See* AC ¶¶ 58, 290-92. The second posting is attributed to "Voice of Sevastopol." AC ¶ 281; Kiernan Decl. Ex. 2. Despite the AC's contention that the posting says "the only way to transfer" dollars to the group was via Sberbank, the posting explicitly identifies other methods for international transfers. Once again, the AC does not allege any transfer via Sberbank to this recipient, let alone a transaction via Sberbank's U.S. correspondent accounts or a connection to MH17.

These limited allegations that two social media postings mentioned Sberbank U.S. correspondent accounts are insufficient to meet the "nexus" requirement for Sberbank in New York. The AC contains no allegations of actual transactions, and mere provision of account information by a third party does not by itself support an inference of such transactions. Instead, the AC identifies many other mechanisms for contributions with no connection to Sberbank's U.S. activities, attempting to juxtapose the basis for jurisdiction over other defendants with Sberbank's unrelated New York activities.

---

usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."); *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotes and citations omitted).

Despite extensively discussing financial activities of DPR Supporters, the AC does not allege any transfer made via a Sberbank correspondent account:

- Paragraphs 170-73 cite a *New York Times* article from June 2015, nearly a year after the MH17 crash.[3]   The AC cites the article as a second-hand source that "one… group, Humanitarian Battalion" provided instructions on how to donate via "Sberbank using correspondent accounts at Citibank, JPMorgan Chase among other banks in New York City." The article continues, "[s]o did the separatist group Veche."  Neither the AC nor the article identifies any Humanitarian Battalion website containing these asserted instructions, nor provides any basis for inferring that these instructions were posted in the short period between the establishment of DPR and the MH17 crash, much less whether any donations *ever* flowed to the group via a Sberbank U.S. account.  *See* AC ¶ 183-91.  While Paragraph 172 cites Veche to support its allegation that *another* bank's U.S. correspondent account information was posted, the AC notably cites only the *Times* article for the statement that Veche disclosed Sberbank's information, presumably because Plaintiffs were readily able to see when citing the Veche website elsewhere in the AC that it actually contained no information about Sberbank.  *See* AC ¶ 253 ("The Veche website explained that international transfers of funds could be routed… to its bank account at VTB Bank."); *see* Kiernan Decl. Ex. 3.[4]

- Paragraph 149 states that "[t]hrough numerous websites, social media posts, and other online fora, the DPR's fundraisers brazenly advertised ways to donate… including through sending money to accounts with, or bank cards issued by… Sberbank" in Russia, but does not mention use of Sberbank's U.S. correspondent accounts.  Paragraph 177 states that DPR Supporters' webpages provided correspondent banking information, again without citing any examples of Sberbank information or transactions through Sberbank's U.S. correspondent accounts.

- Paragraphs 227-29 and 241 describe reports posted by the Center for New Russia, including of its financial receivables.  These paragraphs, and the cited webpages, make no reference to transfers via a Sberbank U.S. correspondent account.  *See* Kiernan Decl. Exs. 4-5.  The financial report of the Center for New Russia cited in paragraphs 236-37 shows 100,000 rubles "transferred from Citibank account."  *See* Kiernan Decl. Ex. 6.  The immediately preceding chart in the cited report lists activity in the Center for New Russia's Citibank account, including "-100,000 transferred to the account of Sberbank" and (among others) "-60 linking to a ruble PayPal account."  These entries reflect Center for New Russia managing its resources across its Russian bank accounts, including its Russian Citibank account, not a

---

[3]     Jo Becker & Steven Lee Myers, *Russian Groups Crowdfund War in Ukraine*, N.Y. Times, June 11, 2015, https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html.
[4]     As many of the websites cited in the Complaint have been taken down since 2014, the AC relies on archived pages available on Archive.org.  *See, e.g.* AC ¶ 263.  The accompanying Kiernan Declaration provides copies of the archived webpages cited in this memorandum, in versions translated by Google Translate.  Certified translations will be provided if the Court so requests.

transfer from a U.S. donor to Center for New Russia's Sberbank account via a Sberbank U.S. correspondent account.

- Paragraph 316 discusses a donor to alleged DPR Supporter Sputnik & Pogrom who "boasted" of having donated $100,000 "to fund the DPR" via fundraiser Alexander Zhuchovsky. The AC does not allege (and the cited webpage contains no mention of) the means of donation or whether the alleged donation took place prior to the downing of MH17. *See* Kiernan Decl. Ex. 7. Paragraph 316 also acknowledges "Zhuchovsky's primary means of accepting donations was through a widely publicized Sberbank bank card or via Western Union," and noting elsewhere "Sputnik & Pogrom's website explicitly states "that money transfers '[f]rom abroad' should be sent 'via Western Union.'" AC ¶ 310. These facts cannot support an inference that this or any other alleged donation was made via a Sberbank U.S. correspondent account—for which the AC nowhere identifies such information in relation to this donation or alleged DPR Supporter.

These and other conclusory and facially deficient claims in the AC highlight the absence of alleged transactions via Sberbank's correspondent accounts. This absence is glaring in light of the AC's extensive citations to DPR Supporters' webpages describing their financial activity. As the AC states, "the DPR went to great lengths to provide maximum transparency that reflected [] the flow of funds into its fundraising accounts." AC ¶¶ 179; *see, e.g.* AC ¶¶ 279 (Voice of Sevastopol reports), 203 (Save Donbass reports), 228 (Center for New Russia reports). Despite this fulsome disclosure, the AC does not cite a single alleged transaction accomplished via a Sberbank U.S. account. This precludes Plaintiffs' *prima facie* showing of personal jurisdiction over Sberbank, and warrants dismissal of Sberbank. *See Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 340 (2012) (the "transaction-of-business" prong [] confer[s] jurisdiction only over those claims in some way arguably connected to the *transaction*.") (emphasis added); *Freeman v. HSBC Holdings PLC*, 1:14-cv-06601-PKC-CLP, 2019 WL 4452364, at *7 (E.D.N.Y. Sept. 16, 2019) (dismissing ATA cause of action for lack of personal jurisdiction when "[n]one of the transactions allegedly executed for the [terror-supporting group] were processed through the United States banking system or banks in New York.").

### 3.    The AC's Allegations Are Constitutionally Insufficient To Impose Personal Jurisdiction

The AC presents no facts supporting a conclusion that Sberbank—which is not properly alleged to have undertaken or directed any activity in New York or engaged in any transactions via the U.S. relevant to the alleged harm—could have reasonably assumed it would be subjected to jurisdiction in New York for a claim relating to the downing of MH17.

The AC does not allege the contacts between relevant Sberbank activity and New York required for the assertion of personal jurisdiction to comport with "fair play and substantial justice" and to satisfy minimum requirements of constitutional due process. *Int'l Shoe Co.,* 326 U.S. at 316. Foreseeability is a key consideration of the due process inquiry: the defendant's "conduct and connection with the forum state" must be such that it "should reasonably anticipate being haled into court" in New York to face the claims asserted. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A finding that Sberbank could reasonably anticipate being brought into court in New York on the facts alleged would imply that it could reasonably anticipate being brought into any court anywhere in the world where it maintains a correspondent account—regardless of the account's lack of relationship to the alleged harm. Jurisdiction is constitutionally appropriate only when "the litigation results from alleged injuries that arise out of or relate to those activities" in the forum. *See Burger King*, 471 U.S. at 472.

## II.    The AC Should Be Dismissed for Failure To Plead Legally Sufficient Claims Under the Anti-Terrorism Act

Even if personal jurisdiction existed over Sberbank, the AC should be dismissed for failure to state a claim under the ATA. The other Defendants' submissions identify multiple respects in which the AC's allegations are insufficient; this submission focuses on the AC's failure to allege the requisite knowledge or intent to commit the predicate crime of providing support for a terrorist act or violate the core ATA provisions of 18 U.S.C. §2333.

The ATA defines liability through a series of statutory incorporations. 18 U.S.C. § 2333(a) establishes liability in tort for anyone who injures a national of the United States "by reason of an act of international terrorism," defined in 18 U.S.C. § 2331(1) to require (1) "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" and (2) apparent intent to "intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion." The AC alleges that Sberbank's "violent acts or acts dangerous to human life" in "violation of" U.S. criminal law were its violations of 18 U.S.C. §§ 2339A and 2339C. AC ¶¶ 400, 410. Section 2339A(a) prohibits providing material support "knowing or intending [the material support is] to be used in preparation for, or in carrying out," one of several enumerated criminal acts. Section 2339C(a)(1) similarly requires that funds be provided or collected "with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" an act intended to cause civilian death or serious injury while trying to intimidate a population or compel a government.

Significantly, the AC does not and cannot assert as an ATA predicate a violation of 18 U.S.C. § 2339B, which criminalizes provision of material support for entities designated by the U.S. Government as FTOs, because DPR and the DPR Supporters have never been designated as FTOs. The principal difference between the predicate statutes on which Plaintiffs rely and § 2339B is that the latter statute criminalizes support for terrorist organizations, while the ones relied on by Plaintiffs criminalize only support for specific terrorist acts (which must be identified and linked to the support provided to establish liability), *not* for organizations generally. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (interpreting §§ 2339A and 2339C as "refer[ring] to intent to further terrorist activity" while observing that "Congress did not import the intent language of those provisions into § 2339B"); *Ahmad v.*

16

*Christian Friends of Israeli Communities*, No. 13 Civ. 3376(JMF), 2014 WL 1796322, at \*3-4 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) (dismissing complaint relying on §§ 2339A and 2339C because allegations that defendants donated to groups who thereafter committed terrorist attacks were legally insufficient to establish linkage between the donations and attacks). Similarly, the AC cannot rely on 18 U.S.C. § 2333(d), which permits aiding and abetting liability, but only in the context of assistance to an FTO; when a non-FTO is involved, the ATA demands the complaint plead a higher degree of direct involvement in terroristic activity.

The AC must plead the elements of each statute in the ATA structure. *Linde v. Arab Bank*, 882 F.3d 314, 325-28 (2d Cir. 2018) (error for jury instruction to assume that satisfaction of the elements of predicate act statute automatically satisfied § 2331(1)(A)'s definition of "international terrorism."). As the predicate of Sberbank's asserted tort liability is its commission of a crime, the elements of that crime must also be sustainably pleaded. In addition, basic tort requirements of "fault, state of mind, causation and foreseeability must be satisfied." *Kemper v. Deutsche Bank*, 911 F.3d 383, 389 (7th Cir. 2018).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at \*4 (S.D.N.Y. Mar. 28, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content plead[ed] that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*, at \*4 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The AC should be dismissed for failure to plead facts supporting a finding of Sberbank's criminal knowledge or intent to provide material support or funding for a terrorist act under §§ 2339A or 2339C, or facts sufficiently alleging Sberbank is liable under § 2333.

A.    **The AC Does Not Allege Sberbank's Legally Culpable Knowledge or Intent To Support Terrorist Acts or Sberbank's Breach of a Legal Duty To Investigate Its Customers Sufficiently to Learn Their Purposes**

1.    **The Obligation to Plead Facts Showing Knowledge or Intent**

Because the ATA provides for treble damages, § 2333(a), the AC must plead "intentional misconduct" by the Defendants, which may include reckless indifference but is not established by showing mere negligence.  *Kemper*, 911 F.3d at 390.  Under the criminal statutes that underlie this tort statute, moreover, the pleading and proof must further establish criminal *mens rea*, which cannot be satisfied merely by alleging negligent unawareness as to the nature of the group receiving the funds.  Rather, the AC must sustainably plead that Sberbank was "deliberately indifferent to whether or not the organization" to which it has provided material support would use that support *to engage in terrorist acts.  Linde*, 882 F.3d at 329-30 & n.11 (2d Cir. 2018) (while *mens rea* required to establish a violation of § 2339B is only "knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities," establishing violation of § 2339A more rigorously requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes," and § 2339C similarly requires "proof of unlawful and willful collection or provision of funds with knowledge funds are to be used, at least in part, to carry out terrorist activities"); *see also Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017); *Zapata v. HSBC Holdings PLC*, 17 Civ. 6645 (NGG)(CLP), 2019 WL 4918626, at *12 (S.D.N.Y. Sept. 30, 2019) (intent not sustainably

18

alleged where "to an objective observer, HSBC's conduct appeared to be 'motivated by economics, not by a desire to 'intimidate or coerce''") (citation omitted).

Allegations of laxity in enforcing anti-money laundering policies and "know your customer" procedures on the part of a financial services company do not state a legally sufficient claim for willful blindness or reckless indifference amounting to knowledge or intent to support terrorist acts. *See Hussein*, 230 F. Supp. 3d at 177-78. A claim of knowing or intentional support is "generally implausible when the only allegations are that the defendants provided routine banking services unaccompanied by any allegations tending to show that the defendants had reason to believe that their customers were terrorists or were assisting terrorists." *Id.* at 176 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010)).

The AC does not satisfy its obligations to plead criminal *mens rea* under the ATA or the predicate statutes by asserting that Sberbank was on notice that DPR would engage in terrorist acts based on "public knowledge" of DPR activities or government investigations regarding DPR before July 17, 2014 or information about DPR Supporters that could be found through website searches. AC ¶ 372. A bare allegation that information was available is not equivalent to an allegation of actual knowledge. *See Kaplan v. Lebanese Canadian Bank, SAL*, No. 08 Civ. 7253 (GBD), 2019 WL 4869617, at *6 (S.D.N.Y. Sept. 20, 2019) (even in an action claiming aiding and abetting of an FTO under § 2333(d)—a claim not advanced or available here—the complaint did not sustainably allege bank's knowledge of payees' affiliations with FTO based on publicly available sources when "Plaintiffs nowhere allege [] that Defendant read or was aware of such sources"). The AC does not allege that Sberbank actually knew of any DPR terroristic activities before MH17 was downed or any relationship between any DPR Supporter and the DPR, let alone for the purpose of engaging in terroristic activity.

Moreover, until OFAC first added DPR to the SDN List the day before the MH17 crash, any asserted "public knowledge" did not include a view of U.S. authorities that DPR was an undesirable recipient of funds.  Nor can the Ukrainian government's alleged investigation of DPR or Sberbank, *see* AC ¶¶ 128, 163-168, establish criminal *mens rea*.  Sberbank's U.S. legal obligations are not governed by characterizations of DPR by a Ukrainian government in armed conflict with DPR.  The alleged investigations described in the AC also exclusively concerned direct support to DPR, without extending to DPR Supporters.  The AC does not allege that the Ukrainian authorities *concluded* that Sberbank violated Ukrainian law, sanctioned Sberbank or put Sberbank on notice of any legally prohibited activities by any DPR Supporters allegedly assisted by Sberbank before the downing of MH17 in July 2014.  *See* AC ¶¶ 163 ("allegations" made against Sberbank), 165 (a government "investigation" of the issues), 363 (allegations concerning Sberbank in a 2018 Ukrainian government brief).

The AC identifies no publically available information of DPR's purposes from before the incident—which purposes, as indicated by DPR's prior acts and contemporaneous communiqué on July 17th, appear to have been directed to secession from Ukraine, as explained further in Western Union's and MoneyGram's joint brief—that would present reasons for Sberbank to anticipate in advance a DPR act like the downing of MH17.  Mere conclusory assertions of Sberbank's knowledge, AC ¶¶ 169-70, do not plead facts showing Sberbank's knowledge of plans by DPR Supporters alleged to have account numbers at Sberbank to support terrorist acts.

Finally, even if knowledge of DPR's alleged activities could cognizably be imputed to Sberbank under a statute that requires criminal knowledge or intent to support a terrorist act, imputed knowledge about DPR would not support the AC's theory of liability, which is based on Sberbank's asserted provision of banking services to DPR Supporters—not DPR itself.  *See* AC

¶¶ 104-128 (media and government reporting concerning DPR, not DPR Supporters). The AC does not allege that any U.S., Ukrainian, Russian or other authority had publicly listed any identified DPR Supporter as a sanctioned entity, as any kind of terrorist or supporter of terrorist acts, or placed it on the SDN List before the MH17 crash. The AC presents no basis for inferring Sberbank's knowledge or intent that a transfer to an account of one of those DPR Supporters before July 17, 2014 would constitute criminally wrongful support for a terrorist act.[5]

### 2.    The Absence of Breach of an Asserted Duty to Investigate

The AC does not remedy its inability to allege that Sberbank knew or intended that transfers to any account of a DPR Supporter would constitute support of a terrorist act by contending that (1) Sberbank could have discovered the relevant entities' purposes through further investigation, or (2) Sberbank breached a legal duty to accomplish such an investigation under the USA PATRIOT Act. These theories further misconstrue the nature of Sberbank's duties and Plaintiffs' obligation to allege plausible facts supporting a finding that Sberbank knew or intended to support a terrorist act. No U.S. legal authority suggests that providing conventional banking services in the ordinary course without conducting extensive investigation of the recipients of funds amounts to willful blindness or reckless indifference to a customer's purpose to support terrorist acts. Similarly, no authority supports Plaintiffs' claim that Sberbank is properly chargeable with holding criminal-level knowledge and intent to support a terrorist act in violation of the ATA to the extent it has not undertaken substantial, continuous investigations

---

[5]    Plaintiffs also allege Sberbank is directly majority-owned by the Russian Federation, AC ¶¶ 33, 361, and Sberbank's alleged actions to support DPR were part of the foreign policy of the Russian Federation, AC ¶ 362—apparently an attempt to assert Sberbank is an instrumentality of Russia. If these false allegations were true, dismissal would be mandated for lack of subject matter jurisdiction over Sberbank as an instrumentality of a foreign government engaged in acts not based on ordinary commercial activity, under 18 U.S.C. § 2337(2) and the Foreign Sovereign Immunities Act, specifically 28 U.S.C. § 1605(a)(2). *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 (1993).

of all of its customers' purposes to ensure they had no connection to terrorist acts. *See Kaplan*, 2019 WL 4869617, at *6 ("[F]ailure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities.") (citing *O'Sullivan*, 2019 WL 1409446, at *10).

The AC contains no allegations of "red flags" supporting an inference that any processing of transfers to alleged DPR Supporters—not identified by any U.S. authority as improperly supporting DPR, and at a time before even DPR was listed as an SDN—amounted to knowing or intentional support for terrorist acts. *See Hussein*, 230 F. Supp. 3d at 176-77. Red flags could include openly providing services to sanctioned individuals or entities, actual notice of government investigation of those entities, clearing large and suspicious transfers without apparent business purpose or "providing unusual services that are not part of the defendant's ordinary course of business." *Id.* at 176.

Lacking these indications, the AC seeks to charge Sberbank with knowledge or intent to support terrorist acts on the basis that it did not conduct sufficient internet searches or other investigations to learn the purposes of entities alleged to be DPR Supporters at a time before the MH17 crash. *See* AC ¶ 374. To sustainably plead such a claim for willful blindness or reckless indifference in the ATA context, Plaintiffs must show Defendants' "conscious[ness] of the risk of harm created by [defendant's] conduct while the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the [defendant's] failure to adopt the precaution a demonstration of the [defendant's] indifference to the risk." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 557 (E.D.N.Y. 2012) (Weinstein, J.) (citing Restatement (Third) of Torts § 2 (2010)). The AC fails to plead Sberbank was aware of the potential harm of processing transactions involving these entities. It also does not allege how

the purportedly required precaution of investigating customers to determine whether they were DPR Supporters would have posed any likelihood of preventing the MH17 crash.

The AC's allegation that Sberbank had a duty under the USA PATRIOT Act to conduct investigations of its customers to discover their alleged terrorist connections, AC ¶¶ 376-378, mischaracterizes that statute and related regulations. No provision of that Act places "know your customer" or diligence obligations on Sberbank as a foreign bank with a U.S. correspondent account. Rather, the Act places certain diligence obligations, not alleged to have been breached here, only on the U.S. financial institutions that maintain correspondent accounts for non-U.S. banks and as such are responsible for sending funds outside the U.S. *See* 31 U.S.C. § 5318(i)(1) ("[E]ach financial institution that… maintains… a correspondent account in the United States for a non-United States person… shall establish appropriate, specific, and where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts."); *see also* 31 C.F.R. § 1010.610(a) (same). Even for U.S. banks, the rules do not contemplate an obligation of investigation of customers not on the SDN List sufficient to discover whether ultimate recipients of funds are on the SDN List, engaged in terrorist acts or supporting terrorist acts. *See e.g.*, Federal Financial Institutions Examination Council, Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual 143 (Feb. 27, 2015) ("[T]he regulations that OFAC administers require banks to do the following: Block accounts and other property of *specified* countries, entities, and individuals. Prohibit or reject unlicensed trade and financial transactions with *specified* countries, entities, and individuals.") (emphasis added).[6]

---

[6] *See also* Dept. of the Treasury, OFAC, OFAC FAQs: Sanctions Compliance #116 (Jan. 15, 2015) (When the U.S. bank hosting a correspondent account "does not know or have reason to know the [ultimate recipient] entity's ownership or other information demonstrating the

The AC contains no allegation that any U.S. bank flagged or reported any transaction related to the AC as suspicious, or faced any criminal or civil liability for allowing any such transfer to take place. The AC's allegations of Sberbank's duty to investigate are legally unsupportable, and Plaintiffs have established no legal basis for imposing a higher duty to investigate transactions on a foreign bank than on its U.S. host.

**B.    The AC Does Not Allege That Sberbank Is Liable Under Section 2333**

Even if the AC plausibly alleged that Sberbank committed the requisite criminal predicate acts under §§ 2339A and 2339C, it does not and cannot allege that Sberbank's acts violated § 2333. Where a plaintiff's ATA claim is based on the a defendant's primary (rather than aiding and abetting) liability, "Plaintiffs must plausibly allege that Defendant's *own* actions '*also* involved violence or endangered human life' and that these actions 'appeared to be intended to intimidate or coerce a civilian population or to influence or affect a government.'" *Kaplan*, 2019 WL 4869617, at *4 (quoting *Linde*, 882 F.3d at 326). As banking services are not inherently dangerous to human life or intended to coerce, "the provision of financial services does not, in itself, equate to international terrorism." *Kaplan*, 2019 WL 4869617, at *4; *see also Linde*, 882 F.3d at 326 ("The provision of material support to a terrorist organization does not invariably equate to an act of international terrorism.").

Plaintiffs cannot show that Sberbank's alleged acts were "acts of international terrorism" as required by § 2333(a), which are "activities that involve violent acts or acts dangerous to human life." § 2331(1). To establish such an act, Plaintiffs are also required to allege that Sberbank intended to "intimidate or coerce a civilian population" or "influence the policy of a

---

blocked status of the entity's property… OFAC would not expect the bank to research the non-account parties listed in the wire transfer that do not appear on the SDN List and, accordingly, would not pursue an enforcement action against the bank for having processed such a transaction."), treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#116.

government by intimidation or coercion." *Id.* Plaintiffs do not allege any facts to support the inference that Sberbank's routine banking activities were intended to intimidate or coerce. *See Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *2-3 (E.D.N.Y. June 30, 2006) (dismissing ATA claims where banks issued letters of credit to companies that sold chemical weapon components to Iraq because allegations did not demonstrate that the banks' "actions [were] designed to coerce civilians or government entities"). While "providing financial services to a known terrorist organization may" violate a predicate statute for purposes of § 2331(1)(A), such support may still "not involve violence or endanger human life and [] not manifest the apparent intent required by § 2331(1)(B)." *Linde*, 882 F.3d at 326. Plaintiffs do not allege that Sberbank did anything more than provide ordinary banking services, which cannot sustain Plaintiffs' claims. Because Plaintiffs do not allege acts of international terrorism, "their primar[y] liability claim cannot survive a motion to dismiss." *Kaplan*, 2019 WL 4869617, at *4.

When "factual allegations delineating relationships between [] services and the terrorist attacks are so attenuated," a complaint cannot satisfy the ATA's requirement that, to establish primary liability, a defendant's own actions be inherently violent or dangerous and intended to coerce or intimidate. *O'Sullivan*, 2019 WL 1409446, at *8. The relationship between Sberbank's non-violent and mechanical provision of financial services to the alleged DPR Supporters and the downing of MH17 is similarly over-attenuated. *See Freeman*, 2019 WL 4452364, at *16 (contrasting support for an FTO proxy with support for "intervening actors… whose independent actions break [the] inferential chain."). The gap cannot be bridged simply by speculation—not pleaded in the AC—of a known or intended link between transfers of unspecified funds and ultimate DPR expenditures on the missile that downed MH17.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the AC as to Sberbank.

Dated: New York, New York
       November 5, 2019

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: */s/ John S. Kiernan*
     John S. Kiernan
     William H. Taft V
     Román J. Rodriguez
     jskiernan@debevoise.com
     whtaft@debevoise.com
     rjrodriguez@debevoise.com

     919 Third Avenue
     New York, New York 10022
     (212) 909-6000

     *Counsel for Sberbank of Russia*