UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and<br><br>CATHARINA TEUNISSEN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and<br><br>NERISSA SCHANSMAN, individually, as surviving Sibling of QUINN LUCAS SCHANSMAN,<br><br>        Plaintiffs,<br><br>      -against-<br><br>SBERBANK OF RUSSIA PJSC, THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., MONEYGRAM INTERNATIONAL, INC., MONEYGRAM PAYMENT SYSTEMS, INC., and VTB BANK PJSC,<br><br>        Defendants. | **SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil No. 19-cv-02985-ALC |

Plaintiffs Thomas Schansman, individually, as surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of minor plaintiff X.S.; Catharina Teunissen, individually, as surviving parent of, and as personal representative of the Estate of, Quinn Lucas Schansman; and Nerissa Schansman, individually, as surviving sibling of Quinn Lucas Schansman, by and through their attorneys, allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1.      On July 17, 2014, the Donetsk People's Republic ("DPR"), a terrorist group operating in eastern Ukraine, launched a surface-to-air missile from territory that it acquired and

controlled through brute force, intimidation, and violent acts. The DPR fired that missile at Malaysia Airlines Flight 17 ("MH17"), a civilian passenger plane traveling from Amsterdam to Kuala Lumpur, killing all 298 passengers on board, including 80 children, and murdering Quinn Lucas Schansman ("Quinn"), a young American.

2.        Quinn's family, the Plaintiffs in this action, bring this lawsuit to hold accountable those who provided material support and financing to the murderers of their son and brother.

3.        Defendants are corporate entities that provided ongoing and essential financial support to the DPR from around the world, including the United States, for the explicit purpose of purchasing tactical and lethal equipment that was necessary (1) for the DPR to acquire and maintain control over the territory from which it launched the missile that took down the MH17 passenger plane, and (2) to carry out its terrorist activities, including the missile attack on MH17.

4.        Defendants provided their services directly to prominent DPR leaders and DPR fundraisers who were unambiguous about their intent:  to arm and equip the DPR to carry out terrorist acts in service of undermining the Government of Ukraine, intimidating and coercing civilians, increasing the Russian Federation's control over territory in eastern Ukraine, and ultimately advancing a political and ideological agenda to reestablish the "Russian Empire" through the creation of "Novorossiya" (New Russia).[1]

---

[1] Novorossiya (or "Novorossia") refers both to an aspirational geographical territory (akin to the Islamic State's ("ISIS") aspirational "Caliphate") as well as a violent extremist political movement.  The term is today associated with an effort to create a pro-Russia confederated state through the forceful acquisition of power and control in eastern Ukraine and re-establish a Russian Empire in the area north of the Black Sea in what is now much of southern and eastern Ukraine.

5.      As with any terrorist group, the DPR is comprised of and funded by individuals and entities who sponsor and use violence, intimidation, and coercion to achieve political ends (in this case, the creation of so-called "Novorossiya").   At all relevant times, in the months leading up to the attack on MH17, some of the most prominent leaders of the DPR were Igor Strelkov, the "commander-in-chief" of the DPR; Pavel Gubarev, the "governor" of the DPR; and Ekaterina Gubareva, the "foreign minister" of the DPR.

6.      At all relevant times, in the months leading up to the attack on MH17, some of the DPR's most prominent fundraisers were Alexander Zhuchkovsky, Boris Rozhin (also known as "Colonel Cassad"), and Alexey Markov (also known as "RedRat").

7.      The DPR's leadership worked closely with these and other DPR members to raise funds for the DPR's terrorist activities through a group of coordinated DPR entities, including Center for New Russia, Humanitarian Battalion, Veche, Rospisatel, Essence of Time, Save Donbass, ICORPUS, The Voice of Sevastopol, Sputnik & Pogrom, World Crisis, Women's Battalion of People's Militia Donbass, and People's Militia of New Russia (together, the "DPR's fundraisers").  The DPR's fundraisers were essential both for the DPR to fund its terrorist activities and obfuscate its sources and methods.

8.      Collectively, the DPR's leaders, members, entities, financial supporters, and fundraisers constitute the DPR.

9.      Defendants provided banking and money transfer services for the DPR while the world's governments and media were intently focused on the DPR's horrific and systematic abuses perpetrated in the name of advancing its vision of Novorossiya.  In the months leading up to the MH17 attack, the DPR's occupation of eastern Ukraine and its killing and torture of civilians constituted perhaps the most significant international news event in the world.  It was the subject

of nearly constant commentary by highly visible officials including the President of the United States, the Prime Minister of the United Kingdom, the President of France, the Chancellor of Germany, and nearly every major media outlet in the world.

10.     The DPR's campaign of terror fundamentally changed the regional order and constituted a major challenge to international security.  Despite this sea change in circumstances for governments around the world and civilians in the region, Defendants Sberbank of Russia, Western Union, MoneyGram, and VTB Bank continued to go about their activities, even when it was clear that they were actively providing critical financial resources to a terrorist group (the DPR) for the explicit purpose of buying lethal equipment—equipment that was ultimately used to carry out the attack that killed Quinn.

11.     Plaintiffs are the parents and siblings of Quinn, a United States citizen, who was killed when he was just eighteen years old as he was traveling aboard MH17 to meet his parents for a family vacation.  Quinn's parents, Thomas and Catharina, both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the senseless murder of their son. Quinn's siblings, Nerissa and X.S., both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the murder of their brother.

12.     Defendants are companies that knew, or exhibited deliberate indifference to the fact, that they provided material support to the DPR—a group that openly engaged in terrorist activity and was condemned by governments around the world—and that the support they provided to the DPR would be used to finance the DPR's terrorist actions.

13.     The support Defendants provided to the DPR allowed the DPR to acquire lethal equipment, which was used to commit violent acts that endangered human life and appeared

intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

14.     Defendants' provision of material support to the DPR was a substantial factor in the DPR's ability to launch a missile from territory it controlled—an attack that killed Quinn and 297 other innocent victims.

15.     By this lawsuit, Plaintiffs challenge Defendants' actions under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA"), which Congress enacted in 1992 in response to the terrorist hijacking of the cruise ship Achille Lauro as well as the bombing of Pan Am Flight 103 over Lockerbie, Scotland in 1988.

16.     In adopting the ATA, Congress recognized that "reluctant courts and . . . jurisdictional hurdles" had often stymied the ability of victims of international terrorism to obtain redress for their injuries.  (136 Cong. Rec. S4568-01 (1990).)

17.     According to the ATA's legislative history, "By its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism," the Act was intended to "interrupt, or at least imperil, the flow of money" to groups engaged in acts of international terrorism that injure American citizens.  (S. Rep. No. 102-342, at 22 (1992).)

18.     As stated by Senator Charles Grassley, Congress enacted the ATA to strike at "the resource that keeps [international terrorists] in business – their money."  (138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley).)

19.     As recently as January 2019, Senator Grassley explained, "The ATA gives U.S. victims of international terrorism their day in court against those who carry out or support terrorism. It provides some semblance of justice and compensation for Americans whose lives have been

forever impacted by terrorism.  Equally important, the ATA sends an unambiguous message to deter international terrorism—those who support terrorism will face the full force of the U.S. justice system."[2]

20.     Defendants are companies that deliberately ignored what the rest of the world, including the President of the United States, was deeply intent on addressing.

21.     The ATA does not permit companies such as Defendants to hide behind invocations of neutrality in their provision of banking and money transfer services in an effort to abdicate responsibility for their role in causing acts of terror.

22.     The aim of this lawsuit is to ensure that, as Congress intended, the companies whose conduct resulted in the death of an innocent American at the hands of terrorists are held responsible for their actions.

## JURISDICTION AND VENUE

23.     This is a civil action under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*.

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2333(a) as a civil action brought by the estate, survivors, or heirs of a United States citizen injured by reason of an act of international terrorism.

25.     Venue is also proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 18 U.S.C. § 2334(a) because Defendants conduct significant business operations in the State of New York and within the Southern District of New York, are subject to the personal jurisdiction

---

[2] Chuck Grassley, United States Senator for Iowa, "Grassley to Trump: State Dept. Should Put American Victims of Terrorism ahead of PLO," *available at* https://www.grassley.senate.gov/news/news-releases/grassley-trump-state-dept-should-put-american-victims-terrorism-ahead-plo

of the courts in the Southern District of New York, and/or have agents within the Southern District of New York.

26.     Defendant The Western Union Company maintains a corporate office in Manhattan, New York. Defendants The Western Union Company, Western Union Financial Services, Inc., MoneyGram International, Inc., and MoneyGram Payment Systems, Inc. maintain numerous agent locations that provide global money transfer services within the Southern District of New York.

27.     Defendants Sberbank of Russia PJSC ("Sberbank") and VTB Bank PJSC ("VTB Bank") maintain offices through their subsidiaries in Manhattan, New York.  At all relevant times, Defendants Sberbank and VTB Bank deliberately and repeatedly routed U.S. dollar-denominated transactions, including transactions to or on behalf of the DPR, through correspondent bank accounts located in Manhattan, New York.

## THE PARTIES

28.     Plaintiff Thomas Schansman is Quinn's father.  His son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  He is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.  He brings this action on behalf of himself, as a surviving parent of his son, Quinn, a United States citizen.

29.     Plaintiff Catharina Teunissen is Quinn's mother.  Her son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as a surviving parent of, and as personal representative of the estate of, her son, Quinn, a United States citizen.

30.　　　Plaintiff Nerissa Schansman is Quinn's sister.  Her brother was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as the surviving sibling of her brother, Quinn, a United States citizen.

31.　　　Plaintiff Thomas Schansman is also a plaintiff on behalf of his minor child, X.S, Quinn's half-brother.  X.S. is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.

## The Russian State-Owned Bank Defendants

32.　　　At all relevant times, the Government of the Russian Federation, led by President Vladimir Putin, had an official policy of supporting the Novorossiya movement, including the terrorist activities of the DPR.

33.　　　Defendant Sberbank is a Russian state-owned banking institution.  It has offices and branches worldwide.

34.　　　At all relevant times, Sberbank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations.

35.　　　Sberbank operates in the United States and New York through its subsidiary Sberbank CIB USA Inc. ("Sberbank CIB"), which is located at 152 W. 57th Street, 46th Floor, New York, New York 10019.

36.　　　Sberbank advertises itself as an international "Group" covering 20 countries with more than 11 million customers outside of Russia, and lists its New York office as a means of contacting the Sberbank Group.

37.      Sberbank also offers American depositary receipts that trade on U.S. over-the-counter markets.  In an April 2018 interview with the *Financial Times*, Herman Gref, the Chairman of Sberbank's executive board, boasted that at least 25 percent of Sberbank's shareholders are located in the United States, claiming that its American ownership was so substantial that "[w]e don't need lobbyists.  Our American shareholders do that for us."[3]  This makes Americans the single largest group of Sberbank shareholders other than the Government of the Russian Federation, which owns 51% of the bank.

38.      In recent years, according to public reports, Sberbank spent hundreds of thousands of dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to address sanctions relief."

39.      Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having done so as recently as 2014.

40.      Defendant VTB Bank is a Russian state-owned banking institution.  It has offices and branches worldwide.  VTB Bank operates a retail bank under the name VTB24.

41.      At all relevant times, VTB Bank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was critical to VTB Bank's combined corporate structure and operations.

42.      Until in or about August of 2018, VTB Bank operated in the United States and New York through its subsidiary VTB Capital, located at 452 Fifth Avenue, 23rd Floor, New York, NY 10018.  In or about August 2018, VTB Capital was sold to its management and renamed

---

[3] Financial Times, "Impact of US Sanctions Threatens to Derail Sberbank Recovery," *available at* https://www.ft.com/content/bee9fb08-3d4f-11e8-b7e0-52972418fec4

Xtellus Capital Partners, although it continues to operate out of the same offices and provide the exact same services for VTB Bank.

43.     In September 2018, VTB Bank stated that it had signed an agreement with Xtellus Capital Partners for Xtellus Capital Partners to serve as "a US chaperoning broker for the VTB Group" in order to allow VTB Bank to "continue working with our Russian and international clients" and ensure that "[t]here will be no change to VTB product offering or level of client service on equity and fixed income markets" as a result of the change.

44.     VTB Bank purposefully avails itself of the courts of New York to resolve its disputes, having done so as recently as 2017.

45.     At all relevant times, Defendants Sberbank and VTB Bank provided banking and money transfer services that allow individuals to send and/or receive money via wire transfers, including wire transfers sent from or through the United States, either to specified accounts at Sberbank or VTB Bank or cards issued by Sberbank or VTB Bank.

46.     The cards issued by Defendants Sberbank and VTB Bank, sometimes known as payment cards or bank cards, allow for the transfer of funds from one card to another or from funds in a bank account to a card.  Defendants' banking services therefore allow individuals to provide funds, typically through an online process, to another individual's card issued by Sberbank or VTB Bank.

47.     Defendants Sberbank and VTB Bank profit by charging fees for certain banking services, as well as a percentage fee for international money transfers.  They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

48.      Sberbank and VTB Bank each maintain correspondent bank accounts in this district in order to deliberately and repeatedly effectuate the transfer of funds in United States dollars:

a)      Sberbank has maintained correspondent bank accounts in New York City with JPMorgan Chase Bank, Citibank N.A., Bank of America, The Bank of New York Mellon, and Deutsche Bank Trust Company Americas;

b)      VTB Bank has maintained correspondent bank accounts with JPMorgan Chase Bank, Bank of America, and Citibank, N.A., among other banks in New York City.

49.      In January 2014, Sberbank's website stated that its "Main correspondent bank for client payments in US dollars" was Deutsche Bank Trust Company Americas in "New York, NY" and that its "Principal correspondent bank for client payments and treasury operations in US dollars" was The Bank of New York Mellon in "New York, NY."

50.      On June 6, 2013, Sberbank announced that Deutsche Bank presented the "2012 USD STP Excellence Award" to Sberbank "for excellence in formatting payments routed through Sberbank's Nostro correspondent accounts with Deutsche Bank Trust Company Americas (USA)," which is located at 60 Wall St., New York, New York.[4]

51.      On its website, Sberbank continues to promote the "advantages" of its "correspondent banking relations . . . for the performance of conversions with many leading world banks," which "enable Sberbank of Russia to offer its clients the best price conditions on the money market."  Its website further advertises that "Sberbank of Russia makes conversions with more than 20 currencies," including "US dollar (USD)."

---

[4] A nostro correspondent account is an account that one bank holds in a foreign currency in another bank.

52.       Sberbank also advertises partnerships, discounts, and promotions on its website through its partnerships with several U.S. credit and consumer companies.

53.       Like Sberbank, VTB Bank advertises on its website that it "offers settlement and cash services" including "[o]pening and maintaining loro correspondent accounts in all international key currencies, Russian roubles, currencies of the CIS and Baltic states and clearing currencies."[5]

54.       VTB Bank further advertises on its website that it "organises partner banks' access to international card payment networks as a sponsor bank."  The listed benefits of this program include "transaction services in three currencies: Russian roubles, US dollars and euros" and "full reimbursement of interbank fees set by payment processing systems." To execute these advertised U.S. dollar services, VTB Bank routinely and systematically relies on its U.S. correspondent accounts located in this district.

55.       VTB Bank advertises on its website that it facilitates "cashless foreign exchange transactions" from "USD to RUB" daily.  To execute these advertised U.S. dollar services, VTB Bank systematically relies on its U.S. correspondent accounts located in this district.

56.       Sberbank and VTB Bank's United States correspondent bank accounts have been prominently advertised by the fundraising arm of the DPR as channels for providing direct funding to the DPR using foreign currencies, such as United States dollars.

57.       For example, with respect to VTB, in the months leading up to the attack on MH17, one webpage that solicited funds for the DPR[6] included instructions that "[m]oney

---

[5] A loro correspondent account is an account held on behalf of a foreign credit institution. Payments through correspondents are executed through reciprocal nostro and loro accounts.

[6] Veche, "Fundraising for the National Squads of Sevastopol," *available at* https://web.archive.org/web/20140307193454/http://veche-

transfer[s], carried out in any currency, other than the account [currency], will be converted into the currency of the VTB 24 (JSC) [on] the date of transfer."[7]   Another webpage soliciting funds for the DPR stated in June 2014 that "For transfers in USD [United States dollars]," funds need to be sent through a VTB correspondent account in New York.[8]

58.     Similarly, in the months leading up to the attack on MH17, another website soliciting funds for the DPR provided instructions on how send transfers in "US dollars" to an account at Sberbank by utilizing Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City, or Sberbank's correspondent account at The Bank of New York Mellon in New York City.[9]

59.     The DPR fundraisers that solicited funds utilizing Sberbank and VTB Bank's correspondent accounts in New York boasted about raising substantial sums of money, and documented how they used that money to procure lethal and tactical equipment for the DPR.  *See* Paragraphs 177-332, *infra*.  Many of these fundraisers continue to rely on the services provided by Sberbank and VTB to raise funds for the DPR's terrorist activities.

60.     Sberbank and VTB Bank's correspondent accounts in New York were repeatedly and intentionally used to send financial support to the DPR for the explicit purposes of

---

info.ru/index.php?option=com_content&view=article&id=973:2014-02-25-21-11-35&catid=1:latest-news&Itemid=1

[7] Throughout this Complaint, documents and source material originally written in Russian have been translated to English for ease of comprehension.  Unless otherwise indicated, website URLs listed herein were active in the months prior to the DPR's terrorist attack on MH17.  Plaintiffs possess screenshots of relevant content from the websites cited herein.

[8] Coordination Center for New Russia, "Requisites" as of June 23, 2014, *available at* https://web.archive.org/web/20140623133432/http://kcpn.info/help

[9] VK, "People's Militia of New Russia – News," *available at* https://vk.com/wall-70618940_781

carrying out violent and lethal activities intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

61.     For example, the DPR, by and through the Coordination Center for New Russia ("Center for New Russia"), reported that between June 23 and July 27, 2014—which encompasses the time during which the DPR planned and executed the attack on MH17—the DPR received "1,673.55" in "transfers in dollars" into its account with Defendant VTB Bank.[10]  At that time, Center for New Russia consistently advertised the account number of Defendant VTB Bank's correspondent bank in New York City, Deutsche Bank Trust Company Americas, as the appropriate channel through which to send "transfers in dollars."[11]

62.     The DPR's fundraisers published many webpages featuring the same wire transfer instructions for over five years, from 2014 through the present.  Thus, despite years of open and notorious advertising, Sberbank and VTB Bank knowingly permitted the DPR to continue fundraising through these accounts.

### The United States-Based Companies Financing Terrorism

63.     Defendant The Western Union Company is a corporation incorporated under the laws of Delaware with its principal place of business in Colorado.  The Western Union Company operates in this district through a corporate office located at 505 Fifth Avenue, New York, New York 10017.  Defendant Western Union Financial Services, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Colorado.  Western Union Financial Services Inc. has a registered agent for service of process in the Southern District

---

[10] Coordination Center for New Russia, "Report for June 23 – July 27," *available at* https://web.archive.org/web/20140930012248/http://kcpn.info/node/55

[11] Coordination Center for New Russia, "Requisites" as of June 23, 2014, *available at* https://web.archive.org/web/20140623133432/http://kcpn.info/help

of New York.   The Western Union Company, operating directly and through its subsidiary, Western Union Financial Services, Inc. (together, "Western Union"), is a global provider of money transfer services.   Western Union maintains hundreds of agent locations within the Southern District of New York that facilitate global money transfers.

64.      Defendant MoneyGram International, Inc., is a corporation incorporated under the laws of Delaware with its principal place of business in Texas.   Defendant MoneyGram Payment Systems, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Minnesota.   MoneyGram Payment Systems, Inc. has a registered agent for service of process in the Southern District of New York.   MoneyGram International, Inc., operating directly and through its subsidiary, MoneyGram Payment Systems, Inc. (together, "MoneyGram"), is a global provider of money transfer services.   MoneyGram maintains dozens of agent locations within this district that facilitate global money transfers.

65.      At all relevant times, Defendants Western Union and MoneyGram provided money transfer services that allow identified individuals to send money to other identified individuals (here, the publicly identified DPR fundraisers) anywhere in the world either online or through in-person payment at a Western Union or MoneyGram agent location.   The sender provides the funds either in cash or via payment from their bank account, debit card, or credit card. The recipient of the money transfer either receives the money directly to his or her bank account or can retrieve the money in person at any Western Union or MoneyGram agent location around the globe.

66.      Defendants Western Union and MoneyGram profit by charging a fee based on the money transfer amount and the recipient's location.   They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

67.     Western Union and MoneyGram repeatedly provided financial support to the DPR for the explicit purposes of carrying out violent and lethal activities intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.  From 2014 through the present, the DPR widely advertised instructions on how to transfer funds to the DPR using Western Union and MoneyGram.  Thus, despite years of open and notorious advertising, Western Union and MoneyGram knowingly permitted the DPR to continue fundraising for their violent acts through their money transfer services.

68.     Each Defendant's business model requires their knowing the identity of their account holders and/or the sender and recipient for each transaction they process.  As such, Defendants knowingly allowed supporters of the DPR to send and transfer money to the DPR.  The DPR, by and through its fundraisers, advertised (in many cases for years) that the money would be used to purchase tactical and lethal equipment to support the DPR's efforts to intimidate or coerce civilians, the Ukrainian government, and other governments seeking to contain Russian aggression, through violent acts or acts dangerous to human life.

69.     Defendants provided these services despite their knowledge that the DPR engaged in terrorist activity and that the material support and financing Defendants provided to the DPR would be used in the commission of terrorist acts.

## FACTUAL ALLEGATIONS

**I.     The Murder of Quinn Lucas Schansman**

70.     Quinn Lucas Schansman was born on November 30, 1995 in New York City. Quinn had dual citizenship in both the United States and the Netherlands.



71.     At the time of his death, Quinn was an eighteen-year-old college student at the Amsterdam School of International Business. Quinn was also a minor league soccer player who played with the team Olympia '25 in the Netherlands.

72.     Quinn was a proud American citizen.  Quinn saw and planned his future in the United States, which was one of the primary reasons he conducted his college studies in English.

73.     On July 17, 2014, Quinn boarded an airplane from Amsterdam to Kuala Lumpur to join his family on vacation in Surabaya, Indonesia.   Quinn's grandfather and

grandmother were born in Indonesia, a former Dutch colony, and his family had planned a vacation there to learn about their Indonesian roots.

74.     Quinn's plane left Amsterdam's Schiphol Airport at 10:31 GMT on July 17, 2014 and was due to arrive at Kuala Lumpur International Airport at 22:10 GMT.

75.     As Quinn and the other 297 passengers (including 15 crew members) on board flew over eastern Ukraine, their plane was shot down by a surface-to-air missile launched from territory controlled by the DPR through brute force, intimidation, and violence.  The missile caused the plane to break up in mid-air, killing all 298 passengers, including Quinn and 80 children.

76.     The missile exploded to the left of the cockpit and caused the plane to break up in stages.  The forward section of the plane was penetrated by hundreds of high-velocity fragments from the warhead, killing the three crew members in the cockpit immediately.  The cockpit then broke away, but the plane continued its flight.  A short while later, the wingtips came off and the rear of the plane broke away, with the tail section then separating further.  The main body of the plane then crashed into the ground upside down.  Investigators believe that it was between 60 and 90 seconds after the cockpit broke away that the rest of the aircraft hit the ground.

77.     Roughly 35 minutes after the plane crashed to the ground, the self-described "Commander-in-Chief" of the DPR, Igor Ivanovich Strelkov, also known as Igor Girkin, posted online:  "In the vicinity of Torez, we just downed a plane . . . . We have video confirming."[12]

---

[12] Radio Free Europe, "Ukraine Separatist Social Media Site Claims Plane Downing," *available at* https://www.rferl.org/a/ukraine-separatist-leader-boasts-downing-plane/25460930.html

78.     Earlier on July 17th, before the attack on MH17, Strelkov posted a message and photograph on Twitter (copied below) showing that the DPR possessed a surface-to-air missile in Snezhnoye in eastern Ukraine, only a few miles from the MH17 crash site.[13]



79.     In late June 2014, the Russian news agency *Tass* reported that the DPR "have taken control over a missile defense army unit equipped with Buk missile defense systems."  In taking control of territory, government buildings, and weapons, the DPR relied on tactical and lethal equipment, including those provided using the material support and financing of Defendants.

80.     Immediately after the attack, the DPR blocked recovery workers from the crash site, removing or destroying evidence before it could be examined by international forensic

---

[13] Twitter, "IgorGirkin," *available at*
https://twitter.com/GirkinGirkin/status/489884062577094656

inspectors.  Armed members of the DPR forced Ukrainian emergency workers, at gunpoint, to hand over bodies that they had pulled from the rubble of the plane.

81.     After blowing up the civilian airliner, the DPR leadership sought to profit.  Igor Strelkov reportedly issued an order demanding that jewelry, watches, and other valuables be taken from the victims' bodies and turned over to the DPR.

82.     As Malaysian and Dutch officials pleaded to be allowed to recover their dead nationals, the victims' bodies lay uncovered in a field—still controlled by the DPR—and had begun to decompose in the summer heat.

83.     It took several days before the DPR allowed investigators to examine the bodies and begin the recovery process, further exacerbating the grief of the victims' families, including Plaintiffs.

84.     On July 22, 2014, following a unanimous vote of the United Nations Security Council to demand immediate international access to the crash site, the DPR finally allowed international investigators access to the crash site and to the flight data recorders that had been taken from the downed plane.

85.     Plaintiffs Thomas Schansman, Catharina Teunissen, minor child X.S., and Nerissa Schansman, suffered and continue to suffer severe physical and mental anguish and extreme emotional distress from the terrorist attack that killed their son and brother, Quinn, and the horrific looting and treatment of his corpse.

86.     Among other harms, in the days and weeks after Quinn's murder, Plaintiffs were uncertain whether Quinn's body would ever be returned to them.  As a result, Plaintiffs were forced to plan and participate in a funeral service without Quinn's body, instead burying a

photograph of Quinn.  Quinn's remains were finally returned to Plaintiffs a month after his death, at which point Plaintiffs planned and held a second funeral for Quinn.

87.     Plaintiffs each endured extraordinary emotional distress and anguish in the aftermath of Quinn's murder, and Quinn's siblings continue to struggle with feelings of intense anxiety when they or their parents travel by plane.

**II.     The DPR's Violent Campaign of Intimidation and Coercion Against Civilians, the Ukrainian Government, and Other Governments Seeking to Contain Russian Aggression**

88.     Like other terrorist groups, such as the Islamic State ("ISIS"), the DPR and its affiliates seek to advance an ideological agenda of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine acquired through acts of intimidation and coercion.

89.     Since the dissolution of the Soviet Union in 1991, there have been periodic attempts by ideological extremists to recreate Novorossiya as a separate state, often buoyed by support from former Soviet and current Russian officials.  In 2005, Russian President Vladimir Putin famously described the breakup of the Soviet Union as the "greatest geopolitical catastrophe of the 20th century."

90.     The Novorossiya movement failed to gain much traction until a popular protest movement managed to unseat then-Ukrainian President Viktor Yanukovych, causing Russia to seek to expand its influence in Ukraine.

91.     In February 2014, pro-Russian Novorossiya-inspired demonstrations began in the Ukrainian region of Crimea.  On or about March 16, 2014, Russia purportedly annexed Crimea.

92.      In March 2014, demonstrations by pro-Russian and anti-Ukrainian government groups spread to the Donetsk and Luhansk regions in eastern Ukraine.  Together, those regions are commonly referred to as the "Donbass."

93.      As early as March 3, 2014, Novorossiya-aligned terrorists occupied the Donetsk regional legislative building.  The terrorists were led by Pavel Gubarev, the founder of the so-called "People's Militia of Donbass," who demanded that he be made the head of Donetsk's regional government.  Gubarev soon thereafter proclaimed himself the "governor" of the DPR.

94.      In announcing sanctions on Pavel Gubarev in 2014, the United States Treasury Department explained that "Gubarev has been described as one of the three most prominent leaders of the separatists in southeast Ukraine," and noted that he "is responsible for or complicit in, or has engaged in, actions or polices [*sic*] that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and is a leader of an entity that has, or whose members have, engaged in actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine."[14]

95.      Roughly contemporaneous with the inception of the DPR, pro-Russia armed terrorists in the Luhansk region declared the creation of the Luhansk People's Republic ("LPR").

96.      The DPR and the LPR, along with other similar groups, formed a cartel that terrorized—and continues to terrorize—civilians to advance the violent agenda of the Novorossiya political movement.  The DPR and its affiliated groups are dedicated to using violent means to achieve their goal of rebuilding the Russian Empire.

---

[14] U.S. Department of the Treasury, "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities," *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx

97.     The DPR has publicly decried countries seeking to contain Russian aggression, including the member states of the North Atlantic Treaty Organization ("NATO")—and in particular the United States—as its enemies.

98.     The DPR leader Igor Strelkov (Girkin) has himself described the work of the DPR as carrying out violent acts intended to affect government policy and intimidate civilians around the world, including in a post online titled, "The manifesto of the public movement 'Novorossiya' Igor Strelkov."

99.     In this "manifesto," Strelkov wrote that "we are fighting for the preservation of the Russian World, for the revival of Great, United Russia," and that "[a]s part of the Movement, we organize actions in support of the fighting New Russia in various regions of Russia and beyond."  Strelkov further wrote that this political movement was fighting against a "foreign policy enemy - NATO, led by the United States."[15]

100.     From its inception, the DPR and its affiliates, including the LPR and other groups, have exhibited a pattern and practice of attacking and intimidating civilians.  The DPR engaged (and continues to engage) in violent acts of intimidation against the civilian population and operated (and continues to operate) with no regard for civilian life, often murdering and torturing civilians.

101.     On June 12, 2018, Ukraine submitted a "Memorial" to the International Court of Justice ("ICJ") (hereinafter, "Government of Ukraine's Brief") regarding violations of the International Convention for the Suppression of the Financing of Terrorism, a treaty ratified by

---

[15] Forum Novorossia, "The Manifesto of the Public Movement 'Novorossiya' Igor Strelkov," *available at* http://forum-novorossia.ru/index.php/topic/87-manifest-obschestvennogo-dvizheniia-%C2%ABnovorossiia%C2%BB/

the United States in 2002.[16]  As Ukraine explained:  "From their earliest days, the DPR and the LPR committed acts of violence and intimidation targeted at civilians in furtherance of their political objectives and their attempt to consolidate control over areas of Ukrainian territory. Terrorist acts form a key element of their *modus operandi*."  (Government of Ukraine's Brief ¶ 42.)

102.     For example, on April 17, 2014 the DPR abducted, tortured, and murdered Volodymyr Rybak, a town councilor from Horlivka, after he attempted to raise the Ukrainian flag outside of town hall.  Igor Bezler, a high ranking DPR "commander," ordered the abduction, and Igor Strelkov ordered the disposal of the body.  Mr. Rybak's body was eventually found by a river, alongside the body of Yuriy Propavko, a 19-year-old student and activist from Kyiv.[17]

103.     The DPR's reign of terror immediately became a prominent international crisis. In the months that followed, international monitors and human rights organizations attributed thousands of civilian deaths and injuries as well as widespread human rights abuses to the DPR and its affiliated groups.

**III.   Prior to the DPR's Terrorist Attack on MH17, Defendants Knew About the DPR's Terrorist Activities**

    A.     <u>Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by the International Media</u>

104.     Since 2014, the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians.  The terrorist acts perpetrated by the DPR and its affiliates were widely reported on and discussed by nearly every government in the world, as well as by international media, multilateral entities, and human rights organizations.  The DPR's pattern and practice of

---

[16] International Court of Justice, "Government of Ukraine's Brief," *available at* https://www.icj-cij.org/files/case-related/166/166-20180612-WRI-01-00-EN.pdf

[17] The Daily Beast, "'In Cold Blood' in Ukraine," *available at* https://www.thedailybeast.com/in-cold-blood-in-ukraine

carrying out terrorist attacks on civilians were therefore notorious and well-known to Defendants and the general public.

105.     On March 3, 2014, months before the attack that killed Quinn, the *New York Times* reported on Pavel Gubarev's role as a terrorist leader in the Donbass.  A couple of months later, on May 8, 2014, the *Washington Post* published an article profiling some of the leadership of the DPR.  Among those profiled were Gubarev, described as the self-declared "people's governor" of the DPR, and his wife, Ekaterina Gubareva, described as the "foreign minister of the Donetsk People's Republic."[18]  At all relevant times, this information was available to Defendants and the public at large.

106.     A May 14, 2014 article in *The Independent* titled, "Ukraine crisis:  Kidnappings abound as the Donbass falls further into anarchy," reported on a series of civilian abductions perpetrated by the DPR and its affiliates in the Donbass, including dozens of political prisoners kept in terrorist strongholds and used as media propaganda.  The May 14, 2014 article includes references to, and pictures of, the DPR possessing tactical and lethal equipment, including masks, "combat uniforms," and "Kalashnikov [rifles]."  These are among the types of equipment that the DPR expressly solicited funds to purchase with Defendants' material support.

107.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with the Defendants' material support was being utilized to purchase lethal equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

---

[18] Washington Post, "Meet the Nobodies Who Said No to Putin," *available at* https://www.washingtonpost.com/news/worldviews/wp/2014/05/08/meet-the-nobodies-who-said-no-to-putin/

108.     A June 18, 2014 article in *The Telegraph* titled, "Beaten and threatened: the 'Donetsk People's Republic turns on city's priest," reported that the DPR was persecuting clergy members who did not follow the Russian Orthodox Church.  The article recounted how one priest was interrogated and repeatedly assaulted "with clubs and whips."  The DPR also "threatened to break the priest's fingers with a hammer."  Another priest was "kidnapped in broad daylight" and interrogated, after which he fled Ukraine.  The June 18, 2014 article includes references to, and pictures of, the DPR possessing the types of equipment—including combat uniforms, guns, and rifle scopes—which the DPR solicited funds to purchase with Defendants' material support.

109.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase lethal equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

110.     A June 29, 2014 article in *Al-Jazeera America* titled, "The Donbass Battalion prepares to save Ukraine from separatists," reported that the DPR's "tactics have included hostage taking, storming and barricading buildings, and using civilians, such as international observers from the Organization for Security and Cooperation in Europe, as human shields."  The June 29, 2014 article includes references to the DPR possessing the types of equipment, including Kalashnikov rifles, which the DPR solicited funds to purchase with Defendants' material support.

111.     At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase tactical and lethal equipment that the DPR used to commit violent acts, such as using  civilians as "human shields."

112.　　　A July 10, 2014 article in *The New York Times* titled, "Shadowy Rebel Wields Iron Fist in Ukraine Fight," profiled the DPR leader Igor Strelkov, explaining that he "consolidated control" over the DPR "by imposing a system of dark and ruthless justice."  At all relevant times, this information was available to Defendants and the public at large.

B.　　　Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by Governments and Intergovernmental Organizations

113.　　　The human rights abuses and terrorist acts perpetrated by the DPR were also widely reported on by governmental entities and intergovernmental organizations.  At all relevant times, this information was available to Defendants and the public at large.

114.　　　On March 21, 2014, the Organization for Security and Co-operation in Europe ("OSCE") deployed a Special Monitoring Mission to Ukraine following a request from Ukraine and a consensus decision by all 57 participating OSCE countries.  The OSCE is the largest regional security organization in the world and is comprised of 57 participating countries from Europe, Central Asia, and North America, including the United States.

115.　　　The reports of the OSCE monitors in Ukraine were and are widely disseminated and publicly available on its website at www.osce.org, including daily reports on the situation and condition in most major Ukrainian cities in three languages (English, Ukrainian, and Russian).  At all relevant times, this information was available to Defendants and the public at large and regularly reported in international media.  The OSCE reports include, among other things, detailed reports of the terrorist activities carried out by the DPR and its affiliates.

116.　　　In March 2014, the Office of the United Nations High Commissioner for Human Rights deployed a Human Rights Monitoring Mission (the "United Nations" or "UN") to evaluate and report on the human rights situation in Ukraine and to provide support to the Ukrainian Government in the promotion and protection of human rights.

117.     As part of its work, the UN prepared (and continues to prepare) monthly reports describing the human rights situation in Ukraine.  These reports were and are widely disseminated and publicly available on the United Nations in Ukraine website at www.un.org.ua and the website of the Office of the United Nations High Commissioner for Human Rights at www.ohchr.org in English, Ukrainian, and Russian.

118.     Eight human rights monitoring reports were released by the UN in 2014, beginning in April 2014.  At all relevant times, this information was available to Defendants and the general public.  They also featured prominently in open meetings of the United Nations Security Council and garnered regular and extensive media attention across the globe.

119.     The UN reported that the DPR and its affiliates operated with impunity, terrorizing the civilian population in areas under their control, pursuing killings, abductions, torture, ill-treatment, and other serious human rights abuses, including the destruction of housing and seizure of property.

120.     In a report issued on May 15, 2014, the UN detailed specific instances of terrorist activity in the Donbass, including an April 28, 2014 attack by the DPR on participants of a peaceful rally, which led to "dozens wounded, and five participants of the rally (reportedly students) [being] abducted."  At all relevant times, this information was available to Defendants and the public at large.

121.     In a report issued on June 15, 2014, the UN stated that, in the spring of 2014, the DPR and its affiliates had committed "an increasing number of acts of intimidation and violence . . ., targeting 'ordinary' people who support Ukrainian unity or who openly oppose" the so-called "people's republics."  At all relevant times, this information was available to Defendants and the public at large.

122.     In a July 4, 2014 press briefing, the UN High Commissioner for Human Rights, Navi Pillay, noted a "disturb[ing] . . . message on the website of one leader of the self-proclaimed 'Donetsk People's Republic', which state[d] that underage children and women are legitimate targets and that the goal is to 'immerse them in horror.'"  (Government of Ukraine's Brief ¶ 48.) At all relevant times, this information was available to Defendants and the public at large.

123.     In a report issued on July 15, 2014, two days before the attack on MH17, the UN stated that "[e]gregious human rights abuses have been committed in the Donetsk and Luhansk regions," controlled by the DPR and the LPR, including "hundreds of abductions with many victims tortured.  Increasing numbers of civilians have been killed."  At all relevant times, this information was available to Defendants and the public at large.

124.     According to the Ukraine 2014 Human Rights Report issued by the U.S. Department of State, the DPR and its affiliates had "launched violent attacks to establish their authority against the Ukrainian government," and "engaged in unlawful killings, abductions, physical abuse, torture, and unlawful detention" aimed at the civilian population in the Donbass. At all relevant times, this information was available to Defendants and the public at large.

125.     Additionally, the nongovernmental organization Human Rights Watch issued periodic reports in 2014 of attacks on civilians committed in the Donbass region by the DPR and its affiliates.  These reports were widely disseminated and available to Defendants and the general public.

126.     A May 23, 2014 news article on the Human Rights Watch website detailed a series of terrorist attacks perpetrated by the DPR and its affiliates to intimidate and coerce the civilian population.  The article described one instance on May 8, 2014 where DPR forces "broke into the home of a pro-Ukraine activist and terrorized and beat him and his father."  The article

included references to the DPR possessing the types of equipment the DPR had solicited funds to purchase with Defendants' material support, including "sawed-off Kalashnikovs" used by the terrorists to shoot up the home of their victims. At all relevant times, this information was available to Defendants and the public at large.

127.      In April 2014, the European Union sanctioned several DPR leaders, including Igor Strelkov. The European Union's sanctions were widely reported on in numerous prominent media outlets, including the *Washington Post* and *The Guardian*. In July 2014, the European Union ("EU") sanctioned several additional DPR leaders, including Pavel Gubarev and Ekaterina Gubareva.

128.      In May 2014, the Ukrainian General Prosecutor Office formally and publicly classified the DPR and its affiliate, the LPR, as "terrorist organizations." First Deputy Prosecutor General in Ukraine Mykola Holomsha stated: "Facts of the persecution of the civilians in eastern Ukraine have been registered. . . . The purpose of the creation of these organizations is to deliberately propagate violence, seize hostages, carry out subversive activity, assassination and intimidation of citizens." This information was available to Defendants and the general public and was reported on by the media at the time.

C.      <u>Prior to the DPR's Terrorist Attack on MH17, the United States Government Expressly Sought to Stop the Flow of Material Support to the DPR and Its Affiliated Terrorist Groups</u>

129.      Beginning on March 6, 2014, President Barack Obama issued a series of Executive Orders in response to the violence in Ukraine. The March 6, 2014 order authorized the United States Treasury Department to impose sanctions on individuals or entities "responsible for or complicit in . . . actions or policies that undermine democratic processes or institutions in Ukraine; [and] actions or policies that threaten the peace, security, stability, sovereignty, or

territorial integrity of Ukraine."  The March 6, 2014 order further authorized sanctions against individuals or entities who "have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" those using violence to affect the Government of Ukraine.

130.    Pursuant to a March 17, 2014 Executive Order, President Obama specifically condemned "the actions and policies of the Government of the Russian Federation with respect to Ukraine," and authorized the United State Treasury Department to impose sanctions on, among others, "official[s] of the Government of the Russian Federation" and individuals or entities associated with these Russian officials.

131.    On June 20, 2014, in response to the terrorist acts perpetrated by the DPR and its affiliates, the United States Treasury Department sanctioned seven individuals connected to the DPR, the LPR, or other affiliated groups.  Among the individuals targeted for sanctions were Igor Strelkov (Girkin), along with Denis Pushilin and Andrey Purgin, two other DPR "leaders." The Treasury Department described Strelkov as "the self-described 'commander-in-chief of the Donetsk People's Republic.'"

132.    A month before the terrorist attack on MH17, the United States government thus formally and explicitly put Defendants on notice that they should not be facilitating the provision of funds to Strelkov.  But as described in Paragraphs 104-128, *supra*, Defendants already knew, long before, that they should not be providing material support or financial assistance to Strelkov or the DPR.

133.    In announcing the sanctions against Strelkov and other DPR leaders, David Cohen, the Treasury Department's Under Secretary for Terrorism and Financial Intelligence, stated:  "These individuals have all contributed to attempts to illegally undermine the legitimate

government in Kyiv, notably by falsely proclaiming leadership positions and fomenting violent unrest."

134.     On July 16, 2014, the Treasury Department imposed sanctions on the DPR and LPR as entities, along with Aleksandr Borodai, the self-declared "prime minister" of the DPR. The Treasury Department stated that the DPR had illegitimately "asserted governmental authority over a part or region of Ukraine without the authorization of the Government of Ukraine."  The Treasury Department also specifically singled out Igor Strelkov (Girkin) as "the leader of the militia of the Donetsk People's Republic."

135.     In a further response to the situation in eastern Ukraine, on July 29, 2014, the Treasury Department announced sanctions on VTB Bank, in an effort to stem the flow of financial support to the DPR and its affiliates.  The Treasury Department stated that VTB "is a state-owned bank, and, together with its subsidiaries ('the VTB Group'), is Russia's second-largest banking group."

136.     On September 12, 2014, the Treasury Department announced sanctions on Defendant Sberbank in an effort to stem the flow of financial support to the DPR and its affiliates.

137.     In subsequent months, the Treasury Department announced sanctions on both Pavel Gubarev and his wife, Ekaterina Gubareva, for their involvement with the DPR.

138.     Defendants VTB Bank and Sberbank continued their deliberate and recurring use of U.S. correspondent accounts in New York, New York to provide funds to the DPR after the European Union and the United States Treasury Department sanctioned the DPR's leadership, and even after the United States Government sanctioned both Defendants VTB Bank and Sberbank in an effort to stem the flow of financial support to the DPR and its affiliates.

139.     Prior to the attack on MH17, it was well known that the DPR's activities had a "strident anti-American tone"[19] that could lead to violence directed towards U.S. citizens, prompting the United States Department of State repeatedly and emphatically to warn U.S. citizens to defer all travel to Donetsk because of the activities of "armed separatist groups…[which] have established illegal checkpoints and have threatened, detained, or kidnapped individuals, including U.S. citizens, for hours or days."[20]

D.     Prior to the DPR's Terrorist Attack on MH17, Defendants Operated Extensively in Ukraine

140.     In the months leading up to the terrorist attack on MH17, each Defendant had substantial operations in Ukraine.

141.     According to Sberbank of Russia's website, "In December 2007 Sberbank of Russia acquired a bank in Ukraine. . . .  According to figures of the National Bank of Ukraine, the Bank features in the top ten largest financial institutions in the country in terms of assets.  The regional network of the subsidiary bank includes more than 200 offices . . . ."[21]

142.     For years prior to the terrorist attack on MH17, and up until 2018, VTB Bank operated a subsidiary in Ukraine with assets that made it the 16th largest bank in the country.

---

[19] U.S. Department of State, "Ukraine Travel Warning, March 21, 2014," *available at* https://web.archive.org/web/20140328011053/http://travel.state.gov/content/passports/english/alertswarnings/ukraine-travel-warning.html

[20] U.S. Department of State, "Ukraine Travel Warning, June 5, 2014," *available at* https://web.archive.org/web/20140704184225/http://travel.state.gov/content/passports/english/alertswarnings/ukraine-travel-warning.html

[21] Sberbank, "Ukraine," *available at*  https://www.sberbank.com/about/group-overview/subsidiaries/ukraine

143.     For years prior to the terrorist attack on MH17, and currently, MoneyGram and Western Union have each maintained numerous agent locations in Ukraine that provide global money transfer services.

144.     Due to their substantial operations in Ukraine, each Defendant was acutely aware that the DPR was engaging in a pattern and practice of terrorist activities targeting civilians.

## IV.     The DPR Relies on a Global Supply Chain Facilitated by Defendants to Fund Terrorism in the Donbass Region

145.     Upon its formation in 2014, the DPR immediately tried to capitalize on the appeal of its fervent Russian-nationalist views to some members of the Russian diaspora, which consists of tens of millions of ethnic Russians who live outside the present-day Russian Federation. The world's largest overseas community of ethnic Russians, estimated at approximately three million, is in the United States.

146.     In an effort to tap into this diaspora and further their common cause of establishing a Novorossiya state, the DPR raised funds for its terrorist acts through an online campaign accessible to anyone around the world, including in the United States.

147.     The online fundraising solicitations described herein were not part of the so-called "dark web," which is accessible only by means of special software or authorization. Rather, each and every one of the websites cited in this Complaint is or was readily accessible online, including via a simple Google search. As such, Defendants—all of whom are sophisticated international corporations with purportedly robust compliance functions and significant operations in Ukraine—were on notice and knew or should have known that they were providing support to the DPR and its terrorist activities.

148.     The DPR relied on Defendants' services to efficiently raise funds that enabled them to carry out a violent campaign of intimidation and coercion.

149.     Because of its widely-recognized status as a (now sanctioned) terrorist group, the DPR does not maintain a central bank account in the name of the "Donetsk People's Republic" or otherwise.

150.     Through numerous websites, social media posts, and other online fora, the DPR's fundraisers brazenly advertised ways to donate to the DPR, including through sending money to accounts with, or bank cards issued by, Defendants Sberbank and VTB Bank.  The DPR also openly and notoriously detailed ways to donate to the DPR using the money transfer services of Defendants MoneyGram and Western Union.

151.     A May 24, 2014 post from a leading DPR fundraiser, Veche Interregional Public Organization ("Veche"), explained that:  "A month ago, having received an appeal from representatives of the people's authorities of the Donetsk People's Republic, … Veche announced the creation of a fund to help self-defense units in South-Eastern Ukraine."[22]

152.     The May 24, 2014 post continued:  "Thousands of concerned citizens of Russia, Ukraine, Belarus and foreign countries have already provided support to self-defense units.  The first tranche of charitable assistance received from concerned citizens and organizations in the amount of 1,100,000 rubles was transferred to representatives of the DPR leadership."

153.     Prior to the downing of MH17, the DPR issued a proclamation, signed by Igor Strelkov (Girkin), which formally incorporated and described these ongoing fundraising efforts under the auspices of the DPR's "Minister of Defense," Igor Strelkov, and the DPR's "Minister of Foreign Affairs," Ekaterina Gubareva.[23]

---

[22] "Assistance to the Southeast: New Arrivals and Humanitarian Aid," *available at* https://www.liveinternet.ru/users/blog_soldier/post325492735/

[23] "Help of New Russia – Addresses and Details (Donetsk, Lugansk, Odessa, Refugees…)," *available at* http://www.golos-epohi.ru/?ELEMENT_ID=12048

154.     The proclamation, reproduced below, stated that the DPR formally entrusted responsibility for fundraising to certain of its members, who would be responsible for "accepting donations and other contributions from Governments, governmental and non-governmental organizations, business representatives and individuals."



155.     The order issued by the DPR was part of a pattern and practice whereby the DPR utilized a small, coordinated group of fundraisers, such as Humanitarian Battalion, Veche, and others, to procure funds for the use and benefit of the DPR's recurring terrorist acts.

156.     The DPR's fundraisers were empowered, authorized, and endorsed by the DPR, which exerted ultimate control over the use of the funds raised.  To that end, the DPR's fundraisers repeatedly described how the DPR's leader at the time, Igor Strelkov, personally confirmed the receipt of funds and supplies.

157.     Prior to the attack on MH17, Strelkov personally issued a video message to the DPR's supporters, publicly available on YouTube, which expressly stated that monetary support for the DPR should be sent to accounts held by the DPR's fundraisers, including Humanitarian Battalion.[24]

158.     Different DPR fundraisers often utilized the same bank accounts and/or email addresses in their online fundraising solicitations, reflecting a close degree of coordination overseen by the DPR and its leadership.  For example, numerous DPR fundraisers publicized the same bank account information for donations to the DPR's fundraiser Veche.  Similarly, many online solicitations seeking monetary support for the DPR were authored by a small number of well-known DPR members and fundraisers, including Alexander Zhuchkovsky, Boris Rozhin ("Colonel Cassad"), and Alexey Markov ("RedRat").

159.     The DPR's fundraisers openly publicized and embraced their close and direct ties to the DPR leadership, including Strelkov as well as the "foreign minister" of the DPR, Ekaterina Gubareva, and her husband, Pavel, who the U.S. government has described as "the self-proclaimed 'governor' of the so-called Donetsk People's Republic."[25]

160.     The DPR relied on Defendants' services and material support to access funds that were essential for its procurement of weapons, ammunition, and other instruments of violence, which the DPR used to intimidate and coerce the Ukrainian government and civilian population,

---

[24] "Strelkov asks for help! YOURS," *available at* http://www.yaplakal.com/forum28/topic849790.html?hl=; YouTube, "Gratitude of Igor Ivanovich Strelkov to the humanitarian battalion of New Russia," *available at* https://youtu.be/f0KZh8eBZUg

[25] U.S. Department of the Treasury, "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities," *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx

and to acquire and control territory, including the territory from which the DPR launched the missile that brought down the MH17 airplane.

161.     The material support provided by Defendants created a diversified global supply chain of funding essential for the DPR's terrorist activities.  In addition to providing direct financial support to carry out terrorist attacks, the nature of the Defendants' support allowed the DPR to ensure both the sustainability of their tactical operations (in that Defendants' support facilitated a diversity of funders) and the ability to obfuscate the identity of other funding sources. Without that global supply chain, and the benefits that came with it, the DPR's ability to carry out lethal tactical activities, including the attack on the MH17, would be substantially compromised.

162.     By enabling the DPR to solicit funds from the Russian diaspora around the world, including the three million members of the Russian diaspora located in the United States, Defendants provided the DPR with a steady flow of funding essential to the DPR's terrorist activities, including the purchase of lethal equipment and other supplies necessary for them.

**V.     Prior to the DPR's Terrorist Attack on MH17, Defendants Were Aware That They Were Providing Material Support and Financing to the DPR**

163.     In April 2014, three months before the missile attack that killed Quinn and 297 other victims, media outlets reported on how this global supply chain, created and operated by Defendants, was providing funding and support necessary for the DPR and its affiliates to carry out their terrorist activities.

164.     An April 19, 2014 article in *Forbes* discussed allegations from Ukraine's Attorney General that Defendant Sberbank was facilitating payments to Ukrainian soldiers "to join Russian separatists in east Ukraine."  The article noted that the Ukraine State Security Service

"showcased to the media some items it seized from captured Russian spies and Ukrainian double-agents.  Sberbank payment cards were among the items."[26]

165.      The April 19, 2014 article makes clear that Sberbank was aware of these allegations, noting that "Sberbank said it contacted the General Prosecutor's Office of Ukraine" to discuss the allegations.

166.      An April 16, 2014 article in *Reuters* titled, "Ukraine says investigating Russia's Sberbank for financing terrorists," quoted Ukraine's Acting Attorney General, Oleh Makhnitsky, as saying that:   "A criminal investigation has been launched against, for example, Sberbank Russia, … for financing terrorism" in eastern Ukraine.

167.      An April 19, 2014 article in the *Kyiv Post* reported that "in recent months many social network groups have been calling for funds to support causes related to separatist movements in different regions of the country.  For example, to transfer aid to separatists and its affiliates, a specified account of the Ukrainian subsidiary of Sberbank of Russia and remittance systems . . . are given."[27]

168.      The *Kyiv Post* article further reported that Defendant VTB Bank was also under investigation by Ukrainian authorities for violating the law on "crime and terrorist financing" by providing banking services to terrorist groups in the Donbass.

169.      The *Kyiv Post* article references statements from both Defendants Sberbank and VTB Bank that confirm their actual knowledge of the investigation initiated by Ukrainian

---

[26] Forbes, "Sberbank Denies Funding Pro-Russia 'Terrorists' in East Ukraine," *available at* https://www.forbes.com/sites/kenrapoza/2014/04/19/sberbank-denies-funding-pro-russia-terrorists-in-east-ukraine/#f01ac6c768fd

[27] Kyiv Post, "Russian Banks Refute Accusations of Financing Separatists in Eastern Ukraine," *available at* https://www.kyivpost.com/article/content/war-against-ukraine/russian-banks-refute-accusations-of-financing-terrorism-in-eastern-ukraine-344247.html

authorities into their support for the DPR. The article specifically references a statement from Sberbank regarding a purported "internal investigation" undertaken in response to these allegations of terrorism financing.

170.     Thus, by no later than April 2014, both Defendants Sberbank and VTB Bank had actual knowledge that they were providing material support and financing to the DPR and its affiliates, including through the DPR's open and notorious online fundraising campaign described herein.

171.     By June 2015, the *New York Times* reported that the DPR and its affiliates had "raised millions of dollars" through these online fundraising efforts in support of their terrorist activities. Specifically, in an article titled, "Russian Groups Crowdfund the War in Ukraine," the *New York Times* reported that, beginning in May 2014, more than a dozen groups had "solicited funds from abroad using large American and European financial institutions, including banks and companies like Western Union."

172.     The article explained that one such group, Humanitarian Battalion—led by former "foreign minister" of the DPR, Ekaterina Gubareva, and her husband Pavel, the former "governor" of the DPR—listed instructions on its website for "how to wire dollars or euros into [an] account at Sberbank using correspondent accounts at Citibank, JPMorgan Chase," among other banks in New York City. Between May 2014 and June 2015, Humanitarian Battalion reported raising "$213,000" in support of the DPR and its affiliates.

173.     The *New York Times* further reported that a representative from an unnamed international bank confirmed that U.S. dollars had passed through the bank to Veche, which is part of the DPR's fundraising arm. Veche has openly advertised VTB Bank correspondent accounts with JPMorgan Chase Bank, among other banks located in New York City, to handle U.S. dollar

transactions.  As reported by the *New York Times*, Veche has also provided instructions online for how to send funds to a Sberbank account using correspondent accounts at Citibank and JPMorgan Chase Bank, among other banks in New York City.

174.     The *New York Times* also reported that a representative from an unnamed international bank confirmed that it had "detected illicit donations," including an attempted contribution to Humanitarian Battalion.

175.     Shortly after publication of the *New York Times* article, one of the DPR's top fundraisers, Boris Rozhin, who goes by the online alias "Colonel Cassad," reposted the article with a postscript stating:  "at the initial stages, support for Novorossia by Russian citizens has become perhaps the largest crowdfunding campaign in post-Soviet Russia.  In fact, foreign technology has played an important role in the horizontal self-organization of the people, which in the initial stages of the uprising ensured the survival of the people's republics hanging on thin threads of state and non-state support."[28]

176.     As Rozhin's statement makes clear, the DPR has expressly claimed that the material support and financing facilitated by Defendants was essential to its very survival as a terrorist group during the first months of its existence, and leading up to the DPR's terrorist attack on MH17.

**VI.     Defendants Repeatedly Provided Material Support and Financing to DPR Fundraisers That Openly and Notoriously Advertised That the DPR Used Defendants' Support to Carry Out Terrorist Acts**

177.     Prior to the attack on MH17, the DPR made no secret as to how it raised funds to support its terrorist activities.

---

[28] Colonel Cassad, "Russian Crowdfunding and the War in Ukraine," *available at* https://colonelcassad.livejournal.com/2231796.html

178.     Many of the DPR's fundraisers provide on their websites an explanation of how to wire U.S. dollars from abroad into accounts held at Russian banks, such as Defendants Sberbank or VTB Bank, using correspondent accounts in New York.  The websites brazenly advertise their account numbers with Sberbank, VTB Bank, and the correspondent banks in New York.

179.     Many of the DPR's fundraisers also openly and notoriously listed account holder and email address information for money transfers through Western Union and MoneyGram.

180.     In order to encourage its financial supporters, the DPR went to great lengths to provide maximum transparency that reflected both the flow of funds into its fundraising accounts as well as how the funds were quickly used to purchase lethal equipment and weaponry necessary for the DPR's terrorist activities, and documented the delivery of this equipment to the DPR's field personnel.

181.     To that end, in the months before the attack on MH17, the DPR, by and through its fundraisers, published online detailed ledgers reflecting the funds that the DPR received using the services and support provided by Defendants.  The DPR's fundraisers also posted frequent updates, including messages from DPR leaders such as Strelkov, alongside photographs and/or videos, showing that the DPR immediately utilized these funds to purchase necessary lethal weapons and other tactical equipment.

182.     The DPR's fundraisers described herein were not the exclusive means by which Defendants provided material support to the DPR.  The DPR also relied upon and received material support from Defendants through additional DPR fundraisers.

A.     <u>Defendants Repeatedly Provided Material Support and Financing Directly to Two of the DPR's Most Notorious Leaders, Pavel Gubarev and Ekaterina Gubareva</u>

183.     As described above, Pavel Gubarev and Ekaterina Gubareva were two of the most prominent leaders of the DPR from its inception up through the DPR's attack on MH17. Pavel served as the "governor" of the DPR, and Ekaterina as the DPR's "foreign minister."

184.     In their capacity as leaders of the DPR, Pavel Gubarev and Ekaterina Gubareva openly and notoriously raised funds to support the DPR's terrorist activities, including as the co-heads of a DPR group called Humanitarian Battalion, as well as through a DPR group called Women's Battalion of People's Militia Donbass.

185.     Humanitarian Battalion and Women's Battalion of People's Militia Donbass are DPR fundraisers, and each constitutes part of the DPR. Their exclusive purpose was and is to raise funds for the violent terrorist activities of the DPR and its affiliates. At all relevant times, Humanitarian Battalion and Women's Battalion of People's Militia Donbass openly and notoriously advertised that the ultimate beneficiary of funds sent to their accounts would be the DPR, namely its leaders Pavel Gubarev and/or Ekaterina Gubareva.

186.     Despite its name, Humanitarian Battalion openly and publicly posted pictures online showing that it was actually purchasing tactical and lethal supplies, including helmets, knives, body armor, and night vision devices.

187.     Prior to the attack on MH17, Pavel Gubarev and Ekaterina Gubareva openly and notoriously solicited funds for the DPR using the material support of Defendants Sberbank and VTB Bank, including as follows:

188.      Pavel Gubarev openly and publicly solicited funds for the DPR, including by providing the account details to donate to a Sberbank bank card.[29]

189.      Similarly, prior to the downing of MH17, Humanitarian Battalion provided the same account information with Sberbank.[30]  Humanitarian Battalion re-posted its Sberbank card number numerous times online throughout June and July 2014, prior to the attack on MH17.

190.      In a video posted online, including on YouTube, weeks prior to the MH17 attack, the DPR's "commander-in-chief," Igor Strelkov, openly and brazenly solicited funds to the same account at Sberbank, including by holding up a piece of paper listing the full Sberbank account number, as shown in a frame of the video featuring Igor Strelkov copied below:[31]



---

[29] Pavel Gubarev's Blog, "Approved by the Minister of Defense of the DNI Strelkov I.I. 'Regulation on the Mobilization Department of the Ministry of Defense of the DPR.,'" *available at* https://web.archive.org/web/20140625043619/http://gubarev.org/category/novosti/

[30] VK, "Humanitarian Aid to Donbass / Gumbat Novorossia," *available at* https://vk.com/battalion_novorossia?w=wall-72625304_168

[31] "Strelkov asks for help! YOURS," *available at* http://www.yaplakal.com/forum28/topic849790.html?hl=; YouTube, "Gratitude of Igor Ivanovich Strelkov to the humanitarian battalion of New Russia," *available at* https://youtu.be/f0KZh8eBZUg

191.     The DPR leaders' solicitations for U.S. dollar donations through their Sberbank account were successful.  By means of example, just prior to the murder of Quinn, Sberbank used its correspondent bank accounts in this District to process two transfers on June 9 and July 2, 2014, from individuals in Maryland and New Jersey.[32]  These transactions utilized and were made possible by Defendant Sberbank's deliberate and intentional use of correspondent bank accounts in this District, in this instance Defendant Sberbank's correspondent accounts at Bank of America and Bank of New York Mellon.

192.     A July 4, 2014 financial report provided online by Humanitarian Battalion noted that "citizens from different countries transfer money to Ekaterina Gubareva's accounts," totaling "significant amounts."

193.     The financial report stated that on June 13, 2014, Humanitarian Battalion transferred "350 thousand rubles" to the DPR, as part of a total expenditure of 1,762,690 rubles on behalf of the DPR in June 2014.  Among the items purchased by Humanitarian Battalion for the DPR were "knives," "tactical gloves," "collimator sights," and accessories "for snipers."[33]  The financial report expressly noted that these purchases were "made by Ekaterina Gubareva [the "foreign minister" of the DPR] in June 2014."

194.     A May 21, 2014 post by the "Women's Battalion of People's Militia Donbass" also solicited funds for the DPR to a VTB account held by Ekaterina Gubareva, the "foreign minister" of the DPR.  The May 21, 2014 post stated that the only way to transfer US Dollars to

---

[32] These donors adhered closely to the DPR's direction in some of its advertising for donors to cite charitable purposes, as described in Paragraph 291, *infra*.

[33] VK, "Humanitarian Aid to Donbass / Gumbat Novorossia" *available at* https://vk.com/battalion_novorossia?w=wall-72625304_1671

the DPR's "foreign minister" Gubareva was through VTB's New York correspondent accounts at Deutsche Bank Trust Company Americas, the details of which were published openly online.[34]

195.     At all relevant times, the DPR utilized the funds raised by Humanitarian Battalion and Women's Battalion of People's Militia Donbass—including those funds raised relying upon the material support of Defendants Sberbank and VTB Bank—in furtherance of its terrorist activities.

B.     <u>Defendants Repeatedly Provided Material Support and Financing to the DPR Through DPR Fundraisers Who Boasted About Providing Lethal Supplies to Igor Strelkov and Other DPR Leaders</u>

### DPR Fundraiser Save Donbass

196.     The Novorossia and Donbass Assistance Fund (a.k.a. "Save Donbass") solicited funds on its website to provide lethal support directly to the DPR.  Save Donbass is one of the DPR's fundraisers and constitutes part of the DPR.  Save Donbass openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

197.     The "Head" of Save Donbass, Gleb Kornilov, was a prominent DPR member and fundraiser.  Kornilov has been profiled in several international media outlets due to his role raising money for the DPR, and is the subject of a criminal case in Ukraine "concerning terrorism financing offenses."  (Government of Ukraine's Brief ¶ 197 & n.465.)

198.     Prior to the attack on MH17, Save Donbass specifically advertised that funds sent to its accounts would be provided directly to the Commander-in-Chief of the DPR, Igor

---

[34] VK, "Women's Battalion of People Military Donbass," *available at* https://vk.com/topic-69858324_29901476

Strelkov, as well as DPR "governor" Pavel Gubarev, and DPR "foreign minister" Ekaterina Gubareva.

199.     Specifically, the Save Donbass website stated, in a large font and all capital letters, that "HELP WILL REACH IGOR STRELKOV AND PAVEL GUBAREV."[35]

200.     The Save Donbass website continued:  "We guarantee that all assistance … is delivered strictly to the hands of those who can rightfully be called Heroes of Donbass.  First of all, these are Igor Strelkov, [and] Pavel and Ekaterina Gubarev."  Save Donbass explained that its "main mission" was to "Deliver assistance to Igor Strelkov or Pavel Gubarev," and that it would "bypass[] intermediaries" to deliver material support "directly" to the DPR.

201.     In June 2014, the Save Donbass website stated that "we provide maximum transparency in fundraising and spending" noting that its donation counter was updated on the website "once a day," and "Once a week, screenshots of all accounts are published."

202.     The goods requested by Save Donbass include lethal equipment, such as ammunition for AK automatic rifles, ammunition belts, laser range finders, optical sights for AK automatic rifles, thermal imaging scopes, night vision scopes, and radio equipment.

203.     As of June 26, 2014, the Save Donbass website referred to these items as the "List of Strelkov,"[36] and noted that the list was "made only with the agreement of the commander

---

[35] Save Donbass, "Our Mission," *available at* http://web.archive.org/web/20140627092814/http:/spasidonbass.ru/our_mission/

[36] Save Donbass, "Homepage," *available at* http://web.archive.org/web/20140626030034/http://spasidonbass.ru/

of the militia of the Donetsk People's Republic Igor Strelkov" and that "Procurement of goods

occurs only after a meeting with Igor Strelkov."[37]



204.      Prior to the DPR's attack on MH17, Save Donbass openly and notoriously

solicited funds for the DPR using the material support of Defendants Sberbank, Western Union,

and MoneyGram, including as follows:

---

[37] Save Donbass, "List of Strelkov," *available at*
http://web.archive.org/web/20140710041531/http://spasidonbass.ru/#strelkov (highlighting
added); *see also* http://web.archive.org/web/20140627090356/http://spasidonbass.ru/services-
view/our-mission/

205.     Throughout June and July 2014, the Save Donbass website provided detailed reports of transfers into and withdrawals from its accounts with Defendant Sberbank, along with a description of money transferred through Defendant Western Union.[38]

206.     For example, a July 3, 2014 report for the period June 27 through July 3, 2014 stated that Save Donbass had received donations of 647,531 rubles, and purchased supplies for the DPR and its affiliates costing 204,484 rubles.  A report from July 15, 2014 for the period July 4 through July 14, 2014 states that Save Donbass received 17,000 rubles in donations sent through Western Union.

207.     The July 15, 2014 report also listed the cost of purchased supplies, including "Prepayment for armored vehicles," and included videos documenting that "The cargo was delivered.  Confirmation from Igor Strelkov . . . ."[39]

208.     Prior to the attack on MH17, the Save Donbass website openly and publicly provided the recipient name and card number for its Sberbank card, noting that "Sberbank cardholders are requested to make direct payments to our card number."  The Save Donbass website also openly and publicly listed the recipient name and email information for money transfers to be sent through Western Union or MoneyGram.

209.     This information regarding how to send transfers of money to the DPR through Western Union or MoneyGram was then reposted on other websites across the internet, including

---

[38] Save Donbass, "Our Reports," *available at* https://web.archive.org/web/20140707035228/http://spasidonbass.ru:80/reports

[39] Save Donbass, "Our Reports," *available at* https://web.archive.org/web/20140721081134/http://spasidonbass.ru/reports/

a July 13, 2014 post on the website "Socialist Basque Country," which reports having nearly 6 million total page views.[40]

210.     At all relevant times, the DPR utilized the funds raised by Save Donbass— including those funds raised relying upon the material support of Defendants Sberbank, Western Union, and MoneyGram—in furtherance of its terrorist activities.

211.     The Save Donbass website currently states that monetary donations can be sent through Defendants Sberbank and Western Union.

**DPR Fundraiser Center for New Russia**

212.     DPR fundraiser Center for New Russia has solicited and continues to solicit funds on its website (http://kcpn.info) to purchase lethal equipment for the DPR and its affiliated groups dedicated to the Novorossiya cause.  Center for New Russia is one of the DPR's fundraisers and constitutes part of the DPR, and its exclusive purpose was and is to raise funds for the violent terrorist activities of the DPR and its affiliates.

213.     At all relevant times, Center for New Russia openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

214.     Prior to the attack on MH17, the Center for New Russia website openly and notoriously solicited funds for the DPR using the material support of Defendants Sberbank, VTB Bank, and Western Union, including as follows:

215.     The Center for New Russia website indicated that "For Moscow residents, the most convenient means of transferring money is Sberbank."  The Center for New Russia openly and publicly provided its bank account and card numbers with Sberbank on its website.

---

[40] Euskal Herria Sozialista, "The Militias Need Antifascist Help!!!, " *available at* http://euskalherriasozialista.blogspot.com/2014/07/las-milicias-necesitan-ayuda.html

216.    The Center for New Russia website also openly and publicly listed an account number with VTB Bank, including New York City correspondent bank information "for transfers in U[nited] S[tates] D[ollars]."  The Center for New Russia website noted that "For holders of VTB 24 bank cards and foreign citizens a special multicurrency account is established."

217.    The Center for New Russia website openly and publicly provided the name, email address, and telephone number for an individual (Alexey Markov, a prominent DPR member and fundraiser, also known as "RedRat") who could receive money transfers for the DPR via Western Union.  The Center for New Russia website stated:  "Western Union transfers continue to be popular."  The Center for New Russia website further stated that Western Union was the "only" option "if you need to transfer cash currency."

218.    The Center for New Russia website currently indicates that funds can be transferred to the organization through Defendants Sberbank and VTB Bank.[41]

219.    At all relevant times, the DPR utilized the funds raised by Center for New Russia—including those funds raised relying upon the material support of Defendants Sberbank, VTB Bank, and Western Union, as described below—in furtherance of its terrorist activities.

220.    Notably, prior to the attack on MH17, Center for New Russia repeatedly emphasized its receipt of U.S. dollar donations, while simultaneously advertising correspondent bank accounts in New York City for the purpose of transmitting U.S. dollar donations.  For example, a Center for New Russia post specifically documented "$4000 transferred" to the Center for New Russia in the weeks leading up to the attack on MH17.[42]  Separately, a Financial Report

---

[41] Center for New Russia, "How else can I send money," *available at* http://kcpn.info/help (last accessed September 11, 2019).

[42] Center for New Russia, "Cash collections in St. Petersburg department," *available at* https://tinyurl.com/y2dcu3ve

posted online by the Center for New Russia reflects the receipt of 4,000 U.S. dollars on June 26, 2014 from "well-wishers."[43]

221.     At the time of these U.S. dollar transfers, Center for New Russia solicited funds for the DPR utilizing the services of Defendants Sberbank, VTB Bank, and Western Union.

222.     In the weeks before the terrorist attack on MH17, the Center for New Russia website openly detailed transfers of money directly to the DPR's "Commander-in-Chief," Igor Strelkov, who has been criminally charged for his leadership role in the downing of MH17.

223.     Prior to the attack on MH17, Center for New Russia's website stated: "Due to the fact that fund-raising activities to purchase the necessary military equipment for Novorossia militia have outgrown the scope of one-time action . . . we decided to establish the Coordination Center for Novorossia (KCPN), which further will be engaged in all organizational activities to raise funds, purchase and forwarding of goods."[44]

224.     Prior to the attack on MH17, a post on the Center for New Russia website, titled, "Why do we do this?", stated that "our main task now is to help militia fighters knock out punishers beyond the borders of their republic . . . .  And in order for our assistance to be effective, we work only with specific detachments conducting combat operations, and only upon requests made by their command."[45]

225.     Prior to the attack on MH17, the Center for New Russia website stated that "We are NOT engaged in humanitarian assistance.  We are engaged in non-humanitarian assistance."

---

[43] Center for New Russia, "Report of the St. Petersburg Branch of the KSCP," *available at* https://web.archive.org/web/20141104001122/http://kcpn.info/node/80

[44] Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20140711024026/http://kcpn.info/

[45] Center for New Russia, "Why Are We Doing This?," *available at* https://tinyurl.com/y6k7r7pd

The Center for New Russia website further explained that the supplies the DPR and its affiliates needed for their efforts "requires money," and that financial support was essential to "support the struggle of our brothers in Novorossiya."

226.    For all relevant periods of this Complaint and to this day, the Center for New Russia website expressly solicits funds to purchase bulletproof vests, helmets, uniforms, rifle scopes, night vision devices, and walkie-talkies for terrorist forces, noting:  "Without constant assistance with military equipment, the guys simply cannot survive."[46]  The Center for New Russia website also directly appeals for volunteers willing to assist the DPR.

227.    As of May 2014, the Center for New Russia website stated that solicited funds had been used to purchase communications equipment (including those used with armored vehicles), telescopes, binoculars, navigational equipment, body armor, and helmets for DPR terrorists.[47]  Another post on the Center for New Russia website from before the attack on MH17 displayed a picture of body armor stored in a warehouse, boasting, "As you can see for yourself, the warehouse is literally breaking down with non-humanitarian aid."[48]

228.    A May 20, 2014 post on the Center for New Russia website recounted—and showed pictures of—the specific tactical and lethal equipment provided to the DPR and its affiliates, including "45 bulletproof vests and helmets," as well as accessories for AK rifles.[49]  The post further stated:  "thanks to your help, they are now equipped enough to perform combat

---

[46] Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20190306123058/kcpn.info/appeal

[47] Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20140623132118/https://kcpn.info/

[48] Center for New Russia, "KTSPN Warehouse in Moscow," *available at* https://tinyurl.com/y6dqbboe

[49] Center for New Russia, "First Shipment Delivered," *available at* https://web.archive.org/web/20150325020733/http://kcpn.info/node/7

missions . . . ."  Among the pictures featured on the website was the following photograph, which reflects lethal and tactical equipment including bulletproof vests and weapon sights:



229.    Another post that day provided a "Financial Report for May 10-19" of 2014. This Financial Report broke down in detail the sources and uses of Center for New Russia's recent funding, including a list of the funds transferred to and withdrawn from Center for New Russia's Sberbank account, resulting in a "356,555,064" ruble "balance of money on the account."

230.     The May 20, 2014 Financial Report further stated that Center for New Russia

had received "$1000" in cash "from Sergey from the USA to Western Union," along with 215

euros sent via Western Union from Germany.[50]



231.     Subsequent posts throughout June and July 2014 provided periodic updates on

"collected and spent money, as well as delivered cargo," which included tactical and lethal

equipment such as "sniper rifle scopes," "masks for snipers," "camouflage skins for snipers,"

"body armor," "night vision devices," and "sniper machine gun sight … created specifically for

aimed shooting from heavy machine gun … at a distance of up to 1500-2000m."

---

[50] *See* English translation of excerpts from the Center for New Russia Financial Report for May
10-19, 2014, *available at* https://web.archive.org/web/20150325211921/http://kcpn.info/node/6
(highlighting added).

232.    These posts also euphemistically referred to the purchase of automatic weapons, which are referred to as "musical instruments."

233.    For instance, a June 11, 2014 post titled "Musical instruments," shows a picture of a sniper rifle (copied below), and states:  "By your efforts and assistance, the guys were able to afford to play the trombone."[51]



234.    The sign on the sniper rile mentioning "RedRat" refers to the Center for New Russia's leader, Alexey Markov, a prominent DPR member and fundraiser who also goes by "RedRat," and who posted many of the Center for New Russia's online updates during the relevant period under the name "RedRat."

---

[51] Center for New Russia, "Musical instruments," *available at* https://tinyurl.com/yxonoqbt

235.    The Center for New Russia website included numerous pictures (including those copied below) documenting the delivery of supplies to the DPR and its affiliates.[52]





---

[52] Center for New Russia, "Reports," *available at*
https://web.archive.org/web/20140924064744/http://kcpn.info/reports

236.     A June 5, 2014 post titled "Two more shipments reached destination" described the delivery of lethal supplies to the DPR, including "night vision binoculars," "10 packs of lighting missiles with starters," and "masks for snipers."[53]  The post also showed pictures of the supplies, such as camouflage, combat boots, and night vision binoculars:



---

[53] Center for New Russia, "Two more shipments reached destination," *available at* https://tinyurl.com/y6j2ypso

237.     A Financial Report posted on June 5, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "211,000" ruble "payment for uniforms . . . and camouflage."

238.     The June 5, 2014 Financial Report further described six different donations sent to Center for New Russia through Defendant Western Union, including three sent in U.S. dollars: "$1,500.00 from Anton V.," "$200.00 from Inna Sablina," and "$100.00 from Olga Levine," resulting in a cash balance of $2,800 U.S. dollars.  The Financial Report also reflects money transfers during this period to Center for New Russia using Western Union that totaled approximately 39,300 rubles.[54]



### Financial report for May 20 - June 5

Posted on Thu, 05/06/2014 - 15:35 by RedRat

```
Cash:

+ 297,061 + $ 1,000 + 1,050 € - cash balance as of May 20
+ 1 645 000 - withdrawn in cash from the account in the Savings Bank
+ 100 000 - from Elena
+ 50 000 - from Cyril
+ 32 000 - from Kostik
+ 20 300 - from Victoria Bucen by Western Union
+ 18 000.16 - from Magda Bucen by Western Union
+ 999.84 - from Inna Andersson to Western Union
+ 5 500 - from Svetlana Shevchenko to Kolibri
+ 1 000 - someone via mobile
+ $ 1,500.00 - from Anton V. by Western Union
+ $ 200.00 - from Inna Sablina to Western Union
+ $ 100,00 - from Olga Levine by Western Union

- 689 500 - translation into "musical instruments" of the orchestra of Stakhanov
- 3 619.50 - transfer commission
- 500 000 - 100 pcs. flak jackets
```

---

[54] *See* English translation of excerpts from the Center for New Russia Financial Report for May 20–June 5, 2014, *available at* https://web.archive.org/web/20150325212035/http://kcpn.info/node/5 (highlighting added).

239.     The June 5, 2014 Financial Report posted by Center for New Russia also shows a transfer of "100,000" to its Sberbank of Russia account "transferred from Citibank account."

240.     A Financial Report posted on June 25, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "100,000" ruble "payment for body armor."

241.     The June 25, 2014 Financial Report further described four different donations sent to Center for New Russia through Western Union, including three sent in U.S. dollars: "$1,500 from Anton V.," "$200 from vikru," and "$109 from Ilya Kupchenko."[55]

242.     The June 25, 2014 Financial Report stated that Center for New Russia maintained an account with VTB Bank that had received transfers of "56,011.17" rubles.[56]

243.     A Financial Report posted in July 2014, which encompasses the time during which the DPR planned and executed the attack on MH17, described a series of transfers into and withdrawals from Center for New Russia's accounts with Defendants VTB Bank and Sberbank. With respect to Sberbank, the Financial Report stated that funds were used for "bulletproof vests" and "helmets" among other items.[57]

244.     The July 2014 Financial Report stated that its account with VTB Bank had received "1,673.55" in "transfers in dollars," followed by a withdrawal of $1,600 in cash.

245.     The July 2014 Financial Report included a separate section just for "Cash dollars," which stated that Center for New Russia had a balance of $4,809 as of June 24, 2014, and

---

[55] Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140729072840/http://kcpn.info/node/18

[56] Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140729072840/http://kcpn.info/node/18

[57] Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140930012248/http://kcpn.info/node/55

which listed six U.S. dollar donations to Center for New Russia, including five through Defendant Western Union.  As of July 2014, Center for New Russia reported a U.S. dollar balance in its accounts of $3,289.

246.     The July 2014 Financial Report also reflects that over 50,000 rubles were sent to Center for New Russia through Western Union during this period as part of five different money transfers.

247.     The July 2014 Financial Report specifically documents two monetary transfers directly to the DPR leader, Igor Strelkov, who had been sanctioned by the EU months earlier due to his role in planning and carrying out acts of terror as a leader of the DPR.

## Report for June 23 - July 27

## Cash dollars:

+ 4 809 - balance in dollars as of June 24
+ 1 600 - withdrawn from the account in VTB 24
+ 700 - from Valeria Z. by Western Union
+ 200 - from Inna S. to Western Union
+ 900 - from Yuriy S. to Western Union
+ 200 - from Sergey Sh. (Byelorussia) to Western Union
+ 300 - from Valeria
+ 200 - from Valeria Z. by Western Union
- 5 000 - transferred in cash to Strelkov in Slavyansk
- 200 - transferred to the operation for the daughter of the militiaman
= 3,209 - cash balance as of July 27

248.     Under a section titled "Euro cash," the July 2014 Financial Report lists "10,000 – transferred in cash to Strelkov in Donetsk."  The "Cash dollars" section further stated that Center for New Russia had transferred $5,000 "in cash to [Igor] Strelkov."

249.     Following the July 2014 Financial Report, the Center for New Russia website included a note thanking "Dmitry P. and Anton V. from the United States, as well as dozens of

other people whose help to the militia of Novorossia … is invaluable.  Thank you friends, for your support!"[58]

250.      Other DPR supporters around the globe advertised Center for New Russia's account information as a way "to help [Igor] Strelkov."[59]  A June 2014 post includes photographs and an update  published by Center for New Russia of "the delivered goods on the fighters," nearly all of which feature rifles or machine guns:



251.      The June 2014 post openly and publicly provided the Center for New Russia's Sberbank card number "for transfers within Sberbank," as well as a Sberbank account number "for transfers from other banks."  The post also provided the recipient information for money transfers to be sent through Western Union to Alexey Markov ("RedRat").

**DPR Fundraisers Veche, Rospisatel, and World Crisis**

252.      Just like Center for New Russia, DPR fundraiser Veche has raised and raises funds on its website (http://veche-info.ru) for the DPR.  Veche constitutes part of the DPR, and

---

[58] Center for New Russia, "Reports," *available at*
https://web.archive.org/web/20140930012248/http://kcpn.info/node/55
[59] Rigort, "Report on the Next Cargo and Details to Help Strelkov," *available at*
https://rigort.livejournal.com/924467.html

the Veche website expressly states that since April 2014, Veche "took an active part in the provision of detachments of the people's militia."[60]

253.    Veche openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts is the DPR and its affiliates, and Veche proudly boasted that it provided lethal weapons directly to the DPR's "Commander-in-Chief," Igor Strelkov.  According to the Veche website, solicited funds have been used to provide the DPR with tactical and lethal equipment, including modern combat supplies.

254.    Prior to the attack on MH17, the Veche website openly and notoriously solicited funds for the DPR using the material support of Defendant VTB Bank, including as follows:

255.    The Veche website indicated that funds could be sent to the DPR through Veche's bank account at VTB Bank.[61]   The Veche website explained that international transfers of funds could be routed through the organization's correspondent accounts at JPMorgan Chase Bank, among others in New York City, to its bank account at VTB Bank.  Its account numbers with VTB Bank and the correspondent banks were openly and publicly listed on Veche's website.

256.    A May 24, 2014 online post openly and publicly solicited donations to the DPR through Veche's account at VTB Bank.  The post explained that "international transfers" could be sent to Veche's account at VTB Bank utilizing correspondent banks in New York, including accounts at JPMorgan Chase Bank and Deutsche Bank Trust Company Americas in this District,

---

[60] Veche, "Humanitarian Aid," *available at* http://veche-info.ru/projects/4261

[61] Veche, "Dear Benefactors and Donors!," *available at* http://web.archive.org/web/20140108093452/http://veche-info.ru/index.php?option=com_content&view=article&id=251&Itemid=69

and it provided the relevant account numbers to facilitate such "international transfers" to the DPR.[62]

257.    The May 24, 2014 post displayed pictures documenting the types of lethal equipment the DPR procured using the funds sent to its fundraiser, Veche, including tactical helmets, bulletproof vests, and thermal imaging scopes:



258.    A June 13, 2014 online post reported that Veche sent the "first batch of purchase equipment," for which "the special forces under the command of Igor Strelkov expressed their gratitude."

259.    The post continued:   "To date, 80 additional equipment sets have been purchased with funds coming to the fund to help the militia of Novorossia," and further provided

---

[62] "Assistance to the Southeast: New Arrivals and Humanitarian Aid," *available at* https://www.liveinternet.ru/users/blog_soldier/post325492735/

pictures confirming that the funds sent were being used to provide the DPR with lethal equipment.[63]

260.     The June 13, 2014 post once again solicited "international transfers" to Veche's account with VTB Bank, and provided the same account and New York correspondent banking information.

261.     At all relevant times, the DPR utilized the funds raised by Veche—including those funds raised relying upon the material support of Defendant VTB Bank—in furtherance of its terrorist activities.

262.     Two other DPR fundraisers with close ties to Veche, Rospisatel group and World Crisis, also openly advertised DPR fundraiser Veche's account information with VTB Bank.

263.     The DPR fundraiser Rospisatel group has solicited and solicits funds on its website (http://www.rospisatel.ru/pjv.htm) to purchase "self-defense" equipment for the DPR and other affiliated groups dedicated to the Novorossiya cause.

264.     Rospisatel is one of the DPR's fundraisers and constitutes part of the DPR. Rospisatel openly and notoriously advertised that the ultimate beneficiary of funds sent to Veche's VTB account would be the DPR and its affiliates.

265.     Prior to the attack on MH17, the Rospisatel website openly and publicly listed Veche's account number with VTB Bank, along with correspondent bank information in New York City for international money transfers.[64]

266.     DPR fundraiser World Crisis has solicited and solicits funds on its website (http://www.worldcrisis.ru/crisis/1547372) to purchase equipment for the DPR and other affiliated

---

[63] "Help of New Russia," *available at* https://www.liveinternet.ru/showjournal.php?journalid=29 42023&jday=13&jyear=2014&jmonth=6

groups dedicated to the Novorossiya cause. World Crisis is one of the DPR's fundraisers and constitutes part of the DPR. World Crisis openly and notoriously advertised that the ultimate beneficiary of funds sent to Veche's VTB account would be the DPR and its affiliates.

267.    In a fundraising solicitation that preceded the DPR's attack on MH17, World Crisis noted that "anti-aircraft systems are very needed" for the DPR.

268.    Prior to the attack on MH17, the World Crisis website openly and publicly listed Veche's VTB Bank account information, along with New York City correspondent bank information for international money transfers.[65]

269.    Prior to the attack on MH17, World Crisis also openly advertised the account number for a Sberbank card "for the transfer of funds directly to Igor Ivanovich Strelkov," the DPR's Commander-in-Chief.

270.    Prior to the attack on MH17, the World Crisis website further provided instructions on how to support the DPR with money transfers through Defendants MoneyGram and Western Union.

271.    At all relevant times, the DPR utilized the funds raised by World Crisis— including those funds raised relying upon the material support of Defendants Sberbank, VTB Bank, MoneyGram and Western Union—in furtherance of its terrorist activities.

## DPR Fundraiser ICORPUS

272.    In 2014, DPR fundraiser ICORPUS solicited funds on its website to purchase lethal equipment for the DPR and its affiliate groups dedicated to the Novorossiya cause.

---

[64] Rospisatel, "How to Help South-East Ukraine," *available at* http://web.archive.org/web/20140629034138/http://www.rospisatel.ru/pjv.htm

[65] World Crisis, "Help to Donbass," *available at* http://web.archive.org/web/20140625074715/http://worldcrisis.ru/crisis/1547372

ICORPUS is one of the DPR's fundraisers and constitutes part of the DPR.  ICORPUS openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

273.     Prior to the DPR's attack on MH17, the ICORPUS website expressly solicited funds for the DPR to purchase guns, thermal imaging scopes, helmets, and body armor.[66]

274.     ICORPUS specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

275.     As of July 4, 2014, the ICORPUS website openly and publicly listed a Sberbank card number, stating that "An official account was opened to raise funds for the needs of the militia . . . under the command of I. Strelkov."

276.     On July 3, 2014, a United States-based supporter of the so-called Novorossiya movement posted an update on his English-language, pro-Russia website regarding the situation in Ukraine.  Prior to the attack on MH17, this website was a forum for chatter among DPR supporters to share ways to assist the DPR's terrorist activities.   For example, a post on the website listed in English, the ICORPUS Sberbank account number, which was described as "the official account to collect funds for slovyansk militia under the command of i. Strelkova [Igor Strelkov]."[67]  Another post added, also in English:   "This is the official Sberbank card account number for Slavyansk militia, Strelkov has confirmed it."

---

[66] ICORPUS, "Opened an Official Account of the Militia in Slavyansk," *available at* http://web.archive.org/web/20140704011043/http://icorpus.ru/otkryt-oficialnyj-schet-opolcheniya-v-slavyanske

[67] The Saker, "Joint Declaration by the Foreign Ministers of Ukraine, Russia, France and Germany," *available at* http://thesaker.is/joint-declaration-by-the-foreign-ministers-of-ukraine-russia-france-and-germany/

277.     Earlier posts on this website include English-language translations of Igor Strelkov (Girkin's) public statements beginning in May 2014, in his capacity as the "commander of the militia of Donetsk People's Republic."  A July 7, 2014 post provided an English-language profile of Strelkov, which received over 14,000 views and 125 comments.[68]

278.     On July 3, 2014, another English-language website provided a "Briefing from Igor Strelkov" that confirmed that Strelkov and the DPR were utilizing the ICORPUS account at Sberbank of Russia "to collect resources for the needs of the Slavyansk Militia commanded by Igor Strelkov."[69]

279.     At all relevant times, the DPR utilized the funds raised by ICORPUS— including those funds raised relying upon the material support of Defendant Sberbank—in furtherance of its terrorist activities.

**DPR Fundraiser Voice of Sevastopol**

280.     The DPR fundraiser Voice of Sevastopol, which is led in part by Boris Rozhin ("Colonel Cassad"), has solicited and solicits funds on its website (http://voicesevas.ru) for assistance for the DPR and its affiliated groups in the Donbass.[70]  Voice of Sevastopol is one of the DPR's fundraisers and constitutes part of the DPR.  Voice of Sevastopol openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

---

[68] The Saker, "Polkovnik (Colonel) Strelkov," *available at* http://thesaker.is/polkovnik-colonel-strelkov/

[69] Slavyangrad, "Strelkov, Berezin and Militia Briefings, July 3, 2014," *available at* https://slavyangrad.org/2014/07/03/strelkov-berezin-and-militia-briefings-july-3-2014/

[70] Voice of Sevastopol, "Details for the Provision of Humanitarian Assistance to the Donbass," *available at* http://voicesevas.ru/video/37146-rekvizity-dlya-okazaniya-voenno-gumanitarnoy-pomoschi-donbassu.html

281.     Voice of Sevastopol's website includes a link to a report of its "Gifts for Donbass," which includes pictures and descriptions of "UAVs [unmanned aerial vehicles or 'drones'] and components," as well as "armor, helmets, glasses, optics, thermal imagery, knives" and other lethal equipment purchased to support terrorists in the Donbass.[71]  Among the pictures featured on the website documenting the delivery of lethal equipment to the DPR is the following image showing knives and bullet-proof vests:



282.     Prior to the DPR's attack on MH17, Voice of Sevastopol publicly solicited funds for the DPR through Defendants Sberbank, Western Union, and MoneyGram.[72]

283.     One post explained that the only way to transfer United States dollars to the DPR fundraiser Voice of Sevastopol--which explicitly advertised that it purchased lethal equipment for the DPR—was to send funds to a Sberbank account utilizing Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York.[73]

---

[71] CIGR Center, "'Gifts' for the Donbass," *available at* https://centercigr.livejournal.com/95618.html

[72] "Fundraising for Militias Novoross (DNI and LC) Voice of Sevastopol," *available at* http://lidiabrull2.blogspot.com/2014/06/fundraising-til-militser-novoross-dni.html

[73] VK, "Golos Sevastopolya," *available at* https://vk.com/wall245978492_2321

284.     At all relevant times, the DPR utilized the funds raised through the Voice of Sevastopol—including those funds raised relying upon the material support of Defendants Sberbank, Western Union, and MoneyGram—in furtherance of its terrorist activities.

285.     Voice of Sevastopol's website currently states that money can be transferred through Defendants Western Union or MoneyGram, and openly and publicly provides recipient and/or email account information for these transfers.  The website also provides instructions for money transfers to Veche's accounts at Defendant VTB Bank, including for international transfers through New York correspondent accounts.  In addition, the website provides the name and card number for two Sberbank bank cards where funds can be sent.

### DPR Fundraiser Essence of Time

286.     The DPR fundraiser Essence of Time ("EOT") has solicited and solicits funds on its website (http://eot61.su) for the DPR and its affiliates in the Donbass region.  EOT is one of the DPR's fundraisers and constitutes part of the DPR.  EOT openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

287.     Prior to the attack on MH17, the EOT website stated that the aid to be provided includes tactical gear (such as helmets and body armor), binoculars, rifle scopes, and thermal imaging equipment.[74]

288.     EOT has openly and publicly received material support from Americans, including Russell Bentley, who indicated that "From January to June 2015, I was a soldier in the Essence of Time combat unit of the Novorussian Armed Forces (NAF).  I served at the Donetsk

---

[74] All-Russian Movement "The Essence of Time" Rostov Region, "Humanitarian Aid Collection for Donbass – South of Russia – June-August 2014" *available at* http://web.archive.org/web/20140626041043/http://eot61.su:80/fa2014

airport and Spartak as a rifleman and RPG [rocket propelled grenade] gunner."[75]  The *Houston Chronicle* reported that Bentley raised more than $2,000 to support his activities in the Donbass.

289.     Prior to the attack on MH17, the EOT website openly and publicly solicited funds for the DPR by listing its account numbers with Sberbank, along with its Sberbank bank card number.  The EOT website also openly and publicly listed the name and email address required to send money via Western Union.

290.     At all relevant times, the DPR utilized the funds raised by EOT—including those funds raised relying upon the material support of Defendants Sberbank and Western Union— in furtherance of its terrorist activities.

291.     The EOT website currently indicates that funds can be transferred directly to its account at or bank card with Sberbank, or to individuals associated with the EOT through Western Union and MoneyGram.  The EOT website explicitly states that donors should not specify the reason for the transfer of funds, but simply indicate that it is for "charity."

### DPR Fundraiser People's Militia of New Russia

292.     The DPR fundraiser People's Militia of New Russia ("People's Militia") has openly and publicly solicited funds online to support the DPR and its affiliates, including through bank accounts and bank cards with Sberbank.[76]  People's Militia is one of the DPR's fundraisers and constitutes part of the DPR.  People's Militia openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

---

[75] Russel "Texas" Bentley, "About," *available at* http://www.russelltexasbentley.com/p/about.html

[76] VK, "People's Militia of New Russia – News," *available at* https://vk.com/wall-70618940_781

293.     Prior to the attack on MH17, People's Militia provided updates from the DPR's Commander-in-Chief, Igor Strelkov.

294.     Prior to the attack on MH17, People's Militia instructed supporters of the DPR that, for transfers in "US dollars," they could send funds to a Sberbank account.  People's Militia openly and notoriously provided instructions for routing the transfer of U.S. dollars through Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City, or through Sberbank's correspondent account at The Bank of New York Mellon in New York City.

C.     Defendants Repeatedly Provided Material Support and Financing to the DPR Through Alexander Zhuchkovsky, a Prominent DPR Fundraiser Who Boasted About Providing Lethal Weapons to Igor Strelkov

295.     In addition to soliciting funds via the DPR's dedicated fundraising entities, the DPR also raised and continues to raise funds through efforts spearheaded by some of its more prominent individual members.

296.     For example, prior to the attack on MH17, Boris Alexandrovich Rozhin (also known as "Colonel Cassad"), solicited donations in support of terrorists in the Donbass.[77]  Rozhin, a prominent international fundraiser for the DPR who was affiliated with Voice of Sevastopol, regularly posted reports and photos of weapons and other equipment he supplied to the DPR.

297.     Rozhin openly and publicly provided the VTB Bank banking account information, including New York correspondent account information, necessary to donate to the DPR through Veche.  Rozhin also solicited funds for the DPR through money transfers to be sent using the services of Defendants Western Union and MoneyGram.[78]  Rozhin openly and

---

[77] Colonel Cassad, "Collection of Funds for Information Fight!," *available at* https://web.archive.org/web/20140317092643/http://colonelcassad.livejournal.com/1476095.html

[78] The Trade Union of Medical Workers of the NKVD, "Information about the Details to Help the Southeast," *available at* https://komissarivanov.livejournal.com/45834.html

notoriously advertised that the ultimate beneficiary of funds sent to these accounts would be the DPR and its affiliates.

298.    One of the most prolific DPR fundraisers in the months before the attack on MH17 was Alexander Zhuchkovsky, a notorious DPR supporter with close ties to the DPR's Commander-in-Chief, Igor Strelkov.  The Government of Ukraine has described Zhuchkovsky as a key fundraiser for the DPR, noting that "Zhuchkovsky publicly boasted about raising millions of rubles and purchasing armored combat vehicles and weapons to benefit the DPR."  (Government of Ukraine's Brief ¶ 176.)

299.    Zhuchkovsky openly reported on using the funds he raised to supply the DPR with equipment that included man-portable surface-to-air missile systems, as well as armored vehicles.  In June 2014, Zhuchkovsky wrote that he is "NOT a humanitarian aid activist but a person who organizes volunteers and, let's say, NON-humanitarian supplies."

300.    A June 26, 2014 post by Zhuchkovsky expressly solicited funds in support of the DPR and its Commander-in-Chief, Igor Strelkov.  Zhuchkovsky wrote:  "Thanks to Igor Strelkov for the last delivery of our cargo."[79]

301.    Zhuchkovsky's June 26, 2014 post stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, or approximately $30,000 dollars based upon the exchange rate at the time.

302.    Zhuchkovsky's June 26, 2014 post stated that funds for the DPR could be sent through a transfer to a Sberbank card, and the post openly and publicly provided the Sberbank card

---

[79] VK, "Alexander Zhuchkovsky," *available at* https://vk.com/wall151630709_2122

number.  Zhuchkovsky further wrote that "From abroad, a transfer can be made … via Western Union."

303.      These instructions for transfers to the DPR utilizing Sberbank and Western Union were reposted on other websites across the internet that featured chatter about the DPR, including a June 28, 2014 post that stated  it was providing "the most reliable details of the aid of Novorossia," and specifically to "Help Strelkov" and "the DPR."[80]

304.      Another post from June 23, 2014 stated:  "Today, Colonel Igor Strelkov thanked Alexander Zhuchkovsky" and others "for raising funds and purchasing equipment and hardware" for the DPR.  The post continued:  "Sending money to Alexander's accounts, you do not send them to abstract militia, but to the militia of STRELKOV."  The post then listed a Sberbank card account number to which funds should be sent.[81]

305.      Zhuchkovsky also raised funds for the DPR through a group called "Sputnik & Pogrom."  Sputnik & Pogrom is one of the DPR's fundraisers and constitutes part of the DPR.  Sputnik & Pogrom openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.  The exclusive purpose of Sputnik & Pogrom was to raise funds for the violent terrorist activities of the DPR and its affiliates.

306.      Sputnik & Pogrom specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

307.      A May 19, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds in support of the "militiamen," specifically referenced "responding

---

[80] VK, "Reliable details for the transfer of money," *available at* https://vk.com/topic-73561094_30070516

[81] "News from the Militia of New Russia," posted on June 23, 2014, *available at* https://vk.com/wall-57424472_4048

to the call of Colonel Strelkov." The post concluded by stating that funds can be sent to a Sberbank card, and the post openly and publicly provided a Sberbank card number.[82]

308.     A May 23, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky includes "photos of purchased items," including soldiers carrying machine guns. The post asked for supporters to "transfer money" using the provided Sberbank card number.[83]

309.     A June 24, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,485,000 rubles worth of supplies to the DPR and its affiliates.[84] Zhuchkovsky wrote that Igor Strelkov "thanked all the donors" and provided a link to a video of Strelkov "confirm[ing] the arrival of the cargo."

310.     A July 2, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,320,000 rubles worth of supplies to the DPR and its affiliates. Zhuchkovsky wrote that remaining funds "will be used to purchase everything needed for the militia. Including telescopes for observing the starry night sky; This time we did not buy them, because there were difficulties with their transportation."[85] On information and belief, "telescopes for observing the starry night sky" referred to surface-to-air missile systems.

---

[82] Sputnik & Pogrom, "Our heroes:  the author of 'Sputnik and Pogrom' went to fight in Novorossia," *available at* https://sputnikipogrom.com/war/12544/heroes-of-sputnik-and-pogrom/

[83] Sputnik & Pogrom, "Russians do not abandon their own: requisites to help the Slavyansk militia," *available at*  https://sputnikipogrom.com/russia/12770/support-our-troops-in-new-russia-2/

[84] Sputnik & Pogrom, "Report on the expenditure of transfers for the needs of the Slavyansk people's militia," *available at* https://sputnikipogrom.com/russia/novorossiya/14801/svalyansk-reports/

[85] Sputnik & Pogrom, "What is your help for the militia of Slavyansk?", *available at* https://web.archive.org/web/20140719204122/http://sputnikipogrom.com/russia/novorossiya/15298/slavyansk-reports-2/

311.     The July 2, 2014 post from Zhuchkovsky stated that transfers could be made to a specified Sberbank bank card number, or "from abroad … via Western Union." Zhuchkovsky added: "I think you all for supporting us for 1.5 months, as well as … for the constant publication of our requisites. (I remind you that Strelkov personally thanked these resources for their support)."

312.     Another post by Sputnik & Pogrom from July 2, 2014 that is attributed to Zhuchkovsky stated that funds could be sent to a Sberbank card, and the post openly and publicly provided a Sberbank card number. In the same post, Zhuchkovsky wrote that money transfers "[f]rom abroad" should be sent "through Western Union."[86]

313.     These instructions for transfers to the DPR through Sputnik & Pogrom were reposted on other websites, including a June 17, 2014 post that published an extensive list of "addresses and banking details" for the "help of Novorossia."[87] The post openly and publicly solicited funds in support of the efforts of "Igor Strelkov's movement," including through transfers utilizing Defendants MoneyGram, Western Union, Sberbank, and VTB Bank. Specifically, the post provided instructions on how to support the DPR through Sputnik & Pogrom, including by openly and publicly providing a Sberbank bank account number as well as a Sberbank card number.

314.     The post specifically detailed how money could be transferred, "including from abroad," to Sputnik & Pogrom using MoneyGram and Western Union, listing the email address "juchkovsky@gmail.com" as the primary contact for these transfers.

315.     The email address "juchkovsky@gmail.com" is utilized by Alexander Zhuchkovsky, including on his personal social media page (https://vk.com/juchkovsky).

---

[86] VK, "Sputnik and Pogrom," *available at* https://vk.com/wall-40399920_453515

[87] "Help of New Russia – Addresses and Details (Donetsk, Lugansk, Odessa, Refugees…)," *available at* http://www.golos-epohi.ru/?ELEMENT_ID=12048

316.     Just below these instructions to contact Zhuchkovsky for donations via MoneyGram and Western Union, the website directs readers to other websites also associated with the DPR for additional information.

317.     Notably, Zhuchkovsky repeatedly solicited and received large U.S. dollar donations for the DPR from the United States, totaling at least $150,000.

318.     In early September 2014, a California-based donor boasted on Sputnik & Pogrom of previously donating $100,000 U.S. dollars to fund the DPR's operations through Zhuchkovsky.[88]  At that time, Zhuchkovsky's primary means of accepting donations was through a widely-publicized Sberbank bank card or via Western Union.

319.     In October 2014, Zhuchkovsky posted an online update stating that he had previously received a transfer of $50,000 from an individual named "George" in the United States. Zhuchkovsky reiterated that money could be sent to him through a Sberbank card or, for transfers, "including from abroad," via MoneyGram and Western Union.[89]

320.     Zhuchkovsky currently operates a website (http://juchkovsky.ru/), which states: "Since 2014, I, Alexander Zhuchkovsky, have been working with my associates in helping the Donbass militia.  Thousands of people from around the world helped us raise 133 million rubles and organize 47 deliveries."  Zhuchkovsky further states that, since 2014, "thousands of people

---

[88] Sputnik & Pogrom, "100 000 dollars for the army of Novorossia:  why did I donate this money," *available at* https://web.archive.org/web/20141007062311/http://sputnikipogrom.com/russia/novorossiya/19805/100000-for-novorossia-army

[89] Greater Russia News Agency, "Report of the Militia Alexander Zhuchkovsky on Expenditures and Purchases for the Militia of New Russia," *available at* https://novorosinform.org/311930

from all over Russia and abroad began to provide large-scale assistance through us to the Donbas

militia, making money transfers and transferring military and humanitarian supplies." [90]

321.     Specifically, Zhuchkovsky states, "Thanks to the support of caring Russian

people in the Russian Federation and abroad, we collected 133 million rubles," noting that "about

two-thirds of this amount was collected in the first six months."[91]  In other words, Zhuchkovsky

alone raised approximately 89 million rubles for the DPR, or roughly $2.5 million U.S. dollars in

the months surrounding the attack on MH17.[92]

322.     As described above in Paragraphs 298-319, Zhuchkovsky raised this $2.5

million U.S. dollars in funds for the DPR through the material support and services of Defendants

Sberbank, MoneyGram, and Western Union.

323.     On his website, Zhuchkovsky provides a link to a "final report" that reflects the

"procurements and expenditures," totaling roughly 79 million rubles, on behalf of the DPR and its

affiliates.

324.     Zhuchkovsky then states that the "closed part of our budget, collected in 2014

during intense hostilities, is not presented in this report.  Some donors (including civil servants)

who regularly donated large sums to us, wished to remain anonymous and asked not to advertise

their help."[93]  However, the site makes clear that the donations collected in 2014 alone, which were

---

[90] Hotline Donbass Juchkovsky, "Dear Friends of Donbass!," *available at* http://hotline-donbass.juchkovsky.ru/

[91] *Id.*

[92] Using the exchange rate in effect on July 17, 2014 of 1 U.S. dollar = 34.93 Rubles.

[93] Hotline Donbass Juchkovsky, "Dear Friends of Donbass!" *available at* http://hotline-donbass.juchkovsky.ru/

intentionally omitted from the report in part to protect donor anonymity, totaled "54 million" rubles.[94]

325.    According to Zhuchkovsky, his "key areas of work since 2014" on behalf of the DPR included "purchasing uniforms, equipment, special equipment," as well as "UAV [unmanned aerial vehicle or 'drones'] collection, aerial reconnaissance."[95]

326.    Specifically, Zhuchkovsky documented the provision of: multiple types of "armored vehicles"; 100 units of armament "for units in the DPR"; 230 units of "sniper and mortar sights, binoculars, rangefinders, thermal imagers"; 14 units of "Drones"; 13,000 units of "Tactical equipment"; 350 units of "Body armor and helmets"; and 1,700 units of what he euphemistically refers to as "Iron."

327.    Under the listing for "Iron," Zhuchkovsky provides well-known abbreviations for automatic or semi-automatic weapons, including "AK" (Kalashnikov automatic rifle), "PM" (Makarov semi-automatic pistol), "TT" (TT-30 semi-automatic pistol), "APS" (APS underwater assault rifle), and "SVD" (Dragunov sniper rifle).

328.    Zhuchkovsky's website provides a link to a spreadsheet[96] that specifically documents certain transfers in the weeks leading up to the attack on MH17.  Among the items provided to the DPR and its affiliates during that time period were: "Recon drone," "pistol holders," "jammers/silencers," and "crossbows."

---

[94]  Kirov Reporting, "Key Areas of Work Since 2014," *available at* http://kirov-reporting.juchkovsky.ru/otchet/

[95] *Id.*

[96] "Zhuchkovsky: Reports," *available at* https://docs.google.com/spreadsheets/d/1_emguIDIN92Ib1RW-Eox7722MPdE6aY0_u2WvZD2Fbo/edit#gid=1043080655

329.     Zhuchkovsky's website identifies by name certain of the donors who provided funds to support the DPR, including donors from Canada and the United States.[97]

330.     Zhuchkovsky's website includes a link to 512 photos saved online that reflect the lethal equipment Zhuchkovsky provided to the DPR, including in the weeks before the DPR's attack on MH17.[98]

331.     Among the photos documenting lethal equipment Zhuchkovsky provided to the DPR in June and July 2014 are the following, which prominently feature tactical gear,  numerous rifles, and an aerial drone:



---

[97] We The People Juchkovsky, "Our Donors," *available at*  http://we-the-people.juchkovsky.ru/

[98] Yandex Disk, "2014," *available at* https://yadi.sk/d/cLnkBrgpjzDmog/2014



332.     Zhuchkovsky's website currently solicits donations to a specified Sberbank of Russia bank card.[99]

## VII.   The Material Support and Financing Defendants Knowingly Provided to the DPR Were Essential to the DPR's Violent Campaign of Terror and Intimidation

333.     The DPR and its affiliates were able to receive substantial and essential donated funds through Defendants' provision of banking and money transfer services to them.

334.     For example, as described in Paragraphs 320-321, *supra*, Zhuchkovsky's website currently states that he raised approximately $2.5 million U.S. dollars during the six months surrounding the DPR's attack on MH17.  Zhuchkovsky solicited these funds through Defendants Sberbank, MoneyGram, and Western Union.

335.     A June 13, 2014 online post quoted Zhuchkovsky as stating, "today we spent more than half a million rubles on means necessary for the Russian militia in Novorossia,"

---

[99] Juchkovsky, "Contacts," *available at* http://juchkovsky.ru/contacts/

followed by a plea for more money to be sent to a designated card account with Defendant Sberbank.

336.     A June 26, 2014 online post from Zhuchkovsky stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, including through Defendants Sberbank and Western Union.

337.     In October 2014, Zhuchkovsky stated that in the prior month he had raised "6 million 150 thousand rubles," including a transfer of $50,000 from the United States. [100] Zhuchkovsky solicited these funds through Defendants Sberbank, MoneyGram, and Western Union.

338.     Similarly, shortly after terrorists forcibly took over the Donetsk regional legislative building, Boris Rozhin ("Colonel Cassad") stated that "more than 1,500,000 rubles have already been transferred and more than 2,200,000 rubles are ready for shipment" as part of the fundraising effort led by DPR fundraiser Veche, relying upon the services of Defendant VTB Bank, including identifying the use of correspondent bank accounts in New York City as the proper channel through which to contribute U.S. Dollars.

339.     By May 2015, DPR fundraiser Save Donbass claimed to have raised approximately $1.3 million in funding sent either to its account with Defendant Sberbank or using money transfer providers, including Defendant Western Union.

340.     By June 2015, DPR fundraiser EOT claimed to have raised 4,240,000 rubles in funding, including through money sent to its bank card with Defendant Sberbank or sent using money transfer providers, including Defendant Western Union.

---

[100] Greater Russia News Agency, "Report of the Militia Alexander Zhuchkovsky on Expenditures and Purchases for the Militia of New Russia," *available at* https://novorosinform.org/311930

341.     DPR fundraiser Center for New Russia reported having raised over 2 million rubles, and thousands of dollars and euros, in the period between June 23 and July 27, 2014, including through wire transfers to its accounts with Defendants VTB Bank and Sberbank, and donations sent via Defendant Western Union.  Center for New Russia consistently advertised the account number of Defendant VTB Bank's correspondent bank Deutsche Bank Trust Company Americas in New York as the appropriate channel through which to send "transfers in USD."

## VIII.  Defendants' Knowing Provision of Material Support and Financing to the DPR Constitute Acts of International Terrorism

342.     Since 2014, Defendants have provided extensive banking and money transfer services to the DPR and its affiliates.  The material support and financing provided by Defendants to the DPR caused, enabled, and facilitated their terrorist activities, including launching, and controlling the territory necessary to launch, the missile attack on the MH17 passenger plane that killed Quinn and 297 others.

343.     But for Defendants' provision of banking and money transfer services to the DPR and its affiliates, the DPR's ability to raise funds from individual supporters in order to conduct terrorist operations would substantially cease.

344.     By their own public statements, in the months before July 17, 2014 (and subsequently), the DPR, including by and through its fundraisers, made and received wire transfers or money transfers via Defendants, including through the use of correspondent bank accounts in this district.

345.     During the relevant period, the DPR, by and through its fundraisers, maintained accounts at Defendants Sberbank and VTB Bank to facilitate wire transfers or bank card transfers,

and the DPR received and used the funds that passed through these accounts, including—but not limited to—as follows:

a)  Center for New Russia maintained accounts with Sberbank with bank account numbers ending in 1988 and 0503 and card account numbers ending in 9248 and 9778, and requested on its website that funds be transferred directly to those accounts.  Center for New Russia also maintained accounts with VTB Bank with bank account numbers ending in 0677 and 4888.  Center for New Russia requested that transfers in U.S. dollars be transferred through Defendant VTB Bank's correspondent account at Deutsche Bank Trust Company Americas in New York City with account number ending in 3603.

b)  Humanitarian Battalion maintained an account at Defendant Sberbank of Russia with card number ending in 6069, which account was under the control of the DPR's "foreign minister" Ekaterina Gubareva.  DPR leaders Pavel Gubarev and Igor Strelkov openly and publicly solicited funds to this account.

c)  Veche maintained a bank account at Defendant VTB Bank with account number ending in 3521 and requested on its website that international funds, including U.S. dollar funds, be transferred to that VTB Bank account through correspondent bank accounts, including an account at JPMorgan Chase in this district with account number ending in 8618, and an account at Deutsche Bank Trust Company Americas in this district with account number ending in 3603.  This VTB correspondent account number with Deutsche Bank in New York City is the same as the correspondent account number advertised by Center for New Russia for US dollar

transfers through VTB.  Veche also maintained a Sberbank card account with account number ending in 6872.

d)   EOT maintained several accounts with Sberbank with bank account numbers ending in 2621 and 0225 and card numbers ending in 0212 and 4786.  EOT's website requested that funds be transferred directly to these accounts.

e)   Save Donbass maintained accounts with Sberbank with bank account numbers ending in 0018 and 0241 and card number ending in 1893.  Save Donbass's website requested that funds be transferred directly to these accounts.

f)   ICORPUS maintained an account at Sberbank with card number ending in 2310, and requested on its website that funds be transferred directly to that account.

g)   The Voice of Sevastopol maintained an account at VTB Bank with card number ending in 8507, and accounts at Sberbank with card numbers ending in 2368 and 6872, and requested on its website that funds be transferred directly to these accounts.  The Voice of Sevastopol also maintained an account at Sberbank with bank account number ending in 0602.  Voice of Sevastopol requested that transfers in U.S. dollars be transferred through Defendant Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City, and it directed supporters to "use the list of Nostro correspondent accounts in foreign currency on the website of Sberbank of Russia."

h)   Sputnik & Pogrom maintained accounts at Sberbank with card number ending in 2956, and bank account number ending in 3378.

i)   World Crisis maintained an account at Sberbank with card number ending in 4065, which was for "the transfer of funds directly to Igor Ivanovich Strelkov."  As of

June 26, 2014, Zhuchkovsky solicited donations to the same Sberbank card account listed by World Crisis.

j)   Zhuchkovsky has solicited donations to a Sberbank card ending in 2704 and a Sberbank bank account ending in 0029.   Zhuchkovsky currently solicits donations to a Sberbank card ending in 9485.

k)   Women's Battalion of People's Militia Donbass maintained a bank account at VTB Bank with account number ending 5527, which was controlled by and/or for the benefit of the former DPR "foreign minister" Ekaterina Gubareva.   Women's Battalion of People's Militia Donbass requested that transfers in U.S. dollars be transferred through VTB's correspondent account at Deutsche Bank Trust Company Americas in New York City with account number ending in 3603.   This VTB correspondent account number with Deutsche Bank in New York City is the same as the correspondent account number advertised by Center for New Russia for US dollar transfers through VTB Bank.   Women's Battalion of People's Militia of Donbass also listed the SWIFT codes for Citibank NA in New York City (CITIUS33), Deutsche Bank (BKTRUS33) in New York City, and JPMorgan Chase Bank (CHASUS33) in New York City, describing them as "Intermediary bank[s]."

l)   People's Militia of New Russia maintained accounts at Sberbank with card numbers ending in 5169 and 1583, as well as a bank account ending in 5978.   People's Militia of New Russia requested that transfers in U.S. dollars be transferred through Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City with account number ending in 1742, or Sberbank's correspondent

account at Bank of New York Mellon in New York City with account number ending in 6837.

346.     Defendants Sberbank and VTB Bank also provided bank accounts and banking services to the DPR by and through additional DPR fundraisers.

347.     During the relevant period, the DPR, by and through its fundraisers, also solicited and received funds via Defendants MoneyGram and Western Union, and the DPR received and used the funds sent through these transfers, including—but not limited to—as follows:

a)     Center for New Russia's website provided instructions on donating funds via Western Union, and expressly documented numerous donations received using the services of Western Union.

b)     Veche's website provided instructions on donating funds via Western Union or MoneyGram.

c)     EOT's website provided instructions on donating funds via Western Union or MoneyGram.

d)     Save Donbass's website provided instructions on donating funds via Western Union or MoneyGram.

e)     The Voice of Sevastopol's website provided instructions on donating funds via Western Union or MoneyGram.

f)     Sputnik & Pogrom provided instructions online on donating funds via Western Union or MoneyGram, including through Zhuchkovsky.

g)     World Crisis's website provided instructions on donating funds via Western Union or MoneyGram.

h)      Zhuchkovsky's social media posts provided instructions on donating funds via Western Union.

348.      Defendants MoneyGram and Western Union also provided money transfer services to the DPR by and through additional DPR fundraisers.

349.      At all times, the bank and/or money transfer accounts described above belonged to the DPR's fundraisers.

350.      At all times, all of the funds in those accounts belonged to the DPR's fundraisers and were under their control.

351.      At all times, all of the transactions carried out in the accounts were carried out by the DPR's fundraisers or at their direction.

352.      At all times, the funds raised through these accounts were for the explicit purpose of purchasing tactical or lethal equipment that the DPR used to commit violent acts that endangered human life and appeared intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

## IX.    Defendants Had Knowledge of the DPR's Terrorist Activities

353.      Defendants, like the rest of the world, knew that the DPR and its affiliates were routinely perpetrating acts of terrorism against civilians.

354.      At all relevant times, the DPR's policy and practice of carrying out terrorist attacks on civilians were notorious and well-known to Defendants and to the public at large, including as described in Paragraphs 104-144, above.

355.      From its inception, the DPR exhibited a pattern and practice of attacking and intimidating civilians, and operated with no regard for civilian life, often murdering and torturing

civilians.  In the months before July 17, 2014, the DPR openly, publicly, and repeatedly carried out multiple acts of terrorism on civilians.

356.     The reputation of the DPR and its affiliates as violent organizations that engaged in and continue to engage in terrorist acts was and is widespread and has been extensively reported in the international news media.  Prior to the missile attack that killed Quinn and 297 others, the international media and human rights organizations reported numerous incidents of abduction, hostage-taking, torture, and murder of civilians by the DPR, including as described in Paragraphs 104-144, above.

357.     The classification of the DPR in May 2014 as a terrorist organization by the Ukrainian Prosecutor General's Office was public information and was reported in the world news media.  This information was known or had to be known to the Defendants.

358.     At all relevant times, Defendants knew or had to know that the DPR and its affiliates were violent organizations that engaged in terrorist activity.  The terrorist acts carried out by the DPR were widely known and constituted one of the highest-profile international news stories at the time.  International media reports and broadcasts at the time were replete with daily coverage of the acts of terrorism committed by the DPR, including as described in Paragraphs 104-112, above.

359.     Despite knowing that the DPR engaged in acts of terrorism, Defendants nevertheless provided material support and financing, including banking and money transfer services, to the DPR, its members, and affiliated groups.

360.     At the time Defendants provided this material support and financing to the DPR and its affiliates, Defendants knew precisely the type of groups they were aiding and supporting.

The DPR was already presiding over a campaign of terror in eastern Ukraine, including the murder and torture of civilians who supported Ukrainian unity.

361.     Defendants knew and/or deliberately disregarded the fact that the DPR would use the material support and financing provided by Defendants to facilitate, enable, and carry out terrorist attacks in a manner consistent with the DPR's previous pattern of disregard for civilian life, including the downing of an airplane with 298 civilians on board.

## X.     Defendants Knew or Were Deliberately Indifferent That Their Conduct Would Result in Terrorism

362.     At all relevant times, the Government of the Russian Federation, including its President Vladimir Putin, provided consistent political support for the DPR.

363.     At all relevant times, Defendants Sberbank and VTB Bank were owned by the Government of the Russian Federation.

364.     At all relevant times, upon information and belief, Defendants Sberbank and VTB Bank provided banking and money transfer services to the DPR, including its fundraisers, and its affiliates as a matter of official policy, consistent with the policy of the Government of the Russian Federation and the agenda of its President Vladimir Putin, in order to assist and advance the DPR's terrorist activities in eastern Ukraine, in order to assist and advance the DPR's goal of using terrorism to establish a Novorossiya state, and in order to assist and advance the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and civilian population.

365.     The Government of Ukraine has stated, "Sberbank, a large financial institution that is majority state-owned, has used its infrastructure to facilitate billions of rubles' worth of transfers to the DPR and LPR."  (Government of Ukraine's Brief ¶ 277.)  The Government of Ukraine has also identified VTB Bank as using its infrastructure and services to funnel billions of rubles to the leadership of the DPR, including its fundraisers.

366.     As described at Paragraphs 164-169, *supra*, due to an investigation into terrorism financing by Ukrainian authorities that began in April 2014, both Sberbank and VTB had actual knowledge that they were providing material support and financing to the DPR and its affiliates, including through the DPR's open and notorious online fundraising campaign described herein.   Prior to the downing of MH17, Sberbank specifically acknowledged conducting an "internal investigation" relating to its provision of material support and financing to the DPR and its affiliates.

367.     At all relevant times, Defendants knew or had to know that the DPR was a violent organization that had carried out numerous terrorist acts on civilians, and that planned and intended to carry out additional terrorist acts.

368.     At all relevant times, Defendants knew or had to know that terrorist organizations such as the DPR require banking and money transfer services in order to operate and in order to plan, prepare for, and carry out terrorist attacks, and that providing banking and money transfer services to the DPR, including by and through the DPR's fundraisers, would enable the DPR to plan, prepare for, and carry out terrorist attacks, because such knowledge is notorious and known to the public at large.

369.     At all relevant times, Defendants continuously supported the DPR and their violent goals and activities against the Ukrainian government and the civilian population, or were deliberately indifferent to those violent goals and activities, consciously disregarding the strong possibility that the banking and money transfer services they provided to the DPR, including by and through the DPR's fundraisers, would be used to further the DPR's terrorist activities and their

campaign to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

370.    At all relevant times, Defendants supported or were deliberately indifferent to the DPR's terrorist acts against civilians and the DPR's goal of using terrorism to coerce, intimidate, and influence civilians, the Ukrainian government, and other governments seeking to contain Russian aggression.

371.    At all relevant times, Defendants provided banking services to the DPR, including by and through the DPR's fundraisers, and executed the money transfers that funded the DPR, with knowledge or deliberate indifference that those money transfers assisted and advanced the DPR's terrorist acts against civilians and assisted and advanced the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and the civilian population.

372.    At all relevant times, Defendants Sberbank and VTB knew or had to know that the accounts at issue were owned and controlled by the DPR's fundraisers, and that the DPR and its affiliates were the ultimate beneficiaries of those accounts.

373.    At all relevant times, Defendants Western Union and MoneyGram knew or had to know that the money transfers to the DPR's fundraisers were being directed to the DPR to support their terrorist acts and campaign of intimidation and coercion.

374.    The DPR's involvement in terrorist acts in the Donbass was notorious public knowledge in 2014, and was widely reported on by the international news media, including as described in Paragraphs 104-112, above.

375.    At all times, the DPR's fundraisers openly, publicly, and repeatedly acknowledged on their websites that they were raising money for the DPR and provided their account numbers with Defendants, including as described in Paragraphs 177-332, above.

376.     At all times, a simple internet search would have informed Defendants that they were providing banking and money transfer services to the DPR, including its fundraisers, and its affiliates, and specifically that the DPR was relying upon these banking and money transfer services to purchase lethal equipment and other supplies necessary for its violent terrorist activities in the Donbass.

377.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because those facts were notorious and public knowledge.

378.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had statutory and legal duties to know their customers, perform due diligence, and refuse to provide banking and financial services to terrorist organizations such as the DPR.

379.     By providing banking services to the DPR and executing the money transfers that funded the DPR, Defendants breached their statutory and legal duties under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, and other related statutes, rules and regulations, to know their customers and perform due diligence and refuse to provide banking and money transfer services to violent terrorist organizations such as the DPR and its affiliates.

380.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had and have statutory and legal duties to monitor, report, and refuse to execute illegal, suspicious, and/or irregular banking and financial transactions.  The money transfers to the DPR's fundraisers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

381.     When executing money transfers into bank accounts controlled by the DPR's fundraisers, Defendants were and are at all times provided with and were aware of the names of all parties to the money transfers, including the names of the originator and of the intended beneficiaries and recipients of each such money transfer.  Thus, Defendants knew in real time that each of the money transfers was made to, from, and/or between accounts belonging to the DPR's fundraisers, and Defendants had the technical and practical ability to block and refuse to carry out the money transfers.

382.     Moreover, as described in Paragraphs 177-332, above, the DPR's fundraisers publicly listed their account information with Defendants on their websites, which were visible to anyone worldwide, including Defendants.

383.     Western Union, as part of its compliance function, conducts internet searches relating to possible terrorist financing, including by utilizing analysts who "hunt through the dark web to gain insight into the tactics . . . terrorist financiers might use to evade detection."[101]  As one Western Union executive has explained, "We actually monitor the dark Web as well and see what's going on out there."[102]  Because the DPR's solicitations to raise funds to purchase lethal equipment were easily accessible and pervasive online—far more readily than material on the "dark web"—Western Union therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR.

384.     MoneyGram similarly requires each of its branches to "monitor and review all transactions . . . to better identify those transactions that might be suspicious, high-risk, or

---

[101] Bloomberg, "Give Us Your Tired, Your Poor, Your Huddled Masses Yearning to Send Cash," *available at* https://www.bloomberg.com/news/features/2017-06-16/for-western-union-refugees-and-immigrants-are-the-ultimate-market

[102] Datanami, "Western Union Clamps Down on Fraud with ML," *available at* https://www.datanami.com/2018/12/03/western-union-clamps-down-on-fraud-with-ml/

otherwise out-of-the-ordinary."  Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, MoneyGram therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR.

385.    VTB Bank purports to have compliance programs in place to identify possible terrorist financing, stating that it has "developed and implemented a consolidated policy on countering money laundering and terrorist financing, as well as international sanctions compliance." Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, VTB Bank therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR, including by maintaining accounts utilized by prominent DPR fundraisers in support of the DPR's terrorist activities.

386.    Sberbank similarly purports to have compliance programs in place to identify possible terrorist financing, stating that it has "developed and implemented" a "counter-terrorism financing" internal control policy, including "customer due diligence."  Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, Sberbank therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR, including by maintaining accounts utilized by prominent DPR fundraisers in support of the DPR's terrorist activities.

387.    Defendants' provision of material support and financing to the DPR is consistent with the fact that several Defendants, including MoneyGram and Western Union, have been previously sanctioned for facilitating money laundering, wire fraud schemes, and/or terrorism financing.

388.     In November 2012, MoneyGram admitted, via a deferred prosecution agreement ("DPA") with the United States Department of Justice ("DOJ"), to money laundering and wire fraud violations.  MoneyGram's services were used in mass marketing and consumer phishing scams that defrauded thousands of victims in the United States.  As part of the settlement, MoneyGram created a $100 million victim compensation fund and retained a corporate monitor to regularly report to the DOJ for an initial five-year period.

389.     During the course of the 2012 DPA, MoneyGram experienced significant weaknesses in its AML and anti-fraud program, inadequately disclosed these weaknesses to the government, and failed to complete all of the DPA's required enhanced compliance undertakings.  As a result of its failures, MoneyGram processed at least $125 million in additional consumer fraud transactions between April 2015 and October 2016.

390.     On November 8, 2018, MoneyGram agreed to extend by 30 months its 2012 DPA and forfeit $125 million due to significant weaknesses in its anti-fraud and anti-money laundering ("AML") program, which resulted in a breach of MoneyGram's 2012 DPA.  MoneyGram further agreed to enhance its anti-fraud and AML compliance programs.

391.     In January 2017, Western Union admitted to wire fraud violations and agreed to pay $586 million for turning a blind eye as criminals used its services for money laundering and fraud.  Between 2004 and 2012, Western Union knew of the fraudulent transactions, but failed to investigate hundreds of thousands of consumer complaints.  Fraudsters had engaged in various advance-fee scams, including offering fake jobs and lottery prizes, and processed the transactions through Western Union.  Western Union was also utilized to make payments to human smugglers.  As part of the settlement, Western Union was required to maintain records of the recipients of money transfers and implement a comprehensive anti-fraud program.

**XI.    Plaintiffs' Injuries Are the Proximate Result of Defendants' Conduct and Actions**

392.    Terrorist organizations, such as the DPR, need to transfer and receive funds in order to operate, and in order to plan, prepare for, and carry out terrorist acts.

393.    The provision of banking and money transfer services to the DPR, including its fundraisers, and its affiliates enables them to plan, prepare for, and carry out terrorist acts, and enhances their ability to implement such acts.

394.    The DPR used the banking and money transfer services provided by Defendants to transfer and receive funds necessary for planning, preparing, and carrying out terrorist activity, including shelling in civilian areas, controlling territory from which it launched assaults like the downing of MH17, and using surface-to-air missiles to bring down planes, in particular MH17. The banking and money transfer services provided by Defendants substantially increased and facilitated the DPR's ability to plan, prepare for, and carry out terrorist acts on civilians, including the downing of the MH17 airplane.  The DPR planned, made the necessary preparations, and carried out the missile attack on the plane, including through acquiring and controlling the territory from which it launched the missile, utilizing (a) funds held by them in bank accounts with Defendants; (b) funds received by them as part of money transfers provided by Defendants; and/or (c) funds that were freed up or otherwise made available to the DPR as a result of the money transfers provided by Defendants.

395.    The ongoing maintenance of these bank accounts and the processing of these money transfers was enabled, facilitated, and carried out by Defendants' conduct and actions described herein.

396.    By providing the DPR with access to funds, and a diverse array of global financial supporters, in the days and weeks leading up to and immediately following the attack on

MH17, Defendants' conduct and actions were a substantial factor in the DPR's ability to launch a surface-to-air missile and to control territory, including the territory necessary to set up, operate, and ultimately launch the missile system that brought down MH17; the DPR controlled this territory utilizing weapons, tactical equipment, and ammunition procured with the material support of Defendants.

397.     Because they provided the DPR with access to critical funds in the days and weeks leading up to the attack on MH17, it was reasonably foreseeable that Defendants' provision of material support to the DPR would make possible the DPR's well-documented ongoing terrorist attacks, including ultimately the attack on MH17.

398.     The downing of the airplane carrying Quinn and 297 other innocent victims was therefore enabled, facilitated, and proximately caused by Defendants' conduct and actions described herein.

399.     Plaintiffs' injuries and Quinn's death are thus the direct and proximate result of Defendants' conduct and actions.

### CLAIM I – PROVISION OF MATERIAL SUPPORT TO TERRORISTS

400.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 399 as if fully set forth herein.

401.     The actions of Defendants in providing financial services to the DPR, including its fundraisers,  and its affiliates and/or executing the money transfers that funded the DPR, constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

402.     As required by 18 U.S.C. § 2331, the actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted a violation of the criminal laws of the United

States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339A, which prohibits the provision of material support to terrorists.

403.     As required by 18 U.S.C. § 2331, Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or tactical equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims its intent to continue such acts of terror.

404.     As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities.  Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

405.     Defendants knowingly and intentionally provided financial services to the DPR, including its fundraisers, and its affiliates and/or executed the money transfers that funded the DPR, when they knew or were deliberately indifferent to the fact that the DPR, including its fundraisers, and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and other governments seeking to contain Russian aggression, and to intimidate and coerce the civilian population.

406.     As a direct and proximate result of Defendants' provision of financial services to the DPR, including its fundraisers, and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

407.     Defendants reasonably could have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

408.     Due to the facts described above, including but not limited to the anti-American sentiment associated with the DPR, and the U.S. Department of State warnings relating to the risk to Americans of traveling in the Donbass region, Defendants reasonably could have foreseen that their provision of financial services to the DPR would result in injury to one or more United States citizens.

409.     Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## CLAIM II – FINANCING OF TERRORISM

410.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 399 as if fully set forth herein.

411.     The actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

412.     As required by 18 U.S.C. § 2331, the actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339C, which prohibits the financing of terrorism.

413.     As required by 18 U.S.C. § 2331, Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or tactical equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims its intent to continue such acts of terror.

414.     As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities.  Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

415.     Defendants knowingly and intentionally provided financial services to the DPR, including its fundraisers, and its affiliates and/or executed the money transfers that funded the DPR, when they knew or were deliberately indifferent to the fact that the DPR, including its fundraisers, and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and other governments seeking to contain Russian aggression,  and to intimidate and coerce the civilian population.

416.      As a direct and proximate result of Defendants' provision of financial services to the DPR, including its fundraisers, and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

417.      Defendants reasonably could have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

418.      Due to the facts described above, including but not limited to the anti-American sentiment associated with the DPR, and the U.S. Department of State warnings relating to the risk to Americans of traveling in the Donbass region, Defendants reasonably could have foreseen that their provision of financial services to the DPR would result in injury to one or more United States citizens, such as Quinn.

419.      Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

a.      awarding Plaintiffs compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

b.      awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 2333;

c.      awarding Plaintiffs the costs of suit as incurred in this action and attorneys' fees pursuant to 18 U.S.C. § 2333;

d.      awarding Plaintiffs any equitable relief to which they may be entitled;

e.      awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowable by law; and

f.      all other relief as may be appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated:  October 5, 2020

Respectfully submitted,

JENNER & BLOCK LLP

By:  s/ *David Pressman*
_____

David Pressman
Lee S. Wolosky
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
Telephone:  (212) 891-1600
Fax: (212) 891-1699
dpressman@jenner.com
lwolosky@jenner.com

*Attorneys for Plaintiffs Thomas Schansman, individually, as the surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of X.S., a minor, Catharina Teunissen, individually, as surviving parent of Quinn Lucas Schansman, and as personal representative of the Estate of Quinn Lucas Schansman, and Nerissa Schansman, individually, as the surviving sibling of Quinn Lucas Schansman*