UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and <br><br> CATHARINA TEUNISSEN, individually, and as surviving Parent and personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and <br><br> NERISSA SCHANSMAN, individually, and as surviving Sibling of QUINN LUCAS SCHANSMAN, <br><br>           Plaintiffs, <br><br>       -against- <br><br> SBERBANK OF RUSSIA PJSC, THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., MONEYGRAM INTERNATIONAL, INC., MONEYGRAM PAYMENT SYSTEMS, INC., and VTB BANK PJSC, <br><br>           Defendants. | Index No. 1:19-CV-02985 (ALC) (GWG) <br><br> Hon. Andrew L. Carter, Jr. <br><br> **ORAL ARGUMENT REQUESTED** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### MEMORANDUM IN SUPPORT OF MOTION BY SBERBANK OF RUSSIA TO DISMISS THE SECOND AMENDED COMPLAINT

John S. Kiernan
William H. Taft V
Román J. Rodriguez
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

*Counsel for Defendant Sberbank of Russia*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

I.    Sberbank's Contacts with New York.............................................................................3

II.   The Donetsk People's Republic and Its Supporters.......................................................4

III.  The U.S. Response to DPR ...........................................................................................6

ARGUMENT .........................................................................................................................7

I.    The SAC Does Not Establish Personal Jurisdiction Over Sberbank ............................7

    A.    The SAC Does Not Establish General Jurisdiction Over Sberbank ......................8

    B.    The SAC Does Not Establish Specific Jurisdiction Over Sberbank....................10

        1.    The Scope of Amenability to Personal Jurisdiction Based on
              Correspondent Accounts in New York Is Limited...................................11

        2.    The SAC's Pleadings Do Not Establish Personal Jurisdiction ................12

            a.    The Cited Transactions Are Insufficient to Confer Personal
                  Jurisdiction Over Sberbank ........................................................12

            b.    The SAC's Allegations of Dissemination of Information About
                  Sberbank's Correspondent Accounts Are Similarly Insufficient ..13

II.   The SAC Does Not Plead Sustainable Claims Under the ATA....................................16

    A.    The SAC Does Not Allege Sberbank's Legally Culpable Knowledge or Intent to
          Support Terrorist Acts or Sberbank's Breach of a Legal Duty to Investigate Its
          Customers Sufficiently to Learn Their Purposes...................................................18

        1.    The Obligation to Plead Facts Showing Knowledge or Intent.................18

        2.    The Absence of the Asserted Duty to Investigate ....................................22

    B.    The SAC Does Not Allege That Sberbank Is Liable Under Section 2333 ..........24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Ahmad v. Christian Friends of Israeli Communities*, No. 13-cv-3376(JMF), 2014 WL
    1796322 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) ......................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................18

*Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698 (2d Cir. 2007) ...........................................10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................18

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)......................................................6

*Comty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216(DLC), 2015 WL 4164763
    (S.D.N.Y. July 10, 2015) ..................................................................................... 11, 13

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ...........................................6

*Daimler AG v. Bauman*, 571 U.S. 117 (2014)................................................................................8, 9

*DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018) .......................................8

*Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019) .............................. 21, 25

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)....................................................23

*Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915 (2011) .........................................10

*Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149 (D. Nev. 2001) ...............................9

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) ...........................................................8

*Hatfield v. Asphalt International, Inc.*, No. 03-cv-1372(DAB), 2004 WL 287680
    (S.D.N.Y. Feb. 11, 2004)................................................................................................9

*Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-3590(TS)(SN), 2017 WL 816136
    (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)....................................... 11, 13

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)...........................................................17

*Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017), *aff'd*, 705
    F. App'x 40 (2d Cir. 2017) ......................................................................................... 19, 22

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005)..................................................8

*In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010).......................19

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995) ...................................6

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)....................................................................10

*JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-cv-3844(CS), 2019 WL 2578306
    (S.D.N.Y. June 24, 2019) ...............................................................................................9

*Kaplan v. Lebanese Canadian Bank, SAL*
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ...................................................... 19-20, 22, 24, 25

*Kemper v. Deutsche Bank*, 911 F.3d 383 (7th Cir. 2018) .................................................... 17, 18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)....................12

*Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) ........................................ 12, 15

*Linde v. Arab Bank*, 882 F.3d 314 (2d Cir. 2018) .................................................. 17, 18, 24, 25

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) ..........................................................6

*O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709(LTS)(GWG), 2019 WL 1409446
    (S.D.N.Y. Mar. 28, 2019) ................................................................................ 17, 18, 22, 25

*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016) ......................................................... 10, 11, 12

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ...........................................................................21

*Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10-cv-4754(JGK), 2011 WL
    4056306 (S.D.N.Y. Sept. 13, 2011) ................................................................................ 12, 13

*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018) .............................................................8

*Stutts v. De Dietrich Group*, No. 03-cv-4058(ILG), 2006 WL 1867060 (E.D.N.Y. June
    30, 2006)...........................................................................................................................25

*United States v. Davidson*, 175 F. App'x 399 (2d Cir. 2006) ......................................................4

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18-cv-1876(PAE), 2019
    WL 2327810 (S.D.N.Y. May 30, 2019)................................................................................12

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18-cv-1876(PAE), 2020
    WL 4586729 (S.D.N.Y. Aug. 10, 2020) .......................................................................6, 13

*Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016)...........................................................................8

*Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342 (S.D.N.Y. Sept. 30, 2019) ......................19

*Zapata v. HSBC Holdings PLC*, No. 19-3355-cv, 2020 WL 6112271 (2d Cir. Oct. 16,
    2020) (Summary order) ....................................................................................................17

S<small>TATUTES</small>

18 U.S.C. § 2331 ................................................................................................*passim*

18 U.S.C. § 2333 ................................................................................................*passim*

18 U.S.C. § 2337 ......................................................................................................21

18 U.S.C. § 2339A ..............................................................................................*passim*

18 U.S.C. § 2339B .......................................................................................... 16, 17, 18

18 U.S.C. § 2339C ..............................................................................................*passim*

28 U.S.C. § 1605 ......................................................................................................21

31 U.S.C. § 5318 ......................................................................................................23

CPLR § 301 ................................................................................................................9

CPLR § 302 ........................................................................................................10, 11

O<small>THER</small> A<small>UTHORITIES</small>

31 C.F.R. § 1010.610 ...............................................................................................23

79 Fed. Reg. 46,302 (Aug. 7, 2014) ..........................................................................7

79 Fed. Reg. 63,021 (Oct. 21, 2014) ..................................................................6-7, 20

80 Fed. Reg. 13,957 (Mar. 17, 2015) ........................................................................7

EU Council Decision 2014/499/CFSP (July 25, 2014) ..............................................7

Fed. R. Civ. P. 12 ..............................................................................................1, 6, 17

Federal Financial Institutions Examination Council, Bank Secrecy Act (BSA)/Anti-
    Money Laundering (AML) Examination Manual (Feb. 27, 2015) ...................24-25

Defendant Sberbank of Russia (misnamed Sberbank of Russia PJSC in the caption) ("Sberbank") submits this memorandum in support of its motion to dismiss the Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to plead legally sustainable claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*

## PRELIMINARY STATEMENT

This case involves a grieving family's effort to hold Sberbank legally responsible for the tragic death of Quinn Schansman, an eighteen-year-old Dutch-American citizen who was killed on July 17, 2014 when Malaysia Airlines Flight 17 ("MH17") was shot down over eastern Ukraine. The Donetsk People's Republic ("DPR"), a pro-Russia separatist group, allegedly claimed a role in downing MH17. Plaintiffs allege that Sberbank provided banking services for purported fundraisers for DPR. Plaintiffs claim that these banking services constituted knowing support for terrorist acts in violation of U.S. criminal law and the ATA.

Sberbank submits this brief to address particularly the absence of personal jurisdiction over Sberbank and the SAC's failure to (1) allege that Sberbank had the knowledge or intent required to commit the crime of supporting a terrorist act under 18 U.S.C. § 2339A or 2339C, the statutory predicates for Plaintiffs' ATA claim or (2) plead facts sustainably alleging acts of violence and coercion by Sberbank necessary to establish a violation of 18 U.S.C. § 2333(a). Sberbank joins in the other Defendants' submissions seeking dismissal of the SAC, including (1) VTB Bank's arguments regarding absence of personal jurisdiction and (2) Western Union's and MoneyGram's joint arguments that (A) the SAC fails to plead the required causal link between Defendants' alleged conduct and Plaintiffs' harm, (B) Defendants' alleged acts were not acts of "international terrorism" within the meaning of 18 U.S.C. § 2331(1)(A) and (C) Plaintiffs' claims fall within the "act of war" exception to the ATA.

1

The SAC does not establish general personal jurisdiction over Sberbank, because Sberbank is not "at home" in New York and the SAC's claim of specific jurisdiction should be rejected for failure to plead facts supporting a finding that Plaintiffs' ATA claims arise from Sberbank's conduct in New York. While the SAC tries to predicate specific jurisdiction on allegations that Sberbank knowingly facilitated contributions to DPR supporters for terrorist purposes through correspondent accounts Sberbank held at U.S. banks (i.e., accounts used to transfer funds from the United States to accounts held by Sberbank customers in Russia), the SAC provides no factual basis for a finding that any non-trivial contributions flowed through any of these correspondent accounts, that Sberbank took any steps to facilitate any such transfers or that any transfers have a cognizable nexus to the wrongful activity alleged to have caused Quinn Schansman's death.

Even after obtaining comprehensive documentary discovery from two U.S. banks with Sberbank correspondent accounts, resulting in the identification of two money transfers collectively amounting to $300 directed to an individual the SAC calls a DPR supporter, Plaintiffs still cannot predicate jurisdiction over Sberbank on more than its mere mechanical processing of these two transfers of trivial amounts. Those transfers do not remotely satisfy Plaintiffs' obligation to plead facts showing that the claimed harm arose from Sberbank actions in New York.

Plaintiffs cannot remedy this inadequacy by proposing an inference of multiple large contributions facilitated by Sberbank through U.S. correspondent accounts because various DPR supporters described in websites how donors could make contributions through U.S. dollar accounts. After extensive research and pleading through two amendments to the complaint, Plaintiffs have identified only one social media posting (and no DPR website) that identified a

Sberbank U.S. correspondent account, which even then identifies the Sberbank account as only one of multiple possible contribution methods. This does not amount to a plausible basis for an inference, contrary to the actual results of Plaintiffs' discovery from U.S. banks, that Sberbank facilitated any non-trivial transfer to a DPR supporter through a correspondent account with a New York bank.

On the merits, the SAC's allegations about Sberbank's provision of routine Russian banking services to alleged DPR fundraisers do not sustainably plead either (1) Sberbank's required knowledge or intent—criminal *mens rea*—to support an ATA claim for direct liability (in a context where aiding and abetting liability is statutorily unavailable, because no alleged recipient had been designated a terrorist on U.S. lists) or (2) the other required elements for primary liability under the ATA's core provision, § 2333(a): a violent or life-endangering act by Sberbank, plus its purpose to intimidate or coerce a government or civilian population. The United States has never designated DPR a Foreign Terrorist Organization, only listed DPR as a Specially Designated National *the day before* MH17 was downed, and has never identified any of the SAC's alleged DPR supporters *on any list* before July 17, 2014. Plaintiffs' claim that Sberbank had a duty under the USA PATRIOT Act and related regulations to discover that these customers were supporters of terrorist acts, because an investigation of those customers would have revealed their support for DPR, mischaracterizes the scope of Sberbank's obligations of inquiry under both U.S. banking law and the operative scienter standard, which requires a showing of Sberbank's knowledge or intent to commit a crime.

## STATEMENT OF FACTS

### I.    Sberbank's Contacts with New York

Sberbank is a Russia-headquartered bank engaged in business activities around the world. Sberbank's alleged U.S. consumer banking activity relevant to the SAC consists solely of

holding correspondent accounts at a number of U.S. banks to facilitate transfers of funds between the United States and customers abroad, including in Russia.[1]  *See* SAC ¶¶ 48, 60.

## II.    The Donetsk People's Republic and Its Supporters

In 2014, following public demonstrations, pro-Russian Ukrainian groups took control of government buildings in Donetsk, declaring the establishment of DPR.  SAC ¶¶ 91-93.  From DPR's formation until July 17, 2014, DPR's activities were exclusively directed to Russian nationalist and separatist actions in eastern Ukraine.  *See, e.g.*, SAC ¶¶ 102, 106, 108, 121, 124, 126.  On July 17, 2014, a surface-to-air missile shot down MH17, a commercial passenger airliner flying over eastern Ukraine, killing all 298 people on board, including Quinn Schansman.  SAC ¶ 1.  As explained in Western Union's and MoneyGram's joint brief, DPR's statement claiming responsibility for this act (partially and selectively quoted in SAC ¶ 77) indicated that DPR believed it had aimed at and hit a Ukrainian military target, with no civilian casualties.

The SAC does not allege that Sberbank facilitated any funding directly to DPR from abroad.  SAC ¶ 149.  Instead, the SAC identifies a number of individuals and groups ("DPR Supporters") that it alleges were fundraisers soliciting donations to support DPR's activities from individuals in Russia and abroad in 2014.  *See, e.g.*, SAC ¶ 7.  The SAC alleges that these supporters operated websites identifying their support for DPR and listed on their websites accounts where donations could be sent, including at Defendants Sberbank and VTB Bank, as well as other means to contribute, including via Defendants Western Union and MoneyGram.  SAC ¶ 150.

---

[1]    A U.S. sender that wants to transfer funds to a Sberbank account in Russia can request a transfer from any U.S. bank where the sender has funds.  That bank will accomplish the transfer through either (1) its own or another bank's correspondent account in Russia, through which the money will be transferred to Sberbank or (2) a Sberbank correspondent account in the United States.  In the second scenario, Sberbank acts as an account-holding customer at a U.S. bank, and then as the bank to an account-holding customer in Russia to whom the funds are transferred, forming a bridge between the banking systems in the two countries.  *See generally United States v. Davidson*, 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (explaining purposes of correspondent banking); SAC ¶¶ 49-51.

Some DPR Supporters' websites allegedly included information on how to donate to DPR Supporters from outside Russia or Ukraine. *See, e.g.*, SAC ¶ 302. While the SAC recites numerous examples of such information, it cites only two instances where alleged DPR fundraisers made internet postings (both on social media pages, not DPR Supporter websites) that provided information about Sberbank U.S. correspondent accounts. One of these two postings explicitly sought funds for the Luhansk People's Republic, *not* for DPR, while the other identified a Sberbank account only as one of several possible vehicles for contribution. SAC ¶¶ 58 & 294, 283. The SAC presents no basis for inferring that these postings actually prompted anyone to make transfers to alleged DPR Supporters through Sberbank's U.S. correspondent accounts. Although the SAC cites websites of DPR Supporters recording in detail their receipt and use of funds, *see* SAC ¶¶ 163-341, the SAC does not identify a single website or communication from a DPR Supporter reporting any transfer through a Sberbank U.S. correspondent account to an account of a DPR Supporter.

Instead, the SAC advances new allegations about two transfers, both to alleged DPR Supporter Ekaterina Gubareva, flowing through a Sberbank correspondent account in New York before MH17 was downed. *See* SAC ¶ 191. Plaintiffs identified these transfers after obtaining comprehensive document discovery during the pendency of Sberbank's prior motion to dismiss, authorized by Magistrate Judge Gorenstein, from two banks where Sberbank held correspondent accounts in New York. *See* Dkt. 136 (order granting Plaintiffs leave to serve non-party subpoenas); Dkt. 140 at 1 ("Plaintiffs complied with the Court's Order and served subpoenas on Bank of America…and Bank of New York Mellon [] as directed."). Plaintiffs have placed further details of these transfers before the Court in prior submissions, describing them as "transfers that took place on June 9 and July 2, 2014…for $100.00 and $200.00 respectively."

*See* Dkt. 143 at 2.[2]  The SAC does not even purport to identify any basis for non-speculatively inferring from these two trivial transfers that Sberbank knowingly facilitated any transfer, or that other such transfers took place through Sberbank's U.S. accounts.

## III.   The U.S. Response to DPR

The U.S. Treasury's Office of Foreign Asset Control ("OFAC"), which maintains lists of entities and individuals who should not receive banking services under U.S. law, took its first official action regarding DPR on July 16, 2014, one day before the MH17 incident (and well after any contribution of funds linkable to that incident), listing DPR as a Specially Designated National ("SDN") on a master list (the "SDN List").  SAC ¶ 134.  This sanction was less severe than the available alternatives of designating DPR as a Specially Designated Global Terrorist or a Foreign Terrorist Organization (an "FTO"), which would have triggered heightened ATA obligations, but it still meant that U.S. banks must thereafter block transfers to DPR.  *See* Sanctions Actions Pursuant to Exec. Orders 13660, 13661 and 13662, 79 Fed. Reg. 63,021 at

---

[2]    On a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials. *See, e.g., Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.* ("*Vasquez II*"), No. 18-cv-1876(PAE), 2020 WL 4586729, n.1 (S.D.N.Y. Aug. 10, 2020), *notice of appeal filed*.

The procedural history and the identified facts related to these transactions are properly before the Court in considering this motion to dismiss.  These facts are integral to the SAC, as discovery of these bank records was the sole source for the information in SAC ¶ 191, and Plaintiffs have had complete access to the information they are referencing.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint," consideration of the facts on a Rule 12 motion is proper); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite" to court's consideration of the outside facts) (emphasis in the original).  In addition, the SAC only partially and selectively describes the documents showing these two transactions. *See Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation omitted); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (incorporation by reference "generally occurs when the material considered…contain[s] obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.").

63,022 (Oct. 21, 2014).  DPR has never been the subject of any stronger sanction than its SDN designation.

Similarly, none of the large group of alleged DPR Supporters identified in the SAC was identified in any published U.S. list of sensitive or sanctioned individuals or entities before MH17 was downed.  OFAC did not list or sanction any individuals assertedly related to DPR until June 20, 2014 and their names were not published in the Federal Register until August 7, 2014.  SAC ¶ 131; *see* Designation of Individuals and Entities Pursuant to Exec. Order 13660 or Exec. Order 13661, 79 Fed. Reg. 46,302 (Aug. 7, 2014).  Alleged DPR leader and fundraiser Ekaterina Gubareva, the recipient of the two transfers from the United States identified in the SAC, was not sanctioned until March 11, 2015.  SAC ¶ 137; *see* Sanctions Actions Pursuant to Executive Orders 13660 and 13685, 80 Fed. Reg. 13,957 (Mar. 17, 2015).[3]

## ARGUMENT

### I.    The SAC Does Not Establish Personal Jurisdiction Over Sberbank

The SAC should be dismissed for failure to establish personal jurisdiction over Sberbank. This action arises from conduct that took place in Ukraine, and the SAC does not justify haling Sberbank into court in New York.  Sberbank's presence in New York is far too limited to support general jurisdiction over it, and the SAC does not adequately allege how Sberbank's asserted responsibility for Quinn Schansman's death arises from Sberbank activities in New York. Plaintiffs' identification of only two instances of very small dollar transfers via a Sberbank correspondent account to an alleged DPR Supporter, with no linkage between these small transfers and the downing of MH17, is legally insufficient to support jurisdiction in New York.

---

[3]      None of the DPR Supporter entities is alleged to have been on any sanctions list in any country at any time. As for individuals, the EU ultimately sanctioned Ekaterina Gubareva and her husband Pavel, but only after July 17, 2014.  *See* Council Decision 2014/499/CFSP (July 25, 2014), https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014D0499.

Plaintiffs' allegations about donors' capacity to make transfers through U.S. accounts and about purported Sberbank account activities in Russia are also legally insufficient to support the required jurisdictional predicate that Plaintiffs' claims arise from Sberbank actions in New York.

Plaintiffs bear the burden of establishing personal jurisdiction. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005).  To survive a motion to dismiss, they must make a prima facie showing that includes "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342-43 (2d Cir. 2018) ("Conclusory non-fact-specific jurisdictional allegations or legal conclusions couched as a factual allegation will not establish a prima facie showing of jurisdiction"); *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018).

The SAC must plead facts that establish either (1) general jurisdiction—that Sberbank is "at home" in New York or (2) specific jurisdiction—that Sberbank not only operates substantially in New York but also engaged in conduct in New York from which the Plaintiffs' claim of harm arises. *See Waldman v. PLO*, 835 F.3d 317, 331 (2d Cir. 2016).

## A.     The SAC Does Not Establish General Jurisdiction Over Sberbank

General jurisdiction over a non-U.S. defendant exists only in the "exceptional case" when defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home" in the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 & n.19 (2014).  A corporation "is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business." *Gucci Am. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014) (citing *Daimler*, 571 U.S. at 139 & n.19).  Sberbank's alleged contacts with New York as a Russian bank with "offices and branches worldwide," SAC ¶ 33, fall far short of presenting it as "at home" in New York.

Plaintiffs' allegation that Sberbank American depositary receipts trade in U.S. markets does not render Sberbank "at home" in New York. "Prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges…without thereby subjecting themselves to New York jurisdiction for unrelated occurrences." *JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-cv-3844(CS), 2019 WL 2578306, at *5 (S.D.N.Y. June 24, 2019) (internal quotation omitted).

Although Sberbank's subsidiary CIB is allegedly present in New York, the SAC contains no allegations that CIB is an agent or alter ego of Sberbank such that its activities can be imputed to Sberbank. SAC ¶¶ 34-35. Even if CIB's activities in New York *were* imputed to Sberbank, those activities would not render Sberbank "at home" in New York. *See Daimler*, 571 U.S. at 139 n.20 (no jurisdiction over foreign defendant based on activities of its in-state subsidiary; a foreign defendant's contacts must be assessed "in their entirety, nationwide and worldwide"; a "corporation that operates in many places can scarcely be deemed at home in all of them.").

Allegations that Sberbank has spent money lobbying the U.S. government, SAC ¶ 38, are also insufficient to establish general jurisdiction. The SAC does not allege that Sberbank pursued any lobbying in New York, and "personal jurisdiction may not be founded upon any kind of lobbying or government contacts such as getting information from or giving information to the government, or getting the government's permission to do something." *Graziose v. Am. Home Prods. Corp.*, 161 F. Supp. 2d 1149, 1153 (D. Nev. 2001).

The allegation that Sberbank has litigated unspecified matters in this Circuit, SAC ¶ 39, similarly does not support the exercise of general jurisdiction. *See Hatfield v. Asphalt International, Inc.*, No. 03-cv-1372(DAB), 2004 WL 287680, at *3 (S.D.N.Y. Feb. 11, 2004) (Under CPLR § 301, alleging that defendants sporadically litigated in New York is insufficient

"to establish continuous, permanent and substantial activity in New York on the part of Defendants.").

The SAC's allegations fall short of the "continuous and systematic" contacts sufficient to render Sberbank "at home" in New York. *See Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 916 (2011) ("A corporation's continuous activity of some sorts within a state…is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

### B. The SAC Does Not Establish Specific Jurisdiction Over Sberbank

In the absence of general jurisdiction, the SAC must allege facts sufficient to establish specific jurisdiction. A claim of specific jurisdiction must satisfy a twofold inquiry under New York's long-arm statute, CPLR § 302(a)(1): "Under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions." *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016); *Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007).

After comprehensive documentary discovery from two correspondent banks, extensive research into internet postings by alleged DPR Supporters and two opportunities to amend the complaint, Plaintiffs' identification of only two mechanical transfers totaling $300 through Sberbank correspondent accounts to an alleged DPR Supporter not listed on any terrorist list is too inconsequential to support personal jurisdiction over Sberbank in New York based on an allegation that DPR's asserted terrorist firing of a military-grade missile arose out of Sberbank actions in New York.

1.    **The Scope of Amenability to Personal Jurisdiction Based on Correspondent Accounts in New York Is Limited**

New York's Court of Appeals has given substantial guidance on addressing claims of specific jurisdiction under the two prongs of CPLR § 302(a)(1) based on a foreign bank's holding of a correspondent account at a New York bank. The first prong of transacting business requires a "course of dealing" by the foreign bank, namely "repeatedly approv[ing] deposits and the movement of funds through that account for the benefit of its customer" in a different jurisdiction. *Rushaid*, 28 N.Y.3d at 328-29. The second prong requires that the cause of action arise from the correspondent banking transaction, in that there is an "articulable nexus…or substantial relationship…between the business transaction and the claim asserted." *Id.* at 329.

To establish that a bank's receipt of funds through a correspondent account establishes a course of dealing, the movement of funds must be more than automatic and passive on the bank's part. *Id.* at 333 (concurring opinion stressing that required nexus exists because the bank "was not a passive banking establishment providing commercial services [but]…[r]ather,… through its executive…, knew of, and affirmatively assisted in the kickback arrangement…knew the corrupt [] employees personally,…and knew they were accepting bribes…"); *Comty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216(DLC), 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015); *Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-3590(TS)(SN), 2017 WL 816136, at nn.6-7 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66, 67 (2d Cir. 2017) (no personal jurisdiction based on transactions through a foreign bank's U.S. correspondent accounts where any instances of "the passage of money through the U.S. bank accounts were merely incidental and not specifically directed by any of the [bank] entities to facilitate the [] scheme").

To establish the required nexus, passage of funds through the correspondent account must indicate "a direct and substantial connection between [New York actions by the bank] and the

wrongful conduct that forms the basis of [plaintiff's] cause of action." *Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10-cv-4754(JGK), 2011 WL 4056306, at *7 (S.D.N.Y. Sept. 13, 2011)  The number, size and scope of the transactions relative to the alleged wrongful acts are key to this inquiry.  *See Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (2012) ("determining what facts constitute 'purposeful availment'...always requires a court to closely examine the defendant's contacts for their quality," and to reject jurisdiction based on New York actions "completely unmoored" from the alleged harm); *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18-cv-1876(PAE), 2019 WL 2327810 at *12 (S.D.N.Y. May 30, 2019) ("the amount of money transferred through the [correspondent] account on behalf of [the relevant] customer" in the forum is a factor in the jurisdictional inquiry).

### 2.    The SAC's Pleadings Do Not Establish Personal Jurisdiction

#### a.    The Cited Transactions Are Insufficient to Confer Personal Jurisdiction Over Sberbank

Courts have not predicated findings of personal jurisdiction against non-U.S. banks on their passive receipt through a correspondent account of transfers as small and inconsequential to the alleged harm as the ones alleged here.  Courts have instead wrestled with assertions of jurisdiction based on foreign banks' active engagement in arranging many large-dollar transactions, *see, e.g.*, *Rushaid*, 28 N.Y.3d at 325-27, or with support for known terrorists through a correspondent account across "dozens" of transfers and "several million dollars," *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (relying on affidavit describing these transactions).  Two transfers of this scale, having no link to the downing of a commercial plane allegedly caused by an entity different from the recipient of the funds, do not remotely satisfy Plaintiffs' obligation to identify "a direct and substantial connection between [New York actions by the bank] and the wrongful conduct that forms the

basis of their cause of action." *Societe d'Assurance de l'Est SPRL*, 2011 WL 4056306, at *7 (internal quotations omitted); *see also Vasquez II*, at *12 ("The three transactions at issue here, however, are too sparse to warrant such an inference" of purposeful availment); *Comty. Fin. Grp.*, 2015 WL 4164763, at *4 (rejecting assertion of personal jurisdiction based on only two alleged transactions through a foreign bank's correspondent account in New York).

The SAC also does not offer any facts supporting an inference that the movement of $300 through Sberbank's correspondent accounts involved any non-automatic action or was purposefully directed by Sberbank. Plaintiffs do not allege that Sberbank—or even any DPR Supporter—instructed the senders to use Sberbank for these two transactions, that DPR received this $300, or that these funds were in any respect linked to the downing of MH17, indicia of a "passive recipient, not [] an entity actively involved or exercising control." *Vasquez II*, 2020 WL 4586729, at *13. Where Plaintiffs do not allege that Sberbank actively directed the passage of particular funds through its U.S correspondent account, that gap further supports a finding of no jurisdiction based on alleged wrongdoing "arising from" these transfers. *Id.* at *13-15; *Comty. Fin. Grp.*, 2015 WL 4164763, at *4; *Hau Yin To*, 2017 WL 816136, at n.6.

### b.    The SAC's Allegations of Dissemination of Information About Sberbank's Correspondent Accounts Are Similarly Insufficient

While the SAC attempts to bolster its assertion of personal jurisdiction through extensive identification of websites of DPR Supporters, those websites do not support an inference of any further transfers to alleged DPR Supporters through U.S. correspondent banks apart from the two identified as a result of direct discovery from the banks.

The SAC cites only two social media postings that publicly displayed Sberbank's U.S. correspondent account information before MH17 was downed. One, attributed to the "People's Militia of New Russia" (a group mentioned in no other context other than this posting), by its

explicit terms seeks contributions for the Luhansk People's Republic, *not* DPR.  Kiernan Decl.
Ex. 1.  Even if the SAC could allege any transfer to the group through a U.S. account (it does
not), it would have no plausible connection to MH17.  *See* SAC ¶¶ 58, 292-94.  The second
posting is attributed to "Voice of Sevastopol."  SAC ¶ 283; Kiernan Decl. Ex. 2.  Despite the
SAC's contention that the posting says "the only way to transfer" dollars to the group was via
Sberbank, the posting explicitly identifies other methods for international transfers.  Once again,
the SAC does not allege any transfer via a Sberbank correspondent account to this recipient, let
alone a transaction via Sberbank's New York accounts or a connection to MH17.

The SAC's limited allegations regarding these two postings, the only ones it could find
mentioning Sberbank U.S. correspondent accounts, fall far short of supporting an inference of
actual transfers or otherwise demonstrating the "nexus" supporting New York jurisdiction over
Sberbank.  Other SAC allegations provide even less support for the inference Sberbank seeks:

- Paragraphs 172-74 cite a *New York Times* article from June 2015, nearly a year after the
  MH17 crash,[4] as a second-hand source that "one…group, Humanitarian Battalion" provided
  instructions on how to donate via "Sberbank using correspondent accounts at Citibank,
  JPMorgan Chase among other banks in New York City."  The article continues, "[s]o did the
  separatist group Veche."  Neither the SAC nor the article identifies any Humanitarian
  Battalion website containing these asserted instructions.  *See* SAC ¶¶ 185-90, 192-95.
  Moreover, while SAC ¶ 173 cites Veche to support its allegation that *another* bank's U.S.
  correspondent account information was posted, the SAC notably cites only the *Times* article
  for the statement that Veche disclosed Sberbank's information, presumably because Plaintiffs
  were readily able to see when citing the Veche website elsewhere in the SAC that it actually
  contained no information about Sberbank.  *See* SAC ¶ 255 ("The Veche website explained
  that international transfers of funds could be routed…to its bank account at VTB Bank."); *see*
  Kiernan Decl. Ex. 3.[5]

- Paragraphs 229-31 and 243 describe reports posted by the Center for New Russia (the
  "Center").  Neither these paragraphs nor the cited webpages refer to transfers via a Sberbank
  U.S. correspondent account.  *See* Kiernan Decl. Exs. 4-5.  The Center's financial report cited

---

[4]    Jo Becker & Steven Lee Myers, *Russian Groups Crowdfund War in Ukraine*, N.Y. Times, June 11, 2015,
https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html.
[5]    As many of the websites cited in the SAC have been taken down since 2014, the SAC relies on archived
pages available on Archive.org. *See, e.g.*, SAC ¶ 268.  The Kiernan Declaration provides copies of the cited archived
webpages, as translated by Google Translate.  Certified translations will be provided if the Court so requests.

in SAC ¶¶ 238-39 shows 100,000 rubles "transferred from Citibank account." *See* Kiernan Decl. Ex. 6. The immediately preceding chart in the cited report lists activity in the Center's Citibank account, including "-100,000 transferred to the account of Sberbank" and (among others) "-60 linking to a ruble PayPal account." These entries reflect the Center managing its resources across its Russian bank accounts, including its Russian Citibank account, not a transfer from a U.S. donor to the Center via a Sberbank U.S. correspondent account.

- Paragraph 318 discusses a donor to alleged DPR Supporter Sputnik & Pogrom who "boasted" of having donated $100,000 "to fund the DPR" via fundraiser Alexander Zhuchovsky. The SAC does not allege (and the cited webpage contains no mention of) the means of donation or whether the alleged donation took place prior to the downing of MH17. *See* Kiernan Decl. Ex. 7. The SAC also acknowledges in SAC ¶ 318, "Zhuchovsky's primary means of accepting donations was through a widely publicized Sberbank bank card or via Western Union," and notes elsewhere "Sputnik & Pogrom's website explicitly states "that money transfers '[f]rom abroad' should be sent 'via Western Union.'" SAC ¶ 312. These facts cannot support an inference that this or any other alleged donation was made via a Sberbank U.S. correspondent account—for which the SAC nowhere identifies any information.

These and other conclusory and facially deficient SAC allegations highlight the absence of legally sufficient jurisdictional pleading regarding uses of Sberbank's correspondent accounts. This absence is glaring in light of the discovery Plaintiffs have taken and the SAC's extensive citations to DPR Supporters' webpages describing their financial activity. As the SAC states, "the DPR went to great lengths to provide maximum transparency that reflected [] the flow of funds into its fundraising accounts." SAC ¶ 180; *see, e.g.*, SAC ¶¶ 281 (Voice of Sevastopol reports), 205 (Save Donbass reports), 230 (Center for New Russia reports).

Plaintiffs' allegations after extensive investigation and discovery collectively present no non-speculative basis for finding personal jurisdiction over Sberbank in New York based on material transfers through New York correspondent accounts before July 14, 2014 that have a substantial nexus to the downing of MH17, as to which Sberbank played a knowing facilitative role beyond mechanically receiving funds through its U.S. correspondent accounts just as with other transfers. *See Licci*, 20 N.Y.3d at 340 (the "transaction-of-business" prong [] confer[s] jurisdiction only over those claims in some way arguably connected to the "transaction.").

## II.    The SAC Does Not Plead Sustainable Claims Under the ATA

Even if personal jurisdiction existed over Sberbank, the SAC should be dismissed for failure to state a claim under the ATA.  The other Defendants' submissions identify multiple respects in which the SAC's allegations are insufficient; this submission focuses on the SAC's failure to plead facts showing the requisite knowledge or intent to commit the predicate crime of providing support for a terrorist act or a violation of other core provisions of 18 U.S.C. § 2333.

The ATA defines liability through a series of statutory incorporations.  Section 2333(a) establishes liability in tort for anyone who injures a national of the United States "by reason of an act of international terrorism," defined in § 2331(1) to require (1) "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" and (2) apparent intent to "intimidate or coerce a civilian population" or to "influence the policy of a government by intimidation or coercion."  The SAC alleges that Sberbank's "violent acts or acts dangerous to human life" in "violation of" U.S. criminal law were its violations of 18 U.S.C. §§ 2339A and 2339C.  SAC ¶¶ 402, 412.  Section 2339A(a) prohibits providing material support "knowing or intending [the material support is] to be used in preparation for, or in carrying out," one of several identified criminal acts.  Section 2339C(a)(1) similarly prohibits providing or collecting funds "with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" an act intended to cause civilian death or serious injury while trying to intimidate a population or compel a government.

Significantly, the SAC does not even try to assert as an ATA predicate a violation of 18 U.S.C. § 2339B, which criminalizes provision of material support for entities designated by the U.S. government as FTOs, because DPR and the DPR Supporters were not designated as FTOs.  Critically, § 2339B criminalizes support for terrorist organizations, while the predicate statutes relied on by Plaintiffs criminalize only support for specific terrorist *acts* (which must be

identified and linked to the support provided to establish liability), *not* for organizations generally. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (§§ 2339A and 2339C "refer to intent to further terrorist activity," while "Congress did not import the intent language of those provisions into § 2339B"); *Ahmad v. Christian Friends of Israeli Communities*, No. 13-cv-3376(JMF), 2014 WL 1796322, at *3-4 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (S.D.N.Y. 2015) (dismissing complaint relying on §§ 2339A and 2339C because allegations that defendants donated to groups that thereafter committed terrorist attacks are legally insufficient to establish linkage between the donations and attacks). Similarly, the SAC cannot rely on 18 U.S.C. § 2333(d), which provides for aiding and abetting liability only in the context of assistance to an FTO; when the recipient is a non-FTO, the complaint must plead direct involvement in terrorist activity.

The SAC must plead the elements of each component of the ATA structure. *Linde v. Arab Bank*, 882 F.3d 314, 325-28 (2d Cir. 2018) (error for jury instruction to assume that satisfaction of the elements of predicate act statute necessarily satisfied § 2331(1)(A)'s definition of "international terrorism."); *Zapata v. HSBC Holdings PLC*, No. 19-3355-cv, 2020 WL 6112271, at *1 (2d Cir. Oct. 16, 2020) (Summary order) ("Plaintiffs must plausibly allege that in *their* case, defendants' conduct satisfies each element required by the statute.") (emphasis in the original). As the predicate of Sberbank's asserted tort liability is its commission of a crime, the elements of that crime must also be sustainably pleaded. In addition, basic tort requirements of "fault, state of mind, causation and foreseeability must be satisfied." *Kemper v. Deutsche Bank*, 911 F.3d 383, 389 (7th Cir. 2018). "To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709(LTS)(GWG), 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28,

2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content plead[ed] that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *O'Sullivan*, 2019 WL 1409446, at *4 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The SAC should be dismissed for failure to plead facts supporting a finding of Sberbank's criminal knowledge or intent to provide material support or funding for a terrorist act under §§ 2339A or 2339C, or facts sufficiently alleging Sberbank is liable under § 2333.

A.    **The SAC Does Not Allege Sberbank's Legally Culpable Knowledge or Intent to Support Terrorist Acts or Sberbank's Breach of a Legal Duty to Investigate Its Customers Sufficiently to Learn Their Purposes**

1.    **The Obligation to Plead Facts Showing Knowledge or Intent**

Because the ATA provides for treble damages, § 2333(a), the SAC must plead "intentional misconduct" by Defendants, which is not established by showing mere negligence. *Kemper*, 911 F.3d at 390. Under the criminal predicate act statutes that underlie this tort statute, moreover, the pleading and proof must further establish criminal *mens rea*. That obligation cannot be satisfied merely by alleging negligent unawareness as to the nature of the recipient of the funds. Rather, the SAC must sustainably plead that Sberbank was "deliberately indifferent to whether or not the organization" to which it has provided material support would use that support *to engage in terrorist acts*. *Linde*, 882 F.3d at 329-30 & n.11 (2d Cir. 2018) (while the *mens rea* required to establish a violation of § 2339B (involving assistance to identified FTOs) is only "knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities," establishing violation of § 2339A (as the SAC alleges) more rigorously requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes," and § 2339C

similarly requires "proof of unlawful and willful collection or provision of funds with knowledge funds are to be used, at least in part, to carry out terrorist activities").  *See also Hussein v. Dahabshiil Transfer Servs.*, 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017); *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 359 (S.D.N.Y. Sept. 30, 2019), *aff'd*, 2020 WL 6112271 (2d Cir. Oct. 16, 2020)  (intent not sustainably alleged where "to an objective observer, [bank]'s conduct appeared to be 'motivated by economics, not by a desire to 'intimidate or coerce'") (internal citation omitted).

Allegations of laxity in enforcing anti-money laundering policies and "know your customer" procedures on the part of a financial services company do not state a legally sufficient claim for willful blindness or reckless indifference amounting to knowledge or intent to support terrorist acts.  *See Hussein*, 230 F. Supp. 3d at 177-78.  A claim of knowing or intentional support is "generally implausible when the only allegations are that the defendants provided routine banking services unaccompanied by any allegations tending to show that the defendants had reason to believe that their customers were terrorists or were assisting terrorists."  *Id.* at 176 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010)).

The SAC does not satisfy its obligations to plead criminal *mens rea* under the ATA or the predicate statutes by asserting that Sberbank was on notice that DPR would engage in terrorist acts based on "public knowledge" of DPR activities or government investigations regarding DPR before July 17, 2014 or information about DPR Supporters that could be found through website searches.  SAC ¶ 374.  A bare allegation that information was available is not equivalent to an allegation of actual knowledge.  *See Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 535 (S.D.N.Y. 2019) (even in an action claiming aiding and abetting of an FTO under § 2333(d), the complaint did not sustainably allege bank's knowledge of payees' affiliations with

FTO based on publicly available sources when "Plaintiffs nowhere allege [] that Defendant read or was aware of such sources"). The SAC does not allege that Sberbank actually knew of any DPR terroristic activities before MH17 was downed or any relationship between any DPR Supporter and DPR, let alone interactions for the purpose of engaging in terroristic activity.

Moreover, until OFAC first added DPR to the SDN List the day before the MH17 crash, any asserted "public knowledge" did not include a view of U.S. authorities that DPR was an undesirable recipient of funds. Nor can the Ukrainian government's alleged investigation of DPR or Sberbank, *see* SAC ¶¶ 128, 164-69, establish criminal *mens rea*. Sberbank's U.S. legal obligations are not governed by characterizations of DPR by a Ukrainian government in armed conflict with DPR. The alleged investigations described in the SAC also exclusively concerned direct support to DPR, without extending to DPR Supporters. The SAC does not allege that the Ukrainian authorities concluded that Sberbank violated Ukrainian law, sanctioned Sberbank or put Sberbank on notice of any legally prohibited activities by any DPR Supporters allegedly assisted by Sberbank before the downing of MH17 in July 2014. *See* SAC ¶¶ 164 ("allegations" made against Sberbank), 166 (a government "investigation" of the issues), 365 (allegations concerning Sberbank in a 2018 Ukrainian government brief).[6]

The SAC identifies no publicly available information of DPR's purposes from before the incident—which purposes, as indicated by DPR's prior acts and contemporaneous communiqué on July 17th, appear to have been directed to secession from Ukraine, as explained further in Western Union's and MoneyGram's joint brief—that would present reasons for Sberbank to

---

[6] The SAC's allegations that Sberbank was subject to U.S. sanctions, SAC ¶ 138, are similarly unable to help establish Sberbank's liability under the ATA. The SAC does not allege this sanctioning was imposed prior to July 17, 2014, or in any event placed relevant restrictions on transactions passing through Sberbank's accounts. *See* Sanctions Actions Pursuant to Executive Orders 13660, 13661 and 13662, 79 Fed. Reg. 63,021 at 63,027 (Oct. 21, 2014) (Sanctions imposed Sept. 12, 2014, limiting certain debt transactions with Sberbank, while "[a]ll other activities with these persons or involving their property or interests in property are permitted…").

anticipate in advance a DPR act like the downing of MH17. Conclusory assertions of Sberbank's knowledge, SAC ¶¶ 170-71, do not plead facts showing Sberbank's knowledge of plans to support terrorist acts by DPR Supporters alleged to have account numbers at Sberbank.

Even if knowledge of DPR's alleged plans could cognizably be imputed to Sberbank under a statute that requires criminal knowledge or intent to support a terrorist act, imputed knowledge about DPR would not support the SAC's theory of liability, which is based on Sberbank's asserted provision of banking services to DPR Supporters—not DPR itself. *See* SAC ¶¶ 104-28 (media and government reporting concerning DPR, not DPR Supporters). The SAC does not allege that any U.S., Ukrainian, Russian or other authority had publicly listed or identified any DPR Supporter as a sanctioned entity before the MH17 crash. The SAC presents no basis for inferring Sberbank's knowledge or intent that a transfer to an account of one of those DPR Supporters before July 17, 2014 would constitute criminally wrongful support for a terrorist act.[7] *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 91 (E.D.N.Y. 2019) ("[g]iven the many legitimate activities that [intermediate, non-FTO] entities engage in, the mere act of providing financial services to them cannot be violent or dangerous"). Plaintiffs similarly never account for the inconsistency of their simultaneous assertions that (1) the fundraisers' terrorist purposes were so obvious that Sberbank is chargeable with knowing those purposes but (2) DPR raised funds through these separate entities to conceal that it would receive those funds.

---

[7]     Plaintiffs allege Sberbank is directly majority-owned by the Russian Federation. SAC ¶ 33. They also allege that Sberbank's purported actions to support DPR were part of the Russian Federation's foreign policy, SAC ¶¶ 363-64, in an apparent attempt to present Sberbank as an instrumentality of Russia. If this false allegation were true, dismissal would be mandated for lack of subject matter jurisdiction over Sberbank as an instrumentality of a foreign government engaged in acts not based on ordinary commercial activity, under 18 U.S.C. § 2337(2) and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2). *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 (1993).

### 2.    The Absence of the Asserted Duty to Investigate

The SAC does not remedy its inability to allege that Sberbank knew or intended that transfers to any account of a DPR Supporter would constitute support of a terrorist act by contending that (1) Sberbank could have discovered the relevant entities' purposes through further investigation, or (2) Sberbank breached a legal duty to accomplish such an investigation under the USA PATRIOT Act.  These theories misconstrue Sberbank's duties and Plaintiffs' obligation to allege plausible facts supporting a finding that Sberbank knew or intended to support a terrorist act.  No U.S. legal authority suggests that providing conventional banking services in the ordinary course without conducting extensive investigation of the recipients of funds amounts to willful blindness or reckless indifference to a customer's purpose to support terrorist acts.  No authority supports Plaintiffs' claim that Sberbank is properly chargeable with holding criminal-level knowledge and intent to support a terrorist act in violation of the ATA to the extent it has not undertaken substantial, continuous investigations of all of its customers' purposes to ensure they had no connection to terrorist acts.  *See Kaplan*, 405 F. Supp. 3d at 535 ("[F]ailure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities.") (citing *O'Sullivan*, 2019 WL 1409446, at *10).

The SAC contains no allegations of "red flags" supporting an inference that any processing of transfers to alleged DPR Supporters—not identified by any U.S. authority as improperly supporting DPR, and before even DPR was listed as an SDN—amounted to knowing or intentional support for terrorist acts.  *See Hussein*, 230 F. Supp. 3d at 176-77.  The SAC cannot sustainably charge Sberbank with knowledge or intent to support terrorist acts on the mere basis that it allegedly did not conduct sufficient internet searches or other investigations to learn the purposes of entities alleged to be DPR Supporters at a time before the MH17 crash.  *See*

SAC ¶ 376.  To plead such a claim for willful blindness or reckless indifference in the ATA context, Plaintiffs must show Defendants' "conscious[ness] of the risk of harm created by [defendant's] conduct while the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the [defendant's] failure to adopt the precaution a demonstration of the [defendant's] indifference to the risk." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 557 (E.D.N.Y. 2012).  The SAC does not plead how Sberbank knew of the potential harm of processing transfers to these entities, or how the purportedly required precaution of investigating customers to learn whether they were DPR Supporters would have likely prevented the MH17 crash.

The SAC's allegation that Sberbank had a duty under the USA PATRIOT Act to conduct investigations of its customers to discover their alleged terrorist connections, SAC ¶¶ 378-80, mischaracterizes that statute and related regulations.  No provision of that Act places "know your customer" or diligence obligations on Sberbank as a foreign bank with a U.S. correspondent account.  Rather, the Act places certain diligence obligations, not alleged to have been breached here, only on the U.S. banks that maintain correspondent accounts and as such are responsible for sending funds outside the United States.  *See* 31 U.S.C. § 5318(i)(1) ("[E]ach financial institution that…maintains…a correspondent account in the United States for a non-United States person…shall establish appropriate, specific, and where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts."); 31 C.F.R. § 1010.610(a) (same).  Even for U.S. banks, the rules do not contemplate an obligation to investigate customers not on the SDN List sufficient to discover whether ultimate recipients of funds are engaged in or supporting terrorist acts.  *See, e.g.*, Federal Financial Institutions Examination Council, Bank Secrecy Act

(BSA)/Anti-Money Laundering (AML) Examination Manual 143 (Feb. 27, 2015) ("[T]he regulations that OFAC administers require banks to do the following: Block accounts and other property of *specified* countries, entities, and individuals. Prohibit or reject unlicensed trade and financial transactions with *specified* countries, entities, and individuals.") (emphasis added).

The SAC contains no allegation that any U.S. bank flagged or reported any transaction related to the SAC as suspicious, or faced any criminal or civil liability for allowing any such transfer to take place. The SAC's allegations of Sberbank's duty to investigate are legally unsupportable, and Plaintiffs have established no legal basis for imposing a higher duty to investigate transactions on a foreign bank than on its U.S. host.

### B.    The SAC Does Not Allege That Sberbank Is Liable Under Section 2333

Even if the SAC plausibly alleged that Sberbank committed the requisite criminal predicate acts under §§ 2339A and 2339C, it does not and cannot allege that Sberbank's acts violated § 2333. Where a plaintiff's ATA claim is based on a defendant's primary (rather than aiding and abetting) liability, "Plaintiffs must plausibly allege that Defendant's *own* actions '*also* involved violence or endangered human life' and that these actions 'appeared to be intended to intimidate or coerce a civilian population or to influence or affect a government.'" *Kaplan*, 405 F. Supp. 3d at 532. As banking services are not inherently dangerous to human life or intended to coerce, "the provision of financial services does not, in itself, equate to international terrorism." *Id.*; *see also Linde*, 882 F.3d at 326 ("The provision of material support to a terrorist organization does not invariably equate to an act of international terrorism.").

Plaintiffs cannot show that Sberbank's alleged acts were "acts of international terrorism" as required by § 2333(a), which are "activities that involve violent acts or acts dangerous to human life." § 2331(1). Plaintiffs also do not satisfy their obligation to allege how Sberbank's routine banking activities were intended to "intimidate or coerce a civilian population" or

"influence the policy of a government by intimidation or coercion." *Id.*; *Stutts v. De Dietrich Group*, No. 03-cv-4058(ILG), 2006 WL 1867060, at *2-3 (E.D.N.Y. June 30, 2006) (dismissing ATA claims where banks issued letters of credit to companies that sold chemical weapon components to Iraq because allegations did not demonstrate that the banks' "actions [were] designed to coerce civilians or government entities"). While "providing financial services to a known terrorist organization may" violate a predicate statute for purposes of § 2331(1)(A), such support may still "not involve violence or endanger human life and [] not manifest the apparent intent required by § 2331(1)(B)." *Linde*, 882 F.3d at 326. Plaintiffs do not allege that Sberbank did anything more than provide ordinary banking services, which cannot sustain Plaintiffs' claims. Because Plaintiffs do not allege acts of international terrorism, "their primar[y] liability claim cannot survive a motion to dismiss." *Kaplan*, 405 F. Supp. 3d at 532.

When "factual allegations delineating relationships between [] services and the terrorist attacks are so attenuated," a complaint cannot satisfy the ATA's requirement that, to establish primary liability, a defendant's own actions be inherently violent or dangerous and intended to coerce or intimidate. *O'Sullivan*, 2019 WL 1409446, at *8. The relationship between Sberbank's non-violent and mechanical provision of financial services to the alleged DPR Supporters and the downing of MH17 is similarly over-attenuated. *See Freeman*, 413 F. Supp. 3d at 92 (contrasting support for an FTO proxy with support for "intervening actors…whose independent actions break [the] inferential chain."). The gap cannot be bridged simply by speculation—not pleaded in the SAC—of a known or intended link between transfers of unspecified funds and ultimate DPR expenditures on the missile that downed MH17.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC as to Sberbank.

Dated: New York, New York
        November 2, 2020

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: */s/ John S. Kiernan*
        John S. Kiernan
        William H. Taft V
        Román J. Rodriguez
        jskiernan@debevoise.com
        whtaft@debevoise.com
        rjrodriguez@debevoise.com


        919 Third Avenue
        New York, New York 10022
        (212) 909-6000

        *Counsel for Sberbank of Russia*