UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and<br><br>CATHARINA TEUNISSEN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and<br><br>NERISSA SCHANSMAN, individually, as surviving Sibling of QUINN LUCAS SCHANSMAN,<br><br>             Plaintiffs,<br><br>        -against-<br><br>SBERBANK OF RUSSIA PJSC, THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., MONEYGRAM INTERNATIONAL, INC., MONEYGRAM PAYMENT SYSTEMS, INC., and VTB BANK PJSC,<br><br>           Defendants. | Civil No. 19-cv-02985-ALC |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 8

    A.    The Murder of Quinn Lucas Schansman ................................................. 8

    B.    The Parties ................................................................................................ 8

    C.    Background and Composition of the DPR Terrorist Group .................... 11

    D.    Defendants Finance the DPR through a Global Fundraising Campaign ............. 12

    E.    Prior to the DPR's Terrorist Attack on MH17, Defendants Knew that They Were Providing Material Support and Financing to the DPR ............................. 13

    F.    Defendants Repeatedly Provided Material Support and Financing to the DPR, Which Openly Used Defendants' Support to Carry Out Terrorism........... 16

        1.    Defendants Repeatedly Provided Material Support and Financing Directly to Two of the DPR's Most Notorious Leaders, Pavel Gubarev and Ekaterina Gubareva ............................................... 17

        2.    Defendants Repeatedly Provided Material Support and Financing Directly to Sanctioned DPR Leader Igor Strelkov ................................... 17

        3.    Defendants Repeatedly Provided Material Support and Financing to the DPR through Alexander Zhuchkovsky, a Prominent DPR Leader .................................................................................... 20

    G.    Defendants Knew or Were Deliberately Indifferent that Their Conduct Would Result in Terrorism ................................................................... 22

LEGAL STANDARD........................................................................................................ 24

ARGUMENT ...................................................................................................................... 24

I.    Sberbank and VTB Bank's Repeated Use of New York City Correspondent Accounts to Route Funds to the DPR Subjects Them to Specific Personal Jurisdiction in This District.......................................................................... 24

    A.    Plaintiffs Have Alleged Unique Jurisdictional Facts Far Beyond What *Licci* Requires ................................................................................. 26

    B.    Exercising Personal Jurisdiction over Sberbank and VTB Bank Is Consistent with Due Process............................................................... 35

II.   Plaintiffs Have Alleged Acts of International Terrorism .................................................. 37

    A.    Defendants' "Providing Material Support to Terrorists" and "Financing of Terrorism" Qualify as Acts of International Terrorism under the ATA .............. 37

    B.    Defendants' Commercial Motives Do Not Insulate Them from Liability under the ATA ........................................................................................................ 42

III.   Plaintiffs Have Alleged that Defendants Were Deliberately Indifferent as to Whether Their Transfers Were Materially Supporting or Financing Terrorism ............... 45

    A.    The ATA Requires Only Deliberate Indifference, Not Actual Knowledge.......... 45

    B.    Defendants Were Deliberately Indifferent as to Whether They Materially Supported or Financed the DPR ............................................................................ 48

    C.    Defendants' Arguments Ignore the Unique Circumstances of the DPR and This Case ......................................................................................................... 52

IV.   Plaintiffs' Claims Readily Satisfy the Proximate Causation Standard under the ATA ....................................................................................................................... 58

    A.    Defendants' Provision of Material Support to the DPR Was a Substantial Factor in the Attack on Quinn's Plane ............................................................... 61

    B.    The Attack on Quinn's Plane Was Reasonably Foreseeable ............................... 65

V.   The ATA's "Act of War" Exception Does Not Apply to the DPR's Terrorist Attack on a Civilian Airliner ....................................................................................... 67

CONCLUSION ............................................................................................................ 70

## **TABLE OF AUTHORITIES**

### **Cases**

*Actava TV, Inc. v. Joint Stock Co.,*
    No. 18-CV-6626 (ALC), 2019 WL 4516642 (S.D.N.Y. Sept. 18, 2019) ......................... 24, 25

*Ahmad v. Christian Friends of Israeli Communities,*
    13 CIV. 3376 JMF, 2014 WL 1796322 (S.D.N.Y. May 5, 2014)............................................ 57

*Al Rushaid v. Pictet & Cie,*
    28 N.Y.3d 316 (2016) ........................................................................................................... 28

*Averbach v. Cairo Amman Bank,*
    No. 19-CV-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
    *report and recommendation adopted* 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)................ 28

*Bakken Res., Inc. v. Edington,*
    No. 15 CIV. 8686 (ALC), 2019 WL 1437273 (S.D.N.Y. Mar. 29, 2019) ............................... 31

*Boim v. Holy Land Found. for Relief & Dev.,*
    549 F.3d 685 (7th Cir. 2008)......................................................................................... passim

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.,*
    291 F.3d 1000 (7th Cir. 2002).......................................................................................... 30, 41

*Brill v. Chevron Corp.*
    No. 15-CV-04916-JD, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017) ......................................... 45

*Bus. Credit & Capital II LLC v. Neuronexus, Inc.,*
    No. 1:18-CV-03374 (ALC), 2019 WL 1426609 (S.D.N.Y. Mar. 29, 2019)............................ 24

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.,*
    No. 14CV5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) .............................. 31, 33

*Cunningham v. City of New York,*
    No. 1:15-CV-01266, 2019 WL 4747714 (S.D.N.Y. Sept. 30, 2019)................................ 24, 53

*Das v. Rio Tinto PLC,*
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ................................................................................... 33

*Estate of Klieman v. Palestinian Auth.,*
    424 F. Supp. 2d 153 (D.D.C. 2006) ...................................................................................... 67

*Freeman v. HSBC Holdings PLC,*
    No. 14-CV-660, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019)................................. 32, 45, 63

*Gill v. Arab Bank, PLC,*
    893 F. Supp. 2d 474 (E.D.N.Y. 2012)......................................................................... 47, 67, 70

*Goldberg v. UBS AG*,
   660 F. Supp. 2d 410 (E.D.N.Y. 2009)..................................................................... passim

*Hau Yin To v. HSBC Holdings PLC*,
   700 F. App'x 66 (2d Cir. 2017)............................................................................... 32

*Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   No. 19-CV-5394 (BMC), 2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020) ..................... 7, 50, 57

*Hussein v. Dahabshiil Transfer Services Ltd.*,
   230 F. Supp. 3d 167 (S.D.N.Y. 2017)......................................................... 47, 55, 56

*Hussein v. Dahabshiil Transfer Services Ltd.*,
   705 F. App'x 40 (2d Cir. 2017) ................................................................................. 58

*In re Chiquita Brands Int'l, Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018)........................................................ 43, 44, 60

*In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*,
   381 F. Supp. 3d 37 (D.D.C.),
   *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019) ........................... 28

*In re Terrorist Attacks on Sept. 11, 2001 ("Al Rajhi Bank")*,
   714 F.3d 118 (2d Cir. 2013) ........................................................................... 63, 64

*In re Terrorist Attacks on Sept. 11, 2001*,
   462 F. Supp. 2d 561 (S.D.N.Y. 2006) ..................................................................... 58

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
   774 N.E.2d 696 (N.Y. 2002) ................................................................................. 28

*Kaplan v. Lebanese Canadian Bank, SAL*,
   No. 08 CIV. 7253 (GBD), 2019 WL 4869617 (S.D.N.Y. Sept. 20, 2019) .................. 42, 63, 64

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ......................................................................... 45, 63

*Lelchook v. Islamic Republic of Iran*,
   393 F. Supp. 3d 261 (E.D.N.Y. 2019)........................................................ 39, 43, 52

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005)..................................................................... 47

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ................................................................................. 32

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ....................................................................... passim

*Linde v. Arab Bank, PLC*,
 882 F.3d 314 (2d Cir. 2018) ........................................................................ passim

*Miller v. Arab Bank, PLC*,
 372 F. Supp. 3d 33 (E.D.N.Y. 2019) ............................................................ passim

*Morris v. Khadr*,
 415 F. Supp. 2d 1323 (D. Utah 2006) ................................................................. 69

*O'Sullivan v. Deutsche Bank AG*,
 No. 17 CV 8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .................... 41, 63

*Owens v. BNP Paribas S.A.*,
 235 F. Supp. 3d 85 (D.D.C. 2017) ...................................................................... 57

*Parex Bank v. Russian Sav. Bank*,
 116 F. Supp. 2d 415 (S.D.N.Y. 2000) .................................................................. 35

*Regenlab USA LLC v. Estar Techs. Ltd.*,
 No. 16-CV-08771 (ALC), 2017 WL 3601304 (S.D.N.Y. Aug. 17, 2017) ............................. 36

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013) .......................................................................... 63, 64

*Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*,
 No. 10 CIV. 4754 JGK, 2011 WL 4056306 (S.D.N.Y. Sept. 13, 2011) .............................. 32

*Sokolow v. Palestine Liberation Org.*,
 583 F. Supp. 2d 451 (S.D.N.Y. 2008) .................................................................. 67

*Strauss v. Credit Lyonnais, S.A.*,
 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................................................ 47, 60, 62

*Strauss v. Credit Lyonnais, S.A.*,
 No. CV-06-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ............................ 39, 60

*Tamam v. Fransabank Sal*,
 677 F. Supp. 2d 720 (S.D.N.Y. 2010) .................................................................. 33

*United States v. Taleb-Jedi*,
 566 F. Supp. 2d 157 (E.D.N.Y. 2008) .................................................................. 42

*VTB Bank PJSC v. Babel*,
 No. 525062/2017 (N.Y. Sup. Ct., Kings Cnty. 2017) ................................................. 35

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*,
 No. 18-cv-1876 (PAE), 2020 WL 4586729 (S.D.N.Y. Aug. 10, 2020) .......................... 31, 34

*Weiss v. Arab Bank, PLC*,
   No. 06 CV 1623 NGVVP, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007) ........................ 69, 70

*Weiss v. Nat'l Westminster Bank PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) .................................................................................... 35

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. 2017) ............................................................................... 44, 64

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ............................................................................. passim

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ............................................................................................. 46, 60

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................... passim

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019),
   *aff'd*, 825 F. App'x 55 (2d Cir. 2020) ....................................................................... 41, 45, 65

## **Statutes**

18 U.S.C. § 2339A ................................................................................................................ passim

18 U.S.C. § 2339C ................................................................................................................ passim

18 U.S.C. § 2331 ................................................................................................................... passim

18 U.S.C. § 2332 ......................................................................................................................... 46

18 U.S.C. § 2333(a) .............................................................................................................. passim

18 U.S.C. § 2334 ......................................................................................................................... 67

18 U.S.C. § 2339B ................................................................................................................. 46, 57

31 C.F.R. § 1010.610 .................................................................................................................. 51

31 U.S.C. § 5318 ......................................................................................................................... 51

## **Rules**

Fed. R. Civ. P. 12(b)(2) ............................................................................................................... 23

Fed. R. Civ. P. 12(b)(6) ........................................................................................................... 8, 24

## <u>Other Authorities</u>

136 Cong. Rec. S4568-01 (1990) ........................................................................... 5

H.R. Rep. No. 115-858 (2018) .......................................................................... 3, 69

H.R. Rep. No. 1-2-1040 (1992) .............................................................................. 69

S. Rep. No. 102-342 (1992) ....................................................................... 3, 37, 44, 69

Plaintiffs Thomas Schansman, individually, as surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of minor plaintiff X.S.; Catharina Teunissen, individually, as surviving parent of, and as personal representative of the Estate of, Quinn Lucas Schansman; and Nerissa Schansman, individually, as surviving sibling of Quinn Lucas Schansman, submit this memorandum in opposition to the memoranda submitted by Defendants in support of their motions to dismiss the Second Amended Complaint (Dkt. Nos. 161 ("Joint Br."), 162 ("MoneyGram Br."), 166 ("Sberbank Br."), and 171 ("VTB Br.")).[1]

## PRELIMINARY STATEMENT

This case is exceptional because the facts here operate in a manner virtually opposite every Antiterrorism Act ("ATA") case before it.  Terrorist financing is historically done in secret.  For good reason, both terrorists and their financial supporters have sought to keep their financial networks and fundraising methods hidden.  Such are the facts in the case law cited by Defendants.

Here, the Donetsk People's Republic ("DPR") terrorist group did not seek to hide, it sought to advertise.  Here, much like an international charity telethon (though one lasting years, not a single day—and without a charitable purpose), the DPR wanted to reach as many people around the world as possible, to encourage them to give so that the DPR could procure weapons.  The DPR advertised its bank account and money transfer information—including specific bank names, account numbers, and New York correspondent account numbers—to encourage radicalized donors to give.  And giving through the financial services offered by the Defendants is exactly what happened, predictably leading to the death of Quinn Lucas Schansman ("Quinn").

Just like a telethon, the DPR advertised publicly and in real-time what these funds would

---

[1] Defendants, two sanctioned Russian state-owned banks and two United States-based money service businesses, are coordinating their defense of Plaintiffs' claims, including by joining and incorporating each other's arguments.  *See* VTB Br. 18–19; Sberbank Br. 1.  Plaintiffs therefore respond to their arguments in a single memorandum pursuant to the Court's order of November 21, 2019.  Dkt. No. 121; *see also* Dkt. No. 155.

be used for (bullets, guns, optical sights, and other tools of mass killing), offered messages of thanks from its top leadership, and documented donations from remote corners of the world to its coffers in order to attract additional funding.  Yet despite this global fundraising campaign, which helped underwrite the murder of 298 people in the DPR's terrorist attack on Malaysia Airlines Flight 17 ("MH17"), the ATA provides a cause of action for only *one* victim:  U.S. citizen Quinn Lucas Schansman.  This lawsuit is not liability run amok; it is precisely what Congress intended for U.S. victims of terrorism, under extraordinary facts.

Eighteen-year-old Quinn was killed when the DPR shot down the MH17 civilian airliner, killing everyone on board.  Quinn's family, the Plaintiffs, bring this lawsuit to hold Defendants accountable for their open and notorious provision of material support and financial services to the murderers of their son and brother.  Each Defendant provided ongoing and essential financial services and funding to the DPR from around the world, including the U.S., for the explicit purpose of purchasing lethal equipment that was necessary (1) for the DPR to acquire and maintain control over the territory from which it launched the missile that shot down the MH17 passenger plane, and (2) to carry out its terrorist activities, including the missile attack on Quinn's plane.  As the Second Amended Complaint ("SAC") establishes in detail—because of the unprecedented, highly transparent manner in which the terrorist financing here occurred—each Defendant did so with either knowledge or deliberate indifference to the fact that they were providing critical support that would enable the DPR to continue its attacks on civilians.

Defendants' defenses hold weight only within the narrow factual context of the cases they cite:  where financial services are provided to a sovereign state with many legitimate and comingled functions, as opposed to a sole-purpose terrorist group like the DPR; where financial services are provided without any express link to the procurement of lethal equipment, unlike here,

where such services are provided explicitly to purchase lethal equipment; and where financial services are provided to individuals or entities that hide their connection to terrorism, unlike here, where the parties sought to broadcast fundraising methods and account information as widely as possible.

Congress passed the ATA, 18 U.S.C. § 2331 *et seq.*, to create civil remedies for those injured by terrorism and, explicitly, those injured by corporations who provide material support and financial services to terrorists.  While Defendants argue that this is an extraordinary application of liability, they should take those concerns to Congress, not ask this Court to rewrite the statute in a manner that would effectively immunize *all* financial service providers from accountability even when they knowingly provide ongoing financial services to a public terrorist financing campaign that kills Americans.

Defendants—large multinational corporations with significant records of violating U.S. and international law—would like to use their size and the volume of transactions they process to immunize themselves from liability.   But Congress explicitly wrote the ATA to ensure that corporations like Defendants do not provide material support and financing to terrorist groups that harm American citizens.  The ATA explicitly imposes liability for the provision of "financial services" to terrorists and for "transmitting" funds to terrorists.  18 U.S.C. §§ 2339A, 2339C.  The ATA's breadth was designed to "interrupt, or at least imperil, the flow of money" to groups engaged in acts of international terrorism.  S. Rep. No. 102-342, at 22 (1992).  Recently, while enacting an amendment to the ATA, Congress reaffirmed the core purpose of its civil liability provision:  "In short, *by cutting terrorists' financial life-lines*, the provision furthers the United States' longstanding efforts to reduce global terrorism and thus protect Americans here and abroad."  H.R. Rep. No. 115-858, at 3–4 (2018).  Defendants ask this Court to rewrite the ATA to

limit its broad prohibition against support for terrorism, ignoring that Congress carefully calibrated the ATA to provide an expansive remedy to a very narrow set of plaintiffs:  U.S. citizens (or their survivors) injured by acts of international terrorism.[2]

Tellingly, faced with numerous allegations, Defendants do not appear to contest that they provided financial services and transmitted funds to the DPR.  Defendants instead resort to arguing that Plaintiffs, Quinn's surviving family members, do not offer forensic evidence tracking, at a hyper-granular level, the precise flows of money that each Defendant provided to the DPR in advance of the attack that killed Quinn.  This remarkable argument would make the ATA a dead letter and fundamentally misstates Plaintiffs' burden.  At the pleading stage, Quinn's family is not required to meet the impossible task of tracing specific dollars provided by each Defendant to the DPR.  Defendants conveniently ignore that Quinn's family does not, prior to discovery, have the ability to examine financial records exclusively within Defendants' custody and control.

Nevertheless, relying upon publicly available sources, all of which were readily accessible to Defendants in real-time, the SAC offers a comprehensive set of allegations regarding specific transfers and flows of funds from Defendants to the DPR in the lead-up to the DPR's attack on Quinn's plane.  In addition to these publicly available documents, the SAC also contains precisely what Sberbank and VTB Bank had previously argued was missing to confer jurisdiction:  concrete evidence establishing specific transfers to the DPR through New York correspondent accounts in the weeks leading up to the attack on MH17.   *See* SAC ¶ 191. Accordingly, Plaintiffs now not only allege but also offer proof that (1) the DPR solicited money through Sberbank's and VTB Bank's New York correspondent accounts, (2) the DPR publicly announced that it received U.S.

---

[2] Notably, whereas Congress through the Communications Decency Act ("CDA") has shielded social media companies from liability for use of their platforms to support terrorist activities, by passing the ATA Congress did the opposite with financial services providers.  Defendants' desire for CDA-like immunity is understandable, but it is contrary to law.

dollar donations through Sberbank's and VTB Bank's accounts, and (3) actual transfers to the DPR were made using New York correspondent accounts prior to Quinn's murder.  These allegations easily satisfy Plaintiffs' burden at the pleading stage.

Sberbank and VTB Bank's attempts to evade liability by arguing that they cannot be subject to personal jurisdiction in New York fail because Plaintiffs have not only alleged but have also now adduced evidence tending to prove their open and systematic use of correspondent banks in this district.  In *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), the Second Circuit held that broad allegations of "dozens of dollar wire transfers" using correspondent accounts in this district, without specifically identifying each individual transfer, were sufficient to confer personal jurisdiction on a foreign bank in an ATA case.  Due to the extraordinary nature by which the DPR openly financed its terrorist activities, the allegations in the SAC far exceed the requirements of *Licci.*  The SAC contains numerous, well-pleaded allegations regarding the Russian-bank Defendants' repeated, continuous and intentional use of New York correspondent accounts to transfer funds to the DPR for the explicit purpose of acquiring lethal equipment.  Faced with these facts, the Russian-bank Defendants respond by claiming that Plaintiffs must somehow identify, *at the pleading stage*, the specific details of all of the wire transfers by which the banks funneled money to the DPR through their correspondent accounts in this district.  This contention is contrary to both *Licci* and Congress's intention that the ATA provide broad access to U.S. courts in response to "reluctant courts and . . . jurisdictional hurdles" that had previously stymied the ability of victims of international terrorism to obtain redress for their injuries.  136 Cong. Rec. S4568-01 (1990).

Defendants' invocation of a misleading "intermediary" defense fares no better.  The SAC squarely alleges that Defendants provided financial services to the DPR.  *See, e.g.*, SAC ¶¶ 3–4,

9–10.  As the SAC describes, *just like any terrorist group*, the DPR necessarily consists of leaders, members, entities, and fundraisers.  While Western Union and MoneyGram contend that Plaintiffs allege money transfers passing through an intermediary prior to flowing to the DPR, this claim misrepresents the SAC's allegations and ignores the inconvenient truth that the individual recipients and entities utilizing Defendants' services are, in fact, the DPR, as alleged in the SAC.  *See, e.g.*, *id.* ¶¶ 5–8.  Defendants' arguments regarding the composition of the DPR—necessarily raising factual questions—cannot be resolved on a motion to dismiss.  While Western Union and MoneyGram may wish that the ATA protects them so long as they do not provide funds to a corporate account styled as "DPR, Inc.," such is not the case under settled law.  The DPR is the terrorists who comprise it, the same ones that Western Union and MoneyGram kept well-funded.

In any event, Defendants entirely fail to address countless allegations in the SAC regarding their knowing and repeated provision of financial services directly to the DPR's top leaders, including its "commander-in-chief," Igor Strelkov, who has been criminally charged for the terrorist attack on MH17, as well as the "foreign minister" of the DPR, Ekaterina Gubareva, and her spouse Pavel Gubarev, the "governor" of the DPR.  *Id.* ¶¶ 5, 222.  Defendants knowingly provided these funds to the DPR and its leaders while the world's governments and media were intently focused on the DPR's horrific and systematic abuses, and in some cases in violation of European Union ("EU") and U.S. sanctions regimes.  *Id.* ¶¶ 127, 131, 134.

Unlike nearly all of the cases cited by Defendants, this is not a case where Defendants can plausibly claim ignorance that the funds they provided to the DPR were being used to support terrorist activities.  At all times, the DPR and its leadership openly and widely advertised that they relied upon Defendants' services to purchase lethal equipment.  As a result, the SAC alleges that (1) Defendants either knew or were deliberately indifferent to the fact that they were providing

6

financial services and transmitting funds to terrorists; and (2) it was reasonably foreseeable that providing material support and financing to a notorious terrorist group would lead to further violent terrorist attacks such as the attack on Quinn's plane.  These allegations are similar to those in a recent case about Hamas fundraisers, where a court denied a bank's motion to dismiss because there was "publicly available information from which the bank could have learned of [its] clients' terrorist identities or connections prior to receiving and transferring funds to and from them." *Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, No. 19-CV-5394 (BMC), 2020 WL 6143654, at *9 (E.D.N.Y. Oct. 20, 2020).

Recognizing the strength of Plaintiffs' allegations, Defendants resort to disputing repeatedly and impermissibly the SAC's allegations and urging the Court to make a series of factual determinations or inferences *in their favor*.  One example is Defendants' last-ditch effort to argue that the ATA's "act of war" exception bars Quinn's family's suit against the DPR terrorist group.  The sad fact is that the DPR shot down a civilian jetliner.  Yet Defendants ask this Court to rely on a series of questionable inferences drawn by Defendants to conclude—contrary to the facts and settled law—that (1) the DPR's attack on the MH17 civilian airliner was a mistake, a misdirected "act of war" rather than a terrorist attack outside recognized norms of international law; and (2) the DPR is a legitimate "military force," not a violent armed terrorist group with no adherence to international norms.  Defendants' fact-specific arguments are both plainly wrong on the merits and wholly inappropriate on a motion to dismiss.

In sum, taking into consideration the totality of the SAC's expansive, detailed, and unique allegations, and drawing all reasonable inferences in Plaintiffs' favor, Quinn's family have satisfied their burden of pleading facts that make out viable ATA claims against each Defendant,

and in establishing personal jurisdiction over Sberbank and VTB Bank.[3]

## STATEMENT OF FACTS

### A.      The Murder of Quinn Lucas Schansman

Quinn, a dual citizen of the U.S. and the Netherlands, was born in New York City.  On July 17, 2014, Quinn boarded MH17 from Amsterdam to join his family on vacation in Indonesia.  But as Quinn and the other 297 passengers on board flew over eastern Ukraine, their plane was shot down by a missile launched from territory controlled by the DPR through brute force, intimidation, and violence.  The missile caused the plane to break up in mid-air, killing all 298 passengers, including Quinn and 80 children.  SAC ¶¶ 73–75.  Within minutes, DPR leader Igor Strelkov boasted publicly that the DPR had downed an airliner.  *Id.* ¶ 77.  Strelkov was later criminally charged for his leadership role in the terrorist attack on MH17.  *Id.* ¶ 222.

As described throughout the SAC, Defendants provided financial services and transmitted funds directly to prominent DPR leaders (including Strelkov) and fundraisers who were unambiguous about their intent:  to arm and equip the DPR to carry out terrorist acts.  Defendants' repeated provision of material support and financial services to the DPR was a substantial factor in the DPR's ability to control the territory from which it launched the attack on MH17.  *Id.* ¶¶ 3–4, 14, 160–62, 342–43, 396.

### B.      The Parties

Plaintiffs are the parents and siblings who survive Quinn and who seek justice in order to honor Quinn's memory:  his father, Thomas Schansman; his mother, Catharina Teunissen; his sister, Nerissa Schansman; and his half-brother, X.S. (on whose behalf Quinn's father brings suit).[4]

---

[3] Furthermore, just as the detailed allegations of the SAC are sufficient to defeat Defendants' Fed. R. Civ. P. 12(b)(6) motions, those allegations readily satisfy Rule 8's requirement of a "short and plain statement of the claim" and provide MoneyGram ample, specific notice of the conduct at issue.  *See* MoneyGram Br. 2.
[4] Quinn's mother brings this suit both on behalf of herself and as personal representative of Quinn's estate.  SAC ¶ 29.

*Id.* ¶¶ 28–31.  Plaintiffs each endured extraordinary emotional distress and anguish in the aftermath of Quinn's murder.  *Id.* ¶¶ 85–87.

Defendants are corporate entities that each provided material support and funding to the DPR that was critical to the DPR's ability to carry out terrorist acts, including controlling the territory from which it launched its attack on MH17.  Defendants The Western Union Company and Western Union Financial Services, Inc. (together, "Western Union"), and MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. (together, "MoneyGram"), are global providers of money transfer services who each maintain numerous agent locations within the Southern District of New York.  *Id.* ¶¶ 63–64.  Western Union and MoneyGram repeatedly provided financial services to the DPR for the explicit purposes of carrying out terrorist activities. *E.g., id.* ¶¶ 67, 179, 204–06, 210, 217, 230, 238, 241, 245, 270, 282, 347–48.  Western Union and MoneyGram provided these services despite their knowledge that the DPR engaged in terrorist activity and that the material support and financing they provided to the DPR would be used to commit terrorist acts.  *Id.* ¶¶ 12, 69, 353–61, 373–84.

Defendants Sberbank and VTB Bank are Russian state-owned banks with offices and branches worldwide, including in the U.S. and Ukraine.  *Id.* ¶¶ 33–36, 40–43, 141–42.  Sberbank and VTB Bank provide banking and money transfer services that allow individuals to send and/or receive money via wire transfers, including wire transfers sent to, from, or through the U.S., either to specified accounts at Sberbank or VTB Bank, or bank cards issued by Sberbank or VTB Bank. *Id.* ¶¶ 45–46.

Sberbank and VTB Bank each maintain correspondent bank accounts in this district to effectuate the transfer of funds in U.S. dollars.  *Id.* ¶ 48.  In the months before the attack on MH17, Sberbank and VTB Bank each deliberately and repeatedly routed U.S. dollar-denominated

transactions, including repeated transactions to or on behalf of the DPR, through their New York City correspondent bank accounts.  *Id.* ¶¶ 27, 191.  Sberbank has maintained correspondent bank accounts in New York City with JPMorgan Chase Bank ("JPMorgan"), Citibank N.A. ("Citibank"), Bank of America, The Bank of New York Mellon ("BNY Mellon"), and Deutsche Bank Trust Company Americas ("Deutsche Bank").  VTB Bank has maintained correspondent bank accounts in New York City with JPMorgan, Bank of America, and Citibank.  *Id.* ¶ 48.  Both Sberbank and VTB Bank have repeatedly advertised and espoused the benefits of their New York correspondent bank accounts.  *Id.* ¶¶ 49–55.

Sberbank's and VTB Bank's New York correspondent bank accounts were prominently advertised by the DPR as channels for providing direct funding to the DPR using U.S. dollars.[5] *Id.* ¶ 56.  In June 2014, one webpage soliciting funds for the DPR stated that "For transfers in USD [U.S. dollars]," funds need to be sent through a VTB Bank correspondent account in New York. *Id.* ¶ 57.  Similarly, another website soliciting funds for the DPR provided instructions on how to send transfers in "US dollars" to a Sberbank account by utilizing Sberbank's correspondent accounts in New York City at Deutsche Bank or BNY Mellon.  *Id.* ¶ 58.

As detailed at length in the SAC, the DPR leaders and fundraisers that solicited funds utilizing Sberbank's and VTB Bank's correspondent accounts in New York boasted about raising substantial sums of money, including large quantities of U.S. dollars, and documented how they used that money to procure lethal equipment for the DPR.  *Id.* ¶¶ 59, 177–332.  Sberbank's and

---

[5] Sberbank asks the Court to discount one instance where its New York correspondent account information was used to support terrorism on the basis of its self-serving factual assertion that the People's Militia of New Russia was "fundraising for the Luhansk People's Republic, *not* DPR."  Sberbank Br. 5, 13–14.  Although the referenced post mentions the DPR's affiliated group, the LPR, in the specific context of recruiting new members, its fundraising solicitation is not so limited.  In fact, a video posted in connection with the solicitation expressly references three cities all in Donetsk, not Luhansk.  VK, "People's Militia of New Russia – News," *available at* https://vk.com/wall-70618940_781.  Indeed, as the SAC alleges, People's Militia of New Russia was a DPR fundraiser that, prior to the attack on MH17, provided repeated updates from the DPR's leader, Igor Strelkov.  SAC ¶¶ 7–8, 292–94.  Sberbank's unsupported claim otherwise should not be credited at the pleading stage.

VTB Bank's correspondent accounts in New York were repeatedly and intentionally used to send financial support to the DPR for the explicit purpose of carrying out violent and lethal activities. *Id.* ¶ 60.  For example, the DPR by and through its fundraiser the Coordination Center for New Russia ("Center for New Russia") openly documented "transfers in dollars" into its account with VTB Bank during the time when the DPR planned and executed the attack on MH17.  *Id.* ¶ 61.  At that time, Center for New Russia consistently advertised the account number of VTB Bank's correspondent bank in New York City, Deutsche Bank, as the appropriate channel through which to send "transfers in dollars."  *Id.*

### C.    Background and Composition of the DPR Terrorist Group

Like other terrorist groups such as the Islamic State ("ISIS"), the DPR is composed of and funded by individuals who use violence, intimidation, and coercion to achieve political ends (where ISIS sought to create a Caliphate, the DPR seeks to create "Novorossiya").  *Id.* ¶¶ 5, 8, 88.  Prior to the attack on MH17, some of the DPR's most prominent leaders were Strelkov, the "commander-in-chief" of the DPR; Gubarev, the DPR's "governor"; and Gubareva, the DPR's "foreign minister."  *Id.* ¶ 5.   Among the DPR's most prominent fundraisers were Alexander Zhuchkovsky and Boris Rozhin ("Colonel Cassad").  *Id.* ¶ 6.  The DPR's leadership worked closely with these and other DPR members to fundraise for the DPR's terrorist activities through a group of coordinated DPR entities:  Center for New Russia, Humanitarian Battalion, Veche, Rospisatel, Essence of Time, Save Donbass, ICORPUS, The Voice of Sevastopol, Sputnik & Pogrom, World Crisis, Women's Battalion of People's Militia Donbass, and People's Militia of New Russia (together, the "DPR's fundraisers").   Collectively, the DPR's leaders, members, entities, financial supporters, and fundraisers constitute the DPR.  *Id.* ¶¶ 7–8.

The DPR exhibited a pattern and practice of attacking civilians, including non-Ukrainians, which was widely documented.  *Id.* ¶¶ 104–28.  In the months leading up to the MH17 attack, the

DPR's killing and torture of civilians constituted perhaps the most significant international news event in the world. *Id.* ¶ 9. The DPR's top leaders, including Gubarev, Gubareva, and Strelkov, were each prominently profiled by the *Washington Post* and *New York Times* in the months before the DPR's attack on Quinn's plane. *Id.* ¶¶ 105, 112.

By May 2014, the Ukrainian General Prosecutor Office formally and publicly classified the DPR and its affiliates as "terrorist organizations." *Id.* ¶ 128. This designation followed the imposition of EU sanctions in April 2014 against several DPR leaders, including Strelkov. *Id.* ¶ 127. In June 2014, in response to the DPR's terrorist attacks, the U.S. sanctioned several DPR leaders, including Strelkov. *Id.* ¶ 131. Shortly before the attack on MH17, the U.S. also imposed sanctions on the DPR as an entity, and it was well-known that the DPR's activities had a "strident anti-American tone" that could lead to violence targeting U.S. citizens.[6] *Id.* ¶¶ 134, 139.

### D.    Defendants Finance the DPR through a Global Fundraising Campaign

The DPR aggressively sought to capitalize on the appeal of its extremist views to the Russian diaspora, including the nearly three million ethnic Russians in the U.S.; to tap into this diaspora, the DPR raised funds for its terrorist acts through an online advertising campaign accessible to anyone around the world, including in the U.S. *Id.* ¶¶ 145–46. Because of its widely recognized status as a terrorist group, the DPR does not maintain a bank account in the name of the "Donetsk People's Republic" or otherwise. Rather, through numerous websites and social media posts, the DPR brazenly advertised ways to donate to the DPR, including through sending money to accounts with, or bank cards issued by, Sberbank and VTB Bank. The DPR also openly

---

[6] In fact, the United States imposed sanctions directly on Defendants Sberbank and VTB Bank to stem the flow of financial support to the DPR and its affiliates. *See* SAC ¶¶ 135–36. Moreover, Sberbank and VTB Bank continued to use their U.S. correspondent accounts in New York to fund the DPR even after the United States sanctioned both banks. *Id.* ¶ 138. VTB Bank protests that the sanctions did not specifically "state that VTB Bank provided financial support to the DPR or the Fundraiser Entities." *See* VTB Br. 8 n.9. However, as the press release attached by VTB Bank indicates, the United States sanctioned VTB Bank, a "state-owned bank," due to "Russia's continuing support for separatists in Ukraine." Harris Decl. Ex. A. Of course, the "separatists" are the DPR.

detailed ways to donate to the DPR outside the formal banking system by using Western Union's and MoneyGram's money transfer services.  *Id.* ¶¶ 148–50.

The DPR's fundraisers were open about their mission:  to raise funds directly for the DPR. On May 24, 2014, a leading DPR fundraiser, Veche, explained, "A month ago, having received an appeal from representatives of the people's authorities of the Donetsk People's Republic, . . . Veche announced the creation of a fund to help self-defense units in South-Eastern Ukraine," which funds Veche "transferred to representatives of the DPR leadership."  *Id.* ¶¶ 151– 52.  Prior to the downing of MH17, the DPR issued a proclamation, signed by Strelkov, which formally incorporated these ongoing fundraising efforts under the auspices of Strelkov and the DPR's "Minister of Foreign Affairs," Gubareva.  *Id.* ¶¶ 153–54.  The DPR exerted ultimate control over the funds it raised, and the DPR repeatedly described how Strelkov and other DPR leaders confirmed the receipt of funds and supplies made possible by Defendants' support.  Prior to the attack on MH17, Strelkov personally issued a public YouTube video message to the DPR's supporters, which expressly stated that monetary support for the DPR should be sent to the accounts at issue in this matter—including a particular Sberbank account.  *Id.* ¶¶ 156–57, 190.

By enabling the DPR to solicit funds from around the world, including the U.S., Defendants provided the DPR with a steady flow of funding essential to the DPR's terrorist activities.  In addition to providing direct financial support to the DPR, the nature of Defendants' support allowed the DPR both to ensure the sustainability of its tactical operations and obfuscate the identity of other funding sources.  *Id*. ¶¶ 161–62.

> **E.    Prior to the DPR's Terrorist Attack on MH17, Defendants Knew that They Were Providing Material Support and Financing to the DPR**

Due to their substantial operations in Ukraine, each Defendant was acutely aware that the DPR was engaging in a pattern and practice of terrorist activities targeting civilians.  *Id.* ¶¶ 140–

44.   Moreover, the DPR's online fundraising solicitations were not part of the so-called "dark web." Rather, all of the websites cited in the SAC are or were readily accessible online, including via a simple Google search. As such, Defendants—all sophisticated international corporations with purportedly robust compliance functions and significant operations in Ukraine—were on notice that they were providing support to the DPR and its terrorist activities. *Id*. ¶ 147.

In April 2014, three months before the missile attack that killed Quinn, multiple media outlets reported that a global fundraising campaign, operated by Defendants, was providing essential funding and support for the DPR to carry out its terrorist activities. An April 19, 2014 article in *Forbes* discussed allegations from Ukraine's Attorney General that Sberbank was facilitating payments to support the DPR and its affiliates. The article makes clear that Sberbank was aware of these allegations, noting that "Sberbank said it contacted the General Prosecutor's Office of Ukraine" to discuss the allegations. *Id.* ¶¶ 163–65. Similarly, an April 16, 2014 article in *Reuters* titled, "Ukraine says investigating Russia's Sberbank for financing terrorists," quoted Ukraine's Acting Attorney General, Oleh Makhnitsky, as saying, "A criminal investigation has been launched against, for example, Sberbank Russia, . . . for financing terrorism" in eastern Ukraine. *Id.* ¶ 166. An April 19, 2014 article in the *Kyiv Post* reported that "in recent months many social network groups have been calling for funds to support causes related to separatist movements in different regions of the country. For example, to transfer aid to separatists and its affiliates, a specified account of the Ukrainian subsidiary of Sberbank of Russia and remittance systems . . . are given." The *Kyiv Post* article further reported that VTB Bank was also under investigation by Ukrainian authorities for violating the law on "crime and terrorist financing" by providing banking services to terrorist groups in the Donbass. *Id.* ¶¶ 167–68.

The *Kyiv Post* article references responsive statements from both Sberbank and VTB Bank

that confirm their actual knowledge of the investigation initiated by Ukrainian authorities into their support for the DPR.[7]   The article specifically references a statement from Sberbank about a purported "internal investigation" in response to these allegations of terrorism financing.   Thus, by no later than April 2014, both Sberbank and VTB Bank had actual knowledge that they were providing ongoing material support and financing to the DPR.  *Id.* ¶ 169.

A subsequent *New York Times* exposé reported that the DPR and its affiliates had "raised millions of dollars" through these online fundraising efforts to support their terrorist activities, noting that, by May 2014, the DPR "solicited funds from abroad using large American and European financial institutions, including banks and companies like Western Union."  *Id.* ¶ 171. The article explained that Humanitarian Battalion—led by DPR leaders Gubareva and Gubarev— listed instructions on its website for "how to wire dollars or euros into [an] account at Sberbank using correspondent accounts at Citibank, JPMorgan Chase," among other banks in New York City.   Between May 2014 and June 2015, Humanitarian Battalion reported raising $213,000 in support of the DPR and its affiliates.  *Id.* ¶ 172.   The *New York Times* further reported that U.S. dollars had passed through an international bank to DPR agent Veche.   Veche has openly advertised VTB Bank correspondent accounts with JPMorgan in New York City to handle U.S. dollar transactions, and has provided instructions online to send funds to a Sberbank account using New York correspondent accounts at Citibank and JPMorgan.[8]  Responding to the *New York Times*

---

[7] VTB Bank's claim that the April 19, 2014 *Kyiv Post* article does not "mention any notification to VTB Bank of any accusations or charges by Ukrainian authorities," VTB Br. 7 n.8, cannot be squared with the quotations in the article from a VTB Bank "press statement" responding directly to the allegations by Ukrainian authorities of financing terrorism.  *Kyiv Post*, "Russian Banks Refute Accusations of Financing Separatists in Eastern Ukraine," available at https://www.kyivpost.com/article/content/war-against-ukraine/russian-banks-refute-accusations-of-financing-terrorism-in-eastern-ukraine-344247.html (cited in SAC ¶¶ 167–69).

[8] Sberbank protests that the SAC does not provide support beyond the *New York Times* report for the proposition that DPR fundraisers Veche and Humanitarian Battalion openly publicized Sberbank's New York correspondent accounts as a method for transferring U.S. dollars to the DPR.  Not only have Plaintiffs now adduced evidence of Sberbank transferring funds to the DPR prior to the MH17 attack, *see supra* p. 25, but Sberbank also acknowledges that "many

article, one of the DPR's top fundraisers, Rozhin, expressly acknowledged that the material support and financing facilitated by Defendants was essential to the DPR's survival in the months before the DPR attack on MH17. *Id*. ¶¶ 175–76.

### F. Defendants Repeatedly Provided Material Support and Financing to the DPR, Which Openly Used Defendants' Support to Carry Out Terrorism[9]

Prior to the attack on MH17, the DPR made no secret as to how it raised funds to support its terrorist activities. Displaying an unprecedented openness and directness, many of the DPR's agents and representatives detailed on their websites how to wire U.S. dollars from abroad into accounts held at Sberbank or VTB Bank using correspondent accounts in New York, brazenly advertising specific account numbers. Many DPR agents and representatives also openly listed account information for money transfers through Western Union and MoneyGram. *Id.* ¶ 177–79.

Prior to the attack on MH17, the DPR's agents published online ledgers reflecting the receipt of funds as well as frequent updates, including from DPR leaders such as Strelkov, alongside photographs and videos, showing that the DPR immediately utilized these funds to purchase necessary lethal weapons and other tactical equipment. *Id*. ¶¶ 180–81. In stark contrast to other ATA cases, the DPR's agents and representatives openly boasted about their terrorist aims, stating that they were "NOT engaged in humanitarian assistance. We are engaged in non-humanitarian assistance." *Id.* ¶¶ 225, 227, 299. Among the lethal equipment the DPR purchased

---

of the websites cited in the Complaint have been taken down since 2014," which supports the logical inference that Sberbank's New York correspondent account information was utilized by additional DPR fundraisers, such as Veche and Humanitarian Battalion, during the relevant period beyond what Plaintiffs were able to identify through open source research several years later. Sberbank Br. 14, n.5; *see also* SAC ¶ 182 (alleging that the DPR relied upon and received material support from Defendants through additional DPR fundraisers beyond those described in the SAC). The same response applies equally to Sberbank's claim, Br. 5, that the SAC's citation to social media posts from DPR fundraisers advertising Sberbank's U.S. correspondent account information, not "DPR Supporter websites," is insufficient. Putting aside the dubious relevance of this distinction, the fact that Sberbank's New York correspondent account information was disseminated throughout social media actually indicates that Sberbank's correspondent account information was publicized more broadly and frequently in 2014 than Sberbank would like to admit.

[9] Given the voluminous allegations contained within the SAC regarding Defendants' provision of material support and financing to the DPR, Plaintiffs have included only a representative sample of those allegations herein. The full set of allegations can be found at SAC ¶¶ 177–352.

using Defendants' support during the relevant period were automatic weapons, armored vehicles, body armor, bulletproof vests, rifle scopes, night vision devices, ammunition for AK automatic rifles, optical sights for AK rifles, thermal imaging scopes, accessories for snipers, drones, and surface-to-air missiles.  *E.g., id.* ¶¶ 193, 202, 207, 226, 232–36, 281, 287, 308–10, 325–28, 331.

       1.    <u>Defendants Repeatedly Provided Material Support and Financing Directly to Two of the DPR's Most Notorious Leaders, Pavel Gubarev and Ekaterina Gubareva</u>

Prior to the attack on MH17, two of the DPR's top leaders, Gubarev and Gubareva, openly solicited funds for the DPR using the material support of Sberbank and VTB Bank, including as the co-heads of a DPR group called Humanitarian Battalion, as well as through a DPR group called Women's Battalion of People's Militia Donbass.  *Id.* ¶¶ 183–87.  Specifically, Gubarev and Humanitarian Battalion openly provided account information for donations utilizing Sberbank. Strelkov personally solicited funds to the same Sberbank account, including by displaying in a YouTube video message a piece of paper listing the full Sberbank account number through which funds could be sent directly to the DPR.  *Id.* ¶¶ 188–90.

A July 4, 2014 financial report provided online by Humanitarian Battalion noted that "citizens from different countries transfer money to Gubareva's accounts," totaling "significant amounts," which funds were used to purchase lethal equipment for the DPR.  A May 21, 2014 post from Women's Battalion of People's Militia Donbass stated that the only way to transfer US Dollars to Gubareva was through VTB Bank's New York correspondent accounts at Deutsche Bank, the details of which were published openly online.  *Id.* ¶¶ 192–95.

       2.    <u>Defendants Repeatedly Provided Material Support and Financing Directly to Sanctioned DPR Leader Igor Strelkov</u>

Much like the groups run by the sanctioned terrorist leaders Gubarev and Gubareva, the Novorossia and Donbass Assistance Fund (a.k.a. "Save Donbass") solicited funds on its website

to provide lethal support directly to the DPR.  Prior to the attack on MH17, Save Donbass advertised that funds sent to its accounts would go directly to the sanctioned leader of the DPR, Strelkov, as well as Gubarev and Gubareva.  The Save Donbass website stated, in a large font and all capital letters, that "HELP WILL REACH IGOR STRELKOV AND PAVEL GUBAREV," and that it would "bypass[] intermediaries" to deliver material support "directly" to the DPR.  *Id.* ¶¶ 196–200.  Save Donbass explicitly sought assistance to purchase lethal equipment detailed on the so-called "List of Strelkov."  *Id.* ¶¶ 202–03.  Prior to the DPR's attack on MH17, Save Donbass openly solicited funds for the DPR using the material support of Sberbank, Western Union, and MoneyGram.  Save Donbass also provided online reports of transfers into and withdrawals from its accounts with Sberbank, along with a description of money transferred through Western Union. *Id.* ¶¶ 204–11.

Another top DPR entity, Center for New Russia, openly solicited funds on its website to purchase lethal equipment for the DPR using the material support of Sberbank, VTB Bank, and Western Union.  The Center for New Russia website indicated that "Western Union transfers continue to be popular," explaining that Western Union was the "only" option "if you need to transfer cash currency."  The Center for New Russia website openly provided the name, email address, and telephone number for an individual (Alexey Markov, a prominent DPR member) who could receive money transfers for the DPR via Western Union.  *Id.* ¶¶ 212–15, 217.

Notably, prior to the attack on MH17, Center for New Russia repeatedly emphasized its receipt of U.S. dollar donations, while simultaneously advertising VTB Bank's correspondent bank accounts in New York City for the purpose of transmitting U.S. dollar donations.  One post specifically documented "$4000 transferred" to the Center for New Russia in the weeks leading up to the attack on MH17.  Separately, a financial report posted online reflects the receipt of 4,000

18

U.S. dollars on June 26, 2014, from "well-wishers."  *Id.* ¶ 220.

Beginning in May 2014, Center for New Russia posted frequent financial reports documenting the receipt of funds and the purchase of lethal equipment for the DPR using those funds, including transfers of money directly to Strelkov.  For instance, a May 20, 2014 report listed a balance of 356,555.64 rubles (over $10,000 at the time) in a Sberbank account, and also documented dollars and euros transmitted to the DPR—including from the U.S.—utilizing Western Union's services.  *Id.* ¶¶ 228–30.  Posts in June described additional large transfers into and withdrawals from Center for New Russia's Sberbank account, as well as ten different donations, totaling thousands of dollars, sent through Western Union, including six sent in U.S. dollars.  *Id.* ¶¶ 237–41.  A June 25, 2014 financial report further stated that Center for New Russia's account with VTB Bank had received transfers of over 56,000 rubles.[10]  *Id.* ¶ 242.

A financial report from July 2014, encompassing the time during which the DPR planned and executed the attack on MH17, described a series of transfers into and out of Center for New Russia's accounts with VTB Bank and Sberbank.  The report described significant "transfers in dollars" funneled through its account with VTB Bank, as well as five U.S. dollar transfers sent via Western Union.  The report also openly detailed a transfer of $5,000 directly to Strelkov, and thanked donors "from the United States" for their support of the DPR.  *Id.* ¶¶ 243–50.  In total, the DPR's Center for New Russia reported raising over 2 million rubles (roughly $60,000), and thousands of dollars and euros, between June 23 and July 27, 2014, including via wire transfers to its accounts with VTB Bank and Sberbank, and donations sent via Western Union.  *Id.* ¶ 341.

---

[10] Trying to minimize the scope of its material support to the DPR, VTB Bank misleadingly converts rubles into U.S. dollars utilizing a current exchange rate.  *See* VTB Br. 5, 20.  The ruble was worth more than twice as much during the relevant period of March to July 2014 as it is today.  *Compare* https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-RUB-2014 (exchange rate of approximately 1 USD = 34 RUB in June 2014) *with* https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-RUB-2020 (exchange rate of approximately 1 USD = 76 RUB in November 2020).

Other prominent DPR entities, such as Veche, also proudly boasted that they provided lethal equipment directly to Strelkov. *Id.* ¶¶ 252–54, 258. Prior to the attack on MH17, Veche openly solicited funds for the DPR using the material support of VTB Bank, explaining that international transfers of funds could be routed through VTB Bank's correspondent accounts at JPMorgan and Deutsche Bank in this district, and providing the relevant account numbers to facilitate such "international transfers" to the DPR. *Id.* ¶¶ 254–56, 260–61. Affiliates of Veche, such as Rospisatel and World Crisis, also advertised that funds could be sent to the DPR through VTB Bank's New York City correspondent accounts. World Crisis also openly provided instructions to support the DPR with money transfers through MoneyGram and Western Union and to a Sberbank account "for the transfer of funds directly to Igor Ivanovich Strelkov." *Id.* ¶¶ 262–71.

Another DPR entity, Voice of Sevastopol, publicly solicited funds for the DPR through Sberbank, Western Union, and MoneyGram. Voice of Sevastopol explained that "to transfer funds in US dollars," funds should be sent to a Sberbank account utilizing Sberbank's correspondent account at Deutsche Bank in New York. *Id.* ¶¶ 280–85.[11] The DPR fundraiser People's Militia of New Russia ("People's Militia") also instructed DPR supporters that, for transfers in "US dollars," they could send funds to a Sberbank account. People's Militia openly and notoriously provided instructions for routing the transfer of U.S. dollars through Sberbank's New York correspondent accounts at Deutsche Bank or BNY Mellon. *Id*. ¶¶ 292–94.

      3.    <u>Defendants Repeatedly Provided Material Support and Financing to the DPR through Alexander Zhuchkovsky, a Prominent DPR Leader</u>

The DPR also raised funds through direct efforts by certain prominent individual members,

---

[11] Sberbank's contention that Voice of Sevastopol also "identifies other methods for international transfers" (Br. 12) ignores that the *only method specifically identified* by Voice of Sevastopol to "transfer funds in US dollars" to the DPR was through Sberbank's New York City correspondent account with Deutsche Bank. *See* Kiernan Decl. Ex. 2.

including Rozhin and Zhuchkovsky.  Rozhin publicly provided VTB Bank account information, including New York correspondent account information, necessary to donate to the DPR through Veche.  Rozhin also solicited funds for the DPR through money transfers sent using the services of Western Union and MoneyGram.  *Id.* ¶¶ 295–97.

Zhuchkovsky, who has close ties to Strelkov, has been described by the Government of Ukraine as a key DPR leader:  "'Zhuchkovsky publicly boasted about raising millions of rubles and purchasing armored combat vehicles and weapons to benefit the DPR.'"  *Id.* ¶ 298 (quoting the Government of Ukraine's June 12, 2018 submission to the International Court of Justice).  On June 26, 2014, Zhuchkovsky publicly stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, or approximately $30,000.  He stated that funds for the DPR could be sent to a listed Sberbank card account number and that "From abroad, a transfer can be made . . . via Western Union."   Another post from June 23, 2014, stated, "Sending money to Alexander's accounts, you do not send them to abstract militia, but to the militia of STRELKOV."  The post then listed a Sberbank card account number to which funds should be sent.  *Id.* ¶¶ 298– 304.

Through his work with the DPR entity Sputnik & Pogrom, Zhuchkovsky publicly reported on the delivery of millions of rubles of support to the DPR prior to the attack on MH17, which funds Zhuchkovsky raised using the financial services of MoneyGram, Sberbank, and Western Union.  For example, Zhuchkovsky's personal email address was widely publicized as the contact for transfers "from abroad" to be sent using MoneyGram and Western Union.   Notably, Zhuchkovsky repeatedly solicited and received large U.S. dollar donations for the DPR from the

U.S., totaling at least $150,000.  *Id.* ¶¶ 304–17.[12]

According to his own website, which details his fundraising and expenditures on lethal equipment, Zhuchkovsky alone raised approximately 89 million rubles (roughly $2.5 million) for the DPR in the months surrounding the attack on MH17.  Zhuchkovsky raised these enormous sums from donors around the world, including the U.S. and Canada, in reliance upon the material support and services of Sberbank, MoneyGram, and Western Union.  *Id.* ¶¶ 320–32.

### G.    Defendants Knew or Were Deliberately Indifferent that Their Conduct Would Result in Terrorism

Defendants, like the rest of the world, knew that the DPR and its affiliates were routinely perpetrating acts of terrorism against civilians.  As described *supra*, the DPR's involvement in terrorist acts in eastern Ukraine was notorious public knowledge in 2014, and was widely reported on by the international news media.  In particular, the classification of the DPR in May 2014 as a terrorist organization by the Ukrainian Prosecutor General's Office was public information and was reported in the world news media.  *Id.* ¶¶ 104–12, 353–61, 374.

Because of the exceptional brazenness that characterized the DPR's telethon-like terrorism financing campaign, Defendants also knew that their services were aiding the DPR's terrorist activities.  Despite the DPR's status as a recognized terrorist organization, and consistent with the policy goals of their Russian-state owners, both Sberbank and VTB Bank knowingly provided banking and financial services to the DPR.  *Id.* ¶¶ 362–64.  Specifically, the Government of Ukraine concluded that "Sberbank . . . has used its infrastructure to facilitate billions of rubles' worth of transfers to the DPR" and its affiliates, and that VTB Bank used its infrastructure and

---

[12] Sberbank's claim (Sberbank Br. 15) that Zhuchkovsky's solicitation of  donations "through a widely publicized Sberbank bank card" somehow undermines the SAC's allegations regarding the DPR's repeated use of Sberbank correspondent accounts in New York misses the larger point.  The SAC establishes a pattern and practice whereby several of Sberbank's services (bank cards, Russian bank accounts, and New York correspondent accounts) were made available to the DPR and widely utilized, in plain sight, by the DPR to finance terrorism.

services to funnel billions of rubles to the leadership of the DPR, including its fundraisers.  *Id.* ¶ 365.  Ukraine's investigation into terrorism financing beginning in April 2014, of which Sberbank and VTB Bank were aware, further establishes Sberbank's and VTB Bank's knowledge that they were providing material support and financing to the DPR and its affiliates.  *Id.* ¶¶ 164–69, 366.

Western Union and MoneyGram also knew that the money transfers to the DPR's agents, representatives, and entities were being directed to the DPR to support their terrorist acts.  Because of the DPR's extraordinary and unprecedented openness about its fundraising methods, in the months before the DPR's attack on MH17, Western Union and MoneyGram would have had to actively ignore the self-evident reality—revealed by a simple internet search—that they were providing money transfer services to the DPR, and specifically that the DPR was relying upon these money transfer services to purchase lethal equipment and other supplies necessary for its violent terrorist activities in the Donbass.  *Id.* ¶¶ 373–78.

Notably, Western Union, as part of its compliance function, conducts internet searches relating to possible terrorist financing, including by utilizing analysts who "hunt through the dark web to gain insight into the tactics . . . terrorist financiers might use to evade detection."  As one Western Union executive has explained, "We actually monitor the dark Web as well and see what's going on out there."  *Id.* ¶ 383.  MoneyGram similarly requires each of its branches to "monitor and review all transactions . . . to better identify those transactions that might be suspicious, high-risk, or otherwise out-of-the-ordinary."  *Id.* ¶ 384.  Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, and openly referenced the provision of lethal supplies to sanctioned terrorist leaders such as Strelkov, MoneyGram and Western Union therefore knew or should have known under their own internal protocols that they

were providing material support and financing to the DPR.  *Id.* ¶¶ 383–84.

## LEGAL STANDARD

To satisfy Fed. R. Civ. P. 12(b)(2), a plaintiff need only "make a prima facie showing that jurisdiction exists." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-CV-6626 (ALC), 2019 WL 4516642, at *6 (S.D.N.Y. Sept. 18, 2019) (Carter, J.) (quoting *Licci*, 732 F.3d at 167).   "Prior to discovery, a plaintiff may meet its burden of making a prima facie showing of personal jurisdiction through factual allegations, which must be presumed true." *Bus. Credit & Capital II LLC v. Neuronexus, Inc.*, No. 1:18-CV-03374 (ALC), 2019 WL 1426609, at *3 (S.D.N.Y. Mar. 29, 2019) (Carter, J.).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court should 'draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Cunningham v. City of New York*, No. 1:15-CV-01266, 2019 WL 4747714, at *2 (S.D.N.Y. Sept. 30, 2019) (Carter, J.).

## ARGUMENT

### I.    Sberbank and VTB Bank's Repeated Use of New York City Correspondent Accounts to Route Funds to the DPR Subjects Them to Specific Personal Jurisdiction in This District

Sberbank and VTB Bank do not dispute the SAC's allegations that, to this day, they purposefully maintain and advertise New York correspondent accounts for the express purpose of facilitating U.S. dollar transactions, including the ones they transacted for the DPR.  SAC ¶¶ 48–55.  The law is clear that "a foreign bank's repeated use of a correspondent account in New York" to route funds to a terrorist group and its affiliates confers specific personal jurisdiction over the bank. *Licci*, 732 F.3d at 168.[13]  Because the SAC alleges that both Sberbank and VTB Bank made

---

[13] Unless otherwise noted, all internal citations, quotation marks, and alterations are omitted, and all emphases are added.

repeated, intentional use of their New York correspondent accounts to transmit funds to the DPR for the purpose of engaging in the activities that led to Quinn's death, Plaintiffs have met their burden of establishing a "prima facie showing that jurisdiction exists." *Actava TV, Inc.*, 2019 WL 4516642, at *6.

In fact, not only have Plaintiffs alleged the use of New York correspondent accounts, Plaintiffs have proved it. Specifically, on June 9 and July 2, 2014—just prior to the attack on MH17—Sberbank used its correspondent accounts at Bank of America and BNY Mellon in this district to process transfers to the DPR from individuals in Maryland and New Jersey. SAC ¶ 191. In an apparent effort to disguise the true reason for these transfers, the two donors adhered to the DPR's instructions and indicated that the money was for charitable purposes. *Id.* ¶¶ 191 n.32.[14]

Both Defendants avoid directly addressing the standard set forth in *Licci*, the operative Second Circuit decision conferring personal jurisdiction here. In *Licci*, plaintiffs sued a foreign bank, Lebanese Canadian Bank ("LCB"), under the ATA in connection with attacks carried out by Hizballah. The plaintiffs alleged that LCB had used a correspondent bank account with American Express in New York to wire money for Hizballah. 732 F.3d at 165–66. The district court dismissed the complaint for lack of personal jurisdiction under the New York long-arm statute, N.Y. C.P.L.R. 302(a)(1), which requires that "(1) [t]he defendant must have transacted business

---

[14] Plaintiffs learned about these transactions even though discovery has not yet commenced. After Defendants refused to meet with Plaintiffs pursuant to Rule 26(f) in order to commence discovery, Plaintiffs sent document preservation letters to several U.S. correspondent banks used by Sberbank and VTB Bank requesting that these correspondent banks agree to voluntarily preserve evidence potentially relevant to this litigation. Dkt. No. 130. The majority of correspondent banks agreed to voluntarily preserve relevant records – and, as such, Plaintiffs still do not have access to any of those banks' records. However, two correspondent banks stated they would not voluntarily preserve evidence unless served with a subpoena. *See* Dkt. No. 130-4; Dkt. No. 136; Dkt. No. 140 at 2. As a result, Judge Gorenstein permitted Plaintiffs to serve subpoenas on banks that would not voluntarily agree to preserve evidence to ensure that such evidence would not be destroyed. Dkt. No. 136. In response to two subpoenas, Bank of America and BNY Mellon provided Plaintiffs with partial and incomplete records, which identified transfers to the DPR prior to the downing of MH17. *See* Dkt. No. 143. As directed by the Court, Plaintiffs filed the SAC on October 5, 2020, to reflect this newly-discovered evidence. Dkt. Nos. 153, 156. The vast majority of correspondent banking records, however, remain unavailable to Plaintiffs without discovery.

within the state; and (2) the claim asserted must arise from that business activity." *Id.* at 168.

In *Licci*, the Second Circuit certified two questions to the New York Court of Appeals to resolve whether plaintiffs had alleged jurisdiction over LCB under the statute. *Id.* at 167. The Court of Appeals confirmed that plaintiffs had made the requisite showing. With regard to the first prong, "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful." *Id.* Thus, "a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment" and satisfies the first prong of the long-arm statute. *Id.* at 168. With regard to the second requirement, the court explained that "the defendant's allegedly culpable conduct stems from this use of the New York correspondent account," so "the plaintiffs' claims are sufficiently related to LCB's New York business activity to satisfy the second prong of section 302(a)(1)." *Id.* at 169.

A.   **Plaintiffs Have Alleged Unique Jurisdictional Facts Far Beyond What *Licci* Requires**

Due to the exceptional nature of the DPR's financing scheme, Plaintiffs' jurisdictional allegations far exceed the comparable allegations in *Licci*. Notably, the *Licci* complaint did not—as Sberbank and VTB Bank would like this Court to require, *see* VTB Br. 5; Sberbank Br. 11—provide details of any specific transactions through New York correspondent accounts or tie specific transactions to the purchase of specific weaponry. Rather, the allegations deemed sufficient by the Second Circuit to confer personal jurisdiction over LCB were: "between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received dozens of dollar wire transfers via defendants Amex Bank and LCB," which transfers "were made to, from, and/or between the Hizbollah Accounts via Amex Bank in New York," which "served as LCB's correspondent bank." *Licci v. Am. Express Bank Ltd.*, 2009 WL 3639957, ¶ 53 (S.D.N.Y.) (First Amended Complaint);

*see also* SAC ¶¶ 41–44, 52–56.

Unlike Plaintiffs here, the *Licci* plaintiffs lacked specific allegations about the mechanics of the financing scheme or the details of transfers as they moved through New York correspondent accounts.  The Second Circuit nevertheless deemed their broad allegations sufficient to establish personal jurisdiction over LCB, consistent with the fact that courts do not require plaintiffs, at the pleading stage, to have access to defendants' financial records such that they can allege the details of any particular wire transfer through a New York account.

While it would be a perversion of Congressional intent to require the families of victims of terrorism to uncover, on their own, the internal flow of dollars within a bank's internal accounts, and while *Licci* had only generalized allegations regarding transfers via a New York correspondent account without any identified nexus to terrorist financing, Plaintiffs here have pleaded numerous allegations relating to the DPR's "telethon" terrorism financing scheme directly implicating Sberbank and VTB Bank, including recently-discovered evidence confirming specific transfers to the DPR through New York correspondent accounts prior to Quinn's murder.  This fundraising campaign urged followers to contribute to purchasing lethal equipment specifically to carry out terrorist activities through specifically identified Sberbank and VTB Bank correspondent accounts maintained by Defendants in this district.  *See, e.g.*, SAC ¶¶ 56–62, 171–73, 178, 194, 216, 220, 255–57, 267–68, 283, 294, 297, 345.[15]

The widespread, intentional use of New York correspondent accounts by Sberbank and VTB Bank to fund the DPR establishes a course of dealing by both banks specifically directed at New York.  These New York correspondent accounts were each bank's primary means of

---

[15] *See also* SAC ¶¶ 57 (VTB Bank); 58 (Sberbank); 61 (VTB Bank); 172 (Sberbank); 173 (Sberbank and VTB Bank); 194 (VTB Bank); 216 (VTB Bank); 255–56 (VTB Bank); 260 (VTB Bank); 265 (VTB Bank); 268 (VTB Bank); 283 (Sberbank); 285 (VTB Bank); 294 (Sberbank); 297 (VTB Bank); 338 (VTB Bank), 345 (Sberbank and VTB Bank).

conducting U.S. dollar transfers, and were widely advertised as such on their websites.  In order to effectuate the transfer of funds in U.S. dollars, Sberbank purposefully utilized correspondent bank accounts in this district with JPMorgan, Citibank, Bank of America, BNY Mellon, and Deutsche Bank, and VTB Bank purposefully utilized correspondent bank accounts in this district with JPMorgan, Bank of America, and Citibank.  Both bank Defendants boasted about the commercial benefits they reaped from utilizing these correspondent accounts in New York.  SAC ¶¶ 48–55.  Plaintiffs further allege the repeated, overt use of Sberbank's and VTB Bank's New York correspondent accounts to transfer funds to the DPR terrorist group for the explicit purpose of supporting the DPR's ongoing terrorist activities.  *E.g.*, *id.* ¶¶ 27, 48, 60–62.

The SAC describes in detail the large sums of money, including significant amounts of U.S. dollars, routed to the DPR prior to the attack on MH17, including through Sberbank's and VTB Bank's correspondent accounts in this district.  *E.g.*, *id.* ¶¶ 59–61, 171–73, 220, 244–45, 317, 321, 341, 345.   These allegations are sufficient to establish personal jurisdiction over each bank, as acknowledged in a case relied upon by Sberbank.  *See Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327–28 (2016) (cited at Sberbank Br. 10–11) ("[r]epeated, deliberate use [of a correspondent bank account] that is approved[16] by the foreign bank on behalf and for the benefit of a customer— as in *Licci*—demonstrates volitional activity constituting transactions of business" in New York).[17]

---

[16] A deposit is "approved" by a foreign bank when the bank credits the funds in the correspondent account to the account of the customer at the foreign bank.  *Al Rushaid*, 28 N.Y.3d at 327–28.  This differs from "unintended and unapproved use of a correspondent bank, where the non-domiciliary bank is a passive and unilateral recipient of funds later rejected," which "does not constitute purposeful availment for personal jurisdiction."  *Id.* at 326.

[17] *See also Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2020 WL 486860, at *7 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted* 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ("When a foreign bank repeatedly approves deposits and the movement of funds through a correspondent account, it is transacting business; that the foreign bank did not initiate the transaction does not change the analysis."); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 701 (N.Y. 2002) (cited in *Licci* and holding that less than a dozen transactions through a New York bank was a sufficient course of dealing to establish jurisdiction); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 57–58 (D.D.C.), *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019) ("correspondent banking activity suffices for specific personal jurisdiction when the exercise of that jurisdiction pertains to the correspondent banking activity").

Notably, unlike the typical ATA case, such as *Licci*, here the DPR did not use Sberbank and VTB Bank's correspondent accounts in secret.  Rather, the SAC specifically alleges that Sberbank and VTB Bank knew that the DPR was utilizing their accounts and services, and their New York correspondent accounts in particular, to support its terrorist activities.  In fact, Sberbank and VTB Bank's provision of support to the DPR was widespread public knowledge at the time, so much so that Ukrainian authorities publicly announced an investigation into Sberbank and VTB Bank's support for the DPR, and both banks issued responsive statements acknowledging the accusations of terrorism financing.  SAC ¶¶ 104–12, 353–61, 374; *see also* Statement of Facts ("SOF"), *supra*, §§ E, G.  Where a bank "has knowledge that it is funding terrorists, contacts created by such funding" will support a finding of personal jurisdiction.  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 34 (D.D.C. 2010) ("the alleged jurisdictional fact that [a foreign bank] knowingly performed a wire transfer for [a terrorist group] thorough one of its U.S. branches supports a finding of specific personal jurisdiction").

Although both Sberbank and VTB Bank raise the theoretical possibility that the large flows of U.S. dollars transmitted to the DPR may have been sent through mechanisms other than their New York correspondent accounts, Sberbank Br. 4 n.1; VTB Br. 2, this supposition is contrary to the SAC's detailed, specific allegations documenting precisely how the DPR instructed its supporters to send U.S. dollars.  The DPR expressly identified Sberbank's and VTB Bank's New York correspondent accounts as the DPR's preferred way to send dollars to the DPR.[18]

Plaintiffs have not only established Sberbank's and VTB Bank's use of New York

---

[18] *See, e.g.*, SAC ¶¶ 57 (Center for New Russia stated that "transfers in USD" needed to be sent through a listed VTB Bank correspondent account at Deutsche Bank in New York), 58 (People's Militia of New Russia instructed DPR supporters to send "US dollars" utilizing Sberbank's correspondent accounts in New York at Deutsche Bank or BNY Mellon), 194 (Women's Battalion of People's Militia Donbass stated that transfers of U.S. dollars to DPR "foreign minister" Gubareva should be sent through a specified VTB Bank New York correspondent account at Deutsche Bank).

correspondent accounts by drawing on the DPR's public solicitations and advertisements, but have also adduced evidence that both banks used their correspondent accounts to transfer U.S. dollars to the DPR in the weeks leading up to the attack on MH17.  *See, e.g.*, SAC ¶¶ 191, 244, 341.  While discovery has not yet commenced in this matter, incomplete records provided by two correspondent banks conclusively establish that Defendants were relying on correspondent accounts in the United States to provide financial support to the DPR during the relevant time period.

Sberbank argues that the two wire transfers to the DPR identified in these incomplete records were for modest amounts, but that argument is beside the point because the two transfers do not represent the totality of the Russian-bank Defendants' use of correspondent accounts in this district.[19]  Rather, Plaintiffs identified these two transfers in incomplete records provided by only two U.S. correspondent banks—one of which did not appear in any of the DPR's advertising described in the SAC (Bank of America).  Once Plaintiffs are afforded the opportunity to commence discovery from U.S. correspondent banks featured prominently in the DPR's online advertising, it is reasonable to conclude that many more pre-MH17 attack transfers will be discovered.[20]  For example, Plaintiffs have not received any documents from Deutsche Bank, which is Sberbank's "[m]ain correspondent bank for client payments in US dollars," *id.* ¶ 49, and which was extensively promoted by the DPR in online solicitations, *see, e.g.*, ¶¶ 58, 61, 194, 256, 283, 294, 341, 345.  Thus, Plaintiffs have not received anything close to "comprehensive document discovery," *see* Sberbank Br. 2, or "jurisdictional discovery," *see* VTB Br. 25.  To the contrary,

---

[19] Moreover, as discussed below, *see infra* p. 41, courts have been clear that "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability" under the ATA.  *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1015 (7th Cir. 2002).

[20] Indeed, the SAC alleges numerous transfers that occurred both prior to and after the MH17 attack.  *See, e.g.*, SAC ¶¶ 27, 59–62, 138, 191

Plaintiffs have managed only to preserve an initial and incomplete set of documents from just two non-party banks that stated they would have otherwise destroyed those records.  *See supra* p. 25 n.14.

Given that Plaintiffs have conclusively established that the DPR received transfers through Sberbank's correspondent bank accounts in New York, Sberbank and VTB Bank's generalized assertions that there are other possible ways for U.S. dollars to reach the DPR should not be credited at the pleading stage.  *See Bakken Res., Inc. v. Edington*, No. 15 CIV. 8686 (ALC), 2019 WL 1437273, at *3 (S.D.N.Y. Mar. 29, 2019) (Carter, J.) ("All jurisdictional allegations 'are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.'").  Dismissal is therefore inappropriate.[21]

None of the cases cited by Sberbank and VTB Bank declining to exercise personal jurisdiction over a foreign bank involves the exceptional facts present here.  For example, *Community Finance Group, Inc. v. Stanbic Bank Ltd.*, No. 14CV5216 (DLC), 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015), VTB Br. 12–13, a non-ATA case, concluded that personal jurisdiction was not warranted because plaintiff did not allege an "established course of dealing" or any "purposeful" activity directed by defendant to New York, since defendant's New York account was used only once by happenstance.  Likewise, in *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18-cv-1876 (PAE), 2020 WL 4586729 (S.D.N.Y. Aug. 10, 2020), Sberbank Br. 13, another non-ATA case, the court concluded—after permitting jurisdictional

---

[21] Notably, neither Sberbank nor VTB Bank denies that they transmitted funds through the New York correspondent accounts expressly identified in the SAC to the DPR accounts also identified in the SAC.  Indeed, despite VTB Bank submitting a sworn affidavit (Dkt. No. 119) in support of its jurisdictional motion, neither bank elected to put forth a sworn statement refuting the SAC's allegations regarding the repeated use of Sberbank's and VTB Bank's New York correspondent accounts to transmit funds to the DPR.  While both Defendants readily and improperly raise issues of fact in their motions to dismiss, neither address the core factual issue raised by Plaintiffs:  their direct involvement in repeatedly funneling money to a group that advertised around the world that it would use that money to purchase lethal material, and ultimately deployed that lethal material to kill an American teenager.

discovery—that the defendant bank was a mere "passive recipient" for the three transactions at issue because it "did nothing to encourage use" of the correspondent accounts.  2020 WL 4586729, at *13, 16.  Here, by contrast, Plaintiffs allege that Sberbank and VTB Bank repeatedly and continuously (including to this day) direct customers to utilize their New York correspondent accounts for transfers in U.S. dollars.  The SAC further alleges that Sberbank and VTB Bank knew that these New York accounts were advertised and utilized by the DPR to fund its terrorist activities.  SAC ¶¶ 56–62; SOF, *supra*, §§ F–G.

*Hau Yin To v. HSBC Holdings PLC*, 700 F. App'x 66, 67 (2d Cir. 2017), Sberbank Br. 11, similarly distinguishes between the "intentional and repeated use of correspondent accounts that amounts to a transaction of business," which is sufficient for jurisdiction, and the "mere maintenance [without use] of correspondent bank accounts at an affiliate bank in New York."  In *Hau Yin To* there was no "continuing relationship" between defendant and New York, but here there was and indeed still is.  *Id.* at 67.[22]

In *Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10 CIV. 4754 JGK, 2011 WL 4056306, at *7 (S.D.N.Y. Sept. 13, 2011), VTB Br. 12, 14, plaintiffs "wholly failed to allege" a "connection between those [correspondent] bank accounts and the wrongful conduct that forms the basis of their cause of action" beyond "merely maintaining correspondent bank accounts in New York" unrelated to the alleged harm.  As the court there observed, personal jurisdiction is appropriate where, as here, plaintiffs allege a "connection between the wrongful conduct . . . and the bank account." *Id.* at *7 n.2 (collecting cases).

Rather than grapple with the operative *Licci* standard, VTB Bank resorts to relying

---

[22] Similarly, *Freeman v. HSBC Holdings PLC*, No. 14-CV-6601 (PKC), 2019 WL 4452364, at *7  (E.D.N.Y. Sept. 16, 2019), Sberbank Br. 21, 25, is distinguishable because there were no allegations of transactions "processed through the United States banking system or banks in New York."

primarily upon *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010), a pre-*Licci* case that is no longer good law.  *See* VTB Br. 13–17.  In fact, in certifying the jurisdictional questions in *Licci* to the New York Court of Appeals, the Second Circuit noted that the district court "rel[ied] upon the factually similar case of *Taman*" in declining to find personal jurisdiction over LCB.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 58 (2d Cir. 2012). Following guidance received from the Court of Appeals, the Second Circuit reversed the district court in *Licci*, thereby *sub silentio* overruling *Tamam*.  Even were *Tamam* good law, it is factually distinguishable:  "[a]fter closely parsing the ninety-four page Amended Complaint," the court found "only one relevant jurisdictional allegation," and no allegations regarding the "transfer of money through New York."  *Tamam*, 677 F. Supp. 2d at 727.  Far from the "speculative leap" described in *Tamam*, Plaintiffs here have alleged in detail a public crowdfunding campaign for the DPR akin to an international telethon, operated with Sberbank and VTB Bank's knowledge, which funded the DPR by advertising specific Sberbank and VTB Bank New York correspondent accounts for the transfer of U.S. dollars to the DPR, and which ultimately resulted in the transfer of large amounts of money to the DPR according to the DPR's own accounting.  Given the totality of the SAC's comprehensive allegations, Plaintiffs have pled "facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2018) (Carter, J.).

Moreover, Sberbank's argument that the two "small" wire transfers revealed in third-party records are insufficient to confer personal jurisdiction is a red herring, and should be rejected.  *See* Sberbank Br. 12–13.  The two transfers, which Plaintiffs discovered in an incomplete set of records from only two U.S. banks, are merely examples of the evidence that Plaintiffs will adduce should discovery commence in this case.  Likewise, Sberbank's reliance on *Community Finance Group*

and *Vasquez* for the proposition that two or three transactions is insufficient to establish personal jurisdiction is misplaced because, as discussed above, *see supra* p. 31, the foreign defendants in those cases were passive recipients of funds. *See* Sberbank Br. 12–13. Here, by contrast, Plaintiffs allege that Sberbank's and VTB Bank's correspondent banks were deliberately used to transfer U.S. dollars to the DPR in furtherance of terrorist activities. And, here, the DPR boasted about having "raised millions of dollars" through their online fundraising efforts. SAC ¶ 171. Thus, this case is not about two wire transfers totaling $300, as Sberbank would have the Court believe.

Finally, Sberbank mischaracterizes Plaintiffs' allegations. For example, Sberbank argues that "Plaintiffs do not allege that Sberbank—or even any DPR Supporter—instructed the senders to use Sberbank for these two transactions." Sberbank Br. 13. In fact, Plaintiffs allege that Sberbank did just that. Immediately prior to these transfers, Sberbank encouraged customers to use its correspondent banks for U.S. dollar payments, *see, e.g.*, SAC ¶ 49, and the DPR solicited funds for U.S. dollar donations through Sberbank's New York correspondent accounts, *see, e.g.*, SAC ¶¶ 188–92. The wire transfers also contain suspicious notations indicating that they were for charitable purposes, which was consistent with the DPR's instructions to its supporters. SAC ¶¶ 191 n.32, 291. Likewise, Sberbank argues that Plaintiffs do not allege that "DPR received" the payments, Sberbank Br. 13, even though Plaintiffs allege just that, SAC ¶ 192. Indeed, earlier in its brief, Sberbank acknowledges that Plaintiffs have identified wire transfers to Ekaterina Gubareva—the DPR's self-identified "foreign minister." [23] Sberbank Br. 7. Similarly, Sberbank argues that Plaintiffs do not allege that the transferred "funds were in any respect linked to the downing of MH17." Sberbank Br. 13. However, Plaintiffs allege these wire transfers to the

---

[23] It is noteworthy that just as Sberbank argues that transferring money to Gubareva apparently does not qualify as transferring money to the DPR, VTB Bank argues that the U.S. government's imposition of sanctions on the Russian-bank Defendants for supporting "separatists" in Ukraine apparently did not refer to the DPR. *See supra* p. 12 n.6.

DPR were made in the weeks prior to the downing of MH17.  SAC ¶ 191; *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019) (holding proximate cause exists where financial institution provides financial services to terrorist organization, or its agent, in advance of attack that caused plaintiff's injury); *supra* p. 25.   In any case, contrary to Sberbank's suggestion, Plaintiffs do not need to allege "that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff."   *See infra* p. 60 (quoting *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009) (emphasis in original)).

### B.  Exercising Personal Jurisdiction over Sberbank and VTB Bank Is Consistent with Due Process

Plaintiffs' allegations also satisfy the Due Process Clause.  Minimum contacts sufficient to satisfy the Due Process Clause "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there."  *Licci*, 732 F.3d at 170.  Here, "per the Second Circuit's express holding [in *Licci*], 'minimum contacts' were established by [Sberbank and VTB Bank's] *repeated* and *deliberate* use of a New York correspondent account to effect the financial services underlying the plaintiffs' claims."  *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

There is nothing surprising or fundamentally unfair about a New York court exercising jurisdiction over banks that repeatedly, continuously, and intentionally rely upon the New York financial system to conduct business.  Both Russian-bank Defendants, to this day, purposefully advertise the very New York correspondent accounts at issue in this case, all while boasting of the "advantages" of their "correspondent banking relations" with New York banks.  SAC ¶¶ 48–55, 62.  Indeed, another court in this district previously held that "Sberbank's use of accounts at Bank of New York for this particular transaction and its practice of conducting other similar transactions using New York banks establishes Sberbank's 'minimum contacts' with this jurisdiction."  *Parex*

*Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 422 (S.D.N.Y. 2000).[24]  These facts easily establish Defendants' "minimum contacts" with New York.

Exercising personal jurisdiction over Sberbank and VTB Bank is also reasonable in light of "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism."  *Licci*, 732 F.3d at 174; *see also Weiss*, 176 F. Supp. 3d at 289 (the ATA's "clear statutory objective" to "give American nationals broad remedies in a procedurally privileged U.S. forum" further supports the conclusion "that exercising jurisdiction over Defendant is consistent with due process").

In sum, the SAC contains allegations far exceeding what is required under *Licci* for alleging personal jurisdiction consistent with New York law and federal due process.  However, should the Court require something more, it should deny Sberbank's and VTB Bank's motions and grant Plaintiffs jurisdictional discovery to document, through additional specific transactions, the sustained, systematic, and material support Sberbank and VTB Bank provided to the DPR through their New York correspondent accounts.  "Generally, a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Regenlab USA LLC v. Estar Techs. Ltd.*, No. 16-CV-08771 (ALC), 2017 WL 3601304, at *4 (S.D.N.Y. Aug. 17, 2017) (Carter, J.).  "[E]ven if a plaintiff has not made a *prima facie* showing, a court may nevertheless order discovery when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record."  *Id.*[25]

---

[24] Moreover, as detailed in Plaintiffs' request for alternative service on Sberbank and VTB Bank (Dkt. No. 41), both Defendants engage in active litigation in U.S. courts, including in a suit brought by VTB Bank in New York, *VTB Bank PJSC v. Babel*, No. 525062/2017 (N.Y. Sup. Ct., Kings Cnty. 2017).

[25] Moreover, because Sberbank and VTB Bank are majority-owned by the Russian Federation, the Court can take judicial notice of the Russian Federation's continuing abrogation of international norms, including U.S. domestic law (see Report of Special Counsel Robert Mueller on the Investigation into Russian Interference in the 2019 Presidential Election, *available at* https://www.justice.gov/storage/report.pdf) and international law, including as evidenced by a December 9, 2019 United Nations General Assembly resolution condemning Russia's ongoing occupation of Crimea

II.     **Plaintiffs Have Alleged Acts of International Terrorism**

In enacting the ATA, Congress expressly intended to authorize the "imposition of liability at any point along the causal chain of terrorism," including by "interrupt[ing] or at least imperil[ing] the flow of money" to terrorist groups.  S. Rep. No. 102-342, at 22 (1992).  To effect this Congressional intent, the ATA provides, through a "chain of explicit statutory incorporations by reference," *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) ("*Boim III*") (Posner, J.), for liability based on "[p]roviding material support to terrorists" and "financing of terrorism," 18 U.S.C. §§ 2339A, 2339C, exactly as Plaintiffs allege.  Thus, while Defendants protest that Plaintiffs have "attempted to stretch" the ATA "beyond recognition," Joint Br. 1, Plaintiffs' allegations explicitly fulfill Congressional intent:  Plaintiffs allege that the DPR solicited funds repeatedly and in plain view via Defendants' financial transfer services for the explicit purpose of acquiring lethal equipment, enabling them to control territory and carry out the attack that killed Quinn.  Defendants' material support to the DPR and financing of the DPR's terrorist activities were "acts dangerous to human life" satisfying the requirements of "an act of international terrorism."  And, as explained below, any commercial motives that Defendants may have had are of no moment under the ATA; indeed, the illogical theory that commercial motives insulate Defendants from liability would mean that even if a financial institution were knowingly or recklessly supporting terrorism, that bank would avoid liability simply because it was *also* trying to make money off of that support.

A.     **Defendants' "Providing Material Support to Terrorists" and "Financing of Terrorism" Qualify as Acts of International Terrorism under the ATA**

The ATA provides liability where a plaintiff has been injured "by reason of an act of

---

(see https://www.un.org/press/en/2019/ga12223.doc.htm).  Therefore, since the SAC plausibly alleges that Quinn was killed as a result of conduct by these two Russian banks, proceeding to fact-finding in this forum would be prudent.

international terrorism."  18 U.S.C. § 2333(a).  The ATA in turn defines "international terrorism" as activities that:  (1) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States," 18 U.S.C. § 2331(1)(A); and (2) "appear to be intended to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping," 18 U.S.C. § 2331(1)(B).  A violation of 18 U.S.C. § 2339A for "[p]roviding material support to terrorists" or a violation of 18 U.S.C. § 2339C for "financing of terrorism," as alleged here, qualifies as "a violation of the criminal laws" sufficient to satisfy 18 U.S.C. § 2331(1)(A) and thus to trigger liability under 18 U.S.C. § 2333(a).

Defendants take the position that simply moving money, even to the DPR, is not "violent or dangerous to human life," and that Plaintiffs have thus failed to plead an act of international terrorism.  *E.g.*, Joint Br. 16–18, Sberbank Br. 24–25, VTB Br. 19–20.  What Defendants did, they suggest, was pressing a button, not firing a gun.  But Defendants are wrong on the facts and the law.  If Congress intended to create liability only for firing a gun rather than pressing a button, it would not have made "[p]roviding material support to terrorists" and "financing of terrorism" the basis for liability under the ATA.  18 U.S.C. §§ 2339A, 2339C.  Congress recognized—as courts have—that pressing a button can be just as, if not more, dangerous to human life than firing a gun.  *See Boim III*, 549 F.3d at 690 ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'"); *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (citing *Boim III*).[26]

---

[26] The Second Circuit recently clarified in *Linde* that the "provision of material support" is not *alone* sufficient to satisfy all statutory requirements of an act of "international terrorism."  882 F.3d at 326–27.  However—as Defendants fail to acknowledge, *see, e.g.*, Sberbank Br. 24–25, VTB Br. 18–19—the Second Circuit was clear that material support

Thus, courts have repeatedly held that material support to terrorists or financing terrorism—merely pressing the button—can constitute an act "dangerous to human life." Recently, in *Lelchook v. Islamic Republic of Iran*, the court held that the defendant Bank Saderat's ("BSPLC") transfers of funds to Hezbollah through multiple intermediary banks and branches plausibly alleged an act "dangerous to human life," because "when banks such as BSPLC route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing 'acts dangerous to human life.'" 393 F. Supp. 3d 261, 264–66 (E.D.N.Y. 2019). *Wultz* similarly held that the plaintiffs had plausibly alleged that, by providing "'extensive banking services to [Palestinian Islamic Jihad ("PIJ")],' which thereby 'enable[d] PIJ to plan, to prepare for and to carry out terrorist attacks,'" defendant Bank of China had engaged in acts "dangerous to human life." 755 F. Supp. 2d at 43–44. In *Goldberg*, the court likewise denied a motion to dismiss because the plaintiffs had plausibly alleged that, by facilitating the transfer of funds and providing financial services to Hamas-associated entities, defendant UBS had "committed acts of international terrorism." 660 F. Supp. 2d at 426–27. In *Strauss v. Credit Lyonnais, S.A.* and *Weiss v. National Westminster Bank PLC*, the courts similarly denied motions to dismiss because the defendant banks' "maintenance of bank accounts[] and processing of deposits and withdrawals" to benefit Hamas-related organizations plausibly stated claims under the ATA. No. CV-06-0702 (CPS), 2006 WL 2862704, at *12–15 (E.D.N.Y. Oct. 5, 2006); 453 F. Supp. 2d 609, 625–28 (E.D.N.Y. 2006) ("the provision of basic banking services may qualify as material support" under ATA); *see also Miller*, 372 F. Supp. 3d at 45–46 (bank's acts, including among others "routing payments and maintaining accounts for terrorists and terrorist organizations," were "dangerous to human life").

or financing terrorism "*can also* satisfy the § 2331(1) definitional requirements of international terrorism." *Id.* at 326–27. The Second Circuit also emphasized that it was not disagreeing with *Boim III*. *Id.* at 327.

39

This is what Plaintiffs allege here.  Plaintiffs allege that Defendants' support allowed the DPR to acquire lethal military equipment and enabled the DPR to wage its campaign of terrorism.[27] As one DPR website stated, "We are NOT engaged in humanitarian assistance. We are engaged in non-humanitarian assistance."   SAC ¶ 225.   Accordingly, Defendants' material support and financing of the DPR's activities, by enabling the DPR to procure military equipment and engage in these activities, were "dangerous to human life."  18 U.S.C. § 2331(1)(A).

Defendants, in characterizing their acts as "ordinary," "non-violent and mechanical" "financial services" or "banking services," Joint Br. 17, VTB Br. 18–19, Sberbank Br. 25, ignore both the SAC and the standards relevant to a motion to dismiss.  Plaintiffs' allegations, with inferences drawn in Plaintiffs' favor, are more than enough to plead that Defendants' acts were "dangerous to human life" and not merely "ordinary" "financial services."   Indeed, in *Linde*, although the Second Circuit rejected the jury instructions there as erroneous, the court explicitly stated that whether a defendant's financial services "should not be viewed as routine" "raises questions of fact for a jury to decide."  882 F.3d at 327.  In other words, whether a defendant has provided "ordinary banking services," as Defendants claim, *see* Sberbank Br. 25, or whether its financial services qualify as an act "dangerous to human life" is, under *Linde*, an issue *not* generally amenable to resolution on a motion to dismiss.  *See Linde*, 882 F.3d at 327.

In denying that their actions constitute acts of "international terrorism," Defendants call attention to the specific dollar figures for particular transfers alleged in the SAC, suggesting that these amounts are insufficient to support a claim under the ATA.  *See, e.g.*, VTB Br. 20. Defendants ignore Plaintiffs' allegations that the DPR and its affiliates were reported to have "raised millions of dollars" through their online fundraising efforts and that the DPR reported

---

[27] *See, e.g.*, SAC ¶¶ 3–4, 14, 160–62, 180–81, 193, 202, 207, 226–27, 299, 232–36, 281, 287, 308–10, 325–28, 331, 342–43, 396.

receiving significant sums of U.S. dollars.  *See* SAC ¶¶ 171, 220, 238, 241, 244, 245, 248, 317–

18.  Moreover, even if counterfactually Plaintiffs did not allege the raising and transmission of

"millions of dollars," the ATA's definition of "material support" does not contain a *de minimis*

exception.  To the contrary, the statute itself defines "material support or resources" as "currency

or other financial securities, financial services, lodging, training, safehouses, false documentation

or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel, transportation, and other physical assets, except medicine or religious materials."  18

U.S.C. § 2339A(b).  Thus, the term "material support" relates "to the *type* of aid provided rather

than whether it is substantial or considerable . . . . [E]ven small donations made knowingly and

intentionally in support of terrorism may meet the standard for civil liability in section 2333."

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1015 (7th

Cir. 2002) ("*Boim II*").  The cases cited by Defendants are distinguishable.  *See* Joint Br. 16–18;

Sberbank Br. 24–25; VTB Br. 18–19.  For instance, Defendants cite cases involving transfers of

money to sovereign states and groups that are not terrorist organizations like the DPR.   In

*O'Sullivan v. Deutsche Bank AG*, the court held that the defendants' "financial services to various

Iranian banks, airlines, shipping and oil companies" were not acts of international terrorism in part

because Iran "is a sovereign state with 'many legitimate agencies, operations, and programs to

fund.'"  No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *5–6, 8 (S.D.N.Y. Mar. 28, 2019).

*Zapata v. HSBC Holdings PLC* applied similar logic where the plaintiffs alleged that HSBC had

laundered drug proceeds for Mexican drug cartels.   414 F. Supp. 3d 342, 346 (E.D.N.Y.

2019), *aff'd*, 825 F. App'x 55 (2d Cir. 2020).  Drug cartels, unlike terrorist organizations, are *de*

*facto* businesses—albeit illegal ones—that engage in myriad activities besides violence and killing

and intimidation of civilians:  "While the Cartels are not sovereign governments, the underlying

logic of these cases is applicable here.  The Cartels may commit acts of terrorism, but . . . they are, first and foremost, organized crime syndicates.  Though the Cartels' main activities are certainly not the 'legitimate . . . operations and programs' of a sovereign government, nor are they international terrorism."  *Id.* at 357 n.10.

Defendants also cite *Kaplan v. Lebanese Canadian Bank, SAL*, in which the plaintiffs alleged that defendant LCB had maintained bank accounts for Hizbollah under the names of Hizbollah affiliates.  No. 08 CIV. 7253 (GBD), 2019 WL 4869617, at *1 (S.D.N.Y. Sept. 20, 2019).  The court held that this conduct did not constitute acts of international terrorism, in part because the plaintiffs failed to allege that the defendant "provided money directly to Hizbollah to carry out the attacks" or that any transferred funds "were, in fact, sent to Hizbollah and then used by Hizbollah to perpetrate the rocket attacks."  *Id.* at *4.  Here, by contrast, Plaintiffs allege transfers directly to the DPR for the express purpose of acquiring weapons.  Additionally, whereas "Hezbollah, a terrorist organization that has been known to deploy suicide bombers, also runs hospitals, schools and even orphanages," *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 168 (E.D.N.Y. 2008), the DPR does not engage in any such nonviolent activities.

### B. Defendants' Commercial Motives Do Not Insulate Them from Liability under the ATA

Defendants next argue that their provision of "ordinary banking services" "driven by commercial motives" do not constitute acts that "appear to be intended to 'intimidate or coerce a civilian population,'" "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping," as required by 18 U.S.C. § 2331(1)(B).  *See* Joint Br. 16, 18–19, Sberbank Br. 24–25.  This standard is "a matter of external appearance rather than subjective intent."  *Boim III*, 549 F.3d at 694.  In other words, a defendant's *subjective* motive is irrelevant to the inquiry of whether it has met the

*objective* "external appearance" requirement of 18 U.S.C. § 2331(1)(B).  Indeed, "[t]o require

proof that the donor *intended* that his contribution be used for terrorism—to make a benign intent

a defense—would as a practical matter eliminate donor liability except in cases in which the donor

was foolish enough to admit his true intent." *Boim III*, 549 F.3d at 698–99.  Rather, given the

"foreseeable consequences" of transfers to terrorists, financial transfers benefiting such terrorists

"would 'appear to be intended . . . to intimidate or coerce a civilian population' or to 'affect the

conduct of a government,'" as required by 18 U.S.C. § 2331(1)(B).  *Id.* at 694; *accord Lelchook*,

393 F. Supp. 3d at 265; *Miller*, 372 F. Supp. 3d at 45; *In re Chiquita Brands Int'l, Inc.*, 284 F.

Supp. 3d 1284, 1319 (S.D. Fla. 2018).  Furthermore, the existence of this statutory element is a

question of fact not properly resolved on a motion to dismiss.  *See Linde*, 882 F.3d at 330 (whether

or not defendant bank's "apparent intent was to intimidate or coerce civilians or to affect a

government" was jury question "about a tortfeasor's state of mind").

Plaintiffs' allegations easily satisfy the requirements of 18 U.S.C. § 2331(1)(B).  As

explained below, Defendants knew or were deliberately indifferent as to whether the funds that

they transferred to the DPR would be used for terrorist acts.  *See generally* SOF, *supra*, §§ E–G;

*see infra* Part III.  Attacks on civilians by the DPR—like the attack that downed MH17—were also

reasonably foreseeable.  *See infra* Part IV.B.  Based on Defendants' knowledge or deliberate

indifference as to their supporting terrorism and given the "foreseeable consequences" of

Defendants' actions, *Boim III*, 549 F.3d at 694, those actions "appear to be intended" to "intimidate

or coerce a civilian population," "influence the policy of a government by intimidation or

coercion," or "affect the conduct of a government," 18 U.S.C. § 2331(1)(B); *see, e.g.*, *Boim III*,

549 F.3d at 694; *Lelchook*, 393 F. Supp. 3d at 266; *Miller*, 372 F. Supp. 3d at 45; *In re Chiquita

Brands Int'l*, 284 F. Supp. 3d at 1319.  Furthermore, Sberbank and VTB Bank, as Russian-owned

banks, acted to further the Russian Federation's policy of supporting the Novorossiya movement, including the DPR's terrorist activities, SAC ¶¶ 32, 33, 40—actions that similarly "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government."  18 U.S.C. § 2331(1)(B).

Defendants assert that they cannot have met the ATA's requirement because they had "commercial" or "economic" motives.  *See* Joint Br. 18–19.  But Defendants' desire to make money does not immunize them when they provide critical material support and financial services to terrorists to carry out lethal attacks such as that on MH17:  any commercial motives that Defendants may have *also* had cannot defeat their liability for having had the requisite intent under 18 U.S.C. § 2331(1)(B).  Defendants' argument is not only morally repugnant but contradicts common sense:  it suggests that, even where a financial institution may be liable for supporting terrorists, it manages to avoid liability simply by *also* seeking to make money off of the provision of financial services to terrorists.  That cannot be.  *See In re Chiquita Brands Int'l*, 284 F. Supp. 3d at 1319 (whether or not material support had "multiple motivational triggers" is a "factor[] for the trier of fact to consider," and a defendant's asserted alternative motivation does not "negate, as a matter of law, the mens rea 'appears to be intended' requirement of 2331(1)(B)").  Such a result would also be inconsistent with the statute itself, which establishes liability for "financing" terrorism, and with Congress's explicit intent to "interrupt or at least imperil the flow of money" to terrorist groups.  S. Rep. No. 102-342, at 22 (1992); *see also Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 642 (E.D.N.Y. 2017) ("Congress specifically has found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'").

Defendants' cases, *see* Joint Br. 19, are distinguishable because there, the funds were not

provided to organizations that announced their aim to purchase lethal weaponry for explicitly terrorist purposes, as here.  Rather, Defendants' cases involve donations to sovereign states and other entities without explicitly terrorist aims.  As explained above, *Zapata* is distinguishable because the plaintiffs there alleged that HSBC had laundered money for drug cartels, which are largely commercial enterprises, albeit illicit ones.  414 F. Supp. 3d at 357 n.10.  Similarly, in *Kemper v. Deutsche Bank AG*, the plaintiffs alleged that Deutsche Bank was "doing business with companies and countries that have significant legitimate operations," including the government of Iran, Iranian banks, and Iran's national maritime carrier.  911 F.3d 383, 388, 390 (7th Cir. 2018).  In *Freeman v. HSBC Holdings PLC*, the plaintiffs likewise alleged that the defendants had "provided financial services to various Iranian banks, airlines, shipping, and oil companies."  No. 14-CV-6601 (PKC), 2019 WL 4452364, at *14 (E.D.N.Y. Sept. 16, 2019).  And in *Brill v. Chevron Corp.*, the plaintiffs alleged that Chevron's payment of illegal oil surcharges and "kickbacks" to third parties through which it purchased oil contributed indirectly to the Iraqi government's support of Palestinian terrorist attacks.  No. 15-CV-04916-JD, 2017 WL 76894, at *1 (N.D. Cal. Jan. 9, 2017).  None of these cases alleges, as here, financial support provided to a terrorist organization for expressly terrorist purposes.

### III.   Plaintiffs Have Alleged that Defendants Were Deliberately Indifferent as to Whether Their Transfers Were Materially Supporting or Financing Terrorism

#### A.   The ATA Requires Only Deliberate Indifference, Not Actual Knowledge

Defendants argue that Plaintiffs have failed to "allege the requisite intent or knowledge required to state a predicate violation of 18 U.S.C. § 2339A and § 2339C."  Joint Br. 19–20; *accord* Sberbank Br. 18–24; VTB Br. 20–23.  Liability under 18 U.S.C. § 2339A attaches to an individual who "provides material support or resources . . . , *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of" one of various criminal laws.  18 U.S.C.

§ 2339A(a). And liability under 18 U.S.C. § 2339C attaches to an individual who has the "knowledge that such funds are to be used, in full or in part, in order to carry out" one of several acts, including "any other act intended to cause death or serious bodily injury to a civilian." 18 U.S.C. § 2339C(a)(1)(B).[28] At the pleading stage, Plaintiffs' burden to plead the requisite state of mind is even less than "the 'lenient' standard" that the Second Circuit has approved at summary judgment "for ruling on the sufficiency of evidence of scienter issues." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014); *see Linde*, 882 F.3d at 330 ("traditionally a jury resolves questions about a tortfeasor's state of mind").

To satisfy 18 U.S.C. §§ 2339A and 2339C, Plaintiffs must show, at most, recklessness.[29] Plaintiffs meet their burden by alleging that Defendants were deliberately indifferent as to whether they were "provid[ing] material support or resources" to the DPR that were "to be used in preparation for, or in carrying out, a violation" of numerous enumerated acts, including homicide or physical violence. *See* 18 U.S.C. § 2339A(a) (citing 18 U.S.C. § 2332). Plaintiffs also meet their burden by alleging that Defendants were deliberately indifferent as to whether they were "provid[ing] . . . funds" to the DPR that were "to be used, in full or in part, in order to carry out" certain enumerated acts, including "any other act intended to cause death or serious bodily injury

---

[28] Sberbank notes in passing that 18 U.S.C. §§ 2339A and 2339C vary from 18 U.S.C. § 2339B in that the latter statute "criminalizes support for terrorist organizations, while the predicate statutes relied on by Plaintiffs criminalize only support for specific terrorist acts." Sberbank Br. 16. That distinction is of no consequence here. Plaintiffs allege not only that Defendants supported the DPR as an "organization[] generally," but specifically that Defendants "provide[d] material support or resources" to the DPR "knowing or intending that they [were] to be used in preparation for, or in carrying out," various enumerated violations under the statute, including homicide or physical violence (prohibited by 18 U.S.C. § 2332). *See* 18 U.S.C. § 2339A(a). Plaintiffs also allege that Defendants financed the DPR "with the knowledge that such funds [were] to be used, in full or in part, in order to carry out . . . any other act intended to cause death or serious bodily injury to a civilian." 18 U.S.C. § 2339C(a)(1).
[29] Defendants incorrectly state the law when they claim or suggest that Plaintiffs must plead *actual* knowledge. *See, e.g.*, Joint Br. 20 ("To plead such knowledge, Plaintiffs must allege facts demonstrating that Western Union and MoneyGram *knew* that the individuals receiving transfers were soliciting donations for the DPR for terrorist purposes."), Sberbank Br. 19 (referring to "actual knowledge"). Rather, recklessness, shown through "conscious and deliberate disregard," satisfies the statute. *Goldberg*, 660 F. Supp. 2d at 428. Defendants acknowledge elsewhere that a recklessness standard governs the *mens rea* required by these statutes. *See, e.g.*, Sberbank Br. 19 (referring to "willful blindness or reckless indifference"); VTB Br. 21 (same).

to a civilian." *See* 18 U.S.C. § 2339C; *see, e.g.*, *Boim III*, 549 F.3d at 693 (state-of-mind requirements satisfied where "one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 506 (E.D.N.Y. 2012) ("[I]t must be shown that the defendant's alleged actions were reckless, knowing, or intentional."); *Goldberg*, 660 F. Supp. 2d at 428 ("[C]onscious and deliberate disregard of the interest of others, in the face of a known risk, can qualify as sufficiently deliberate wrongdoing.").[30]

Courts have routinely found this requirement satisfied even where defendants transferred funds through purported "intermediate" entities rather than directly to terrorists. For example, in *Strauss v. Credit Lyonnais, S.A.*, the plaintiffs alleged that Credit Lyonnais provided "financial services to Hamas' primary fundraiser in France," which transferred funds to alter egos of Hamas. 925 F. Supp. 2d 414, 431–32 (E.D.N.Y. 2013). The court found "a genuine issue of material fact as to whether Defendant knew about or deliberately disregarded [the Hamas fundraiser's] purported support of Hamas," notwithstanding that the transfers involved intermediary "charities" serving as Hamas front groups. *Id.* at 429. In *Goldberg*, the plaintiffs similarly alleged that Hamas was financed through false "charities," and that UBS had provided financial services and transfers for one such fundraiser. 660 F. Supp. 2d at 415–16. The court held that the plaintiffs had plausibly alleged UBS's knowledge under 18 U.S.C. § 2339C because "public sources of information . . . plausibly could have informed UBS" that it was providing services to Hamas, and

---

[30] Furthermore, "Sections 2339A and 2339C only require knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts. Neither requires the specific intent to aid or encourage the particular attacks that injured plaintiffs." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 586 n.9 (E.D.N.Y. 2005); *accord Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 172 (S.D.N.Y. 2017) ("Section 2339A also requires evidence that the defendant knew or intended that its financial services would 'generally facilitate' the FTO's activities, but there is no requirement that the defendant specifically know or intend to support a particular terrorist attack."); *see also Goldberg*, 660 F. Supp. 2d at 434.

"[p]roviding funds to an organization known to be engaged in violent acts of terrorism is sufficient to establish defendant's knowledge that the funds provided would be used in whole or in part for terrorist activities." *Id.* at 433–34.

**B.     Defendants Were Deliberately Indifferent as to Whether They Materially Supported or Financed the DPR**

This case is unique in the history of the ATA.  The DPR, whose activities were internationally condemned, raised funds for its terrorist activities via crowdsourcing (through Defendants' financial services) across popular mainstream websites.  And it made no secret of its activities:  the DPR's fundraising was designed to be seen, not hidden, and was intended to communicate that funds raised were being used to procure lethal equipment to carry out violent attacks.  Accordingly, Plaintiffs more than sufficiently allege that, by funding the DPR's entities and leaders—who openly identified themselves as such, and who made clear that funds would be used for lethal equipment, not charity—Defendants knew of or were deliberately indifferent as to whether their transfers materially supported or financed the DPR's terrorist activities.

The DPR's campaign of terror, including its pattern and practice of attacking and intimidating civilians, was widely documented and reported on at the time, and constituted one of the most significant international news events in the world.  SAC ¶¶ 5, 8, 88, 91–93, 96, 104–28. Before the downing of MH17, in April 2014, the EU sanctioned DPR leaders, including Strelkov; in May 2014, Ukrainian authorities classified the DPR and its affiliates as terrorist organizations; and in June 2014, the U.S. sanctioned several DPR leaders, again including Strelkov.  *Id.* ¶¶ 127– 28, 131.  As sophisticated financial institutions, Defendants knew or must have known, like the rest of the world, that the DPR was routinely perpetrating acts of terrorism against civilians.  *Id.* ¶¶ 104–12, 353–61, 374.

Furthermore, the DPR raised funds for its terrorist activities through an open and public

"crowdfunding" campaign operated by a coordinated set of actors, who made numerous public statements online regarding their support of the DPR's activities. *Id.* ¶¶ 6–7, 145–52, 158–59, 175–76, 223, 272–79.  These actors—including Strelkov himself—posted advertisements across the Internet that openly solicited funds to support the DPR (including to DPR leaders themselves), and that specifically mentioned Defendants' financial transfer services.[31]

Moreover, these coordinated DPR actors—and Strelkov himself—publicly and proudly boasted that Defendants had used these funds to purchase lethal weaponry, including posting photographs of the equipment that they had purchased, in order to raise yet more funds to support the DPR's terrorist activities.  *E.g.*, *id.* ¶¶ 193 (equipment "for snipers"), 202 (automatic rifles), 207 ("Confirmation from Igor Strelkov" regarding purchase of "armored vehicles" and other cargo), 226, 232–36 (photos of sniper rifles), 281, 287, 308–10, 325–28 ("armored vehicles" and automatic weapons), 331 (photos of rifles).  DPR entities and leaders also specifically advertised their use of Defendants' services and confirmed that the transfers in question had been made using those financial services, again with the goal of soliciting further funds.[32]  DPR fundraisers posted financial "reports," which were ledgers showing detailed credits and debits of funds in and out of their accounts, including identifying transfers to Strelkov himself.  For example, a June 2014 report showed funds being sent to fundraisers in U.S. dollars "by Western Union" that were used to

---

[31] *E.g.*, *id.* ¶¶ 57 (VTB Bank), 58 (Sberbank), 61 (VTB Bank), 172 (Sberbank), 173 (Sberbank and VTB Bank), 188 (Sberbank), 189 (Sberbank), 190 (Sberbank), 194 (VTB Bank), 208 (Sberbank, Western Union, and MoneyGram), 211 (Sberbank and Western Union), 215 (Sberbank), 216 (VTB Bank), 217 (Western Union), 255 (VTB Bank), 256 (VTB Bank), 260 (VTB Bank), 262 (VTB Bank), 265 (VTB Bank), 269 (Sberbank), 270 (MoneyGram and Western Union), 275 (Sberbank), 282 (Sberbank, Western Union, and MoneyGram), 283 (Sberbank), 285 (Western Union, MoneyGram, Sberbank, and VTB Bank), 292 (Sberbank), 294 (Sberbank), 297 (Western Union and MoneyGram), 302–04 (Sberbank, Western Union), 307 (Sberbank), 311 (Western Union), 312 (Western Union), 313 (MoneyGram, Western Union, Sberbank, and VTB Bank), 314 (MoneyGram and Western Union), 341 (VTB Bank, Sberbank, and Western Union).

[32] *E.g.*, *id.* ¶¶ 61 (VTB Bank), 206 (Western Union), 229 (Sberbank), 230 (Western Union), 237 (Sberbank), 238 (Western Union), 240 (Sberbank), 241 (Western Union), 242 (VTB Bank), 243 (VTB Bank and Sberbank), 244 (VTB Bank), 245 (Western Union), 246 (Western Union), 247 (VTB Bank and Western Union), 304 (Sberbank), 338 (VTB Bank).

purchase "musical instruments" (a euphemism for weapons) and flak jackets. SAC ¶¶ 232, 238; *see id.* ¶¶ 232–33 (referring to rifle as "musical instrument"). A July 2014 report showed various deposits "by Western Union" followed by a debit "in cash to Strelkov." *Id.* ¶ 247.

This widespread campaign of online crowdsourcing specifically for terrorist acts was enough to have put the Defendants—which are sophisticated, worldwide corporate entities with activities in the region—on notice of their role in providing financial transfers to the DPR. *See, e.g.*, *id.* ¶¶ 33–36, 40–43, 63–64, 67, 69, 140–44, 147. Indeed, in a recent case about Hamas fundraisers, a court denied the bank defendant's motion to dismiss, explaining, "courts in this district have denied motions to dismiss where there is publicly available information from which the bank could have learned of their clients' terrorist identities or connections prior to receiving and transferring funds to and from them." *Henkin*, 2020 WL 6143654, at *9. In doing so, the court discredited any "supposed 'trend'" requiring plaintiffs to plead with specificity that the bank "read or was actually aware of information connecting its customers" to terrorist organization to survive a motion to dismiss. *Id.* at *8. Rejecting such a requirement, the Court held: "If I were to adopt defendant's position, it would be rare and fortuitous that any potential plaintiff could survive a motion to dismiss and obtain crucial discovery as to the bank's actual knowledge of whether it was assuming a role in an illicit activity. In fact, it would be virtually impossible." *Id.* at *4. Moreover, the court explained that "[a]s a practical matter—absent discovery—terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities." *Id.* at *9. The court was "aware of no financial institution (or any other institution for that matter) that would so freely and publicly air its own dirty laundry or otherwise prematurely disclose sensitive internal communication among its agents from which a

plaintiff could piece together a complaint adequate to satisfy" the heightened pleading standard requested by the Defendants here. *Id.*

Furthermore, all four Defendants are required to have and do have robust in-house compliance functions designed to identify possible terrorist financing (though nothing more sophisticated than Google would have been necessary to locate these websites). *Id.* ¶¶ 373–78, 383–84. "All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know-your-customer ('KYC'), anti-money laundering ('ATL') and anti-terrorist financing ('ATF') standards, as defined and enforced by the Financial Action Task Force ('FATF') and its supporting governments."[33] *Weiss*, 453 F. Supp. 2d at 619. These standards "include a due diligence obligation to monitor publicly accessible information relating to 'high risk' customers," and "this obligation exists independently of any particular transaction." *Id.*[34]

Defendants confirm that they have implemented programs fulfilling these diligence responsibilities: Western Union boasts that it conducts deep dives into possible financing, including by "monitor[ing] the dark Web" and using expert analysts who "hunt through the dark web to gain insight into the tactics . . . terrorist financiers might use to evade detection." SAC

---

[33] Russia is a participant in the FATF. *See* Financial Action Task Force (FATF), "Russian Federation," *available at* https://www.fatf-gafi.org/countries/#Russian%20Federation. Russia has enacted a regime to combat the financing of terrorism pursuant to its participation in the FATF, including requiring financial institutions to implement ongoing "customer due diligence," and specifically requiring institutions "to collect data on a customer's activity." *See* Financial Action Task Force, "Second Mutual Evaluation Report: Anti-Money Laundering and Combating the Financing of Terrorism," at 10, 81, *available at* https://www.fatf-gafi.org/media/fatf/documents/reports/mer/MER%20Russia%20ful.pdf.
[34] The PATRIOT Act requires "financial institutions" to "establish anti-money laundering programs, including, at a minimum— (A) the development of internal policies, procedures, and controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs." 31 U.S.C. § 5318. Sberbank argues that "the rules do not contemplate an obligation of investigation of customers not on the SDN List sufficient to discover whether ultimate recipients of funds are on the SDN List, engaged in terrorist acts or supporting terrorist acts." Sberbank Br. 23. But the rules are not so limited. *See* 31 C.F.R. § 1010.610(a)(2) (financial institutions required to assess risk "based on a consideration of all relevant factors").

¶ 383.  MoneyGram similarly requires its branches to "monitor and review **all transactions** . . . to better identify those transactions that might be suspicious, high-risk, or otherwise out-of-the-ordinary."  *Id.* ¶ 384; *see also id.* ¶¶ 385–86 (VTB Bank and Sberbank's compliance programs).[35] At the pleading stage, the Court can reasonably infer that Defendants' compliance programs put Defendants on notice of the risk that they were providing funds in violation of 18 U.S.C. §§ 2339A and 2339C.  *See, e.g.*, *Weiss*, 453 F. Supp. 2d at 630 (because "Natwest had an obligation to investigate its customers and those organizations to which those customers transferred or from which they received funds, one may infer that NatWest knew of AlAqsa's terrorist activities").[36]

### C.    Defendants' Arguments Ignore the Unique Circumstances of the DPR and This Case

Citing cases from other contexts and ignoring allegations of the type that have never existed at the pleading stage in even successful ATA lawsuits, Defendants argue that Plaintiffs have failed to plead the necessary *mens rea*.  *See* Joint Br. 20–21; Sberbank Br. 18–24; VTB Br. 20–23.  These arguments fail.

Defendants first attempt to distinguish between the "DPR" itself, whose terrorist activities they do not contest were widespread knowledge in 2014, and entities or individuals who made advertisements and received funds through Defendants' services.[37]  Defendants are wrong:  the

---

[35] Sberbank also states that it "has been assessed and certified as meeting the requirements" of the International Compliance Association for "Compliance Management System (CMS) associated with Anti-money laundering (AML)/Counter terrorist financing (CMF)."  Sberbank, "International Compliance Association" Certificate, *available at* https://www.sberbank.com/portalserver/content/atom/747d8d5f-3e81-4999-8e8f-2e86904dec8e/content?id=dd62 81c3-193a-4a81-8f9d-7492868fba86.

[36] As explained above in Part II.B, the knowledge or deliberate indifference alleged in the SAC do not only satisfy the *mens rea* requirements of 18 U.S.C. § 2339A and § 2339C, as outlined here, but also confirm that Defendants' actions "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government."  18 U.S.C. § 2331(1)(B); *see, e.g.*, *Boim III*, 549 F.3d at 694; *Lelchook*, 393 F. Supp. 3d at 266; *Miller*, 372 F. Supp. 3d at 45.

[37] *See, e.g.*, Joint Br. 20 ("None of the individual recipients named on the websites identified in the Second Amended Complaint that purportedly received transfers from Western Union or MoneyGram is referenced in the cited press reports predating the attack, nor alleged to have been designated as a terrorist or sanctioned person by the Treasury Department."); Sberbank Br. 21 ("[T]he SAC's theory of liability . . . is based on Sberbank's asserted provision of

DPR's advertisements were explicit that their beneficiaries would be the DPR and solicited transfers directly to the DPR and its leaders, including Gubarev, Gubareva, and Strelkov. *See*, *e.g.*, SAC ¶¶ 199 ("HELP WILL REACH IGOR STRELKOV AND PAVEL GUBAREV."), 203 (soliciting assistance to purchase lethal equipment on "LIST OF STRELKOV"), 207 ("The cargo was delivered.  Confirmation from Igor Strelkov . . . ."), 248 (reporting funds "transferred in cash to Strelkov in Donetsk"), 258 ("special forces under the command of Igor Strelkov expressed their gratitude"), 269 (soliciting funds "directly to Igor Ivanovich Strelkov").  Gubarev and Strelkov also personally requested funds to be sent directly to them via Sberbank. *Id.* ¶¶ 188, 190.

In any event, any distinction between the DPR and its fundraisers is false: these fundraisers *were* the DPR, because the DPR raised funds to conduct its terrorist activities not through a central bank account but through a crowdfunding campaign involving these entities and individuals. *E.g.*, ¶¶ 6–7, 145–52, 158–59, 175–76, 223, 272–79.[38]  To the extent that Defendants dispute that these DPR fundraisers were members of the DPR, those are factual questions unsuitable for resolution on a motion to dismiss. *See, e.g.*, *Cunningham*, 2019 WL 4747714, at *2 ("The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'"); *see also Goldberg*, 660 F. Supp. 2d at 415, 433 (finding, where plaintiffs plausibly alleged that "[f]inancing for Hamas is . . . principally procured through an extensive network of 'charities' and organizations," that

---

banking services to DPR Supporters—not DPR itself."); VTB Br. 21 ("many of the sources referenced in the SAC do not actually mention the Fundraiser Entities"); MoneyGram Br. 3.

[38] Even if the DPR and "DPR Supporters" or "Fundraiser Entities" *were* properly considered separate entities or organizations, which they are not, Plaintiffs' allegations *still* would support the *mens rea* needed to establish ATA liability.  As Judge Posner has explained, those who materially support or finance terrorism cannot "escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations. Donor *A* gives to innocent-appearing organization *B* which gives to innocent-appearing organization *C* which gives to Hamas.  As long as *A* either knows or is reckless in failing to discover that donations to *B* end up with Hamas, *A* is liable." *Boim III*, 549 F.3d at 701–02.

plaintiffs plausibly alleged that "ASP acted as an fundraising agent of Hamas").

Defendants' second main challenge to their *mens rea* is that they were simply unaware of the sources cited in the SAC.[39]  But these websites were not "obscure," and a simple Google search would have revealed them.  SAC ¶¶ 147, 376.  More fundamentally, Defendants—large, complex financial institutions transferring many millions of dollars around the world—have a duty to exercise responsibility in that business, including to "monitor publicly accessible information . . . independently of any particular transaction," *Weiss*, 453 F. Supp. 2d at 619, and cannot excuse that obligation by dismissing these websites as mere "information" that "was available," Sberbank Br. 19.[40]  Defendants do not appear to dispute that they have a general responsibility to investigate, monitor, and review transactions.  *See, e.g.*, Sberbank Br. 19 (acknowledging "anti-money laundering [AML] policies and 'know your customer' procedures"); VTB Br. 22 (referring to "compliance obligations with respect to a financial services company").  Instead, Defendants suggest that any such "KYC" diligence here did not uncover or would not have uncovered the nature of the transfers, and thus Defendants were not on notice of the risk that they were materially supporting or financing terrorism.[41]

Those arguments fail for multiple reasons.  First, even if Defendants were correct that investigation did not turn up or would not have turned up these websites, that is a factual question

---

[39] *See, e.g.*, Joint Br. 20–21 (SAC "pleads no facts to explain how Western Union or MoneyGram would have known to go looking for these obscure Russian websites and social media pages"); Sberbank Br. 19 ("A bare allegation that information was available is not equivalent to an allegation of actual knowledge."); VTB Br. 22 ("Plaintiffs do not advance any well-plead allegations that show VTB was or should have been aware of the various websites allegedly linked to the DPR . . . .").

[40] Western Union and MoneyGram also cannot avoid liability by suggesting that the "fundraiser pages and their alleged support for the DPR" were not public knowledge until a year after the MH17 attack.  *See* Joint Br. 21.  Basic diligence, let alone these Defendants' sophisticated compliance structures, would have revealed these fundraising advertisements and websites, which clearly referred to Western Union and MoneyGram alongside solicitations for funds to transfer to DPR and DPR leaders.

[41] *See, e.g.*, Joint Br. 21 (Plaintiffs "plead no facts to explain what was suspicious" about the transfers); Sberbank Br. 22 (arguing that Sberbank is not obligated to conduct "extensive investigation of the recipients of funds" and that transfers contained no "red flags"); VTB Br. 21–22.

Case 1:19-cv-02985-ALC-GWG   Document 172   Filed 11/30/20   Page 63 of 79

inappropriate to address here, where all facts must be assumed true and all inferences must be drawn in Plaintiffs' favor. Furthermore, as alleged, copious "red flags" *did* exist here. Even basic diligence would have revealed that Defendants were materially supporting or financing terrorism because the DPR was clearly soliciting funds using Defendants' financial services and explicitly for terrorist purposes. *See supra* Part III.B. Even more powerfully, as early as April 2014, Ukrainian authorities had alleged that Sberbank was facilitating payments to support the DPR; opened a criminal investigation into Sberbank's conduct; and investigated VTB Bank for providing banking services to terrorist groups—as Sberbank and VTB Bank were aware—thus putting them both on notice of additional "red flags" concerning their services and making it clear that they should conduct further diligence. *Id.* ¶¶ 163–69, 366.[42]

Moreover, to the extent that Defendants were in fact *not* on notice because their diligence procedures were insufficient to locate the websites in question or because they did not implement those diligence procedures, those failures are independently enough to show recklessness. *See id.* ¶ 379; *see, e.g.*, *Weiss*, 453 F. Supp. 2d at 619, 630 (explaining financial institutions' "due diligence obligation to monitor publicly accessible information" and "obligation to investigate [their] customers," including under FATF). Whether Defendants had unsatisfactory diligence procedures in place or whether they violated their procedures, they were as a result reckless as to whether their transfers were materially supporting terrorists or financing terrorism. *See id.*

---

[42] Sberbank dismisses the Ukrainian investigation as merely an "investigation" or "allegations" rather than a conclusion. Sberbank Br. 20. No matter: the investigation put Sberbank on notice of the possibility that it was materially supporting or financing terrorism, sufficient to require additional diligence. Sberbank also argues that the investigation "exclusively concerned direct support to DPR, without DPR supporters," *id.*, but for the reasons above, the false distinction between the "DPR" and "DPR supporters" is unsupported by the SAC. Sberbank also provides a list of "red flags" that it claims were absent here, including "openly providing services to sanctioned individuals or entities, actual notice of government investigation of those entities, clearing large and suspicious transfers without apparent business purpose or 'providing unusual services that are not part of the defendant's ordinary course of business.'" Sberbank Br. 22 (citing *Hussein*, 230 F. Supp. 3d at 176–77). Remarkably, however, exactly these red flags *were* present, including notably that the DPR's leaders *were* sanctioned as of the spring of 2014, prior to the downing of Quinn's plane. SAC ¶¶ 127–28, 131.

55

Defendants argue that "[a]llegations of laxity in enforcing anti-money laundering policies and 'know your customer' procedures on the part of a financial services company do not state a legally sufficient claim for willful blindness or reckless indifference."  Sberbank Br. 19; *accord* VTB Br. 22.  But the only case Defendants cite for that proposition, *Hussein v. Dahabshiil Transfer Services Ltd.*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017), does not support their argument.  In *Hussein*, the plaintiffs alleged that certain branches of the Dahabshiil fund transfer network had transferred funds to the terrorist group al-Shabaab.  *Id.* at 170, 177.  The plaintiffs alleged that Danish regulators had criticized a separate Danish branch of the Dahabshiil network for inadequate AML policies.  *Id.* at 177.  However, the court found that this allegation regarding the Danish branch was irrelevant to the defendants, which were *other* members of the Dahabshiil network.  *Id.*  Here, by contrast, Plaintiffs allege that Defendants *themselves* provided financial services to terrorists and did so with knowledge of what the DPR intended to do with those funds.  SAC ¶ 379.

Defendants' remaining arguments on *mens rea* fare no better.  Their claim that the SAC "identifies no publically available information of DPR's purposes from before the incident," Sberbank Br. 20; *see* VTB Br. 20–21, is plainly wrong:  the EU sanctioned several DPR leaders, including Strelkov, in April 2014; Ukraine designated the DPR and its affiliates as "terrorist organizations" in May 2014; and in June 2014, the U.S. sanctioned several DPR leaders, including Strelkov.  SAC ¶¶ 127, 128, 131.[43]  The fundraising websites were similarly openly accessible throughout this period.  *See Goldberg*, 660 F. Supp. 2d at 433 (denying motion to dismiss due to "public sources of information . . . which plausibly could have informed UBS" of its support for

---

[43] Western Union and MoneyGram similarly falsely assert that the DPR's "fundraisers or related individuals . . . are not alleged to have been designated as terrorists, included on any Treasury Department sanctions lists, or mentioned in news reports prior to the attack."  Joint Br 6 n.2.  For the reasons above, this is flatly contradicted by the SAC, which alleges, for example, that Strelkov himself raised funds through Defendants' financial services and was sanctioned prior to the attack.  The SAC also alleges that Strelkov, Gubarev, and Gubareva were prominently profiled in *The Washington Post* and *New York Times* prior to the attack.  SAC ¶¶ 105, 112.

Hamas); *Henkin*, 2020 WL 6143654, at \*8 (denying motion to dismiss where it was "generally known" that entity was a fundraiser for Hamas).  Defendants also argue that Plaintiffs fail to allege "a view of U.S. authorities that DPR was an undesirable recipient of funds," or that the DPR was specifically sanctioned or designated by the Treasury or State Department.  Sberbank Br. 20–21; VTB Br. 22.  But both the EU and the U.S. *did* sanction DPR leaders, including Strelkov, prior to the attack on MH17.  SAC ¶¶ 127–28, 131.  More important, 18 U.S.C. §§ 2339A and § 2339C do *not* require that the recipient of the funds was specifically sanctioned or designated—they prohibit providing material support to "*terrorists*" and financing "*terrorism*"—and such a requirement would render as surplusage 18 U.S.C. § 2339B, which prohibits providing material support or financing to "*designated* foreign terrorist *organizations*."

Defendants' cases are also distinguishable.  *See* Joint Br. 20–21; Sberbank Br. 18–24; VTB Br. 19–22.  Again, Defendants rely on cases involving transfers to sovereign states or individuals who were not terrorists.  In *Owens v. BNP Paribas S.A.*, the plaintiffs alleged that the defendant had processed financial transactions to benefit Sudan, which "is a government, and as such it has many legitimate agencies, operations, and programs to fund."  235 F. Supp. 3d 85, 99 (D.D.C. 2017) ("Processing funds for Sudan is not the same as processing funds for a terrorist organization or a terrorist front.  'Unlike the fronts . . . [Sudan] [is] not merely a funnel of funds to terrorists. [Sudan] [is] a recognized sovereign nation with a variety of responsibilities and pursuing a variety of interests.'").  Similarly, in *Ahmad v. Christian Friends of Israeli Communities*, the plaintiffs alleged that the defendants provided financial support for Israeli settlers who did not "have publicly stated terrorist goals" and who were not "associates of established terrorist organizations." No. 13 CIV. 3376 JMF, 2014 WL 1796322, at \*1–3 (S.D.N.Y. May 5, 2014).

Defendants also rely on cases in which the nature of the transfers was concealed.  In

*Hussein v. Dahabshiil Transfer Services Ltd.*, where the plaintiffs alleged that the defendants had facilitated transfers to al-Shabaab, "all four transfers were sent by individuals unaffiliated with defendants, who deliberately concealed the nature of the transactions by sending the money under false names, or to individuals with no public association with al-Shabaab." 705 F. App'x 40, 41 (2d Cir. 2017). Likewise, in *In re Terrorist Attacks on Sept. 11, 2001*, the plaintiffs alleged that Saudi American Bank supported al Qaeda through, for example, construction projects, but failed to allege how the bank "knew or should have known that funds they purportedly provided for construction projects in Sudan would aid al Qaeda." 462 F. Supp. 2d 561, 563–64 (S.D.N.Y. 2006). Such cases have no bearing on the DPR's widespread online crowdfunding campaign, which was explicitly designed to be seen, not hidden.[44]

## IV.   Plaintiffs' Claims Readily Satisfy the Proximate Causation Standard under the ATA

Under 18 U.S.C. § 2333(a), "[a]ny national of the United States injured in his or person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs" is entitled to recovery under the ATA. "The words 'by reason of' have been interpreted to express Congress's intent to require a showing of proximate causation." *Goldberg*, 660 F. Supp. 2d at 429. "A showing of proximate causation requires that plaintiffs show defendant's actions were 'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Id.* This standard is not disputed by Defendants. *See* Joint Br. 7–8; Sberbank Br. 1; VTB Br. 19.

Defendants do not—and cannot—dispute that they provided financial services for the DPR

---

[44] Sberbank also argues that Plaintiffs "never account for the inconsistency of their simultaneous assertions that (1) the fundraisers' terrorist purposes were so obvious that Sberbank is chargeable with knowing those purposes but (2) DPR raised funds through these separate entities to conceal that it would receive those funds." Sberbank Br. 21. However, the use of the crowdsourcing was designed to obfuscate *other* sources of funds to the DPR, not to suggest in any way that DPR tried to keep the channels for crowdsourcing hidden.

and its leaders, which enabled supporters from around the world to fund the DPR's procurement of lethal equipment.  *See* Joint Br. 1; Sberbank Br. 2; VTB Br. 1. Yet Defendants contend that this action should be dismissed because Plaintiffs do not forensically trace the flow of money funneled by Defendants to the DPR prior to the attack on Quinn's plane.  This assertion is entirely without merit and misstates Plaintiffs' burden at the pleading stage.  Quinn's family is not required (or able), prior to discovery, to examine with microscopic accuracy Defendants' financial records in order to track each Defendant's sustained and systematic provision of material support and financial services to the DPR.  Nevertheless, because the DPR was engaged in an unprecedented public fundraising campaign, the SAC provides details of specific transfers and flows of funds from Defendants to the DPR in the period prior to the attack on Quinn's plane—all of which were easily accessible to Defendants in real-time.  Indeed, to attract funding, the DPR documented donations from all over the world to its accounts and showed the flow of funds to purchase lethal equipment.[45]  Moreover, Plaintiffs have already shown that the DPR utilized VTB Bank's correspondent accounts in this district prior to Quinn's murder, and have conclusively established that the DPR received funds through Sberbank's U.S. correspondent banks during that time period.

---

[45] *See* SOF, *supra*, § F; *see, e.g.*, SAC ¶¶ 61, 244 (DPR received U.S. dollars  into its VTB Bank account through Center for New Russia); 172 (Humanitarian Battalion raised U.S. dollars through Sberbank's New York correspondent accounts); 193 (Humanitarian Battalion spent 1,762,690 rubles on behalf of the DPR in June 2014); 204–06 (from June to July 2014, Save Donbass received donations of 647,531 rubles through the material support of Sberbank, Western Union, and MoneyGram, and purchased supplies for the DPR costing 204,484 rubles); 206 (in July 2014, Save Donbass received 17,000 rubles in donations sent through Western Union); 214–20 (Center for New Russia received $4,000 in the weeks prior to the attack through the material support of Sberbank, VTB Bank, and Western Union); 230 (in May 2014, Center for New Russia received $1,000 from the U.S. through Western Union); 238 (in June 2014, Center for New Russia received $1,800 from the U.S. and transfers of 39,300 rubles through Western Union); 239–40 (in June 2014, Center for New Russia transferred 100,000 to its Sberbank account and then withdrew 100,000 from that account for the purchase of "body armor"); 241 (in June 2014, Center for New Russia received $1,809 from the U.S. through Western Union); 242 (in June 2014, Center for New Russia received transfers of 56,011.17 rubles into its VTB Bank account); 245 (in June 2014, Center for New Russia had a cash balance of $4,809, which included five U.S. dollar donations through Western Union); 246 (Center for New Russia's July 2014 Financial Report reflected over 50,000 rubles sent through Western Union); 297–301 (in June 2014, People's Militia of New Russia received more than 1 million rubles or approximately $30,000 through the material support of VTB Bank, Western Union, and MoneyGram).

*See, e.g.*, SAC ¶¶ 191, 244, 341.

Courts have held that proximate cause exists where a financial institution provides financial services to a terrorist organization, or its agent, in advance of the attack that caused the plaintiff's injury. *See*, *e.g.*, *Miller*, 372 F. Supp. 3d at 46; *In re Chiquita Brands Int'l.*, 284 F. Supp. 3d at 1309–14, 1317–18; *Wultz*, 755 F. Supp. 2d at 53; *Weiss*, 453 F. Supp. 2d at 632; *Strauss*, 2006 WL 2862704, at *17–18. Because money is fungible, a plaintiff may establish proximate cause for his injuries under the ATA by showing that the funds or financial services furnished by a financial institution "provided material support to a *terrorist organization*, irrespective of whether the support aided terrorist activities." *Weiss*, 768 F.3d at 206 (emphasis in original); *see also Strauss*, 925 F. Supp. 2d at 433 ("plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard"). As *Goldberg* explained:

> Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA . . . . 'money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.' . . . 'it is clear that proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries.'

*Goldberg*, 660 F. Supp. 2d at 429 (emphasis in original). Proximate cause does not require that plaintiffs allege "that the funds supplied by the defendant were used to buy the specific weapons and train the specific men who killed or injured the plaintiffs." *Weiss*, 453 F. Supp. 2d at 631.

### A. Defendants' Provision of Material Support to the DPR Was a Substantial Factor in the Attack on Quinn's Plane

Under the ATA, proximate cause "requires a showing that Defendant's actions were 'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable.'" *Id.* at 432. Plaintiffs are not required to show that absent Defendants' financial

support, "the DPR would have been unable to acquire the surface-to-air missile used in the attack, or even that the fundraisers would have lacked funds or other means to send funds to the DPR." Joint Br. 13.  A showing that defendant's conduct was the "but for" cause of plaintiff's injuries is not required under § 2333(a).  *Miller*, 372 F. Supp. 3d at 46.  As *Miller* explained:

> Requiring a showing of but-for causation would eviscerate Section 2333(a) of the ATA because money is fungible.  'Even if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack – a requirement rejected by this Court – that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere.'  In such circumstances, 'the requirement of proving causation is relaxed because otherwise there would be a wrong and an injury but no remedy because the court would be unable to determine which wrongdoer inflicted the injury.'  '[I]t would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm . . .'

*Id.*

The SAC sufficiently alleges that Defendants' provision of material support to the DPR was a substantial factor in the DPR's ability to launch a missile from territory it controlled—an attack that killed Quinn and 297 other innocent victims.  SAC ¶ 14.  In order to operate the missile that killed Quinn, the DPR needed to control the territory from which the missile was launched. *Id.* ¶ 75.  The support that Defendants provided to the DPR enabled the DPR to acquire the weapons, ammunition, and other lethal equipment necessary to control that territory, and commit violent acts that endangered human life, including Quinn's murder.  *Id.* ¶ 13.

Even after it was clear that Defendants were actively providing critical financial resources to the DPR for the explicit purpose of buying lethal equipment, Defendants continued to repeatedly provide such support.  From 2014 to the present, the DPR widely advertised instructions on how to transfer funds in support of their terrorist activities using Western Union and MoneyGram and Sberbank and VTB Bank's New York correspondent bank accounts.  The DPR boasted about

raising substantial sums of money, and documented how it used that money to procure lethal and tactical equipment for the DPR.  *Id.* ¶¶ 10, 56, 59, 67, 180–81.

To evade liability for their provision of material support to the DPR, Defendants assert a novel "intermediary" defense and argue that the ATA immunizes companies for any transfer of funds in support of terrorism if the transfers made were made to "intermediaries" as opposed to accounts maintained explicitly in the name of a terrorist organization.  *See* Joint Br. 12; VTB Br. 23; Sberbank Br. 1.  This is contrary to common sense and settled precedent.  The DPR does not have a corporate structure and does not maintain bank accounts held in its name.  As with many terrorist organizations, the DPR is composed of and funded by a network of individuals and entities, including the individuals and entities described above.  SAC ¶ 5; SOF, *supra*, §§ C, D.  Indeed, the funds transferred by Defendants went directly to the DPR for the explicit purpose of acquiring lethal equipment that went into the hands of Strelkov and other DPR leaders to carry out terrorist attacks.  SAC ¶¶ 8, 180–81, 183–90, 192–203.  Moreover, as described *supra* in Part II.A, courts routinely hold that providing financial support to entities associated with a terrorist organization can support a claim under the ATA because sending "money to organizations that were controlled by [a terrorist organization] . . . is no different from sending money directly to [the terrorist organization] for purposes of the ATA."[46]

Defendants cite a handful of cases concerning the provision of financial services to foreign sovereigns and related instrumentalities engaged in a range of legitimate activities, which do not

---

[46] *Strauss*, 925 F. Supp. 2d at 432 (finding "genuine issue of material fact" as to whether bank's alleged direct provision of financial services to a Hamas fundraiser had proximately caused harm to victims of Hamas terrorist attacks); *see Goldberg*, 660 F. Supp. 2d at 430 (refusing to dismiss claims against bank that allegedly supported Hamas fundraiser because "fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist organization would lead to violence"); *Wultz*, 755 F. Supp. 2d at 19, 53 (proximate causation was adequately pled against bank that had "provided financial services to an agent of the PIJ'" because bank "could have reasonably anticipated plaintiffs' injuries" since it "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence").

support their theory.  In *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), involving funding provided to Iran, the court found foreseeability and proximate cause to be lacking because "Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund," which does not hold true for funds transferred to the DPR—a terrorist organization with no legitimate functions.  The same distinction is true of *O'Sullivan*, 2019 WL 1409446, and *Kemper*, 911 F.3d 383, as discussed *supra* in Part II.A and Part II.B.  As *Kemper* noted:  "When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute."  911 F.3d at 393.  Likewise, in *Freeman*, 2019 WL 4452364, at *2, the plaintiffs alleged that banking institutions had provided financial services to Iran and that Iranian-affiliated terrorist organizations developed explosive devices that were used to kill or injure plaintiffs in Iraq.  The court found that foreseeability and proximate causation were lacking because "Plaintiffs have only alleged that Defendants dealt with Iranian intermediaries, all of whom have significant legitimate operations and *are not merely fundraising fronts for terrorist organizations*."  2019 WL 4452364, at *14.  Unlike governmental entities that engage in legitimate functions and activities, the DPR exists solely for terrorist purposes.

The other cases cited by Defendants are equally unavailing.  In *In re Terrorist Attacks on September 11, 2001 ("Al Rajhi Bank")*, 714 F.3d 118, 124 (2d Cir. 2013), defendants were "alleged to have provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations."  The court found that such allegations were insufficient to establish proximate causation because plaintiffs did not allege that defendants provided money directly to al Qaeda or that the money donated by defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks.  *Id.*  In *Kaplan*, the plaintiffs alleged that the defendant bank had maintained bank accounts

for Hizbollah in the names of Hizbollah affiliates.  The court found that proximate causation was not sufficiently alleged because the complaint was devoid of any factual allegations demonstrating that the defendant provided money to Hizbollah to carry out the attacks or that any funds transferred by the defendant accounts were, in fact, sent to Hizbollah and then used by Hizbollah to carry out the attacks.  2019 WL 4869617, at *4.

Unlike *Al Rajhi Bank* and *Kaplan*, the SAC is replete with factual allegations that the funds transferred by Defendants here went directly to the DPR for the explicit purpose of acquiring lethal equipment to carry out terrorist attacks.  As part of its unprecedented terrorism financing campaign, the DPR advertised that they were seeking funds to purchase lethal weaponry and went to great lengths to document the flow of funds into its fundraising accounts, how the funds were quickly used to purchase lethal equipment and weaponry necessary for the DPR's terrorist activities as advertised, and the delivery of this equipment into the hands of the DPR's field personnel.  SAC ¶ 180; *see also* SOF, *supra*, § F.  Additionally, Defendants' provision of financial support to the DPR was a substantial factor in the DPR's ability to control territory necessary for it to launch a missile, murdering Quinn and 297 other innocent victims.  SAC ¶ 14.

In *Weiss*, the court distinguished both *Rothstein* and *Al Rajhi Bank*, finding that "a bank cannot 'routinely' provide banking services, if they provide those services with knowledge of their assistance in funding terrorist activities."  278 F. Supp. 3d at 641.  "[W]here the money from Defendant was purportedly going to Hamas front-groups, rather than to a government that performs myriad legitimate functions in addition to allegedly funding terrorist organizations," and "Hamas carried out the attacks during the period of time within which the money was transferred," the court denied summary judgment to Defendant on the issue of proximate causation because it was sufficiently pled and a genuine issue of fact existed.  *Id.* at 642–43.

*Zapata* is also inapposite because, as described above, *Zapata* concerned the laundering of drug proceeds for Mexican cartels, and proximate cause was lacking because plaintiffs failed to allege any relationship between the defendant bank's money laundering and the acts of violence perpetrated against them.  414 F. Supp. 3d at 356.  Drug cartels, unlike terrorist organizations, are *de facto* businesses—albeit illegal ones—that engage in myriad activities besides violence and the killing and intimidation of civilians.

Accordingly, the SAC sufficiently alleges that the provision of funds to the DPR through use of Defendants' financial services was a substantial factor in the attack on Quinn's plane.

**B.**     **The Attack on Quinn's Plane Was Reasonably Foreseeable**

Defendants' contentions that the attack on Quinn's plane was not reasonably foreseeable because (1) the DPR's fundraisers were not on any sanctions list; (2) the SAC does not allege that specific funds were in fact transferred to the DPR or used by the DPR to perpetrate the attack on Quinn's plane; and (3) the DPR did not solicit funds for attacks on civilians are incorrect and contrary to the allegations in the SAC.

Since 2014, the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians.  The terrorist acts perpetrated by the DPR and its affiliates were widely reported on and discussed by nearly every government in the world, as well as by international media, multilateral entities, and human rights organizations.  The DPR's pattern and practice of carrying out terrorist attacks on civilians were therefore notorious and well-known to Defendants and the general public. SAC ¶ 104; *see also* SOF, *supra*, § C.  Additionally, the DPR's top leaders, who led fundraising efforts, were sanctioned by the EU in April 2014 and by the U.S. in June 2014.  SAC ¶¶ 127, 134. In May 2014, as the DPR's terrorist activities continued unabated, Ukraine formally and publicly classified the DPR and its affiliates as "terrorist organizations."  *Id.* ¶ 128.  And shortly before the attack on MH17, the U.S. imposed sanctions on the DPR.  *Id.* ¶ 134.

As discussed above, prior to the attack on Quinn's plane, the DPR openly raised funds to support its terrorist activities and purchase lethal weapons, relying on Defendants' financial services, brazenly listing account numbers and account holder and email address information with Defendants to facilitate the transfer of funds. SAC ¶¶ 177–79. The DPR also published meticulous online ledgers detailing the funds that the DPR received through the financial services and material support provided by Defendants, and posted frequent updates with photographs and videos showing that the DPR had utilized the funds received to purchase lethal weapons and other tactical equipment, which went directly into the hands of Strelkov and other DPR field personnel. *Id.* ¶¶ 180–81, 193, 202, 207, 226, 232–36, 281, 287, 308–10, 325–28, 331.

Where a financial institution transfers funds to a terrorist organization responsible for the attack at issue ***prior*** to the attack, the court will find that "the ultimate harm was foreseeable" because "[a] fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist organization would lead to violence and Congress had precisely that lethal connection in mind in passing the ATA." *Goldberg*, 660 F. Supp. 2d at 430; *see also Wultz*, 755 F. Supp. 2d at 53 (defendant bank "could have reasonably anticipated plaintiffs' injuries" where defendant "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence").

## V.   The ATA's "Act of War" Exception Does Not Apply to the DPR's Terrorist Attack on a Civilian Airliner

Defendants' contention that the ATA's act of war exception precludes Plaintiffs' claims is premised both on a distortion of the SAC's allegations and a series of counter-factual inferences. An "act of war" is defined as "any act occurring ***in the course of***—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). Defendants' argument, relying solely

upon § 2334(C), fails because (1) the DPR's terrorist attack on MH17 did not occur "in the course" of an armed conflict; and (2) the DPR is not a military force as that term is used in the ATA.[47]

Under settled law, a war crime, such as an attack on civilians, is not considered an "act occurring in the course" of an armed conflict for ATA purposes.  *See Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 166 (D.D.C. 2006) ("As a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict.  An armed attack on a civilian bus . . . violates these established norms [and therefore does not constitute an 'act of war' under the ATA].").  Notably, Defendants cite only a single case from within the Second Circuit, *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008).  But *Sokolow* rejected an attempt to invoke the act of war exception because, just as Plaintiffs allege here, "violent attacks upon non-combatant civilians, who were allegedly simply going about their everyday lives, do not constitute acts of war for purposes of the ATA."  *Id*. at 459; *see also Gill*, 893 F. Supp. 2d at 515 (to fall under act of war exception, a "terrorist group or organization must act as a 'military' traditionally (but not universally) does—*i.e.,* in substantial conformance with the laws of war").

Faced with this clear precedent, Defendants claim to divine the intent of the DPR by characterizing the attack on MH17 as a "mistaken attack."  Joint Br. 25.  While it is all too predictable that a Russian-owned bank would try to absolve the DPR of terroristic intent, *e.g.*, Sberbank Br. 4, it is gravely troubling to see two U.S. companies, Western Union and MoneyGram, do the same.  Moreover, this astonishingly bold approach to determining—at the pleading stage— the motivations behind the killers of Quinn and 297 others appears to rely upon Defendants'

---

[47] In an indication of how tenuous their argument is, not a single Defendant identified the ATA's act of war exception as a potential basis for dismissal in their earlier letter submissions to the Court describing their anticipated dismissal motions.  *See* Dkt. Nos. 51, 55, 83, 84.

inaccurate reading of a statement made shortly after the DPR's attack on MH17.

To support their factual assertion that "the DPR believed it had successfully shot down a Ukrainian military aircraft," Defendants mischaracterize Strelkov's statement after the attack. Joint Br. 24.  Strelkov's statement said no such thing.  Rather, Strelkov boasted that the DPR had "just downed a plane, an AN-26"—a plane used by numerous *civilian* airliners[48]—and noted, "The bird fell on a waste heap.  Residential areas were not hit.  Civilians were not injured."  SAC ¶ 77.[49]  Defendants' claim that Strelkov was asserting there were "no civilian casualties" is simply not supported by the full context of the statement, which clearly reassured his supporters that the wreckage of the downed airliner did not injure any civilians that he cared about, namely his supporters *on the ground living in territory that he controlled through force*.  The civilians killed aboard the plane traveling through his "Republic" without permission were of no concern.  Defendants' interpretation of Strelkov's translated statement is just that, *their interpretation*, based on inferences they impermissibly ask the Court to make in their favor.

In addition to asking this Court to determine, as a matter of law, that the attack on MH17 was not a terrorist attack, Defendants also ask this Court to find, in the face of countless well-pleaded allegations otherwise, that the DPR is a regular "military force," as that term is used in the

---

[48] The AN-26 is used for non-military purposes by multiple commercial airlines and is routinely used as a civilian cargo and passenger aircraft. *See, e.g.*, Air Charter Service, "Antonov AN-26," *available at* https://www.aircharterservice.com/aircraft-guide/cargo/antonov-ukraine/antonovan-26; Airlines Inform, "Antonov An-26," *available at* https://www.airlines-inform.com/commercial-aircraft/An-26.html (listing operators including Aerogaviota, Air Urga, Constanta Airline, Tajik Air, Vietnam Air Services, Amur, Angara Airlines, Iraero, Kostroma Air Enterprise, KrasAvia, Petropavlovsk-Kamchatski Airline, Polar Airlines, Turuhan, Khabarovsk Airlines, and Chukotavia).

[49] Remarkably, in support of their claim that the SAC "does not allege that the DPR was targeting any civilians outside of eastern Ukraine," Joint Br. 24–25, Western Union and MoneyGram materially alter the allegations in the SAC by inserting the word "Ukrainian" into their citation to SAC ¶ 107 such that it reads "intended to intimidate or coerce [Ukrainian] civilians."  There is no good faith basis for Defendants' alteration, as the SAC consistently alleges that the DPR's terrorist attacks broadly targeted civilians, not just Ukrainians, including specific allegations regarding the anti-American focus of the DPR, as well as June 2014 media reporting on how the DPR used "civilians, such as international observers from the Organization for Security and Cooperation in Europe, as human shields."  SAC ¶¶ 110, 139.

ATA, and not a terrorist group.  Defendants resort to this extreme argument because the ATA's

act of war exception operates only to "bar actions for injuries that result from military action by

recognized governments as opposed to terrorists," which is plainly not the case here.  H.R. Rep.

No. 1-2-1040, at 7 (1992); S. Rep. No. 102-342, at 46 (1992).  Since the ATA's enactment, courts

have repeatedly held that a military force and a terrorist group are "mutually exclusive," such that

a terrorist group "cannot constitute a military force of any origin."  *Weiss v. Arab Bank, PLC*, No.

06 CV 1623 NGVVP, 2007 WL 4565060, at 4–5 (E.D.N.Y. Dec. 21, 2007); *see also Morris v.

Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) ("Plaintiffs' complaint alleges acts of terrorism,

not acts of a nation's armed forces.  The court refuses to be al Qaeda's advocate and force plaintiffs

to prove that, in fact, al Qaeda's members are not 'military forces of any origin' that would be

entitled to immunity under the ATA.").[50]

   The SAC alleges that the DPR was a terrorist group—not a "military force" (as that term

is used in the ATA)—that engaged in a pattern and practice of attacking and intimidating civilians

and operated with no regard for civilian life, often murdering and torturing civilians.  *See, e.g.*,

SAC ¶¶ 1, 96–144, 355.  By May 2014, Ukraine classified the DPR as a "terrorist organization."

*Id*. ¶ 128.  As the Government of Ukraine explained:  "From their earliest days, the DPR and the

LPR committed acts of violence and intimidation targeted at civilians in furtherance of their

political objectives and their attempt to consolidate control over areas of Ukrainian territory.

Terrorist acts form a key element of their *modus operandi*."  *Id.* ¶ 101.

   Defendants resort to cherry-picking a handful of quotations from materials cited in the

---

[50] A 2018 amendment to the ATA was designed to respond to the minority view that a terrorist organization could in certain cases be a military force.  The ATA now explicitly excludes government-designated foreign terrorist organizations and specially designated global terrorists from the definition of a "military force," and also excludes any entity that "has been determined by the court to not be a 'military force.'" 18 U.S.C. § 2331(6).  The House report explains that this third category was intended "to make clear a person in addition to an FTO or an SDGT may be found not to be a military force."  H.R. Rep. No. 115-858, at 4 n.11 (2018).

SAC, none of which refer to the DPR as a "military force," in support of their factual assertion that the DPR was "engage[d] in military activities." Joint Br. 23–24. But "[t]o describe, in common parlance, as the Complaint does, that the terrorists engage in military or paramilitary-type activities does not mean that [the DPR] is a 'military force' within the meaning of the ATA's 'act of war' exclusion." *Weiss*, 2007 WL 4565060, at *6. Defendants' argument would require a finding that terrorist groups such as ISIS, which control large swaths of territory through force, are also outside the ATA's reach but for the personal intervention of the United States Secretary of State.

Finally, Defendants' assertions, even if credited, cannot be ruled on as a matter of law. "[T]he relevant questions raised by section 2331 generally and by subsection 2331(4)(C) in particular—whether injury or loss occurred during the course of an 'armed conflict,' and whether a given organization qualifies as a 'military force'—seem at least in part to be factual, requiring adjudication either on summary judgment or by a jury." *Gill*, 893 F. Supp. 2d at 509; *Atchley v. AstraZeneca UK Ltd.*, No. CV 17-2136 (RJL), 2020 WL 4040345, at *8 (D.D.C. July 17, 2020) (holding that whether the organization was a "military force" that injured the plaintiffs in the course of "armed conflict" is a factual question not appropriate to resolve on a motion to dismiss, with the Court writing "I decline to wade into that particular factual thicket at the motion-to-dismiss stage").

## CONCLUSION

Quinn's family are the only plaintiffs who have standing to hold Defendants accountable for providing material support to those responsible for shooting down MH17, killing 298 civilians, including 80 children.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss the Second Amended Complaint.

Dated:  November 30, 2020

Respectfully submitted,


By:     /s/ David Pressman

David Pressman
Lee Wolosky
Andrew Lichtman
JENNER & BLOCK LLP
919 Third Avenue
New York, NY  10022
Telephone:  (212) 891-1600
Fax:  (212) 891-1699
dpressman@jenner.com


*Attorneys for Plaintiffs Thomas Schansman,
individually, as the surviving parent of
Quinn Lucas Schansman, and as legal
guardian on behalf of X.S., a minor,
Catharina Teunissen, individually, as
surviving parent of Quinn Lucas
Schansman, and as personal representative
of the Estate of Quinn Lucas Schansman,
and Nerissa Schansman, individually, as the
surviving sibling of Quinn Lucas Schansman*