USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: September 30, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and<br><br>CATHARINA TEUNISSEN, individually, and as surviving Parent and personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and<br><br>NERISSA SCHANSMAN, individually, and as surviving Sibling of QUINN LUCAS SCHANSMAN,<br><br>     Plaintiffs,<br><br>    -against-<br><br>SBERBANK OF RUSSIA PJSC, THE WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES, INC., MONEYGRAM INTERNATIONAL, INC., MONEYGRAM PAYMENT SYSTEMS, INC., and VTB BANK PJSC,<br><br>     Defendants | 19 CV 2985 (ALC)<br><br>**MEMORANDUM AND ORDER** |

**ANDREW L. CARTER, JR., District Judge:**

  Plaintiffs bring this action under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA") on behalf of Quinn Lucas Schansman. Pending before the Court is Defendants' motions to dismiss Plaintiffs' Second Amended Complaint. (ECF Nos. 160, 165, 168.) For the following reasons, Defendants' motions to dismiss are denied.

1

## BACKGROUND

According to the second amended complaint, which the Court assumes to be true for purposes of Defendants' Rule 12(b)(6) motions, this action arises from the downing of a Malaysia Airlines Flight 17 (MH17) on July 17, 2014 by a terrorist group known as the Donetsk People's Republic ("DPR").[1] 298 passengers were killed when the DPR fired a missile at the civilian passenger plane traveling from Amsterdam to Kuala Lumpur, including Quinn Lucas Schansman, whose family, the Plaintiffs in this action, bring this lawsuit on his behalf. Second Am. Compl. ¶¶ 1-2, 73-75. The Defendants in this action are Russian State-owned Banks, Sberbank and VTB Bank. Additionally, The Western Union Company and MoneyGram International, Inc. are United States based company Defendants. *Id.* at ¶¶ 33, 40, 63-64.

The DPR is a terrorist group based on an ideology of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine. Second Am. Compl. ¶ 88. Additionally, the DPR have carried out violent acts intended to affect government policy and intimidate civilians around the world. *Id.* at ¶¶ 98, 102.

The basic tenet of Plaintiffs' claims is that Defendants provided material support and financing to the DPR. Second Am. Compl. ¶ 79. In providing this material support, Plaintiffs allege that Defendants were aware of the DPR's terrorist activities, as the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians, and these attacks were widely reported and discussed by nearly every government across the world, media, and human rights organizations. Second Am. Compl. ¶ 104. Plaintiffs' cite articles from the New York Times, the Washington Post, The Independent, The Telegraph, and the Al-Jazeera America detailing the DPR, including attacks, their tactics, and profiling the DPR's leadership. *Id.* at ¶¶ 104-106, 108, 110, 112.

---

[1] The DPR's leader, Igor Ivanovich Stelkov, took credit for the attack on the plane. Am. Compl. ¶ 77.

In the months leading to the attack on MH17, Defendants had extensive operations in Ukraine, maintaining locations and providing global money transfer services. Second Am. Compl. ¶¶ 139-143. The DPR used Defendants' services to raise money and advertised ways to donate money to accounts or bank cards associated with Defendants Sberbank and VTB Bank. *Id.* at ¶¶ 143-150. Additionally, the DPR detailed ways to donate using the money transfer services of MoneyGram and Western Union. *Id.* The DPR utilized a small group of fundraisers, and the DPR detailed how the receipt of funds were confirmed by their leader, Igor Strelkov. *Id.* at ¶¶ 154-155. As to the use of the funds, the DPR relied on Defendants' services to access funds that were essential for its procurement of weapons and ammunition and to acquire control of the territory from which the DPR launched the missile that brought down MH17. Id. at ¶ 159.

Plaintiffs further allege that Defendants were aware that they were providing material support and financing to the DPR. Plaintiffs cite news outlets, Forbes, the New York Times, Reuters and the Kyiv Post as reporting the DPR's funding scheme. Second Am. Compl. ¶¶ 162-167. For instance, Forbes discussed Defendant Sberbank facilitating payments to Ukrainian soldiers to assist Russian Separatists in East Ukraine; a Reuters article titled "Ukraine says investigating Russia's Sberbank for financing terrorists;" and an April article by Kyiv post detailed the DPR's call for funds as well as references to Sberbank and VTB Bank's knowledge of the investigation initiated by Ukrainian authorities prior to the downing of MH17. Id.at ¶¶ 167-169.

DPR fundraisers advertised and provided an explanation on how to wire U.S. dollars from abroad into Russian bank accounts like Sberbank and VTB Bank. Second Am. Compl. ¶ 177. These fundraisers also listed account holder and email address information for money transfers through Western Union and MoneyGram. *Id.* at ¶ 178. As to the funds received, the DPR published online detailed ledgers reflecting the funds that the DPR received using Defendants' services, and

the DPR also detailed how the funds were used to purchase equipment and weaponry "necessary for the DPR's terrorist activities." *Id.* at ¶¶ 179-180.

Plaintiffs detail several fundraisers, including Save Donbass, the Center for New Russia, Veche, Rospisatel, World Crisis, Icorpus, Sevastopol, Essence of Time, and People's Militia of New Russia, that were used to solicit funds to provide lethal support directly to the DPR, specifically Igor Strelkov and Paul Gubarev (the self-declared people's governor of the DPR). Additionally, the fundraisers provided reports of transfers and withdrawals from its accounts with Defendants Sberbank and VTB Bank and money transferred through Defendant Western Union. Additionally, many of the fundraisers advertised that transfers could be made through Defendants Western Union and Moneygram. Second Am. Compl. ¶¶ 105, 194-209, 210-292.

Additionally, Plaintiffs detail Defendants' support through Alexander Zhuchkovsky, who publicly boasted about raising millions of rubles for the DPR and then provided lethal weapons to Igor Strelkov. Second Am. Compl. ¶¶ 293, 296-305. Additionally, Zhuchkovsky indicated that transfers could be made to a specific Sberbank bank card or via Western Union, and Zhuchkovsky solicited funds through transfers utilizing VTB Bank, Sberbank, Moneygram, and Western Union. *Id.* at ¶¶ 317, 318. Zhuchkovsky's website indicates that he has raised approximately 89 Rubles, or $2.5 million U.S. dollars for the DPR during the first six months of 2014, prior to the attach on MH17. *Id.* at ¶¶ 321-326.

Through the material support and financing to the DPR using Defendants' services Plaintiffs allege that Defendants have knowingly provided this material support and financing to the DPR, and Defendants' knowledge or deliberate indifference in providing this support constituted acts of international terrorism. *Id.* at ¶¶ 342-391.

**PROCEDURAL HISTORY**

4

Plaintiffs commenced this action on April 4, 2019. (ECF No. 1.) Plaintiffs filed a First Amended Complaint on October 8, 2019, and a Second Amended Complaint on October 5, 2020. (ECF Nos. 104, 156.) Defendants moved to dismiss the second amended complaint on November 2, 2020. (ECF Nos. 160, 165, 168.) Plaintiffs opposed the motion on November 30, 2020, and Defendants replied on December 14, 2020. (ECF Nos. 172, 173, 174, 175, 176.) The Court considers the motions fully briefed.

## DISCUSSION

### I. Standard of Review

When deciding a motion to dismiss for lack of personal jurisdiction, courts may rely on pleadings and affidavits, in which case "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (internal quotation marks omitted). When deciding whether Plaintiffs have made such a showing, the Court must "construe the pleadings and affidavits in the light most favorable to [Plaintiffs], resolving all doubts in [their] favor." *Id.*

"This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) ("Licci I") (internal quotation marks and alterations omitted). When parties do not submit "an affidavit or other evidence on which the court could rely . . . the court must rely on the allegations in the complaint to determine if personal jurisdiction exists." *MacFarlane v. Brock*, No. 3:00 CV 97, 2000 WL 1827353, at *2 (D. Conn. Nov. 30, 2000). Here, the parties have not submitted affidavits on the issue of personal jurisdiction, but they have submitted declarations and exhibits.

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

### i. Personal Jurisdiction

VTB Bank and Sberbank argue that the Second Amended Complaint fails to establish personal jurisdiction as the conduct took place in Ukraine, and Plaintiffs have failed to establish that the two banks transacted business within New York. *See* VTB Bank's Mem. of Law at 18; Sberbank's Mem. of Law at 7-15. The Court disagrees.

In determining personal jurisdiction, the Court must first "look to the law of the forum state to determine whether personal jurisdiction will lie" and, if "jurisdiction lies, [courts] consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 168 (2d Cir. 2013) (Licci II). New York's long-arm statute provides that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1).

A single transaction may be sufficient to satisfy this requirement, provided the relevant claims arise from that transaction. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999). To exercise specific jurisdiction over a defendant consistent with the defendant's due process rights, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 335 (2d Cir. 2016). However, "[t]here is no requirement under [New York's long-arm statute] that a plaintiff's claim must arise exclusively from New York conduct." *Strauss v. Crédit Lyonnais, S.A.*, 175 F.Supp.3d 3, 25 (E.D.N.Y. 2016) (Strauss II).

The Second Circuit has held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs" under the ATA is sufficient for a

bank to be subject to the specific jurisdiction of a district court in New York. *Licci II*, 732 F.3d at 171. In *Licci II,* specific jurisdiction was proper when a bank "deliberately chose to process . . . wire transfers . . . in New York" when "[i]n light of the widespread acceptance and availability of U.S. currency, [the bank] could have . . . processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world." *Id.*

Further, to establish personal jurisdiction, ATA claims "do not necessarily [have to] correspond one-to-one with particular transfers, but instead [may] rest upon the millions of dollars [d]efendant allegedly transferred to [terrorist] front organizations in close temporal proximity to the . . . attacks in which Plaintiffs were injured." *Strauss* II, 175 F.Supp.3d at 24; *see also Weiss v. National Westminster Bank PLC*, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016) (finding personal jurisdiction over a bank proper when transfers routed through a bank "overlapped with the attacks . . . that caused Plaintiffs' injuries, but also occurred at a time when Defendant allegedly knew that funds it transferred . . . were being used to support a terrorist organization").

When transfers made through New York are "part of that allegedly unlawful conduct, the Court may exercise jurisdiction with respect to claims made in connection with all [relevant] attacks." *Strauss* II at 24. "A foreign bank's repeated use of a correspondent account in New York on behalf of a client – in effect, a course of dealing – shows purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 19 (internal quotation marks and alterations omitted).

Here, the Court relies on the allegations in the complaint to determine whether it has personal jurisdiction over the Defendant banks. The allegations in the Second Amended Complaint are sufficient for Plaintiffs to make a prima facie case that the Court has personal jurisdiction over

VTB Bank and Sberbank as the banks chose to operate correspondent accounts in New York and are alleged to have made transfers using New York's banking system when the Defendant banks could have processed transfers anywhere in the world. According to the Second Amended Complaint, VTB Bank and Sberbank routed U.S. Dollar dominated transactions to or on behalf of the DPR. Second Am. Complaint ¶¶ 27, 56, 177-332. Additionally, Plaintiffs allege that prior to the attack on MH17, the DPR provided instructions on how to send transfers in U.S. Dollars to Sberbank and VTB Bank's correspondent accounts in New York. *Id.* at ¶ 58. Likewise, fundraisers for the DPR advertised VTB Bank's and Sberbank's correspondent accounts in New York, as well their account numbers, to process U.S. Dollar transactions, and the New York Times reported that U.S. Dollars had passed from an unnamed international bank to the Veche fundraiser. *Id.* at ¶¶ 173, 178, 216, 220. The DPR's Sevastopol fundraiser explained that the only way to transfer U.S. Dollars was to use Sberbank's correspondent account in New York. *Id.* at ¶ 283.

Taking this conduct into consideration, the Court finds that Plaintiffs have made a prima facie showing that jurisdiction exists and that Defendants VTB Bank and Sberbank provided financial services to the DPR using New York's banking system. Defendants' arguments that Plaintiffs have not provided factual support that they knew they were supporting terrorist organizations and that the organizations that were provided funds are not listed as Foreign Terrorist Organizations are unavailing in light Plaintiffs' allegations that VTB Bank and Sberbank were aware of Ukrainian investigations as early as April 2014, three months before the attack, into their support of Ukrainian separatists associated with the DPR. *See* Second Am. Compl. ¶¶ 163-170. Additionally, Defendants' support of the DPR through fundraisers or other intermediaries does not foreclose a finding of personal jurisdiction over Defendants as Plaintiffs allege facts to support that Defendants knew they were supporting the DPR when they completed transfers for fundraisers

supporting the DPR. *See generally Strauss II* at 29-31. Moreover, Defendants' argument that the two identified transfers amounting to $300 are insufficient is equally unavailing in light of the second amended complaint. Plaintiffs have alleged that the DPR has raised millions of dollars through fundraising, some of which were transferred using VTB Bank and Sberbank's services. *See* SAC ¶ 171, 298. Construing this in the light most favorable to Plaintiffs, the inference is that some of those funds raised were transferred using VTB Bank and Sberbank's services. Plaintiffs need not allege "dozens of transfers over an extended period . . . to establish a course of dealing and purposeful use of the New York correspondent accounts." *Averbach v. Cairo Amman Bank*, No. 19 CV 0004, 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020), report and recommendation adopted sub nom. *Averbach for Est. of Averbach v. Cairo Amman Bank*, No. 19-CV 00004, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). At this juncture of the case, Plaintiffs are not required to make the showing that Defendants suggest. Plaintiffs need only plead facts that, if credited, would establish jurisdiction over Defendants. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

The Court may therefore exercise personal jurisdiction over VTB Bank and Sberbank for Plaintiffs' claims.

   **ii.  Liability under 18 U.S.C. § 2333(a)**

**a. International Terrorism**
Section 2333(a) of the ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue" for damages. Section 2331(1) of the ATA defines "international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

      (B) appear to be intended—
      (i) to intimidate or coerce a civilian population;
      (ii) to influence the policy of a government by intimidation or coercion; or
      (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
      (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

The Second Circuit has "conclude[d] . . . that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to . . . compel a finding that as a matter of law, the services" met the definition of "international terrorism" under the ATA. *Linde v. Arab Bank, PLC,* 882 F.3d 314, 327 (2d Cir. 2018) ("*Linde II*"). Whether financial services are "routine . . . raises questions of fact for a jury to decide." *Id.*

Judge Posner of the Seventh Circuit explained that when Defendants provide financial support to an organization like Hamas who "knew the aims and activities of the organization" would "by augmenting Hamas's resources . . . enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel." *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 694 (7th Cir. 2008) (Boim III). "And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1)" of the ATA. *Id.* (internal quotation marks and alterations omitted). Even if one does not know the organization engages in terrorism, liability is appropriate when one "is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care." *Id.* at 693.

11

Thus, "[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life'" under the ATA. *Id.* at 690. Courts have opined that providing financial services, like the money transfers alleged in the present case "increases Hamas' ability to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them." *Linde v. Arab Bank, PLC*, 97 F.Supp.3d 287, 323 (E.D.N.Y. 2015) (vacated on other grounds) ("Linde I").

Defendants allege that their actions were not acts of international terrorism and the ATA's act of war exclusion bars Plaintiffs' claims. Additionally, Defendants allege that Plaintiffs have failed to meet the ATA's proximate causation requirement. Defendant Sberbank further alleges that Plaintiffs fail to plead facts showing the requisite knowledge or intent to commit predicate crimes of providing support for a terrorist act. *See generally* Defs' Mem. of Law, ECF Nos. 161, 162, 166, 171, 173, 174, 175, 176.

Plaintiffs have adequately pleaded that Defendants' actions were acts of international terrorism. The Court considers whether Defendants' providing of financial support to fundraisers and individuals who in turn provided money to the DPR that assisted in the attack on MH17 is a "violent act[ ] or act[ ] dangerous to human life" within the meaning of 18 U.S.C. § 2331(1). As the Court noted *supra*, while the Second Circuit opined that providing routine financial support to terrorist organizations is not "so akin to providing a loaded gun to a child," it did not preclude this Court from finding that such conduct is an act of "international terrorism." *Linde*, 882 F.3d at 327 ("We need not here decide whether we would . . . conclude that a jury could find that direct monetary donations

12

to a known terrorist organization satisfy § 2331(1)'s definitional requirements for an act of terrorism.").

Courts have made such a finding before, reasoning that when banks such as Sberbank and VTB Bank route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing "acts dangerous to human life." *Miller v. Arab Bank*, PLC, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019). The Court applies the same reasoning here. Plaintiffs allege that Defendants Sberbank, VTB Bank, Moneygram, and Western Union provided financial services to fundraisers and individuals who supported the DPR, and these fundraisers and individuals then provided the funds to the DPR before and after the attack on MH17. Plaintiffs further allege that the fundraiser funds were confirmed by Igor Strelkov, the leader of the DPR, and additional funds were raised by Alexander Zhuchkovsky, who publicly boasted about raising millions for the DPR. Additionally, Plaintiffs allege that the funds raised were used to purchase lethal weapons prior to the attack on MH17. Thus, based on the well pleaded allegations in the Second Amended Complaint, Defendants committed an act of "international terrorism" within the meaning of 18 U.S.C. § 2331(1).

 **b. Intent**

Plaintiffs have adequately pleaded the requisite intent or knowledge required for 18 U.S.C. § 2339A and § 2339C. Plaintiffs allege that Defendants were deliberately indifferent to whether they were providing material support to the DPR or to whether they were providing financial services to the DPR that were used to carry out certain enumerated acts outlined in Sections 2339A and 2339C.

Under § 2339A, liability attaches when the provider of material support or resources knew or intended that its financial services would be used in preparation for or carrying out violations of the various criminal-law provisions referenced in subsection (a). 18 U.S.C. § 2339A(a). However, the provider need not have had the "specific intent to aid or encourage the particular attacks that injured plaintiffs." *Linde,* 384 F.Supp.2d at 586 n. 9.

Under § 2339C, liability attaches when Defendants provide or collect funds with knowledge that such funds are to be used, in full or part, to carry out . . . any . . . act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act. § 2339C(a)(1). The provision includes "giving, donating, and transmitting" funds and collection includes "raising and receiving" funds. 18 U.S.C. § 2339C(e)(4). Thus, providing financial services to a terrorist organization falls within the scope of § 2339C, to the extent that the financial institution receives and transmits the organization's funds. *See, e.g., Weiss,* 453 F.Supp.2d at 628–30 (concluding, after reviewing legislative history, that "maintenance of bank accounts[ ] and processing of deposits and withdrawals" constitutes provision and collection under § 2339C); *Linde,* 384 F.Supp.2d at 588 (denying motion to dismiss claims against bank for provision of financial services under § 2339C where bank received funds as deposits and transmitted funds to terrorist organizations).

Regarding state of mind, like § 2339A, § 2339C does not require a showing of specific intent that the defendant acted to further the organization's terrorist activities or that it intended to aid or encourage the particular attack giving rise to a plaintiff's injuries. *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1023 (7th Cir. 2002) (Boim I). Rather, mere knowledge that the funds provided and collected would be used to carry out the

predicate act is enough. *See, e.g., Linde,* 384 F.Supp.2d at 588 (denying motion to dismiss where the plaintiffs alleged that a financial institution knew that funds received as deposits and transmitted to various organizations "were to be used for conducting acts of international terrorism.").

Plaintiffs allege that Defendants were deliberately indifferent as to whether they were providing funds to the DPR due to the DPR's public crowdsourcing campaign, international recognition of their activities, funding of the DPR's leaders who identified their relation to the DPR, the DPR's publicizing of its terrorist activities across several websites, and the investigation by Ukrainian authorities into VTB Bank and Sberbank.

These allegations are sufficient to satisfy the intent requirement. The Court notes that Plaintiffs need not show that Defendants knew their providing of financial services would further terrorism or the attack on MH17. Rather, it is sufficient to show that it deliberately disregarded such facts while continuing to provide financial services to the DPR with knowledge that the services would in all likelihood assist the organization in accomplishing its goals. *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009); *see also Boim* II, 549 F.3d at 685 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir.2008)) ("To give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care. 'When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.'"

Here, Defendants were on notice of the DPR's activities. Plaintiffs cite news outlets, Forbes, the New York Times, Reuters and the Kyiv Post as reporting the DPR's funding scheme.

Second Am. Compl. ¶¶ 162-167. For instance, Forbes discussed Defendant Sberbank facilitating payments to Ukrainian soldiers to assist Russian Separatists in East Ukraine; a Reuters article titled "Ukraine says investigating Russia's Sberbank for financing terrorists;" and an April article by Kyiv post detailed the DPR's call for funds as well as references to Sberbank and VTB Bank's knowledge of the investigation initiated by Ukrainian authorities prior to the downing of the plane. Id. at ¶¶ 167-169. Additionally, Plaintiffs allege that the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians, and these attacks were widely reported and discussed by nearly every government across the world, media, and human rights organizations. Second Am. Compl. ¶ 104.

Plaintiffs' allegations are sufficient to show that Defendants were deliberately indifferent as to whether they were providing financial support to the DPR. Notably, such allegations are especially sufficient where the DPR has not been designated as a Foreign Terrorist Organization. Plaintiffs have thus adequately pleaded the intent requirement under sections 2339A and 2339C.

    c. **Proximate Cause**

To satisfy the ordinary tort requirement of causation and foreseeability, as well as the textual requirement that injury be suffered "by reason of" an act of international terrorism, plaintiffs must plead that an alleged act of international terrorism proximately caused their injury. § 2333(a); *Boim III,* 549 F.3d at 691–98; *Biton v. Palestinian Interim Self-Gov't Auth.,* 310 F. Supp. 2d 172, 182 (D.D.C. 2004) (citing *Boim I,* 291 F.3d at 1011–12 (interpreting "by reason of" language of § 2333(a) as requiring showing that defendant's actions proximately caused plaintiffs' injuries)). "Foreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." *Biton,* 310 F. Supp. 2d at 182.

Regarding whether events are reasonably foreseeable, the Second Circuit has opined that,

> Assessment of what an observer could reasonably find "*appear[ed] to be intended*" depends on whether the consequences of the defendant's activities were reasonably foreseeable, *see*, *e.g.*, *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685, 693-94 (7th Cir. 2008), and reasonable foreseeability depends largely on what the defendant knew, *see id*. ("A *knowing* donor" to an FTO--"that is *a donor who knew*" the terroristic "aims and activities" directed at a particular territory--"would *know* ... that donations to" the entity would enable it to "kill more people in" the territory. "And *given such foreseeable consequences*, such donations would *appear to be intended* ... to intimidate or coerce a civilian population or to affect the conduct of a government by ... assassination, as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes." (internal quotation marks omitted) (emphases ours)).

*Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 161 (2d Cir. 2021).

Defendants could have reasonably anticipated Plaintiffs' injuries, assuming Plaintiffs' allegations to be true. Defendants allegedly knew or were deliberately indifferent that they were providing financial services to the DPR through their charities and other intermediaries, and that the DPR used those services to buy lethal equipment to carry out their terroristic activities. *See* Intent discussion *supra*.

Moreover, the lack of direct transfers to the DPR for the specific attack on MH17 is not dispositive of proximate cause. *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) (Strauss I) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because '[m]oney is fungible.'").

In light of these allegations, Plaintiffs have adequately pleaded facts alleging Defendants' proximate causation of Plaintiffs' injuries. *See Weiss,* 453 F. Supp. 2d at 632 (concluding that plaintiffs plead proximate cause where they alleged that bank provided financial services to terrorists before terrorist attack).

### d. Act of War exception

Congress has, however, precluded claims for injury resulting from an act of war: "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). In order to state a claim for civil damages under Section 2333(a), plaintiffs must allege that the decedents were injured "by reason of" acts of "international terrorism." Defendants argue that the DPR is a military force, engaged in armed conflict in Ukraine. Therefore, since MH17 was downed during this armed conflict, Plaintiffs' claims are barred by the ATA's act of war exclusion. The issue before the court, therefore, is whether this legal conclusion is supported by plaintiffs' factual allegations.

The ATA defines "act of war" to mean any act occurring in the course of-

> (A) declared war;
> (B) armed conflict, whether or not war has been declared, between two or more nations; or
> (C) armed conflict between military forces of any origin.

18 U.S.C. § 2331(4).

Defendants' submissions focus on (B) and (C); therefore, the Court's analysis shall focus on whether the DPR is a military force. The Complaint alleges that MH17 was downed by the DPR, a terrorist group based on an ideology of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine. Am. Compl. ¶ 88. The DPR has not been designated a Foreign Terrorist Organization. There is a lack of authority on whether a non-designated terrorist organization can constitute a "military force" for purposes of 18 U.S.C. § 2331(4)(C). Courts have opined that:

> "there are undoubtedly differences between military forces and terrorists. A conventional dictionary definition of "military" is "armed forces" or the persons serving in them. "Armed forces," in turn, are "the combined military, naval, and air forces *of a nation."* In contrast, "terrorism" is conventionally defined as "the systematic use of terror especially as a means of coercion." "Terror" itself is defined

18

as "violent or destructive acts (as bombing) committed by *groups* in order to intimidate a population or government into granting their demands.""

*Weiss v. Arab Bank, PLC*, No. 06 CV 1623, 2007 WL 4565060, at *3–5 (E.D.N.Y. Dec. 21, 2007)

The DPR, as Plaintiffs allege it to be, is a terrorist group operating in eastern Ukraine that acquired that territory through force and intimidation, and the DPR continues to engage in violent acts against civilians, which often includes torture and murder. Second Am. Compl. ¶¶ 1, 88-101. Thus, as alleged in the Second Amended Complaint, which the Court assumes as true for the purposes of this motion, the DPR is not a nation with armed forces. Rather, the DPR is a terrorist group that uses intimidation and violence attacks against citizens, as it did when it downed MH17. Therefore, the Court finds that based on the allegations in the Second Amended Complaint, the DPR is not a military force or nation for purposes of 18 U.S.C. § 2331 (4)(B) and (4)(C).

## CONCLUSION

For the aforementioned reasons, Plaintiffs' have adequately pleaded claims pursuant to 18 U.S.C. §§ 2331, 2339A, and 2339C. Therefore, Defendants' motions to dismiss the second amended complaint are denied. (ECF Nos. 160, 165, 168.)

**SO ORDERED.**

**Dated: September 30, 2021**
     New York, New York

ANDREW L. CARTER, JR.
United States District Judge