UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| THOMAS SCHANSMAN, individually, as surviving Parent of QUINN LUCAS SCHANSMAN, and as legal guardian on behalf of X.S., a minor, and | : Index No. 1:19-CV-02985 (ALC) (GWG) |
| CATHARINA TEUNISSEN, individually, and as surviving Parent and personal representative of the ESTATE OF QUINN LUCAS SCHANSMAN, and | : Hon. Andrew L. Carter, Jr. |

THOMAS SCHANSMAN, individually, as surviving
Parent of QUINN LUCAS SCHANSMAN, and as
legal guardian on behalf of X.S., a minor, and          :    Index No. 1:19-CV-02985
                                                        :    (ALC) (GWG)
                                                        :
CATHARINA TEUNISSEN, individually, and as               :    Hon. Andrew L. Carter, Jr.
surviving Parent and personal representative of the     :
ESTATE OF QUINN LUCAS SCHANSMAN, and                    :
                                                        :
NERISSA SCHANSMAN, individually, and as                 :
surviving Sibling of QUINN LUCAS                         :
SCHANSMAN,                                               :
                                                        :
                    Plaintiffs,                         :
                                                        :
              -against-                                 :
                                                        :
SBERBANK OF RUSSIA PJSC, THE WESTERN                     :
UNION COMPANY, WESTERN UNION                             :
FINANCIAL SERVICES, INC., MONEYGRAM                      :
INTERNATIONAL, INC., MONEYGRAM                           :
PAYMENT SYSTEMS, INC., and VTB BANK                      :
PJSC,                                                    :
                                                        :
                    Defendants.                         :
                                                        :
                                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**ANSWER OF SBERBANK OF RUSSIA TO THE SECOND AMENDED COMPLAINT**

Defendant Sberbank of Russia ("Sberbank"), by and through its undersigned counsel, answers and asserts affirmative defenses to the allegations contained in Plaintiffs' Second Amended Complaint as set forth herein.  As a threshold matter, however, Sberbank objects to this Court's subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1601 *et seq*.  Sberbank is majority-owned by the Russian Federation and thus is an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603.  As such, Sberbank is immune from jurisdiction and suit in this action.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

## GENERAL DENIAL

Except as otherwise expressly admitted herein, Sberbank denies each and every allegation contained in the Second Amended Complaint.  Sberbank states that the titles, and headings throughout the Second Amended Complaint do not constitute well-pleaded allegations of fact and, therefore, require no response. To the extent a response is required, the allegations of the titles and headings in the Second Amended Complaint are denied.  Sberbank expressly reserves the right to seek to amend and/or supplement its Answer as may be necessary.

By referring to or admitting the existence of any documents quoted, described, or otherwise referenced in the Second Amended Complaint, Sberbank does not acknowledge or concede that such documents are what they purport to be, are accurate as to their substance, constitute business records within the meaning of the rules of evidence, or are otherwise admissible on any other basis.  By referring to or admitting the existence of any document quoted, described, or otherwise referenced in the Second Amended Complaint, Sberbank does not acknowledge or concede that Sberbank has any knowledge or information concerning the document quoted, described, or otherwise referenced at any particular point in time prior to the filing of the Second Amended Complaint, unless explicitly admitted herein.

\* \* \*

## NATURE OF THIS ACTION

1.      On July 17, 2014, the Donetsk People's Republic ("DPR"), a terrorist group operating in eastern Ukraine, launched a surface-to-air missile from territory that it acquired and controlled through brute force, intimidation, and violent acts.  The DPR fired that missile at Malaysia Airlines Flight 17 ("MH17"), a civilian passenger plane traveling from Amsterdam to Kuala Lumpur, killing all 298 passengers on board, including 80 children, and murdering Quinn Lucas Schansman ("Quinn"), a young American.

ANSWER:  As the Second Amended Complaint does not define who or what constitutes the Donetsk People's Republic ("DPR") and appears to offer inconsistent characterizations of the DPR, Sberbank is unable to either admit or deny the allegation in the first sentence of Paragraph 1.  To avoid repetition, Sberbank incorporates that aspect of its Answer into each paragraph responding to allegations concerning the DPR.  Sberbank admits that in eastern Ukraine individuals purported to found an organization described as the Donetsk People's Republic.  Sberbank further admits that on July 17, 2014, Malaysia Airlines Flight 17 ("MH17") traveling from Amsterdam to Kuala Lumpur crashed in Ukraine and that all passengers on board, including Quinn Lucas Schansman ("Schansman"), died.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 1.

2.      Quinn's family, the Plaintiffs in this action, bring this lawsuit to hold accountable those who provided material support and financing to the murderers of their son and brother.

ANSWER:  Paragraph 2 consists of characterizations, accusations, and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations.

3.      Defendants are corporate entities that provided ongoing and essential financial support to the DPR from around the world, including the United States, for the explicit purpose of purchasing tactical and lethal equipment that was necessary (1) for the DPR to acquire and maintain control over the territory from which it launched the missile that

took down the MH17 passenger plane, and (2) to carry out its terrorist activities, including the missile attack on MH17.

ANSWER:  Paragraph 3 contains characterizations to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 3, except Sberbank admits that it is a business entity.

4.     Defendants provided their services directly to prominent DPR leaders and DPR fundraisers who were unambiguous about their intent: to arm and equip the DPR to carry out terrorist acts in service of undermining the Government of Ukraine, intimidating and coercing civilians, increasing the Russian Federation's control over territory in eastern Ukraine, and ultimately advancing a political and ideological agenda to reestablish the "Russian Empire" through the creation of "Novorossiya" (New Russia).[1]

ANSWER:  Paragraph 4 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding the intent of DPR leaders and DPR fundraisers in Paragraph 4.  Sberbank otherwise denies the allegations in Paragraph 4.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Footnote 1.

5.     As with any terrorist group, the DPR is comprised of and funded by individuals and entities who sponsor and use violence, intimidation, and coercion to achieve political ends (in this case, the creation of so-called "Novorossiya").  At all relevant times, in the months leading up to the attack on MH17, some of the most prominent leaders of the DPR were Igor Strelkov, the "commander-in-chief" of the DPR; Pavel Gubarev, the "governor" of the DPR; and Ekaterina Gubareva, the "foreign minister" of the DPR.

ANSWER:  Paragraph 5 contains characterizations to which no response is required.  Sberbank is unable to address what is meant by "all relevant times" because that presents a legal

---

[1]     Novorossiya (or "Novorossia") refers both to an aspirational geographical territory (akin to the Islamic State's ("ISIS") aspirational "Caliphate") as well as a violent extremist political movement.  The term is today associated with an effort to create a pro-Russia confederated state through the forceful acquisition of power and control in eastern Ukraine and re-establish a Russian Empire in the area north of the Black Sea in what is now much of southern and eastern Ukraine.

question and, to avoid repetition, Sberbank incorporates that aspect of its Answer into each paragraph responding to allegations that refer to "all relevant times." To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 5.

6.  At all relevant times, in the months leading up to the attack on MH17, some of the DPR's most prominent fundraisers were Alexander Zhuchkovsky, Boris Rozhin (also known as "Colonel Cassad"), and Alexey Markov (also known as "RedRat").

ANSWER:  Paragraph 6 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 6.

7.  The DPR's leadership worked closely with these and other DPR members to raise funds for the DPR's terrorist activities through a group of coordinated DPR entities, including Center for New Russia, Humanitarian Battalion, Veche, Rospisatel, Essence of Time, Save Donbass, ICORPUS, The Voice of Sevastopol, Sputnik & Pogrom, World Crisis, Women's Battalion of People's Militia Donbass, and People's Militia of New Russia (together, the "DPR's fundraisers"). The DPR's fundraisers were essential both for the DPR to fund its terrorist activities and obfuscate its sources and methods.

ANSWER:  Paragraph 7 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 7.

8.  Collectively, the DPR's leaders, members, entities, financial supporters, and fundraisers constitute the DPR.

ANSWER:  Paragraph 8 consists of characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations.

9.  Defendants provided banking and money transfer services for the DPR while the world's governments and media were intently focused on the DPR's horrific and systematic abuses perpetrated in the name of advancing its vision of Novorossiya. In the months leading up to the MH17 attack, the DPR's occupation of eastern Ukraine and its killing and torture of civilians constituted perhaps the most significant international news event in the world. It was the subject of nearly constant commentary by highly visible

officials including the President of the United States, the Prime Minister of the United Kingdom, the President of France, the Chancellor of Germany, and nearly every major media outlet in the world.

ANSWER:  Paragraph 9 consists of characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations regarding its conduct in the first sentence of Paragraph 9 and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 9.  To the extent Paragraph 9 purports to characterize public reporting by the international news media and commentary by "highly visible officials," Sberbank respectfully refers the Court to that reporting and commentary for their contents.

10.     The DPR's campaign of terror fundamentally changed the regional order and constituted a major challenge to international security.  Despite this sea change in circumstances for governments around the world and civilians in the region, Defendants Sberbank of Russia, Western Union, MoneyGram, and VTB Bank continued to go about their activities, even when it was clear that they were actively providing critical financial resources to a terrorist group (the DPR) for the explicit purpose of buying lethal equipment—equipment that was ultimately used to carry out the attack that killed Quinn.

ANSWER:  Paragraph 10 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations regarding Sberbank in the second sentence of Paragraph 10 and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 10.

11.     Plaintiffs are the parents and siblings of Quinn, a United States citizen, who was killed when he was just eighteen years old as he was traveling aboard MH17 to meet his parents for a family vacation.  Quinn's parents, Thomas and Catharina, both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the senseless murder of their son.  Quinn's siblings, Nerissa and X.S., both suffered and continue to suffer deep and debilitating psychological and emotional distress due to the murder of their brother.

ANSWER:  Paragraph 11 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that Schansman died

when MH17 crashed in Ukraine, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 11.

12.     Defendants are companies that knew, or exhibited deliberate indifference to the fact, that they provided material support to the DPR—a group that openly engaged in terrorist activity and was condemned by governments around the world—and that the support they provided to the DPR would be used to finance the DPR's terrorist actions.

ANSWER:     Paragraph 12 consists of characterizations, accusations, and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 12.

13.     The support Defendants provided to the DPR allowed the DPR to acquire lethal equipment, which was used to commit violent acts that endangered human life and appeared intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 13 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations.

14.     Defendants' provision of material support to the DPR was a substantial factor in the DPR's ability to launch a missile from territory it controlled—an attack that killed Quinn and 297 other innocent victims.

ANSWER:  Paragraph 14 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations as to Sberbank in Paragraph 14.

15.     By this lawsuit, Plaintiffs challenge Defendants' actions under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA"), which Congress enacted in 1992 in response to the terrorist hijacking of the cruise ship Achille Lauro as well as the bombing of Pan Am Flight 103 over Lockerbie, Scotland in 1988.

ANSWER:  Paragraph 15 purports to characterize the action and the historical context for the Antiterrorism Act and to define a term, and it does not require a response.  To the extent a response is required, Sberbank denies the allegations in Paragraph 15.

16.    In adopting the ATA, Congress recognized that "reluctant courts and . . . jurisdictional hurdles" had often stymied the ability of victims of international terrorism to obtain redress for their injuries. (136 Cong. Rec. S4568-01 (1990).)

ANSWER:  Paragraph 16 purports to quote from and characterize the Congressional Record, and Sberbank respectfully refers the Court to the Congressional Record for its contents. To the extent a response is required, Sberbank denies the allegations in Paragraph 16.

17.    According to the ATA's legislative history, "By its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism," the Act was intended to "interrupt, or at least imperil, the flow of money" to groups engaged in acts of international terrorism that injure American citizens. (S. Rep. No. 102-342, at 22 (1992).)

ANSWER:  Paragraph 17 purports to quote from and characterize Senate Report No. 102-342, and Sberbank respectfully refers the Court to that report for its contents. To the extent a response is required, Sberbank denies the allegations in Paragraph 17.

18.    As stated by Senator Charles Grassley, Congress enacted the ATA to strike at "the resource that keeps [international terrorists] in business – their money." (138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley).)

ANSWER:  To the extent Paragraph 18 purports to quote from and characterize a statement by Senator Charles Grassley on the Congressional Record, Sberbank respectfully refers the Court to that statement for its contents. To the extent a response is required, Sberbank denies the allegations in Paragraph 18.

19.    As recently as January 2019, Senator Grassley explained, "The ATA gives U.S. victims of international terrorism their day in court against those who carry out or support terrorism. It provides some semblance of justice and compensation for Americans whose lives have been forever impacted by terrorism. Equally important, the ATA sends an unambiguous message to deter international terrorism—those who support terrorism will face the full force of the U.S. justice system."[2]

---

[2]    Chuck Grassley, United States Senator for Iowa, "Grassley to Trump: State Dept. Should Put American Victims of Terrorism ahead of PLO," *available at* https://www.grassley.senate.gov/news/news-releases/grassley-trump-state-dept-should-put-american-victims-terrorism-ahead-plo

ANSWER:  Paragraph 19 purports to quote from and characterize a news release by Senator Charles Grassley, and Sberbank respectfully refers the Court to that news release for its contents.  To the extent a response is required, Sberbank denies the allegations in Paragraph 19. Footnote 2 purports to contain a citation to the news release described in Paragraph 19 to which no response is required, and Sberbank respectfully refers the Court to that news release for its contents.

20.     Defendants are companies that deliberately ignored what the rest of the world, including the President of the United States, was deeply intent on addressing.

ANSWER:  Paragraph 20 consists of characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 20.

21.     The ATA does not permit companies such as Defendants to hide behind invocations of neutrality in their provision of banking and money transfer services in an effort to abdicate responsibility for their role in causing acts of terror.

ANSWER:  Paragraph 21 states a legal conclusion to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 21.

22.     The aim of this lawsuit is to ensure that, as Congress intended, the companies whose conduct resulted in the death of an innocent American at the hands of terrorists are held responsible for their actions.

ANSWER:   Paragraph 22 consists of characterizations, accusations, and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 22.

## JURISDICTION AND VENUE

23.     This is a civil action under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*

ANSWER:  Paragraph 23 states a legal conclusion to which no response is required.  To the extent a response is required, Sberbank admits that the Second Amended Complaint purports to seek relief under the Antiterrorism Act.

9

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2333(a) as a civil action brought by the estate, survivors, or heirs of a United States citizen injured by reason of an act of international terrorism.

ANSWER:  Paragraph 24 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank admits that Plaintiffs invoke this Court's subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2333(a) and lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding the Plaintiffs.  Sberbank otherwise denies the allegations in Paragraph 24.  Sberbank further denies that subject-matter jurisdiction exists under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1601 *et seq.*, including without limitation § 1605B, which is the exclusive basis for subject-matter jurisdiction over this action as against Sberbank.

25.     Venue is also proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 18 U.S.C. § 2334(a) because Defendants conduct significant business operations in the State of New York and within the Southern District of New York, are subject to the personal jurisdiction of the courts in the Southern District of New York, and/or have agents within the Southern District of New York.

ANSWER:  Paragraph 25 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations relating to it in Paragraph 25.  Sberbank further denies that this Court has personal jurisdiction over Sberbank.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Western Union, MoneyGram, and VTB Bank in Paragraph 25.

26.     Defendant The Western Union Company maintains a corporate office in Manhattan, New York.  Defendants The Western Union Company, Western Union Financial Services, Inc., MoneyGram International, Inc., and MoneyGram Payment Systems, Inc. maintain numerous agent locations that provide global money transfer services within the Southern District of New York.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 26.

27.     Defendants Sberbank of Russia PJSC ("Sberbank") and VTB Bank PJSC ("VTB Bank") maintain offices through their subsidiaries in Manhattan, New York.  At all relevant times, Defendants Sberbank and VTB Bank deliberately and repeatedly routed U.S. dollar-denominated transactions, including transactions to or on behalf of the DPR, through correspondent bank accounts located in Manhattan, New York.

ANSWER:  Sberbank denies the allegations in Paragraph 27, except admits that it owns a subsidiary headquartered in New York City and that it holds correspondent bank accounts in banks with Manhattan, New York offices.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank.

## THE PARTIES

28.     Plaintiff Thomas Schansman is Quinn's father.  His son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  He is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.  He brings this action on behalf of himself, as a surviving parent of his son, Quinn, a United States citizen.

ANSWER:  Paragraph 28 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that Quinn Schansman died, lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Thomas Schansman, and otherwise denies the allegations in Paragraph 28.

29.     Plaintiff Catharina Teunissen is Quinn's mother.  Her son was killed by the DPR, a violent terrorist group that received material support and financing from Defendants.  She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as a surviving parent of, and as personal representative of the estate of, her son, Quinn, a United States citizen.

ANSWER:  Paragraph 29 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that Schansman died, lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Catharina Teunissen, and otherwise denies the allegations in Paragraph 29.

30.     Plaintiff Nerissa Schansman is Quinn's sister.  Her brother was killed by the DPR, a violent terrorist group that received material support and financing from Defendants. She is a citizen of the Netherlands and is domiciled in the Netherlands.  She brings this action on behalf of herself, as the surviving sibling of her brother, Quinn, a United States citizen.

ANSWER:  Paragraph 30 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that Schansman died, lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Nerissa Schansman, and otherwise denies the allegations in Paragraph 30.

31.     Plaintiff Thomas Schansman is also a plaintiff on behalf of his minor child, X.S, Quinn's half-brother.  X.S. is a citizen of the Netherlands, resides in this district, and is domiciled in the Netherlands.

ANSWER:  Paragraph 31 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that Plaintiff Thomas Schansman purports to be a plaintiff on behalf of his minor child, X.S., and lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 31.

## The Russian State-Owned Bank Defendants

32.     At all relevant times, the Government of the Russian Federation, led by President Vladimir Putin, had an official policy of supporting the Novorossiya movement, including the terrorist activities of the DPR.

ANSWER:  Paragraph 32 contains characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 32.

33.     Defendant Sberbank is a Russian state-owned banking institution.  It has offices and branches worldwide.

ANSWER: Sberbank denies the allegations in Paragraph 33, except admits that it is a Russia-headquartered bank and that the Ministry of Finance of the Russian Federation (the "**Ministry of Finance**") owns a majority of its equity.

34.     At all relevant times, Sberbank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations.

ANSWER:   Sberbank denies the allegations in Paragraph 34, except admits that it

indirectly owns a subsidiary that has an office in New York City.

35.     Sberbank operates in the United States and New York through its subsidiary Sberbank CIB USA Inc. ("Sberbank CIB"), which is located at 152 W. 57th Street, 46th Floor, New York, New York 10019.

ANSWER:   Sberbank admits that it indirectly owns a subsidiary, Sberbank CIB USA

Inc., that has an office in New York City at 152 W. 57th Street, 46th floor, NYC 10019, and

otherwise denies the allegations in Paragraph 35.

36.     Sberbank advertises itself as an international "Group" covering 20 countries with more than 11 million customers outside of Russia, and lists its New York office as a means of contacting the Sberbank Group.

ANSWER:   To the extent Paragraph 36 purports to quote from and characterize

Sberbank's website, Sberbank respectfully refers the Court to that website for its contents.

Sberbank otherwise denies the allegations in Paragraph 36.

37.     Sberbank also offers American depositary receipts that trade on U.S. over-the-counter markets.  In an April 2018 interview with the *Financial Times*, Herman Gref, the Chairman of Sberbank's executive board, boasted that at least 25 percent of Sberbank's shareholders are located in the United States, claiming that its American ownership was so substantial that "[w]e don't need lobbyists.  Our American shareholders do that for us."[3]  This makes Americans the single largest group of Sberbank shareholders other than the Government of the Russian Federation, which owns 51% of the bank.

ANSWER:  Sberbank denies the allegations in the first sentence of Paragraph 37, except

admits that Sberbank American depositary receipts trade on U.S. over-the-counter markets.  To

the extent the second, third, and fourth sentences of Paragraph 37 purport to quote from and

---

[3]     Financial Times, "Impact of US Sanctions Threatens to Derail Sberbank Recovery," *available at* https://www.ft.com/content/bee9fb08-3d4f-11e8-b7e0-52972418fec4

characterize an article in the *Financial Times*, Sberbank respectfully refers the Court to that article for its contents.  Sberbank admits that Herman Gref is Sberbank's CEO and Chairman of its Executive Board, that as of April 30, 2020 the Ministry of Finance has owned a 50% equity stake plus one ordinary share in Sberbank, and that U.S. investors own equity interests in Sberbank, and otherwise denies the allegations in the second, third, and fourth sentences of Paragraph 37.  Footnote 3 purports to contain a citation to the article described in Paragraph 37 to which no response is required, and Sberbank respectfully refers the Court to that article for its contents.

38.    In recent years, according to public reports, Sberbank spent hundreds of thousands of dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to address sanctions relief."

ANSWER:  Paragraph 38 purports to quote from and characterize unnamed "public reports," and Sberbank respectfully refers the Court to those reports for their contents.  Sberbank otherwise denies the allegations in Paragraph 38.

39.    Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having done so as recently as 2014.

ANSWER:  Paragraph 39 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 39, except admits that Sberbank was a plaintiff in another state in this Circuit in 2014.

40.    Defendant VTB Bank is a Russian state-owned banking institution.  It has offices and branches worldwide.  VTB Bank operates a retail bank under the name VTB24.

ANSWER:  Sberbank admits that VTB Bank does business in Russia and other countries and that Russia owns a portion of VTB's equity, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 40.

41.    At all relevant times, VTB Bank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was critical to VTB Bank's combined corporate structure and operations.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 41.

42.    Until in or about August of 2018, VTB Bank operated in the United States and New York through its subsidiary VTB Capital, located at 452 Fifth Avenue, 23rd Floor, New York, NY 10018.   In or about August 2018, VTB Capital was sold to its management and renamed Xtellus Capital Partners, although it continues to operate out of the same offices and provide the exact same services for VTB Bank.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 42.

43.    In September 2018, VTB Bank stated that it had signed an agreement with Xtellus Capital Partners for Xtellus Capital Partners to serve as "a US chaperoning broker for the VTB Group" in order to allow VTB Bank to "continue working with our Russian and international clients" and ensure that "[t]here will be no change to VTB product offering or level of client service on equity and fixed income markets" as a result of the change.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 43.

44.    VTB Bank purposefully avails itself of the courts of New York to resolve its disputes, having done so as recently as 2017.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 44.

45.    At all relevant times, Defendants Sberbank and VTB Bank provided banking and money transfer services that allow individuals to send and/or receive money via wire transfers, including wire transfers sent from or through the United States, either to specified accounts at Sberbank or VTB Bank or cards issued by Sberbank or VTB Bank.

ANSWER:   Sberbank denies the allegations in Paragraph 45, except admits that Sberbank provided money transfer services that allowed individuals to send and/or receive money via wire transfers, including wire transfers sent from or through the United States, to specified accounts at Sberbank or to cards issues by Sberbank.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank in Paragraph 45.

46.     The cards issued by Defendants Sberbank and VTB Bank, sometimes known as payment cards or bank cards, allow for the transfer of funds from one card to another or from funds in a bank account to a card.  Defendants' banking services therefore allow individuals to provide funds, typically through an online process, to another individual's card issued by Sberbank or VTB Bank.

ANSWER:  Sberbank denies the allegations in Paragraph 46, except admits that it issues bank cards that facilitate transfers of funds from one bank account to another bank account. Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank in Paragraph 46.

47.     Defendants Sberbank and VTB Bank profit by charging fees for certain banking services, as well as a percentage fee for international money transfers.  They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

ANSWER:   Sberbank denies the allegations in Paragraph 47, except admits that it charges fees for certain banking transactions, for international money transfers, and for transfers sent in one currency and received in a different currency. Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank in Paragraph 47.

48.     Sberbank and VTB Bank each maintain correspondent bank accounts in this district in order to deliberately and repeatedly effectuate the transfer of funds in United States dollars:

a)      Sberbank has maintained correspondent bank accounts in New York City with JPMorgan Chase Bank, Citibank N.A., Bank of America, The Bank of New York Mellon, and Deutsche Bank Trust Company Americas;

b)      VTB Bank has maintained correspondent bank accounts with JPMorgan Chase Bank, Bank of America, and Citibank, N.A., among other banks in New York City.

ANSWER:  Paragraph 48 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 48(a)-(b), except admits that Sberbank maintains correspondent accounts at JPMorgan

Chase Bank, Citibank N.A., Bank of America, The Bank of New York Mellon, and Deutsche

Bank Trust Company Americas, which have offices in New York City, to facilitate transfers of

funds in United States dollars. Sberbank lacks knowledge or information sufficient to form a

belief regarding the truth of the allegations regarding VTB Bank in Paragraph 48.

49.     In January 2014, Sberbank's website stated that its "Main correspondent bank for
client payments in US dollars" was Deutsche Bank Trust Company Americas in "New
York, NY" and that its "Principal correspondent bank for client payments and treasury
operations in US dollars" was The Bank of New York Mellon in "New York, NY."

ANSWER:  Paragraph 49 purports to quote from and characterize Sberbank's website as

of January 2014, and Sberbank respectfully refers the Court to that website for its contents.

Sberbank otherwise denies the allegations in Paragraph 49.

50.     On June 6, 2013, Sberbank announced that Deutsche Bank presented the "2012
USD STP Excellence Award" to Sberbank "for excellence in formatting payments routed
through Sberbank's Nostro correspondent accounts with Deutsche Bank Trust Company
Americas (USA)," which is located at 60 Wall St., New York, New York.[4]

ANSWER: To the extent Paragraph 50 purports to quote from and characterize a June 6,

2013 Sberbank press release, Sberbank respectfully refers the Court to that press release for its

contents.   Sberbank otherwise denies the allegations in Paragraph 50, except admits that

Deutsche Bank Trust Company Americas (USA) is located at 60 Wall St., New York, New York

and admits the allegations in Footnote 4.

51.     On its website, Sberbank continues to promote the "advantages" of its
"correspondent banking relations . . .  for the performance of conversions with many
leading world banks," which "enable Sberbank of Russia to offer its clients the best price
conditions on the money market." Its website further advertises that "Sberbank of Russia
makes conversions with more than 20 currencies," including "US dollar (USD)."

---

[4]     A nostro correspondent account is an account that one bank holds in a foreign currency in
another bank.

ANSWER:  Paragraph 51 purports to quote from and characterize Sberbank's website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 51.

52.    Sberbank also advertises partnerships, discounts, and promotions on its website through its partnerships with several U.S. credit and consumer companies.

ANSWER:  Paragraph 52 purports to characterize Sberbank's website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 52.

53.    Like Sberbank, VTB Bank advertises on its website that it "offers settlement and cash services" including "[o]pening and maintaining loro correspondent accounts in all international key currencies, Russian roubles, currencies of the CIS and Baltic states and clearing currencies."[5]

ANSWER:  Paragraph 53 purports to quote from and characterize VTB Bank's website, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise lacks information sufficient to form a belief regarding the truth of the allegations in Paragraph 53.  Sberbank denies the allegations in Footnote 5.

54.    VTB Bank further advertises on its website that it "organises partner banks' access to international card payment networks as a sponsor bank." The listed benefits of this program include "transaction services in three currencies: Russian roubles, US dollars and euros" and "full reimbursement of interbank fees set by payment processing systems." To execute these advertised U.S. dollar services, VTB Bank routinely and systematically relies on its U.S. correspondent accounts located in this district.

ANSWER:  To the extent that Paragraph 54 purports to quote from and characterize VTB Bank's website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 54.

---

[5]    A loro correspondent account is an account held on behalf of a foreign credit institution. Payments through correspondents are executed through reciprocal nostro and loro accounts.

55.     VTB Bank advertises on its website that it facilitates "cashless foreign exchange transactions" from "USD to RUB" daily.   To execute these advertised U.S. dollar services, VTB Bank systematically relies on its U.S. correspondent accounts located in this district.

ANSWER:  To the extent that Paragraph 55 purports to quote from and characterize VTB Bank's website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 55.

56.     Sberbank and VTB Bank's United States correspondent bank accounts have been prominently advertised by the fundraising arm of the DPR as channels for providing direct funding to the DPR using foreign currencies, such as United States dollars.

ANSWER:  Paragraph 56 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 56.

57.     For example, with respect to VTB, in the months leading up to the attack on MH17, one webpage that solicited funds for the DPR[6] included instructions that "[m]oney transfer[s], carried out in any currency, other than the account [currency], will be converted into the currency of the VTB 24 (JSC) [on] the date of transfer."[7]  Another webpage soliciting funds for the DPR stated in June 2014 that "For transfers in USD [United States dollars]," funds need to be sent through a VTB correspondent account in New York.[8]

---

[6]   Veche, "Fundraising for the National Squads of Sevastopol," *available at* https://web.archive.org/web/20140307193454/http://veche-info.ru/index.php?option=com_content&view=article&id=973:2014-02-25-21-11-35&catid=1:latest-news&Itemid=1

[7]   Throughout this Complaint, documents and source material originally written in Russian have been translated to English for ease of comprehension.  Unless otherwise indicated, website URLs listed herein were active in the months prior to the DPR's terrorist attack on MH17.  Plaintiffs possess screenshots of relevant content from the websites cited herein.

[8]   Coordination Center for New Russia, "Requisites" as of June 23, 2014, *available at* https://web.archive.org/web/20140623133432/http://kcpn.info/help

ANSWER:  Paragraph 57 purports to quote from and characterize two webpages, and Sberbank respectfully refers the Court to those webpages for their contents.  Sberbank otherwise denies the allegations in Paragraph 57.  Footnotes 6 and 8 purport to contain citations to the webpages described in Paragraph 57 to which no response is required, and Sberbank respectfully refers the Court to those webpages for their contents.  Footnote 7 purports to describe Plaintiffs' approach in the Second Amended Complaint to translations of Russian-language documents and source material, website URLs, and screenshots of relevant content from websites, and does not require a response.

58.     Similarly, in the months leading up to the attack on MH17, another website soliciting funds for the DPR provided instructions on how send [*sic*] transfers in "US dollars" to an account at Sberbank by utilizing Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City, or Sberbank's correspondent account at The Bank of New York Mellon in New York City.[9]

ANSWER:  Paragraph 58 purports to quote from and characterize a website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 58.  Footnote 9 purports to contain a citation to the website described in Paragraph 58 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

59.     The DPR fundraisers that solicited funds utilizing Sberbank and VTB Bank's correspondent accounts in New York boasted about raising substantial sums of money, and documented how they used that money to procure lethal and tactical equipment for the DPR.  *See* Paragraphs 177-332, *infra*.  Many of these fundraisers continue to rely on the services provided by Sberbank and VTB to raise funds for the DPR's terrorist activities.

ANSWER:  The first sentence of Paragraph 59 purports to characterize and summarize the allegations at Paragraphs 177-332, *infra*, to which no response is required.  To the extent a

---

[9]     VK, "People's Militia of New Russia – News," *available at* https://vk.com/wall-70618940_781

response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 177-332, infra, as though fully set forth herein, and otherwise denies the allegations in the first sentence of Paragraph 59.   The second sentence of Paragraph 59 contains characterizations to which no response is required.   To the extent a response is required, Sberbank denies the allegations in the second sentence of Paragraph 59.

60.     Sberbank and VTB Bank's correspondent accounts in New York were repeatedly and intentionally used to send financial support to the DPR for the explicit purposes of carrying out violent and lethal activities intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:   Paragraph 60 consists of characterizations, accusations, and legal conclusions to which no response is required.   To the extent a response is required, Sberbank denies the allegations in Paragraph 60.

61.     For example, the DPR, by and through the Coordination Center for New Russia ("Center for New Russia"), reported that between June 23 and July 27, 2014—which encompasses the time during which the DPR planned and executed the attack on MH17—the DPR received "1,673.55" in "transfers in dollars" into its account with Defendant VTB Bank.[10]   At that time, Center for New Russia consistently advertised the account number of Defendant VTB Bank's correspondent bank in New York City, Deutsche Bank Trust Company Americas, as the appropriate channel through which to send "transfers in dollars."[11]

ANSWER:   To the extent Paragraph 61 purports to quote from and characterize online statements by Coordination Center for New Russia, Sberbank respectfully refers the Court to those statements for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 61.   Footnotes 10

---

[10]   Coordination Center for New Russia, "Report for June 23 – July 27," *available at* https://web.archive.org/web/20140930012248/http://kcpn.info/node/55

[11]   Coordination Center for New Russia, "Requisites" as of June 23, 2014, *available at* https://web.archive.org/web/20140623133432/http://kcpn.info/help

and 11 purport to contain citations to the Coordination Center for New Russia statements described in Paragraph 61 to which no response is required, and Sberbank respectfully refers the Court to those statements for their contents.

62.     The DPR's fundraisers published many webpages featuring the same wire transfer instructions for over five years, from 2014 through the present.  Thus, despite years of open and notorious advertising, Sberbank and VTB Bank knowingly permitted the DPR to continue fundraising through these accounts.

ANSWER:  The first sentence of Paragraph 62 purports to characterize "many webpages" published by the "DPR's fundraisers."  Sberbank respectfully refers this Court to the contents of those webpages, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the first sentence of Paragraph 62.  The second sentence of Paragraph 62 consists of characterizations and legal conclusions to which no response is required.  To the extent the second sentence of Paragraph 62 requires a response, Sberbank denies the allegations.

### The United States-Based Companies Financing Terrorism

63.     Defendant The Western Union Company is a corporation incorporated under the laws of Delaware with its principal place of business in Colorado.  The Western Union Company operates in this district through a corporate office located at 505 Fifth Avenue, New York, New York 10017.  Defendant Western Union Financial Services, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Colorado.  Western Union Financial Services Inc. has a registered agent for service of process in the Southern District of New York.  The Western Union Company, operating directly and through its subsidiary, Western Union Financial Services, Inc. (together, "Western Union"), is a global provider of money transfer services.  Western Union maintains hundreds of agent locations within the Southern District of New York that facilitate global money transfers.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 63.

64.     Defendant MoneyGram International, Inc., is a corporation incorporated under the laws of Delaware with its principal place of business in Texas.  Defendant MoneyGram Payment Systems, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Minnesota.  MoneyGram Payment Systems, Inc. has a

registered agent for service of process in the Southern District of New York. MoneyGram International, Inc., operating directly and through its subsidiary, MoneyGram Payment Systems, Inc. (together, "MoneyGram"), is a global provider of money transfer services. MoneyGram maintains dozens of agent locations within this district that facilitate global money transfers.

ANSWER: Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 64.

65.   At all relevant times, Defendants Western Union and MoneyGram provided money transfer services that allow identified individuals to send money to other identified individuals (here, the publicly identified DPR fundraisers) anywhere in the world either online or through in-person payment at a Western Union or MoneyGram agent location. The sender provides the funds either in cash or via payment from their bank account, debit card, or credit card. The recipient of the money transfer either receives the money directly to his or her bank account or can retrieve the money in person at any Western Union or MoneyGram agent location around the globe.

ANSWER: Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 65.

66.   Defendants Western Union and MoneyGram profit by charging a fee based on the money transfer amount and the recipient's location. They also earn additional revenue on international transactions that are sent in one currency and received in a different currency.

ANSWER: Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 66.

67.   Western Union and MoneyGram repeatedly provided financial support to the DPR for the explicit purposes of carrying out violent and lethal activities intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression. From 2014 through the present, the DPR widely advertised instructions on how to transfer funds to the DPR using Western Union and MoneyGram. Thus, despite years of open and notorious advertising, Western Union and MoneyGram knowingly permitted the DPR to continue fundraising for their violent acts through their money transfer services.

ANSWER: Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 67.

68.   Each Defendant's business model requires their knowing the identity of their account holders and/or the sender and recipient for each transaction they process. As

such, Defendants knowingly allowed supporters of the DPR to send and transfer money to the DPR. The DPR, by and through its fundraisers, advertised (in many cases for years) that the money would be used to purchase tactical and lethal equipment to support the DPR's efforts to intimidate or coerce civilians, the Ukrainian government, and other governments seeking to contain Russian aggression, through violent acts or acts dangerous to human life.

<u>ANSWER</u>:  Paragraph 68 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations regarding Sberbank in the first and second sentences of Paragraph 68.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Western Union, MoneyGram, and VTB Bank in the first and second sentences of Paragraph 68.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the third sentence of Paragraph 68.

69.    Defendants provided these services despite their knowledge that the DPR engaged in terrorist activity and that the material support and financing Defendants provided to the DPR would be used in the commission of terrorist acts.

<u>ANSWER</u>:   Paragraph 69 consists of characterizations, accusations, and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 69.

## <u>FACTUAL ALLEGATIONS</u>

**I.    The Murder of Quinn Lucas Schansman**

70.    Quinn Lucas Schansman was born on November 30, 1995 in New York City. Quinn had dual citizenship in both the United States and the Netherlands.



<u>ANSWER</u>:    Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 70.

71.    At the time of his death, Quinn was an eighteen-year-old college student at the Amsterdam School of International Business.  Quinn was also a minor league soccer player who played with the team Olympia '25 in the Netherlands.

<u>ANSWER</u>:    Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 71.

72.    Quinn was a proud American citizen.  Quinn saw and planned his future in the United States, which was one of the primary reasons he conducted his college studies in English.

<u>ANSWER</u>:    Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 72.

73.    On July 17, 2014, Quinn boarded an airplane from Amsterdam to Kuala Lumpur to join his family on vacation in Surabaya, Indonesia.  Quinn's grandfather and grandmother were born in Indonesia, a former Dutch colony, and his family had planned a vacation there to learn about their Indonesian roots.

ANSWER:  Sberbank admits that Schansman was on board MH17 from Amsterdam to Kuala Lumpur on July 17, 2014.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 73.

74.     Quinn's plane left Amsterdam's Schiphol Airport at 10:31 GMT on July 17, 2014 and was due to arrive at Kuala Lumpur International Airport at 22:10 GMT.

ANSWER:  Sberbank admits that MH17 departed from Amsterdam on July 17, 2014, traveling to Kuala Lumpur, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 74.

75.     As Quinn and the other 297 passengers (including 15 crew members) on board flew over eastern Ukraine, their plane was shot down by a surface-to-air missile launched from territory controlled by the DPR through brute force, intimidation, and violence.  The missile caused the plane to break up in mid-air, killing all 298 passengers, including Quinn and 80 children.

ANSWER:  Sberbank admits that MH17 crashed in Ukraine while traveling from Amsterdam to Kuala Lumpur and that all passengers on board, including Quinn Schansman, died.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 75.

76.     The missile exploded to the left of the cockpit and caused the plane to break up in stages.  The forward section of the plane was penetrated by hundreds of high-velocity fragments from the warhead, killing the three crew members in the cockpit immediately. The cockpit then broke away, but the plane continued its flight.  A short while later, the wingtips came off and the rear of the plane broke away, with the tail section then separating further.  The main body of the plane then crashed into the ground upside down.  Investigators believe that it was between 60 and 90 seconds after the cockpit broke away that the rest of the aircraft hit the ground.

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 76.

77.     Roughly 35 minutes after the plane crashed to the ground, the self-described "Commander-in-Chief" of the DPR, Igor Ivanovich Strelkov, also known as Igor Girkin,

posted online: "In the vicinity of Torez, we just downed a plane . . . .   We have video confirming."[12]

<u>ANSWER</u>:  Paragraph 77 purports to quote from and characterize an online post by Igor Ivanovich Strelkov, and Sberbank respectfully refers the Court to that post for its contents. Sberbank otherwise denies the allegations in Paragraph 77.  Footnote 12 purports to contain a citation to a Radio Free Europe website, and Sberbank respectfully refers the Court to that website for its contents.

78.    Earlier on July 17th, before the attack on MH17, Strelkov posted a message and photograph on Twitter (copied below) showing that the DPR possessed a surface-to-air missile in Snezhnoye in eastern Ukraine, only a few miles from the MH17 crash site.[13]



<u>ANSWER</u>:  Paragraph 78 purports to characterize and depict a tweet by Strelkov, and Sberbank respectfully refers the Court to that tweet for its contents.  Sberbank otherwise denies the allegations in Paragraph 78.  Footnote 13 purports to contain a citation to the tweet

---

[12]    Radio Free Europe, "Ukraine Separatist Social Media Site Claims Plane Downing," *available at* https://www.rferl.org/a/ukraine-separatist-leader-boasts-downing-plane/25460930.html

[13]    Twitter, "IgorGirkin," *available at* https://twitter.com/GirkinGirkin/status/489884062577094656

referenced in Paragraph 78, and Sberbank respectfully refers the Court to that tweet for its

contents.

79.     In late June 2014, the Russian news agency Tass reported that the DPR "have taken control over a missile defense army unit equipped with Buk missile defense systems." In taking control of territory, government buildings, and weapons, the DPR relied on tactical and lethal equipment, including those provided using the material support and financing of Defendants.

ANSWER:  Paragraph 79 contains characterizations and legal conclusions to which no

response is required.  To the extent a response is required, Sberbank denies that it provided

material support and financing to the DPR, and otherwise lacks knowledge or information

sufficient to form a belief regarding the truth of the allegations in Paragraph 79.  To the extent

Paragraph 79 purports to quote from and characterize reporting by Tass, Sberbank respectfully

refers the Court to that reporting for its contents.

80.     Immediately after the attack, the DPR blocked recovery workers from the crash site, removing or destroying evidence before it could be examined by international forensic inspectors.  Armed members of the DPR forced Ukrainian emergency workers, at gunpoint, to hand over bodies that they had pulled from the rubble of the plane.

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 80.

81.     After blowing up the civilian airliner, the DPR leadership sought to profit.  Igor Strelkov reportedly issued an order demanding that jewelry, watches, and other valuables be taken from the victims' bodies and turned over to the DPR.

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 81.

82.     As Malaysian and Dutch officials pleaded to be allowed to recover their dead nationals, the victims' bodies lay uncovered in a field—still controlled by the DPR—and had begun to decompose in the summer heat.

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 82.

83.     It took several days before the DPR allowed investigators to examine the bodies and begin the recovery process, further exacerbating the grief of the victims' families, including Plaintiffs.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 83.

84.     On July 22, 2014, following a unanimous vote of the United Nations Security Council to demand immediate international access to the crash site, the DPR finally allowed international investigators access to the crash site and to the flight data recorders that had been taken from the downed plane.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 84.  To the extent Paragraph 84 purports to characterize a U.N. Security Council vote, Sberbank respectfully refers the Court to the resolution associated with that vote for its contents.

85.     Plaintiffs Thomas Schansman, Catharina Teunissen, minor child X.S., and Nerissa Schansman, suffered and continue to suffer severe physical and mental anguish and extreme emotional distress from the terrorist attack that killed their son and brother, Quinn, and the horrific looting and treatment of his corpse.

ANSWER:  Paragraph 85 contains characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 85.

86.     Among other harms, in the days and weeks after Quinn's murder, Plaintiffs were uncertain whether Quinn's body would ever be returned to them.  As a result, Plaintiffs were forced to plan and participate in a funeral service without Quinn's body, instead burying a photograph of Quinn.  Quinn's remains were finally returned to Plaintiffs a month after his death, at which point Plaintiffs planned and held a second funeral for Quinn.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 86.

87.     Plaintiffs each endured extraordinary emotional distress and anguish in the aftermath of Quinn's murder, and Quinn's siblings continue to struggle with feelings of intense anxiety when they or their parents travel by plane.

ANSWER:  Paragraph 87 contains characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 87.

II.      **The DPR's Violent Campaign of Intimidation and Coercion Against Civilians, the Ukrainian Government, and Other Governments Seeking to Contain Russian Aggression**

88.      Like other terrorist groups, such as the Islamic State ("ISIS"), the DPR and its affiliates seek to advance an ideological agenda of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine acquired through acts of intimidation and coercion.

ANSWER:  Paragraph 88 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 88.

89.      Since the dissolution of the Soviet Union in 1991, there have been periodic attempts by ideological extremists to recreate Novorossiya as a separate state, often buoyed by support from former Soviet and current Russian officials.  In 2005, Russian President Vladimir Putin famously described the breakup of the Soviet Union as the "greatest geopolitical catastrophe of the 20th century."

ANSWER:  Paragraph 89 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 89.

90.      The Novorossiya movement failed to gain much traction until a popular protest movement managed to unseat then-Ukrainian President Viktor Yanukovych, causing Russia to seek to expand its influence in Ukraine.

ANSWER:  Paragraph 90 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 90.

91.      In February 2014, pro-Russian Novorossiya-inspired demonstrations began in the Ukrainian region of Crimea.  On or about March 16, 2014, Russia purportedly annexed Crimea.

ANSWER:  Paragraph 91 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 91.

92.   In March 2014, demonstrations by pro-Russian and anti-Ukrainian government groups spread to the Donetsk and Luhansk regions in eastern Ukraine.  Together, those regions are commonly referred to as the "Donbass."

ANSWER:  Paragraph 92 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 92.

93.   As early as March 3, 2014, Novorossiya-aligned terrorists occupied the Donetsk regional legislative building.  The terrorists were led by Pavel Gubarev, the founder of the so-called "People's Militia of Donbass," who demanded that he be made the head of Donetsk's regional government.   Gubarev soon thereafter proclaimed himself the "governor" of the DPR.

ANSWER:  Paragraph 93 contains historical and political characterizations to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 93.

94.   In announcing sanctions on Pavel Gubarev in 2014, the United States Treasury Department explained that "Gubarev has been described as one of the three most prominent leaders of the separatists in southeast Ukraine," and noted that he "is responsible for or complicit in, or has engaged in, actions or polices [*sic*] that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and is a leader of an entity that has, or whose members have, engaged in actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine."[14]

ANSWER:  To the extent Paragraph 94 purports to quote from and characterize a press release by the U.S. Treasury Department, Sberbank respectfully refers the Court to that press release for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a

---

[14]   U.S. Department of the Treasury, "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities," *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx

belief regarding the truth of the allegations in Paragraph 94.  Footnote 14 purports to contain a

citation to the press release described in Paragraph 94 to which no response is required, and

Sberbank respectfully refers the Court to the press release for its contents.

95.    Roughly contemporaneous with the inception of the DPR, pro-Russia armed terrorists in the Luhansk region declared the creation of the Luhansk People's Republic ("LPR").

ANSWER:  Paragraph 95 contains historical and political characterizations to which no

response is required.  To the extent a response is required, Sberbank lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations in Paragraph 95.

96.    The DPR and the LPR, along with other similar groups, formed a cartel that terrorized—and continues to terrorize—civilians to advance the violent agenda of the Novorossiya political movement.  The DPR and its affiliated groups are dedicated to using violent means to achieve their goal of rebuilding the Russian Empire.

ANSWER:  Paragraph 96 contains historical and political characterizations to which no

response is required.  To the extent a response is required, Sberbank lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations in Paragraph 96.

97.    The DPR has publicly decried countries seeking to contain Russian aggression, including the member states of the North Atlantic Treaty Organization ("NATO")—and in particular the United States—as its enemies.

ANSWER:  Paragraph 97 contains historical and political characterizations to which no

response is required.  To the extent a response is required, Sberbank lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations in Paragraph 97.  To

the extent Paragraph 97 purports to characterize public statements by the DPR, Sberbank

respectfully refers this Court to the contents of any such public statements.

98.    The DPR leader Igor Strelkov (Girkin) has himself described the work of the DPR as carrying out violent acts intended to affect government policy and intimidate civilians around the world, including in a post online titled, "The manifesto of the public movement 'Novorossiya' Igor Strelkov."

ANSWER:   To the extent Paragraph 98 purports to quote from and characterize a manifesto by Igor Strelkov, Sberbank respectfully refers the Court to that manifesto for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 98.

99.     In this "manifesto," Strelkov wrote that "we are fighting for the preservation of the Russian World, for the revival of Great, United Russia," and that "[a]s part of the Movement, we organize actions in support of the fighting New Russia in various regions of Russia and beyond." Strelkov further wrote that this political movement was fighting against a "foreign policy enemy - NATO, led by the United States."[15]

ANSWER:   Paragraph 99 purports to quote from and characterize a manifesto by Igor Strelkov, and Sberbank respectfully refers the Court to that manifesto for its contents.  Sberbank otherwise denies the allegations in Paragraph 99.  Footnote 15 purports to contain a citation to the manifesto referenced in Paragraph 99 to which no response is required, and Sberbank respectfully refers the Court to the press release for its contents.

100.     From its inception, the DPR and its affiliates, including the LPR and other groups, have exhibited a pattern and practice of attacking and intimidating civilians.  The DPR engaged (and continues to engage) in violent acts of intimidation against the civilian population and operated (and continues to operate) with no regard for civilian life, often murdering and torturing civilians.

ANSWER:   Paragraph 100 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 100.

101.     On June 12, 2018, Ukraine submitted a "Memorial" to the International Court of Justice ("ICJ") (hereinafter, "Government of Ukraine's Brief") regarding violations of the International Convention for the Suppression of the Financing of Terrorism, a treaty

---

[15]   Forum Novorossia, "The Manifesto of the Public Movement 'Novorossiya' Igor Strelkov," *available at* http://forum-novorossia.ru/index.php/topic/87-manifest-obschestvennogo-dvizheniia-%C2%ABnovorossiiaC2%BB/

ratified by the United States in 2002.[16]  As Ukraine explained: "From their earliest days, the DPR and the LPR committed acts of violence and intimidation targeted at civilians in furtherance of their political objectives and their attempt to consolidate control over areas of Ukrainian territory.  Terrorist acts form a key element of their *modus operandi*." (Government of Ukraine's Brief ¶ 42.)

ANSWER:  To the extent Paragraph 101 purports to quote from and characterize Ukraine's Memorial to the International Court of Justice ("Government of Ukraine's Brief"), Sberbank respectfully refers the Court to that brief for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 101.  Footnote 16 purports to contain a citation to the Government of Ukraine's Brief referenced in Paragraph 101 to which no response is required, and Sberbank respectfully refers the Court to the press release for its contents.

102.    For example, on April 17, 2014 the DPR abducted, tortured, and murdered Volodymyr Rybak, a town councilor from Horlivka, after he attempted to raise the Ukrainian flag outside of town hall.  Igor Bezler, a high ranking DPR "commander," ordered the abduction, and Igor Strelkov ordered the disposal of the body.  Mr. Rybak's body was eventually found by a river, alongside the body of Yuriy Propavko, a 19-year-old student and activist from Kyiv.[17]

ANSWER:  To the extent Paragraph 102 purports to quote from and characterize a *Daily Beast* news article, Sberbank respectfully refers the Court to that article for its contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 102.  Footnote 17 purports to contain a citation to the article referenced in Paragraph 102 to which no response is required, and Sberbank respectfully refers the Court to the article for its contents.

---

[16]    International Court of Justice, "Government of Ukraine's Brief," *available at* https://www.icj-cij.org/files/case-related/166/166-20180612-WRI-01-00-EN.pdf

[17]    The Daily Beast, "'In Cold Blood' in Ukraine," *available at* https://www.thedailybeast.com/in-cold-blood-in-ukraine

103.    The DPR's reign of terror immediately became a prominent international crisis. In the months that followed, international monitors and human rights organizations attributed thousands of civilian deaths and injuries as well as widespread human rights abuses to the DPR and its affiliated groups.

ANSWER:  Paragraph 103 contains historical and political characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 103.  To the extent Paragraph 103 purports to characterize public reporting by "international monitors and human rights organizations," Sberbank respectfully refers this Court to the contents of that reporting.

## III.   Prior to the DPR's Terrorist Attack on MH17, Defendants Knew About the DPR's Terrorist Activities

### A.    Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by the International Media

104.    Since 2014, the DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians.  The terrorist acts perpetrated by the DPR and its affiliates were widely reported on and discussed by nearly every government in the world, as well as by international media, multilateral entities, and human rights organizations.  The DPR's pattern and practice of carrying out terrorist attacks on civilians were therefore notorious and well-known to Defendants and the general public.

ANSWER:  Paragraph 104 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the first and second sentences of Paragraph 104.  To the extent the second sentence of Paragraph 104 purports to characterize public reporting by "international media, multilateral entities, and human rights organizations," Sberbank respectfully refers this Court to the contents of that reporting. Sberbank denies the allegations in the third sentence of Paragraph 104.

105.    On March 3, 2014, months before the attack that killed Quinn, the *New York Times* reported on Pavel Gubarev's role as a terrorist leader in the Donbass.  A couple of

months later, on May 8, 2014, the *Washington Post* published an article profiling some of the leadership of the DPR.  Among those profiled were Gubarev, described as the self-declared "people's governor" of the DPR, and his wife, Ekaterina Gubareva, described as the "foreign minister of the Donetsk People's Republic."[18]  At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 105 purports to quote from and characterize articles in the *New York Times* and the *Washington Post*, Sberbank respectfully refers the Court to those articles for their contents.  Sberbank lacks knowledge or information sufficient to form a belief as to which articles published by the *New York Times* and the *Washington Post* were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 105.  Footnote 18 purports to contain a citation to a *Washington Post* article referenced in Paragraph 105 to which no response is required, and Sberbank respectfully refers the Court to the article for its contents.

106.    A May 14, 2014 article in *The Independent* titled, "Ukraine crisis: Kidnappings abound as the Donbass falls further into anarchy," reported on a series of civilian abductions perpetrated by the DPR and its affiliates in the Donbass, including dozens of political prisoners kept in terrorist strongholds and used as media propaganda.  The May 14, 2014 article includes references to, and pictures of, the DPR possessing tactical and lethal equipment, including masks, "combat uniforms," and "Kalashnikov [rifles]." These are among the types of equipment that the DPR expressly solicited funds to purchase with Defendants' material support.

ANSWER:  Paragraph 106 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 106 purports to quote from and characterize an article in *The Independent*, Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise denies the allegations in Paragraph 106.

107.    At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with the Defendants' material support was

---

[18]    Washington Post, "Meet the Nobodies Who Said No to Putin," *available at* https://www.washingtonpost.com/news/worldviews/wp/2014/05/08/meet-the-nobodies-who-said-no-to-putin/

being utilized to purchase lethal equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 107 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief as to which articles published by the *The Independent* were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 107.

108.    A June 18, 2014 article in The Telegraph titled, "Beaten and threatened: the 'Donetsk People's Republic turns on city's priest," reported that the DPR was persecuting clergy members who did not follow the Russian Orthodox Church.  The article recounted how one priest was interrogated and repeatedly assaulted "with clubs and whips." The DPR also "threatened to break the priest's fingers with a hammer." Another priest was "kidnapped in broad daylight" and interrogated, after which he fled Ukraine.  The June 18, 2014 article includes references to, and pictures of, the DPR possessing the types of equipment—including combat uniforms, guns, and rifle scopes— which the DPR solicited funds to purchase with Defendants' material support.

ANSWER:  Paragraph 108 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 108 purports to quote from and characterize an article in *The Telegraph*, Sberbank respectfully refers the Court to that article for its contents. Sberbank otherwise denies the allegations in Paragraph 108.

109.    At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase lethal equipment that the DPR used to commit violent acts, or acts dangerous to human life, intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 109 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief as to which articles published by *The Telegraph* were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 109.

110.    A June 29, 2014 article in *Al-Jazeera America* titled, "The Donbass Battalion prepares to save Ukraine from separatists," reported that the DPR's "tactics have included hostage taking, storming and barricading buildings, and using civilians, such as international observers from the Organization for Security and Cooperation in Europe, as human shields." The June 29, 2014 article includes references to the DPR possessing the types of equipment, including Kalashnikov rifles, which the DPR solicited funds to purchase with Defendants' material support.

ANSWER:  Paragraph 110 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 110 purports to quote from and characterize an article in *Al-Jazeera America*, Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 110, except denies that Sberbank provided material support.

111.    At all relevant times, this information was available to Defendants and the public at large, including the fact that money raised with Defendants' knowing material support was being utilized to purchase tactical and lethal equipment that the DPR used to commit violent acts, such as using civilians as "human shields."

ANSWER:  Paragraph 111 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief as to which articles published by *Al-Jazeera America* were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 111.

112.    A July 10, 2014 article in *The New York Times* titled, "Shadowy Rebel Wields Iron Fist in Ukraine Fight," profiled the DPR leader Igor Strelkov, explaining that he "consolidated control" over the DPR "by imposing a system of dark and ruthless justice." At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  The first sentence of Paragraph 112 purports to quote from and characterize an article in *The New York Times*, and Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise denies the allegations of the first sentence of Paragraph 112.  The second sentence of Paragraph 112 consists of characterizations and legal conclusions to which no

response is required.  To the extent the second sentence of Paragraph 112 requires a response, Sberbank lacks knowledge or information sufficient to form a belief as to which articles published by the *New York Times* were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations.

> B.    Prior to the DPR's Terrorist Attack on MH17, the DPR's Terrorist Activities Were Widely Known and Extensively Reported on by Governments and Intergovernmental Organizations

113.    The human rights abuses and terrorist acts perpetrated by the DPR were also widely reported on by governmental entities and intergovernmental organizations.  At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  Paragraph 113 consists of characterizations and legal conclusions to which no response is required.  To the extent the first sentence of Paragraph 113 purports to characterize public reporting by "governmental entities and intergovernmental organizations," Sberbank respectfully refers this Court to the contents of that reporting and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the first sentence of Paragraph 113.  To the extent the second sentence of Paragraph 113 requires a response, Sberbank denies the allegations.

114.    On March 21, 2014, the Organization for Security and Co-operation in Europe ("OSCE") deployed a Special Monitoring Mission to Ukraine following a request from Ukraine and a consensus decision by all 57 participating OSCE countries.  The OSCE is the largest regional security organization in the world and is comprised of 57 participating countries from Europe, Central Asia, and North America, including the United States.

ANSWER:  Paragraph 114 contains historical and political characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 114.  To the extent Paragraph 114 purports to characterize a March 21, 2014 decision by the Permanent

Council of the Organization for Security and Co-operation in Europe ("OSCE"), Sberbank

respectfully refers the Court to that decision for its contents.

      115.    The reports of the OSCE monitors in Ukraine were and are widely disseminated and publicly available on its website at www.osce.org, including daily reports on the situation and condition in most major Ukrainian cities in three languages (English, Ukrainian, and Russian).  At all relevant times, this information was available to Defendants and the public at large and regularly reported in international media.  The OSCE reports include, among other things, detailed reports of the terrorist activities carried out by the DPR and its affiliates.

      <u>ANSWER</u>:  To the extent Paragraph 115 purports to characterize reports by the OSCE

and the "international media," Sberbank respectfully refers the Court to those reports for their

contents.  Sberbank lacks knowledge or information sufficient to form a belief as to which

reports issued by the OSCE were publicly available in which languages, in which places, and on

which dates, and otherwise denies the allegations in Paragraph 115.

      116.    In March 2014, the Office of the United Nations High Commissioner for Human Rights deployed a Human Rights Monitoring Mission (the "United Nations" or "UN") to evaluate and report on the human rights situation in Ukraine and to provide support to the Ukrainian Government in the promotion and protection of human rights.

      <u>ANSWER</u>:  Paragraph 116 contains historical and political characterizations to which no

response is required.  To the extent a response is required, Sberbank lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations in Paragraph 116.

      117.    As part of its work, the UN prepared (and continues to prepare) monthly reports describing the human rights situation in Ukraine.  These reports were and are widely disseminated and publicly available on the United Nations in Ukraine website at www.un.org.ua and the website of the Office of the United Nations High Commissioner for Human Rights at www.ohchr.org in English, Ukrainian, and Russian.

      <u>ANSWER</u>:  To the extent Paragraph 117 purports to characterize reports by the United

Nations and two websites purportedly featuring those reports, Sberbank respectfully refers the

Court to those reports and websites for their contents.  Sberbank lacks knowledge or information

sufficient to form a belief as to which reports issued by the United Nations were publicly

available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 117.

118.   Eight human rights monitoring reports were released by the UN in 2014, beginning in April 2014.   At all relevant times, this information was available to Defendants and the general public.   They also featured prominently in open meetings of the United Nations Security Council and garnered regular and extensive media attention across the globe.

ANSWER:   To the extent Paragraph 118 purports to characterize certain reports issued by the United Nations in 2014, the record of open meetings of the United Nations Security Council, and public reporting by the "media . . . across the globe," Sberbank respectfully refers the Court to those reports and records and to that reporting for their contents.   Sberbank lacks knowledge or information sufficient to form a belief as to which reports issued by the United Nations were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 118.

119.   The UN reported that the DPR and its affiliates operated with impunity, terrorizing the civilian population in areas under their control, pursuing killings, abductions, torture, ill-treatment, and other serious human rights abuses, including the destruction of housing and seizure of property.

ANSWER:   To the extent Paragraph 119 purports to characterize certain reports issued by the United Nations, Sberbank respectfully refers the Court to those reports for their contents. Sberbank otherwise denies the allegations in Paragraph 119.

120.   In a report issued on May 15, 2014, the UN detailed specific instances of terrorist activity in the Donbass, including an April 28, 2014 attack by the DPR on participants of a peaceful rally, which led to "dozens wounded, and five participants of the rally (reportedly students) [being] abducted." At all relevant times, this information was available to Defendants and the public at large.

ANSWER:   To the extent Paragraph 120 purports to quote from and characterize a May 15, 2014 report issued by the United Nations, Sberbank respectfully refers the Court to that report for its contents.   Sberbank lacks knowledge or information sufficient to form a belief as to

which reports issued by the OSCE were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 120.

121.    In a report issued on June 15, 2014, the UN stated that, in the spring of 2014, the DPR and its affiliates had committed "an increasing number of acts of intimidation and violence . . ., targeting 'ordinary' people who support Ukrainian unity or who openly oppose" the so-called "people's republics." At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 121 purports to quote from and characterize a June 15, 2014 report issued by the United Nations, Sberbank respectfully refers the Court to that report for its contents.  Sberbank lacks knowledge or information sufficient to form a belief as to which reports issued by the United Nations were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 121.

122.    In a July 4, 2014 press briefing, the UN High Commissioner for Human Rights, Navi Pillay, noted a "disturb[ing] . . .  message on the website of one leader of the self-proclaimed 'Donetsk People's Republic', which state[d] that underage children and women are legitimate targets and that the goal is to 'immerse them in horror.'" (Government of Ukraine's Brief ¶ 48.) At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 122 purports to quote from and characterize a July 4, 2014 press briefing and the Government of Ukraine's June 2018 Brief, Sberbank respectfully refers the Court to that press briefing and brief for their contents.  Sberbank lacks knowledge or information sufficient to form a belief as to when accounts of the press briefing and the Government of Ukraine's Brief were publicly available in specific languages and in specific places, and otherwise denies the allegations in Paragraph 122.

123.    In a report issued on July 15, 2014, two days before the attack on MH17, the UN stated that "[e]gregious human rights abuses have been committed in the Donetsk and Luhansk regions," controlled by the DPR and the LPR, including "hundreds of abductions with many victims tortured.  Increasing numbers of civilians have been killed." At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 123 purports to quote from and characterize a July 15, 2014 report issued by the United Nations, Sberbank respectfully refers the Court to that report for its contents.  Sberbank lacks knowledge or information sufficient to form a belief as to which reports issued by the United Nations were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 123.

124.    According to the Ukraine 2014 Human Rights Report issued by the U.S. Department of State, the DPR and its affiliates had "launched violent attacks to establish their authority against the Ukrainian government," and "engaged in unlawful killings, abductions, physical abuse, torture, and unlawful detention" aimed at the civilian population in the Donbass.  At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 124 purports to quote from and characterize a 2014 report by the U.S. State Department, Sberbank respectfully refers the Court to that report for its contents.  Sberbank lacks knowledge or information sufficient to form a belief as to which reports issued by the State Department were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 124.

125.    Additionally, the nongovernmental organization Human Rights Watch issued periodic reports in 2014 of attacks on civilians committed in the Donbass region by the DPR and its affiliates.  These reports were widely disseminated and available to Defendants and the general public.

ANSWER:   To the extent Paragraph 125 purports to characterize reports by Human Rights Watch, Sberbank respectfully refers the Court to those reports for their contents. Sberbank lacks knowledge or information sufficient to form a belief as to which reports issued by Human Rights Watch were publicly available in which languages, in which places, and on which dates, and otherwise denies the allegations in Paragraph 125.

126.    A May 23, 2014 news article on the Human Rights Watch website detailed a series of terrorist attacks perpetrated by the DPR and its affiliates to intimidate and coerce the civilian population.  The article described one instance on May 8, 2014 where DPR forces "broke into the home of a pro-Ukraine activist and terrorized and beat him and his father." The article included references to the DPR possessing the types of equipment the

43

DPR had solicited funds to purchase with Defendants' material support, including "sawed-off Kalashnikovs" used by the terrorists to shoot up the home of their victims. At all relevant times, this information was available to Defendants and the public at large.

ANSWER:  To the extent Paragraph 126 purports to quote from and characterize an article on the Human Rights Watch website, Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief as to truth of the allegations in the first and second sentences of Paragraph 126.  The third and fourth sentences of Paragraph 126 contain characterizations and legal conclusions to which no response is required.  To the extent the third and fourth sentences of Paragraph 126 contain factual allegations, Sberbank denies the allegations.

127.   In April 2014, the European Union sanctioned several DPR leaders, including Igor Strelkov.  The European Union's sanctions were widely reported on in numerous prominent media outlets, including the *Washington Post* and *The Guardian*.  In July 2014, the European Union ("EU") sanctioned several additional DPR leaders, including Pavel Gubarev and Ekaterina Gubareva.

ANSWER:  Paragraph 127 contains historical and political characterizations to which no response is required.  To the extent Paragraph 127 purports to characterize public reporting by "numerous prominent media outlets, including the *Washington Post* and *The Guardian*," Sberbank respectfully refers the Court to that reporting for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 127.

128.   In May 2014, the Ukrainian General Prosecutor Office formally and publicly classified the DPR and its affiliate, the LPR, as "terrorist organizations." First Deputy Prosecutor General in Ukraine Mykola Holomsha stated: "Facts of the persecution of the civilians in eastern Ukraine have been registered. . . .  The purpose of the creation of these organizations is to deliberately propagate violence, seize hostages, carry out subversive activity, assassination and intimidation of citizens." This information was available to Defendants and the general public and was reported on by the media at the time.

ANSWER:  To the extent Paragraph 128 purports to quote from and characterize a public classification by the Ukrainian General Prosecutor Office, a statement by Mykola Holomsha, and public reporting "by the media," Sberbank respectfully refers the Court to that classification, statement, and reporting for their contents.  Sberbank admits that there were media reports about the announcement by the Ukrainian General Prosecutor Office in May 2014, and otherwise denies the allegations in Paragraph 128.

C.   Prior to the DPR's Terrorist Attack on MH17, the United States Government Expressly Sought to Stop the Flow of Material Support to the DPR and Its Affiliated Terrorist Groups

129.   Beginning on March 6, 2014, President Barack Obama issued a series of Executive Orders in response to the violence in Ukraine.  The March 6, 2014 order authorized the United States Treasury Department to impose sanctions on individuals or entities "responsible for or complicit in . . .  actions or policies that undermine democratic processes or institutions in Ukraine; [and] actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine." The March 6, 2014 order further authorized sanctions against individuals or entities who "have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" those using violence to affect the Government of Ukraine.

ANSWER:  To the extent Paragraph 129 purports to quote from and characterize Executive Orders issued by President Barack Obama and to quote from and characterize an Executive Order issued on March 6, 2014, Sberbank respectfully refers the Court to those Executive Orders for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 129.

130.   Pursuant to a March 17, 2014 Executive Order, President Obama specifically condemned "the actions and policies of the Government of the Russian Federation with respect to Ukraine," and authorized the United State [*sic*] Treasury Department to impose sanctions on, among others, "official[s] of the Government of the Russian Federation" and individuals or entities associated with these Russian officials.

ANSWER:  To the extent Paragraph 130 purports to quote from and characterize an Executive Order issued on March 17, 2014, Sberbank respectfully refers the Court to that

Executive Order for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 130.

131.    On June 20, 2014, in response to the terrorist acts perpetrated by the DPR and its affiliates, the United States Treasury Department sanctioned seven individuals connected to the DPR, the LPR, or other affiliated groups.  Among the individuals targeted for sanctions were Igor Strelkov (Girkin), along with Denis Pushilin and Andrey Purgin, two other DPR "leaders." The Treasury Department described Strelkov as "the self-described 'commander-in-chief of the Donetsk People's Republic.'"

ANSWER:  To the extent Paragraph 131 purports to quote from and characterize a statement by the Treasury Department, Sberbank respectfully refers the Court to that statement for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 131.

132.    A month before the terrorist attack on MH17, the United States government thus formally and explicitly put Defendants on notice that they should not be facilitating the provision of funds to Strelkov.  But as described in Paragraphs 104-128, *supra*, Defendants already knew, long before, that they should not be providing material support or financial assistance to Strelkov or the DPR.

ANSWER:  The first sentence of Paragraph 132 consists of characterizations and legal conclusions to which no response is required.  To the extent the first sentence of Paragraph 132 requires a response, Sberbank denies the allegations.  The second sentence of Paragraph 132 purports to characterize and summarize the allegations at Paragraphs 104-128, *supra*, to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 104-128, *supra*, as though fully set forth herein, and otherwise denies the allegations.

133.    In announcing the sanctions against Strelkov and other DPR leaders, David Cohen, the Treasury Department's Under Secretary for Terrorism and Financial Intelligence, stated: "These individuals have all contributed to attempts to illegally undermine the legitimate government in Kyiv, notably by falsely proclaiming leadership positions and fomenting violent unrest."

ANSWER:  To the extent Paragraph 133 purports to quote from and characterize a statement by David Cohen, Sberbank respectfully refers the Court to that statement for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 133.

134.    On July 16, 2014, the Treasury Department imposed sanctions on the DPR and LPR as entities, along with Aleksandr Borodai, the self-declared "prime minister" of the DPR.  The Treasury Department stated that the DPR had illegitimately "asserted governmental authority over a part or region of Ukraine without the authorization of the Government of Ukraine." The Treasury Department also specifically singled out Igor Strelkov (Girkin) as "the leader of the militia of the Donetsk People's Republic."

ANSWER:  To the extent Paragraph 134 purports to quote from and characterize statements by the Treasury Department, Sberbank respectfully refers the Court to those statements for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 134.

135.    In a further response to the situation in eastern Ukraine, on July 29, 2014, the Treasury Department announced sanctions on VTB Bank, in an effort to stem the flow of financial support to the DPR and its affiliates.  The Treasury Department stated that VTB "is a state-owned bank, and, together with its subsidiaries ('the VTB Group'), is Russia's second-largest banking group."

ANSWER:  To the extent Paragraph 135 purports to quote from and characterize a statement by the Treasury Department, Sberbank respectfully refers the Court to that statement for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 135.

136.    On September 12, 2014, the Treasury Department announced sanctions on Defendant Sberbank in an effort to stem the flow of financial support to the DPR and its affiliates.

ANSWER:  Paragraph 136 purports to characterize a September 12, 2014 announcement by the Treasury Department, and Sberbank respectfully refers the Court to that announcement for its contents.  Sberbank otherwise denies the allegations in Paragraph 136.

137.    In subsequent months, the Treasury Department announced sanctions on both Pavel Gubarev and his wife, Ekaterina Gubareva, for their involvement with the DPR.

ANSWER:   Paragraph 137 purports to characterize an announcement by the Treasury Department, and Sberbank respectfully refers the Court to that announcement for its contents. Sberbank otherwise denies the allegations in Paragraph 137.

138.    Defendants VTB Bank and Sberbank continued their deliberate and recurring use of U.S. correspondent accounts in New York, New York to provide funds to the DPR after the European Union and the United States Treasury Department sanctioned the DPR's leadership, and even after the United States Government sanctioned both Defendants VTB Bank and Sberbank in an effort to stem the flow of financial support to the DPR and its affiliates.

ANSWER:   Paragraph 138 consists of characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank denies the allegations in Paragraph 138.

139.    Prior to the attack on MH17, it was well known that the DPR's activities had a "strident anti-American tone"[19] that could lead to violence directed towards U.S. citizens, prompting the United States Department of State repeatedly and emphatically to warn U.S. citizens to defer all travel to Donetsk because of the activities of "armed separatist groups …[which] have established illegal checkpoints and have threatened, detained, or kidnapped individuals, including U.S. citizens, for hours or days."[20]

ANSWER:   To the extent Paragraph 139 purports to quote from and characterize posts on the U.S. State Department website, Sberbank respectfully refers the Court to those posts for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 139.

---

[19]   U.S. Department of State, "Ukraine Travel Warning, March 21, 2014," *available at* https://web.archive.org/web/20140328011053/http://travel.state.gov/content/passports/englis h/al ertswarnings/ukraine-travel-warning.html

[20]   U.S. Department of State, "Ukraine Travel Warning, June 5, 2014," *available at* https://web.archive.org/web/20140704184225/http://travel.state.gov/content/passports/englis h/al ertswarnings/ukraine-travel-warning.html

D.   Prior to the DPR's Terrorist Attack on MH17, Defendants Operated Extensively in Ukraine

140.   In the months leading up to the terrorist attack on MH17, each Defendant had substantial operations in Ukraine.

ANSWER:  Paragraph 140 consists of characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations regarding Sberbank in Paragraph 140 except admits that Sberbank has a subsidiary in Ukraine that engages in substantial banking activity there.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Western Union, MoneyGram, and VTB Bank.

141.   According to Sberbank of Russia's website, "In December 2007 Sberbank of Russia acquired a bank in Ukraine. . . .  According to figures of the National Bank of Ukraine, the Bank features in the top ten largest financial institutions in the country in terms of assets.  The regional network of the subsidiary bank includes more than 200 offices . . . ."[21]

ANSWER:  Paragraph 141 purports to quote from and characterize Sberbank's website, and Sberbank respectfully refers the Court to the website for its contents.  Sberbank otherwise denies the allegations in Paragraph 141.

142.   For years prior to the terrorist attack on MH17, and up until 2018, VTB Bank operated a subsidiary in Ukraine with assets that made it the 16th largest bank in the country.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 142.

143.   For years prior to the terrorist attack on MH17, and currently, MoneyGram and Western Union have each maintained numerous agent locations in Ukraine that provide global money transfer services.

---

[21]   Sberbank, "Ukraine," *available at* https://www.sberbank.com/about/group-overview/subsidiaries/ukraine

<u>ANSWER</u>:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 143.

144.    Due to their substantial operations in Ukraine, each Defendant was acutely aware that the DPR was engaging in a pattern and practice of terrorist activities targeting civilians.

<u>ANSWER</u>:  Paragraph 144 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 144.

## IV.   The DPR Relies on a Global Supply Chain Facilitated by Defendants to Fund Terrorism in the Donbass Region

145.    Upon its formation in 2014, the DPR immediately tried to capitalize on the appeal of its fervent Russian-nationalist views to some members of the Russian diaspora, which consists of tens of millions of ethnic Russians who live outside the present-day Russian Federation.  The world's largest overseas community of ethnic Russians, estimated at approximately three million, is in the United States.

<u>ANSWER</u>:  Paragraph 145 contains historical and political characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 145.

146.    In an effort to tap into this diaspora and further their common cause of establishing a Novorossiya state, the DPR raised funds for its terrorist acts through an online campaign accessible to anyone around the world, including in the United States.

<u>ANSWER</u>:  Paragraph 146 contains historical and political characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 146.

147.    The online fundraising solicitations described herein were not part of the so-called "dark web," which is accessible only by means of special software or authorization. Rather, each and every one of the websites cited in this Complaint is or was readily accessible online, including via a simple Google search.  As such, Defendants—all of whom are sophisticated international corporations with purportedly robust compliance functions and significant operations in Ukraine—were on notice and knew or should have known that they were providing support to the DPR and its terrorist activities.

ANSWER:  Paragraph 147 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that it owns a subsidiary with operations in the Ukraine and that it has a robust compliance function, and otherwise denies the allegations.  To the extent Paragraph 147 purports to characterize "websites cited in this Complaint," Sberbank respectfully refers the Court to those websites for their contents.

148.    The DPR relied on Defendants' services to efficiently raise funds that enabled them to carry out a violent campaign of intimidation and coercion.

ANSWER:  Paragraph 148 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 148.

149.    Because of its widely-recognized status as a (now sanctioned) terrorist group, the DPR does not maintain a central bank account in the name of the "Donetsk People's Republic" or otherwise.

ANSWER:  Paragraph 149 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 149.

150.    Through numerous websites, social media posts, and other online fora, the DPR's fundraisers brazenly advertised ways to donate to the DPR, including through sending money to accounts with, or bank cards issued by, Defendants Sberbank and VTB Bank. The DPR also openly and notoriously detailed ways to donate to the DPR using the money transfer services of Defendants MoneyGram and Western Union.

ANSWER:  Paragraph 150 contains characterizations to which no response is required. To the extent Paragraph 150 purports to characterize "websites, social media posts, and other online fora," Sberbank respectfully refers the Court to those websites, posts, and fora for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 150.

151.    A May 24, 2014 post from a leading DPR fundraiser, Veche Interregional Public Organization ("Veche"), explained that: "A month ago, having received an appeal from representatives of the people's authorities of the Donetsk People's Republic, … Veche announced the creation of a fund to help self-defense units in South-Eastern Ukraine."[22]

ANSWER:  Paragraph 151 purports to quote from and characterize a May 24, 2014 post by Veche Interregional Public Organization ("Veche"), and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 151.  Footnote 22 purports to contain a citation to the Veche post described in Paragraph 151 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

152.    The May 24, 2014 post continued: "Thousands of concerned citizens of Russia, Ukraine, Belarus and foreign countries have already provided support to self-defense units.  The first tranche of charitable assistance received from concerned citizens and organizations in the amount of 1,100,000 rubles was transferred to representatives of the DPR leadership."

ANSWER:  Paragraph 152 purports to quote from and characterize a May 24, 2014 post by Veche, and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 152.

153.    Prior to the downing of MH17, the DPR issued a proclamation, signed by Igor Strelkov (Girkin), which formally incorporated and described these ongoing fundraising efforts under the auspices of the DPR's "Minister of Defense," Igor Strelkov, and the DPR's "Minister of Foreign Affairs," Ekaterina Gubareva.[23]

ANSWER:  To the extent Paragraph 153 purports to quote from and characterize a proclamation signed by Igor Strelkov, Sberbank respectfully refers the Court to that proclamation for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 153.  Footnote 23 purports to

---

[22]    "Assistance to the Southeast: New Arrivals and Humanitarian Aid," *available at* https://www.liveinternet.ru/users/blog_soldier/post325492735/

[23]    "Help of New Russia – Addresses and Details (Donetsk, Lugansk, Odessa, Refugees.)," *available at* http://www.golos-epohi.ru/?ELEMENT_ID12048

contain a citation to the proclamation described in Paragraph 153 to which no response is required, and Sberbank respectfully refers the Court to that proclamation for its contents.

154.     The proclamation, reproduced below, stated that the DPR formally entrusted responsibility for fundraising to certain of its members, who would be responsible for "accepting donations and other contributions from Governments, governmental and non-governmental organizations, business representatives and individuals."



ANSWER:     Paragraph 154 purports to quote from, characterize, and depict a proclamation signed by Igor Strelkov, and Sberbank respectfully refers the Court to that proclamation for its contents.  Sberbank otherwise denies the allegations in Paragraph 154.

155.     The order issued by the DPR was part of a pattern and practice whereby the DPR utilized a small, coordinated group of fundraisers, such as Humanitarian Battalion, Veche, and others, to procure funds for the use and benefit of the DPR's recurring terrorist acts.

ANSWER:  Paragraph 155 contains characterizations to which no response is required. To the extent Paragraph 155 purports to characterize a proclamation signed by Igor Strelkov, Sberbank respectfully refers the Court to that proclamation for its contents.  Sberbank otherwise

lacks knowledge or information sufficient to form a belief regarding the truth of the allegations

in Paragraph 155.

156.    The DPR's fundraisers were empowered, authorized, and endorsed by the DPR, which exerted ultimate control over the use of the funds raised.  To that end, the DPR's fundraisers repeatedly described how the DPR's leader at the time, Igor Strelkov, personally confirmed the receipt of funds and supplies.

ANSWER:  Paragraph 156 contains characterizations to which no response is required.

To the extent a response is required, Sberbank lacks knowledge or information sufficient to form

a belief regarding the truth of the allegations.

157.    Prior to the attack on MH17, Strelkov personally issued a video message to the DPR's supporters, publicly available on YouTube, which expressly stated that monetary support for the DPR should be sent to accounts held by the DPR's fundraisers, including Humanitarian Battalion.[24]

ANSWER:  To the extent Paragraph 157 purports to characterize a video message issued

by Igor Strelkov, Sberbank respectfully refers the Court to that message for its contents.

Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 157.  Footnote 24 purports to contain citations to the video

message described in Paragraph 157 to which no response is required, and Sberbank respectfully

refers the Court to that video message for its contents.

158.    Different DPR fundraisers often utilized the same bank accounts and/or email addresses in their online fundraising solicitations, reflecting a close degree of coordination overseen by the DPR and its leadership.  For example, numerous DPR fundraisers publicized the same bank account information for donations to the DPR's fundraiser Veche.  Similarly, many online solicitations seeking monetary support for the DPR were authored by a small number of well-known DPR members and fundraisers, including Alexander Zhuchkovsky, Boris Rozhin ("Colonel Cassad"), and Alexey Markov ("RedRat").

---

[24]    "Strelkov asks for help! YOURS," *available at* http://www.yaplakal.com/forum28/topic849790.html?hl; YouTube, "Gratitude of Igor Ivanovich Strelkov to the humanitarian battalion of New Russia," *available at* https://youtu.be/f0KZh8eBZUg

ANSWER:  Paragraph 158 contains characterizations to which no response is required. To the extent Paragraph 158 purports to characterize online fundraising solicitations, Sberbank respectfully refers the Court to those solicitations for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 158.

159.    The DPR's fundraisers openly publicized and embraced their close and direct ties to the DPR leadership, including Strelkov as well as the "foreign minister" of the DPR, Ekaterina Gubareva, and her husband, Pavel, who the U.S. government has described as "the self-proclaimed 'governor' of the so-called Donetsk People's Republic."[25]

ANSWER:  Paragraph 159 contains characterizations to which no response is required. To the extent Paragraph 159 purports to quote from and characterize a U.S. Treasury Department press release, Sberbank respectfully refers the Court to that press release for its contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 159.  Footnote 25 purports to contain a citation to the Treasury Department press release referenced in Paragraph 159 to which no response is required, and Sberbank respectfully refers the Court to that press release for its contents.

160.    The DPR relied on Defendants' services and material support to access funds that were essential for its procurement of weapons, ammunition, and other instruments of violence, which the DPR used to intimidate and coerce the Ukrainian government and civilian population, and to acquire and control territory, including the territory from which the DPR launched the missile that brought down the MH17 airplane.

ANSWER:  Paragraph 160 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 160.

---

[25]    U.S. Department of the Treasury, "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities," *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx

161.    The material support provided by Defendants created a diversified global supply chain of funding essential for the DPR's terrorist activities.  In addition to providing direct financial support to carry out terrorist attacks, the nature of the Defendants' support allowed the DPR to ensure both the sustainability of their tactical operations (in that Defendants' support facilitated a diversity of funders) and the ability to obfuscate the identity of other funding sources.  Without that global supply chain, and the benefits that came with it, the DPR's ability to carry out lethal tactical activities, including the attack on the MH17, would be substantially compromised.

ANSWER:  Paragraph 161 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 161.

162.    By enabling the DPR to solicit funds from the Russian diaspora around the world, including the three million members of the Russian diaspora located in the United States, Defendants provided the DPR with a steady flow of funding essential to the DPR's terrorist activities, including the purchase of lethal equipment and other supplies necessary for them.

ANSWER:  Paragraph 162 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 162.

## V.    Prior to the DPR's Terrorist Attack on MH17, Defendants Were Aware That They Were Providing Material Support and Financing to the DPR

163.    In April 2014, three months before the missile attack that killed Quinn and 297 other victims, media outlets reported on how this global supply chain, created and operated by Defendants, was providing funding and support necessary for the DPR and its affiliates to carry out their terrorist activities.

ANSWER:  Paragraph 163 consists of characterizations and legal conclusions to which no response is required.  To the extent Paragraph 163 purports to characterize public reporting by "media outlets," Sberbank respectfully refers the Court to that reporting for its contents. Sberbank otherwise denies the allegations in Paragraph 163.

164.    An April 19, 2014 article in *Forbes* discussed allegations from Ukraine's Attorney General that Defendant Sberbank was facilitating payments to Ukrainian soldiers "to join Russian separatists in east Ukraine." The article noted that the Ukraine

State Security Service "showcased to the media some items it seized from captured Russian spies and Ukrainian double-agents.  Sberbank payment cards were among the items."[26]

ANSWER:  Paragraph 164 purports to characterize an article in *Forbes*, and Sberbank respectfully refers the Court to that reporting for its contents.  Sberbank otherwise denies the allegations in Paragraph 164.  Footnote 26 purports to contain a citation to the *Forbes* article described in Paragraph 164 to which no response is required, and Sberbank respectfully refers the Court to that article for its contents.

165.   The April 19, 2014 article makes clear that Sberbank was aware of these allegations, noting that "Sberbank said it contacted the General Prosecutor's Office of Ukraine" to discuss the allegations.

ANSWER:  Paragraph 165 purports to characterize an article in *Forbes*, and Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise denies the allegations in Paragraph 165, except admits that it was aware of a statement by the acting Attorney General of Ukraine on the launch of a criminal investigation by Ukrainian enforcement agencies on the alleged availability of financing for terrorism in relation to the subsidiary bank of Sberbank of Russia in Ukraine.

166.   An April 16, 2014 article in *Reuters* titled, "Ukraine says investigating Russia's Sberbank for financing terrorists," quoted Ukraine's Acting Attorney General, Oleh Makhnitsky, as saying that: "A criminal investigation has been launched against, for example, Sberbank Russia, … for financing terrorism" in eastern Ukraine.

ANSWER:  Paragraph 166 purports to characterize an article in *Reuters*, and Sberbank respectfully refers the Court to that reporting for its contents. Sberbank otherwise denies the allegations in Paragraph 166.

---

[26]   Forbes, "Sberbank Denies Funding Pro-Russia 'Terrorists' in East Ukraine," *available at* https://www.forbes.com/sites/kenrapoza/2014/04/19/sberbank-denies-funding-pro-russia-terrorists-in-east-ukraine/#f01acc768fd

167.   An April 19, 2014 article in the *Kyiv Post* reported that "in recent months many social network groups have been calling for funds to support causes related to separatist movements in different regions of the country.  For example, to transfer aid to separatists and its affiliates, a specified account of the Ukrainian subsidiary of Sberbank of Russia and remittance systems . . .  are given."[27]

ANSWER:   Paragraph 167 purports to characterize an article in the *Kyiv Post*, and Sberbank respectfully refers the Court to that reporting for its contents.  Sberbank otherwise denies the allegations in Paragraph 167.  Footnote 27 purports to contain a citation to the *Kyiv Post* article described in Paragraph 167 to which no response is required, and Sberbank respectfully refers the Court to that article for its contents.

168.   The *Kyiv Post* article further reported that Defendant VTB Bank was also under investigation by Ukrainian authorities for violating the law on "crime and terrorist financing" by providing banking services to terrorist groups in the Donbass.

ANSWER:   Paragraph 168 purports to characterize an article in the *Kyiv Post*, and Sberbank respectfully refers the Court to that reporting for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 168.

169.   The *Kyiv Post* article references statements from both Defendants Sberbank and VTB Bank that confirm their actual knowledge of the investigation initiated by Ukrainian authorities into their support for the DPR.  The article specifically references a statement from Sberbank regarding a purported "internal investigation" undertaken in response to these allegations of terrorism financing.

ANSWER:   To the extent Paragraph 169 purports to characterize an article in the *Kyiv Post*, Sberbank respectfully refers the Court to that reporting for its contents.  Sberbank otherwise denies the allegations in Paragraph 169, except admits that it was aware of a statement

---

[27]   Kyiv Post, "Russian Banks Refute Accusations of Financing Separatists in Eastern Ukraine," *available at* https://www.kyivpost.com/article/content/war-against-ukraine/russian-banks-refute-accusations-of-financing-terrorism-in-eastern-ukraine-344247.html

by the acting Attorney General of Ukraine on the launch of a criminal investigation by Ukrainian enforcement agencies on the alleged availability of financing for terrorism in relation to the subsidiary bank of Sberbank of Russia in Ukraine.

170.    Thus, by no later than April 2014, both Defendants Sberbank and VTB Bank had actual knowledge that they were providing material support and financing to the DPR and its affiliates, including through the DPR's open and notorious online fundraising campaign described herein.

ANSWER:  Paragraph 170 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 170.

171.    By June 2015, the *New York Times* reported that the DPR and its affiliates had "raised millions of dollars" through these online fundraising efforts in support of their terrorist activities.  Specifically, in an article titled, "Russian Groups Crowdfund the War in Ukraine," the *New York Times* reported that, beginning in May 2014, more than a dozen groups had "solicited funds from abroad using large American and European financial institutions, including banks and companies like Western Union."

ANSWER:  Paragraph 171 purports to quote from and characterize an article in the *New York Times*, and Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise denies the allegations in Paragraph 171.

172.    The article explained that one such group, Humanitarian Battalion—led by former "foreign minister" of the DPR, Ekaterina Gubareva, and her husband Pavel, the former "governor" of the DPR—listed instructions on its website for "how to wire dollars or euros into [an] account at Sberbank using correspondent accounts at Citibank, JPMorgan Chase," among other banks in New York City.  Between May 2014 and June 2015, Humanitarian Battalion reported raising "$213,000" in support of the DPR and its affiliates.

ANSWER:  To the extent Paragraph 172 purports to quote from and characterize an article in the *New York Times*, Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 172.

173.   The *New York Times* further reported that a representative from an unnamed international bank confirmed that U.S. dollars had passed through the bank to Veche, which is part of the DPR's fundraising arm.  Veche has openly advertised VTB Bank correspondent accounts with JPMorgan Chase Bank, among other banks located in New York City, to handle U.S. dollar transactions.  As reported by the *New York Times*, Veche has also provided instructions online for how to send funds to a Sberbank account using correspondent accounts at Citibank and JPMorgan Chase Bank, among other banks in New York City.

ANSWER:  To the extent Paragraph 173 purports to characterize an article in the *New York Times*, Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 173.

174.   The *New York Times* also reported that a representative from an unnamed international bank confirmed that it had "detected illicit donations," including an attempted contribution to Humanitarian Battalion.

ANSWER:  Paragraph 174 purports to quote from and characterize an article in the *New York Times*, and Sberbank respectfully refers the Court to that article for its contents.  Sberbank otherwise denies the allegations in Paragraph 174.

175.   Shortly after publication of the *New York Times* article, one of the DPR's top fundraisers, Boris Rozhin, who goes by the online alias "Colonel Cassad," reposted the article with a postscript stating: "at the initial stages, support for Novorossia by Russian citizens has become perhaps the largest crowdfunding campaign in post-Soviet Russia. In fact, foreign technology has played an important role in the horizontal self-organization of the people, which in the initial stages of the uprising ensured the survival of the people's republics hanging on thin threads of state and non-state support."[28]

ANSWER:  To the extent Paragraph 175 purports to quote from and characterize an online post by Boris Rozhin, Sberbank respectfully refers the Court to that post for its contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 175.  Footnote 28 purports to contain a citation to the post

---

[28]   Colonel Cassad, "Russian Crowdfunding and the War in Ukraine," *available at* https://colonelcassad.livejournal.com/2231796.html

by Boris Rozhin described in Paragraph 175 to which no response is required, and Sberbank

respectfully refers the Court to that post for its contents.

176.    As Rozhin's statement makes clear, the DPR has expressly claimed that the material support and financing facilitated by Defendants was essential to its very survival as a terrorist group during the first months of its existence, and leading up to the DPR's terrorist attack on MH17.

ANSWER:  Paragraph 176 consists of characterizations and legal conclusions to which

no response is required.  To the extent a response is required, Sberbank denies the allegations in

Paragraph 176.

## VI.    Defendants Repeatedly Provided Material Support and Financing to DPR Fundraisers That Openly and Notoriously Advertised That the DPR Used Defendants 'Support to Carry Out Terrorist Acts

177.    Prior to the attack on MH17, the DPR made no secret as to how it raised funds to support its terrorist activities.

ANSWER:  Paragraph 177 consists of characterizations and legal conclusions to which

no response is required.  To the extent a response is required, Sberbank lacks knowledge or

information sufficient to form a belief regarding the truth of the allegations in Paragraph 177.

178.    Many of the DPR's fundraisers provide on their websites an explanation of how to wire U.S. dollars from abroad into accounts held at Russian banks, such as Defendants Sberbank or VTB Bank, using correspondent accounts in New York.  The websites brazenly advertise their account numbers with Sberbank, VTB Bank, and the correspondent banks in New York.

ANSWER:  Paragraph 178 consists of characterizations to which no response is required.

To the extent Paragraph 178 purports to characterize the websites of "[m]any of the DPR's

fundraisers," Sberbank respectfully refers the Court to those websites for their contents.

Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 178.

179.    Many of the DPR's fundraisers also openly and notoriously listed account holder and email address information for money transfers through Western Union and MoneyGram.

ANSWER:    Paragraph 179 consists of characterizations to which no response is required.  To the extent Paragraph 179 purports to characterize the websites of "the DPR's fundraisers," Sberbank respectfully refers the Court to those websites for their contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 179.

180.    In order to encourage its financial supporters, the DPR went to great lengths to provide maximum transparency that reflected both the flow of funds into its fundraising accounts as well as how the funds were quickly used to purchase lethal equipment and weaponry necessary for the DPR's terrorist activities, and documented the delivery of this equipment to the DPR's field personnel.

ANSWER:  Paragraph 180 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 180.

181.    To that end, in the months before the attack on MH17, the DPR, by and through its fundraisers, published online detailed ledgers reflecting the funds that the DPR received using the services and support provided by Defendants.  The DPR's fundraisers also posted frequent updates, including messages from DPR leaders such as Strelkov, alongside photographs and/or videos, showing that the DPR immediately utilized these funds to purchase necessary lethal weapons and other tactical equipment.

ANSWER:   To the extent Paragraph 181 purports to characterize published online ledgers and updates, Sberbank respectfully refers the Court to those websites for their contents. Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 181.

182.    The DPR's fundraisers described herein were not the exclusive means by which Defendants provided material support to the DPR.  The DPR also relied upon and received material support from Defendants through additional DPR fundraisers.

ANSWER:  Paragraph 182 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 182.

A.   Defendants Repeatedly Provided Material Support and Financing Directly to Two of the DPR's Most Notorious Leaders, Pavel Gubarev and Ekaterina Gubareva

183.   As described above, Pavel Gubarev and Ekaterina Gubareva were two of the most prominent leaders of the DPR from its inception up through the DPR's attack on MH17. Pavel served as the "governor" of the DPR, and Ekaterina as the DPR's "foreign minister."

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 183.

184.   In their capacity as leaders of the DPR, Pavel Gubarev and Ekaterina Gubareva openly and notoriously raised funds to support the DPR's terrorist activities, including as the co-heads of a DPR group called Humanitarian Battalion, as well as through a DPR group called Women's Battalion of People's Militia Donbass.

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 184.

185.   Humanitarian Battalion and Women's Battalion of People's Militia Donbass are DPR fundraisers, and each constitutes part of the DPR.  Their exclusive purpose was and is to raise funds for the violent terrorist activities of the DPR and its affiliates.  At all relevant times, Humanitarian Battalion and Women's Battalion of People's Militia Donbass openly and notoriously advertised that the ultimate beneficiary of funds sent to their accounts would be the DPR, namely its leaders Pavel Gubarev and/or Ekaterina Gubareva.

ANSWER:  Paragraph 185 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 185.

186.   Despite its name, Humanitarian Battalion openly and publicly posted pictures online showing that it was actually purchasing tactical and lethal supplies, including helmets, knives, body armor, and night vision devices.

ANSWER:   To the extent Paragraph 186 purports to characterize online posts by Humanitarian Battalion, Sberbank respectfully refers the Court to those posts for their contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 186.

187.    Prior to the attack on MH17, Pavel Gubarev and Ekaterina Gubareva openly and notoriously solicited funds for the DPR using the material support of Defendants Sberbank and VTB Bank, including as follows:

ANSWER:  Paragraph 187 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 187.

188.    Pavel Gubarev openly and publicly solicited funds for the DPR, including by providing the account details to donate to a Sberbank bank card.[29]

ANSWER:  To the extent Paragraph 188 purports to characterize a blog post by Pavel Gubarev, Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 188.  Footnote 29 purports to contain a citation to the blog post described in Paragraph 188 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

189.    Similarly, prior to the downing of MH17, Humanitarian Battalion provided the same account information with Sberbank.[30]  Humanitarian Battalion re-posted its Sberbank card number numerous times online throughout June and July 2014, prior to the attack on MH17.

---

[29]    Pavel Gubarev's Blog, "Approved by the Minister of Defense of the DNI Strelkov I.I. 'Regulation on the Mobilization Department of the Ministry of Defense of the DPR.,'" *available at* https://web.archive.org/web/20140625043619/http://gubarev.org/category/novosti/

[30]    VK, "Humanitarian Aid to Donbass / Gumbat Novorossia," *available at* https://vk.com/battalion_novorossia?w=wall-72625304_168

<u>ANSWER</u>:  To the extent Paragraph 189 purports to characterize "numerous" online posts by Humanitarian Battalion, Sberbank respectfully refers the Court to those posts for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 189.  Footnote 30 purports to contain a citation to an online post described in Paragraph 189 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

190.    In a video posted online, including on YouTube, weeks prior to the MH17 attack, the DPR's "commander-in-chief," Igor Strelkov, openly and brazenly solicited funds to the same account at Sberbank, including by holding up a piece of paper listing the full Sberbank account number, as shown in a frame of the video featuring Igor Strelkov copied below:[31]



<u>ANSWER</u>:  To the extent Paragraph 190 purports to characterize a video posted online, Sberbank respectfully refers the Court to that video for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 190.  Footnote 31 purports to contain citations to the video described in Paragraph 190

---

[31]    "Strelkov asks for help! YOURS," *available at* http://www.yaplakal.com/forum28/topic849790.html?hl=; YouTube, "Gratitude of Igor Ivanovich Strelkov to the humanitarian battalion of New Russia," *available at* https://youtu.be/f0KZh8eBZUg

to which no response is required, and Sberbank respectfully refers the Court to that video for its contents.

191.   The DPR leaders' solicitations for U.S. dollar donations through their Sberbank account were successful.  By means of example, just prior to the murder of Quinn, Sberbank used its correspondent bank accounts in this District to process two transfers on June 9 and July 2, 2014, from individuals in Maryland and New Jersey. [32]  These transactions utilized and were made possible by Defendant Sberbank's deliberate and intentional use of correspondent bank accounts in this District, in this instance Defendant Sberbank's correspondent accounts at Bank of America and Bank of New York Mellon.

ANSWER:   Paragraph 191 and Footnote 32 contain characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 191, except admits that transfers took place on or about June 9 and July 2, 2014 from individuals apparently in Maryland and New Jersey via its correspondent bank accounts in New York City at Bank of America and Bank of New York Mellon.

192.   A July 4, 2014 financial report provided online by Humanitarian Battalion noted that "citizens from different countries transfer money to Ekaterina Gubareva's accounts," totaling "significant amounts."

ANSWER:  Paragraph 192 purports to quote from and characterize a financial report by Humanitarian Battalion, and Sberbank respectfully refers the Court to that report for its contents.  Sberbank otherwise denies the allegations in Paragraph 192.

193.   The financial report stated that on June 13, 2014, Humanitarian Battalion transferred "350 thousand rubles" to the DPR, as part of a total expenditure of 1,762,690 rubles on behalf of the DPR in June 2014.  Among the items purchased by Humanitarian Battalion for the DPR were "knives," "tactical gloves," "collimator sights," and

---

[32]   These donors adhered closely to the DPR's direction in some of its advertising for donors to cite charitable purposes, as described in Paragraph 291, *infra*.

accessories "for snipers."[33]   The financial report expressly noted that these purchases were "made by Ekaterina Gubareva [the "foreign minister" of the DPR] in June 2014."

ANSWER:  Paragraph 193 purports to quote from and characterize a financial report by Humanitarian Battalion, and Sberbank respectfully refers the Court to that report for its contents. Sberbank otherwise denies the allegations in Paragraph 193.  Footnote 33 purports to contain a citation to the report described in Paragraph 193 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

194.   A May 21, 2014 post by the "Women's Battalion of People's Militia Donbass" also solicited funds for the DPR to a VTB account held by Ekaterina Gubareva, the "foreign minister" of the DPR.  The May 21, 2014 post stated that the only way to transfer US Dollars to the DPR's "foreign minister" Gubareva was through VTB's New York correspondent accounts at Deutsche Bank Trust Company Americas, the details of which were published openly online.[34]

ANSWER:  To the extent Paragraph 194 purports to characterize a post by the "Women's Battalion of People's Militia Donbass," Sberbank respectfully refers the Court to that post for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 194.  Footnote 34 purports to contain citations to the post described in Paragraph 194 to which no response is required, and Sberbank respectfully refers the Court to that video for its contents.

195.   At all relevant times, the DPR utilized the funds raised by Humanitarian Battalion and Women's Battalion of People's Militia Donbass—including those funds raised relying upon the material support of Defendants Sberbank and VTB Bank—in furtherance of its terrorist activities.

---

[33]   VK, "Humanitarian Aid to Donbass / Gumbat Novorossia" *available at* https://vk.com/battalion_novorossia?w=wall-72625304_1671

[34]   VK, "Women's Battalion of People Military Donbass," *available at* https://vk.com/topic-69858324_29901476

ANSWER:  Paragraph 195 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 195.

B.     Defendants Repeatedly Provided Material Support and Financing to the DPR Through DPR Fundraisers Who Boasted About Providing Lethal Supplies to Igor Strelkov and Other DPR Leaders

**DPR Fundraiser Save Donbass**

196.    The Novorossia and Donbass Assistance Fund (a.k.a.  "Save Donbass") solicited funds on its website to provide lethal support directly to the DPR.  Save Donbass is one of the DPR's fundraisers and constitutes part of the DPR.  Save Donbass openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

ANSWER:  Paragraph 196 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 196 purports to characterize the website of Novorossia and Donbass Assistance Fund ("Save Donbass"), Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations.

197.    The "Head" of Save Donbass, Gleb Kornilov, was a prominent DPR member and fundraiser.  Kornilov has been profiled in several international media outlets due to his role raising money for the DPR, and is the subject of a criminal case in Ukraine "concerning terrorism financing offenses." (Government of Ukraine's Brief ¶ 197 & n.465.)

ANSWER:  To the extent Paragraph 197 purports to characterize public reporting by "several international media outlets" and to quote from and characterize the Government of Ukraine's Brief, Sberbank respectfully refers the Court to that reporting and brief for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 197.

198.    Prior to the attack on MH17, Save Donbass specifically advertised that funds sent to its accounts would be provided directly to the Commander-in-Chief of the DPR, Igor

Strelkov, as well as DPR "governor" Pavel Gubarev, and DPR "foreign minister" Ekaterina Gubareva.

ANSWER:  To the extent Paragraph 198 purports to characterize advertisements by Save Donbass, Sberbank respectfully refers the Court to those advertisements for their contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 198.

199.    Specifically, the Save Donbass website stated, in a large font and all capital letters, that "HELP WILL REACH IGOR STRELKOV AND PAVEL GUBAREV."[35]

ANSWER:  Paragraph 199 purports to quote from and characterize the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 199.  Footnote 35 purports to contain a citation to the website described in Paragraph 199 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

200.    The Save Donbass website continued: "We guarantee that all assistance … is delivered strictly to the hands of those who can rightfully be called Heroes of Donbass. First of all, these are Igor Strelkov, [and] Pavel and Ekaterina Gubarev." Save Donbass explained that its "main mission" was to "Deliver assistance to Igor Strelkov or Pavel Gubarev," and that it would "bypass[] intermediaries" to deliver material support "directly" to the DPR.

ANSWER:  Paragraph 200 purports to quote from and characterize the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph  200.

201.    In June 2014, the Save Donbass website stated that "we provide maximum transparency in fundraising and spending" noting that its donation counter was updated on the website "once a day," and "Once a week, screenshots of all accounts are published."

---

[35]   Save Donbass, "Our Mission," *available at* http://web.archive.org/web/20140627092814/http:/spasidonbass.ru/our_mission/

ANSWER:  Paragraph 201 purports to quote from and characterize the June 2014 version of the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 201.

202.    The goods requested by Save Donbass include lethal equipment, such as ammunition for AK automatic rifles, ammunition belts, laser range finders, optical sights for AK automatic rifles, thermal imaging scopes, night vision scopes, and radio equipment.

ANSWER:  To the extent Paragraph 202 purports to characterize the June 2014 version of the Save Donbass website, Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 202.

203.    As of June 26, 2014, the Save Donbass website referred to these items as the "List of Strelkov,"[36] and noted that the list was "made only with the agreement of the commander of the militia of the Donetsk People's Republic Igor Strelkov" and that "Procurement of goods occurs only after a meeting with Igor Strelkov."[37]

---

[36]    Save Donbass, "Homepage," *available at* http://web.archive.org/web/20140626030034/http://spasidonbass.ru/

[37]    Save Donbass, "List of Strelkov," *available at* http://web.archive.org/web/20140710041531/http://spasidonbass.ru/#strelkov (highlighting added); see also http://web.archive.org/web/20140627090356/http://spasidonbass.ru/services-view/our-mission/



**ANSWER:**  To the extent Paragraph 203 purports to quote from, characterize, and depict pages on the Save Donbass website as of June 26, 2014, Sberbank respectfully refers the Court to those pages for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 203.  Footnotes 36 and 37 purport to contain citations to the pages described in Paragraph 203 to which no response is required, and Sberbank respectfully refers the Court to those pages for their contents.

204.    Prior to the DPR's attack on MH17, Save Donbass openly and notoriously solicited funds for the DPR using the material support of Defendants Sberbank, Western Union, and MoneyGram, including as follows:

ANSWER:  Paragraph 204 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 204.

205.    Throughout June and July 2014, the Save Donbass website provided detailed reports of transfers into and withdrawals from its accounts with Defendant Sberbank, along with a description of money transferred through Defendant Western Union.[38]

ANSWER:  Paragraph 205 purports to characterize the June and July 2014 versions of the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 205.  Footnote 38 purports to contain a citation to the website described in Paragraph 205 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

206.    For example, a July 3, 2014 report for the period June 27 through July 3, 2014 stated that Save Donbass had received donations of 647,531 rubles, and purchased supplies for the DPR and its affiliates costing 204,484 rubles.  A report from July 15, 2014 for the period July 4 through July 14, 2014 states that Save Donbass received 17,000 rubles in donations sent through Western Union.

ANSWER:  Paragraph 206 purports to characterize reports by Save Donbass dated July 3, 2014 and July 15, 2014, and Sberbank respectfully refers the Court to those reports for their contents.  Sberbank otherwise denies the allegations in Paragraph 206.

207.    The July 15, 2014 report also listed the cost of purchased supplies, including "Prepayment for armored vehicles," and included videos documenting that "The cargo was delivered.  Confirmation from Igor Strelkov . . . ."[39]

ANSWER:  Paragraph 207 purports to quote from and characterize a July 15, 2014 report by Save Donbass, and Sberbank respectfully refers the Court to that report for its contents.

---

[38]  38 Save Donbass, "Our Reports," *available at*
https://web.archive.org/web/20140707035228/http://spasidonbass.ru:80/reports

[39]  Save Donbass, "Our Reports," *available at*
https://web.archive.org/web/20140721081134/http://spasidonbass.ru/reports/

Sberbank otherwise denies the allegations in Paragraph 207.  Footnote 39 purports to contain a citation to the report described in Paragraph 207 to which no response is required, and Sberbank respectfully refers the Court to that report for its contents.

208.    Prior to the attack on MH17, the Save Donbass website openly and publicly provided the recipient name and card number for its Sberbank card, noting that "Sberbank cardholders are requested to make direct payments to our card number." The Save Donbass website also openly and publicly listed the recipient name and email information for money transfers to be sent through Western Union or MoneyGram.

ANSWER:  Paragraph 208 purports to quote from and characterize the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 208.

209.    This information regarding how to send transfers of money to the DPR through Western Union or MoneyGram was then reposted on other websites across the internet, including a July 13, 2014 post on the website "Socialist Basque Country," which reports having nearly 6 million total page views.[40]

ANSWER:  To the extent Paragraph 209 purports to quote from and characterize a July 13, 2014 post on the website "Socialist Basque Country" and "other websites across the internet," Sberbank respectfully refers the Court to those websites for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 209.  Footnote 40 purports to contain a citation to the post on the website "Socialist Basque Country" described in Paragraph 209 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

210.    At all relevant times, the DPR utilized the funds raised by Save Donbass—including those funds raised relying upon the material support of Defendants Sberbank, Western Union, and MoneyGram—in furtherance of its terrorist activities.

---

[40]    Euskal Herria Sozialista, "The Militias Need Antifascist Help!!!," *available at* http://euskalherriasozialista.blogspot.com/2014/07/las-milicias-necesitan-ayuda.html

ANSWER:  Paragraph 210 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 210.

211.    The Save Donbass website currently states that monetary donations can be sent through Defendants Sberbank and Western Union.

ANSWER:  Paragraph 211 purports to characterize the Save Donbass website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 211.

### DPR Fundraiser Center for New Russia

212.    DPR fundraiser Center for New Russia has solicited and continues to solicit funds on its website (http://kcpn.info) to purchase lethal equipment for the DPR and its affiliated groups dedicated to the Novorossiya cause.  Center for New Russia is one of the DPR's fundraisers and constitutes part of the DPR, and its exclusive purpose was and is to raise funds for the violent terrorist activities of the DPR and its affiliates.

ANSWER:  Paragraph 212 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 212 purports to characterize the website of the Center for New Russia, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations.

213.    At all relevant times, Center for New Russia openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

ANSWER:  Paragraph 213 consists of characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 213.

214.    Prior to the attack on MH17, the Center for New Russia website openly and notoriously solicited funds for the DPR using the material support of Defendants Sberbank, VTB Bank, and Western Union, including as follows:

ANSWER:  Paragraph 214 consists of characterizations and legal conclusions to which no response is required.  To the extent Paragraph 214 purports to characterize the Center for New Russia website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations.

215.    The Center for New Russia website indicated that "For Moscow residents, the most convenient means of transferring money is Sberbank."  The Center for New Russia openly and publicly provided its bank account and card numbers with Sberbank on its website.

ANSWER:  Paragraph 215 purports to quote from and characterize the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 215.

216.    The Center for New Russia website also openly and publicly listed an account number with VTB Bank, including New York City correspondent bank information "for transfers in U[nited] S[tates] D[ollars]." The Center for New Russia website noted that "For holders of VTB 24 bank cards and foreign citizens a special multicurrency account is established."

ANSWER:  Paragraph 216 purports to quote from and characterize the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 216.

217.    The Center for New Russia website openly and publicly provided the name, email address, and telephone number for an individual (Alexey Markov, a prominent DPR member and fundraiser, also known as "RedRat") who could receive money transfers for the DPR via Western Union.  The Center for New Russia website stated: "Western Union transfers continue to be popular." The Center for New Russia website further stated that Western Union was the "only" option "if you need to transfer cash currency."

ANSWER:  To the extent Paragraph 217 purports to quote from and characterize the Center for New Russia website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 217.

218.    The Center for New Russia website currently indicates that funds can be transferred to the organization through Defendants Sberbank and VTB Bank.[41]

ANSWER:  Paragraph 218 purports to characterize the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 218.  Footnote 41 purports to contain a citation to the website described in Paragraph 218 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

219.    At all relevant times, the DPR utilized the funds raised by Center for New Russia—including those funds raised relying upon the material support of Defendants Sberbank, VTB Bank, and Western Union, as described below—in furtherance of its terrorist activities.

ANSWER:  Paragraph 219 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 219.

220.    Notably, prior to the attack on MH17, Center for New Russia repeatedly emphasized its receipt of U.S. dollar donations, while simultaneously advertising correspondent bank accounts in New York City for the purpose of transmitting U.S. dollar donations.  For example, a Center for New Russia post specifically documented "$4000 transferred" to the Center for New Russia in the weeks leading up to the attack on MH17.[42]  Separately, a Financial Report posted online by the Center for New Russia reflects the receipt of 4,000 U.S. dollars on June 26, 2014 from "well-wishers."[43]

ANSWER:  Paragraph 220 purports to quote from and characterize a Center for New Russia post and financial report and to characterize "repeated[]" other statements by the Center

---

[41]    Center for New Russia, "How else can I send money," *available at* http://kcpn.info/help (last accessed September 11, 2019).

[42]    Center for New Russia, "Cash collections in St. Petersburg department," *available at* https://tinyurl.com/y2dcu3ve

[43]    Center for New Russia, "Report of the St. Petersburg Branch of the KSCP," *available at* https://web.archive.org/web/20141104001122/http://kcpn.info/node/80

for New Russia, Sberbank respectfully refers the Court to that post and report and those other statements for their contents.  Sberbank otherwise denies the allegations in Paragraph 220. Footnotes 42 and 43 purport to contain citations to the post and report described in Paragraph 220 to which no response is required, and Sberbank respectfully refers the Court to that post and report for their contents.

221.    At the time of these U.S. dollar transfers, Center for New Russia solicited funds for the DPR utilizing the services of Defendants Sberbank, VTB Bank, and Western Union.

ANSWER:  Paragraph 221 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 221.

222.    In the weeks before the terrorist attack on MH17, the Center for New Russia website openly detailed transfers of money directly to the DPR's "Commander-in-Chief," Igor Strelkov, who has been criminally charged for his leadership role in the downing of MH17.

ANSWER:  To the extent Paragraph 222 purports to characterize the Center for New Russia website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 222.

223.    Prior to the attack on MH17, Center for New Russia's website stated: "Due to the fact that fund-raising activities to purchase the necessary military equipment for Novorossia militia have outgrown the scope of one-time action . . . we decided to establish the Coordination Center for Novorossia (KCPN), which further will be engaged in all organizational activities to raise funds, purchase and forwarding of goods."[44]

ANSWER:  Paragraph 223 purports to quote from and characterize the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents.

---

[44]   Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20140711024026/http://kcpn.info/

Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 223. Footnote 44 purports to contain a citation to the website described in Paragraph 223 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

224.    Prior to the attack on MH17, a post on the Center for New Russia website, titled, "Why do we do this?", stated that "our main task now is to help militia fighters knock out punishers beyond the borders of their republic . . . . And in order for our assistance to be effective, we work only with specific detachments conducting combat operations, and only upon requests made by their command."[45]

ANSWER:  Paragraph 224 purports to quote from and characterize a post on the Center for New Russia website, and Sberbank respectfully refers the Court to that post for its contents. Sberbank otherwise denies the allegations in Paragraph 224. Footnote 45 purports to contain a citation to the post described in Paragraph 224 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

225.    Prior to the attack on MH17, the Center for New Russia website stated that "We are NOT engaged in humanitarian assistance. We are engaged in non-humanitarian assistance." The Center for New Russia website further explained that the supplies the DPR and its affiliates needed for their efforts "requires money," and that financial support was essential to "support the struggle of our brothers in Novorossiya."

ANSWER:  Paragraph 225 purports to quote from and characterize the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 225.

226.    For all relevant periods of this Complaint and to this day, the Center for New Russia website expressly solicits funds to purchase bulletproof vests, helmets, uniforms, rifle scopes, night vision devices, and walkie-talkies for terrorist forces, noting: "Without constant assistance with military equipment, the guys simply cannot survive."[46] The

---

[45]    Center for New Russia, "Why Are We Doing This?," *available at* https://tinyurl.com/y6k7r7pd

[46]    Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20190306123058/kcpn.info/appeal

Center for New Russia website also directly appeals for volunteers willing to assist the DPR.

ANSWER:   To the extent Paragraph 226 purports to quote from and characterize the Center for New Russia website, Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 226.   Footnote 46 purports to contain a citation to the website described in Paragraph 226 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

227.   As of May 2014, the Center for New Russia website stated that solicited funds had been used to purchase communications equipment (including those used with armored vehicles), telescopes, binoculars, navigational equipment, body armor, and helmets for DPR terrorists.[47] Another post on the Center for New Russia website from before the attack on MH17 displayed a picture of body armor stored in a warehouse, boasting, "As you can see for yourself, the warehouse is literally breaking down with non-humanitarian aid."[48]

ANSWER:   Paragraph 227 purports to quote from and characterize posts on the Center for New Russia website, and Sberbank respectfully refers the Court to those posts for their contents.   Sberbank denies the allegations in Paragraph 227.   Footnotes 47 and 48 purport to contain citations to the posts described in Paragraph 227 to which no response is required, and Sberbank respectfully refers the Court to those posts for their contents.

228.   A May 20, 2014 post on the Center for New Russia website recounted—and showed pictures of—the specific tactical and lethal equipment provided to the DPR and its affiliates, including "45 bulletproof vests and helmets," as well as accessories for AK rifles.[49] The post further stated: "thanks to your help, they are now equipped enough to

---

[47]   Center for New Russia, "Appeal to Citizens of Russia," *available at* https://web.archive.org/web/20140623132118/https://kcpn.info/

[48]   Center for New Russia, "KTSPN Warehouse in Moscow," *available at* https://tinyurl.com/y6dqbboe

[49]   Center for New Russia, "First Shipment Delivered," *available at* https://web.archive.org/web/20150325020733/http://kcpn.info/node/7

perform combat missions . . . ." Among the pictures featured on the website was the following photograph, which reflects lethal and tactical equipment including bulletproof vests and weapon sights:



ANSWER:  Paragraph 228 purports to quote from, characterize, and depict a May 20, 2014 post on the Center for New Russia website, and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 228.  Footnote 49 purports to contain a citation to the post described in Paragraph 228 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

229.    Another post that day provided a "Financial Report for May 10-19" of 2014.  This Financial Report broke down in detail the sources and uses of Center for New Russia's recent funding, including a list of the funds transferred to and withdrawn from Center for New Russia's Sberbank account, resulting in a "356,555,064" ruble "balance of money on the account."

ANSWER:  Paragraph 229 purports to quote from and characterize a May 20, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that report for its contents.  Sberbank otherwise denies the allegations in Paragraph 229.

230.    The May 20, 2014 Financial Report further stated that Center for New Russia had received "$1000" in cash "from Sergey from the USA to Western Union," along with 215 euros sent via Western Union from Germany.[50]



ANSWER:   Paragraph 230 purports to quote from, characterize, and depict a May 20, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that report for its contents.   Sberbank otherwise denies the allegations in Paragraph 230. Footnote 50 purports to contain a citation to a website containing English translations of excerpts from the report described in Paragraph 230 to which no response is required, and Sberbank respectfully refers the Court to the cited website for its contents.

---

[50]    See English translation of excerpts from the Center for New Russia Financial Report for May 10-19, 2014, *available at* https://web.archive.org/web/20150325211921/http://kcpn.info/node/6 (highlighting added).

231.    Subsequent posts throughout June and July 2014 provided periodic updates on "collected and spent money, as well as delivered cargo," which included tactical and lethal equipment such as "sniper rifle scopes," "masks for snipers," "camouflage skins for snipers," "body armor," "night vision devices," and "sniper machine gun sight ... created specifically for aimed shooting from heavy machine gun ... at a distance of up to 1500-2000m."

ANSWER:  Paragraph 231 purports to quote from and characterize June and July 2014 posts on the Center for New Russia website, and Sberbank respectfully refers the Court to those posts for their contents.  Sberbank otherwise denies the allegations in Paragraph 231.

232.    These posts also euphemistically referred to the purchase of automatic weapons, which are referred to as "musical instruments."

ANSWER:  To the extent Paragraph 232 purports to quote from and characterize June and July 2014 posts on the Center for New Russia website, Sberbank respectfully refers the Court to those posts for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 232.

233.    For instance, a June 11, 2014 post titled "Musical instruments," shows a picture of a sniper rifle (copied below), and states: "By your efforts and assistance, the guys were able to afford to play the trombone."[51]

---

[51]    Center for New Russia, "Musical instruments," *available at* https://tinyurl.com/yxonoqbt



ANSWER:  To the extent Paragraph 233 purports to quote from, characterize, and depict a June 11, 2014 post on the Center for New Russia website, Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 233.  Footnote 51 purports to contain a citation to the post described in Paragraph 233 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

234.   The sign on the sniper rile mentioning "RedRat" refers to the Center for New Russia's leader, Alexey Markov, a prominent DPR member and fundraiser who also goes by "RedRat," and who posted many of the Center for New Russia's online updates during the relevant period under the name "RedRat."

ANSWER:  To the extent Paragraph 234 purports to quote from and characterize a June 11, 2014 post on the Center for New Russia website and to characterize "many of the Center for New Russia's online updates during the relevant period," Sberbank respectfully refers the Court to that post and those online updates for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 234.

235.    The Center for New Russia website included numerous pictures (including those copied below) documenting the delivery of supplies to the DPR and its affiliates.[52]





ANSWER:  Paragraph 235 purports to characterize and depict the Center for New Russia website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 235.  Footnote 52 purports to contain a citation to

---

[52]    Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140924064744/http://kcpn.info/reports

the website described in Paragraph 235 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

236.    A June 5, 2014 post titled "Two more shipments reached destination" described the delivery of lethal supplies to the DPR, including "night vision binoculars," "10 packs of lighting missiles with starters," and "masks for snipers."[53]   The post also showed pictures of the supplies, such as camouflage, combat boots, and night vision binoculars:

---

[53]    Center for New Russia, "Two more shipments reached destination," *available at* https://tinyurl.com/y6j_ypso



ANSWER:  Paragraph 236 purports to quote from, characterize, and depict a June 5, 2014 post on the Center for New Russia website, and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 236.  Footnote 53 purports to contain a citation to the post described in Paragraph 236 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

237.    A Financial Report posted on June 5, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "211,000" ruble "payment for uniforms . . .  and camouflage."

<u>ANSWER</u>:   Paragraph 237 purports to quote from and characterize a June 5, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.   Sberbank otherwise denies the allegations in Paragraph 237.

238.   The June 5, 2014 Financial Report further described six different donations sent to Center for New Russia through Defendant Western Union, including three sent in U.S. dollars: "$1,500.00 from Anton V.," "$200.00 from Inna Sablina," and "$100.00 from Olga Levine," resulting in a cash balance of $2,800 U.S. dollars.   The Financial Report also reflects money transfers during this period to Center for New Russia using Western Union that totaled approximately 39,300 rubles.[54]



<u>ANSWER</u>:   Paragraph 238 purports to quote from, characterize, and depict a June 5, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the

---

[54]   *See* English translation of excerpts from the Center for New Russia Financial Report for May 20–June 5, 2014, *available at* https://web.archive.org/web/20150325212035/http://kcpn.info/node/5 (highlighting added).

Court to that report for its contents.  Sberbank otherwise denies the allegations in Paragraph 238.

Footnote 50 purports to contain a citation to a website containing English translations of excerpts from the report described in Paragraph 238 to which no response is required, and Sberbank respectfully refers the Court to the cited website for its contents.

> 239.    The June 5, 2014 Financial Report posted by Center for New Russia also shows a transfer of "100,000" to its Sberbank of Russia account "transferred from Citibank account."

ANSWER:  Paragraph 239 purports to quote from and characterize a June 5, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 239.

> 240.    A Financial Report posted on June 25, 2014 described additional transfers into and withdrawals from Center for New Russia's Sberbank account, including a "100,000" ruble "payment for body armor."

ANSWER:  Paragraph 240 purports to quote from and characterize a June 25, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 240.

> 241.    The June 25, 2014 Financial Report further described four different donations sent to Center for New Russia through Western Union, including three sent in U.S. dollars: "$1,500 from Anton V.," "$200 from vikru," and "$109 from Ilya Kupchenko."[55]

ANSWER:  Paragraph 241 purports to quote from and characterize a June 25, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in

---

[55]    Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140729072840/http://kcpn.info/node/18

Paragraph 241.    Footnote 55 purports to contain a citation to the report described in Paragraph 241 to which no response is required, and Sberbank respectfully refers the Court to that report for its contents.

242.    The June 25, 2014 Financial Report stated that Center for New Russia maintained an account with VTB Bank that had received transfers of "56,011.17" rubles.[56]

ANSWER:  Paragraph 242 purports to quote from and characterize a June 25, 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 242.  Footnote 56 purports to contain a citation to the report described in Paragraph 242 to which no response is required, and Sberbank respectfully refers the Court to that report for its contents.

243.    A Financial Report posted in July 2014, which encompasses the time during which the DPR planned and executed the attack on MH17, described a series of transfers into and withdrawals from Center for New Russia's accounts with Defendants VTB Bank and Sberbank.  With respect to Sberbank, the Financial Report stated that funds were used for "bulletproof vests" and "helmets" among other items.[57]

ANSWER:  To the extent Paragraph 243 purports to quote from and characterize a July 2014 financial report on the Center for New Russia website, Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 243. Footnote 57 purports to contain a citation to the report described in Paragraph 243 to which no response is required, and Sberbank respectfully refers the Court to that report for its contents.

---

[56]    Center for New Russia, "Reports," *available at*
https://web.archive.org/web/20140729072840/http://kcpn.info/node/18

[57]    Center for New Russia, "Reports," *available at*
https://web.archive.org/web/20140930012248/http://kcpn.info/node/55

244.     The July 2014 Financial Report stated that its account with VTB Bank had received "1,673.55" in "transfers in dollars," followed by a withdrawal of $1,600 in cash.

ANSWER:  Paragraph 244 purports to quote from and characterize a July 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 244.

245.     The July 2014 Financial Report included a separate section just for "Cash dollars," which stated that Center for New Russia had a balance of $4,809 as of June 24, 2014, and which listed six U.S. dollar donations to Center for New Russia, including five through Defendant Western Union.  As of July 2014, Center for New Russia reported a U.S. dollar balance in its accounts of $3,289.

ANSWER:  Paragraph 245 purports to quote from and characterize a July 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 245.

246.     The July 2014 Financial Report also reflects that over 50,000 rubles were sent to Center for New Russia through Western Union during this period as part of five different money transfers.

ANSWER:  Paragraph 246 purports to quote from and characterize a July 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 246.

247.     The July 2014 Financial Report specifically documents two monetary transfers directly to the DPR leader, Igor Strelkov, who had been sanctioned by the EU months earlier due to his role in planning and carrying out acts of terror as a leader of the DPR.

## Report for June 23 - July 27

## Cash dollars:

+ 4 809 - balance in dollars as of June 24
+ 1 600 - withdrawn from the account in VTB 24
+ 700 - from Valeria T. by Western Union
+ 200 - from Inna S. to Western Union
+ 990 - from Yuriy S. to Western Union
+ 280 - from Sergey Sh. (Byelorussia) to Western Union
+ 300 - from Valeria
+ 380 - from Valeria J. by Western Union
- 5 000 - transferred in cash to Strelkov in Slavyansk
- 200 - transferred to the operation for the daughter of the militiaman
= 3,209 - cash balance as of July 27

ANSWER:  To the extent Paragraph 247 purports to characterize and depict a July 2014 financial report on the Center for New Russia website, Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 247.

248.     Under a section titled "Euro cash," the July 2014 Financial Report lists "10,000 – transferred in cash to Strelkov in Donetsk." The "Cash dollars" section further stated that Center for New Russia had transferred $5,000 "in cash to [Igor] Strelkov."

ANSWER:  Paragraph 248 purports to quote from and characterize a July 2014 financial report on the Center for New Russia website, and Sberbank respectfully refers the Court to that financial report for its contents.  Sberbank otherwise denies the allegations in Paragraph 248.

249.     Following the July 2014 Financial Report, the Center for New Russia website included a note thanking "Dmitry P. and Anton V. from the United States, as well as dozens of other people whose help to the militia of Novorossia … is invaluable.  Thank you friends, for your support!"[58]

---

[58]     Center for New Russia, "Reports," *available at* https://web.archive.org/web/20140930012248/http://kcpn.info/node/55

ANSWER:   Paragraph 249 purports to quote from and characterize a "note" on the Center for New Russia website, and Sberbank respectfully refers the Court to that note for its contents.  Sberbank otherwise denies the allegations in Paragraph 249.  Footnote 58 purports to contain a citation to the note described in Paragraph 249 to which no response is required, and Sberbank respectfully refers the Court to that note for its contents.

250.    Other DPR supporters around the globe advertised Center for New Russia's account information as a way "to help [Igor] Strelkov."[59]  A June 2014 post includes photographs and an update published by Center for New Russia of "the delivered goods on the fighters," nearly all of which feature rifles or machine guns:



ANSWER:  To the extent Paragraph 250 purports to quote from, characterize, and depict a "June 2014 post," and to characterize advertisements by "[o]ther DPR supporters around the globe," Sberbank respectfully refers the Court to that post and those advertisements for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 250.  Footnote 58 purports to contain a citation to the June 2014 post described in Paragraph 250 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

---

[59]    Rigort, "Report on the Next Cargo and Details to Help Strelkov," *available at* https://rigort.livejournal.com/924467.html

251.    The June 2014 post openly and publicly provided the Center for New Russia's Sberbank card number "for transfers within Sberbank," as well as a Sberbank account number "for transfers from other banks." The post also provided the recipient information for money transfers to be sent through Western Union to Alexey Markov ("RedRat").

ANSWER:  Paragraph 251 purports to quote from and characterize a "June 2014 post," and Sberbank respectfully refers the Court to that post and those advertisements for their contents.  Sberbank otherwise denies the allegations in Paragraph 251.

### DPR Fundraisers Veche, Rospisatel, and World Crisis

252.    Just like Center for New Russia, DPR fundraiser Veche has raised and raises funds on its website (http://veche-info.ru) for the DPR.  Veche constitutes part of the DPR, and the Veche website expressly states that since April 2014, Veche "took an active part in the provision of detachments of the people's militia."[60]

ANSWER:  Paragraph 252 consists of characterizations and legal conclusions to which no response is required.  To the extent Paragraph 252 purports to quote from and characterize the Veche website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 252.

253.    Veche openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts is the DPR and its affiliates, and Veche proudly boasted that it provided lethal weapons directly to the DPR's "Commander-in-Chief," Igor Strelkov. According to the Veche website, solicited funds have been used to provide the DPR with tactical and lethal equipment, including modern combat supplies.

ANSWER:  Paragraph 253 consists of characterizations to which no response is required. To the extent Paragraph 253 purports to characterize the Veche website, Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 253.

---

[60]    Veche, "Humanitarian Aid," *available at* http://veche-info.ru/projects/4261

254.    Prior to the attack on MH17, the Veche website openly and notoriously solicited funds for the DPR using the material support of Defendant VTB Bank, including as follows:

ANSWER:  Paragraph 254 consists of characterizations and legal conclusions to which no response is required.  To the extent Paragraph 254 purports to characterize the Veche website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 254.

255.    The Veche website indicated that funds could be sent to the DPR through Veche's bank account at VTB Bank.[61]  The Veche website explained that international transfers of funds could be routed through the organization's correspondent accounts at JPMorgan Chase Bank, among others in New York City, to its bank account at VTB Bank.  Its account numbers with VTB Bank and the correspondent banks were openly and publicly listed on Veche's website.

ANSWER:  Paragraph 255 purports to characterize the Veche website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 255.  Footnote 60 purports to contain a citation to the website described in Paragraph 255 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

256.    A May 24, 2014 online post openly and publicly solicited donations to the DPR through Veche's account at VTB Bank.  The post explained that "international transfers" could be sent to Veche's account at VTB Bank utilizing correspondent banks in New York, including accounts at JPMorgan Chase Bank and Deutsche Bank Trust Company

---

[61]    Veche, "Dear Benefactors and Donors!," *available at* http://web.archive.org/web/20140108093452/http://veche-info.ru/index.php?optioncom_content&viewarticle&id251&Itemid69

Americas in this District, and it provided the relevant account numbers to facilitate such "international transfers" to the DPR.[62]

ANSWER:   Paragraph 256 purports to quote from and characterize a "May 24, 2014 online post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 256.  Footnote 62 purports to contain a citation to the post described in Paragraph 256 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

257.   The May 24, 2014 post displayed pictures documenting the types of lethal equipment the DPR procured using the funds sent to its fundraiser, Veche, including tactical helmets, bulletproof vests, and thermal imaging scopes:

---

[62]   "Assistance to the Southeast: New Arrivals and Humanitarian Aid," *available at* https://www.liveinternet.ru/users/blog_soldier/post325492735/



ANSWER:  Paragraph 257 purports to characterize and depict a "May 24, 2014 post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 257.

258.    A June 13, 2014 online post reported that Veche sent the "first batch of purchase equipment," for which "the special forces under the command of Igor Strelkov expressed their gratitude."

ANSWER:  Paragraph 258 purports to quote from and characterize a "June 13, 2014 online post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 258.

259.    The post continued: "To date, 80 additional equipment sets have been purchased with funds coming to the fund to help the militia of Novorossia," and further provided

pictures confirming that the funds sent were being used to provide the DPR with lethal equipment.[63]

ANSWER:  Paragraph 259 purports to quote from and characterize a "June 13, 2014 online post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 259.  Footnote 63 purports to contain a citation to the post described in Paragraph 259 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

260.    The June 13, 2014 post once again solicited "international transfers" to Veche's account with VTB Bank, and provided the same account and New York correspondent banking information.

ANSWER:  Paragraph 260 purports to quote from and characterize the "June 13, 2014 post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 260.

261.    At all relevant times, the DPR utilized the funds raised by Veche—including those funds raised relying upon the material support of Defendant VTB Bank—in furtherance of its terrorist activities.

ANSWER:  Paragraph 261 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 261.

262.    Two other DPR fundraisers with close ties to Veche, Rospisatel group and World Crisis, also openly advertised DPR fundraiser Veche's account information with VTB Bank.

---

[63]    "Help of New Russia," *available at* https://www.liveinternet.ru/showjournal.php?journalid29 42023&jday=13&jyear=2014&jmonth=6

ANSWER:  Paragraph 262 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 262.

263.    The DPR fundraiser Rospisatel group has solicited and solicits funds on its website (http://www.rospisatel.ru/pjv.htm) to purchase "self-defense" equipment for the DPR and other affiliated groups dedicated to the Novorossiya cause.

ANSWER:  To the extent Paragraph 263 purports to quote from and characterize the Rospisatel group website, Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 263.

264.    Rospisatel is one of the DPR's fundraisers and constitutes part of the DPR. Rospisatel openly and notoriously advertised that the ultimate beneficiary of funds sent to Veche's VTB account would be the DPR and its affiliates.

ANSWER:  Paragraph 264 consists of characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 264.

265.    Prior to the attack on MH17, the Rospisatel website openly and publicly listed Veche's account number with VTB Bank, along with correspondent bank information in New York City for international money transfers.[64]

ANSWER:  Paragraph 265 purports to characterize the Rospisatel website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 265.  Footnote 64 purports to contain a citation to the website described in Paragraph

---

[64]    Rospisatel, "How to Help South-East Ukraine," *available at* http://web.archive.org/web/20140629034138/http://www.rospisatel.ru/pjv.htm

265 to which no response is required, and Sberbank respectfully refers the Court to that website

for its contents.

266.    DPR fundraiser World Crisis has solicited and solicits funds on its website
(http://www.worldcrisis.ru/crisis/1547372) to purchase equipment for the DPR and other
affiliated groups dedicated to the Novorossiya cause.  World Crisis is one of the DPR's
fundraisers and constitutes part of the DPR.  World Crisis openly and notoriously
advertised that the ultimate beneficiary of funds sent to Veche's VTB account would be
the DPR and its affiliates.

ANSWER:  Paragraph 266 contains characterizations and legal conclusions to which no

response is required.  To the extent Paragraph 266 purports to characterize the website of World

Crisis, Sberbank respectfully refers the Court to that website for its contents.  Sberbank

otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the

allegations in Paragraph 266.

267.    In a fundraising solicitation that preceded the DPR's attack on MH17, World
Crisis noted that "anti-aircraft systems are very needed" for the DPR.

ANSWER:  Paragraph 267 purports to quote from and characterize "a fundraising

solicitation," and Sberbank respectfully refers the Court to that solicitation for its contents.

Sberbank otherwise denies the allegations in Paragraph 267.

268.    Prior to the attack on MH17, the World Crisis website openly and publicly listed
Veche's VTB Bank account information, along with New York City correspondent bank
information for international money transfers.[65]

ANSWER:  Paragraph 268 purports to characterize the World Crisis website, and

Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks

knowledge or information sufficient to form a belief regarding the truth of the allegations in

Paragraph 268.  Footnote 65 purports to contain a citation to the website described in Paragraph

---

[65]    World Crisis, "Help to Donbass," *available at*
http://web.archive.org/web/20140625074715/http://worldcrisis.ru/crisis/1547372

268 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

269.   Prior to the attack on MH17, World Crisis also openly advertised the account number for a Sberbank card "for the transfer of funds directly to Igor Ivanovich Strelkov," the DPR's Commander-in-Chief.

ANSWER:   Paragraph 269 purports to characterize the World Crisis website, and Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise denies the allegations in Paragraph 269.

270.   Prior to the attack on MH17, the World Crisis website further provided instructions on how to support the DPR with money transfers through Defendants MoneyGram and Western Union.

ANSWER:   Paragraph 270 purports to characterize the World Crisis website, and Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 270.

271.   At all relevant times, the DPR utilized the funds raised by World Crisis—including those funds raised relying upon the material support of Defendants Sberbank, VTB Bank, MoneyGram and Western Union—in furtherance of its terrorist activities.

ANSWER:  Paragraph 271 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 271.

## DPR Fundraiser ICORPUS

272.   In 2014, DPR fundraiser ICORPUS solicited funds on its website to purchase lethal equipment for the DPR and its affiliate groups dedicated to the Novorossiya cause. ICORPUS is one of the DPR's fundraisers and constitutes part of the DPR.  ICORPUS openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

ANSWER:  Paragraph 272 contains characterizations and legal conclusions to which no response is required.   To the extent Paragraph 272 purports to characterize the website of

ICORPUS, Sberbank respectfully refers the Court to that website for its contents. Sberbank

otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the

allegations in Paragraph 272.

273. Prior to the DPR's attack on MH17, the ICORPUS website expressly solicited funds for the DPR to purchase guns, thermal imaging scopes, helmets, and body armor.[66]

ANSWER: Paragraph 273 purports to characterize the ICORPUS website, and Sberbank

respectfully refers the Court to that website for its contents. Sberbank otherwise lacks

knowledge or information sufficient to form a belief regarding the allegations in Paragraph 273.

Footnote 65 purports to contain a citation to the website described in Paragraph 273 to which no

response is required, and Sberbank respectfully refers the Court to that website for its contents.

274. ICORPUS specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

ANSWER: To the extent Paragraph 274 purports to characterize the website of

ICORPUS, Sberbank respectfully refers the Court to that website for its contents. Sberbank

otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the

allegations in Paragraph 274.

275. As of July 4, 2014, the ICORPUS website openly and publicly listed a Sberbank card number, stating that "An official account was opened to raise funds for the needs of the militia . . . under the command of I. Strelkov."

ANSWER: Paragraph 275 purports to quote from and characterize the ICORPUS

website, and Sberbank respectfully refers the Court to that website for its contents. Sberbank

otherwise denies the allegations in Paragraph 275.

---

[66] ICORPUS, "Opened an Official Account of the Militia in Slavyansk," *available at* http://web.archive.org/web/20140704011043/http://icorpus.ru/otkryt-oficialnyj-schet-opolcheniya-v-slavyanske

276.    On July 3, 2014, a United States-based supporter of the so-called Novorossiya movement posted an update on his English-language, pro-Russia website regarding the situation in Ukraine.  Prior to the attack on MH17, this website was a forum for chatter among DPR supporters to share ways to assist the DPR's terrorist activities.  For example, a post on the website listed in English, the ICORPUS Sberbank account number, which was described as "the official account to collect funds for slovyansk militia under the command of i. Strelkova [Igor Strelkov]."[67] Another post added, also in English: "This is the official Sberbank card account number for Slavyansk militia, Strelkov has confirmed it."

ANSWER:  To the extent Paragraph 276 purports to quote from and characterize an "English-language, pro-Russia website" and two posts on that website, Sberbank respectfully refers the Court to that website and those posts for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 276.  Footnote 67 purports to contain a citation one of the posts described in Paragraph 276 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

277.    Earlier posts on this website include English-language translations of Igor Strelkov (Girkin's) public statements beginning in May 2014, in his capacity as the "commander of the militia of Donetsk People's Republic." A July 7, 2014 post provided an English-language profile of Strelkov, which received over 14,000 views and 125 comments.[68]

ANSWER:  Paragraph 277 purports to quote from and characterize an "English-language, pro-Russia website" and two posts on that website, and Sberbank respectfully refers the Court to that website and those posts for their contents.  Sberbank otherwise denies the allegations in Paragraph 277.  Footnote 68 purports to contain a citation one of the posts described in

---

[67]   The Saker, "Joint Declaration by the Foreign Ministers of Ukraine, Russia, France and Germany," *available at* http://thesaker.is/joint-declaration-by-the-foreign-ministers-of-ukraine-russia-france-and-germany/

[68]   The Saker, "Polkovnik (Colonel) Strelkov)," *available at* http://thesaker.is/polkovnik-colonel-strelkov/

Paragraph 277 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

278.    On July 3, 2014, another English-language website provided a "Briefing from Igor Strelkov" that confirmed that Strelkov and the DPR were utilizing the ICORPUS account at Sberbank of Russia "to collect resources for the needs of the Slavyansk Militia commanded by Igor Strelkov."[69]

ANSWER:   Paragraph 278 purports to quote from and characterize "another English-language website," and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 278. Footnote 69 purports to contain a citation to the website described in Paragraph 278 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

279.    At all relevant times, the DPR utilized the funds raised by ICORPUS— including those funds raised relying upon the material support of Defendant Sberbank—in furtherance of its terrorist activities.

ANSWER:   Paragraph 279 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 279.

### DPR Fundraiser Voice of Sevastopol

280.    The DPR fundraiser Voice of Sevastopol, which is led in part by Boris Rozhin ("Colonel Cassad"), has solicited and solicits funds on its website (http://voicesevas.ru) for assistance for the DPR and its affiliated groups in the Donbass.[70]  Voice of Sevastopol is one of the DPR's fundraisers and constitutes part of the DPR.  Voice of Sevastopol openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

---

[69]   Slavyangrad, "Strelkov, Berezin and Militia Briefings, July 3, 2014," *available at* https://slavyangrad.org/2014/07/03/strelkov-berezin-and-militia-briefings-july-3-2014/

[70]   Voice of Sevastopol, "Details for the Provision of Humanitarian Assistance to the Donbass," *available at* http://voicesevas.ru/video/37146-rekvizity-dlya-okazaniya-voenno-gumanitarnoy-pomoschi-donbassu.html

ANSWER:  Paragraph 280 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 280 purports to characterize the website of Voice of Sevastopol, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 280.  Footnote 70 purports to contain a citation to the website described in Paragraph 280 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

281.    Voice of Sevastopol's website includes a link to a report of its "Gifts for Donbass," which includes pictures and descriptions of "UAVs [unmanned aerial vehicles or 'drones'] and components," as well as "armor, helmets, glasses, optics, thermal imagery, knives" and other lethal equipment purchased to support terrorists in the Donbass.[71]  Among the pictures featured on the website documenting the delivery of lethal equipment to the DPR is the following image showing knives and bullet-proof vests:



ANSWER:  Paragraph 281 purports to quote from, characterize, and depict a report on Voice of Sevastopol's website, and Sberbank respectfully refers the Court to that report for its contents.  Sberbank otherwise denies the allegations in Paragraph 281.  Footnote 71 purports to

---

[71]    CIGR Center, "'Gifts' for the Donbass," *available at* https://centercigr.livejournal.com/95618.html

contain a citation to the report described in Paragraph 281 to which no response is required, and Sberbank respectfully refers the Court to that report for its contents.

282.     Prior to the DPR's attack on MH17, Voice of Sevastopol publicly solicited funds for the DPR through Defendants Sberbank, Western Union, and MoneyGram.[72]

ANSWER:  To the extent that Paragraph 282 purports to characterize an online post titled "Fundraising for Militias Novoross (DNI and LC) Voice of Sevastopol," Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 282.  Footnote 72 purports to contain a citation to an online post to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

283.     One post explained that the only way to transfer United States dollars to the DPR fundraiser Voice of Sevastopol--which explicitly advertised that it purchased lethal equipment for the DPR—was to send funds to a Sberbank account utilizing Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York.[73]

ANSWER:  Paragraph 283 purports to characterize a post by Voice of Sevastopol, and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 283.  Footnote 73 purports to contain a citation to the post described in Paragraph 283 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

284.     At all relevant times, the DPR utilized the funds raised through the Voice of Sevastopol—including those funds raised relying upon the material support of Defendants Sberbank, Western Union, and MoneyGram—in furtherance of its terrorist activities.

---

[72]     "Fundraising for Militias Novoross (DNI and LC) Voice of Sevastopol," *available at* http://lidiabrull2.blogspot.com/2014/06/fundraising-til-militser-novoross-dni.html

[73]     VK, "Golos Sevastopolya," *available at* https://vk.com/wall245978492_2321

ANSWER:  Paragraph 284 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 284.

285.    Voice of Sevastopol's website currently states that money can be transferred through Defendants Western Union or MoneyGram, and openly and publicly provides recipient and/or email account information for these transfers.  The website also provides instructions for money transfers to Veche's accounts at Defendant VTB Bank, including for international transfers through New York correspondent accounts.  In addition, the website provides the name and card number for two Sberbank bank cards where funds can be sent.

ANSWER:  Paragraph 285 purports to characterize the Voice of Sevastopol's website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 285.

## DPR Fundraiser Essence of Time

286.    The DPR fundraiser Essence of Time ("EOT") has solicited and solicits funds on its website (http://eot61.su) for the DPR and its affiliates in the Donbass region.  EOT is one of the DPR's fundraisers and constitutes part of the DPR.  EOT openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

ANSWER:  Paragraph 286 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 286 purports to characterize the website of Essence of Time, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 286.

287.    Prior to the attack on MH17, the EOT website stated that the aid to be provided includes tactical gear (such as helmets and body armor), binoculars, rifle scopes, and thermal imaging equipment.[74]

---

[74]    All-Russian Movement "The Essence of Time" Rostov Region, "Humanitarian Aid Collection for Donbass – South of Russia – June-August 2014" *available a*t http://web.archive.org/web/20140626041043/http://eot61.su:80/fa2014

ANSWER:  Paragraph 287 purports to characterize the Essence of Time website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 287.  Footnote 74 purports to contain a citation to the website described in Paragraph 287 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

288.    EOT has openly and publicly received material support from Americans, including Russell Bentley, who indicated that "From January to June 2015, I was a soldier in the Essence of Time combat unit of the Novorussian Armed Forces (NAF).  I served at the Donetsk airport and Spartak as a rifleman and RPG [rocket propelled grenade] gunner."[75]  The *Houston Chronicle* reported that Bentley raised more than $2,000 to support his activities in the Donbass.

ANSWER:  Paragraph 288 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 288 purports to characterize the website of Russell Bentley and reporting by the *Houston Chronicle*, Sberbank respectfully refers the Court to that website and that reporting for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 288.  Footnote 75 purports to contain a citation to the website described in Paragraph 288 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

289.    Prior to the attack on MH17, the EOT website openly and publicly solicited funds for the DPR by listing its account numbers with Sberbank, along with its Sberbank bank card number.  The EOT website also openly and publicly listed the name and email address required to send money via Western Union.

ANSWER:  Paragraph 289 purports to characterize the Essence of Time website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 289.

---

[75]   Russel "Texas" Bentley, "About," *available at* http://www.russelltexasbentley.com/p/about.html

290.   At all relevant times, the DPR utilized the funds raised by EOT—including those funds raised relying upon the material support of Defendants Sberbank and Western Union—in furtherance of its terrorist activities.

ANSWER:   Paragraph 290 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 290.

291.   The EOT website currently indicates that funds can be transferred directly to its account at or bank card with Sberbank, or to individuals associated with the EOT through Western Union and MoneyGram.  The EOT website explicitly states that donors should not specify the reason for the transfer of funds, but simply indicate that it is for "charity."

ANSWER:   Paragraph 291 purports to quote from and characterize the Essence of Time website, and Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise denies the allegations in Paragraph 291.

### DPR Fundraiser People's Militia of New Russia

292.   The DPR fundraiser People's Militia of New Russia ("People's Militia") has openly and publicly solicited funds online to support the DPR and its affiliates, including through bank accounts and bank cards with Sberbank.[76]  People's Militia is one of the DPR's fundraisers and constitutes part of the DPR.  People's Militia openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.

ANSWER:   Paragraph 292 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 292 purports to characterize online solicitations of People's Militia of New Russia ("People's Militia"), Sberbank respectfully refers the Court to those solicitations for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 292.  Footnote 76 purports to contain a citation to one of the online solicitations described in Paragraph 292 to

---

[76]   VK, "People's Militia of New Russia – News," *available at* https://vk.com/wall-70618940_781

which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

293.    Prior to the attack on MH17, People's Militia provided updates from the DPR's Commander-in-Chief, Igor Strelkov.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 293.

294.    Prior to the attack on MH17, People's Militia instructed supporters of the DPR that, for transfers in "US dollars," they could send funds to a Sberbank account. People's Militia openly and notoriously provided instructions for routing the transfer of U.S. dollars through Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York City, or through Sberbank's correspondent account at The Bank of New York Mellon in New York City.

ANSWER:  To the extent Paragraph 294 purports to quote from and characterize public instructions by People's Militia of New Russia ("People's Militia"), Sberbank respectfully refers the Court to those instructions for their contents.  Sberbank admits that it has maintained correspondent accounts at Deutsche Bank Trust Company and the Bank of New York Mellon in New York City, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 294.

C.    Defendants Repeatedly Provided Material Support and Financing to the DPR Through Alexander Zhuchkovsky, a Prominent DPR Fundraiser Who Boasted About Providing Lethal Weapons to Igor Strelkov

295.    In addition to soliciting funds via the DPR's dedicated fundraising entities, the DPR also raised and continues to raise funds through efforts spearheaded by some of its more prominent individual members.

ANSWER:  Paragraph 295 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 295.

296.    For example, prior to the attack on MH17, Boris Alexandrovich Rozhin (also known as "Colonel Cassad"), solicited donations in support of terrorists in the Donbass.[77] Rozhin, a prominent international fundraiser for the DPR who was affiliated with Voice of Sevastopol, regularly posted reports and photos of weapons and other equipment he supplied to the DPR.

ANSWER:  To the extent Paragraph 296 purports to quote from and characterize online posts by Boris Alexandrovich Rozhin, Sberbank respectfully refers the Court to those posts for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 296.  Footnote 77 purports to contain a citation to one of the online posts described in Paragraph 296 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

297.    Rozhin openly and publicly provided the VTB Bank banking account information, including New York correspondent account information, necessary to donate to the DPR through Veche.  Rozhin also solicited funds for the DPR through money transfers to be sent using the services of Defendants Western Union and MoneyGram.[78]  Rozhin openly and notoriously advertised that the ultimate beneficiary of funds sent to these accounts would be the DPR and its affiliates.

ANSWER:  To the extent Paragraph 297 purports to quote from and characterize online posts by Rozhin, Sberbank respectfully refers the Court to those posts for their contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 297.  Footnote 78 purports to contain a citation to one of the online posts described in Paragraph 297 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

---

[77]   Colonel Cassad, "Collection of Funds for Information Fight!," *available at* https://web.archive.org/web/20140317092643/http://colonelcassad.livejournal.com/1476095 .html

[78]   The Trade Union of Medical Workers of the NKVD, "Information about the Details to Help the Southeast," *available at* https://komissarivanov.livejournal.com/45834.html

298.    One of the most prolific DPR fundraisers in the months before the attack on MH17 was Alexander Zhuchkovsky, a notorious DPR supporter with close ties to the DPR's Commander-in-Chief, Igor Strelkov.  The Government of Ukraine has described Zhuchkovsky as a key fundraiser for the DPR, noting that "Zhuchkovsky publicly boasted about raising millions of rubles and purchasing armored combat vehicles and weapons to benefit the DPR." (Government of Ukraine's Brief ¶ 176.)

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 298.   To the extent that Paragraph 298 purports to quote from and characterize the Government of Ukraine's Brief, Sberbank respectfully refers the Court to that brief for its contents.

299.    Zhuchkovsky openly reported on using the funds he raised to supply the DPR with equipment that included man-portable surface-to-air missile systems, as well as armored vehicles.  In June 2014, Zhuchkovsky wrote that he is "NOT a humanitarian aid activist but a person who organizes volunteers and, let's say, NON-humanitarian supplies."

ANSWER:  To the extent Paragraph 299 purports to quote from and characterize online posts by Alexander Zhuchkovsky, Sberbank respectfully refers the Court to those posts for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 299.

300.    A June 26, 2014 post by Zhuchkovsky expressly solicited funds in support of the DPR and its Commander-in-Chief, Igor Strelkov.  Zhuchkovsky wrote: "Thanks to Igor Strelkov for the last delivery of our cargo."[79]

ANSWER:  Paragraph 300 purports to quote from and characterize a June 26, 2014 post by Zhuchkovsky, and Sberbank respectfully refers the Court to that post for its contents. Sberbank otherwise denies the allegations in Paragraph 300.  Footnote 79 purports to contain a citation to the online post described in Paragraph 300 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

---

[79]    VK, "Alexander Zhuchkovsky," *available at* https://vk.com/wall151630709_2122

301.    Zhuchkovsky's June 26, 2014 post stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, or approximately $30,000 dollars based upon the exchange rate at the time.

ANSWER:  To the extent Paragraph 301 purports to quote from and characterize a June 26, 2014 post by Zhuchkovsky, Sberbank respectfully refers the Court to that post for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 301.

302.    Zhuchkovsky's June 26, 2014 post stated that funds for the DPR could be sent through a transfer to a Sberbank card, and the post openly and publicly provided the Sberbank card number.  Zhuchkovsky further wrote that "From abroad, a transfer can be made … via Western Union."

ANSWER:  Paragraph 302 purports to quote from and characterize a June 26, 2014 post by Zhuchkovsky, and Sberbank respectfully refers the Court to that post for its contents. Sberbank otherwise denies the allegations in Paragraph 302.

303.    These instructions for transfers to the DPR utilizing Sberbank and Western Union were reposted on other websites across the internet that featured chatter about the DPR, including a June 28, 2014 post that stated it was providing "the most reliable details of the aid of Novorossia," and specifically to "Help Strelkov" and "the DPR."[80]

ANSWER:  To the extent Paragraph 303 purports to quote from and characterize a "June 28, 2014 post" and posts "on other websites across the internet," Sberbank respectfully refers the Court to those posts for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 303.

304.    Another post from June 23, 2014 stated: "Today, Colonel Igor Strelkov thanked Alexander Zhuchkovsky" and others "for raising funds and purchasing equipment and hardware" for the DPR.  The post continued: "Sending money to Alexander's accounts,

---

[80]    VK, "Reliable details for the transfer of money," *available at* https://vk.com/topic-73561094_30070516

you do not send them to abstract militia, but to the militia of STRELKOV." The post then listed a Sberbank card account number to which funds should be sent.[81]

ANSWER:  Paragraph 304 purports to quote from and characterize a June 23, 2014 online post, and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 304.   Footnote 81 purports to contain a citation to the online post described in Paragraph 304 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

305.    Zhuchkovsky also raised funds for the DPR through a group called "Sputnik & Pogrom." Sputnik & Pogrom is one of the DPR's fundraisers and constitutes part of the DPR.  Sputnik & Pogrom openly and notoriously advertised that the ultimate beneficiary of funds sent to its accounts would be the DPR and its affiliates.  The exclusive purpose of Sputnik & Pogrom was to raise funds for the violent terrorist activities of the DPR and its affiliates.

ANSWER:  Paragraph 305 contains characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 305.

306.    Sputnik & Pogrom specifically advertised that funds sent to its accounts would be provided to the Commander-in-Chief of the DPR, Igor Strelkov.

ANSWER:  Paragraph 306 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 306.

307.    A May 19, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds in support of the "militiamen," specifically referenced "responding to the call of Colonel Strelkov." The post concluded by stating that funds

---

[81]    "News from the Militia of New Russia," posted on June 23, 2014, *available at* https://vk.com/wall-57424472_4048

can be sent to a Sberbank card, and the post openly and publicly provided a Sberbank card number.[82]

ANSWER:  Paragraph 307 purports to quote from and characterize a "May 19, 2014 post on Sputnik & Pogrom's website," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 307.   Footnote 82 purports to contain a citation to the post described in Paragraph 307 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

308.    A May 23, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky includes "photos of purchased items," including soldiers carrying machine guns.  The post asked for supporters to "transfer money" using the provided Sberbank card number.[83]

ANSWER:  Paragraph 308 purports to quote from and characterize a "May 23, 2014 post on Sputnik & Pogrom's website," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 308.   Footnote 83 purports to contain a citation to the post described in Paragraph 308 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

309.    A June 24, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,485,000 rubles worth of supplies to the DPR and its affiliates.[84]  Zhuchkovsky wrote that Igor Strelkov "thanked all the donors" and provided a link to a video of Strelkov "confirm[ing] the arrival of the cargo."

---

[82]   Sputnik & Pogrom, "Our heroes: the author of 'Sputnik and Pogrom' went to fight in Novorossia," *available at* https://sputnikipogrom.com/war/12544/heroes-of-sputnik-and-pogrom/

[83]   Sputnik & Pogrom, "Russians do not abandon their own: requisites to help the Slavyansk militia," *available at* https://sputnikipogrom.com/russia/12770/support-our-troops-in-new-russia-2/

[84]   Sputnik & Pogrom, "Report on the expenditure of transfers for the needs of the Slavyansk people's militia," *available at* https://sputnikipogrom.com/russia/novorossiya/14801/svalyansk-reports/

ANSWER:  Paragraph 309 purports to quote from and characterize a "June 24, 2014 post on Sputnik & Pogrom's website," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 309.   Footnote 84 purports to contain a citation to the post described in Paragraph 309 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

310.    A July 2, 2014 post on Sputnik & Pogrom's website that is attributed to Zhuchkovsky solicited funds for the DPR and reported on the delivery of almost 1,320,000 rubles worth of supplies to the DPR and its affiliates.  Zhuchkovsky wrote that remaining funds "will be used to purchase everything needed for the militia.  Including telescopes for observing the starry night sky; This time we did not buy them, because there were difficulties with their transportation."[85] On information and belief, "telescopes for observing the starry night sky" referred to surface-to-air missile systems.

ANSWER:  To the extent Paragraph 310 purports to quote from and characterize a "July 2, 2014 post on Sputnik & Pogrom's website," Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 310.  Footnote 85 purports to contain a citation to the post described in Paragraph 310 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

311.    The July 2, 2014 post from Zhuchkovsky stated that transfers could be made to a specified Sberbank bank card number, or "from abroad … via Western Union."  Zhuchkovsky added: "I think you all for supporting us for 1.5 months, as well as … for the constant publication of our requisites.  (I remind you that Strelkov personally thanked these resources for their support)."

ANSWER:  Paragraph 311 purports to quote from and characterize a "July 2, 2014 post on Sputnik & Pogrom's website," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 311.

---

[85]   Sputnik & Pogrom, "What is your help for the militia of Slavyansk?", *available at* https://web.archive.org/web/20140719204122/http://sputnikipogrom.com/russia/novorossiya /152 98/slavyansk-reports-2/

312.   Another post by Sputnik & Pogrom from July 2, 2014 that is attributed to Zhuchkovsky stated that funds could be sent to a Sberbank card, and the post openly and publicly provided a Sberbank card number.  In the same post, Zhuchkovsky wrote that money transfers "[f]rom abroad" should be sent "through Western Union."[86]

ANSWER:   Paragraph 312 purports to quote from and characterize "[a]nother post by Sputnik & Pogrom from July 2, 2014," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 312.   Footnote 86 purports to contain a citation to the post described in Paragraph 312 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

313.   These instructions for transfers to the DPR through Sputnik & Pogrom were reposted on other websites, including a June 17, 2014 post that published an extensive list of "addresses and banking details" for the "help of Novorossia."[87]  The post openly and publicly solicited funds in support of the efforts of "Igor Strelkov's movement," including through transfers utilizing Defendants MoneyGram, Western Union, Sberbank, and VTB Bank.  Specifically, the post provided instructions on how to support the DPR through Sputnik & Pogrom, including by openly and publicly providing a Sberbank bank account number as well as a Sberbank card number.

ANSWER:   Paragraph 313 purports to quote from and characterize a "June 17, 2014 post" and other unnamed websites, and Sberbank respectfully refers the Court to that post and those websites for their contents.   Sberbank otherwise denies the allegations in Paragraph 313. Footnote 87 purports to contain a citation to the post described in Paragraph 313 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

314.   The post specifically detailed how money could be transferred, "including from abroad," to Sputnik & Pogrom using MoneyGram and Western Union, listing the email address "juchkovsky@gmail.com" as the primary contact for these transfers.

---

[86]   VK, "Sputnik and Pogrom," *available at* https://vk.com/wall-40399920_453515

[87]   "Help of New Russia – Addresses and Details (Donetsk, Lugansk, Odessa, Refugees …)," *available at* http://www.golos-epohi.ru/?ELEMENT_ID=12048

ANSWER:  Paragraph 314 purports to quote from and characterize a "June 17, 2014 post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 314.

315.  The email address "juchkovsky@gmail.com" is utilized by Alexander Zhuchkovsky, including on his personal social media page (https://vk.com/juchkovsky).

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 315.  To the extent Paragraph 315 purports to characterize Alexander Zhuchkovsky's personal social media page, Sberbank respectfully refers the Court to that page for its contents.

316.  Just below these instructions to contact Zhuchkovsky for donations via MoneyGram and Western Union, the website directs readers to other websites also associated with the DPR for additional information.

ANSWER:  To the extent Paragraph 316 purports to characterize a "June 17, 2014 post" and "other websites," Sberbank respectfully refers the Court to those websites for their contents. Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 316.

317.  Notably, Zhuchkovsky repeatedly solicited and received large U.S. dollar donations for the DPR from the United States, totaling at least $150,000.

ANSWER:  Paragraph 317 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 317.

318.  In early September 2014, a California-based donor boasted on Sputnik & Pogrom of previously donating $100,000 U.S. dollars to fund the DPR's operations through Zhuchkovsky.[88] At that time, Zhuchkovsky's primary means of accepting donations was through a widely-publicized Sberbank bank card or via Western Union.

---

[88]   Sputnik & Pogrom, "100 000 dollars for the army of Novorossia: why did I donate this money," *available at*

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 318.  To the extent Paragraph 318 purports to characterize a post on Sputnik & Pogrom's website, Sberbank respectfully refers the Court to that post for its contents.  Footnote 88 purports to contain a citation to the post described in Paragraph 318 to which no response is required, and Sberbank respectfully refers the Court to that post for its contents.

319.   In October 2014, Zhuchkovsky posted an online update stating that he had previously received a transfer of $50,000 from an individual named "George" in the United States.  Zhuchkovsky reiterated that money could be sent to him through a Sberbank card or, for transfers, "including from abroad," via MoneyGram and Western Union.[89]

ANSWER:   Paragraph 319 purports to quote from and characterize an October 2014 online update, and Sberbank respectfully refers the Court to that update for its contents.  Sberbank otherwise denies the allegations in Paragraph 319.   Footnote 89 purports to contain a citation to the update described in Paragraph 319 to which no response is required, and Sberbank respectfully refers the Court to that update for its contents.

320.   Zhuchkovsky currently operates a website (http://juchkovsky.ru/), which states: "Since 2014, I, Alexander Zhuchkovsky, have been working with my associates in helping the Donbass militia.  Thousands of people from around the world helped us raise 133 million rubles and organize 47 deliveries." Zhuchkovsky further states that, since 2014, "thousands of people from all over Russia and abroad began to provide large-scale assistance through us to the Donbas militia, making money transfers and transferring military and humanitarian supplies."[90]

---

https://web.archive.org/web/20141007062311/http://sputnikipogrom.com/russia/novorossiya/19805/100000-for-novorossia-army

[89]   Greater Russia News Agency, "Report of the Militia Alexander Zhuchkovsky on Expenditures and Purchases for the Militia of New Russia," *available at* https://novorosinform.org/311930

[90]   Hotline Donbass Juchkovsky, "Dear Friends of Donbass!," *available at* http://hotline-donbass.juchkovsky.ru/

ANSWER:  Paragraph 320 purports to quote from and characterize a website operated by Zhuchkovsky, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 320.  Footnote 90 purports to contain a citation to the website described in Paragraph 320 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

> 321.    Specifically, Zhuchkovsky states, "Thanks to the support of caring Russian people in the Russian Federation and abroad, we collected 133 million rubles," noting that "about two-thirds of this amount was collected in the first six months."[91] In other words, Zhuchkovsky alone raised approximately 89 million rubles for the DPR, or roughly $2.5 million U.S. dollars in the months surrounding the attack on MH17.[92]

ANSWER:   To the extent Paragraph 321 purports to quote from and characterize a website operated by Zhuchkovsky, Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 321 and Footnote 92.  Footnote 91 purports to refer to a citation to the website described in Paragraph 321 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

> 322.    As described above in Paragraphs 298-319, Zhuchkovsky raised this $2.5 million U.S. dollars in funds for the DPR through the material support and services of Defendants Sberbank, MoneyGram, and Western Union.

ANSWER:   Paragraph 322 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 298-319, as though fully set forth herein, and otherwise denies the allegations in Paragraph 322.

---

[91]   *Id.*

[92]   Using the exchange rate in effect on July 17, 2014 of 1 U.S. dollar = 34.93 Rubles.

323.     On his website, Zhuchkovsky provides a link to a "final report" that reflects the "procurements and expenditures," totaling roughly 79 million rubles, on behalf of the DPR and its affiliates.

ANSWER:  Paragraph 323 purports to quote from and characterize a website operated by Zhuchkovsky, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 323.

324.     Zhuchkovsky then states that the "closed part of our budget, collected in 2014 during intense hostilities, is not presented in this report.  Some donors (including civil servants) who regularly donated large sums to us, wished to remain anonymous and asked not to advertise their help."[93]  However, the site makes clear that the donations collected in 2014 alone, which were intentionally omitted from the report in part to protect donor anonymity, totaled "54 million" rubles.[94]

ANSWER:  Paragraph 324 purports to quote from and characterize a website operated by Zhuchkovsky, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 324.  Footnotes 93 and 94 purport to contain citations to the website described in Paragraph 324 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

325.     According to Zhuchkovsky, his "key areas of work since 2014" on behalf of the DPR included "purchasing uniforms, equipment, special equipment," as well as "UAV [unmanned aerial vehicle or 'drones'] collection, aerial reconnaissance."[95]

ANSWER:  Paragraph 325 purports to quote from and characterize a website operated by Zhuchkovsky, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 325.  Footnote 95 purports to refer to a

---

[93]   Hotline Donbass Juchkovsky, "Dear Friends of Donbass!" *available at* http://hotline-donbass.juchkovsky.ru/

[94]   Kirov Reporting, "Key Areas of Work Since 2014," *available at* http://kirov-reporting.juchkovsky.ru/otchet/

[95]   Id.

citation to the website described in Paragraph 325 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

326.    Specifically, Zhuchkovsky documented the provision of: multiple types of "armored vehicles"; 100 units of armament "for units in the DPR"; 230 units of "sniper and mortar sights, binoculars, rangefinders, thermal imagers"; 14 units of "Drones"; 13,000 units of "Tactical equipment"; 350 units of "Body armor and helmets"; and 1,700 units of what he euphemistically refers to as "Iron."

ANSWER:  Paragraph 326 purports to quote from and characterize a website operated by Zhuchkovsky, and Sberbank respectfully refers the Court to that website for its contents. Sberbank otherwise denies the allegations in Paragraph 326.

327.    Under the listing for "Iron," Zhuchkovsky provides well-known abbreviations for automatic or semi-automatic weapons, including "AK" (Kalashnikov automatic rifle), "PM" (Makarov semi-automatic pistol), "TT" (TT-30 semi-automatic pistol), "APS" (APS underwater assault rifle), and "SVD" (Dragunov sniper rifle).

ANSWER:   To the extent Paragraph 327 purports to quote from and characterize a website operated by Zhuchkovsky, Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 327.

328.    Zhuchkovsky's website provides a link to a spreadsheet [96] that specifically documents certain transfers in the weeks leading up the attack on MH17.   Among the items provided to the DPR and its affiliates during that time period were: "Recon drone," "pistol holders," "jammers/silencers," and "crossbows."

ANSWER:   Paragraph 328 purports to quote from and characterize Zhuchkovsky's website and a spreadsheet to which the website links, and Sberbank respectfully refers the Court to that website and spreadsheet for their contents.   Sberbank otherwise denies the allegations in Paragraph 328.   Footnote 96 purports to contain a citation to the spreadsheet described in

---

[96]    "Zhuchkovsky: Reports," available at
https://docs.google.com/spreadsheets/d/1_emguIDIN92Ib1RW-
Eox7722MPdE6aY0_u2WvZDFbo/edit#gid1043080655

Paragraph 328 to which no response is required, and Sberbank respectfully refers the Court to that spreadsheet for its contents.

329.   Zhuchkovsky's website identifies by name certain of the donors who provided funds to support the DPR, including donors from Canada and the United States.[97]

ANSWER:   Paragraph 329 purports to characterize Zhuchkovsky's website, and Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise denies the allegations in Paragraph 329.   Footnote 97 purports to refer to a citation to the website described in Paragraph 329 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

330.   Zhuchkovsky's website includes a link to 512 photos saved online that reflect the lethal equipment Zhuchkovsky provided to the DPR, including in the weeks before the DPR's attack on MH17.[98]

ANSWER:   Paragraph 330 purports to characterize Zhuchkovsky's website and 512 photos saved online to which the website links, and Sberbank respectfully refers the Court to that website and those photos for their contents.   Sberbank otherwise denies the allegations in Paragraph 330.   Footnote 98 purports to contain a citation to the photos described in Paragraph 330 to which no response is required, and Sberbank respectfully refers the Court to those photos for their contents.

331.   Among the photos documenting lethal equipment Zhuchkovsky provided to the DPR in June and July 2014 are the following, which prominently feature tactical gear, numerous rifles, and an aerial drone:

---

[97]   We The People Juchkovsky, "Our Donors," available at http://we-the-people.juchkovsky.ru/

[98]   Yandex Disk, "2014," available at https://yadi.sk/d/cLnkBrgpjzDmog/2014





ANSWER:   Paragraph 331 purports to characterize and depict some of the photos referenced in Paragraph 330, and Sberbank respectfully refers the Court to those photos for their contents.  Sberbank otherwise denies the allegations in Paragraph 331.

332.    Zhuchkovsky's website currently solicits donations to a specified Sberbank of Russia bank card.[99]

ANSWER:    Paragraph 332 purports to characterize Zhuchkovsky's website, and Sberbank respectfully refers the Court to that website for its contents.   Sberbank otherwise denies the allegations in Paragraph 332.  Footnote 99 purports to contain a citation to the website described in Paragraph 332 to which no response is required, and Sberbank respectfully refers the Court to that website for its contents.

## VII.    The Material Support and Financing Defendants Knowingly Provided to the DPR Were Essential to the DPR's Violent Campaign of Terror and Intimidation

333.    The DPR and its affiliates were able to receive substantial and essential donated funds through Defendants' provision of banking and money transfer services to them.

ANSWER:  Paragraph 333 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 333.

334.    For example, as described in Paragraphs 320-321, *supra*, Zhuchkovsky's website currently states that he raised approximately $2.5 million U.S. dollars during the six months surrounding the DPR's attack on MH17.  Zhuchkovsky solicited these funds through Defendants Sberbank, MoneyGram, and Western Union.

ANSWER:  Paragraph 334 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 320-321, as though fully set forth herein,  and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 334, except denies the allegations of the last sentence relating to Sberbank.

---

[99]    Juchkovsky, "Contacts," available at http://juchkovsky.ru/contacts/

335.    A June 13, 2014 online post quoted Zhuchkovsky as stating, "today we spent more than half a million rubles on means necessary for the Russian militia in Novorossia," followed by a plea for more money to be sent to a designated card account with Defendant Sberbank.

ANSWER:  Paragraph 335 purports to quote from and characterize a "June 13, 2014 online post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 335.

336.    A June 26, 2014 online post from Zhuchkovsky stated that in the last few days, "our accounts have received more than 1 million rubles" in funding, including through Defendants Sberbank and Western Union.

ANSWER:  Paragraph 336 purports to quote from and characterize a "June 26, 2014 online post," and Sberbank respectfully refers the Court to that post for its contents.  Sberbank otherwise denies the allegations in Paragraph 336.

337.    In October 2014, Zhuchkovsky stated that in the prior month he had raised "6 million 150 thousand rubles," including a transfer of $50,000 from the United States.[100] Zhuchkovsky solicited these funds through Defendants Sberbank, MoneyGram, and Western Union.

ANSWER:  To the extent Paragraph 337 purports to quote from and characterize a statement by Zhuchkovsky, Sberbank respectfully refers the Court to that statement for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 337, except denies the allegations relating to Sberbank in the last sentence. Footnote 100 purports to contain a citation to the statement described in Paragraph 337 to which no response is required, and Sberbank respectfully refers the Court to that statement for its contents.

---

[100]   Greater Russia News Agency, "Report of the Militia Alexander Zhuchkovsky on Expenditures and Purchases for the Militia of New Russia," available at https://novorosinform.org/311930

338.    Similarly, shortly after terrorists forcibly took over the Donetsk regional legislative building, Boris Rozhin ("Colonel Cassad") stated that "more than 1,500,000 rubles have already been transferred and more than 2,200,000 rubles are ready for shipment" as part of the fundraising effort led by DPR fundraiser Veche, relying upon the services of Defendant VTB Bank, including identifying the use of correspondent bank accounts in New York City as the proper channel through which to contribute U.S. Dollars.

ANSWER:   To the extent Paragraph 338 purports to quote from and characterize a statement by Boris Rozhin, Sberbank respectfully refers the Court to that statement for its contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 338.

339.    By May 2015, DPR fundraiser Save Donbass claimed to have raised approximately $1.3 million in funding sent either to its account with Defendant Sberbank or using money transfer providers, including Defendant Western Union.

ANSWER:   To the extent Paragraph 339 purports to characterize unspecified public claims by Save Donbass, Sberbank respectfully refers the Court to those claims for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 339.

340.    By June 2015, DPR fundraiser EOT claimed to have raised 4,240,000 rubles in funding, including through money sent to its bank card with Defendant Sberbank or sent using money transfer providers, including Defendant Western Union.

ANSWER:   To the extent Paragraph 340 purports to characterize unspecified public claims by Essence of Time, Sberbank respectfully refers the Court to those claims for their contents.   Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 340.

341.    DPR fundraiser Center for New Russia reported having raised over 2 million rubles, and thousands of dollars and euros, in the period between June 23 and July 27, 2014, including through wire transfers to its accounts with Defendants VTB Bank and Sberbank, and donations sent via Defendant Western Union.   Center for New Russia consistently advertised the account number of Defendant VTB Bank's correspondent bank Deutsche Bank Trust Company Americas in New York as the appropriate channel through which to send "transfers in USD."

126

ANSWER:  To the extent Paragraph 341 purports to characterize unspecified public reports and advertisements by Center for New Russia, Sberbank respectfully refers the Court to those reports and advertisements for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 341.

## VIII.   Defendants 'Knowing Provision of Material Support and Financing to the DPR Constitute Acts of International Terrorism

342.    Since 2014, Defendants have provided extensive banking and money transfer services to the DPR and its affiliates.  The material support and financing provided by Defendants to the DPR caused, enabled, and facilitated their terrorist activities, including launching, and controlling the territory necessary to launch, the missile attack on the MH17 passenger plane that killed Quinn and 297 others.

ANSWER:  Paragraph 342 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 342.

343.    But for Defendants' provision of banking and money transfer services to the DPR and its affiliates, the DPR's ability to raise funds from individual supporters in order to conduct terrorist operations would substantially cease.

ANSWER:    Paragraph 343 consists of legal conclusions, characterizations, and predictions about future behavior to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 343.

344.    By their own public statements, in the months before July 17, 2014 (and subsequently), the DPR, including by and through its fundraisers, made and received wire transfers or money transfers via Defendants, including through the use of correspondent bank accounts in this district.

ANSWER:  Paragraph 344 purports to characterize public statements by "the DPR, including by and through its fundraisers," and Sberbank respectfully refers the Court to those statements for their contents.  Sberbank otherwise denies the allegations in Paragraph 344 relating to Sberbank.

345.     During the relevant period, the DPR, by and through its fundraisers, maintained accounts at Defendants Sberbank and VTB Bank to facilitate wire transfers or bank card transfers, and the DPR received and used the funds that passed through these accounts, including—but not limited to—as follows:

ANSWER:  Paragraph 345 consists of characterizations to which no response is required.

To the extent a response is required, Sberbank denies the allegations in Paragraph 345.

a)     Center for New Russia maintained accounts with Sberbank with bank account numbers ending in 1988 and 0503 and card account numbers ending in 9248 and 9778, and requested on its website that funds be transferred directly to those accounts.  Center for New Russia also maintained accounts with VTB Bank with bank account numbers ending in 0677 and 4888.  Center for New Russia requested that transfers in U.S. dollars be transferred through Defendant VTB Bank's correspondent account at Deutsche Bank Trust Company Americas in New York City with account number ending in 3603.

ANSWER:  To the extent Paragraph 345(a) purports to characterize Center for New Russia's website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the first sentence of Paragraph 345(a), except states that at this time, pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian Civil Code (Article 857) and the Russian Law on Banks and Banking Activity No. 395-1, dated 2 December 1990 (Article 26), (collectively, the "**Russian Bank Secrecy Law**").  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the second and third sentences in Paragraph 345(a).

b)     Humanitarian Battalion maintained an account at Defendant Sberbank of Russia with card number ending in 6069, which account was under the control of the DPR's "foreign minister" Ekaterina Gubareva.  DPR leaders Pavel Gubarev and Igor Strelkov openly and publicly solicited funds to this account.

ANSWER:  Paragraph 345(b) contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank states that at this time,

pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is unable

to admit or deny whether an individual or institution is a Sberbank client and maintains bank

accounts or cards with Sberbank in light of constraints imposed by the Russian Bank Secrecy

Law, and otherwise lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 345(b).

c)      Veche maintained a bank account at Defendant VTB Bank with account number
ending in 3521 and requested on its website that international funds, including U.S. dollar funds,
be transferred to that VTB Bank account through correspondent bank accounts, including an
account at JPMorgan Chase in this district with account number ending in 8618, and an account
at Deutsche Bank Trust Company Americas in this district with account number ending in 3603.
This VTB correspondent account number with Deutsche Bank in New York City is the same as
the correspondent account number advertised by Center for New Russia for US dollar transfers
through VTB.  Veche also maintained a Sberbank card account with account number ending in
6872.

ANSWER:  To the extent Paragraph 345(c) purports to characterize Veche's website,

Sberbank respectfully refers the Court to that website for its contents.   Sberbank lacks

knowledge or information sufficient to form a belief regarding the truth of the allegations in the

first and second sentences of Paragraph 345(c).  Sberbank states that at this time, pending receipt

of authorization from the Bank of Russia or a Russian court, Sberbank is unable to admit or deny

whether an individual or institution is a Sberbank client and maintains bank accounts or cards

with Sberbank in light of constraints imposed by the Russian Bank Secrecy Law, and otherwise

denies the allegations in the third sentence of Paragraph 345(c).

d)      EOT maintained several accounts with Sberbank with bank account numbers
ending in 2621 and 0225 and card numbers ending in 0212 and 4786.  EOT's website requested
that funds be transferred directly to these accounts.

ANSWER:  To the extent Paragraph 345(d) purports to characterize Essence of Time's

website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank states

that at this time, pending receipt of authorization from the Bank of Russia or a Russian court,

Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and

maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian

Bank Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 345(d).

e)   Save Donbass maintained accounts with Sberbank with bank account numbers
ending in 0018 and 0241 and card number ending in 1893.  Save Donbass's website requested
that funds be transferred directly to these accounts.

ANSWER:  To the extent Paragraph 345(e) purports to characterize Save Donbass's

website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank states

that at this time, pending receipt of authorization from the Bank of Russia or a Russian court,

Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and

maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian

Bank Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 345(e).

f)   ICORPUS maintained an account at Sberbank with card number ending in 2310,
and requested on its website that funds be transferred directly to that account.

ANSWER:  To the extent Paragraph 345(f) purports to characterize Save Donbass's

website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank states

that at this time, pending receipt of authorization from the Bank of Russia or a Russian court,

Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and

maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian

Bank Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 345(f).

g)   The Voice of Sevastopol maintained an account at VTB Bank with card number
ending in 8507, and accounts at Sberbank with card numbers ending in 2368 and 6872, and
requested on its website that funds be transferred directly to these accounts.  The Voice of
Sevastopol also maintained an account at Sberbank with bank account number ending in 0602.
Voice of Sevastopol requested that transfers in U.S. dollars be transferred through Defendant
Sberbank's correspondent account at Deutsche Bank Trust Company Americas in New York

City, and it directed supporters to "use the list of Nostro correspondent accounts in foreign currency on the website of Sberbank of Russia."

ANSWER:  To the extent Paragraph 345(g) purports to quote from and characterize Voice of Sevastopol's website, Sberbank respectfully refers the Court to that website for its contents.  Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank in the first sentence in Paragraph 345(g).  Sberbank otherwise states that at this time, pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian Bank Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 345(g).

h)     Sputnik & Pogrom maintained accounts at Sberbank with card number ending in 2956, and bank account number ending in 3378.

ANSWER:  Sberbank states that at this time, pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian Bank Secrecy Law, and otherwise denies the allegations in Paragraph 345(h).

i)     World Crisis maintained an account at Sberbank with card number ending in 4065, which was for "the transfer of funds directly to Igor Ivanovich Strelkov." As of June 26, 2014, Zhuchkovsky solicited donations to the same Sberbank card account listed by World Crisis.

ANSWER:  To the extent Paragraph 345(i) purports to quote from and characterize a statement by World Crisis and solicitations by Zhuchkovsky, Sberbank respectfully refers the Court to that statement and those solicitations for their contents.  Sberbank states that at this time, pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is

131

unable to admit or deny whether an individual or institution is a Sberbank client and maintains

bank accounts or cards with Sberbank in light of constraints imposed by the Russian Bank

Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief regarding

the truth of the remaining allegations in Paragraph 345(i).

j)       Zhuchkovsky has solicited donations to a Sberbank card ending in 2704 and a
Sberbank bank account ending in 0029.  Zhuchkovsky currently solicits donations to a Sberbank
card ending in 9485.

ANSWER:  To the extent Paragraph 345(j) purports to characterize solicitations by

Zhuchkovsky, Sberbank respectfully refers the Court to those solicitations for their contents.

Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the

truth of the allegations in Paragraph 345(j).

k)       Women's Battalion of People's Militia Donbass maintained a bank account at
VTB Bank with account number ending in 5527, which was controlled by and/or for the benefit
of the former DPR "foreign minister" Ekaterina Gubareva.  Women's Battalion of People's
Militia Donbass requested that transfers in U.S. dollars be transferred through VTB's
correspondent account at Deutsche Bank Trust Company Americas in New York City with
account number ending in 3603.  This VTB correspondent account number with Deutsche Bank
in New York City is the same as the correspondent account number advertised by Center for
New Russia for US dollar transfers through VTB Bank.  Women's Battalion of People's Militia
of Donbass also listed the SWIFT codes for Citibank NA in New York City (CITIUS33),
Deutsche Bank (BKTRUS33) in New York City, and JPMorgan Chase Bank (CHASUS33) in
New York City, describing them as "Intermediary bank[s]."

ANSWER:  Sberbank lacks knowledge or information sufficient to form a belief

regarding the truth of the allegations in Paragraph 345(k).

l)       People's Militia of New Russia maintained accounts at Sberbank with card
numbers ending in 5169 and 1583, as well as a bank account ending in 5978.  People's Militia of
New Russia requested that transfers in U.S. dollars be transferred through Sberbank's
correspondent account at Deutsche Bank Trust Company Americas in New York City with
account number ending in 1742, or Sberbank's correspondent account at Bank of New York
Mellon in New York City with account number ending in 6837.

ANSWER:  To the extent Paragraph 345(l) purports to characterize requests by People's

Militia of New Russia, Sberbank respectfully refers the Court to those requests for their contents.

Sberbank states that at this time, pending receipt of authorization from the Bank of Russia or a Russian court, Sberbank is unable to admit or deny whether an individual or institution is a Sberbank client and maintains bank accounts or cards with Sberbank in light of constraints imposed by the Russian Bank Secrecy Law, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 345(l).

346.    Defendants Sberbank and VTB Bank also provided bank accounts and banking services to the DPR by and through additional DPR fundraisers.

ANSWER:    Paragraph 346 consists of characterizations, accusations, and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 346.

347.    During the relevant period, the DPR, by and through its fundraisers, also solicited and received funds via Defendants MoneyGram and Western Union, and the DPR received and used the funds sent through these transfers, including—but not limited to—as follows:

a)    Center for New Russia's website provided instructions on donating funds via Western Union, and expressly documented numerous donations received using the services of Western Union.

b)    Veche's website provided instructions on donating funds via Western Union or MoneyGram.

c)    EOT's website provided instructions on donating funds via Western Union or MoneyGram.

d)    Save Donbass's website provided instructions on donating funds via Western Union or MoneyGram.

e)    The Voice of Sevastopol's website provided instructions on donating funds via Western Union or MoneyGram.

f)    Sputnik & Pogrom provided instructions online on donating funds via Western Union or MoneyGram, including through Zhuchkovsky.

g)    World Crisis's website provided instructions on donating funds via Western Union or MoneyGram.

h)      Zhuchkovsky's social media posts provided instructions on donating funds via Western Union.

ANSWER:   Paragraph 347(a)-(h) contains characterizations to which no response is required. To the extent Paragraph 347(a)-(h) purports to characterize websites, social media posts, and instructions, Sberbank respectfully refers the Court to those websites, social media posts, and instructions for their contents.  Sberbank otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 347(a)-(h).

348.    Defendants MoneyGram and Western Union also provided money transfer services to the DPR by and through additional DPR fundraisers.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 348.

349.    At all times, the bank and/or money transfer accounts described above belonged to the DPR's fundraisers.

ANSWER:   Paragraph 349 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 349.

350.    At all times, all of the funds in those accounts belonged to the DPR's fundraisers and were under their control.

ANSWER:   Paragraph 350 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 350.

351.    At all times, all of the transactions carried out in the accounts were carried out by the DPR's fundraisers or at their direction.

ANSWER:  Paragraph 351 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 351.

352.    At all times, the funds raised through these accounts were for the explicit purpose of purchasing tactical or lethal equipment that the DPR used to commit violent acts that endangered human life and appeared intended to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 352 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 352.

## IX.    Defendants Had Knowledge of the DPR's Terrorist Activities

353.    Defendants, like the rest of the world, knew that the DPR and its affiliates were routinely perpetrating acts of terrorism against civilians.

ANSWER:  Paragraph 353 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 353.

354.    At all relevant times, the DPR's policy and practice of carrying out terrorist attacks on civilians were notorious and well-known to Defendants and to the public at large, including as described in Paragraphs 104-144, above.

ANSWER:  Paragraph 354 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 104-144, as though fully set forth herein, and otherwise denies the allegations in Paragraph 354.

355.    From its inception, the DPR exhibited a pattern and practice of attacking and intimidating civilians, and operated with no regard for civilian life, often murdering and torturing civilians.  In the months before July 17, 2014, the DPR openly, publicly, and repeatedly carried out multiple acts of terrorism on civilians.

ANSWER:  Paragraph 355 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 355.

356.    The reputation of the DPR and its affiliates as violent organizations that engaged in and continue to engage in terrorist acts was and is widespread and has been extensively reported in the international news media.  Prior to the missile attack that killed Quinn and 297 others, the international media and human rights organizations reported numerous incidents of abduction, hostage-taking, torture, and murder of civilians by the DPR, including as described in Paragraphs 104-144, above.

ANSWER:  Paragraph 356 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 104-144, as though fully set forth herein, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 356.  To the extent Paragraph 356 purports to characterize reporting by the "international news media" and "human rights organizations," Sberbank respectfully refers the Court to those websites, social media posts, and instructions for their contents.

357.    The classification of the DPR in May 2014 as a terrorist organization by the Ukrainian Prosecutor General's Office was public information and was reported in the world news media.  This information was known or had to be known to the Defendants.

ANSWER:  Paragraph 357 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank admits that the news media reported that the Ukrainian Prosecutor General's Office described the DPR as a terrorist organization in May 2014, and otherwise denies the allegations in Paragraph 357.  To the extent Paragraph 357 purports to characterize public reporting by the "world news media," Sberbank respectfully refers the Court to that reporting for its contents.

358.    At all relevant times, Defendants knew or had to know that the DPR and its affiliates were violent organizations that engaged in terrorist activity.  The terrorist acts carried out by the DPR were widely known and constituted one of the highest-profile international news stories at the time.  International media reports and broadcasts at the

time were replete with daily coverage of the acts of terrorism committed by the DPR, including as described in Paragraphs 104-112, above.

ANSWER:  Paragraph 358 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 104-112, as though fully set forth herein, and otherwise denies the allegations in Paragraph 358. To the extent Paragraph 358 purports to characterize public reporting by the international news media, Sberbank respectfully refers the Court to that reporting for its contents.

359.   Despite knowing that the DPR engaged in acts of terrorism, Defendants nevertheless provided material support and financing, including banking and money transfer services, to the DPR, its members, and affiliated groups.

ANSWER:  Paragraph 359 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 359.

360.   At the time Defendants provided this material support and financing to the DPR and its affiliates, Defendants knew precisely the type of groups they were aiding and supporting.  The DPR was already presiding over a campaign of terror in eastern Ukraine, including the murder and torture of civilians who supported Ukrainian unity.

ANSWER:  Paragraph 360 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in the first sentence in Paragraph 360 and lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the second sentence of Paragraph 360.

361.   Defendants knew and/or deliberately disregarded the fact that the DPR would use the material support and financing provided by Defendants to facilitate, enable, and carry out terrorist attacks in a manner consistent with the DPR's previous pattern of disregard for civilian life, including the downing of an airplane with 298 civilians on board.

ANSWER:  Paragraph 361 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 361.

## X.   Defendants Knew or Were Deliberately Indifferent That Their Conduct Would Result in Terrorism

362.   At all relevant times, the Government of the Russian Federation, including its President Vladimir Putin, provided consistent political support for the DPR.

ANSWER:  Paragraph 362 contains historical and political characterizations to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 362.

363.   At all relevant times, Defendants Sberbank and VTB Bank were owned by the Government of the Russian Federation.

ANSWER:   Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding VTB Bank in Paragraph 363.  Sberbank denies the allegations regarding Sberbank in Paragraph 363, except admits that during 2014 the Bank of Russia owned an equity stake in Sberbank.

364.   At all relevant times, upon information and belief, Defendants Sberbank and VTB Bank provided banking and money transfer services to the DPR, including its fundraisers, and its affiliates as a matter of official policy, consistent with the policy of the Government of the Russian Federation and the agenda of its President Vladimir Putin, in order to assist and advance the DPR's terrorist activities in eastern Ukraine, in order to assist and advance the DPR's goal of using terrorism to establish a Novorossiya state, and in order to assist and advance the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and civilian population.

ANSWER:  Paragraph 364 contains political characterizations to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 364.

365.   The Government of Ukraine has stated, "Sberbank, a large financial institution that is majority state-owned, has used its infrastructure to facilitate billions of rubles' worth of transfers to the DPR and LPR." (Government of Ukraine's Brief ¶ 277.) The Government of Ukraine has also identified VTB Bank as using its infrastructure and

services to funnel billions of rubles to the leadership of the DPR, including its fundraisers.

ANSWER:  The first sentence of Paragraph 365 purports to quote from and characterize the Government of Ukraine's Brief, and Sberbank respectfully refers the Court to that brief for its contents.  Sberbank otherwise denies the allegations in the first sentence of Paragraph 365. Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in the second sentence of Paragraph 365.

366.   As described at Paragraphs 164-169, *supra*, due to an investigation into terrorism financing by Ukrainian authorities that began in April 2014, both Sberbank and VTB had actual knowledge that they were providing material support and financing to the DPR and its affiliates, including through the DPR's open and notorious online fundraising campaign described herein.  Prior to the downing of MH17, Sberbank specifically acknowledged conducting an "internal investigation" relating to its provision of material support and financing to the DPR and its affiliates.

ANSWER:  Paragraph 366 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 164-169, as though fully set forth herein.  Sberbank otherwise denies the allegations in Paragraph 366, except admits that it was aware of a statement by the acting Attorney General of Ukraine on the launch of a criminal investigation by Ukrainian enforcement agencies on the alleged availability of financing for terrorism in relation to the subsidiary bank of Sberbank of Russia in Ukraine.

367.   At all relevant times, Defendants knew or had to know that the DPR was a violent organization that had carried out numerous terrorist acts on civilians, and that planned and intended to carry out additional terrorist acts.

ANSWER:  Paragraph 367 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 367.

368.   At all relevant times, Defendants knew or had to know that terrorist organizations such as the DPR require banking and money transfer services in order to operate and in

order to plan, prepare for, and carry out terrorist attacks, and that providing banking and money transfer services to the DPR, including by and through the DPR's fundraisers, would enable the DPR to plan, prepare for, and carry out terrorist attacks, because such knowledge is notorious and known to the public at large.

ANSWER:  Paragraph 368 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 368.

369.    At all relevant times, Defendants continuously supported the DPR and their violent goals and activities against the Ukrainian government and the civilian population, or were deliberately indifferent to those violent goals and activities, consciously disregarding the strong possibility that the banking and money transfer services they provided to the DPR, including by and through the DPR's fundraisers, would be used to further the DPR's terrorist activities and their campaign to intimidate or coerce civilians and influence the Ukrainian government and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 369 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 369.

370.    At all relevant times, Defendants supported or were deliberately indifferent to the DPR's terrorist acts against civilians and the DPR's goal of using terrorism to coerce, intimidate, and influence civilians, the Ukrainian government, and other governments seeking to contain Russian aggression.

ANSWER:  Paragraph 370 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 370.

371.    At all relevant times, Defendants provided banking services to the DPR, including by and through the DPR's fundraisers, and executed the money transfers that funded the DPR, with knowledge or deliberate indifference that those money transfers assisted and advanced the DPR's terrorist acts against civilians and assisted and advanced the DPR's goal of coercing, intimidating, and influencing the Ukrainian government and the civilian population.

ANSWER:  Paragraph 371 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 371.

372.    At all relevant times, Defendants Sberbank and VTB knew or had to know that the accounts at issue were owned and controlled by the DPR's fundraisers, and that the DPR and its affiliates were the ultimate beneficiaries of those accounts.

ANSWER:  Paragraph 372 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 372.

373.    At all relevant times, Defendants Western Union and MoneyGram knew or had to know that the money transfers to the DPR's fundraisers were being directed to the DPR to support their terrorist acts and campaign of intimidation and coercion.

ANSWER:  Paragraph 373 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 373.

374.    The DPR's involvement in terrorist acts in the Donbass was notorious public knowledge in 2014, and was widely reported on by the international news media, including as described in Paragraphs 104-112, above.

ANSWER:  Paragraph 374 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 104-112, as though fully set forth herein, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 374.  To the extent Paragraph 374 purports to characterize public reporting by the international news media, Sberbank respectfully refers the Court to that reporting for its contents.

375.    At all times, the DPR's fundraisers openly, publicly, and repeatedly acknowledged on their websites that they were raising money for the DPR and provided

their account numbers with Defendants, including as described in Paragraphs 177-332, above.

ANSWER:  Paragraph 375 contains characterizations to which no response is required. To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 177-332, as though fully set forth herein, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 375.  To the extent Paragraph 375 purports to characterize certain websites, Sberbank respectfully refers the Court to those websites for their contents.

376.    At all times, a simple internet search would have informed Defendants that they were providing banking and money transfer services to the DPR, including its fundraisers, and its affiliates, and specifically that the DPR was relying upon these banking and money transfer services to purchase lethal equipment and other supplies necessary for its violent terrorist activities in the Donbass.

ANSWER:  Paragraph 376 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 376.

377.    At all times, Defendants should have known and had a duty to inform themselves of the above facts because those facts were notorious and public knowledge.

ANSWER:  Paragraph 377 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 377.

378.    At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had statutory and legal duties to know their customers, perform due diligence, and refuse to provide banking and financial services to terrorist organizations such as the DPR.

ANSWER:  Paragraph 378 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 378.

379.     By providing banking services to the DPR and executing the money transfers that funded the DPR, Defendants breached their statutory and legal duties under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, and other related statutes, rules and regulations, to know their customers and perform due diligence and refuse to provide banking and money transfer services to violent terrorist organizations such as the DPR and its affiliates.

ANSWER:  Paragraph 379 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 379.

380.     At all times, Defendants should have known and had a duty to inform themselves of the above facts because Defendants had and have statutory and legal duties to monitor, report, and refuse to execute illegal, suspicious, and/or irregular banking and financial transactions.  The money transfers to the DPR's fundraisers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

ANSWER:  Paragraph 380 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 380.

381.     When executing money transfers into bank accounts controlled by the DPR's fundraisers, Defendants were and are at all times provided with and were aware of the names of all parties to the money transfers, including the names of the originator and of the intended beneficiaries and recipients of each such money transfer.  Thus, Defendants knew in real time that each of the money transfers was made to, from, and/or between accounts belonging to the DPR's fundraisers, and Defendants had the technical and practical ability to block and refuse to carry out the money transfers.

ANSWER:  Paragraph 381 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 381.

382.     Moreover, as described in Paragraphs 177-332, above, the DPR's fundraisers publicly listed their account information with Defendants on their websites, which were visible to anyone worldwide, including Defendants.

ANSWER:  Paragraph 382 contains characterizations to which no response is required. To the extent a response is required, Sberbank incorporates by reference its responses to each allegation in Paragraphs 177-332, as though fully set forth herein, and otherwise lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 382.  To the extent Paragraph 382 purports to characterize certain websites, Sberbank respectfully refers the Court to those websites for their contents.

383.    Western Union, as part of its compliance function, conducts internet searches relating to possible terrorist financing, including by utilizing analysts who "hunt through the dark web to gain insight into the tactics . . .  terrorist financiers might use to evade detection."[101] As one Western Union executive has explained, "We actually monitor the dark Web as well and see what's going on out there."[102]  Because the DPR's solicitations to raise funds to purchase lethal equipment were easily accessible and pervasive online— far more readily than material on the "dark web"— Western Union therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR.

ANSWER:  Paragraph 383 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 383.  To the extent Paragraph 383 purports to quote from and characterize two news articles on Western Union, Sberbank respectfully refers the Court to those articles for their contents.  Footnotes 101 and 102 purport to contain citations to the articles described in Paragraph 383 to which no response is required, and Sberbank respectfully refers the Court to those articles for their contents.

---

[101]   Bloomberg, "Give Us Your Tired, Your Poor, Your Huddled Masses Yearning to Send Cash," *available at* https://www.bloomberg.com/news/features/2017-06-16/for-western-union-refugees-and-immigrants-are-the-ultimate-market

[102]   Datanami, "Western Union Clamps Down on Fraud with ML," *available at* https://www.datanami.com/2018/12/03/western-union-clamps-down-on-fraud-with-ml/

384.    MoneyGram similarly requires each of its branches to "monitor and review all transactions . . .  to better identify those transactions that might be suspicious, high-risk, or otherwise out-of-the ordinary." Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, MoneyGram therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR.

ANSWER:  Paragraph 384 contains characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 384. To the extent Paragraph 384 purports to quote from and characterize an unspecified statement or policy by MoneyGram, Sberbank respectfully refers the Court to that statement or  policy for its contents.

385.    VTB Bank purports to have compliance programs in place to identify possible terrorist financing, stating that it has "developed and implemented a consolidated policy on countering money laundering and terrorist financing, as well as international sanctions compliance." Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, VTB Bank therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR, including by maintaining accounts utilized by prominent DPR fundraisers in support of the DPR's terrorist activities.

ANSWER:  Paragraph 385 contains characterizations and legal conclusions to which no response is required.   To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 385. To the extent Paragraph 385 purports to quote from and characterize an unspecified statement or policy by VTB Bank, Sberbank respectfully refers the Court to that statement or  policy for its contents.

386.    Sberbank similarly purports to have compliance programs in place to identify possible terrorist financing, stating that it has "developed and implemented" a "counter-terrorism financing" internal control policy, including "customer due diligence." Because the DPR's solicitations to raise funds and purchase lethal equipment were easily accessible and pervasive online, Sberbank therefore knew or should have known under its own internal protocols that it was providing material support and financing to the DPR,

including by maintaining accounts utilized by prominent DPR fundraisers in support of the DPR's terrorist activities.

ANSWER:  Paragraph 386 contains characterizations and legal conclusions to which no response is required.  To the extent Paragraph 386 purports to characterize prior statements by Sberbank, Sberbank respectfully refers the Court to those statement for their contents.  Sberbank otherwise denies the allegations in Paragraph 386, except admits that Sberbank has internal control policies in place, including to counter the financing of terrorism.

387.    Defendants' provision of material support and financing to the DPR is consistent with the fact that several Defendants, including MoneyGram and Western Union, have been previously sanctioned for facilitating money laundering, wire fraud schemes, and/or terrorism financing.

ANSWER:  Paragraph 387 consists of characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 387.

388.    In November 2012, MoneyGram admitted, via a deferred prosecution agreement ("DPA") with the United States Department of Justice ("DOJ"), to money laundering and wire fraud violations.  MoneyGram's services were used in mass marketing and consumer phishing scams that defrauded thousands of victims in the United States.  As part of the settlement, MoneyGram created a $100 million victim compensation fund and retained a corporate monitor to regularly report to the DOJ for an initial five-year period.

ANSWER:  Paragraph 388 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 388.  To the extent Paragraph 388 purports to quote from and characterize a deferred prosecution agreement between MoneyGram and the U.S. Department of Justice, Sberbank respectfully refers the Court to that agreement for its contents.

389.    During the course of the 2012 DPA, MoneyGram experienced significant weaknesses in its AML and anti-fraud program, inadequately disclosed these weaknesses to the government, and failed to complete all of the DPA's required enhanced compliance

undertakings.  As a result of its failures, MoneyGram processed at least $125 million in additional consumer fraud transactions between April 2015 and October 2016.

ANSWER:  Paragraph 389 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 389.

390.    On November 8, 2018, MoneyGram agreed to extend by 30 months its 2012 DPA and forfeit $125 million due to significant weaknesses in its anti-fraud and anti-money laundering ("AML") program, which resulted in a breach of MoneyGram's 2012 DPA. MoneyGram further agreed to enhance its anti-fraud and AML compliance programs.

ANSWER:  Paragraph 390 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 390.

391.    In January 2017, Western Union admitted to wire fraud violations and agreed to pay $586 million for turning a blind eye as criminals used its services for money laundering and fraud.  Between 2004 and 2012, Western Union knew of the fraudulent transactions, but failed to investigate hundreds of thousands of consumer complaints. Fraudsters had engaged in various advance-fee scams, including offering fake jobs and lottery prizes, and processed the transactions through Western Union.  Western Union was also utilized to make payments to human smugglers.  As part of the settlement, Western Union was required to maintain records of the recipients of money transfers and implement a comprehensive anti-fraud program.

ANSWER:  Paragraph 391 contains characterizations and legal conclusions to which no response is required.  To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 391.

## XI.    Plaintiffs 'Injuries Are the Proximate Result of Defendants 'Conduct and Actions

392.    Terrorist organizations, such as the DPR, need to transfer and receive funds in order to operate, and in order to plan, prepare for, and carry out terrorist acts.

ANSWER:  Paragraph 392 contains characterizations to which no response is required. To the extent a response is required, Sberbank lacks knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 392.

393.    The provision of banking and money transfer services to the DPR, including its fundraisers, and its affiliates enables them to plan, prepare for, and carry out terrorist acts, and enhances their ability to implement such acts.

ANSWER:  Paragraph 393 contains characterizations to which no response is required.

To the extent a response is required, Sberbank lacks knowledge or information sufficient to form

a belief regarding the truth of the allegations in Paragraph 393.

394.    The DPR used the banking and money transfer services provided by Defendants to transfer and receive funds necessary for planning, preparing, and carrying out terrorist activity, including shelling in civilian areas, controlling territory from which it launched assaults like the downing of MH17, and using surface-to-air missiles to bring down planes, in particular MH17.   The banking and money transfer services provided by Defendants substantially increased and facilitated the DPR's ability to plan, prepare for, and carry out terrorist acts on civilians, including the downing of the MH17 airplane. The DPR planned, made the necessary preparations, and carried out the missile attack on the plane, including through acquiring and controlling the territory from which it launched the missile, utilizing (a) funds held by them in bank accounts with Defendants; (b) funds received by them as part of money transfers provided by Defendants; and/or (c) funds that were freed up or otherwise made available to the DPR as a result of the money transfers provided by Defendants.

ANSWER:  Paragraph 394 contains characterizations to which no response is required.

To the extent a response is required, Sberbank denies the allegations in Paragraph 394 relating to

Sberbank, and lacks knowledge or information sufficient to form a belief regarding the truth of

the allegations relating to other Defendants.

395.    The ongoing maintenance of these bank accounts and the processing of these money transfers was enabled, facilitated, and carried out by Defendants' conduct and actions described herein.

ANSWER:  Paragraph 395 contains characterizations to which no response is required.

To the extent a response is required, Sberbank denies the allegations in Paragraph 395 relating to

Sberbank, and lacks knowledge or information sufficient to form a belief regarding the truth of

the allegations relating to other Defendants.

396.    By providing the DPR with access to funds, and a diverse array of global financial supporters, in the days and weeks leading up to and immediately following the attack on MH17, Defendants' conduct and actions were a substantial factor in the DPR's ability to

launch a surface-to-air missile and to control territory, including the territory necessary to set up, operate, and ultimately launch the missile system that brought down MH17; the DPR controlled this territory utilizing weapons, tactical equipment, and ammunition procured with the material support of Defendants.

ANSWER:  Paragraph 396 consists of characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 396 relating to Sberbank, and lacks knowledge or information sufficient to form a belief regarding the truth of the allegations relating to other Defendants..

397.    Because they provided the DPR with access to critical funds in the days and weeks leading up to the attack on MH17, it was reasonably foreseeable that Defendants' provision of material support to the DPR would make possible the DPR's well-documented ongoing terrorist attacks, including ultimately the attack on MH17.

ANSWER:  Paragraph 397 consists of characterizations and legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 397 relating to Sberbank, and lacks knowledge or information sufficient to form a belief regarding the truth of the allegations relating to other Defendants.

398.    The downing of the airplane carrying Quinn and 297 other innocent victims was therefore enabled, facilitated, and proximately caused by Defendants' conduct and actions described herein.

ANSWER:  Paragraph 398 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 398.

399.    Plaintiffs' injuries and Quinn's death are thus the direct and proximate result of Defendants' conduct and actions.

ANSWER:  Paragraph 399 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 399.

### CLAIM I – PROVISION OF MATERIAL SUPPORT TO TERRORISTS

400.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 399 as if fully set forth herein.

ANSWER:  Sberbank repeats and realleges its responses to Paragraphs 1 through 399 as if fully set forth herein.

401.    The actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

ANSWER:  Paragraph 401 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 401.

402.    As required by 18 U.S.C. § 2331, the actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339A, which prohibits the provision of material support to terrorists.

ANSWER:  Paragraph 402 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 402.

403.    As required by 18 U.S.C. § 2331, Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or tactical equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims its intent to continue such acts of terror.

ANSWER:  Paragraph 403 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 403.

404.    As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities. Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

ANSWER:  Paragraph 404 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 404, except admits that on July 17, 2014, MH17 traveling from Amsterdam to Kuala Lumpur crashed in Ukraine and all passengers on board, including Quinn Schansman, died, and lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the victims' nationalities.

405.    Defendants knowingly and intentionally provided financial services to the DPR, including its fundraisers, and its affiliates and/or executed the money transfers that funded the DPR, when they knew or were deliberately indifferent to the fact that the DPR, including its fundraisers, and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and other governments seeking to contain Russian aggression, and to intimidate and coerce the civilian population.

ANSWER:  Paragraph 405 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Sberbank denies the allegations in Paragraph 405.

406.    As a direct and proximate result of Defendants' provision of financial services to the DPR, including its fundraisers, and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

ANSWER:  Paragraph 406 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 406.

407.    Defendants reasonably could have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

ANSWER:  Paragraph 407 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 407.

408.    Due to the facts described above, including but not limited to the anti-American sentiment associated with the DPR, and the U.S. Department of State warnings relating to the risk to Americans of traveling in the Donbass region, Defendants reasonably could have foreseen that their provision of financial services to the DPR would result in injury to one or more United States citizens.

ANSWER:  Paragraph 408 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 408.

409.    Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

ANSWER:  Paragraph 409 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 409.

## CLAIM II – FINANCING OF TERRORISM

410.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 399 as if fully set forth herein.

ANSWER:  Sberbank repeats and realleges its responses to Paragraphs 1 through 399 as if fully set forth herein.

411.    The actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

ANSWER:  Paragraph 411 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 411.

412.    As required by 18 U.S.C. § 2331, the actions of Defendants in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339C, which prohibits the financing of terrorism.

ANSWER:  Paragraph 412 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 412.

413.    As required by 18 U.S.C. § 2331, Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, were dangerous to human life, because the funds were raised explicitly to purchase lethal and/or tactical equipment for the DPR, which was and remains a violent terrorist organization that has murdered and tortured thousands of civilians since its establishment and openly proclaims its intent to continue such acts of terror.

ANSWER:  Paragraph 413 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 413.

414.    As required by 18 U.S.C. § 2331, the violent acts committed by the DPR through Defendants' material support, specifically the missile attack that brought down the MH17 airplane, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.  The missile was launched from DPR-held territory in Ukraine and destroyed a Malaysian airplane that departed the Netherlands en route to Malaysia carrying 298 victims of 11 different nationalities. Defendants' actions in providing financial services to the DPR, including its fundraisers, and its affiliates and/or executing the money transfers that funded the DPR, also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

ANSWER:  Paragraph 414 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 414, except admits that on July 17, 2014, MH17 traveling from Amsterdam to Kuala Lumpur crashed in Ukraine and all passengers on board, including Quinn Schansman, died.

415.    Defendants knowingly and intentionally provided financial services to the DPR, including its fundraisers, and its affiliates and/or executed the money transfers that funded the DPR, when they knew or were deliberately indifferent to the fact that the DPR, including its fundraisers, and its affiliates were violent organizations dedicated to using terrorism to intimidate and influence the conduct of the Ukrainian government and other governments seeking to contain Russian aggression, and to intimidate and coerce the civilian population.

ANSWER:  Paragraph 415 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 415.

416.    As a direct and proximate result of Defendants' provision of financial services to the DPR, including its fundraisers, and its affiliates and/or execution of the money transfers that funded the DPR, Plaintiffs suffered the harms described herein.

ANSWER:  Paragraph 416 consists of legal conclusions to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 416.

417.    Defendants reasonably could have foreseen that persons, such as Plaintiffs and Quinn, would be injured by Defendants' conduct and actions described herein.

ANSWER:  Paragraph 417 consists of legal conclusions to which no response is required.

To the extent a response is required, Sberbank denies the allegations in Paragraph 417.

418.    Due to the facts described above, including but not limited to the anti-American sentiment associated with the DPR, and the U.S. Department of State warnings relating to the risk to Americans of traveling in the Donbass region, Defendants reasonably could have foreseen that their provision of financial services to the DPR would result in injury to one or more United States citizens, such as Quinn.

ANSWER:  Paragraph 418 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Sberbank denies the allegations in Paragraph 418.

419.    Defendants are therefore liable for all of Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

ANSWER:  Paragraph 419 consists of legal conclusions to which no response is required.

To the extent a response is required, Sberbank denies the allegations in Paragraph 419.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

a)    awarding Plaintiffs compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

b)    awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 2333;

c)    awarding Plaintiffs the costs of suit as incurred in this action and attorneys' fees pursuant to 18 U.S.C. § 2333;

d)    awarding Plaintiffs any equitable relief to which they may be entitled;

e)    awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowable by law; and

f)    all other relief as may be appropriate.

ANSWER:  Sberbank denies that Plaintiffs are entitled to the relief requested in this section, or to any relief.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

ANSWER:  Sberbank admits that Plaintiffs demand a trial by jury.

## AFFIRMATIVE DEFENSES

Sberbank alleges, asserts, and states the following defenses as separate and distinct defenses to the Second Amended Complaint.  By virtue of alleging these further defenses, Sberbank does not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.  Sberbank reserves the right to assert additional defenses or to amend these defenses as this action proceeds.

## FIRST AFFIRMATIVE DEFENSE

This Court lacks subject-matter jurisdiction over Plaintiffs' claims against Sberbank.  As of April 30, 2020 the Ministry of Finance has owned a 50% equity stake plus one ordinary share in Sberbank.  By virtue of its direct majority ownership by a "foreign state or political subdivision thereof," Sberbank is an "agency or instrumentality of a foreign state" within the meaning of § 1603 of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1601 *et seq.*, and, as such, Sberbank is immune from jurisdiction and suit.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)).

## SECOND AFFIRMATIVE DEFENSE

The Second Amended Complaint fails to state a claim, in whole or in part, upon which relief may be granted against Sberbank.

## THIRD AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over Sberbank with respect to the claims alleged in the Second Amended Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the intervening acts, wrongs, omissions and/or negligence of other individuals or entities.

### FIFTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs have suffered harm or damages, any such harm or damages were not proximately caused by any conduct of Sberbank, but resulted in whole or in part from the conduct of persons other than Sberbank, nor was Sberbank's conduct a but-for cause of any harm or damages suffered by Plaintiffs.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs fail to adequately allege scienter.

### SEVENTH AFFIRMATIVE DEFENSE

There is no legal basis for Plaintiffs' requested relief of the costs of suit as incurred in this action and attorneys' fees.

### EIGHTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs have already recovered or will recover from other persons for the injuries alleged by them, they are barred from seeking duplicative recovery from Sberbank.

### NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims fall within the "act of war" exception to the ATA.

### TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims cannot be maintained against a foreign state, which includes Sberbank as an agency or instrumentality of a foreign state.

### ELEVENTH AFFIRMATIVE DEFENSE

In response to Plaintiffs' claims, Sberbank intends to invoke all other defenses, including affirmative defenses, that become apparent in the future (including through discovery), and

reserve the right, in accordance with the Federal Rules of Civil Procedure and the Local Civil

Rules of the United States District Court for the Southern District of New York, to assert such

defenses at a later point in time.

Dated: New York, New York
      November 15, 2021

                        Respectfully submitted,

                        DEBEVOISE & PLIMPTON LLP

                        By: */s/ John S. Kiernan*          
                              John S. Kiernan
                              William H. Taft V
                              Román J. Rodriguez
                              jskiernan@debevoise.com
                              whtaft@debevoise.com
                              rjrodriguez@debevoise.com

                              919 Third Avenue
                              New York, New York 10022
                              (212) 909-6000

                        WHITE & CASE LLP

                              Nicole Erb
                              Claire A. DeLelle
                              Matthew S. Leddicotte*
                              nerb@whitecase.com
                              claire.delelle@whitecase.com
                              mleddicotte@whitecase.com

                              701 Thirteenth Street, NW
                              Washington, D.C.  20005
                              (202) 626-3600
                              *admitted pro hac vice*

                              *Counsel for* Sberbank of Russia