UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS SCHANSMAN, individually, as surviving
Parent of QUINN LUCAS SCHANSMAN, and as
legal guardian on behalf of X.S., a minor, and

CATHARINA TEUNISSEN, individually, as
surviving Parent of QUINN LUCAS SCHANSMAN,
and as personal representative of the ESTATE OF
QUINN LUCAS SCHANSMAN, and

Civil No. 19-cv-02985-ALC-GWG

NERISSA SCHANSMAN, individually, as surviving
Sibling of QUINN LUCAS SCHANSMAN,

Plaintiffs,

-against-

SBERBANK OF RUSSIA PJSC, THE WESTERN
UNION COMPANY, WESTERN UNION
FINANCIAL SERVICES, INC., MONEYGRAM
INTERNATIONAL, INC., MONEYGRAM
PAYMENT SYSTEMS, INC., and VTB BANK
PJSC,

Defendants.

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR RECONSIDERATION

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ................................................................. 1

LEGAL STANDARD ............................................................................... 5

ARGUMENT .......................................................................................... 6

I.    Defendants Fail to Show "Exceptional Circumstances" Meriting Reconsideration of this Court's Well-Reasoned Decision and Order .................................... 6

      A.    VTB Bank and Sberbank Improperly Seek a Rehearing of the Court's Holding that Plaintiffs Sufficiently Alleged Facts Supporting Personal Juridscition. ................................................................................ 7

      B.    Defendants Improperly Seek to Relitigate the Court's Holding that Funding Terrorism Can Be an "Act of International Terrorism" under the ATA. .............................................................................. 10

      C.    Defendants Improperly Seek to Relitigate the Court's Holding that Plaintiffs Sufficiently Allege the Requisite Intent or Knowledge. ......... 14

      D.    Defendants Improperly Seek to Relitigate this Court's Proximate Cause Holding. ............................................................................... 18

II.    Even if the Court Reaches Defendants' Arguments Again, It Should Reject Them as Contrary to Law and Plaintiffs' Well-Pleaded Allegations ....................... 22

      A.    Sberbank and VTB Bank's Repeated and Deliberate Use of New York Correspondent Accounts to Provide Funds to the DPR Subjects Them to Specific Personal Jurisdiction in This District. ...................................... 22

      B.    Defendants' Actions Were Acts of International Terrorism. ................. 29

            1.    Defendants Engaged in Acts that Endanger Human Life. ......... 30

            2.    Defendants Engaged In Acts that Appear to be Intended to Coerce or Intimidate. ........................................................................ 33

            3.    MoneyGram Incorrectly Claims that Plaintiffs Failed to Allege Funds Were Transferred Through its Services. ........................... 35

      C.    The Court Correctly Held That Plaintiffs Satisfied The Scienter Requirement Based on Defendants' Deliberate Indifference ................... 36

      D.    Plaintiffs Adequately Allege Proximate Causation. ........................... 43

i

1.    Defendants' Actions were a Substantial Factor in the Sequence of
      Responsible Causation. ...........................................................................43

2.    The ATA Does Not Require Plaintiffs to Allege "But For"
      Causation..............................................................................................47

3.    The Court Correctly Applied the Foreseeability Analysis........................49

CONCLUSION.............................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie*,
   28 N.Y.3d 316 (2016) .........................................................................................................24

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
   684 F.3d 36 (2d Cir. 2012)............................................................................................3, 6, 22

*Atchley v. AstraZeneca UK Ltd.*,
   2022 WL 30153 (D.C. Cir. Jan. 4, 2022)..................................................................27, 46, 50

*Atchley v. AstraZeneca UK Ltd.*,
   474 F. Supp. 3d 194 (D.D.C. 2020)...................................................................................46

*Averbach v. Cairo Amman Bank*,
   2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) .....................................................................8, 24

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020).....................................................................32

*Batte v. Hecla Mining Co.*,
   2021 WL 516546 (S.D.N.Y. Feb. 11, 2021).........................................................................5

*Biehner v. City of New York*,
   2021 WL 5827536 (S.D.N.Y. Dec. 7, 2021) .........................................................................7

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ...................................................................................13, 37, 40

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief and Dev.*,
   291 F.3d 1000 (7th Cir. 2002) ...........................................................................................17, 27

*Buari v. City of New York*,
   530 F. Supp. 3d 356 (S.D.N.Y. 2021)..................................................................................26

*Canfield v. SS&C Techs. Holdings, Inc.*,
   2021 WL 1026128 (S.D.N.Y. Mar. 17, 2021) ....................................................................1, 5

*In re Chiquita Brands Int'l, Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018) ................................................................................44

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018)..................................................................................29

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..........................................................32, 34, 47

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) .............................................................37, 47

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................................ *passim*

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009)............................................................................................48

*Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020) ...................................................................39

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................................................37

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)............................................................................................47

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ..................................................................... *passim*

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
    705 F. App'x 40 (2d Cir. 2017) ....................................................................37, 38

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
    774 N.E.2d 696 (N.Y. 2002).................................................................................24

*In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*,
    381 F. Supp. 3d 37 (D.D.C.) ..........................................................................10, 24

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)...............................................................2, 14, 15, 42

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ....................................................................34, 46, 48

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
    729 F.3d 99 (2d Cir. 2013)...............................................................................5, 22

*Lelchook v. Islamic Republic of Iran*,
    393 F. Supp. 3d 261 (E.D.N.Y. 2019) ...................................................................31

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003).................................................................................47

*Licci v. Am. Express Bank Ltd.*,
  2009 WL 3639957 (S.D.N.Y.)......................................................................................25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)......................................................................................3, 23

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)...............................................................................3, 33, 43

*Miller v. Arab Bank, PLC*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................................... *passim*

*O'Sullivan v. Deutsche Bank AG*,
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .........................................................46

*Oxman v. Drager*,
  2018 WL 4043136 (S.D.N.Y. Aug. 13, 2018)...........................................................22

*Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*,
  2019 WL 1261352 (W.D. Ky. Mar. 19, 2019) .........................................................10

*Rapaport v. Barstool Sports, Inc.*,
  2021 WL 2635821 (S.D.N.Y. June 25, 2021) ...........................................................9

*Rock v. Enfants Riches Deprimes, LLC.*,
  2020 WL 2793026 (S.D.N.Y. May 29, 2020) ...........................................................6

*Rosner v. United States*,
  2019 WL 1451253 (S.D.N.Y. Mar. 18, 2019) ...........................................................5

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)...................................................................19, 36, 46, 49

*Sarikaputar v. Veratip Corp.*,
  2019 WL 2343215 (S.D.N.Y. June 3, 2019) ...........................................................11

*In re Sealed Case*,
  932 F.3d 915 (D.C. Cir. 2019) ..........................................................................10, 24

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995)........................................................................................6

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)...............................................................................35, 36

*Singer v. Bank of Palestine*,
  2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) .........................................................28

*So. Westchester Realty Assocs., LLC v. Am. States Ins. Co.*,
    2018 WL 2947969 (S.D.N.Y. May 15, 2018) ........................................................21

*Strauss v. Credit Lyonnais, S.A.*,
    2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ....................................................31, 44

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ....................................................20, 40, 44

*Tamam v. Fransabank Sal*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ..............................................................28, 29

*In re Term Commodities Cotton Futures Litig.*,
    2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) ....................................................5

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ..........................................................................19, 47

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ....................................................................................37

*Vista Food Exch., Inc. v. Lawson Foods, LLC*,
    2020 WL 7364489 (S.D.N.Y. Dec. 15, 2020) ..............................................3, 6, 7

*Wachovia Mortg., FSB v. Toczek*,
    841 F. App'x 267 (2d Cir. 2021) ..........................................................................1

*Weiss v. Nat'l Westminster Bank PLC*,
    278 F. Supp. 3d 6363 (E.D.N.Y. 2017) ..............................................................45

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) ..........................................................................43, 44

*Weiss v. National Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ....................................................31, 39, 44

*Weiss v. National Westminster Bank PLC*,
    993 F.3d 144 (2d Cir. 2021) .................................................................... *passim*

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ....................................................26, 31, 44, 50

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019) ..............................................................34, 46

**Statutes**

18 U.S.C. § 2331(1) .................................................................................... *passim*

18 U.S.C. § 2333(a) ...........................................................................................................30, 43

18 U.S.C. § 2339A ...........................................................................................................30, 37

18 U.S.C. § 2339C ...........................................................................................................30, 37

Plaintiffs Thomas Schansman, individually, as surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of minor plaintiff X.S.; Catharina Teunissen, individually, as surviving parent of, and as personal representative of the Estate of Quinn Lucas Schansman; and Nerissa Schansman, individually, as surviving sibling of Quinn Lucas Schansman ("Quinn"), submit this consolidated memorandum in opposition to Defendants' motions for reconsideration of the Court's Memorandum Opinion and Order dated September 30, 2021 ("Op."), denying Defendants' motions to dismiss the Second Amended Complaint ("SAC").

## PRELIMINARY STATEMENT

"[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Canfield v. SS&C Techs. Holdings, Inc.*, 2021 WL 1026128, at *1 (S.D.N.Y. Mar. 17, 2021) (Carter, J.). Defendants, however, cannot accept this core principle. To the contrary, following the Court's careful and well-reasoned opinion denying Defendants' motions to dismiss, Defendants have done everything in their power to frustrate Plaintiffs' efforts to move this case forward. Defendants filed four separate requests to certify the Court's Order for interlocutory appeal, Sberbank filed a post-answer *second* motion to dismiss and a motion to stay discovery, and Sberbank and VTB Bank have preemptively indicated that they will seek to use foreign regulations to frustrate U.S. discovery. And here, Defendants have filed four motions for reconsideration of the Court's opinion, but not one motion identifies a single change in controlling law, a newly available fact, or anything remotely approaching clear error. Defendants do not come close to meeting their heavy burden to demonstrate "exceptional circumstances" sufficient to justify such "extraordinary judicial relief." *Wachovia Mortg., FSB v. Toczek*, 841 F. App'x 267, 272 (2d Cir. 2021).

In support of their highly disfavored motion for reconsideration, Defendants admittedly do not cite any intervening change of controlling law since the Court's opinion, or the availability of

new evidence.  Rather, Defendants critique the Court as having committed "clear error" or causing a "manifest injustice" based on arguments and case law the Court purportedly "overlooked," including three recent Second Circuit decisions: *Weiss v. National Westminster Bank PLC*, 993 F.3d 144 (2d Cir. 2021); *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021); and *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021).  But the Court did not overlook these cases—in fact, it expressly cited the Second Circuit's decision in *Weiss*—and Defendants never brought any of these cases to the Court's attention (all of which were decided well before the Court issued its decision).  If Defendants thought these cases would have altered the Court's decision, meriting the "extraordinary" relief they now seek on reconsideration, surely Defendants would have alerted the Court by filing a notice of supplemental authority.  Defendants did not do so, because, as explained in more detail herein, these cases do not offer any support for their losing arguments.  Among other reasons, in *Weiss* (resolved at the summary judgment stage) and *Honickman*, the recipients of funds were not publicly and overtly raising funds for terrorism.  In stark contrast, Plaintiffs here point to reams of public evidence showing that the Donetsk People's Republic ("DPR") existed only to commit acts of terror and was overt about that purpose and about the purpose of its fundraising.  And in *Kaplan*, the Second Circuit *reversed* the granting of a motion to dismiss, holding that the plaintiffs pled plausible aiding and abetting terrorism claims (separate claims not at issue here) where the defendant funded entities that were "publicly and repeatedly acknowledged" to be associated with Hizbollah.  999 F.3d at 864.  If anything, *Kaplan* supports Plaintiffs' case, and provides no new rules or principles that would aid Defendants.

Aside from these three unhelpful cases, Defendants simply re-raise the same issues and arguments that were extensively briefed in their four separate motions to dismiss.  The Court didn't "overlook" these arguments; it expressly rejected them, for good reason.  Defendants seek what

the Second Circuit forbids: a "second bite at the apple," attempting to achieve a different result based on the same facts and law. *Vista Food Exch., Inc. v. Lawson Foods, LLC*, 2020 WL 7364489, at *1 (S.D.N.Y. Dec. 15, 2020) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

*First*, Defendants Sberbank and VTB Bank contest the Court's finding of personal jurisdiction, but, having failed to persuade the Court through voluminous briefing on this issue alone, they simply repeat the same arguments. Just as they argued previously, Sberbank and VTB Bank again argue that Plaintiffs must plead internal transactional details (details available only to banks) in order to survive a motion to dismiss. But the Court correctly held that Plaintiffs' allegations meet the governing standard set forth in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) by showing the "selection and repeated use of New York's banking system" for transfers to the DPR. Op. at 7–10. Plaintiffs do not have to forensically trace "dozens of transfers" from the banks' internal files, prior to discovery—no plaintiff ever could. *See id.* at 10. As the Court held, it is more than sufficient for Plaintiffs to allege that the DPR advertised the use of VTB Bank and Sberbank correspondent accounts in New York, received transfers from those accounts, and raised millions of U.S. dollars, which were then used to acquire lethal weapons.

*Second*, Defendants take issue with the Court's holding that Plaintiffs adequately alleged a "violent act or acts dangerous to human life" under the ATA. Specifically, the Court held that Plaintiffs satisfied the standard set forth in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ("*Linde II*") based on Plaintiffs' allegations that Defendants provided financial services directly to the DPR's leaders and fundraisers. Op. at 10–13. Defendants repeat the same arguments the Court has already rejected, and ignore Plaintiffs' well-pleaded allegations, which show that Defendants

directly funded the DPR, which publicly stated that the money would be used to commit violent acts. As the Court found, by deliberately routing money to a group that said they would use those funds for carrying out violent acts of terror, Defendants "enhance[d] their ability to commit terrorist attacks," and thus "commit[e]d 'acts dangerous to human life." Op. at 13 (quoting *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019)).

*Third*, Defendants seek an improper rehearing of the Court's holding that they knew of or were deliberately indifferent to their provision of funds to the DPR's terroristic activities. Here again, Defendants recycle their deficient arguments, such as seeking a higher standard of intent or disputing the facts alleged in the SAC, which squarely put them on notice of their significant contributions to the DPR's public crowdfunding campaign. Defendants selectively dispute individual news articles, but the Court properly held that Plaintiffs alleged an abundance of publicly available information showing that these sophisticated Defendants knew what they were funding—including, among other things, the DPR's public boasting of raising millions of dollars with the Defendants' services, and their carrying out of violent attacks against civilians while "these attacks were widely reported and discussed by nearly every government across the world, media, and human rights organizations." Op. at 16.

*Fourth*, and finally, Defendants re-argue that their funding the DPR did not proximately cause the downing of MH17, but the Court's conclusion rejecting these arguments was correct. As the Court held, Plaintiffs need not trace the very dollars Defendants transferred to the very attack in question to hold Defendants' responsible for their material support to a terrorist group. Op. at 17. That the DPR would engage in terrorism was well documented, the focus of international media coverage, and the center of global diplomatic efforts to curb terrorism targeting civilians. That the DPR would use funding to engage in terrorism was not just reasonably

foreseeable, it was unavoidable fact.

In short, without citing any intervening authority, newly available evidence, or clear error based on controlling law, Defendants seek a re-do of the Court's carefully reasoned decision. Defendants may be disappointed with the Court's rejection of their arguments, but the Second Circuit forbids them from seeking reconsideration in these circumstances. Plaintiffs respectfully request that the motions be denied, so that Plaintiffs' important claims may proceed to the merits.

## LEGAL STANDARD

"To succeed on a motion for reconsideration, the movant carries a heavy burden." *Rosner v. United States*, 2019 WL 1451253, at *1 (S.D.N.Y. Mar. 18, 2019). A "motion for reconsideration should be granted only when the defendant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Canfield*, 2021 WL 1026128, at *1 (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013)). To establish clear error or manifest injustice, the defendant must identify "controlling law or factual matters" that "the court overlooked and that might reasonably be expected to alter the conclusion." *In re Term Commodities Cotton Futures Litig.*, 2014 WL 5014235, at *1 (S.D.N.Y. Sept. 30, 2014) (Carter, J.).[1] "Courts narrowly construe and strictly apply these principles in order to avoid repetitive arguments on issues that have already been considered fully by the court." *Batte v. Hecla Mining Co.*, 2021 WL 516546, at *2 (S.D.N.Y. Feb. 11, 2021) (Carter, J.).

A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.

---

[1] Unless otherwise noted, all internal citations, quotation marks, and alterations are omitted, and all emphases are added.

1995).  It is "not a vehicle for relitigating old issues, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Vista Food*, 2020 WL 7364489, at *1 (quoting *Analytical Surveys*, 684 F.3d at 52).  "The decision to grant or deny a motion for reconsideration is committed to the sound discretion of the district court, but in exercising that discretion, the court must be mindful that a motion for reconsideration is not favored and is properly granted only upon a showing of exceptional circumstances."  *Id.*

## ARGUMENT

**I.      Defendants Fail to Show "Exceptional Circumstances" Meriting Reconsideration of this Court's Well-Reasoned Decision and Order**

Defendants argue that the Court "overlooked" their earlier arguments and three recent Second Circuit decisions, and thus claim reconsideration is necessary to correct "clear error" or prevent "manifest injustice."  *See* WU MFR Br. 3 (Dkt. No. 211); VTB MFR Br. 3 (Dkt. No. 214); MG MFR Br. 3 (Dkt. No. 219); Sberbank MFR Br. 4 (Dkt. No. 221).  Yet rather than pointing to anything this Court overlooked, Defendants simply re-raise the same arguments that the Court already considered and rejected, and in some cases rely on new arguments and case law that they could have previously raised.  "It is settled law in this District that a motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced."  *Rock v. Enfants Riches Deprimes, LLC.*, 2020 WL 2793026, at *2 (S.D.N.Y. May 29, 2020) (Carter, J.).  Courts routinely hold that "this alone is reason" to deny such motions.  *Id*  In short, Defendants claim they are "not seeking a second bite at the apple by contending [their] arguments were not considered in the first instance."  *Vista Food*, 2020 WL 7364489, at *2.  "The record says otherwise."  *Id.* (denying motion for reconsideration).

A.    **VTB Bank and Sberbank Improperly Seek a Rehearing of the Court's Holding that Plaintiffs Sufficiently Alleged Facts Supporting Personal Juridsciton.**

In their motions for reconsideration, VTB Bank and Sberbank state that they "respectfully disagree" with the Court's conclusion that Plaintiffs alleged sufficient facts to show their "selection and repeated use of New York's banking system," to establish jurisdiction under *Licci*, which they admit is the governing Second Circuit standard.  VTB MFR Br. 4.  But the "fact that [a party] disagrees with the Court's decision is . . . not a basis for reconsideration." *Biehner v. City of New York*, 2021 WL 5827536, at *3 (S.D.N.Y. Dec. 7, 2021).  Nor is "[r]eiterating the same arguments" that were already rejected, *id.*, which is what VTB Bank and Sberbank proceed to do in their present motions.  VTB Bank argues that the Court *should have* distinguished *Licci*, because there were "dozens" of specific transfers identified in that case.  VTB MFR Br. 5.  VTB Bank argues that Plaintiffs resorted to "group pleading," and that the Court relied on many paragraphs in the SAC that "make no mention of" VTB Bank at all.  *Id.* at 8–9.  VTB Bank and Sberbank further critique the Court for making an "impermissibly large speculative leap" in accepting Plaintiffs' allegations of VTB Bank and Sberbank routing transfers to the DPR through U.S. correspondent bank accounts.  *Id.* at 7; *see also id.* at 7–16; Sberbank MFR Br. 20–22 (arguing that the "Opinion's inferences" in support of personal jurisdiction are "unwarranted").

These arguments, now framed as criticism of the Court's opinion, may sound familiar because they were all expressly raised in the motion to dismiss briefing, and then subsequently rejected by the Court.  VTB Bank and Sberbank argued at length that Plaintiffs allegations did not meet the governing standard in *Licci*, for which they argued that Plaintiffs must show "dozens of transfers."  Sberbank MTD Br. 12 (Dkt. No. 166).  VTB Bank argued that Plaintiffs did not identify any specific transactions routed through a VTB Bank correspondent account.  VTB MTD Br. 12–14 (Dkt. No. 171).  And both Defendants argued that the DPR's advertisement of Sberbank and

VTB Bank U.S. correspondent bank accounts, and those same DPR entities receiving significant amounts of U.S. dollars, did not support the allegation that Sberbank and VTB Bank transferred funds through the United States.  Sberbank MTD Br. 14–15; VTB MTD Br. 13–14 (arguing that this was too far a "speculative leap").

In its decision, the Court considered and rejected all of these arguments.  Relying on governing Second Circuit law, the Court held that "'the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs' under the ATA is sufficient for a bank to be subject to the specific jurisdiction of a district court in New York."  Op. at 7–8 (quoting *Licci*, 732 F.3d at 171).  The Court described Plaintiffs' allegations regarding these transfers in detail, including, for example, that "prior to the attack on MH17, the DPR provided instructions on how to send transfers in U.S. Dollars to Sberbank and VTB Bank's correspondent accounts in New York," and "explained that the only way to transfer U.S. Dollars was to use Sberbank's correspondent account in New York."  *Id.* at 9.  The DPR raised "millions of dollars through fundraising" via these platforms offered by Defendants.  *Id.* at 10.  Construing those allegations "in the light most favorable to Plaintiffs," the Court held that the "inference is that some of those funds raised were transferred using VTB Bank and Sberbank's services."  *Id.*  The Court specifically rejected Defendants' arguments that Plaintiffs must identify with specificity, prior to the commencement of discovery, "dozens of transfers over an extended period," holding that "Plaintiffs are not required to make the showing that Defendants suggest."  *Id.* (quoting *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020)).  Indeed, Defendants' continued insistence on Plaintiffs having to forensically trace specific transfers made, prior to discovery and without access to Defendants' internal records, is clearly wrong.  Deciding

otherwise would be a perversion of Congressional intent and stop all victims seeking to hold financial institutions accountable for their material support of terrorism at the courthouse door.

VTB Bank also suggests in its present motion, misleadingly, that Plaintiffs have had the benefit of discovery, and still have not alleged any New York correspondent account transfers by VTB Bank. VTB MFR Br. 2, 12. Neither is true. Plaintiffs did not obtain discovery, but instead received limited documents from two correspondent banks that refused to voluntarily preserve records. It is correct that Plaintiffs identified two transfers by Sberbank to the DPR in the lead-up to the downing of the MH17. However, as the Court already held, Defendants' arguments that these two transfers were insufficient is "unavailing in light of the [SAC]," which alleges that the "DPR has raised millions of dollars through fundraising," including by using Sberbank and VTB Bank's services. Op. at 10. And contrary to VTB Bank's repeated argument, the Court cited to many paragraphs in the SAC that include specific allegations showing the DPR repeatedly and publicly advertising VTB Bank accounts, and raising U.S. dollars in doing so. Op. at 9.[2]

In short, VTB Bank and Sberbank identify nothing beyond the same arguments that the Court already considered and rejected. They do not even suggest that the Court overlooked any case law; they agree that *Licci* sets forth the governing standard, they just disagree with the Court's application of it. This is not a permissible use of the motion for reconsideration. *See, e.g.*, *Rapaport v. Barstool Sports, Inc.*, 2021 WL 2635821, at *5 (S.D.N.Y. June 25, 2021) (holding that while movant "disagrees with our application of . . . case law, he does not present any cases or evidence that we may have overlooked, and thus he impermissibly attempts to use his motion for reconsideration as a substitute for an appeal.").

---

[2] *See also* SAC ¶¶ 57 (VTB Bank); 61 (VTB Bank); 173 (Sberbank and VTB Bank); 194 (VTB Bank); 216 (VTB Bank); 255–56 (VTB Bank); 260 (VTB Bank); 265 (VTB Bank); 268 (VTB Bank); 285 (VTB Bank); 297 (VTB Bank); 338 (VTB Bank), 345 (Sberbank and VTB Bank).

Finally, lacking any "exceptional circumstances" that are required to justify this motion, VTB Bank appears to make the novel argument that the very fact that it is now subject to discovery is itself an exceptional circumstance. VTB MFR Br. 17–19. To be clear, VTB Bank takes the remarkable position that the Court should reconsider its decision because VTB Bank intends to frustrate the discovery process by relying on Russian regulations purpotedly impeding discovery in the United States, a position routinely rejected in U.S. courts. *See, e.g.*, *Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, 2019 WL 1261352, at *2 (W.D. Ky. Mar. 19, 2019) (ordering production of documents over objection that production would conflict with Russian laws); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 72 (D.D.C.) (ordering foreign banks to comply with subpoenas despite their invocation of foreign privacy laws because they were in essence seeking a "*de facto* rule of first resort to any international treaty despite the Supreme Court having rejected such a rule."), *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019). Not surprisingly, VTB Bank cites no case law suggesting these extreme positions support reconsideration. Because VTB Bank and Sberbank present no cause for the Court to reconsider its opinion, the Court should reject their motions outright.

**B.    Defendants Improperly Seek to Relitigate the Court's Holding that Funding Terrorism Can Be an "Act of International Terrorism" under the ATA.**

Western Union, joined by the other Defendants, takes the lead in rehashing Defendants' prior arguments that their funding of the DPR cannot constitute an "act of international terrorism" under the ATA. WU MFR Br. 3–10. Western Union claims that its motion is premised on the Court purportedly overlooking the Second Circuit's decision in *Weiss v. National Westminster Bank PLC*, 993 F.3d 144 (2d Cir. 2021), *Id.* at 4, a case that was argued in May 2020 (well prior to Defendants' motions) and decided in April 2021 (well prior to the Court's decision). Far from

10

overlooking *Weiss*, the Court relied upon it even though no Defendant ever cited this case in the motion to dismiss briefing. *See* Op. at 17. Raising it for the first time, Western Union notes that it was issued after their prior motions were fully briefed. *See, e.g.*, WU MFR Br. 4. Of course, if this decision—or any of the new Second Circuit authorities Defendants now cite—offered any meaningful support to Defendants, they surely would have alerted the Court by filing a notice of supplemental authority. Defendants did not do so because *Weiss* did not announce any new rules, holdings, or guidance that help their case.

To demonstrate "exceptional circumstances," Defendants must point to "controlling decisions . . . that the court overlooked" and which "might reasonably be expected to alter the conclusion reached by the court." *Sarikaputar v. Veratip Corp.*, 2019 WL 2343215, at *2 (S.D.N.Y. June 3, 2019) (Carter, J.) (denying motion for reconsideration). Although this Court did not overlook the Second Circuit's decision in *Weiss*, and thus need not reach the merits of Defendants' arguments, it is also clear that *Weiss* could not reasonably be expected to alter the Court's conclusions. In *Weiss*, which was decided on summary judgment based on a complete factual record, the Second Circuit upheld the district court's determination that the plaintiffs failed to provide evidence that the recipients of funds transferred through the defendant bank were engaged in terrorism, or that the transfers were designated for that purpose. This failure of proof was "material to an assessment" of whether the defendant bank "appeared to intend intimidation or coercion." 993 F.3d at 161.

The Court, relying on governing Second Circuit law in *Linde II*, found that the opposite was true in this case. The Court held that, at the pleading stage, Plaintiffs sufficiently allege a "violent act[] or act[] dangerous to human life" because Defendants "provided financial services to" the DPR's public requests for financial support in order to purchase lethal equipment, and those

11

funds were in fact "used to purchase lethal weapons prior to the attack on MH17." Op. at 12–13 (quoting 18 U.S.C. §2331(1)); *see also id.* at 11, 12–13 (citing *Linde II*, 882 F.3d at 327). Nothing in *Weiss* alters the Second Circuit's decision in *Linde II*, or counsels a different decision than what the Court already reached, based on different facts and at a different procedural posture.

Rather than furthering their arguments, Defendants' reliance on *Weiss* is a thinly veiled pretext to once again re-raise the same arguments that this Court already rejected. Western Union argues that its "motives were economic in nature," and that the Court "did not consider whether Western Union's provision of money transfer services, without more, was a (1) violent or life-endangering act that (2) appeared intended to intimidate or coerce a civilian population or affect government." WU MFR Br. 5, 7. Defendants raised this same argument in their motions to dismiss, arguing that providing banking or money transfer services, even to the DPR, is not "violent" or "dangerous to human life" as required under 18 U.S.C. § 2331(1)(A). *See, e.g.*, Sberbank MTD Br. 24; VTB MTD Br. 19–20; WU & MG MTD Br. 16–19 (Dkt. No. 161) (arguing that they did not commit an act of terrorism because their "commercial motives" led them to provide banking services to the DPR).

The Court considered and properly rejected all of these arguments. The Court explained that whether financial services are "routine" or whether they amount to a terrorist act may "raise[] questions of fact for a jury to decide," and that by alleging that all Defendants provided funds to the DPR in response to an overt crowdsourcing campaign to raise funds for the purchase of lethal equipment and that funds were used for the purchase of "lethal weapons prior to the attack on MH17," Plaintiffs in this case sufficiently allege an act of terrorism. Op. at 11, 13 (citing *Linde II*, 882 F.3d at 327 and *Miller*, 372 F. Supp. 3d at 45). And the Court rejected Defendants' argument that their "economic" or "commercial" motives insulate them from ATA liability; of

course, any subjective intent to make money off of terrorism does not alter the Court's holding that when "Defendants provide financial support to an organization" engaged in terrorist activity, "such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1) of the ATA." *Id.* at 11 (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) ("*Boim III*")); *see also Boim III*, 549 F.3d at 698–99 (holding that to make a purportedly "benign intent a defense" for an ATA defendant "would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent").

Western Union also argues that the DPR is not a designated terrorist organization and argues that the donations to the DPR were purportedly indirect. WU MFR Br. 7. Both of these arguments were also raised in the motions to dismiss, WU & MG MTD Br. 17–18, and rejected by the Court. *See* Op. at 16 (rejecting Defendants' argument based on the fact that the "DPR has not been designated as a Foreign Terrorist Organization"); *id.* at 17 (rejecting Defendants' argument that there was a purported "lack of direct transfers to the DPR"). Western Union also mischaracterizes the SAC, contending that Plaintiffs "do[] not plead facts that the alleged money transfers . . . were made to individuals or entities known to funnel money to a terrorist organization." WU MFR Br. 6. To the contrary, as the Court noted, that is exactly what Plaintiffs allege. *See* Op. at 13 (noting, for example, that well-known DPR leaders and fundraisers who received funding from the Defendants were publicly "boast[ing] about raising millions for the DPR").

For its part, MoneyGram argues that it cannot be liable under the ATA because Plaintiffs do not allege any specific transfers through MoneyGram. MG MFR Br. 5–6. MoneyGram raised the same argument in its motion to dismiss. MG MTD Br. 3 (Dkt. No. 162). However, as Plaintiffs

explain throughout their opposition brief and in numerous allegations in the SAC, Plaintiffs allege many specific instances in which MoneyGram was openly and explicitly advertised as one method through which DPR supporters could donate, and through which the DPR received funding.  SAC ¶¶ 67, 179, 204, 208–10, 270–71, 282, 284–85, 347-48.  This argument also ignores the Court's opinion, which found that "many of the fundraisers advertised that transfers could be made through Defendants Western Union and MoneyGram," Op. at 4 (citing SAC ¶¶ 105, 194-209, 210-292), and that in the six months prior to the attack on MH17, DPR fundraisers such as Alexander Zhuchkovsky "publicly boasted about raising millions of rubles for the DPR" through these means. *Id.* (citing SAC ¶¶ 293, 296-305, 317, 318, 321-326).

Far from pointing to any controlling law or facts that the Court overlooked, Defendants have simply re-raised the arguments that the Court properly rejected.  They have thus shown no cause for reconsideration on this issue.

### C.   Defendants Improperly Seek to Relitigate the Court's Holding that Plaintiffs Sufficiently Allege the Requisite Intent or Knowledge.

In seeking reconsideration of the Court's decision that Plaintiffs sufficiently alleged the necessary *mens rea* under the ATA, Defendants again point to recent Second Circuit case law issued prior to the Court's decision that they are raising for the first time in this motion: *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) and *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021).  *See* WU MFR Br. 12–13; Sberbank MFR Br. 17.  As with *Weiss*, these decisions do not support Defendants' arguments, but instead are a pretext for Defendants to relitigate their losing arguments.

In *Kaplan*, the Second Circuit *reversed* the district court's granting of a motion to dismiss the plaintiffs' JASTA aiding and abetting claim, holding under the separate standards applicable to those claims that the plaintiffs had sufficiently alleged the defendants' general awareness that

they were funding terrorist acts based on alleged public statements on the terrorist group
Hizbollah's website and statements made by terrorist leaders. 999 F.3d at 865. Sberbank suggests
that because the facts are purportedly more extreme in *Kaplan*—itself a questionable proposition—
that decision may have raised the standard of intent Plaintiffs must meet. Sberbank MFR Br. 19.
But nothing in that opinion changed the pleading standards for Plaintiffs' claims. Rather, the
Second Circuit's decision in *Kaplan* supports this Court's opinion, finding the defendants to be on
notice where—as here—the terrorist group "repeatedly publicized" their ties to the entities being
funded by the defendants. 999 F.3d at 862. In fact, the present case is even more extraordinary,
as the DPR itself repeatedly publicized its funding ties to *the Defendants themselves*.

In *Honickman*, the plaintiffs alleged that the defendant-bank funded three social welfare
organizations, which in turn secretly funded Hamas, and that the defendant must have been aware
it was indirectly funding Hamas based on a "limited" set of "public sources." 6 F. 4th at 501. The
Second Circuit affirmed the dismissal of the plaintiffs' JASTA claims, holding that those limited
public sources did not plausibly put the defendants on notice that they were funding terrorist
activities by providing funds to social welfare organizations. *Id.* at 502. *Honickman* has no bearing
on this case, where Plaintiffs allege that Defendants repeatedly funded the DPR directly, and base
their awareness of their funding not on news articles alone, but on the fact that the DPR itself
carried out a public crowdfunding campaign, openly boasting of their reliance on Defendants'
funding for all to see, cataloging transfers of funds to the DPR through Defendants, and
documenting the purchase of weapons with that money, SAC ¶¶ 177–332, all while the DPR
"openly, publicly, and repeatedly carried out terrorist attacks on civilians," acts that were "widely
reported on and discussed by nearly every government in the world, as well as by international
media, multilateral entities, and human rights organizations." *Id.* ¶¶ 104–144. The facts before

the Court document a public and overt telethon for terror; not a covert funding operation funneled through social welfare organizations as in *Honickman*.

Defendants rely on *Honickman* in their present motions to argue that certain news articles in the SAC could not have put them on notice of the DPR's terrorist activities.  Sberbank MFR Br. 12; WU MFR Br. 13–14.  But Defendants' quibbling about a couple of news articles is an argument they previously made, WU & MG MTD Br. 20, and it fundamentally misconstrues Plaintiffs' allegations.  As this Court held in rejecting Defendants' arguments, Plaintiffs rely on far more than news articles.  Far from the "limited public sources" in *Honickman*, the Court cited an abundance of facts alleged in the SAC that would have put Defendants on notice that they were funding terrorist activities, including (1) "the DPR's public crowdsourcing campaign" in which it advertised the use of Defendants' services to raise money for its violent activities, (2) "international recognition of [the DPR's] activities," (3) "funding of the DPR's leaders who identified their relation to the DPR," (4) "the DPR's publicizing of its terrorist activities across several websites," (5) "the investigation by Ukrainian authorities into VTB Bank and Sberbank," (6) prominent media coverage of the DPR's funding scheme by outlets such as "Forbes, the New York Times, Reuters and the Kyiv Post,"[3] and (7) Plaintiffs' allegations that the "DPR has openly, publicly, and repeatedly carried out terrorist attacks on civilians, and these attacks were widely reported and discussed by nearly ever government across the world, media, and human rights organizations."  Op. at 15–16.

Stripped of their façade of arguing that the Court overlooked case law that they did not raise, and which does not help them, Defendants' position on this issue again boils down to

---

[3] These articles all pre-dated the MH17 attack, or—in the New York Times article's case, described the DPR's longstanding public fundraising campaign, including prior to the attack.  *See* SAC ¶ 171.

16

relitigating arguments that were already rejected.  Defendants argue that a deliberate indifference, or recklessness, standard is inappropriate, WU MFR Br. 11–12, but they made the same argument in their motions to dismiss, attempting to raise the required standard of intent under Sections 2339A and 2339C of the ATA to one of "actual knowledge."  Sberbank MTD Br. 19; WU & MG MTD Br. 20.  Now, as then, Defendants do not cite any authority that holds that Sections 2339A and 2339C require such a standard.  *See* MTD Opp. Br. 45–48 (Dkt. No. 172).

In rejecting these arguments, the Court relied on case law within this Circuit and across the country to conclude that the state of mind requirement under those two provisions "does not require a showing of specific intent that the defendant acted to further the organization's terrorist activities or that it intended to aid or encourage the particular attack giving rise to a plaintiff's injuries."  Op. at 14 (citing *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief and Dev.*, 291 F.3d 1000, 1023 (7th Cir. 2002) ("*Boim I*")).  Rather, "mere knowledge that the funds provided and collected would be used to carry out the predicate [terrorist] act is enough."  *Id.* at 14–15 (citing *Linde*, 384 F. Supp. 2d at 588).  With respect to knowledge, the Court explained that it is "sufficient" to show that Defendants "deliberately disregarded" facts showing that their provision of financial services to the DPR would further terrorism, "with knowledge that the services would in all likelihood assist the organization in accomplishing its goals."  *Id.* at 15 (citing *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) and *Boim III*, 549 F.3d at 685).  As set forth above, the Court held, citing an abundance of sources in the SAC, that Plaintiffs sufficiently alleged that the Defendants were on notice that their services were furthering terrorism under this standard.  *Id.* at 15–16.

Finally, Western Union argues once again that it could not have the requisite notice because it claims it transferred funds not to the DPR, but to "intermediary fundraiser organizations."  WU

MFR Br. 14.  This argument was based on a blatant mischaracterization of Plaintiffs' allegations when Defendants made it previously, *see* WU & MG MTD Br. 20, Sberbank MTD Br. 21, and remains incorrect after it has been rejected by the Court.  As Plaintiffs previously explained in response to Defendants' motions to dismiss, "any distinction between the DPR and its fundraisers is false: these fundraisers *were* the DPR, because the DPR raised funds to conduct its terrorist activities not through a central bank account but through a crowdfunding campaign involving these entities and individuals."  MTD Opp. Br. 53.  And as the Court previously concluded, it was the "*DPR's* public crowdsourcing campaign" using Defendants' services, the "*DPR's* call for funds" from Defendants, and the "*DPR's* leaders" who were "identif[ying] their relation to the DPR" and "publicizing . . . its terrorist activities."  Op. at 15–16.  Defendants disagree with this well-supported conclusion, but that is not a basis for reconsideration.

The core of Plaintiffs' complaint is that—unlike in typical ATA cases—the DPR, including its leaders and fundraisers, openly boasted about raising millions of dollars for expressly "non-humanitarian" ends, while advertising the use of Defendants' services, and then committing those violent acts while the world watched.  Op. at 15–16.  Defendants cannot ignore those well-pleaded facts, and their attempt to re-litigate their previously rejected arguments presents no cause for disturbing this Court's opinion.

### D.    Defendants Improperly Seek to Relitigate this Court's Proximate Cause Holding.

Finally, Defendants seek to relitigate the issue of proximate cause.  *See* Sberbank MFR Br. 5–17; *see also* WU MFR Br. 14–17; MG MFR Br. 8–11.  Defendants argue that the Court erred because it did not expressly state the phrase "substantial factor" in rejecting their causation arguments.  WU MFR Br. 15; MG MFR Br. 9; Sberbank MFR Br. 8–10.  But the Court plainly

considered and rejected Defendants' arguments that their conduct was not a substantial factor in the DPR's terrorism that murdered Quinn.

In Defendants' motions to dismiss, they argued that their support for the DPR was not a "substantial factor" in the downing of Quinn's flight on the MH17, primarily because they claimed not to have provided funds directly to the DPR. *See* WU & MG MTD Br. 8; VTB MTD Br. 23–24. In opposition, Plaintiffs detailed why this was wrong, because the "support that Defendants provided to the DPR enabled the DPR to acquire the weapons, ammunition, and other lethal equipment necessary to control that territory, and commit violent acts that endangered human life," and, as noted above, Defendants did *not* provide funds to intermediaries, but funded the DPR directly. MTD Opp. Br. 60–65. Plaintiffs distinguished Defendants' cited case law, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) and *In re Terrorist Attacks on September 11, 2001 ("Al Rajhi Bank")*, 714 F.3d 118, 124 (2d Cir. 2013), because Defendants' reliance on those cases— among others—was based on the fiction that the DPR fundraisers were separate, legitimate entities. In *Rothstein*, the defendant funded the government of Iran, which does more than sponsor terrorism and has "many legitimate agencies, operations, and programs to fund." MTD Opp. Br. 63 (citing *Rothstein*, 708 F.3d at 97). And in *Al Rajhi Bank*, the defendants donated money to charity organizations, without alleging that the money donated to those organizations was actually transferred to Al Qaeda in the lead-up to the September 11 attacks. *Id.* (citing *Al Rajhi Bank*, 714 F.3d at 124). Neither holding bears on this case, in which the DPR has no legitimate, non-violent purpose and explicitly stated that it was raising money to acquire weapons to carry out violent acts.

The Court plainly considered these arguments and held in favor of Plaintiffs, finding that Plainitffs "adequately pleaded facts alleging Defendants' proximate causation of Plaintiffs' injuries." Op. at 17. The Court rejected Defendants' arguments that their conduct was not a

"substantial factor" in the DPR's ability to control territory by force from which it could launch lethal attacks like the one that killed Quinn, holding that the lack of earmarking "direct transfers to the DPR for the specific attack on MH17 is not dispositive of proximate cause." *Id.* The Court relied upon the district court's decision in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) ("*Strauss I*"), quoting its holding that "[P]lainitffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because 'money is fungible.'" *Id.* In *Strauss I*, the court held that a jury could conclude that when a defendant sent millions of dollars to Hamas around the same time Hamas carried out attacks on the plaintiffs, those funds were a substantial factor in the perpetration of those attacks. 925 F. Supp. 2d at 432. By rejecting Defendants' contentions advanced in support of their "substantial factor" causation argument, citing case law that discussed the substantial factor test, and holding that proximate causation was established, the Court plainly found that Plaintiffs pled that Defendants' activities were a substantial factor and rejected any arguments by Defendants to the contrary. Op. at 16–17.

For the same reasons, the Court did not overlook the *Rothstein* and *Al Rajhi Bank* decisions, as Sberbank suggests. *See* Sberbank MFR Br. 15. Those decisions are inapplicable for the reasons Plaintiffs explained in their MTD opposition, and as further detailed herein. *See* MTD Opp. Br. 63–64; *infra* at 45–48. And the Court's holding that sufficient facts establishing proximate cause were pled and that Defendants funded the DPR, a known terrorist group, would not be affected by the holdings in those cases, which deal with financial transactions with a foreign government (engaged in a range of activities having nothing to do with terrorism) and charitable entities (engaged in activities other than terrorism). *See* MTD Opp. Br. 63. Even if the Court "did not explicitly reference [those] case[s] in its decision," it plainly rejected Defendants' arguments that

"substantially relied upon" those cases. *So. Westchester Realty Assocs., LLC v. Am. States Ins. Co.*, 2018 WL 2947969, at *2 (S.D.N.Y. May 15, 2018). Accordingly, Defendants' re-raising of those cases and arguments is far from "exceptional circumstances," but instead constitute "an improper attempt to re-litigate the Court's" decision. *Id.* (denying motion for reconsideration).

Defendants also critique the other aspects of the Court's causation holding. Defendants challenge the Court's holding that the attack on MH17 was a reasonably foreseeable result of their provision of funds to the DPR, arguing—as they did in their motions to dismiss—that the chain of causation is too attenuated. *See* Sberbank MFR Br. 11–12. The Court rejected these arguments as well, holding that Defendants could have "reasonably anticipated Plaintiffs' injuries" where Defendants knew or were deliberately indifferent to their funding of the DPR and of the DPR's use of Defendant's services "to buy lethal equipment to carry out their terrorist activities." Op. at 17 (quoting *Weiss*, 993 F.3d at 16); *see also id.* at 14–16. Defendants' disagreement with that conclusion is not a basis for reconsideration.

Finally, Defendants once again argue for a stricter "but for" causation standard, *see* WU & MG MTD Br. 13; Sberbank MFR Br. 5–6—a standard that no court has endorsed for an ATA claim. *See* MTD Opp. Br. 60–61; *Miller*, 372 F. Supp. 3d at 46 ("Requiring a showing of but-for causation would eviscerate Section 2333(a) of the ATA because money is fungible."). For that reason, the Court rejected Defendants' arguments for a stricter standard. Op. at 16–17. Sberbank injects new arguments and case law in support of an argument for but-for causation, citing a string of Supreme Court cases that issued years prior to Defendants' motions to dismiss but that Sberbank did not cite. *See* Sberbank MFR Br. 5–6, 12–13. However, motions for reconsideration are not vehicles for "presenting the case under new theories" or new case law or arguments that could have been raised previously. *Analytical Surveys*, 684 F.3d at 52; *see Oxman v. Drager*, 2018 WL

4043136, at *3 (S.D.N.Y. Aug. 13, 2018) (Carter, J.) (denying motion for reconsideration because it is "well-settled that a party may not, on a motion for reconsideration, raise an argument for the first time").  In any event, none of these newly cited cases support importing a stricter standard of causation into ATA case law for the very first time.  *See infra* at 46–47.

* * *

For all these reasons, Defendants have presented no cause for the Court to reconsider its prior, well-reasoned decision, which followed years of briefing by Plaintiffs and all four Defendants, and which responded to all of Defendants' arguments.  As the Court held, Plaintiffs' well-pleaded allegations concerning Defendants' financial support of the terrorist group that killed 298 civilians, including Quinn, should proceed to discovery for proper evaluation of the merits of these claims.  Defendants disagree with the Court's decision, but have failed to meet the stringent standards for a motion for reconsideration.  This Court should deny Defendants' present motions, and allow this case to proceed, without once again reaching all of their same arguments.

## II.   Even if the Court Reaches Defendants' Arguments Again, It Should Reject Them as Contrary to Law and Plaintiffs' Well-Pleaded Allegations

Even if the Court were to consider Defendants' arguments in their motions for reconsideration, the Court should once again reject those arguments because they do not demonstrate any "clear error" by the Court.  *Kolel Beth*, 729 F.3d at 104.

### A.   Sberbank and VTB Bank's Repeated and Deliberate Use of New York Correspondent Accounts to Provide Funds to the DPR Subjects Them to Specific Personal Jurisdiction in This District.

As in their prior motion, VTB Bank and Sberbank do not dispute the SAC's allegations that, to this day, they purposefully maintain and advertise correspondent accounts in New York City for the express purpose of facilitating U.S. dollar transactions.  SAC ¶¶ 48–55.  And as the SAC alleges, those accounts were used repeatedly to provide funds to the DPR.  *E.g.*, *id.* ¶¶ 56–

22

62. The law is clear that "a foreign bank's repeated use of a correspondent account in New York" to route funds to a terrorist group and its affiliates confers specific personal jurisdiction over the bank. *Licci*, 732 F.3d at 168. This Court correctly held that Plaintiffs met their burden of establishing a prima facie case for personal jurisdiction over VTB Bank and Sberbank because the banks "chose to operate correspondent accounts in New York and are alleged to have made transfers using New York's banking system when [they] could have processed transfers anywhere in the world." Op. at 8-9. In other words, the Court recognized that Plaintiffs adequately alleged that VTB Bank and Sberbank *repeatedly* and *deliberately* chose to use their New York correspondent bank accounts to transmit funds to support the DPR's terrorist activities.

Indeed, Plaintiffs have pleaded numerous allegations relating to the DPR's "telethon" terrorism financing scheme directly implicating Sberbank and VTB Bank. This fundraising campaign urged followers to contribute to purchasing lethal equipment specifically to carry out terrorist activities through specifically-identified Sberbank and VTB Bank correspondent accounts maintained by Defendants in this district. *See, e.g.*, SAC ¶¶ 56–62, 171–73, 178, 194, 216, 220, 255–57, 267–68, 283, 294, 297, 345.

The widespread, intentional use of New York correspondent accounts by Sberbank and VTB Bank to fund the DPR establishes a course of dealing by both banks specifically directed at New York. These New York correspondent accounts were each bank's primary means of conducting U.S. dollar transfers, and were widely advertised as such on their websites. SAC ¶¶ 49–55. In order to effectuate the transfer of funds in U.S. dollars, Sberbank deliberately utilized correspondent bank accounts in this district with JPMorgan, Citibank, Bank of America, BNY Mellon, and Deutsche Bank, and VTB Bank deliberately utilized correspondent bank accounts in this district with JPMorgan, Bank of America, and Citibank. *Id.* ¶ 48. Both bank Defendants

boasted about the commercial benefits they reaped from utilizing these correspondent accounts in New York.  *Id.* ¶¶ 50–55.  Plaintiffs further allege that the DPR repeatedly advertised these correspondent bank accounts in New York for the purpose of raising funds in U.S. dollars, boasted of raising millions of U.S. dollars, *e.g.*, *id.* ¶¶ 59–61, 171–73, 177–82, 220, 244–45, 307, 313, 317, 341, 345; and Plaintiffs specifically documented the DPR depicting (even with photographs) the purchase of lethal equipment with those funds.  *E.g.*, *id.* ¶¶ 228–36, 250, 257, 281, 331.  As the Court correctly recognized, Op. at 10, these allegations are sufficient to establish personal jurisdiction over each bank, as VTB Bank and Sberbank's "[r]epeated, deliberate use [of their correspondent bank accounts] that [are] approved by the[se] foreign bank[s] on behalf and for the benefit of a customer—as in *Licci*—demonstrates volitional activity constituting transaction of business" in New York.  *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327–28 (2016).[4]

VTB Bank (joined by Sberbank) erroneously argues that this case is not analogous to *Licci*, and that *Licci* in fact "disproves a finding of personal jurisdiction."  VTB MFR Br. 4–6.  Specifically, they assert that the plaintiffs in *Licci* identified dates and amounts of funds that were wired through the defendants' New York correspondent account.  VTB MFR Br. 5.  Not only is this an improper argument on a motion for reconsideration, but it is also (still) incorrect.  The *Licci* complaint did not provide details of any specific transactions through New York correspondent accounts.  Rather, the allegations deemed sufficient by the Second Circuit to confer personal

---

[4] *See also Averbach*, 2020 WL 486860, at *7 ("When a foreign bank repeatedly approves deposits and the movement of funds through a correspondent account, it is transacting business; that the foreign bank did not initiate the transaction does not change the analysis."); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 701 (N.Y. 2002) (cited in *Licci* and holding that less than a dozen transactions through a New York bank was a sufficient course of dealing to establish jurisdiction); *In re Grand Jury*, 381 F. Supp. 3d at 57–58 ("correspondent banking activity suffices for specific personal jurisdiction when the exercise of that jurisdiction pertains to the correspondent banking activity").

jurisdiction over the defendant bank in *Licci* (LCB) were: "between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received dozens of dollar wire transfers via defendants Amex Bank and LCB," which transfers "were made to, from, and/or between the Hizbollah Accounts via Amex Bank in New York," which "served as LCB's correspondent bank." *Licci v. Am. Express Bank Ltd.*, 2009 WL 3639957, ¶ 53 (S.D.N.Y.) (First Amended Complaint); *see also* SAC ¶¶ 41–44, 52–56. Due to the exceptional nature of the DPR's financing scheme, Plaintiffs' jurisdictional allegations far exceed the comparable allegations in *Licci*. Unlike Plaintiffs here, the *Licci* plaintiffs lacked specific allegations about the mechanics of the financing scheme or the details of transfers as they moved through New York correspondent accounts. The Second Circuit nevertheless deemed their broad allegations sufficient to establish personal jurisdiction over LCB, consistent with the fact that courts do not require plaintiffs, at the pleading stage, to have access to defendants' financial records such that they can allege the details of any particular wire transfer through a New York account.

Contrary to VTB Bank's suggestion, VTB MFR Br. 8-10, Plaintiffs allege transfers from New York correspondent accounts as to *each* of VTB Bank and Sberbank, and do not engage in group pleading of VTB by lumping it together with Sberbank.[5] For example, Plaintiffs allege that the DPR's Coordination Center for New Russia reported receiving transfers in dollars at the same time that it was advertising the account number of one of VTB Bank's correspondent banks in

---

[5] *See, e.g.*, SAC ¶¶ 173 (alleging that Veche "openly advertised VTB Bank correspondent accounts with JPMorgan Chase Bank" and other banks in New York "to handle U.S. dollar transactions"); 244 (alleging that Center for New Russia's July 2014 Financial Report reported that "its account with VTB Bank had received '1,673.55' in 'transfers in dollars'"); 341 (Center for New Russia stated that "transfers in USD" needed to be sent through a listed VTB Bank correspondent account at Deutsche Bank in New York); 345 (alleging specific VTB Bank accounts maintained by Center for New Russia, Veche, the Voice of Sevastopol, Women's Battalion of People's Militia Donbass, which these groups advertised and requested that donations be made through U.S. correspondent banks).

New York as the appropriate channel to send contributions in dollars.  SAC ¶¶ 57, 61.  Similarly, VTB Bank itself even highlights an allegation in the SAC that one of the DPR's most prominent fundraisers "openly and publicly provided the VTB Bank banking account information, including New York correspondent account information."  VTB MFR Br. 9 n.5 (citing SAC ¶ 297).  This allegation, together with the SAC's other allegations regarding VTB Bank, such as its advertising of its New York correspondent accounts for the express purpose of facilitating U.S. dollar transactions, including the ones they transacted for the DPR, is sufficient to support a finding of personal jurisdiction.  Thus, Defendants' group pleading argument must be rejected.  *See Buari v. City of New York*, 530 F. Supp. 3d 356, 390–91 (S.D.N.Y. 2021) (rejecting defendants' group pleading argument where plaintiff alleged involvement of each defendant) (citing cases).

VTB Bank and Sberbank's repeated suggestions that they did not deliberately and repeatedly choose to use their New York correspondent bank accounts to facilitate transfers in connection with the downing of MH17, VTB MFR Br. 3, 15–16, belie the specific factual allegations in the SAC, *see supra* at 8–9, 23–24.  Notably, unlike the typical ATA case, such as *Licci*, here the DPR did not use Sberbank's and VTB Bank's correspondent accounts in secret.  Rather, Plaintiffs specifically allege that Sberbank and VTB Bank knew that the DPR was utilizing their accounts and services, and their New York correspondent accounts in particular, to support its terrorist activities.[6]  Where a bank "has knowledge that it is funding terrorists, . . . contacts created by such funding" will support a finding of personal jurisdiction.  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 34 (D.D.C. 2010).

---

[6] In fact, Sberbank and VTB Bank's provision of support to the DPR was widespread public knowledge at the time, so much so that Ukrainian authorities publicly announced an investigation into Sberbank and VTB Bank's support of the DPR, and both banks issued responsive statements acknowledging the accusations of terrorism financing.  SAC ¶¶ 104–12, 164–70, 353–61, 374; *see also* MTD Opp. Br. Statement of Facts ("SOF") §§ E, G.

Plaintiffs not only established Sberbank and VTB Bank's use of New York correspondent accounts by drawing on the DPR's prolific public solicitations and advertisements, but they also adduced evidence from incomplete records that Sberbank used its correspondent accounts to transfer U.S. dollars to the DPR in the weeks leading up to the attack on MH17. *See, e.g.*, SAC ¶¶ 191, 237, 243, 244, 341. The Court correctly recognized that the two transfers do not represent the totality of the Russian-bank Defendants' use of correspondent accounts in this district and are merely examples of the evidence that Plaintiffs will adduce during discovery.[7] Plaintiffs identified these two transfers in incomplete records provided by only two U.S. correspondent banks, produced after those two banks stated they would not be retaining documents up until the discovery period in this case.[8] Plaintiffs have alleged facts in the SAC concerning the DPR's public fundraising of millions of dollars through Defendants, and as discovery proceeds in this case, many more specific transfers will be discovered in the Russian-bank Defendants' records and the records of other U.S. correspondent banks.[9] Therefore, as the Court correctly found, the allegations in the SAC are sufficient to satisfy Plaintiffs' burden to establish a prima facie case for personal jurisdiction over VTB Bank and Sberbank.[10]

---

[7] Moreover, courts have been clear that "even small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability" under the ATA. *Boim I*, 291 F.3d at 1015. As the D.C. Circuit recently noted, "Financial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals. . . . [E]ven relatively trivial aid could count as substantial." *Atchley v. AstraZeneca UK Ltd.*, 2022 WL 30153, at *12 (D.C. Cir. Jan. 4, 2022).

[8] The two correspondent banks that produced records (Bank of New York Mellon and Bank of America) also only ran searches against a limited set of DPR-related individuals named in the complaint.

[9] Indeed, the SAC alleges numerous transfers that occurred both prior to and after the MH17 attack. *See, e.g.*, SAC ¶¶ 27, 59–62, 138, 191, 237, 240, 243, 341.

[10] Notably, Sberbank and VTB Bank yet again do not deny that they transmitted funds through the New York correspondent accounts expressly identified in the SAC to the DPR accounts also identified in the SAC. As Plaintiffs previously pointed out, despite VTB Bank submitting a sworn affidavit (Dkt. No. 170)

In the only new ATA case concerning personal jurisdiction cited by either VTB Bank or Sberbank, *Singer v. Bank of Palestine*, 2021 WL 4205176, at *7–8 (E.D.N.Y. Apr. 30, 2021), VTB MFR Br. 6, 13, the court actually denied defendants' motion to dismiss based on lack of personal jurisdiction because the plaintiffs there had asserted that the defendant "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with [the terrorist organization] during the relevant period." A finding of jurisdiction is even more appropriate here, where the Defendants transferred U.S. dollars to the DPR itself, which—unlike the entity receiving funds in *Singer*—explicity advertised the fact that it was raising funds for the pruppose of procuring weapons.

VTB Bank attempts to distinguish the *Averbach* case upon which this Court relied, *see* VTB MFR Br. 13–14, but challenging this Court's interpretation of another district court's decision is not appropriate on a motion for reconsideration. In any case, the Court was correct. The plaintiffs in *Averbach* alleged only seven specific transfers, whereas here Plaintiffs allege that Sberbank and VTB Bank *repeatedly* and *continuously* (including to this day) direct customers to utilize their New York correspondent accounts for transfers in U.S. dollars, that Sberbank and VTB Bank knew that these New York accounts were advertised and utilized by the DPR to fund its terrorist activities, and that the DPR "raised millions of dollars" through their online advertising efforts, at least some of which was routed through VTB Bank and Sberbank's correspondent accounts. *See e.g.*, SAC ¶¶ 56–62, 171; MTD Opp. Br. SOF §§ F–G.

VTB Bank once again relies on *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010), *see* VTB MFR Br. 7, a pre-*Licci* case that is no longer good law. *See* MTD Opp.

---

in support of its motion to dismiss, neither bank elected to put forth a sworn statement refuting the SAC's allegations regarding the repeated use of Sberbank and VTB Bank's New York correspondent accounts to transmit funds to the DPR, and they did not do so in their motions for reconsideration.

Br. 32–33. Even were *Tamam* good law, it is factually distinguishable: "[a]fter closely parsing the ninety-four page Amended Complaint," the court found "only one relevant jurisdictional allegation," and no allegations regarding the "transfer of money through New York." *Tamam*, 677 F. Supp. 2d at 727. Given the totality of the SAC's comprehensive allegations describing the crowdfunding campaign for the DPR akin to an international telethon, operated with Sberbank and VTB Bank's knowledge, Plaintiffs have pled "facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2018) (Carter, J.).

Finally, the Court should again reject VTB Bank's argument that Plaintiffs do not adequately allege that their claims arise from the transactions alleged in the SAC. VTB MFR Br. 17. Contrary to VTB Bank's suggestion, Plaintiffs do not need to allege "that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff." *Goldberg*, 660 F. Supp. 2d at 429 (emphasis in original). Plaintiffs allege that transfers to the DPR using the Russian-bank Defendants' New York correspondent banks were made in the weeks prior to the downing of MH17, *e.g.*, SAC ¶¶ 191, 244, 341, which suffices to show that Plaintiffs' claims arise from the Russian-bank Defendants' transactions. *See* Op. at 8 (citing *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 24 (E.D.N.Y. 2016) (*Strauss II*); *Weiss v. National Westminster Bank PLC*, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016)). Accordingly, even if this Court were to closely consider and address each of the Russian-bank Defendants' arguments once again, the Court should not change its well-reasoned decision.

### B.    Defendants' Actions Were Acts of International Terrorism.

The Court correctly determined that Plaintiffs "adequately pleaded that Defendants' actions were acts of international terrorism." Op. at 12. The ATA provides liability where a plaintiff has been injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a).

The ATA defines "international terrorism" as activities that: (1) "involve violent acts or acts dangerous to human life," 18 U.S.C. § 2331(1)(A); (2) would "be a criminal violation if committed within the jurisdiction of the United States or of any State," *id.*; (3) "appear to be intended—(i) to intimidate or coerce a civilian population, (ii) to influence the policy of a government by intimidation or coercion, or (iii) to affect the conduct of a government" by specified means, *id.* § 2331(1)(B) (cleaned up); and (4) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries," *id.* § 2331(1)(C).   The violations of 18 U.S.C. § 2339A for "[p]roviding material support to terrorists" or a violation of 18 U.S.C. § 2339C for "financing of terrorism," as has been alleged here, are sufficient to satisfy 18 U.S.C. § 2331(1)(A) and thus to trigger liability under 18 U.S.C. § 2333(a).

Defendants argue that the Court failed to consider whether Plaintiffs adequately pleaded that the Defendants' actions constituted (1) a violent act or an act that endangered human life that (2) appeared to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government.  WU MFR Br. 3–5; MG MFR Br. 1 n.1.  Contrary to Defendants' contentions, the Court squarely addressed both questions, and concluded based on an abundance of allegations that Plaintiffs' Second Amended Complaint more than adequately satisfies both elements.  Op. at 12–13; *see, e.g.*, SAC ¶¶ 3–4, 12–13, 160–62, 180–81, 202, 204, 206–11, 213, 219, 221–27, 232–36, 281, 287, 296–99, 308–10, 325–28, 331, 342–43, 396.

1.    Defendants Engaged in Acts that Endanger Human Life.

Courts have repeatedly held that providing material support to terrorists or financing terrorism can constitute an act "dangerous to human life."  For example, in *Lelchook v. Islamic Republic of Iran*, the court held that a defendant bank's transfers of funds to Hizbollah through multiple intermediary banks and branches plausibly alleged an act "dangerous to human life,"

because "when banks such as BSPLC route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing 'acts dangerous to human life.'" 393 F. Supp. 3d 261, 264–66 (E.D.N.Y. 2019). *See also Wultz*, 755 F. Supp. 2d at 43–44 (by providing "extensive banking services to [Palestinian Islamic Jihad ("PIJ")], which thereby enable[d] PIJ to plan, to prepare for and to carry out terrorist attacks," defendant Bank of China had engaged in acts "dangerous to human life"); *Goldberg*, 660 F. Supp. 2d at 426–27 (by providing financial services to Hamas-associated entities, defendant UBS had "committed acts of international terrorism").[11] Additionally, as this Court recognized, in *Miller*, the court held that the bank's acts, including "routing payments and maintaining accounts for terrorists and terrorist organizations," "enhanced terrorists' ability to conduct acts of violence," and were "dangerous to human life." 372 F. Supp. 3d at 45.

Defendants argue (once again) that because they did not directly transfer funds to the DPR, their acts did not endanger human life. WU MFR Br. at 7–8. Not so. Defendants directly transferred funds to the DPR's leadership and fundraisers who publicly declared their funds would support the DPR's violent activities.[12] The DPR is the terrorists who comprise it—Defendants cannot evade liability under the ATA because the terrorists failed to register a "DPR Inc."

---

[11] *See also Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *15–19 (E.D.N.Y. Oct. 5, 2006) (defendant banks' "maintenance of bank accounts[] and processing of deposits and withdrawals" to benefit Hamas-related organizations plausibly stated claims under the ATA); *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 628–29 (E.D.N.Y. 2006) ("the provision of basic banking services may qualify as material support" under ATA).

[12] As just one of many examples, the DPR entity "Save Donbass" publicly advertised that any funds donated would go directly to DPR leaders, stating in all capital letters, "HELP WILL REACH IGOR STRELKOV AND PAVEL GUBAREV," and explicitly promising that those donations would "bypass intermediaries" such that donations would go "directly" to the DPR. SAC ¶¶ 196–200.

corporate account.  At the motion to dismiss stage, the Court properly rejected Defendants' factual arguments about the composition of the DPR.

Defendants rely once again on a series of inapposite district court cases that they previously raised and this Court previously considered.  In *Kaplan v. Lebanese Canadian Bank, SAL*, the plaintiffs alleged that defendant LCB maintained bank accounts for Hizbollah under the names of Hizbollah affiliates.  405 F. Supp. 3d 525, 528 (S.D.N.Y. 2019).  The court held that this conduct did not constitute acts of international terrorism, in part because the plaintiffs failed to allege that the defendant "provided money directly to Hizbollah to carry out the attacks" or that any transferred funds "were, in fact, sent to Hizbollah and then used by Hizbollah to perpetrate the rocket attacks."  *Id.* at 533.  Similarly in *Bartlett v. Societe Generale de Banque Au Liban SAL*, the court held that where the plaintiffs admitted that they did "not allege that Defendants donated funds or provided currency to Hezbollah or any Hezollah affiliates," the defendants' services were not life-endangering acts.  2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020).  Likewise, in *Freeman v. HSBC Holdings PLC*, the plaintiffs alleged that the defendants had "provided financial services to various Iranian banks, airlines, shipping, and oil companies," *i.e.*, legitimate businesses, and not directly to the terrorist organizations.  413 F. Supp. 3d 67, 90 (E.D.N.Y. 2019).  In contrast to all of these cases, Plaintiffs here have alleged that transfers through Defendants' banks and money transfer services were made directly to the DPR, including its leaders and fundraisers, for the express (and publicly acknowledged) purpose of acquiring weapons and other lethal material.[13]

---

[13] Defendants argue, in passing, that the SAC fails to allege that the DPR is a designated foreign terrorist organization.  WU MFR Br. 1 n.1, 7.  As the Court has held, this is of no import where Plaintiffs have alleged that it has openly carried out terrorist activities.  Op. at 16.  Moreover, the EU and U.S. sanctioned several DPR leaders, including Strelkov, in April and June 2014, and Ukraine designated the DPR and its affiliates as "terrorist organizations" in May 2014. SAC ¶¶ 127–28, 131.

2.    Defendants Engaged In Acts that Appear to be Intended to Coerce or Intimidate.

Despite not raising it previously, Defendants now stress that the Second Circuit's April 7, 2021 decision in *Weiss v. National Westminster Bank PLC* warrants dismissal. WU MFR Br. 4–7. Although this argument is not properly considered on a motion for reconsideration, *see supra* at 10–11, it is without merit in any event. As noted above, the Court in *Weiss* upheld the district court's determination, on a full record at summary judgment, that the plaintiffs failed to prove that the charitable organizations that had received funds transferred through the defendant bank were engaged in terrorism, or alternatively, that the transfers were designated for that purpose. 993 F.3d at 161. That failure of proof was "material to an assessment" of whether the defendant bank "appeared to intend intimidation or coercion." *Id.* As in *Linde II*, 882 F.3d at 326, Plaintiffs have made the exact factual allegations that Defendants acknowledge are required, with abundant demonstrative support in the SAC: money transfers through Defendants' banks and money transfer services were sent to the DPR for the purpose of purchasing weapons (as documented in numerous exemplar photographs), and it was readily apparent that the DPR was perpetrating terrorist acts (as reported by the DPR itself, and news, governments, and humanitarian organizations around the world). *See, e.g.*, SAC ¶¶ 3–4, 12–13, 160–62, 180–81, 202, 204, 206–11, 213, 219, 221–27, 232–36, 281, 287, 296–99, 308–10, 325–28, 331, 342–43, 396. The Second Circuit's decision in *Weiss* in no way undermines a finding of the requisite intent when a plaintiff alleges that the funds were transferred to entities that constitute the terrorist organization itself. *Weiss*, 993 F.3d at 162 (noting that, in *Linde*, the bank's actions appeared "intended to intimidate a population or government" because "there was 'evidence' that transfers were made to 'purported charities known to funnel money to Hamas'"). At the motion to dismiss stage, Plaintiffs' factual allegations that Defendants

transferred money to the DPR itself, even beyond a sufficient showing of transfers to individuals and entities "known to funnel money" to the DPR, are more than sufficient to meet this element.

Moreover, Defendants claim once again that they do not meet the intent requirement under 18 U.S.C. § 2331(1)(B) because they had "economic" motives. WU MFR Br. 7. However, merely because Defendants *also* profit from monetary transfers does not immunize them from liability under the ATA when they provide material support and financial services to terrorists carrying out lethal attacks. The cases Defendants cite, all of which they relied upon in their prior briefing, are again easily distinguished, as the funds in those cases were provided to either sovereign governments or organizations engaged in activities broader than terrorism—not, as here, entities of the DPR that publicly, and repeatedly, announced their aim to purchase lethal weaponry for explicitly terrorist purposes. *See Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 346, 357 n.10, 358 (E.D.N.Y. 2019), *aff'd*, 825 F. App'x 55 (2d Cir. 2020) (plaintiffs alleged HSBC had laundered money for drug cartels, which are largely (illicit) commercial entities rather than terrorist organizations); *Freeman*, 413 F. Supp. 3d at 90 (defendants had "provided financial services to various Iranian banks, airlines, shipping, and oil companies," all commercial enterprises); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 388, 390 (7th Cir. 2018) (plaintiffs alleged that Deutsche Bank was "doing business with companies and countries that have significant legitimate operations," including the government of Iran, Iranian banks, and Iran's national maritime carrier). Unlike Plaintiffs' factual allegations against Defendants, in none of those cases were the defendants alleged to have provided financial support directly to a terrorist organization for expressly terrorist purposes.

### 3. MoneyGram Incorrectly Claims that Plaintiffs Failed to Allege Funds Were Transferred Through its Services.

MoneyGram renews its argument that Plaintiffs fail to allege it provided financial services to the DPR and therefore the claims against it should be dismissed. This is factually incorrect. As the Court acknowledged, and MoneyGram ignored, "many of the fundraisers advertised that transfers could be made through Defendants Western Union and MoneyGram," Op. at 4 (citing SAC ¶¶ 105, 194–209, 210–292),[14] and that in the six months prior to the attack on MH17, supporters such as Alexander Zhuchkovsky "publicly boasted about raising millions of rubles for the DPR," which were used to provide lethal weapons to Igor Strelkov, *id.* (citing SAC ¶¶ 293, 296–305, 317, 318, 321–26). Far from being "devoid of *any* factual content," MG MFR Br. 9, the SAC provided multiple specific instances in which MoneyGram was openly and explicitly advertised as a method through which DPR supporters could donate, SAC ¶¶ 67, 179, 204, 208–10, 270–71, 282, 284–85, 347–48. Prior to discovery, Plaintiffs do not need to provide transactional details about the specific financial transactions MoneyGram facilitated in order to allege and track MoneyGram's sustained and systematic provision of material support and financial services to the DPR.

The two cases MoneyGram cites once again—*Siegel v. HSBC N. Am. Holdings, Inc.* and *Rothstein v. UBS AG*—remain readily distinguishable. Neither *Siegel* nor *Rothstein* concerned whether the plaintiffs adequately alleged that the defendants engaged in acts of international terrorism under 18 U.S.C. § 2331(1)(A)–(C). Additionally, both cases involved money transfers through the defendant banks to organizations that were not themselves terrorist organizations. In

---

[14] *See also, e.g.,* SAC ¶¶ 208 (Sberbank, Western Union, and MoneyGram), 270 (MoneyGram and Western Union), 282 (Sberbank, Western Union, and MoneyGram), 285 (Western Union, MoneyGram, Sberbank, and VTB), 297 (Western Union and MoneyGram), 313 (MoneyGram, Western Union, Sberbank, and VTB), 314 (MoneyGram and Western Union).

*Siegel*, HSBC was alleged to have provided banking services to Al Rajhi Bank ("ARB"), Saudi Arabia's largest bank, which plaintiffs alleged provided financial support to various terrorist organizations. 933 F.3d 217, 220 (2d Cir. 2019). However, unlike here, the plaintiffs in *Siegel* failed to allege that most, or even many, of ARB's banking activities were linked to terrorists, and conceded that ten months prior to the terrorist attacks at issue, HSBC ceased doing business with ARB entirely; thus any connection between HSBC and the resulting attack was even more tenuous. *Id.* at 224. Here, Defendants continued to fund the DPR well after they were publicly committing acts of terror, up to the time of the attack on the MH17, and even well afterwards. Similarly, in *Rothstein*, the plaintiffs alleged that because UBS transferred cash to Iran, those funds "would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations," but the court found those allegations conclusory because Iran is a sovereign government with "many legitimate agencies, operations, and programs to fund." 708 F.3d at 97. Here, Plaintiffs allege that MoneyGram facilitated the transfer of funds directly from supporters to the DPR for the purpose of carrying out acts of terrorism. Accordingly, Defendants have not shown cause for the Court to grant the extraordinary relief of changing its well-reasoned opinion on this issue.

### C.    The Court Correctly Held That Plaintiffs Satisfied The Scienter Requirement Based on Defendants' Deliberate Indifference.

The Court, relying on several well-reasoned legal authorities from around the country, concluded that Plaintiffs adequately alleged that Defendants were deliberately indifferent to the risk that they were providing financial support to terrorists. Op. at 13–16 (citing, *e.g.*, *Boim III*, 549 F.3d at 693; *Goldberg*, 660 F. Supp. 2d at 428). Then, relying on Plaintiffs' specific allegations of the DPR's open, notorious, and internationally-condemned campaign to solicit funding through Defendants for its reign of terror and its unprecedented public documentation of its use of those funds for those purposes, the Court concluded that Defendants were reckless, at

the very least.  Op. at 15–16.  Defendants do not present any ground to disturb either conclusion.

Defendants marshal no contrary authority, much less any that would satisfy their heavy burden on reconsideration.  Western Union places new emphasis on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)—a case cited previously, Sberbank MTD Br. 17—and *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), a case that could have been but was not cited previously.  WU MFR Br. 10–11.  Neither case held nor suggested that deliberate indifference fails to satisfy the knowledge requirements of 18 U.S.C. § 2339A or § 2339C.  In fact, neither case mentions deliberate indifference at all.  These cases merely stand for the proposition that these statutes have elevated scienter requirements.  *Holder*, 561 U.S. at 56–60; *Stewart*, 590 F.3d at 118.  But as several courts have repeatedly held—including the *en banc* Seventh Circuit—deliberate indifference satisfies those requirements.  *E.g.*, *Boim III*, 549 F.3d at 693; *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 505–06 (E.D.N.Y. 2012); *Goldberg*, 660 F. Supp. 2d at 428.[15] And the Second Circuit has agreed, as Western Union itself acknowledges.  *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 705 F. App'x 40, 41 (2d Cir. 2017) (complaint dismissed for failure to "provide a plausible basis to infer that defendants . . . knew *or were deliberately indifferent* to the

---

[15] Defendants acknowledge *Goldberg* and *Boim III*'s holdings that ATA claims can be alleged with a showing of deliberate indifference, but allege that those cases are distinguishable because defendants there provided "material support directly to a terrorist organization." WU MFR Br. 11. Defendants' interpretation of *Goldberg* and *Boim III* cannot be reconciled with the cases themselves, which expressly contemplate liability based on the provision of services to so-called intermediary groups. *Goldberg*, 660 F. Supp. 2d at 415–16, 433–34 (scienter requirement satisfied where public sources of information plausibly could have informed defendant bank that it was providing services to Hamas and where defendant bank provided financial services and transfers to a "charity that plaintiffs describe[d] as a well-known [terrorist] front."); *see also Boim III*, 549 F.3d at 701–02 (no escape from liability where "terrorists and their supporters launder donations through a chain of intermediate organizations"). In any case, the provision of "material support directly to a terrorist organization" is exactly what Plaintiffs allege here, no matter how hard Defendants try to separate the DPR from its fundraisers. *E.g.*, SAC ¶¶ 4–8.

fact that their services were used to send funds" to terrorists); *see also* WU MFR Br. 12.[16] Defendants' suggestion that this Court should, on reconsideration, break with every other court to have considered the issue is inappropriate.

As the Court recognized, Plaintiffs have more than demonstrated (at the pleading stage) Defendants' deliberate indifference to overwhelming and apparent evidence that their services were being used to fund terrorism. *See* Op. at 15–16; MTD Opp. Br. 48–52. The most powerful governments in the western world identified the DPR's leadership, including Igor Strelkov, as terrorists in the spring of 2014. SAC ¶¶ 127–31. News sources widely documented and reported on the DPR's campaign of terror against civilian populations. *Id.* ¶¶ 104–28. The Ukrainian government publicly announced investigations into major financial institutions (*i.e.*, defendants Sberbank and VTB Bank) that were providing services to the terrorist separatists in the Donbass. *Id.* ¶¶ 163–68. The DPR itself announced its intentions to the world by raising substantial funds for its terrorist activities via crowdsourcing (through Defendants' financial services) across popular mainstream websites, *id.* ¶¶ 6–7, 145–52, 158–59, 175–76, 223, 272–79, using advertisements that specifically encouraged the use of Defendants' services.[17] Anyone paying attention would have realized where these funds were going.

And Defendants are not just anyone. They are sophisticated financial institutions with in-house compliance functions expressly designed to identify possible terrorist financing. *Id.* ¶¶ 373–78, 383–86; *see Weiss*, 453 F. Supp. 2d at 630; *Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495

---

[16] The Second Circuit did not do so in a "passing[] refer[ence]," as Western Union characterizes it. WU MFR Br. 12. The court of appeals' statement of the ATA scienter requirement as requiring that the defendants "knew or were deliberately indifferent" came in the middle of the court's holding. 705 F. App'x at 41.

[17] *See* MTD Opp. Br. 49 n.31 (listing additional specific allegations as to each Defendant).

F. Supp. 3d 144, 150, 155, 160 (E.D.N.Y. 2020); MTD Opp. Br. 50–52. The Court was thus on firm ground in concluding that Plaintiffs pled that these Defendants must have known that the DPR was routinely perpetrating acts of terrorism against civilians—and that funds Defendants put into their hands would be used for these ends.

In the face of all this, Western Union and MoneyGram urge reconsideration based almost entirely on variations of the same arguments which, as explained above, this Court already considered and rejected.[18] None of them fare better on second glance.

Defendants suggest they could not have been on notice of their funding of the DPR because DPR individuals and entities who solicited funds through their services were not "reported" to be part of DPR. WU MFR Br. 13; MG MFR Br. 6–7. But these individuals and entities linked *themselves* to the DPR in an open and notorious fashion. Defendants refuse to acknowledge the mountains of public evidence that these fundraisers were using Defendants' services to fund the DPR's campaign of terror.[19] Plaintiffs have demonstrated that the DPR—including Strelkov himself—loudly sought contributions through each defendant in the case.[20] While MoneyGram complains that the Court cited only one exemplar website that referred to its services, *see* MG MFR Br. 7, the SAC specifically alleges that no fewer than six DPR entities solicited contributions

---

[18] Sberbank incorporates Western Union's briefing on scienter, making no argument of its own except that the Court erred by failing to consider *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). Sberbank MFR Br. 17–19. For the reasons explained *supra* at 15–16 and *infra* at 40–41, that argument goes nowhere.

[19] Western Union once again argues that it cannot be liable because "the Complaint does not allege that Western Union actually read or was aware of any earlier reporting." WU MFR Br. 14. Plaintiffs have already explained why this was unnecessary. MTD Opp. Br. at 54-56; *see also Henkin*, 495 F. Supp. 3d at 15 (no requirement that plaintiffs must plead with specificity that the bank "read or was actually aware of information connecting its customers" to terrorist organizations to survive a motion to dismiss, as long as that information is publicly available). A sophisticated entity like Western Union cannot put its head in the sand and avoid such publicly available information while funding terrorism—that is the definition of deliberate indifference.

[20] *Supra* notes 4, 11, 13.

through MoneyGram. SAC ¶ 347. For instance, Plaintiffs specifically allege that the DPR's Save Donbass site openly solicited funds before the MH17 attack using the material support of Sberbank, Western Union, and MoneyGram. *Id.* ¶¶ 204–11. It stated that it would purchase lethal equipment and deliver material support "directly" to the DPR's leaders Igor Strelkov, Ekaterina Gubareva, and Pavel Gubarev. ¶¶ 196–200, 202–03. And the SAC explains in excruciating detail how the DPR procured funds through all four Defendants and publicly accounted for its use of those monies for the perpetration of its heinous campaign.[21]

Next, Defendants again mischaracterize the SAC by arguing that they should not be held liable for doing business with the DPR's fundraisers (as so-called "intermediaries") rather than the DPR as a corporate entity. WU Br. 14; *see also* MG MFR Br. 7 (distinguishing between "individual recipients" and the DPR). As Plaintiffs have explained, this makes no sense and is contrary to settled precedent. First, the fundraisers are part of the DPR—they are not separate entities with legitimate missions, as in other cases cited by Defendants. *E.g.*, ¶¶ 5–7, 145–52, 158–59, 175–76, 223, 272–79. Second, even assuming *arguendo* any conceptual daylight between the DPR and its fundraisers (which there is not), courts have routinely found the scienter requirement satisfied where defendants transferred funds through purported "intermediate" entities rather than directly to terrorists. *See Strauss I*, 925 F. Supp. 2d at 429, 431–32; *Goldberg*, 660 F. Supp. 2d at 415–16, 433–34; *see also Boim III*, 549 F.3d at 701–02 (no escape from liability where "terrorists and their supporters launder donations through a chain of intermediate organizations"). Plaintiffs have described the DPR's advertising blitz, in which it made clear that donations would end up

---

[21] MTD Opp. Br. 59 n.45.

directly in the hands of the DPR's leadership, with unusual specificity.[22]

Defendants' new reliance on *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) does not help their cause. *Honickman* does not affect, much less control, the Court's prior analysis. Instead, *Honickman* counsels, consistent with prior case law, that where overtly benevolent organizations are covertly funding terrorism, a plaintiff needs to present more than a handful of limited public sources suggesting the fundraisers' secret purpose for a bank to be on notice of their nefarious ends.[23] *See id.* at 502 (Hamas organizations presented as relief charities, using "humanitarian[] . . . purposes *as a cover*" for their funding of terrorism). That has no bearing here. As the Court has recognized, the DPR's fundraisers did not "maintain[] a 'cover' in public" by using a false humanitarian mission to conceal their true nature to the world. *Id.*; Op. at 15–16. Instead, they advertised for all the world to see that their mission was obtaining funds for the DPR's weapons and military equipment—the tools they needed to carry out their campaign of terror. SAC ¶¶ 225 ("We are NOT engaged in humanitarian assistance. We are engaged in non-humanitarian assistance."), 227, 299. The *Honickman* complaint did not allege that the leadership of Hamas had publicly advertised that donors should send funds through the charitable organizations, nor did the leadership of Hamas thank the bank's customers for contributing funds through those channels, as DPR Commander-in-Chief Igor Strelkov did here. SAC ¶¶ 157, 188– 190. There was no allegation in *Honickman* that the bank had been investigated by authorities

---

[22] Western Union attempts to suggest the Court improperly relied on a 2015 *New York Times* article published after the MH17 attack, WU MFR Br. 13–14, but the article itself describes the DPR's longstanding and extraordinarily public campaign to raise funds through Defendants for terrorism. And, as explained above, the Court did not rely on just this article in finding Defendants' intent.

[23] *Honickman* certainly does not require that the link between a specific customer and an identified terrorist organization be "common knowledge" in order for liability to attach, as Western Union asserts. WU MFR Br. 12. That standard appears nowhere in the case.

because of their terror-related transactions. *See* Complaint ¶¶ 588–640, *Honickman v. BLOM Bank SAL*, 432 F. Supp. 3d 253 (E.D.N.Y. 2020), (No. 19-cv-8), ECF No. 1 [hereinafter *Honickman* Compl.]. Multiple defendants here were. SAC ¶¶ 164–69, 366. There was no allegation in *Honickman* that the bank had boasted about its ability to detect and prevent the sorts of illicit transactions at issue in this case. *See Honickman* Compl. ¶¶ 588–640. But that is what Defendants here did. SAC ¶¶ 383–86.[24]

Defendants attempt to raise the pleading bar by reference to the extreme facts in the Second Circuit's recent decision in *Kaplan*, but while that case is not directly applicable anyway, as it bears on JASTA aiding and abetting claims, its "detailed, numerous sources" connecting the bank to a terrorist group bring this case far closer to *Kaplan* than *Honickman.* MG MFR Br. 17–18. In *Kaplan*, Hizbollah publicly acknowledged the entities being funded were parts of their organization, and financial institutions kept funding them anyway—here, the DPR went even further and publicly advertised and solicited funding through the Defendants' services for their terrorist acts, advertised that they received that funding through Defendants, and then boasted of their purchase of weapons to be used for violent acts. *Compare* MTD Opp. Br. 48–50 *with Kaplan*, 999 F.3d at 862 (bank had knowledge that its customers were "integral parts" of Hizbollah because the terrorists "repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations").

In any case, Plaintiffs' burden to plead the requisite state of mind at the pleading stage is even less than "the lenient standard" that the Second Circuit has approved at summary judgment

---

[24] There is no reason to believe that the Court applied a JASTA "foreseeability" analysis as opposed to the ATA scienter analysis, as Western Union suggests. WU MFR Br. 12 n.7. After all, the Court correctly applied the same deliberate indifference analysis that the *Boim III* and *Goldberg* courts applied in those ATA cases. Op. at 15.

"for ruling on the sufficiency of evidence of scienter issues." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014); *see Linde*, 882 F.3d at 330 ("traditionally a jury resolves questions about a tortfeasor's state of mind"). Plaintiffs have more than satisfied that standard. For these reasons, none of Defendants' arguments justify reconsideration of the Court's well-reasoned opinion on scienter.

### D. Plaintiffs Adequately Allege Proximate Causation.

Under 18 U.S.C. § 2333(a), "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs" is entitled to recovery under the ATA. "The words 'by reason of' have been interpreted to express Congress's intent to require a showing of proximate causation." *Goldberg*, 660 F. Supp. 2d at 429. "A showing of proximate causation requires that plaintiffs show defendant's actions were [1] 'a substantial factor in the sequence of responsible causation,' and [2] that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Id.* The Court correctly applied this standard, and correctly concluded that Plaintiffs allege that Defendants' actions proximately caused Plaintiffs' injuries.

### 1. Defendants' Actions were a Substantial Factor in the Sequence of Responsible Causation.

As the Court recognized, the SAC plausibly alleges that Defendants' conduct was a substantial factor in the chain of causation that ended with Quinn's murder. Plaintiffs allege that Defendants provided financial services for the DPR and its leaders, and that those financial services enabled supporters from around the world to fund the DPR's procurement of territory and lethal equipment. The SAC provides numerous specific examples of transfers and flows of funds from Defendants to the DPR in the period prior to the downing of MH17, which were publicly available and accessible to Defendants at the time. And it makes clear that Defendants' provision

of material support to the DPR was a substantial and direct contributor to the DPR's ability to hold

the territory from which it fired the missile that destroyed MH17 and murdered Quinn.  *See* SAC

¶¶ 13–14, 75.  Indeed, relying on just some of the many allegations in the SAC, the Court stated

that "the DPR relied on Defendants' services to access funds that were *essential* for its procurement

of weapons and ammunition and to acquire control of the territory from which the DPR launched

the missile that brought down MH17." Op. at 3 (citing SAC ¶ 159).[25]

As the Court recognized, proximate cause exists where a financial institution provides

financial services to a terrorist organization, or its agent, in advance of the attack that caused the

plaintiff's injury.  Op. at 17; *see, e.g.*, *Miller*, 372 F. Supp. 3d at 46; *In re Chiquita Brands Int'l,*

*Inc.*, 284 F. Supp. 3d 1284, 1309–14, 1317–18 (S.D. Fla. 2018); *Wultz*, 755 F. Supp. 2d at 53;

*Weiss*, 453 F. Supp. 2d at 632; *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *17–18

(E.D.N.Y. Oct. 5, 2006).  Because money is fungible, a plaintiff may establish proximate cause

for his injuries under the ATA by showing that the funds or financial services furnished by a

financial institution "provided material support to a *terrorist organization*, irrespective of whether

the support aided terrorist activities." *Weiss*, 768 F.3d at 206 (emphasis in original); *see also*

*Strauss*, 925 F. Supp. 2d at 433 ("[P]laintiffs who bring an ATA action are not required to trace

specific dollars to specific attacks to satisfy the proximate cause standard").[26]

---

[25] The Court thus considered whether the substantial factor requirement had been met, contrary to
Defendants' argument.  *See* MG MFR Br. 9–11.  Additionally, the Court noted that Plaintiffs identified
"several fundraisers, including Save Donbass, the Center for New Russia, Veche, Rospisatel, World Crisis,
Icorpus, Sevastopol, Essence of Time, and People's Militia of New Russia, that were used to solicit funds
to provide lethal support directly to the DPR," and that the fundraisers not only solicited donations through
Defendants VTB Bank, Sberbank, Western Union, and MoneyGram, but also "provided reports of transfers
and withdrawals from its accounts with Defendants Sberbank and VTB Bank and money transferred
through Defendant Western Union." Op. at 4 (citing SAC ¶¶ 105, 194–209, 210–292).

[26] For similar reasons, the Court should disregard Defendants' argument that because Plaintiffs did not
include an exact amount of funds that were transferred through each Defendant, Plaintiffs have failed to

None of Defendants' evasions on reconsideration—some new, some just reheated—allow them to break the causal chain. First, far from providing "routine banking services to organizations and individuals said to be affiliated" with a terrorist organization, Sberbank MFR Br. 9 (quoting *Al Rajhi Bank*, 714 F.3d at 124), Plaintiffs allege that Defendants provided financial services to individuals and organizations that existed for the sole purpose of financing the DPR's campaign of terrorism. *See Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 641–43 (E.D.N.Y. 2017); *see also* MTD Opp. Br. 64.

Second, Defendants' argument that the ATA immunizes them for transferring funds in support of terrorism because the transfers were made to "intermediaries" (as opposed to the terrorist organization directly) is not only contrary to settled precedent, it is a misstatement of the well-pleaded facts in the SAC. The DPR fundraisers are not intermediaries. The DPR is not a corporate entity that can hold bank accounts in its own name. In this case, the direct recipients of funds transferred through Defendants' services were organizations, entities, and individuals that made up the DPR. *See* MTD Opp. Br. 5–6.

Each case cited by Defendants to support its "intermediary" defense is easily distinguishable, as Plaintiffs explained in depth when responding to the same defense in the first round of briefing, and similarly explained once again with respect to Defendants' intent arguments. MTD Opp. Br. 62–65; *supra* at 39–42. In those cases, unlike here, the funds were not provided to organizations that had publicly announced their aims to purchase lethal weaponry for terrorist purposes. Instead, Defendants' cases involve donations to sovereign governments and other

---

adequately plead that Defendants' conduct was a substantial factor in the Plaintiffs' injuries. *See* Sberbank MFR Br. 15. This is an impossibly high standard for *pleadings* prior to discovery, and it is one the Court already properly rejected, particularly in light of Plaintiffs' well-supported allegations that the DPR raised "millions" of dollars through its public crowdfunding campaign. Op. at 10, 13.

entities without solely terrorist aims. *See, e.g.*, *Kemper*, 911 F.3d at 393 (government of Iran and Iranian companies); *Rothstein*, 708 F.3d at 97 (same); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *5 (S.D.N.Y. Mar. 28, 2019) (same); *Zapata*, 414 F. Supp. 3d at 356 (laundering of funds for drug cartels with illicit commercial but not terrorist aims).

Making its "intermediary" argument again in its present motion, Sberbank cited as support the district court's holding in *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 209 (D.D.C. 2020). Sberbank MFR Br. 10. In recently reversing this holding and finding that the plaintiffs had pled proximate cause, the D.C. Circuit provided further support for this Court's opinion, noting that a "sovereign state has 'many legitimate agencies, operations, and programs to fund' so, even if the state is known to prop up terrorists, we cannot presume that aid to such state finds its way into terrorist hands," and holding that—as in this case—"plaintiffs do not allege that defendants aided an autonomous nation with many functions and priorities." *Atchley v. AstraZeneca UK Ltd.*, --- F. 4th ---, 2022 WL 30153, at *17 (D.C. Cir. Jan. 4, 2022). In *Atchley*, the "defendants gave to a single agency that had been overtaken by terrorists." *Id.* Here, Defendants donated directly to the terrorist group itself, thus creating an even clearer case for liability.[27]

Defendants' reliance on *Al Rajhi Bank* is equally unavailing. In *Al Rajhi Bank*, the court held that allegations the defendants provided funding to purported charity organizations that provided funding to al Qaeda and other terrorist organizations were insufficient because the plaintiffs failed to allege that the defendants provided money directly to al Qaeda or that the money

---

[27] Moreover, the Court in *Atchley* held that even "when a defendant aids an intervening intermediary, the defendant's position 'one step removed' from the terrorists does not defeat proximate causation so long as plaintiffs allege some facts demonstrating a substantial connection between the defendant and terrorism," which the plaintiffs could do by showing that the funding to the intermediary "were nonetheless substantially connected to [the] acts of terrorism that harmed plaintiffs." *Id.* at *18. Here, even if the DPR's fundraisers were separate from the DPR—which they are not—there is no question that those funds are substantially connected to the DPR.

donated by defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks.  714 F.3d at 124.[28]

None of these cases supports Defendants' argument that "intervening causes" preclude a finding of liability.  Sberbank MFR Br. 10; WU MFR Br. 15-16; MG MFR Br. 11.  The SAC contains numerous factual allegations that the funds transferred by Defendants went directly to the DPR for the explicit purpose of acquiring lethal equipment to hold territory and carry out terrorist attacks.  *See, e.g.*, SAC ¶¶ 14, 180.  The DPR held that territory and used it to carry out those attacks, including launching the missile that murdered Quinn.  Plaintiffs thus sufficiently allege that the provision of funds to the DPR through the Defendants banks and money transfer services was a substantial factor in the downing of the MH17 flight.

## 2.    The ATA Does Not Require Plaintiffs to Allege "But For" Causation.

Defendants wrongly suggest that the substantial factor test requires a showing of but-for causation.  *See* MG MFR Br. 10.  It does not.  Contrary to Defendants' claims, Plaintiffs are not required to show that "the attack on MH17 could not have occurred without funding transferred by any particular Defendant."  Sberbank MFR Br. 13.  "'But for' cause cannot be required in the section 2333(a) context."  *Gill*, 893 F. Supp. 2d at 507; *see also Freeman*, 413 F. Supp. 3d at 84 n.24 ("Importantly, however, *Rothstein*'s proximate causation requirement does not require a plaintiff to allege that the defendant's conduct was a "but for" cause of his injuries.").  Requiring

---

[28] Defendants' reliance on the proximate cause standard in the distinct context of RICO cases is equally unpersuasive.  Sberbank MFR Br. 11.  In *Lerner v. Fleet Bank, N.A.*, the Second Circuit merely held that in RICO cases, the reasonably foreseeable victims are "the targets, competitors and intended victims of the racketeering enterprise."  318 F.3d 113, 124 (2d Cir. 2003), *as amended* (Apr. 16, 2003) (applying the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b)).  *See also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) (securities fraud case).  Nothing about this separate context changes the proximate cause standard in the ATA context, or requires plaintiffs to show that Defendants had to have foreseen with specificity the particular victims of their conduct, *i.e.*, passengers aboard MH17.

that plaintiffs allege but-for causation in Section 2333(a) cases would "eviscerate" the ATA because "money is fungible." *Miller*, 372 F. Supp. 3d at 46.

Defendants base their but-for causation argument on a slew of newly-cited Supreme Court decisions interpreting entirely different statutory schemes, none of which direct a but-for requirement in the ATA. Sberbank MFR Br.12–14; WU MFR Br. 17. In *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009), the Supreme Court explicitly noted that "[w]hen conducting statutory interpretation, we must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Id.* at 174; *see also id.* 175 n.2 (noting that the Court had interpreted the phrase "because of age" differently from "because of race or sex" based on the factors internal to the staute (cleaned up)). Defendants' new reliance on cases in completely different contexts does not change the existing case law on how every other court has interpreted the ATA, including after the Supreme Court opinions that Defendants newly inject following the Court's decision.

Defendants unsuccessfully strain to construe the Second Circuit's decisions in *Honickman* and *Rothstein* to require but-for causation in ATA cases.[29] The Second Circuit in *Honickman* did not even address but-for causation, and noted only in a footnote that pre-JASTA cases were "inapposite" to aiding-and-abetting liability claims, which are not at issue here. 6 F.4th at 499 n.14. And in *Rothstein*, the court merely held that a plaintiff is required to make factual allegations

_____

[29] Defendants also cite to the Seventh Circuit decision in *Kemper* to suggest the well-established principle that but-for causation is not required in the ATA context has "been called into question following *Burrage*." Sberbank MFR Br. 13. This argument is disingenuous at best. The party in *Kemper* that allegedly "called into question" the applicability of but-for causation in ATA cases was the *defendant bank*, hardly a neutral decisionmaker. In reality, the court in *Kemper* soundly rejected the defendant's argument because "a rigid insistence on singular but-for causation would perversely result in the tortfeasor's escaping liability" despite having committed a wrongful act. *Kemper*, 911 F.3d at 391. The court reaffirmed its decision in *Boim III* and concluded that the "causation inquiry was not meant to prevent liability in these situations." *Kemper*, 911 F.3d at 391.

that establish *proximate cause*, rather than a lower or more expansive causal threshold. *Rothstein*, 708 F.3d at 96. In fact, *Rothstein* distinguishes between proximate and but-for causation, explaining that a case cited by the plaintiffs was "misplaced" because the case "was discussing not proximate cause but 'cause-in-fact' and 'but-for cause.'" *Id*. And in rejecting the plaintiffs' claims, the court suggested that had plaintiffs made allegations that "the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas," (which would not satisfy a but-for causation requirement) the result would have been different. *Id.* at 96. In this case, Plaintiffs have alleged, in great detail, how the money transferred through the Defendants' banks and money transfer services were "in fact" sent to the DPR. Defendants fail to cite a single in-circuit case holding that the ATA requires otherwise.

### 3.    The Court Correctly Applied the Foreseeability Analysis.

Defendants argue that because the DPR had not yet engaged in activity "resembling the downing of a plane filled with non-combatants who might include Americans before the downing of MH17," such an attack was not reasonably foreseeable. Sberbank MFR Br. 16. This distorts the foreseeability standard, and ignores the enormous amount of publicly available information that since 2014, the DPR has repeatedly carried out brutal terrorist attacks on civilians. The DPR's campaign of terror was widely reported on and condemned by governments in 2014. Additionally, the DPR's top leaders, who led fundraising efforts, were sanctioned by the European Union in April 2014 and by the U.S. in June 2014. SAC ¶¶ 127, 134. In May 2014, as the DPR's terrorist activities continued unabated, Ukraine formally and publicly classified the DPR and its affiliates as "terrorist organizations." *Id.* ¶ 128. And shortly before the attack on MH17, the U.S. imposed sanctions on the DPR. *Id.* ¶¶ 131–34.

Where a financial institution transfers funds to a terrorist organization responsible for the attack at issue prior to the attack, the court will find that "the ultimate harm was foreseeable"

because "[a] fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist organization would lead to violence and Congress had precisely that lethal connection in mind in passing the ATA." *Goldberg*, 660 F. Supp. 2d at 430; *see also Atchley*, 2022 WL 30153, at *16 (holding that "providing fungible resources to a terrorist organization allows it to grow" therefore "[i]t was reasonably foreseeable that financially fortifying" a "known terrorist group" would lead to the terrorist attacks suffered by the plaintiffs); *Wultz*, 755 F. Supp. 2d at 53 (defendant bank "could have reasonably anticipated plaintiffs' injuries" where defendant "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence"). Merely because the DPR had not previously shot down a passenger jet carrying nearly 300 civilians, including one US citizen, does not mean that such actions were not reasonably foreseeable.[30] There is no requirement that to be reasonably foreseeable, the defendants in ATA cases must have been able to predict the precise manner in which a terrorist group would continue to kill innocents.

## CONCLUSION

This Court has already considered Defendants' arguments for dismissal of this case, and in a well-reasoned decision, held that Quinn's family can advance their case to holding Defendants accountable for providing material support to those responsible for shooting down MH17, killing Quinn and 297 other civilians. For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions for reconsideration of the Court's Memorandum Opinion and Order.

---

[30] And in fact, Plaintiffs alleged facts showing that it was foreseeable that Americans could be targeted, including the DPR's well-known "strident anti-American tone," the DPR's use of "civilians, such as international observers" from multilateral organizations, as human shields, and the U.S. Department of State's warnings to Americans not to travel to Eastern Ukraine. SAC ¶¶ 110, 134, 139

Dated:  January 7, 2022

Respectfully submitted,


By:   /s/ David Pressman

David J. Pressman
Andrew J. Lichtman
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1654
dpressman@jenner.com
alichtman@jenner.com

Terri L. Mascherin (admitted *pro hac vice*)
Jenner & Block LLP
353 N. Clark St.
Chicago, IL 60654
(312) 923-2799
tmascherin@jenner.com

*Attorneys for Plaintiffs Thomas Schansman, individually, as the surviving parent of Quinn Lucas Schansman, and as legal guardian on behalf of X.S., a minor, Catharina Teunissen, individually, as surviving parent of Quinn Lucas Schansman, and as personal representative of the Estate of Quinn Lucas Schansman, and Nerissa Schansman, individually, as the surviving sibling of Quinn Lucas Schansman*