UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

THOMAS SCHANSMAN, individually, as surviving
Parent of QUINN LUCAS SCHANSMAN, and

CATHARINA TEUNISSEN, individually, as
surviving Parent of QUINN LUCAS SCHANSMAN,
and as personal representative of the ESTATE OF
QUINN LUCAS SCHANSMAN, and

NERISSA SCHANSMAN, individually, as surviving
Sibling of QUINN LUCAS SCHANSMAN, and

XANDER SCHANSMAN, individually, as surviving
Sibling of QUINN LUCAS SCHANSMAN,

        Plaintiffs,

        -against-

SBERBANK OF RUSSIA PJSC, THE WESTERN
UNION COMPANY, WESTERN UNION
FINANCIAL SERVICES, INC., MONEYGRAM
INTERNATIONAL, INC., MONEYGRAM
PAYMENT SYSTEMS, INC., and VTB BANK
PJSC,

        Defendants.

Civil No. 19-cv-02985-ALC-GWG

---

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SBERBANK OF RUSSIA PJSC'S SECOND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

David Pressman
Jason P. Hipp
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1654
dpressman@jenner.com
jhipp@jenner.com

Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 923-2799
tmascherin@jenner.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD ..................................................................................................... 5

ARGUMENT ................................................................................................................... 5

I.      Sberbank of Russia Was Not An Instrumentality At The Time The Action Was
        Brought And Is Therefore Not Immune For Purposes Of This Litigation. ........................ 5

        A.      The U.S. Supreme Court's Holding In *Dole Food* Establishes That
                Ownership Is Determined at the Time of Suit. ...................................... 5

        B.      The Time-Of-Filing Rule Considers The Defendant's Status At The Time
                The Action Was Brought, Not At The Time Of Each Post-Filing
                Amendment. ........................................................................................ 8

II.     The Central Bank Of Russia Is Not A "Political Subdivision" Of The Russian
        Federation. ................................................................................................................ 10

        A.      Courts Have Invariably Held, And Congress Clearly Stated, That Central
                Banks Are Agencies Or Instrumentalities. ........................................... 11

        B.      The Central Bank Exercises Predominantly Commercial Functions. .................. 14

        C.      The Central Bank Is Legally, Politically, And Structurally Independent Of
                The Russian Federation. ...................................................................... 16

III.    Even If Sberbank Of Russia Is Entitled To A Presumption Of Immunity, FSIA
        Exceptions Apply And Strip Sberbank Of Its Presumption Of Immunity. ...................... 19

        A.      Plaintiffs' Suit Is Based Upon Commercial Activity Undertaken By
                Sberbank Of Russia, And Thus Falls Within The FSIA's Commercial
                Activity Exception. ............................................................................. 19

        B.      Section 2337 Does Not Bar This Action, And The General Exceptions
                Remain Available. ............................................................................... 20

IV.     Sberbank of Russia Has Waived The Right To An Immediate Determination Of
        Its Immunity Defense. ............................................................................................... 22

CONCLUSION ............................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Abrams v. Societe Nationale Des Chemins De Fer Francais*,
   389 F.3d 61 (2d Cir. 2004)....................................................................................5, 8

*Apostol v. Gallion*,
   870 F.2d 1335 (7th Cir. 1989) .........................................................................24, 25

*Ashraf-Hassan v. Embassy of France in the United States*,
   40 F. Supp. 3d 94 (D.D.C. 2014) ...........................................................................24

*Bartlett v. Societe Generale de Banque au Liban SAL*,
   No. 19-cv-00007, 2021 WL 3706909 (E.D.N.Y. Aug. 6, 2021) ..........................6, 8

*Berg v. Kingdom of Netherlands*,
   24 F.4th 987 (4th Cir. 2022) ...................................................................................16

*Berg v. Kingdom of the Netherlands*,
   No. 2:18-CV-3123-BHH, 2020 WL 2829757 (D.S.C. Mar. 6, 2020) .............. 12-13

*Biton v. Palestinian Interim Self-Gov't Auth.*,
   510 F. Supp. 2d 144 (D.D.C. 2007)......................................................................6, 7

*Boelens v. Redman Homes, Inc.*,
   759 F.2d 504 (5th Cir. 1985) ..................................................................................10

*Bolduc v. United States*,
   402 F.3d 50 (1st Cir. 2005) ....................................................................................25

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   137 S.Ct. 1312 (2017) ............................................................................................25

*Breuer v. Jim's Concrete of Brevard, Inc.*,
   538 U.S. 691 (2003)................................................................................................22

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
   727 F.2d 274 (2nd Cir. 1984)............................................................................23, 24

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993)....................................................................................5

*Chettri v. Nepal Rastra Bank*,
   834 F.3d 50 (2d Cir. 2016)......................................................................................11

*Conolly v. Taylor*,
   27 U.S. 556 (1829)....................................................................................................9

*Davoyan v. Republic of Turkey*,
No. CV 10-5636, 2010 WL 11507885 (C.D. Cal. Dec. 7, 2010) ........................12, 13, 14, 18

*Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*,
162 F.3d 63 (2d Cir. 1998)................................................................................................10

*Doe v. Bin Laden*,
663 F.3d 64 (2d Cir. 2011)................................................................................................21

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003)...................................................................................................*passim*

*Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*,
12 F.3d 317 (2d Cir. 1993)................................................................................................23

*Eitzen Bulk A/S v. Bank of India*,
827 F. Supp. 2d 234 (S.D.N.Y. 2011)...............................................................................24

*Filler v. Hanvit Bank*,
378 F.3d 213 (2d Cir. 2004).........................................................................................6, 18

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
No. CIV. A. 82-0220, 1988 WL 122568 (D.D.C. Nov. 8, 1988) .........................................23

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006)...............................................................................11, 13, 15

*Grupo Dataflux v. Atlas Global Grp.*,
541 U.S. 567, 570-71 (2004) ..............................................................................................7

*Henkin v. Islamic Republic of Iran*,
No. 1:18-cv-1273, 2021 WL 2914036 (D.D.C. July 12, 2021) .......................................12, 15

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. MD 06-1775JGVVP, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) ..........................6, 8

*In re Terrorist Attacks on Sept. 11, 2001*,
Civ. A. No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22,
2011) ...............................................................................................................................18

*Holladay v. Islamic Republic of Iran*,
523 F. Supp. 3d 100 (D.D.C. 2021) ......................................................................13, 15, 16

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021)..............................................................................................21

*Kennedy v. City of Cleveland*,
797 F.2d 297 (6th Cir. 1986) ............................................................................................24

*Land v. Dollar*,
   330 U.S. 731 (1947)........................................................................................20

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936)........................................................................................24

*Link v. Wabash R. Co.*,
   370 U.S. 626 (1962)........................................................................................24

*Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic
Def. Sys., Inc.*,
   495 F.3d 1024 (9th Cir. 2007) .................................................................. 17-18

*NML Cap., Ltd. v. Space Expl. Techs. Corp.*,
   No. CV 14-02262 SVW, 2015 WL 1334291 (C.D. Cal. Mar. 6, 2015) ...................12

*NXP Semiconductors USA, Inc. v. Brevets*,
   No. C 14-1225 SI, 2014 WL 4621017 (N.D. Cal. Sept. 15, 2014).........................18

*Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A.*,
   509 F.3d 347, 349 (7th Cir. 2007) ....................................................................7, 9

*Parex Bank v. Russian Sav. Bank*,
   81 F. Supp. 2d 506 (S.D.N.Y. 2000)...................................................................12

*Peterson v. Islamic Republic of Iran*,
   563 F. Supp. 2d 268 (D.D.C. 2008)....................................................................12

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
   185 F. Supp. 2d 335 (S.D.N.Y. 2002).................................................................20

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992)........................................................................................13

*Republic of Iraq v. Beaty*,
   556 U.S. 848 (2009)..........................................................................................7

*Robinson v. Gov't of Malaysia*,
   269 F.3d 133 (2d Cir. 2001)...............................................................................5

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007)........................................................................................10

*S & S Machinery Co. v. Masinexportimport*,
   706 F.2d 411 (2d Cir. 1983)..............................................................................11

*Samantar v. Yousuf*,
   560 U.S. 305 (2010)........................................................................................22

*Servaas Inc. v. Republic of Iraq*,
   653 F. App'x 22 (2d Cir. 2011), *as amended* (Feb. 16, 2011)................................................12

*Shapiro v. Republic of Bolivia*,
   930 F.2d 1013 (2d Cir. 1991)......................................................................................23, 24

*Taylor v. Kingdom of Sweden*,
   No. 18-1133 (RJL), 2019 WL 3536599 (D.D.C. Aug. 2, 2019)..........................................12

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   30 F.3d 148 (D.C. Cir. 1994)......................................................................................13

*Ungar v. PLO*,
   402 F.3d 274 (1st Cir. 2005)...................................................................................22, 25

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983)......................................................................................................12

*Weininger v. Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006).............................................................................12

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010)....................................................................................9

*Yates v. City of Cleveland*,
   941 F.2d 444 (6th Cir. 1991)........................................................................................25

*Zuza v. Office of the High Representative*,
   857 F.3d 935 (D.C. Cir. 2017)........................................................................................7

**Statutes**

18 U.S.C. § 2337................................................................................................20, 21, 22

28 U.S.C. § 1330.......................................................................................................9

28 U.S.C. § 1331.......................................................................................................9

28 U.S.C. § 1603.................................................................................6, 7, 9, 10, 22

28 U.S.C. § 1605................................................................................................19, 23

Justice Against Sponsors of Terrorism Act,
   Pub. L. No. 114-222, 130 Stat. 852 (2016)......................................................................21

**Court Rules**

Federal Rule of Civil Procedure 12 ..................................................................................5

**Other Authorities**

Central Bank of Russia, BANK OF RUSSIA ANNUAL REPORT OF 2020 (Apr. 2021),
https://www.cbr.ru/Collection/Collection/File/39294/ar_2020.pdf....................................15, 17

H.R. Rep. No. 94-1487 (1976)........................................................................................13

*Interview with CBR Deputy Chairman Zabotkin*, Bank of Russia (July 16, 2020),
https://www.cbr.ru/press/event/?id=6927 ................................................................17

Federal Law No. 86-FZ of July 10, 2002 "On the Central Bank of the Russian
Federation (Bank of Russia)".......................................................................14, 17, 18

L. G. Efimova, Банковское право. Банковская система Российской
Федерации [Banking Law. Banking System of the Russian Federation] 103
(2010) ........................................................................................................................16

*Russia's Difficult Path to the Inflation Target*, Bank of Russia (Sept. 6, 2018),
http://www.cbr.ru/press/event/?id=5227 ................................................................16

*Russian President Vladimir Putin's Big News Conference*, Official Website of the
Plenipotentiary Representative of the President of the Russian Federation
(Dec. 14, 2017), http://szfo.gov.ru/press/events/1743 ...........................................16

Plaintiffs submit this memorandum in opposition to Defendant Sberbank of Russia PJSC's ("Sberbank of Russia's") second motion to dismiss the Second Amended Complaint ("SAC").[1]

## PRELIMINARY STATEMENT

In its Motion, Sberbank of Russia asserts belated and baseless claims that are contrary to both its own positions and longstanding U.S. Supreme Court precedent in a transparent attempt to procure an interlocutory appeal that would delay discovery into its complicity in an act of terrorism in eastern Ukraine. For the first two-and-a-half years of this litigation, Sberbank of Russia explicitly disclaimed immunity under the Foreign Sovereign Immunities Act (the "FSIA"), strenuously arguing in multiple filings that it was not an instrumentality of the Russian Federation. Sberbank of Russia's self-identification changed after the Court required it to participate in discovery, and it found new counsel prepared to advance the strained and meritless argument that is now before the Court.

And even by describing itself anew to conjure new bases for a new motion to dismiss, Sberbank of Russia's novel understanding of its own identity has continued to evolve in order to service its actual objective: obstruction, obfuscation, and delay. First, according to Sberbank, it was entitled to immunity because as of April 30, 2020, it was owned by the Ministry of Finance of the Russian Federation. But this lawsuit was filed on April 4, 2019, and controlling Supreme Court precedent establishes that ownership by a foreign state for purposes of the FSIA is determined at the time the action was brought. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003). Every court to examine this issue, including the Second Circuit and district courts in

---

[1] Sberbank has failed to produce certain documents notwithstanding its jurisdictional discovery obligations. *See* ECF Nos. 306, 309, 311. Given the publicly available statements from Sberbank's CEO and others, *see infra* § II.C and ECF No. 283 at 7-8, outstanding discovery into communications and statements from Sberbank's officers will reinforce the conclusion that Sberbank pursues this motion solely to obstruct this litigation and that the Central Bank of Russia is not a "political subdivision" of the Russian Federation. *Infra* § II. Plaintiffs may need to supplement or amend this opposition brief after Sberbank complies with the Court's jurisdictional discovery order.

this Circuit, has applied *Dole Food* to reject claims of immunity based on post-filing changes of status.

Once confronted with this black letter law, Sberbank of Russia then claimed (after filing its Answer) that it has actually been immune all along given its ownership prior to April 2020 by the Central Bank of Russia ("Central Bank" or "Bank of Russia"). Notwithstanding that Sberbank claimed the exact opposite for two-and-a-half years, that defense fails on the merits. Uniform case law and unambiguous legislative history make clear that a central bank is (at most) an "agency or instrumentality" of a foreign state rather than a "political subdivision," which fails to qualify Sberbank for any entitlement to immunity. Sberbank's motion ignores all of this authority.

Even if the Court were to accept Sberbank's invitation to overrule the Supreme Court, it would be for naught as Sberbank is a commercial bank, servicing private customers, and the cause of action in this case arises out of those commercial transactions. As a result, the FSIA's commercial activity exception strips Sberbank of any presumption of immunity.

The question before the Court is not merely the merits of Sberbank of Russia's immunity defense, but also the appropriate way to ensure that manipulative tactics intended to disrupt litigation are not rewarded. *Any* determination by this Court in response to Sberbank's wholly baseless motion could potentially entitle Sberbank to an immediate appeal that divests this Court of jurisdiction, disrupting this action and furthering Sberbank's ploy to avoid discovery for years. Sberbank's unprecedented and egregious tactics—and the need for discovery into Sberbank's commercial activity before deciding all issues raised on this motion—warrant this Court deciding Sberbank's motion after the close of discovery.

## **BACKGROUND**

In 2014, Sberbank of Russia knowingly transmitted funds directly to the leadership of the terrorist organization the Donetsk People's Republic (the "DPR"), which used those funds to

acquire tactical and lethal equipment necessary to control territory and carry out terrorist activities, including the terrorist attack that killed 18-year-old Quinn Schansman and the 297 other passengers aboard MH17 on July 17, 2014.  ECF No. 156 ¶¶ 3-4.  On April 4, 2019, Quinn's family filed suit against Sberbank of Russia for the unimaginable pain and suffering caused by their son and brother's tragic death.  *See* ECF No. 1 (Pls.' Original Complaint).  At that time, Sberbank of Russia was purportedly owned by the Central Bank of Russia.  ECF No. 258 at 4-5 (Sberbank's Second Mot. to Dismiss the Second Am. Compl.) ("Mot.").

For the next two-and-a-half years, Sberbank of Russia fought vigorously to evade responsibility for its role in Quinn's death.  In its first three attempts to dismiss the case, Sberbank expressly disclaimed immunity under the FSIA or that it held any status as an instrumentality of the Russian Federation.  Sberbank described Plaintiffs' characterization of it as "an instrumentality of Russia" as "false," and acknowledged that it was not entitled to immunity under the FSIA.  ECF No. 98 at 21 n.6.  Plaintiffs twice amended their complaint.  Each time Sberbank moved to dismiss, it disclaimed instrumentality status and immunity under the FSIA.  *See* ECF No. 115 at 1-3, 21 n.5; ECF No. 166 at 1-3, 21 n.7.  Sberbank consistently maintained that position even after April 30, 2020, when the Russian Ministry of Finance replaced the Central Bank as Sberbank's majority owner by acquiring a bare majority of Sberbank's shares.  Mot. at 4-5; *see also* ECF No. 148 (June 6, 2020 Am. Corp. Disclosure Statement)

After this Court denied Sberbank of Russia's motion to dismiss the SAC, ECF No. 185, Sberbank scrambled for new strategies to evade discovery.  But Sberbank did not file a motion to dismiss claiming immunity under the FSIA right away.  Instead, it sought Plaintiffs' consent to a 30-day extension of time for Sberbank to answer the SAC, making no mention of a new motion to dismiss.  ECF No. 189.  Plaintiffs proposed that the extension should be "subject to Defendants'

agreement not to move to stay discovery," and Sberbank agreed not to "use the pendency of any motion for reconsideration or reargument as the basis for a request to stay discovery," again saying nothing about a new motion to dismiss.  *See* ECF No. 250 at 1.  Plaintiffs consented to and the Court granted Sberbank an extension until November 15, 2021.  ECF No. 194.

On November 14, 2021, the eve of Sberbank of Russia's extended Answer deadline, Sberbank for the first time announced that it intended to seek the Court's permission to file yet another motion to dismiss, this time asserting immunity under the FSIA.  Specifically, Sberbank argued that it had become immune as an "agency or instrumentality" of the Russian Federation when the Ministry of Finance became its majority owner in April 2020.  *See* ECF No. 206 at 2.  Sberbank did not explain why it had waited nineteen months to raise this argument or cite any authority finding immunity under the FSIA based on an entity's change of status after suit was brought.  *Id.*  Before the Court responded to Sberbank's request, Sberbank filed its Answer to the SAC, which asserted the same theory of immunity based on the Ministry of Finance becoming its majority owner in April 2020.  ECF No. 223 at 155; ECF No. 226 at 155.

Over the course of the next few months, Sberbank repeatedly, but unsuccessfully, sought to stay the proceedings.  *See, e.g.*, ECF No. 233 & 244.  In seven separate filings, Sberbank asserted the same basis for immunity based on its post-filing change of status.  ECF Nos. 206, 223, 226, 231, 233, 240, 244, 252. Plaintiffs responded that *Dole Food* requires a showing of immunity at the time suit is filed.  *See, e.g.*, ECF No. 228 at 2.  Only on December 30, 2021, did Sberbank again change its tune, claiming for the first time that it has been a Russian instrumentality all along.  *See* ECF 258 at 12-18.  According to its newest theory, Sberbank claims that when this lawsuit began in April 2019, Sberbank was majority owned by the Central Bank of Russia, which Sberbank asserts is a "political subdivision" of the Russian Federation, purportedly making Sberbank immune under

the FSIA at the time this suit was filed. *Id.* Sberbank asserts this new defense, notwithstanding uniform case law and clear legislative history about central banks that directly preclude Sberbank's entitlement to immunity under the FSIA, all of which Sberbank's motion ignores.

## LEGAL STANDARD

To adjudicate a Rule 12(b)(1) challenge to jurisdiction under the FSIA, a court "must look at the substance of the allegations to determine jurisdiction." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993). In doing so, the court must "review the pleadings and any evidence before it." *Id.* Where the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). "[T]he ultimate burden of persuasion" on whether immunity should be granted under the FSIA rests "with the alleged foreign sovereign." *Cargill Int'l*, 991 F.2d at 1016.

## ARGUMENT

**I.** **Sberbank of Russia Was Not An Instrumentality At The Time The Action Was Brought And Is Therefore Not Immune For Purposes Of This Litigation.**

**A.** **The U.S. Supreme Court's Holding In *Dole Food* Establishes That Ownership Is Determined at the Time of Suit.**

The Supreme Court's mandate is clear: a corporation "is owned" by a foreign state for purposes of the FSIA, 28 U.S.C. §§ 1602 *et seq.*, only when a foreign state directly owns a majority of a corporation's shares *at the time the action is brought*. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 480 (2003). This rule is dispositive in FSIA status determinations, as *Dole Food* "unequivocally" held "that an entity's status as an instrumentality of a foreign state should be 'determined at the time of the filing of the complaint.'" *Abrams v. Societe Nationale Des Chemins*

*De Fer Francais*, 389 F.3d 61, 64 (2d Cir. 2004).[2]

Sberbank of Russia admits that the Russian Federation (through the Russian Ministry of Finance) did not become its majority owner until April 2020, approximately one year after this action was brought.  *See* Mot. at 4-5; *see also* ECF No. 148.  But *Dole Food* requires that Sberbank show that it was owned by a foreign state at the time this action was filed.  This Sberbank cannot do, because prior to April 2020, Sberbank was owned by the Central Bank of Russia, an agency or instrumentality of the Russian Federation.  *See infra* § II.  Sberbank's claim of immunity is thus foreclosed.  *See Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004) (holding that bank majority owned by an agency or instrumentality was not entitled to immunity under the FSIA); *Bartlett v. Societe Generale de Banque au Liban SAL*, No. 19-cv-00007, 2021 WL 3706909, at *8 (E.D.N.Y. Aug. 6, 2021) (applying this rule despite post-filing change of status).

Sberbank of Russia seeks to avoid the clear mandate of *Dole Food*, selectively splicing the Supreme Court's sentences to make its point. Sberbank argues that it is presumptively immune under the FSIA regardless of when it acquired its status as an "agency or instrumentality" because Section 1603(b) of the FSIA uses the present tense—"which is owned."  Mot. at 5-6.  To be sure, the Supreme Court in *Dole Food* did interpret "§ 1603(b) 'so that the present tense has real significance,'" *id.* at 6 (quoting *Dole Food*, 538 U.S. at 478) (emphasis omitted)), but it did so to endorse "the 'longstanding principle that the jurisdiction of the Court depends upon the state of things *at the time of the action brought*.'"  *Dole Food*, 538 U.S. at 478 (quoting *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)) (emphasis added). Sberbank's artful editing and its

---

[2] *See also Bartlett v. Societe Generale de Banque au Liban SAL*, No. 19-cv-00007, 2021 WL 3706909, at *8 (E.D.N.Y. Aug. 6, 2021) (applying *Dole Food* to reject claim of immunity based on post-filing change of status), *appeal filed* No. 21-2019 (2d Cir. 2021); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775JGVVP, 2008 WL 5958061, at *40 (E.D.N.Y. Sept. 26, 2008) (same), *report and recommendation adopted*, No. 06-MD-1775, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009), *aff'd on other grounds*, 697 F.3d 154 (2d Cir. 2012); *Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F. Supp. 2d 144, 147 (D.D.C. 2007) (same).

reliance (at 8-9) on cases interpreting statutes other than the FSIA cannot overrule the Supreme Court's definitive and binding interpretation of the FSIA.[3]

Even if a District Court could re-interpret § 1603(b) of the FSIA, the reading Sberbank of Russia advances is the wrong one, flying in the teeth of "hornbook law." *Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 570-71 (2004). Indeed, no court has concluded that post-filing changes in ownership alter the FSIA analysis. For example, the Seventh Circuit applied the time-of-filing rule to reject an argument that an entity majority owned by a foreign state at the time the action was commenced lost FSIA protection by virtue of a post-filing change in ownership. *Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 349 (7th Cir. 2007) (citing *Dole Food*, 538 U.S. at 478). Judge Posner concluded that the defendant's loss of majority state ownership after the suit commenced did not deprive the defendant of the protections afforded to sovereign entities—in that case, a right to a bench trial—because the relevant jurisdictional facts are always set at the time of filing. *Id.* In a case brought under the Antiterrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA"), a court rejected an argument of the Palestinian Interim Self-Government Authority and the Palestinian Liberation Organization that post-filing changes in its political status justified a reevaluation of its previously rejected claim of immunity. *See Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F. Supp. 2d 144, 147 (D.D.C. 2007). The court concluded that, for purposes of the FSIA, any events after the time of filing "cannot change Defendants' status as of the time this action commenced," which was the only relevant time. *Id.* (citing *Dole Food*, 538 U.S. at 478).

In another ATA case, the Eastern District of New York recently rejected a bank's attempt

---

[3] Sberbank gains nothing (at 6-9) by citing *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009), and *Zuza v. Office of the High Representative*, 857 F.3d 935 (D.C. Cir. 2017). Those decisions interpreted statutes other than the FSIA and addressed a distinct question: where Congress expressly authorizes the Executive to confer immunity, and the Executive does so during the pendency of a suit, should the Court be deprived of jurisdiction? *Beaty*, 556 U.S. at 866-67; *Zuza*, 857 F.3d at 938. Those statutes and that question are not present here. *See also* ECF Nos. 242, 248 at 6-7.

to invoke the FSIA when it came under the control of the Government of Lebanon "many months after [the] lawsuit was filed." *Bartlett*, 2021 WL 3706909, at *8 (citing *Dole Food*, 538 U.S. at 478). The court rejected the bank's "cabined reading" of *Dole Food*, explaining that the "Second Circuit has characterized *Dole Food* as 'holding unequivocally that an entity's status as an instrumentality of a foreign state should be determined at the time of the filing of the complaint.'" *Id.* at *8 (quoting *Abrams*, 389 F.3d at 64). Likewise, the Eastern District rejected South African Airlines' attempt to leverage its post-filing transfer to state ownership into a dismissal under the FSIA—even though an agreement for its nationalization by the South African Government had been executed before the action was commenced and even though the airline was wholly owned by the Government before the motion to dismiss was decided. *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775JGVVP, 2008 WL 5958061, at *38-39 (E.D.N.Y. Sept. 26, 2008). In that case, the post-filing corporate ownership changes were irrelevant because it was "clear that instrumentality status under the FSIA is set at the time of filing of the complaint." *Id.* at *39 (citing *Dole Food*, 538 U.S. at 480).

These courts' holdings are clear: *Dole Food* requires that courts assess an entity's status under the FSIA as it existed at the time suit is commenced.

**B.    The Time-Of-Filing Rule Considers The Defendant's Status At The Time The Action Was Brought, Not At The Time Of Each Post-Filing Amendment.**

Sberbank of Russia attempts (at 11-12) to circumvent the Supreme Court's clear time-of-filing rule in *Dole Food* by arguing that the "time of filing of the complaint" refers to the "operative complaint" rather than the original complaint. To do so, Sberbank ignores the precedent cited above, *supra* § I.A., and claims that the original complaint controls in the diversity-jurisdiction and removal contexts but not in federal question cases like this one. Sberbank's argument runs directly contrary to the Supreme Court's determination in *Dole Food* that the "time of the filing of

the complaint" is "the time the action is brought" and "the time *suit* is filed." *Dole Food*, 538 U.S. at 478 (emphasis added).

The Court's careful language in *Dole Food* was consistent with settled law. Centuries ago, Chief Justice Marshall made clear that "[w]here there is no change of party, a jurisdiction *depending on the condition of the party*, is governed by that condition as it was at the commencement of the suit." *Conolly v. Taylor*, 27 U.S. 556, 565 (1829) (Marshall, C.J.) (emphasis added). The FSIA involves exactly such a scenario. Whether jurisdiction is proper under 28 U.S.C. § 1331 or, conversely, may only be exercised under 28 U.S.C. §§ 1330 and 1602, depends on the details of a party's condition—here, whether a corporation is an "agency or instrumentality" of a foreign state because of its ownership and structure. 28 U.S.C. § 1603(a)-(b).

The time-of-filing rule makes sense in the FSIA context. As Judge Posner explained in *Olympia Express*, which applied *Dole Food* in the context of FSIA immunity, the time-of-filing rule prevents gamesmanship designed to frustrate the federal courts' subject-matter jurisdiction:

> What has been privatized can be renationalized. Suppose that confronted with an unexpected demand for a jury trial a privatized defendant owned 49 percent by the government asks the government to repurchase 2 percent of the shares from the private stockholders; conversely, suppose that a defendant 51 percent owned by its government decides when it is sued that it would prefer a jury trial and so it asks its government to sell 2 percent of the shares from the government's holding, which the government could then repurchase after the suit was over.

509 F.3d at 351 (warning of this "strategic maneuvering"). In other words, a firm jurisdictional rule is necessary to prevent foreign states from selectively immunizing favored corporations to stymie federal court jurisdiction. Sberbank is simply "wrong to think" that the jurisdictional focal point—when the action was brought—can be redirected to a later date. *Id.* at 349.

As Sberbank admits (at 11), courts have rejected its argument that amending a complaint resets the jurisdictional clock. *See also, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 23, 29 (D.D.C. 2010) (citing date of original complaint for purposes of subject-matter jurisdiction,

and date of amended complaint for non-jurisdictional factual matters).  The cases Sberbank cites (at 12) do not suggest otherwise.  None involved the FSIA, and none addressed how the permissive amendment of a pleading affects a jurisdictional "condition of the parties," altered by a defendant mid-litigation.[4]  Quite the opposite, the Supreme Court emphasized in Sberbank's leading case, *Rockwell Int'l Corp. v. United States*, that its decision was to be interpreted consistently with "[t]he rule that subject-matter jurisdiction 'depends on the state of things at the time of the action brought.'"  549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)).

Accordingly, the fact that Plaintiffs amended their complaint after the Ministry of Finance became Sberbank's majority owner has no effect on whether Sberbank is entitled to immunity.[5]

## II.   The Central Bank Of Russia Is Not A "Political Subdivision" Of The Russian Federation.

Sberbank of Russia next contends that it has actually been immune all along because, at the time of suit, it was owned by the Central Bank of Russia, which it asserts is a "political subdivision" of the Russian Federation.  This argument runs contrary to Sberbank's own assertions over the past two-and-a-half years of litigation and is without merit.

The FSIA distinguishes between an "agency or instrumentality" and a "political subdivision."  Entities owned by an "agency or instrumentality" at the time of filing—like Sberbank—are not entitled to a presumption of immunity; entities owned by a "political subdivision," however, are.  *Compare* 28 U.S.C. § 1603(b)(2) (establishing a presumption of immunity for an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"), *with Dole Food.*, 538 U.S. at 473.  To determine

---

[4] *See generally Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007) (False Claims Act); *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63 (2d Cir. 1998) (admiralty jurisdiction *in rem*); *Boelens v. Redman Homes, Inc.*, 759 F.2d 504 (5th Cir. 1985) (pendent jurisdiction over state-law claims).

[5] Sberbank also argues (at 4) that Plaintiffs' allegation that Sberbank is owned by the Russian Federation confers instrumentality status. ECF No. 244 at 1. But instrumentality status under the FSIA requires that an entity be *both* directly and majority owned by a government, which Plaintiffs never alleged.

whether an entity is an "agency or instrumentality" or a "political subdivision" under the FSIA, the Second Circuit applies the "core functions" test, *Garb v. Republic of Poland*, 440 F.3d 579, (2d Cir. 2006), which asks whether an entity is "predominantly governmental or commercial in nature," *id.* at 594. If it is predominantly "commercial," then it is at most an "agency or instrumentality"; if it is predominantly "governmental," then it is a "political subdivision." *Id.*

Sberbank of Russia fails to establish immunity based on its majority ownership by the Central Bank for at least three reasons. *First*, uniform case law and unambiguous legislative history make clear that a central bank is at most an "agency or instrumentality" of a foreign state and not a "political subdivision." *Second*, under the "core functions test," the Central Bank exercises predominantly commercial functions, not governmental ones. *Third*, the Central Bank operates with political, structural, and legal independence from the Russian Federation, confirming that it is not a "political subdivision."

### A.     Courts Have Invariably Held, And Congress Clearly Stated, That Central Banks Are Agencies Or Instrumentalities.

Countless courts—including the Second Circuit—have held that central banks are "agencies or instrumentalities" for purposes of the FSIA. Sberbank simply ignores this wall of authority. Prior to its adoption of the "core functions" test, the Second Circuit stated that "[s]tate-owned central banks indisputably are included in the . . . definition of 'agency or instrumentality.'" *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (internal citation omitted). The Court observed that "[i]t would be difficult to imagine a clearer example of a state 'agency or instrumentality' . . . than the Romanian [Central] Bank," which had been created to "effect state goals concerning payments, credit, and currency control in foreign trade." *Id.*

Subsequent decisions by the Second Circuit and district courts in this Circuit have followed that reasoning, even after the adoption of the "core functions" test. *See Chettri v. Nepal*

*Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (accepting that Nepal's central bank was an "agency or instrumentality" for FSIA purposes); *Weininger v. Castro*, 462 F. Supp. 2d 457, 498 (S.D.N.Y. 2006) (holding that the central bank of the Republic of Cuba was an "agency or instrumentality" under the FSIA); *see also Parex Bank v. Russian Sav. Bank*, 81 F. Supp. 2d 506, 507 (S.D.N.Y. 2000) (determining that the Central Bank of Russia is an "agency or instrumentality" of the Russian Federation). Courts in other circuits have invariably reached the same conclusion. *See Henkin v. Islamic Republic of Iran*, No. 1:18-cv-1273, 2021 WL 2914036, at *18 (D.D.C. July 12, 2021) (holding that it was "clearly" the case that the central bank of Iran's "core functions are commercial, making it an agency or instrumentality of Iran"); *Davoyan v. Republic of Turkey*, No. CV 10-5636, 2010 WL 11507885, at *3-4 (C.D. Cal. Dec. 7, 2010) (holding that Turkish central bank was an "agency or instrumentality"); *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 275 (D.D.C. 2008) (holding that Japanese central bank was "plainly an 'agency or instrumentality' of a foreign state"). *See also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 482 (1983) (describing Central Bank of Nigeria as "an instrumentality of Nigeria").

Sberbank of Russia does not cite (and Plaintiffs have not found) a single case in which a court has concluded that a central bank was a "political subdivision." Instead, Sberbank of Russia relies on a handful of cases involving entities that look nothing like a central bank, such as the Swedish National Museum and the Argentinian space exploration agency. *See* Mot. at 22. But all of those cases concern political departments of a foreign state, entities housed within those departments, or state-run entities that do not engage in commerce at all.[6]

---

[6] *See Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 25 (2d Cir. 2011) (Iraqi Ministry of Industry), *as amended* (Feb. 16, 2011); *Taylor v. Kingdom of Sweden*, No. 18-1133 (RJL), 2019 WL 3536599, at *3 (D.D.C. Aug. 2, 2019) (Sweden's National Museums of World Culture, "a state agency within the Swedish Ministry of Culture, which is itself a department of the Government of the Kingdom of Sweden"); *NML Cap., Ltd. v. Space Expl. Techs. Corp.*, No. CV 14-02262 SVW, 2015 WL 1334291, at *6 (C.D. Cal. Mar. 6, 2015) (Argentinian space exploration agency with "nothing *commercial*" about its existence (emphasis in original)); *Berg v. Kingdom of the Netherlands*, No. 2:18-CV-

Legislative history also cuts clearly against Sberbank of Russia's argument that the Bank of Russia is a "political subdivision." When Congress enacted the FSIA, it explicitly listed "a central bank" as a type of entity "which meet[s] the definition of an 'agency or instrumentality of a foreign state.'" H.R. Rep. No. 94-1487, at 15-16 (1976). In other words, the "FSIA . . . contemplated that a foreign state's central bank would constitute an 'agency or instrumentality.'" *Davoyan*, 2010 WL 11507885, at *3-4.

The consistent conclusions of courts and Congress make good sense. Unlike entities that form "an integral part of a foreign state's political structure," *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994) (internal citation omitted), modern central banks exist in parallel to the government rather than "*beneath* the central government," *Garb*, 440 F.3d at 596 (quoting H.R. Rep. No. 94-1487, at 15 (1976)), thereby falling outside the term "political subdivision." Central banks also exercise their principal function—currency stabilization—through commercial conduct, such as the purchase and sale of assets on domestic and foreign exchanges and the issuance of loans. While this function bears a relation to government and may even serve a governmental purpose, "the FSIA's focus [is] on the 'nature' of the activity, rather than its 'purpose.'" *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 114 (D.D.C. 2021) (holding that Iranian central bank is an "agency or instrumentality" of a foreign state); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (holding that Argentinian central bank's issuance of debt was "commercial" because the FSIA inquiry focuses on "particular actions that the foreign state performs (whatever the motive behind them)"). The "core functions" test was built around these realities and "designed . . . such that a central bank would be treated as an

---

3123-BHH, 2020 WL 2829757, at *1 (D.S.C. Mar. 6, 2020) (Dutch Ministry of Education, Culture, and Science, and Culture and associated Cultural Heritage Agency), *reconsideration denied*, Civ. A. No. 2:18 -3123-BHH, 2020 WL 3104699 (D.S.C. June 11, 2020).

agency or instrumentality." *Davoyan*, 2010 WL 11507885, at *3.

## B. The Central Bank Exercises Predominantly Commercial Functions.

Nothing about the Central Bank of Russia justifies a different outcome here. The Russian Constitution is clear that the principal function of the Central Bank is to stabilize the ruble, Decl. of W.E. Butler ¶ 7, ECF No. 305 ("Butler Decl."), a function accomplished through core commercial conduct like setting the key benchmark interest rate for its "customers" (banks),[7] buying and selling currencies, buying and selling government bonds, and extending loans to Russian banks.[8] The discretion to engage in these commercial activities belongs exclusively to the Central Bank's Board of Directors, outside of the reach of the State Duma, the National Financial Board, or any formal governmental body. *See* Federal Law No. 86-FZ of July 10, 2002 "On the Central Bank of the Russian Federation (Bank of Russia)," ECF Nos. 260-04 & 260-05 ("Bank Law"), art. 18(9); *see also* Ex. A (Efimova Dep. Tr. 105:23-105:25) ("[T]he [Central Bank] has operational independence in using the tools that it has at its disposal."); *infra* at 17-18. Beyond this, the Central Bank is authorized to undertake significant commercial activities in the form of ordinary banking transactions uncharacteristic of many central banks. *See* Butler Decl. ¶ 16. This notably includes servicing as *clients* certain natural persons, including servicemembers of the Russian military, the Bank's own employees, and persons in areas where no credit institution operates. Butler Decl. ¶ 14; *see also* Decl. of L.G. Efimova ¶ 30, ECF No. 260 ("Efimova Decl.").

The economic reality of the Central Bank's operation, *i.e.*, "the banking operations and transactions performed by the Bank [that] are, in fact, the economic tools of the monetary-credit policy," Efimova Decl. ¶ 34—include, among other commercial activities in 2020, the Bank's

---

[7] *See also* Butler Decl. ¶ 13 (quoting L.G. Efimova, Banking Law 103 (2010)) ("[T]he Bank of Russia effectuates the banking servicing of credit organizations, being a 'bank of banks.").
[8] *See* Ex. A (Efimova Dep. Tr. 86:10-91:24) (describing monetary policy tools of the Central Bank).

receipt of 7.408 billion rubles for "fees for Bank of Russia services provided to clients,"[9] generation of 2.1 trillion rubles from securities trading,[10] and maintenance of 30.452 trillion rubles in funds implicating non-residents and foreign securities.[11]  The Central Bank also placed 3.76 trillion rubles in loans and deposits[12] and issued 574 billion rubles worth of coupon bonds *in its own name*.[13]  *See Holladay*, 523 F. Supp. 3d at 112-13 (D.D.C. 2021) (central bank's loan balance of one trillion Rials supported finding that entity was predominantly "commercial").

Sberbank of Russia responds to this evidence by relying (at 16-17) on the uncontroversial proposition that the Central Bank (like all central banks) exercises *some* regulatory functions as part of its portfolio.  However, the "core functions" test asks not whether regulatory functions can be identified at all, but whether those functions "predomina[te]" over the Bank's commercial functions.  *Garb*, 440 F.3d at 594.  For example, the district court in *Henkin* determined that Iran's central bank's "functions are undisputedly commercial," even though the bank serves as "the principal regulator of other banks," "issues currency," and "provides more banking services to the Iranian government than other commercial banks." 2021 WL 2914036, at *18.  Simply put, the Central Bank, like other central banks, is predominantly an economic engine and thus is not a "political subdivision."

Prior to this litigation, Sberbank of Russia's expert also touted the extent of the Bank of Russia's commercial activities.  It is, in her words, "a bank which, first and foremost engages in banking services to the State itself."[14]  And while Sberbank emphasizes (at 18) Professor

---

[9] CENTRAL BANK OF THE RUSSIAN FEDERATION, BANK OF RUSSIA ANNUAL REPORT OF 2020 285 (Apr. 2021) ("2020 Annual Report"), *available at* https://www.cbr.ru/Collection/Collection/File/39294/ar_2020.pdf

[10] *Id.* at 284.

[11] *Id.* at 271.

[12] *Id.* at 273.

[13] *Id.* at 281.

[14] Butler Decl. ¶ 13 (quoting L. G. Efimova, Банковское право. Банковская система Российской Федерации [Banking Law. Banking System of the Russian Federation] 103 (2010)).

Efimova's conclusions about the Central Bank's supposed non-profiteering, prior to this litigation she has cautioned against "prudishly drawing a veil over the profit-making nature of the Bank of Russia."[15]  Rather, in her pre-litigation estimation, one "must acknowledge that the Bank of Russia is forced to earn money to ensure its survival."[16]  Naturally, the Central Bank earns money through substantial commercial activity.

### C.   The Central Bank Is Legally, Politically, And Structurally Independent Of The Russian Federation.

Courts consider an entity's political, legal, and financial independence as highly probative of its status as an "agency or instrumentality."  *Berg v. Kingdom of Netherlands*, 24 F.4th 987, 995 (4th Cir. 2022).   ("[A]s *Garb* and *de Csepel II* teach, structure informs function, and it [is] not improper for the district court to holistically assess the evidence regarding [an entity's] function.");  *Holladay*, 523 F. Supp. 3d at 113 (central bank's status as "an independent and distinct legal entity, separate from the Iranian government" supported "agency or instrumentality" finding).

With respect to the Central Bank, the "independence" analysis is not complicated: prominent leaders of the Russian Federation and the Central Bank itself have regularly touted the Central Bank's independence from the Russian Federation.   These have included President Vladimir Putin,[17] Central Bank Governor Elvira Nabiullina,[18] and Deputy Governor Alexey

---

[15] Butler Decl., Ex. C, at 8, ECF No. 305-003 [L.G. Efimova, Еще раз о юридической личности Банка России [Once More on the Legal Identity of the Bank of Russia], 3 Бизнес и банки [Business and Banks] 5 (1999)].

[16] L. G. Efimova, Банковское право. Банковская система Российской Федерации [Banking Law. Banking System of the Russian Federation] 96-97 (2010) (attached as Exhibit B).

[17] *Russian President Vladimir Putin's Big News Conference*, Official Website of the Plenipotentiary Representative of the President of the Russian Federation (Dec. 14, 2017), http://szfo.gov.ru/press/events/1743 (the "Central Bank, in accordance with the law and worldwide practice, is an independent entity, which in its core function is outside of Government control and acts exclusively independently") (translated from original Russian language).

[18] *Russia's Difficult Path to the Inflation Target*, Bank of Russia (Sept. 6, 2018), http://www.cbr.ru/press/event/?id=5227 ("Even though the independence of the Bank of Russia is formalized in law, we had to prove it when we were confronted by serious external pressures in 2014.") (professionally translated from original Russian language).

Zabotkin,[19] and their statements reflect the well-established principle of Russian constitutional and statutory law that the Central Bank is legally, politically, and structurally independent from the Russian Federation's political organs. *See* Butler Decl. ¶¶ 7-9. Indeed, as Professor Butler wrote over a decade ago and reiterated in his Declaration, "[t]he Central Bank may be a State institution, at least in part, but the Bank is not an agency of State power or administration, that is, the Bank is not part of the executive, legislative, or other branches of State and is not part of the Government." *Id.* ¶ 9. Sberbank's expert has advanced a comparable position in prior writings, notwithstanding her conspicuous silence on this point in her Declaration and recent about-face in her deposition.[20]

This separateness from the State is reflected in the Central Bank's operation. As Sberbank of Russia's own expert admits, the Bank Law "establishes that the Bank of Russia has independent financial liability and its assets are separate from the State," and it is required to "cover its expenses with its own revenues," **including** "those pertaining to the performance of state functions." Efimova Decl. ¶ 24. Further, members of the Central Bank's management body—its Board of Directors—are prohibited from holding State office or maintaining membership in political parties, Bank Law, art. 19, and Central Bank employees do not receive the benefits of civil servants of the Russian Federation, such as State-provided pensions and medical and life insurance.[21] In sum, the Central Bank possesses the hallmarks of an "agency or instrumentality": it "is primarily responsible for its own finances," it "is run as a distinct economic enterprise," and it "operates with independence from close political control." *Ministry of Defense & Support for Armed Forces*

---

[19] *Interview with CBR Deputy Chairman Zabotkin*, Bank of Russia (July 16, 2020), https://www.cbr.ru/press/event/?id=6927 ("Bank of Russia is independent, and this independence is respected by other institutions of government.") (professionally translated from original Russian language).

[20] *See* Butler Decl., Ex. C at 7-8 ("Thus, while the nature of the activity of the Bank of Russia is comparable to the activity of executive authorities, the main bank of Russia was not included in their system."). In her deposition, Professor Efimova also admitted that even though it was her opinion that the Central Bank is a "body of executive power," "legally it is not so"—*i.e.*, "the Central Bank of the Russian Federation is not included in the system of the bodies of executive state power." Ex. A (Efimova Dep. Tr. 126:16-126:19, 181:5-181:8).

[21] 2020 Annual Report, *supra* n.9, at 282; *see also* Bank Law, arts. 89-90.

*of Islamic Republic of Iran v. Cubic Defense Sys., Inc.*, 495 F.3d 1024, 1036 (9th Cir. 2007) (cleaned up) (subsequent history omitted).

In the teeth of this evidence, Sberbank of Russia contends principally (at 15-16) that the Central Bank is coextensive with the Russian Federation because it must submit reports to the State Duma and is supervised by an entity that "formally is not a management body," Efimova Decl. ¶ 26, called the National Financial Board.[22]   According to Sberbank's expert, the State "possesses and exercises in practice the ability to control" the Central Bank through these channels, notwithstanding the constitutional and statutory independence guaranteed to it. *Id.* ¶ 39.  In reality, the oversight exercised by the State Duma and the National Financial Board is both casual and removed, *see* Butler Decl. ¶ 10; Ex. A (Efimova Dep. Tr. 165:6-165:12) (the Central Bank has "no direct dependence on the government or even administrative subordinates [*sic*] . . . to the State Duma," and describing the State's involvement as "indirect guidance")—a common feature of "agencies or instrumentalities," not "political subdivisions."[23]   That the Central Bank is nominally subject to the oversight of a separate board rather than a single governmental individual, Sberbank admits, counsels against the conclusion that it is a "political subdivision." Mot. at 16.

Accordingly, because the Central Bank is not a "political subdivision" of the Russian Federation, Sberbank is not entitled to a presumption of immunity.  *See Filler*, 378 F.3d at 218.

---

[22] Sberbank of Russia also suggests that the Central Bank is not independent because the Bank's Board of Directors is "accountable" to the State Duma through its powers of appointment and, allegedly, dismissal.  *See* Efimova Decl. ¶ 34.  However, the Chairman of the Central Bank is entitled to a four-year term and can only be dismissed for cause, *see* Bank Law, art. 14, and other members of the Board of Directors can only be dismissed upon recommendation of the Chairman, *id.*, art. 15.  These constraints support a finding that the Central Bank is an "agency or instrumentality." *See Davoyan*, 2010 WL 11507885, at *4 (Turkish Central Bank Governor's five-year term and selection based on economic acumen "suggests that [the] Central Bank's function is economic rather than political.").

[23] *See, e.g.*, *Filler*, 378 F.3d at 217 (describing an "agency or instrumentality" as an entity that has "many of its operations overseen by" the government); *NXP Semiconductors USA, Inc. v. Brevets, S.A.S*, No. C 14-1225 SI, 2014 WL 4621017, at *9 (N.D. Cal. Sept. 15, 2014) (holding that a French public depository that functions like a bank was an "agency or instrumentality" even though "France exercises some degree of control and involvement in the [entity] . . . [because] French law guarantees [its] autonomy"); *In re Terrorist Attacks on Sept. 11, 2001*, Civ. A. No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011) (Iranian central bank is merely an "organ" of Iran, *i.e.*, an "agency or instrumentality," even though it is "tightly connected to the government of Iran.").

### III.   Even If Sberbank Of Russia Is Entitled To A Presumption Of Immunity, FSIA Exceptions Apply And Strip Sberbank Of Its Presumption Of Immunity.

### A.   Plaintiffs' Suit Is Based Upon Commercial Activity Undertaken By Sberbank Of Russia, And Thus Falls Within The FSIA's Commercial Activity Exception.

Even if the Court were to hold that Sberbank of Russia is entitled to a presumption of immunity, Sberbank's "material support and financing to the DPR," which involved providing commercial banking services to private customers "using New York's banking system," supports a finding that the commercial activity exception of 28 U.S.C. 1605(a)(2) applies.  ECF No. 185 at 2 (citing SAC ¶ 79); *id.* at 8-9.

Under controlling case law, this is enough to strip Sberbank of Russia of any immunity it may possess.  In a similar case, *United States v. Turkiye Halk Bankasi A.S.*, the Second Circuit held the commercial activity exception applied where the defendant bank, which was majority owned by the Government of Turkey, participated in "schemes to launder Iranian oil and gas proceeds through non-U.S. transactions" and caused U.S. correspondent banks to participate.  16 F.4th 336, 349 (2d Cir. 2021).  The court found the bank's activities in the United States were "plainly the type of activity in which banks, including privately owned correspondent banks, routinely engage."  *Id*.  Similarly, in *Rosner v. Bank of China*, the court found the commercial activity exception applied where the defendant was alleged to have "in its business as a bank operating in the United States . . . effectuated the transfer of [fraudulent] funds from the United States" to a country abroad.  528 F. Supp. 2d 419, 424 (S.D.N.Y. 2007).

Sberbank of Russia argues (at 23) that the commercial activity exception does not apply because "even after comprehensive documentary discovery . . . Plaintiffs identified only two transfers that were passively processed through Sberbank of Russia correspondent accounts in New York."  However, nothing remotely close to "comprehensive documentary discovery" has occurred—Sberbank itself has produced only publicly available documents in jurisdictional

discovery (and none pertaining to its commercial activity), and to date Plaintiffs have received only partial productions from a few (not all) U.S.-based banks that had a correspondent banking relationship with Sberbank.

The Court limited jurisdictional discovery to only the question of whether Sberbank of Russia is entitled to a presumption of immunity.  ECF No. 298.  Accordingly, if the Court determines that the facts alleged in the SAC are insufficient to trigger the commercial activity exception, the Court should defer ruling and permit Plaintiffs to complete ongoing merits discovery into Sberbank's commercial activities.[24]  Immediate  resolution of a motion to dismiss for lack of subject-matter jurisdiction would be inappropriate on a factually incomplete record.  *Land v. Dollar*, 330 U.S. 731, 739 (1947) (holding "that the District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits" where, like here, there was overlap in jurisdictional and merits questions).  In light of Plaintiffs' allegations, jurisdictional and merits discovery in these circumstances is largely coextensive, *see Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 185 F. Supp. 2d 335, 340 (S.D.N.Y. 2002), and proceeding on the discovery schedule ordered by Judge Gorenstein, ECF No. 197, risks no affront to Sberbank's purported immunity, particularly in light of Sberbank's waiver, *infra* § IV.

**B.**      **Section 2337 Does Not Bar This Action, And The General Exceptions Remain Available.**

Sberbank of Russia argues (at 19-20) that § 2337(2) of the ATA bars this action and forecloses the FSIA's exceptions to sovereign immunity.  Sberbank is wrong.

Under the FSIA's plain terms, the FSIA's general exceptions are available "in *any* case."

---

[24] Ongoing third-party discovery has already revealed more than three hundred instances of Sberbank's using the New York banking system to provide material support and financing to the DPR.  Three of the six correspondent banks that Plaintiffs subpoenaed during discovery have not yet produced any documents, and the productions from the remaining correspondent banks are incomplete.

28 U.S.C. § 1650(a) (emphasis added). Separate from any FSIA immunity analysis, § 2337(2) of the ATA exempts a narrow group of defendants—"a foreign state, an agency of a foreign state, or an officer or employee" of either—from liability for ATA claims. 18 U.S.C. § 2337(2). Notably, the prohibition does not exempt an "instrumentality" of a foreign state. In this case, because Sberbank is not and does not purport to be either "foreign state" or an "agency" of the Russian Federation, § 2337(2) is simply irrelevant. The inquiry ends there.

Facing unambiguous statutory language that permits suit against it, Sberbank of Russia instead points to the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 ("JASTA"), to argue that because JASTA expanded the immunity exceptions of the FSIA, the FSIA's general exceptions do not apply. This is clearly wrong. JASTA was enacted in 2016 to ensure that foreign states not designated as "state sponsors of terrorism" are held liable for aiding and abetting acts of terrorism committed on U.S. soil, and it *expanded* the circumstances under which ATA claims may be brought, notwithstanding the FSIA. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (explaining that JASTA was passed "'to provide civil litigants with the broadest possible basis . . . to seek relief against persons [and] entities" for acts of terrorism). Congress said nothing about ATA claims that were proper in the first instance, like those alleged here, or the general exceptions writ large. Reading JASTA's partial *abrogation* of the limitations imposed by § 2337(2) as a bar on actions properly heard in the first instance would turn the statute's purpose on its head. *Cf. Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) (rejecting argument that the addition of the "terrorism exception" to the FSIA "acts . . . as an implicit *limitation* on the already-existing jurisdiction conferred").

Sberbank of Russia also attempts to circumvent the clear language of § 2337 by arguing that the definition of "foreign state" under the ATA "includes a political subdivision of a foreign

state or an agency or instrumentality of a foreign state," and "the ATA and the FSIA should be read '*in pari materia*.'"  Mot. at 10 (citing *Ungar v. PLO*, 402 F.3d 274, 283 (1st Cir. 2005)).  But the ATA does not define a "foreign state," and the Court should reject Sberbank's attempt to import the FSIA's definition.   Doing so would contravene the clear text of the FSIA, which states that the FSIA's definitions apply *only* for purposes of the chapter that houses it, *see* 28 U.S.C. 1603, which does not include the ATA, *see* 18 U.S.C. §§ 2331 *et seq*.

Nothing in *Ungar* justifies rewriting the ATA or the FSIA.  In that case, the court addressed § 2337(2)'s use of the term "foreign state" only for purposes of discerning whether the Palestinian Authority was precisely that—a foreign state proper.  *Ungar*, 402 F.3d at 282–83.  Reading the ATA and the FSIA *in pari materia* makes little sense given the specific inclusions and exclusions selected by Congress in Section 2337(2), *infra* at 21-22, which also prohibits suit against "officials" and "employees" of a foreign state or agency—natural persons who are notably outside of the FSIA's grant of immunity.  *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  Treating the ATA and the FSIA the same upsets the careful balance Congress struck when it decided to limit the ATA's applicability with respect to some entities and individuals but not others.[25]

## IV.    Sberbank of Russia Has Waived The Right To An Immediate Determination Of Its Immunity Defense.

Instrumentalities of foreign states do not sit on—never mind expressly disclaim—their own claims of immunity.  But this was the strategy Sberbank of Russia elected, changing course only after its attempt to dismiss this action failed and discovery commenced.  By doing so, Sberbank waived any claim of immunity it did possess, and it may not resurrect that claim now.  At the very

---

[25] Sberbank attempts (at 10-11) to muddy the interpretative waters by referring to the word "maintained" in Section 2337 of the ATA.  But "'maintain' in reference to a legal action is often read as 'bring' or 'file'; '[t]o maintain an action or suit may mean to commence or institute it; the term imports the existence of a cause of action.'"  *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 693 (2003) (citing Black's Law 1885 Dictionary 1143 (3d ed. 1933)).

least, Sberbank has waived a right to an immediate determination of its immunity defense, including a determination that would allow it to avoid discovery.  Because *any* determination by this Court of Sberbank's immunity could entitle Sberbank to an immediate appeal that would divest this Court of jurisdiction—disrupting this action and endorsing Sberbank's ploy to avoid discovery—the Court should determine Sberbank's motion after the close of discovery.

The FSIA expressly provides that a foreign state may waive its claim of immunity "either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  The Second Circuit has thus instructed that district courts have considerable discretion to determine whether waiver has occurred "in light of the circumstances of a particular case."  *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984).  While the failure to assert a defense of sovereign immunity in a party's first responsive pleading has been treated as a pertinent indicator of waiver, *see Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991), this "does not mean that a party may securely withhold assertion of the defense until that time in every case."  *Canadian Overseas*, 727 F.2d at 278; *see also Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993) (noting that the first responsive pleading is simply the "*last chance* to assert FSIA immunity if the defense has not been previously asserted" (emphasis in original)).  Rather, courts are to consider the extent and nature of a party's participation in litigation, *Canadian Overseas*, 727 F.2d at 277, including, "most importantly," whether the party has taken "position[s] before the court inconsistent with the assertion of the sovereign immunity defense," *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, No. CIV. A. 82-0220, 1988 WL 122568, at *6 (D.D.C. Nov. 8, 1988).

The Court is soundly within its discretion to find that Sberbank of Russia has waived its claim of immunity.  In three separate dispositive motions, Sberbank charged Plaintiffs with

"false[ly]" attempting "to present Sberbank of Russia as an instrumentality of Russia." *See* ECF No. 166 at 21 n.7; *see also* ECF No. 98 at 21 n.6; ECF No. 115 at 21 n.5. Sberbank thus disclaimed any alleged immunity three times even though it now asserts immunity deriving from circumstances that existed at the time this action was brought. Sberbank then procured more time to answer without ever indicating it planned to file a second motion to dismiss. *Supra* at 3-4. This is precisely the "unmistakable" and "unambiguous" conduct contemplated by the FSIA's waiver provision, *Shapiro*, 930 F.2d at 1017, and Sberbank of Russia's midnight reversal cannot resurrect the defense it has discarded.[26] *See Ashraf-Hassan v. Embassy of France in the United States*, 40 F. Supp. 3d 94, 102 (D.D.C. 2014) (concession in motion to dismiss and continued participation in suit constituted waiver of immunity); *Eitzen Bulk A/S v. Bank of India*, 827 F. Supp. 2d 234, 241 (S.D.N.Y. 2011) (finding waiver where a party delayed more than one year to raise the issue of sovereign immunity); *cf. Canadian Overseas*, 727 F.2d at 276, 278 (foreign entity's reservation of substantive rights in stipulation supported finding of no waiver).

Crucially here, Sberbank has at least waived its right to an immediate determination of its motion while discovery remains ongoing. "Courts are not helpless in the face of manipulation," and the abusive use of immunity claims are appropriately and consistently met with a proportionate remedy. *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989).[27] Where, as here, parties "use claims of immunity in a manipulative fashion, they surrender any entitlement to" certain rights ordinarily accompanying an assertion of immunity. *Id.* at 1339; *see also Kennedy v. City of Cleveland*, 797 F.2d 297, 301 (6th Cir. 1986). Indeed, courts have consistently held—including

---

[26] In its Answer to the SAC, Sberbank invokes immunity solely based on the Ministry of Finance's April 2020 majority acquisition. *See* ECF No. 226 at 155. Any claim of immunity premised on Sberbank's prior ownership by the Central Bank of Russia is thus properly considered waived under any rubric.

[27] It has long been understood that district courts are empowered "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962), including to control the disposition of their dockets, *see Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936).

in the FSIA context—that parties may forfeit at least some of those rights and must participate in the litigation while their dismissal motion remains pending.[28]

By waiting until two-and-a-half years into this litigation to first raise an argument available since April 2019 (and an argument it had previously rejected), Sberbank has forfeited any entitlement to an immediate determination of this motion before the conclusion of the discovery schedule that Sberbank agreed to and the Court has ordered.  Ignoring the cases where courts have resisted the same manipulative tactics, Sberbank relies on generic language (at 3) that a court should "reach a decision about immunity as near to the outset of the case as is reasonably possible."  (citing *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1320 (2017)).  But *Helmerich* expressly limited this observation to the "normal[]" case, 137 S. Ct. at 1320, and in a case where all parties agreed that subject-matter jurisdiction turned on the FSIA.  Here, as a result of Sberbank's manipulative use of immunity, adjudication of its second motion to dismiss is properly delayed and that motion should ultimately be denied in light of binding Supreme Court precedent and unwavering authority.[29]

## CONCLUSION

For the foregoing reasons, the Court should rule on Sberbank's second and belated motion to dismiss after the close of discovery, at which time Sberbank's motion should be denied.

---

[28] *Ungar*, 402 F.3d at 292 (sustaining default judgment for party's failure "to comply with the court's discovery orders" after defendant lost initial motions to dismiss but continued to seek an immediate determination of a subsequent motion to dismiss on its FSIA defense while discovery was ongoing); *Bolduc v. United States*, 402 F.3d 50, 54 (1st Cir. 2005) (requiring United States to proceed to trial notwithstanding pending but belatedly filed motion to dismiss for lack of subject-matter jurisdiction); *Apostol*, 870 F.2d at 1339 (holding that defendant may waive right to immediate appeal based on manipulative use of immunity claim); *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991) (same).
[29] Sberbank of Russia also argues (at 23-24), that the Court lacks personal jurisdiction.  For the reasons stated above, *supra* §§ I-II, Sberbank is not entitled to a presumption of sovereign immunity.  The personal jurisdiction requirements of the FSIA are therefore irrelevant.  In addition, the Court has already determined that it has personal jurisdiction over Sberbank in light of its domestic operations, *see* ECF No. 185 at 9, and Sberbank's effort to relitigate that issue now—while its motion for reconsideration of that decision remains pending and Sberbank has refused to cooperate in discovery—is wholly inappropriate.

Dated:  April 14, 2022

Respectfully submitted,

By:   /s/ David Pressman

David Pressman
Jason P. Hipp
JENNER & BLOCK LLP
919 Third Avenue
38th Floor
New York, NY 10022
212-891-1654
dpressman@jenner.com
jhipp@jenner.com

Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 923-2799
tmascherin@jenner.com

*Attorneys for Plaintiffs Thomas Schansman, individually, as the surviving parent of Quinn Lucas Schansman, Catharina Teunissen, individually, as surviving parent of Quinn Lucas Schansman, and as personal representative of the Estate of Quinn Lucas Schansman, Nerissa Schansman, individually, as the surviving sibling of Quinn Lucas Schansman, and Xander Schansman, individually, as the surviving sibling of Quinn Lucas Schansman*