LAW OFFICES
WILLIAMS & CONNOLLY LLP

CHRISTOPHER N. MANNING
(202) 434-5121
CManning@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
(202) 434-5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

June 16, 2022

**Via ECF**

The Honorable Gabriel W. Gorenstein
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  *Schansman et al v. Sberbank of Russia PJSC et al.*, 19-cv-02985-ALC-GWG
> **Response to Plaintiffs' Request for Pre-Motion Conference**

Dear Judge Gorenstein:

Plaintiffs' letter concerning their proposed motion to compel the production of documents from Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. ("MoneyGram") (ECF 357) ("Letter") begins with the false characterization of MoneyGram's productions as "woefully incomplete" because they include "no transaction records" and "no records relating to internal investigations into the use of its services by the DPR or other terrorists." Letter 1. The reason for that is simple: as MoneyGram has repeatedly told Plaintiffs, MoneyGram searched its internal transaction databases and found ***no transactions*** received by anyone identified in the Second Amended Complaint ("SAC") prior to the crash of Flight MH17. The absence of such transactions necessarily eliminates MoneyGram as the cause of the crash, and thus the basis for the claims against MoneyGram in this lawsuit.

But instead of dismissing those claims, Plaintiffs have embarked on a wide-ranging fishing expedition. They demand that MoneyGram conduct a global search for "individuals and entities that Plaintiffs have identified through their own investigation as related to the DPR" that are listed on what they refer to as "Appendix A," and do so for a period spanning over five years (over three years for transaction records). Letter 5–6. What Plaintiffs fail to mention is that their "Appendix A" contains ***more than 450 names***, the overwhelming majority of which are not mentioned ***at all*** in the SAC and have no apparent connection to the DPR or a public solicitation for MoneyGram transfers—the basis for the claims against MoneyGram. Despite our repeated requests, Plaintiffs refuse to explain the relevance of these names, instead asserting that this information is protected by the work-product doctrine. Plaintiffs also omit that MoneyGram cannot even conduct all the searches they have demanded, because as the SAC concedes, MoneyGram provides money transfer services between individuals, not entities or email addresses. SAC ¶ 65.

WILLIAMS & CONNOLLY LLP®
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 2

We last wrote to Plaintiffs on May 6, 2022, setting forth our position on these issues. Plaintiffs did not respond for over a month. On June 8, 2022, Plaintiffs' counsel sent an email requesting to meet and confer on their proposed motion to compel. During the June 14, 2022 call, it was apparent that Plaintiffs had no intention of attempting to resolve or narrow the scope of any dispute, notwithstanding our repeated attempts to do so.

The downing of Flight MH17 and the resulting deaths of Quinn Schansman and hundreds of other passengers were an undeniable tragedy, but the fact that the true perpetrators "may be beyond the reach of [this] court . . . cannot create liability elsewhere." *Crosby v. Twitter*, 921 F.3d 617, 619 (6th Cir. 2019). Nor can it justify the massive burden that Plaintiffs' unreasonable discovery demands would impose on MoneyGram and its law enforcement partners, or the chilling precedent that their desired outcome would create for all financial institutions and their customers.

For the reasons explained herein, Plaintiffs' request for a pre-motion conference should be denied. Instead, the Court should order Plaintiffs to meaningfully confer with MoneyGram to identify the actual individuals on their Appendix A lists who were publicly associated with the DPR or a DPR fundraiser prior to the MH17 crash, and to provide additional identifying information so that MoneyGram can conduct a search for pre-crash transfers to those persons.

**I.   Background**

Plaintiffs have asserted claims under the direct (or primary) liability prong of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), against two Russian banks (VTB Bank PJSC ("VTB Bank") and Sberbank of Russia PJSC ("Sberbank")), The Western Union Company and Western Union Financial Services, Inc. (together, "Western Union"), and MoneyGram, arising from Quinn Schansman's death on Flight MH17. To prove their claims, Plaintiffs must demonstrate that each defendant knowingly provided "material support and financing to the DPR" that caused the MH17 crash.[1] ECF 185 (Mem. & Order), at 4, 17; ECF 172 (Pls.' Opp. to Mot. to Dismiss), at 66 (citation omitted); SAC ¶¶ 400–19.

---

[1] An international investigation concluded that Flight MH17 was shot down by a Buk surface-to-air missile from Russia's 53rd Anti-aircraft Missile Brigade at the beginning of the armed conflict in the Donbas region of Ukraine. *See*, *e.g.*, *Update in Criminal Investigation MH17 Disaster*, Gov't Neth. (May 24, 2018), *available at* https://www. prosecutionservice.nl/topics/mh17-plane-crash/news/2018/05/24/update-in-criminal-investigation-mh17-disaster ("The [Joint Investigation Team (JIT)] is convinced that the BUK TELAR that was used to down MH17, originates from the 53rd Anti Aircraft Missile brigade . . ., a unit of the Russian Army from Kursk in the Russian Federation."); Volodymyr Zelenskyy, Speech by President of Ukraine in the Australian Parliament (Mar. 31, 2022), *available at* https://www.president.gov.ua/en/news/promova-prezidenta-ukrayini-volodimira-zelenskogo-v-parlamen-73993 (stating MH17 was "shot down by the Russian occupiers in the sky over the Ukrainian Donbas"). Thus, Plaintiffs' claims fail to satisfy the ATA's causation requirement and also fall within its Act of War exclusion. *See generally* ECF 161.

Case 1:19-cv-02985-ALC-GWG   Document 362   Filed 06/16/22   Page 3 of 9

WILLIAMS & CONNOLLY LLP
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 3

As to MoneyGram, Plaintiffs' theory is that MoneyGram "allow[ed] individuals to send money to other identified individuals" that were soliciting funds on behalf of various "coordinated DPR entities" that comprise the "DPR's fundraisers," which in turn gave money or goods to DPR, which was responsible for the attack that killed Quinn Schansman. SAC ¶¶ 7, 14, 65. Plaintiffs further assert that MoneyGram was on notice and knew or should have known that these individuals were providing support to the DPR because the fundraising websites were "readily accessible online, including via a simple Google search." *Id*. ¶ 147.

Unlike the allegations against the other defendants, however, Plaintiffs did not identify any money transfers that were processed by MoneyGram before the crash. Instead, Plaintiffs pointed to a handful of websites belonging to various fundraising entities that listed MoneyGram and others as possible conduits for a money transfer. SAC ¶¶ 208–09, 270, 282, 297; Letter 2. But they did not plead any facts indicating that an actual transfer took place prior to the MH17 crash on July 17, 2014, or that MoneyGram was actually aware of the websites during the short period they were active before the crash. Plaintiffs also failed to explain how MoneyGram, in the absence of any pre-crash transfers, could have caused the MH17 crash or had the requisite *mens rea* to violate 18 U.S.C. §§ 2339A or 2339C, the relevant criminal predicate statutes. On September 30, 2021, the Court denied Defendants' motions to dismiss (ECF 185), but without addressing these or other arguments set forth in MoneyGram's supplemental memorandum. MoneyGram thus filed a motion for reconsideration of the Order, which is pending. ECF 218.

To be clear, the current dispute is not about pleading deficiencies. Prior to discovery opening in this case, MoneyGram voluntarily provided Plaintiffs with two sworn declarations verifying that MoneyGram had conducted an exhaustive search of its transaction databases and did not identify ***a single money transfer*** received by any of the individuals identified in the SAC between the formation of the DPR on March 3, 2014 and the MH17 crash on July 17, 2014.[2] Plaintiffs nevertheless refused to dismiss their claims against MoneyGram.

Since discovery commenced, MoneyGram has made multiple productions, including of company policies, agent locations in Donbas, and an initial production of emails. On May 20, 2022, MoneyGram proposed terms for a further email search, to which Plaintiffs only responded yesterday. Plaintiffs suggestion that MoneyGram is "stonewalling discovery," Letter 3, is thus entirely unfounded.[3]

---

[2] Plaintiffs' letter misleadingly suggests that someone named Alexey Khudyakov—an individual not mentioned in the SAC, or even in Plaintiffs' Appendix A lists of names—was openly soliciting funds through MoneyGram on the website of a DPR organization called Russian Choice prior to the MH17 crash. Letter 2. This is not the case: the website cited by Plaintiffs does not mention an Alexey Khudyakov, nor request that funds be sent to him. *See* ECF 113-2.

[3] So too are Plaintiffs' references to an April 2022 CFPB press release (which MoneyGram disputes) and MoneyGram's 2012 deferred prosecution agreement, Letter 3–4; SAC ¶ 388, neither of which concern the DPR or the facts of this case.

WILLIAMS & CONNOLLY LLP
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 4

## II. The Parties' Discovery Dispute

Plaintiffs purport to identify three disputes for the Court's resolution, but all three principally concern a single issue. In November and December 2021, Plaintiffs served three sets of Requests for Production with a list of names of **more than 450** individuals, entities, and email addresses—including the names of over 300 individuals who are not mentioned at all in the SAC—and demanded that MoneyGram conduct a search for any transactions with such persons "to or from any location" over a period of over three years, and for any other documents mentioning such persons over a period of over five years. *See* Letter 1, 4. In our last meet and confer call on June 14, 2022, Plaintiffs represented that they intend to continue to supplement this list.

MoneyGram has repeatedly asked Plaintiffs for an explanation of the relevance of the hundreds of names not mentioned in the SAC. None appear to have been on any sanctions list (which MoneyGram closely monitors) prior to the MH17 crash, nor is MoneyGram aware of any information connecting the overwhelming majority of names to the DPR or a DPR fundraiser—let alone a public solicitation requesting that funds be sent to such persons via MoneyGram, the premise of Plaintiffs' theory of liability. Yet, Plaintiffs have refused to meaningfully confer or otherwise provide information regarding these names on the basis that such information constitutes work product. Instead, Plaintiffs have said that MoneyGram's counsel should comb the thousands of pages of their document productions for answers, even though Plaintiffs have confirmed that their productions do not mention many of these names, and refuse to even confirm that all of them were affiliated with the DPR prior to the MH17 crash. And many of the documents are in Cyrillic. Plaintiffs also refuse to provide any identifying information concerning the names on Appendix A, such as a location or date of birth, to ensure that searches are for the correct persons. In other words, Plaintiffs have taken the position that they can impose a massive and disproportionate discovery burden on MoneyGram by demanding a search concerning anyone in the world sharing hundreds of names, with **no** demonstrated relevance to their allegations.

MoneyGram has continually represented that it will search its records for transfers received by the individuals listed in Appendix A who were publicly affiliated with the DPR or a DPR fundraiser prior to the MH17 crash. Again, as explained above, MoneyGram already ran searches for transfers received by the persons named in the SAC (on a global basis, contrary to Plaintiffs' suggestion that MoneyGram is refusing to conduct searches outside of a narrow geographic range) and provided the results of this search to Plaintiffs. But, as MoneyGram explained to Plaintiffs, it will not engage in a fishing expedition for private consumer data that has no relevance to this action. *See Strauss v. Credit Lyonnais, S.A.*, 2011 WL 4736358, at *4 (E.D.N.Y. Oct. 6, 2011) (holding customers "'have a 'justifiable expectation that their names and financial records not be revealed to the public'" (citation omitted)). Nor can we imagine that any financial institution would take a different position if confronted with similarly sweeping demands. Nevertheless, Plaintiffs have refused to budge, and thus MoneyGram agrees we are at an impasse as to the transactional data sought.

Plaintiffs' positions are unreasonable for several reasons:

WILLIAMS & CONNOLLY LLP
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 5

1. As an initial matter, certain aspects of Plaintiffs' demanded search are impossible. As MoneyGram has repeatedly informed Plaintiffs, unlike a bank, MoneyGram's money transfer service is peer to peer, meaning it is only available between individuals. Except for two exceptions not applicable in this case, MoneyGram does not process transfers sent by or to an organization or entity.[4] It also does not maintain accounts for customers, nor does it process transactions or store transaction records in Cyrillic characters. MoneyGram has provided Plaintiffs with sworn declarations confirming these facts.

2. Where it is not obvious from the pleadings, a party is required to explain the relevance of their discovery requests before imposing the corresponding burdens on others. Discovery "'is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" *Tottenham v. Trans World Gaming Corp.*, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) (citation omitted). For example, in *In re Terrorist Attacks on Sept. 11, 2001*, the court denied the plaintiffs' request for discovery into 21 individuals and some related entities on the basis that "the complaint does not actually allege ties between [them and the defendant]," and "separate discovery into 21 people is likely to impose a substantial burden that cannot be justified." 2021 WL 5449825, at *9 (S.D.N.Y. Nov. 22, 2021). Similarly, in another ATA case, the court denied a motion to compel the production of transactional information concerning only three persons, because the complaint had not alleged any facts suggesting that the defendant "knew or had reason to know that those customers supported or had connections to HAMAS, the terrorist organization responsible for the attacks giving rise to the claims in this action." *Strauss v. Lyonnais*, 2009 WL 10702129, at *1 (E.D.N.Y. Aug. 10, 2009). Here, Plaintiffs have identified **over 300** names of individuals that are not mentioned in the SAC or otherwise alleged to have been soliciting funds via MoneyGram. Plaintiffs' work-product objection to explaining their connection to this case is unsupported by the law: "Work product protection typically applies only to 'documents and tangible things,' and not to facts within the documents." *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 230 (E.D.N.Y. 2007) (holding that information plaintiffs obtained as part of investigation did "not fall within the protection of the work-product doctrine"). Defendants are "entitled to have access to the information and documents upon which plaintiffs rely to establish their claims"; "plaintiffs may not use their information and documents both as a sword and, to the extent they seek protection from disclosure, as a shield." *Id.* at 237–38.

The burden in this case is even more substantial than in *In re Terrorist Attacks* or *Strauss*. MoneyGram's Global Security and Investigations Group, which has primary responsibility for running transaction searches, works seven days a week responding to subpoenas and other requests from law enforcement worldwide asking for real-time assistance with their investigations, often

---

[4] The first exception is a bill paying service, available only within the United States, which allows consumers to make bill payments to select preapproved companies, such as utilities. The other is a service that is only available to preapproved businesses in North America and allows those businesses to send funds to consumers or employees. Both exceptions were disclosed last year, prior to formal discovery, and Plaintiffs do not contend that either is relevant to their claims.

WILLIAMS & CONNOLLY LLP
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 6

requiring very quick turnaround times. This global team of 25 people processes, on average, at least 60 individual requests per day (over 22,000 requests per year). Pulling them away from this work to conduct the time-consuming fishing expedition Plaintiffs are seeking would impose a tremendous burden on MoneyGram and cause delays to time-sensitive government investigations. As discussed below, law enforcement regularly tailors their requests to minimize these burdens, but Plaintiffs refuse to do so here.

3.  A global transactional search for hundreds of names, with no locations or other identifying information, would yield a massive volume of entirely irrelevant material and private transaction data of customers having no connection to the allegations whatsoever. Unlike a bank, MoneyGram cannot simply pull all transactions for a specific customer's account; instead, it must search across the more than 20 million unique transactions MoneyGram processes annually in over 200 countries and territories. A global search for all transactions received by anyone with a relatively common name would return records for hundreds, if not thousands, of different individuals. Even searches for names that might seem less common can return results for multiple persons. For example, MoneyGram agreed over a month ago to run a transactions search for the Alexey Khudyakov mentioned in Plaintiffs' letter, but it requested additional identifying information, as an internet search for that name returns results for many different "Alexey Khudyakovs," including almost 100 different people with a variation of that name on Facebook alone. When this effect is multiplied by over 300 names, the number of false positives and burdens on MoneyGram's personnel and systems would be massive. By contrast, law enforcement regularly provides MoneyGram with detailed identifying information, such as a location, date of birth, phone number, or other details, in order to target the actual suspects, instead of requiring a blunderbuss search. Yet, Plaintiffs refuse to provide any such information, instead insisting on a global search for anyone sharing one of hundreds of names, without limitation.

To be clear, MoneyGram has ***not*** asserted a blanket objection to conducting a global search under any circumstances. *See* Letter 7 n.5. The names and details in the SAC made it possible for MoneyGram to conduct a global transactions search for those persons. Even then, that search returned false positives, as MoneyGram disclosed to Plaintiffs. But the notion that a plaintiff can require a financial institution without account information to run searches on a global basis for anyone with one of hundreds of names, with no further identifying information, and no demonstrated connection to the claims, is unsupported by law,[5] would plainly result in the

---

[5] The cases Plaintiffs cite are plainly distinguishable. *In re Vitamins Antitrust Litigation* involved a global antitrust conspiracy that had been investigated by law enforcement officials in multiple countries, and the defendants' own experts were planning to rely on the transactional data sought. 2001 WL 1049433, at *11–12 (D.D.C. June 20, 2001). And the unpublished order in *Linde v. Arab Bank, PLC* concerned a request for bank account information for a *defined list of specified accounts identified by the plaintiffs*, and expressly provided that, other than persons identified in the course of the defendant bank's review of its own files, "the defendant is not required to conduct research or investigation to otherwise identify [the relevant accountholders]." No. 04-CV-2799-BMC-VVP at *3-4 (E.D.N.Y. Mar. 3, 2006) (No. 160).

**WILLIAMS & CONNOLLY**LLP®
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 7

disclosure of irrelevant private financial information on an unprecedented scale, and would create a chilling precedent for all financial institutions and their customers. It would also cause needless delays for state, federal, and international law enforcement agencies that depend on MoneyGram to investigate active matters quickly. It is no answer to say that these sweepingly irrelevant results can simply be designated as confidential under a protective order. Letter 8. Protective orders are intended to protect confidential information in *relevant* documents. "There is no basis to compel [MoneyGram] to turn over information that is not relevant to the claims and defenses in this matter." *Aviles v. S&P Glob., Inc.*, 2021 WL 2077932, at *4 (S.D.N.Y. May 24, 2021). Nor can Plaintiffs refuse to provide the identifying information on work product grounds. *Strauss*, 242 F.R.D. at 237–38.

Plaintiffs' additional demand that MoneyGram search for transfers *from* the hundreds of names in Appendix A, Letter 8, would multiply the false positives and burdens discussed above with no apparent benefit, particularly where (1) Plaintiffs' theory is that MoneyGram knew or should have known that specific individuals were publicly soliciting funds to be sent *to* them via MoneyGram so those funds could be provided to the DPR or DPR fundraisers (SAC ¶ 67); (2) those individuals could not have forwarded any monies received to the DPR or its fundraising entities via MoneyGram, since MoneyGram does not process money transfers to entities; and (3) any transfers to those individuals would be captured by MoneyGram's search, regardless of who sent funds to them (so transfers between such individuals would be captured).

Again, MoneyGram has offered to confer with Plaintiffs to identify those individuals who were soliciting MoneyGram transfers on behalf of the DPR, or were otherwise publicly affiliated with the DPR or a DPR fundraiser, in an attempt to avoid, or at least narrow, this dispute. But Plaintiffs have flatly refused to engage in such a process.

4.  Plaintiffs' insistence that MoneyGram search for over *three years* of transactional data, and over *five years* for other documents, Letter 4, is unsupported by authority, seeks substantial irrelevant information, and is entirely disproportional to the needs of this case.[6]

As to the proposed start date, the premise of the SAC is that defendants knowingly facilitated money transfers to leaders and fundraisers of the DPR, SAC ¶ 3–4, which the SAC pleads *did not exist* until March 3, 2014. SAC ¶ 93. The SAC contains no allegations concerning the DPR, or any other relevant conduct, in 2013. There is thus no basis in the SAC for Plaintiffs' demand that MoneyGram search for transactions and custodial records prior to March 3, 2014, and certainly not as early as November 21, 2013. Even so, MoneyGram offered a start date of January 1, 2014 as a compromise, but Plaintiffs refused this.

---

[6] While Plaintiffs make a blanket request for five years as to "all other relevant documents," Letter 4, the focus of both their letter and the parties' June 14, 2022 meet-and-confer was transactional data. Plaintiffs have propounded 41 individual document requests. If Plaintiffs intend to move to compel as to other post-crash documents, they should be ordered to meet and confer regarding the specific documents in question to determine if any dispute can be narrowed or avoided.

WILLIAMS & CONNOLLY LLP
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 8

As to the proposed end date, Plaintiffs fail to explain the relevance of post-crash transactional data or custodial documents to their claims. During the parties' meet-and-confer on February 22, 2022, Plaintiffs' counsel conceded that "but-for" causation was lacking for post-crash transactions. Plaintiffs do not argue otherwise in their letter, and instead assert that they seek post-crash transactions for other purposes, such as Federal Rule of Evidence 404(b). Letter 5. But in this Circuit, evidence that "arose out of the same transaction or series of transactions," "is inextricably intertwined with the evidence regarding the charged offense," or "is necessary to complete the story" at trial is *inadmissible* under Rule 404(b). *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Furthermore, "subsequent act" evidence offered under Rule 404(b), which the Second Circuit has recognized is less probative than prior acts, is admissible only when it "closely parallel[s]" the charged conduct. *United States v. Curley*, 639 F.3d 50, 61 (2d Cir. 2011). Plaintiffs make no such argument here: the DPR is not alleged to have downed other civilian aircraft, nor to have killed other Americans in violation of the ATA. Plaintiffs also argue that post-crash evidence could lead to admissible evidence about persons who funded the DPR before the crash. Letter 5. This is even more speculative, where no pre-crash MoneyGram transfers were received by persons identified in the SAC, nor is it necessary, where MoneyGram has offered to search for pre-crash transfers to other persons publicly associated with the DPR or a DPR fundraiser. In short, Plaintiffs fall well short of justifying the burdens that such an extensive transactions search would impose on MoneyGram personnel or its law enforcement partners.

Finally, Plaintiffs assert that "documents created after a key event may be relevant to a defendant's knowledge of that event." Letter 4. But the only case that Plaintiffs cite within this Circuit—*In re Terrorist Attacks on Sept. 11, 2001*—does not support their demands for a multi-year discovery period in this case. 2021 WL 5449825, at *4–5. There, the court made clear that it was permitting discovery into a multi-year period because of the unique circumstances of the September 11 attacks, which were especially complex and took significant time for al Qaeda to plan, finance and execute. *Id.* at *4. (Here, by contrast, the entire time period from the formation of the DPR to the MH17 crash was four months.) There, the court also made clear that it was *not* intending to set a "bright line rule . . . for every case.'" *Id*. Indeed, the court cited favorably to cases holding that "'post-attack financial support to the families of terrorists' was not sufficient to show a violation of the [ATA]" and that "'after-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused a terrorist attack." *Id.* (citations omitted)). Moreover, as Plaintiffs concede, even in that case, the Court did not permit discovery for the lengthy period that Plaintiffs are seeking here. *Id.* at *5. Plaintiffs' other, out-of-circuit case, *Estate of Klieman v. Palestinian Authority*, is even further afield; in contrast to the voluminous transaction data sought here, the court in that case was considering a narrowly-tailored subpoena to a third-party news organization for materials concerning an interview it had recorded with individuals affiliated with the terrorist attack's perpetrator. 293 F.R.D. 235, 242–44 (D.D.C. 2013). "In sum, the burden of opening discovery into . . . financial transactions postdating the relevant events far outweighs any potential evidentiary benefits," *Keck v. Union Bank of Switz.*, 1997 WL 411931, at *3 (S.D.N.Y. July 22, 1997). This is especially so in conjunction with Plaintiffs' blanket refusal to provide any additional information about the names in their various Appendix A lists.

**WILLIAMS & CONNOLLY**LLP®
Hon. Gabriel W. Gorenstein
June 16, 2022
Page 9

*   *   *

For the foregoing reasons, MoneyGram respectfully requests that the Court deny Plaintiffs' request for a conference, and instead order Plaintiffs to meaningfully confer with MoneyGram to identify the actual individuals on Plaintiffs' Appendix A lists who were publicly affiliated with the DPR or a DPR fundraiser prior to the MH17 crash, and to provide additional identifying information so that MoneyGram can conduct a search for pre-crash transfers to those persons. Similarly, if Plaintiffs seek the production of post-crash documents other than transactional data, the Court should order them to meet and confer regarding the specific documents in question to determine if any dispute can be narrowed or avoided. *See* note 6, *supra*.

If the Court is inclined to grant Plaintiffs' request to file a motion, MoneyGram is prepared to provide more fulsome briefing and supporting declarations on these issues. MoneyGram also would welcome the opportunity to expand on these points and provide supporting materials if it would assist the Court. Finally, we apologize for submitting a letter in excess of the Court's usual page limit for discovery letters (Individual Practices, ¶ 2(a)), but it was necessary to respond to Plaintiffs' nine-page submission.

Respectfully submitted,

*/s/ Christopher N. Manning*
Christopher N. Manning

*Counsel for the MoneyGram Defendants*

cc:   Counsel of Record (via ECF)