UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS SCHANSMAN, et al.

               Plaintiffs,

           -against-

SBERBANK OF RUSSIA PJSC, et al.

              Defendants.

No. 1:19-cv-02985-ALC-GWG

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR RENEWED MOTION TO COMPEL THE PRODUCTION
<u>OF DOCUMENTS FROM VTB BANK PJSC</u>**

Lee Wolosky
Jason P. Hipp
Susanna D. Evarts (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1628
lwolosky@jenner.com
jhipp@jenner.com
sevarts@jenner.com

Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 923-2799
tmascherin@jenner.com

*Counsel for the Schansmans*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    Motion To Compel............................................................................ 4

    B.    Developments Since Briefing The Motion to Compel. ........................... 6

        1.    Non-Transactional Records. ...................................................... 7

        2.    Transactional Records & Suspicious Activity Reports........................... 11

    C.    VTB's Rule 30(b)(6) Deposition. ....................................................... 13

    D.    VTB's Efforts To Render Itself Judgment Proof. .................................... 15

ARGUMENT ....................................................................................................... 16

I.    VTB Has Not Met Its Burden To Prove The Existence And Applicability Of A Conflicting Foreign Law. ....................................................................... 17

II.    Under The Governing Supreme Court Analysis, VTB Is Required To Produce The Discovery Sought By the Schansmans. ............................................................... 19

    A.    The U.S. Interest In Adjudicating ATA Claims Far Outweighs Any Interest Of The Russian Federation In Shielding Terrorist-Funding Information From Discovery. ............................................................................... 20

    B.    The Requested Documents Are Critical To This Case, And The Schansmans' Requests Are Sufficiently Specific. .......................................... 24

        1.    Transactions Providing Material Support for Terrorists (RFP Nos. 1, 2, 40, 52 & 54). ................................................................. 25

        2.    VTB's Monitoring Activities (RFP Nos. 5, 13, 32, 50 & 53) and Compliance Policies (RFP Nos. 25–27, 30, 59–60). ........................... 27

    C.    No Reasonable Alternative Means Exist To Secure The Information Requested From VTB. ........................................................................ 30

        1.    VTB's Approval Processes Are Not Viable. ........................................ 30

        2.    VTB's Extensive Redactions Also Make Clear There Is No Easily Available Alternative Means. ........................................................ 32

    D.    VTB Will Face No Undue Hardship In Complying With The Schansmans' Discovery Requests........................................................................... 34

i

E.      VTB Has Not Participated in Discovery in Good Faith. ...................................... 35

CONCLUSION ................................................................................................................................ 38

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adidas (Canada) Ltd. v. SS Seatrain Bennington*,
  No. 80-CV-1911, 1984 WL 423 (S.D.N.Y. May 30, 1984) ....................................................22

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1775, 2010 WL 2976220 ............................................................................31, 34

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  278 F.R.D. 51 (E.D.N.Y. 2010) ...................................................................................22

*Alfadda v. Fenn*,
  149 F.R.D. 28 (S.D.N.Y. 1993) ...................................................................................17

*AnywhereCommerce, Inc. v. Ingenico, Inc.*,
  No. 19-CV-11457-IT, 2020 WL 5947735 (D. Mass. Aug. 31, 2020) ....................................30

*Chevron Corp. v. Donziger*,
  296 F.R.D. 168 (S.D.N.Y. 2013) .............................................................................19, 20

*Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.*,
  105 F.R.D. 16 (S.D.N.Y. 1984) ..............................................................................36, 37

*EFG Bank AG v. AXA Equitable Life Ins. Co.*,
  No. 17-CV-4767 (JMF), 2018 WL 1918627 (S.D.N.Y. Apr. 20, 2018) ................................18

*Gucci Am., Inc. v. Curveal Fashion*,
  No. 09-CV-8458, 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ...............................30, 34, 35

*JPMorgan Chase Bank, N.A. v. VTB Bank, P.J.S.C.*,
  No. 24-CV-02924 (S.D.N.Y. Apr. 18, 2024)...........................................................15, 16, 37

*Laydon v. Mizuho Bank, Ltd.*,
  183 F. Supp. 3d 409 (S.D.N.Y. 2016)...........................................................................17

*Linde v. Arab Bank, PLC*,
  269 F.R.D. 186 (E.D.N.Y. 2010) ..............................................................................29, 32

*Linde v. Arab Bank, PLC*,
  463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006), 2007 WL 812918
  (E.D.N.Y. Mar. 14, 2007) ................................................................................20, 24, 27

*Linde v. Arab Bank, PLC*,
  706 F.3d 92 (2d Cir. 2013)............................................................................... *passim*

*In re Mercedes Benz Emissions Litig.*,
   No. 16-CV-881, 2020 WL 487288 (D.N.J. Jan. 30, 2020) ...................................................33

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ...................................................................................29

*Miller v. Arab Bank, PLC*,
   No. 18-CV-2192, 2023 WL 2731681 (E.D.N.Y. Mar. 31, 2023) ...............................21, 26, 28

*Milliken & Co. v. Bank of China*,
   758 F. Supp. 2d 238 (S.D.N.Y. 2010) ..............................................................................30, 34

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   116 F.R.D. 517 (S.D.N.Y. 1987) .......................................................................................36

*Owen v. Elastos Found.*,
   343 F.R.D. 268 (S.D.N.Y. 2023) .......................................................................................35

*Société Nationale Industrielle Aérospatiale v. United States District Court for the
   Southern District of Iowa*,
   482 U.S. 522 (1987) .............................................................................................2, 16, 22

*Strauss v. Credit Lyonnais, S.A.*,
   242 F.R.D. 199 (E.D.N.Y. 2007) ..................................................................... *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-MD-01570GBDSN, 2023 WL 4447869 (S.D.N.Y. July 11, 2023) ...........................18

*United States v. Vetco Inc.*,
   691 F.2d 1281 (9th Cir. 1981) .........................................................................................34

*Weiss v. Nat'l Westminster Bank, PLC*,
   242 F.R.D. 33 (E.D.N.Y. 2007) ................................................................20, 21, 24, 35

*Wultz v. Bank of China Ltd.*
   942 F. Supp. 2d 452, 473 (S.D.N.Y. 2013) .................................................................21, 29

**Statutes**

18 U.S.C. § 2333(a) ...............................................................................................................3, 4

18 U.S.C. § 2339A ...................................................................................................................3

18 U.S.C. § 2339C ...................................................................................................................3

**Regulations**

31 C.F.R. 501.801 ...................................................................................................................15

31 C.F.R. 589.210 ...................................................................................................15

**Rules**

Federal Rule of Civil Procedure 26 ........................................................................28

Federal Rule of Civil Procedure 30(b).........................................................10, 13, 14

Federal Rule of Civil Procedure 34 ..........................................................................1

Federal Rule of Civil Procedure 37 ..........................................................................1

Federal Rule of Evidence 404(b).............................................................................28

**Other Authorities**

54th Sess., Supp. No. 49, G.A. Res. 54/109 ..........................................................23

Exec. Order No. 13662 ............................................................................................15

Exec. Order No. 14065 ............................................................................................15

Federal Financial Monitoring Service, *FATF*,
    https://web.archive.org/web/20220308112813/https://www.fedsfm.ru/en
    (captured Mar. 8, 2022) .....................................................................................23

*International Standards on Combatting Money Laundering and the Financing of
    Terrorism & Proliferation: The FATF Recommendations* 14 (Nov. 2023),
    https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/
    FATF%20Recommendations%202012.pdf..........................................................24

Restatement (Third) of Foreign Relations Law § 442 (1987)...................................19

Statement on the Russian Invasion (Feb. 24, 2023), https://www.fatf-gafi.org/en/
    publications/Fatfgeneral/fatf-statement-russian-federation.html............................23

Plaintiffs Thomas Schansman, individually, as surviving parent of Quinn Lucas Schansman; Catharina Teunissen, individually, as surviving parent of, and as personal representative of the Estate of Quinn Lucas Schansman; Nerissa Schansman, individually, as surviving sibling of Quinn Lucas Schansman; and Xander Schansman, individually, as surviving sibling of Quinn Lucas Schansman ("Quinn"), submit this memorandum of law in support of their renewed Motion to Compel the production of documents from Defendant VTB Bank PJSC ("VTB") pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Schansman family's discovery requests have been outstanding for over thirty-two months, with VTB objecting to producing most documents on the claim that Russian blocking statutes preclude VTB from producing anything. In November 2022, Plaintiffs moved to compel. VTB responded that the motion to compel was premature, and pleaded for more time to seek permission from Russian authorities to produce the responsive documents. This Court acceded to VTB's request, giving VTB six months to produce the documents. That deadline came and went. So did the next deadline in January 2024, the next deadline in April 2024, and, now, the final deadline of July 31, 2024.

What has all that Kafkaesque delay produced? 

But VTB has produced only 635 non-transactional documents—

The Ministry of Finance has refused to permit VTB to produce any further documents, and the Russian Central Bank has never responded to VTB's request for permission to produce the

. As a result, VTB has produced zero records of monetary transactions,

███████████████████████████████

███████████████████████████████

████████ [1]

The time has come to end this charade.  As a result of VTB's insistence that it will not produce documents in this case unless authorized by the Russian government, the Schansmans have been significantly hampered in their ability to prosecute their Anti-Terrorism Act ("ATA") claims against VTB for its role in funding the terrorist organization that downed the flight carrying their eighteen-year-old son and brother.  Last month, the Schansmans commemorated the tenth anniversary of Quinn's death.  It has now been five years since they brought this action, nearly three years since discovery began, and more than two years since they sought to compel the production of documents from VTB.  But accountability remains a distant hope.  It is time for discovery to proceed.

VTB's Russian law objections clearly fail the test established by the Supreme Court in *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522 (1987).  First, VTB has failed to meet its burden to prove that the Russian laws it cites actually prohibit the production of all the documents it refuses to produce.  Second, under the comity analysis outlined in *Aérospatiale* and its progeny, the most significant factors all support requiring VTB to produce the requested documents.  The United States has a strong interest in countering terrorism through suits like this one.  The document requests are sufficiently specific—indeed, VTB does not object to any of the requests on grounds of burden or

---

[1] Included as Exhibit A is a chart of the Schansmans' discovery requests and VTB's responses and objections separated into the categories identified above (the "Discovery Request Chart").  The Discovery Request Chart also identifies whether VTB has produced documents responsive to each request, to the extent the Schansmans are able to discern that given VTB's extensive redaction of the documents that it has produced.

overbreadth—and seek information that is critically important to resolving the claims and defenses in this case. There is no other way for the Schansmans to obtain discovery from VTB absent a ruling from the Court. And VTB cannot show that it will face any concrete harm from producing documents required by court order. The Schansmans' Motion to Compel should be granted, and VTB should be required to produce all of the responsive documents in unredacted form.

## STATEMENT OF FACTS

This case concerns VTB's facilitation of financing of the DPR, a terrorist group, to procure weapons and other instruments of violence to carry out terrorist activity in eastern Ukraine. To encourage supporters from around the world to finance their terrorist aims, members of the DPR advertised an array of transaction options—including transfers to bank accounts with VTB— through which they sought to receive funds. As Judge Carter held in his opinion denying VTB's motion to dismiss, the Schansmans sufficiently allege that VTB chose to operate correspondent accounts in New York and that VTB provided financial services to the DPR, including through transactions processed via those accounts. *See* Dkt. 185 at 7–9. These payments allowed the DPR to purchase lethal equipment that was necessary for the DPR to acquire and maintain control over the territory from which it launched the missile that shot down the MH17 passenger plane, and to carry out its terrorist activities, including the missile attack on Quinn's plane on July 17, 2014. That heinous attack killed all 298 occupants on board, including eighteen-year-old U.S. national Quinn.

The Schansmans' discovery requests focus on the core issues in this case: (1) VTB's provision of material support to terrorists and its financing of terrorism, 18 U.S.C. §§ 2339A & 2339C; (2) VTB's acts of international terrorism, 18 U.S.C. § 2333(a); (3) VTB's deliberate indifference to the risk that it was providing financial support to terrorism, 18 U.S.C. § 2339A(a);

3

and (4) VTB's proximate causation of the Schansmans' injuries, 18 U.S.C. § 2333(a).  To obtain relevant discovery concerning those core issues, the Schansmans have requested information and documents related to: (1) transactions and other customer-specific information to identify the movement of funds through VTB benefitting the DPR;[2] (2) VTB's monitoring of the 2013–2014 political and social unrest in Ukraine, VTB's financing of terrorists, and VTB's compliance with laws regarding its support for terrorist activities in Ukraine;[3] and (3) VTB's policies, practices, and procedures concerning counterterrorism and anti-money laundering efforts.[4] ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

### A.  Motion To Compel.

Discovery began nearly three years ago on October 27, 2021, after the Court denied Defendants' motions to dismiss.  Dkt. 197.  The Schansmans promptly served discovery requests.  From the outset, VTB objected to producing *any* documents, asserting that a variety of Russian laws prohibited VTB from producing documents without permission from certain Russian government entities.  Dkts. 480-2, 480-3.  Even were permission ever granted, VTB expressly refused to produce documents it views as subject to Russia's bank secrecy statutes.  Dkt. 320 at 4; *infra* Sections B.1–2.

On April 18, 2022, after VTB had failed to produce a single document, the Schansmans sought permission to move to compel.  Dkt. 314.  The next day, VTB's counsel moved to withdraw

---

[2] *See* Dkts. 480-4, 480-5 (RFP Nos. 1, 2, 40, 52, 54).

[3] *See* Dkts. 480-4, 480-5 (RFP Nos. 5, 13, 32, 50, 53).

[4] *See* Dkts. 480-4, 480-5 (RFP Nos. 25–27, 30, 59–60).

4

from representing VTB, shortly after the U.S. imposed sanctions on VTB as a result of Russia's invasion of Ukraine.  Dkt. 316.  Briefing on the Schansmans' motion to compel was stayed for four months while VTB sought new counsel.  Dkts. 316, 426–428.

After VTB's new counsel appeared, VTB continued to make the same Russian law objections to producing any documents, and on November 11, 2022, the Schansmans filed their motion to compel VTB to produce documents notwithstanding its Russian law objections.  Dkt. 479.  In its Opposition, VTB claimed the Schansmans' motion was premature because VTB was beginning the process of collecting and reviewing documents and planned to seek permission from the Russian government to produce documents.  Dkt. 488 at 11–12.

To be clear, the documents for which VTB sought Russian government approval were never going to fulfill VTB's discovery obligations in this case, because VTB unilaterally redacted or withheld from production any information that is subject to Russian blocking statutes.  That information was redacted even from the documents it submitted to the Russian regulators.  Dkt. 551 at 2.  VTB redacted all bank personnel names and identifying information, as well as all identifying information in customer records and transactional documents.  *See id.*  VTB admits this means *none* of the documents submitted to the Russian government for approval contains information that is prohibited from production under Russian law, and the Russian government also made clear from the outset that such information could not be produced.  *See, e.g.*, Ex. B (VTB-SCHANSMAN002747) & Ex. C (VTB-SCHANSMAN002756) (███████████████████ ████████████████████████████████████████████████); Ex. D (VTB-SCHANSMAN000096) & Ex. E (VTB-SCHANSMAN002746) (███████████████ ████████████████████████████████████████).

**B.  Developments Since Briefing The Motion to Compel.**

In the twenty-one months since the Schansmans moved to compel, VTB has sought and received three extensions from the deadlines this Court has set for it to complete production of all responsive documents.  *See* Dkts. 197, 491, 554, 578.  ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████, VTB has produced only 635 documents to the Schansmans—███████████████████████████████.  VTB reports that the Russian Ministry of Finance has denied its request for approval to produce all but one of the remaining sets of non-transactional documents submitted to the Ministry, and there is no reason to believe the Ministry will permit VTB to produce the rest of the documents.  The Central Bank has not acted on VTB's request, no transaction documents have been produced, and the Schansmans have no reason to believe any will be produced.  In short, VTB has failed to produce the vast majority of responsive documents:

| | Documents Sent for Approval | Documents Produced to Plaintiffs |
|---|---|---|
| Ministry of Finance | ██ | 635 |
| Central Bank of Russia | ██ | 0 |
| **TOTAL** | ██ | **635** ██ |

Given the passage of VTB's final document production deadline on July 31, 2024, VTB is now deemed to have refused to produce all outstanding documents.  *See* Dkts. 509, 589.  VTB has acknowledged that it is no longer seeking more time to await further responses from the Russian government.  *See* Dkts. 589, 591. More than a year ago, the Court recognized that VTB's "delay in production" of documents "has had a severe and negative impact on the progress of this case."

Dkt. 509 at 1; *see also* Dkt. 554 at 1.  It is now clear that VTB's efforts to obtain approval from Russian government entities has failed.

### 1.  Non-Transactional Records.

VTB maintains that, under Russian law, it can only produce non-transactional records with the consent of the Russian Ministry of Finance.   But its efforts to obtain that consent have been slow and ineffective.

Initially, VTB informed the Ministry of Finance that it intended to produce . Ex. F (VTB-SCHANSMAN0000002). *Id.* at 1. Ex. II ("VTB 30(b)(6) Tr. (Aug. 6, 2024)") 92:13–24, 98:20–99:21, 104:19–23.  It was not until more than three months after the Schansman family moved to compel that VTB actually requested permission from the Ministry of Finance to produce any documents. Ex. G (VTB-SCHANSMAN000091).  A series of requests to the Ministry followed, spanning the past year.[5]

In response, the Ministry of Finance repeatedly made clear that it would not authorize VTB to produce information prohibited by Russian laws.  In all responses, the Ministry stated that "." *See, e.g.*, Ex. D (VTB-SCHANSMAN000096).  The Ministry has also directed that "

---

[5]  Ex. H (VTB-SCHANSMAN000079); Ex. B (VTB-SCHANSMAN002747); Ex. I (VTB-SCHANSMAN002754); Ex. C (VTB-SCHANSMAN002756); Ex. J (VTB-SCHANSMAN002758); Ex. K (VTB-SCHANSMAN002759); Ex. L (VTB-SCHANSMAN002766).

█████████████████████████████████████████████████████████

███████████████████ " *Id.* (emphasis added).

Between February 2023 and May 2024, VTB submitted eight requests to the Ministry of

Finance, ███████████████████████████.[6]  Ex. JJ ("VTB 30(b)(6) Tr. (Aug. 7,

2024)") 191:5–191:7, 170:11–171:3; Dkt. 523 at 1.  The Ministry granted "approval" for VTB to

produce the documents referenced in four of the smaller requests, totaling 635 documents, with

the significant caveat that VTB was prohibited from disclosing any information that is subject to

Russian blocking statutes.[7]  The limited number of documents VTB has produced comprise

general policies, travel receipts, and Ministry of Finance regulations, as well as heavily redacted

email correspondence and other documents regarding VTB's compliance efforts not specific to the

DPR.    Dkt.  523;  Dkt.  535;  Ex.  G  (VTB-SCHANSMAN000091);  Ex.  H  (VTB-

SCHANSMAN000079);    Ex.    B    (VTB-SCHANSMAN002747);    Ex.    I    (VTB-

SCHANSMAN02754);  Ex.  C  (VTB-SCHANSMAN002756).    All  personally  identifiable

information was redacted from these documents, which makes it very difficult, at best, for the

Schansmans to determine the relevance of many of the documents.[8]   VTB 30(b)(6) Tr. (Aug. 6,

2024) 45:12–17; Ex. JJ ("VTB 30(b)(6) Tr. (Aug. 7, 2024)") 115:17–116:25, 130:15–131:8.

---

[6]  Ex.  G  (VTB-SCHANSMAN000091);  Ex.  H  (VTB-SCHANSMAN000079);  Ex.  B  (VTB-SCHANSMAN002747); Ex. I (VTB-SCHANSMAN02754); Ex. C (VTB-SCHANSMAN002756); Ex. J (VTB-SCHANSMAN002758);    Ex.    K    (VTB-SCHANSMAN002759);    Ex.    L    (VTB-SCHANSMAN002766).

[7]  Ex.  D  (VTB-SCHANSMAN000096);  Ex.  E  (VTB-SCHANSMAN002746);  Ex.  AA  (VTB-SCHANSMAN002764).

[8] Because all customer information has been redacted, it is impossible to determine which documents relate the individuals, entities, email addresses, domain names, websites, and account numbers that were used openly to raise funds to support the DPR or the Luhansk People's Republic ("LPR") or that were otherwise publicly associated with the DPR or LPR (the "DPR Individuals and Fundraisers"). That information, of course, is core to the Schansmans' claims.  Second, the names, titles, and roles of VTB's employees are essential to the Schansmans' ability to determine what further discovery to pursue, because the Schansmans

Throughout that process, VTB's status reports have included representations that later turned out to be inaccurate. The Court ordered VTB to "disclose[] in writing . . . on a regular basis" its efforts to obtain approval to produce documents. Dkt. 511 at 30:23–25; Dkt. 509 at 1. The Court and the Schansmans have relied on these status updates to assess VTB's progress and the utility of additional extensions. *See* Dkt. 554 at 1. However, representations VTB made in several of these letters have proven to be incorrect:

- In its February 12, 2024 status update, VTB represented that its productions to the Ministry of Finance were "substantially complete," and that it anticipated sending its "eighth and final production to the Ministry" within the next week. Dkt. 561 at 2. But VTB did not make another submission to the Ministry for four months. On June 12, 2024, VTB reported that it had provided an additional 11,000 documents to the Ministry of Finance in May. Dkt. 585 at 1. The May 2024 submission included more documents than all previous submissions to the Ministry combined, showing that the process was not "substantially complete" in February. In the interim, VTB had used its reported "substantial" completion of submissions to the Ministry to obtain an additional extension of the deadline to produce all responsive documents to the Schansmans. *See* Dkt. 578.

- On April 8, 2024, VTB represented to the Court that it planned to produce to the Schansmans documents from its fourth and fifth submissions to the Ministry of Finance. Dkt. 574. VTB had previously informed the Court that these two productions contained 715 documents. *See* Dkts. 551 at 2; Dkt. 557 at 1; Dkt. 574 at 1. However, when the documents were finally produced to the Schansmans on May 30, the production contained only 396 documents. Ex. M (June 20, 2024 email from counsel for Plaintiffs to counsel for VTB). VTB has been unable to explain that discrepancy.

- When seeking extensions, VTB has repeatedly stated that "everything that VTB does in discovery is new territory for the bank," and that it has been forced to "build[] a U.S. discovery process from the ground up." Dkt. 528 at 3–4; *see also* Dkt. 541 at 3 (explaining, months after retaining its outside consultant, that VTB "is not familiar with and has no systems in place to accommodate" U.S. discovery); Dkt. 547 at 1 (justifying the continued delays and claiming that U.S.-style litigation "is not a process that occurs in the Russian Federation"). ███████████

███████████████████████████████████████████
███████████████████████████████████████████

---

cannot discern which VTB personnel have first-hand knowledge of VTB's compliance procedures and relevant customer activity.

██████████████████ VTB 30(b)(6) Tr. (Aug. 6, 2024) 28:3–29:15.

Throughout this process, VTB repeatedly assured the Court and the Schansmans that the Ministry was likely to approve VTB's remaining requests. *See, e.g.*, Dkt. 562 at 2 ("[W]e have no reason to believe VTB's subsequent requests for production will be denied."); Dkt. 586 at 1 ("[T]he Ministry should be in a position to issue a formal approval shortly."). Then, on July 25, 2025—six days before VTB's final deadline to produce all documents—VTB's counsel wrote to the Schansmans' counsel that there was "a negative change in attitude" from the Ministry of Finance and suggested that the Ministry would not approve four of VTB's outstanding requests. Ex. N (July 25, 2024 email from counsel for VTB to counsel for Plaintiffs). On August 1, 2024, the Ministry of Finance formally denied three of the four remaining requests ████████████████ ████████. Ex. O (August 1, 2024 letter from the Ministry of Finance to VTB); Dkt. 589; VTB 30(b)(6) Tr. (Aug. 7, 2024) 203:20–204:5. The Ministry has not responded to VTB's eighth request (the one submitted in May 2024, ████████████████). VTB 30(b)(6) Tr. (Aug. 7, 2024) 204:11–23. VTB now finally concedes that the Schansmans' Motion to Compel should not be delayed to await further word from the Ministry. Dkt. 590.

In total, VTB has produced only a fraction of the non-transactional documents responsive to the Schansmans' requests:

| | Number of Documents | Percent of Total |
|---|---|---|
| Documents produced to Plaintiff after the Ministry of Finance "approved" production | ██ | ██ |
| Documents denied production by the Ministry of Finance | ██ | ██ |

---

[9] VTB withheld at least two documents from production after the Ministry's "approval."

| Documents as to which the Ministry of Finance has not responded | ███████ | ████ |
|---|---|---|
| **TOTAL** | ███████ | |

### 2. Transactional Records & Suspicious Activity Reports.

The Schansmans are seeking production of all transactional records and suspicious activity reports connected to the individuals and accounts identified on the Schansmans' list of DPR Individuals and Fundraisers. ████████████████████████████

████████████████████████████████████████

████████████████    Since December 2022, VTB has maintained that it cannot produce any records of account transactions and suspicious activity reports responsive to the Schansmans' requests without first receiving permission from at least the Central Bank of Russia. *See* Dkt. 488 at 11–12; Dkt. 559 at 1–2.[10]

Through its document review efforts, ████████████████████████

████████████████████████████████████. VTB 30(b)(6) Tr. (Aug. 7, 2024) 128:9–18. ████████████████████████

████████████████. *Id.* ████████████████████████████████

████████████████████████████████████████. *Id.* at 139:25–140:24, 146:5–23.

---

[10] At various times VTB has taken different positions regarding whether the Ministry of Finance and Rosfinmonitoring must also give permission to produce transaction records. *Compare* Dkt. 488 at 12 ("[I]n order to provide the US court with customer information containing bank secrecy (in part of the banking transactions), VTB must obtain the prior consent of the Ministry of Finance and the permission of Rosfinmonitoring."), *with* VTB 30(b)(6) Tr. (Aug. 6, 2024) 101:13–102:10 ████████████████

████████████████████████████████████████████████████████████
████).

VTB delayed until the last possible moment seeking approval from the Central Bank to produce those transaction records, despite repeated requests from the Schansmans that VTB prioritize the production of those records. Dkt. 544 at 1–2; Dkt. 553 at 5. VTB finally sought permission from the Central Bank on January 31, 2024—the last possible day permitted under this Court's order of December 4, 2023. *See* Dkts. 509, 554, 559.

Throughout this process, VTB has asserted it has been in frequent communication with the Central Bank regarding its request. VTB represented to this Court in its February 2024 status update that "[r]epresentatives of VTB [] met with representatives of the Central Bank to provide additional context and facilitate their approval of a production to Plaintiffs." Dkt. 561 at 1. VTB additionally asserted that at that meeting the "Central Bank confirmed that one of its departments, the Financial Monitoring and Currency Control Department, is reviewing VTB's request," and that "it will coordinate with . . . RosFinMonitoring to seek its approval of the production of the records." *Id.* ████████████████████████████ VTB 30(b)(6) Tr. (Aug. 6, 2024) 99:19–21; VTB 30(b)(6) Tr. (Aug. 7, 2024) 214:12–20, 216:7–18. ████ ██████████████████████████████████████████████████ ████████████████████████████[11] VTB 30(b)(6) Tr. (Aug. 6, 2024) 92:25–93:4; VTB 30(b)(6) Tr. (Aug. 7, 2024) 214:17–20.

The Central Bank has not responded to VTB's request to produce ████████████ ███████████, and VTB has no timeline for when it can expect a response. VTB 30(b)(6) Tr. (Aug. 6, 2024) 92:13–24, 98:20–99:21, 104:19–23. ██████████████████ ███████████. VTB 30(b)(6) Tr. (Aug. 7, 2024) 214:12–16. Zero transaction,

---

[11] The Schansmans requested these communications during the 30(b)(6) deposition and followed up on August 14, 2024, but VTB has not produced them. VTB 30(b)(6) Tr. (Aug. 7, 2024) 219:2–10.

account, or suspicious activity records have been produced.  VTB 30(b)(6) Tr. (Aug. 6, 2024) 96:7–98:5.

### C. VTB's Rule 30(b)(6) Deposition.

As part of its ruling on VTB's final request for an extension of time to produce documents, the Court ordered that the Schansmans could take a Rule 30(b)(6) deposition regarding VTB's document collection, review, and submission of documents to the Russian authorities.  Dkt. 578.



VTB 30(b)(6) Tr. (Aug. 6, 2024) 13:18–21, 17:23–18:3.

. VTB 30(b)(6) Tr. (Aug. 7, 2024) 140:25–144:16.

. SAC ¶¶ 57, 151, 155, 252-71.



[12] *Id.*

. *See* SAC ¶¶ 6, 158, 217, 233–34, 251.

[13]

. *E.g.*, Ex. S (SCHANSMAN00005467).

one of VTB's primary bases for its repeated requests to reconsider the Court's decision on VTB's motion to dismiss and brief an early summary judgment motion on personal jurisdiction was the Schansmans' alleged failure to identify sufficient transactional records related to Markov.  Dkt. 443 at 3; Dkt. 546 at 2.

VTB 30(b)(6) Tr. (Aug. 7, 2024) 141:4–9, 142:20–143:12.

. *Id.* at 128:22–129:2, 131:16–132:21, 135:4–12.

. *Id.* at 129:17–

---

[12] *See, e.g.*, Ex. P (SCHANSMAN00001025); Ex. Q (SCHANSMAN00003815); Ex. R (SCHANSMAN00004721); *see also* SCHANSMAN00003806; SCHANSMAN00001018.

[13] *See, e.g.*, Ex. S (SCHANSMAN00005467).

130:2. ██████████████████████████████████████████

██████████████████████████████████ .

### D.  VTB's Efforts To Render Itself Judgment Proof.

At the same time VTB sought and received multiple extensions of time for it to produce documents in this case, VTB has attempted to remove the funds in one of its correspondent bank accounts—currently frozen due to U.S. sanctions—from this jurisdiction.  On April 17, 2024—the same day this Court granted VTB's fifth extension to produce documents in this case, Dkt. 578—VTB sued JPMorgan Chase Bank, N.A. ("JPMorgan") in Russia, where it sought an order requiring JPMorgan to release the $439.5 million in frozen assets held in VTB's correspondent bank account in New York to VTB.  Ex. BB (Complaint, ECF No. 1, *JPMorgan Chase Bank, N.A. v. VTB Bank, P.J.S.C.*, No. 24-cv-02924 (S.D.N.Y. Apr. 18, 2024)).  U.S. law prohibits JPMorgan from releasing those sanctioned funds without a license from the U.S. Office of Foreign Assets Control, for which the Schansmans could apply if they obtain a money judgment against VTB in this case.  *See* 31 C.F.R. 589.210(f); 31 C.F.R. 501.801; Exec. Order No. 14065; Exec. Order No. 13662.

The next day, JPMorgan countered with a suit in this District, obtaining a preliminary anti-suit injunction prohibiting VTB from continuing or maintaining the Russian suit.  Ex. CC (Order Granting Preliminary Injunction, ECF No. 19, *JPMorgan*, No. 24-cv-02924).  VTB promptly violated that injunction, procuring its own anti-suit injunction against JPMorgan in the Russian court prohibiting JPMorgan from prosecuting the New York litigation.  Ex. DD (Letter Motion for Conference, ECF No. 21, *JPMorgan*, No. 24-cv-02924); *see also* Ex. EE (ECF Nos. 53, *JPMorgan*, No. 24-cv-02924); Ex. FF (ECF No. 64, *JPMorgan*, No. 24-cv-02924).  VTB also sought to recover $439 million from JPMorgan's Russian assets if JPMorgan did not dismiss the New York litigation.  Ex. DD (ECF No. 21, *JPMorgan*, No. 24-cv-02924).  JPMorgan ultimately

decided to voluntarily dismiss the suit in this District, based on its concern the Russian court would seize its assets held in Russia, but not before this Court held VTB in contempt of court and fined VTB $500,000 for violating the injunction order.  Ex. HH (Order Granting Discontinuance, ECF No. 71, *JPMorgan*, No. 24-cv-02924); Ex. GG (Sanctions Order, ECF No. 67, *JPMorgan*, No. 24-cv-02924).

The delay that VTB has caused in this case may materially impact the Schansman family's ability to enforce any judgment against VTB if they succeed in proving their claims.  It is evident from the litigation between VTB and JPMorgan that VTB will take drastic steps to shield its U.S. assets from litigants like the Schansman family who seek to enforce judgments against the bank.

## ARGUMENT

VTB has delayed discovery for nearly three years, hiding behind various Russian laws and making the general assertion that those laws prohibit it from producing documents responsive to almost all the Schansmans' requests.  VTB's proposed process to obtain "approval" from the Russian government to produce documents has been a profound waste of time and judicial resources, and has resulted in the production of only 635 documents, none of which reflect transactions.

Despite this delay, the bases for the Schansmans' Motion to Compel remain largely unchanged.  VTB still has not and cannot met its burden to establish that the Russian laws it invokes actually prohibit it from producing documents responsive to the Schansmans' discovery requests.  And even if it did, the Schansmans would be entitled to discovery under the comity analysis set forth by the Supreme Court in *Société Nationale Industrielle Aérospatiale*, 482 U.S. 522 (1987), because the documents VTB has refused to produce are central to this case and not obtainable through alternative means.  The Motion should be granted, requiring VTB to produce all of its responsive documents in unredacted form.

16

I.    **VTB Has Not Met Its Burden To Prove The Existence And Applicability Of A Conflicting Foreign Law.**

VTB objects broadly to all but two of the Schansmans' fifty-three document requests on the basis that Russian law prohibits it from producing any responsive documents and information absent permission from Russian authorities and VTB's customers.[14]  VTB's broad objections fail to satisfy its burden of demonstrating with "particularity and specificity" that its discovery obligations conflict with any specific Russian law.  *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (denying defendant's motion for a protective order invoking foreign privacy laws).

A party invoking foreign law to resist discovery "bears the burden of demonstrating that such law actually bars the production or testimony at issue."  *Id.*  To determine whether the "particularity and specificity" threshold is met, courts in this Circuit have required parties resisting discovery to present evidence that specific provisions of the foreign law, as interpreted and applied by that country's courts and enforcement authorities, would be violated if the party disclosed documents or information responsive to specific discovery requests.  *See, e.g.*, *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413–19 (S.D.N.Y. 2016) (defendants met the "particularity and specificity" burden where they individually addressed the conflicts between specific discovery requests and specific foreign privacy laws, cited court opinions and governmental documents interpreting those individual laws, and produced multiple expert declarations affirming those interpretations).

By contrast, courts have made clear that "a mere 'risk'" that a foreign law would be applied because of the party's compliance with discovery "is insufficient to carry [the resisting party's]

---

[14] The Schansmans are moving to compel the production of documents in response to the following requests for production: 1–2, 5, 13, 25–27, 30, 32, 40, 50, 52–54, 59–60.  *See supra* note 1.  VTB's refusal to produce documents, however, extends to all but two of the Schansmans' document requests.

burden." *EFG Bank AG v. AXA Equitable Life Ins. Co.*, No. 17-CV-4767 (JMF), 2018 WL 1918627, at *2 (S.D.N.Y. Apr. 20, 2018). For example, in *EFG Bank AG*, the plaintiff, like VTB, "fail[ed] to demonstrate with sufficient particularity and specificity that the discovery sought [was] prohibited by Swiss law" as the plaintiff "fail[ed] to identify a single case" establishing that "production by a party in the circumstances presented here violates [foreign law]." *Id.*; *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03MD01570GBDSN, 2023 WL 4447869, at *5 (S.D.N.Y. July 11, 2023) (holding that bank failed to meet its burden to show that foreign law prohibited the disclosure of certain information, and ordering the bank to remove all redactions based on foreign law), *objections overruled*, No. 03MDL1570GBDSN, 2023 WL 5432199 (S.D.N.Y. Aug. 23, 2023).

Here, VTB falls short of its burden, a high hurdle given the breadth of its objections. In response to the November 11, 2022 motion to compel, VTB sought to meet its burden by submitting a declaration from a Russian law professor, Oleg Mikhailovich Ivanov (the "Ivanov Declaration"). Dkt. 489-2. The Ivanov Declaration does not meet VTB's burden to show that specific Russian laws prohibit VTB from producing all of the remaining documents and information responsive to the Schansmans' specific discovery requests. While the Schansmans do not dispute that some information requested may be subject to Russian laws, VTB takes an impermissibly broad view of the documents and information actually subject to conflicting Russian law. For example, VTB's expert opines that under Decree No. 1285 ("On Measures to Protect the Interests of the Russian Federation in the Course of Foreign Economic Activities Performed by Russian Legal Entities"), VTB is prohibited from disclosing any "information related to [VTB's] activities" unless it receives permission from the Ministry of Finance. Ivanov Decl. at 5. VTB's expert defines information related to VTB's activities as broadly as possible to

include not only information about VTB's "activities," but also the much broader category of information about VTB's "operations"—a conclusion that is not supported by the plain language of the Decree or by Russian canons of statutory interpretation, as shown in the declaration of the Schansmans' Russian law expert, Professor William Elliott Butler.  *See* Dkt. 305, Decl. of William Elliott Butler ¶¶ 14–16 ("Butler Decl.").  Accordingly, VTB fails to meet its burden to show a conflict of law.

## II.    Under The Governing Supreme Court Analysis, VTB Is Required To Produce The Discovery Sought By the Schansmans.

Even if VTB met its burden to show a conflict of law, Russian law can only serve as the basis for withholding documents if ordering production would violate principles of comity.  *See*, *e.g.*, *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 190, 197–207 (S.D.N.Y. 2013) (principles of comity warranted the production of documents, notwithstanding defendants' foreign law objections).  It is well-settled that "the operation of foreign law 'do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that [law].'"  *Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) (alterations in original) (quoting *Aérospatiale*, 482 U.S. at 544 n. 29) (denying petition to vacate sanctions ordered against defendant bank based on its failure to comply with orders to produce documents); *see also* Restatement (Third) of Foreign Relations Law § 442 (1987).

Under the *Aérospatiale* test, courts consider five factors in deciding whether parties must produce information notwithstanding purportedly conflicting foreign law: (1) "the importance to the . . . litigation of the documents or other information requested"; (2) "the degree of specificity of the request"; (3) "whether the information originated in the United States"; (4) "the availability of alternative means of securing the information"; and (5) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the

19

request would undermine important interests of the state where the information is located." *Linde*, 706 F.3d at 98–99 (omission in original) (quoting Restatement (Third) of Foreign Relations Law § 442(1)(c)).  The fifth factor—whether noncompliance by the party resisting discovery would "undermine important interests of the United States" or the foreign state—is considered the "most important" factor in the analysis.  *Donziger*, 296 F.R.D. at 206.  Courts in the Second Circuit also consider "the hardship of compliance on the party or witness from whom discovery is sought and the good faith of the party resisting discovery."  *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 210 (E.D.N.Y. 2007) (cleaned up).

Here, these factors dictate that VTB's production of the records the Schansmans seek to pursue their ATA claims would not violate principles of comity.

**A.     The U.S. Interest In Adjudicating ATA Claims Far Outweighs Any Interest Of The Russian Federation In Shielding Terrorist-Funding Information From Discovery.**

Under the fifth factor of the *Aérospatiale* test, claims arising under the ATA have been accorded significant deference in the *Aérospatiale* comity analysis.  This is because the United States' interest in applying U.S. law in ATA cases is "nearly [at] its highest point" given the crucial role ATA claims play in U.S. counterterrorism policy.  *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 46 (E.D.N.Y. 2007) (internal citation omitted).  Respecting the strength of this interest, courts in this Circuit have routinely held that a foreign bank facing ATA claims may not withhold information on the basis of purported violations of foreign laws.  For example, in *Linde v. Arab Bank, PLC*, the court held that "there is no question that important interests of the United States [in ATA cases] would be undermined by noncompliance with the discovery orders issued by the court," notwithstanding the bank's refusal to produce documents on the basis of foreign bank secrecy laws.  463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006), *aff'd*, No. 04-cv-2799, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007).  In particular, the court rejected the bank's alleged fear of criminal

prosecution, without more, as a sufficient justification for not complying with discovery orders. *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 208 & n.1 (E.D.N.Y. 2010). Likewise, in *Wultz v. Bank of China Ltd.*, another ATA case, the court compelled the foreign bank to produce bank account and other information over objections premised on foreign bank secrecy laws. 942 F. Supp. 2d 452, 473 (S.D.N.Y. 2013). The court acknowledged "the U.S. interest in deterring terrorist attacks and seeing justice done between the parties would strongly outweigh even this Court's respect for the Chinese government's interest in preserving the confidentiality of its state secrets." *Id.* at 468; *see, e.g.*, *Strauss*, 242 F.R.D. at 227–28 (compelling foreign bank to produce bank records and documents relating to the bank customer alleged to be the conduit for funds funneled to the foreign terrorist organization); *Weiss*, 242 F.R.D. at 58–58 (same).[15]

The same holds here. The Schansmans allege that VTB knowingly facilitated and provided material support to the DPR, a terrorist group, providing accounts to DPR members and fundraisers who publicly sought funding to support their terrorist activities. The result of VTB's support for the DPR was the murder of the Schansmans' son and brother, Quinn, when MH17 was shot down over Ukrainian territory by a Russian BUK surface-to-air missile operated from territory controlled by the DPR. VTB has shown no meaningful interest of the Russian Federation that would be undermined if the information sought here were disclosed. Moreover, any purported Russian interest in confidentiality or secrecy would pale in comparison to the important interests of the United States in combatting terrorism, an interest also shared by the Russian Federation.

---

[15] *See also, e.g.*, *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013) (noting that "the ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement"); *Miller v. Arab Bank, PLC*, No. 18-cv-2192 & 18-cv-4670, 2023 WL 2731681, at *12–13 (E.D.N.Y. Mar. 31, 2023) (discussing *Linde*).

VTB relies on two statutes to argue that permission from the Ministry of Finance and the Central Bank of Russia is required before VTB may produce documents in this case. VTB maintains that under Decree No. 1285 ("On Measures to Protect the Interests of the Russian Federation in the Course of Foreign Economic Activities Performed by Russian Legal Entities"), it is prohibited from disclosing any information related to VTB's activities unless it receives permission from the Ministry of Finance. Ex. T (Am. R&Os to Pls.' First Set of RFPs, General Objection No. 11 (June 2, 2023)); Ex. U (Am. R&Os to Pls.' Second Set of RFPs, General Objection No. 11 (June 2, 2023)). VTB also maintains that under part 9 of Article 4.1 of the Law of Countersanctions (the "Federal Law on Measures (Countermeasures) in Response to Unfriendly Actions of the United States of America and Foreign States") it must obtain approval from Rosfinmonitoring, through the Central Bank of Russia, before it can produce any transactional records. *See* Dkt. 488 at 12; Ivanov Decl. at 5–6.

These laws are clearly "blocking statutes," which are given little deference under the *Aérospatiale* test, as such statutes entirely circumvent the balancing test to measure state interests. *See Aérospatiale*, 482 U.S. at 544 n.29 ("Blocking statutes that frustrate this goal need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States." (cleaned up)). As the full title of the Law of Countersanctions makes abundantly clear, this statute reflects Russia's response to sanctions imposed by the United States and is "intended to protect [Russian] businesses from excessive discovery in hostile foreign litigation"—the hallmark of a blocking statute. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (internal citation omitted); *see also Adidas (Canada) Ltd. v. SS Seatrain Bennington*, No. 80 Civ. 1911, 1984 WL 423, at *3 (S.D.N.Y. May 30, 1984) (concluding the French law was a blocking statute as it was "never expected or intended to be

enforced against French subjects but was intended . . . to provide them with tactical weapons and bargaining chips in foreign courts").

VTB's reliance on other statutes to resist producing documents in this case—*e.g.*, Russian bank secrecy and data protection laws, Exs. T & U (Am. R&Os to Pls.' First and Second Sets of RFPs, Am. R&Os General Objection No. 11 (June 2, 2023))—is inconsistent with Russian commitments to counteract terrorism. As a party to the United Nations' International Convention for the Suppression of the Financing of Terrorism, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, G.A. Res. 54/109, U.N. Doc. A/RES/54/109 (Dec. 9, 1999), Russia has a clear interest in counteracting terrorist financing. The Convention provides that "States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy." *Id.* at 12(f). The Russian Federation has doubled down on this principle through membership in the Financial Action Task Force ("FATF"), an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing, and the financing of proliferation of weapons of mass destruction. *See* Federal Financial Monitoring Service, *FATF*, https://web.archive.org/web/20220308112813/https://www.fedsfm.ru/en (captured Mar. 8, 2022) (detailing Russia's membership).[16]

The commitments Russia has made through its membership in the FATF include that it will "ensure that financial institution secrecy laws do not inhibit implementation of the FATF Recommendations," that it will "[n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions . . . to maintain secrecy or confidentiality," and

---

[16] The FATF suspended the Russian Federation's membership after the military invasion of Ukraine, but continues to hold Russia accountable for implementing FATF standards. Press Release, FATF, FATF Statement on the Russian Invasion (Feb. 24, 2023), https://www.fatf-gafi.org/en/publications/Fatfgeneral/fatf-statement-russian-federation.html.

that it will "ensure that [its] competent authorities can rapidly, constructively and effectively provide the widest range of international cooperation in relation to . . . terrorist financing." *International Standards on Combatting Money Laundering and the Financing of Terrorism & Proliferation: The FATF Recommendations* 14, 27, 29 (Nov. 2023), https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf (detailing various recommendations related to mutual legal assistance in terrorism-financing related investigations). In other words, as a "member[] of the . . . Financial Action Task Force," the Russian Federation has "expressly adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering and terrorist financing." *Linde*, 463 F. Supp. 2d at 315–16 (further stating that the interest in maintaining bank secrecy "must yield to the interests of combating terrorism and compensating its victims"); *see also Weiss*, 242 F.R.D. at 51–53 (reasoning that the United Kingdom's membership in the FATF was evidence of its interests in combatting terrorism); *Strauss*, 242 F.R.D. at 217 (same, with respect to France). That commitment undercuts VTB's position that Russian secrecy and privacy laws prohibit disclosure of the types of records that the Schansmans seek.

VTB cannot meet its burden to show that Russian interests in bank secrecy and in shielding Russian companies from being subject to U.S. discovery should be afforded comity in this case.

**B.    The Requested Documents Are Critical To This Case, And The Schansmans' Requests Are Sufficiently Specific.**

Under the first and second factors of the *Aérospatiale* test, the documents VTB has refused to produce are central to this case and the Schansmans' requests are sufficiently specific. The Schansmans' discovery requests go to the core issues necessary to resolve the Schansmans' ATA claims and VTB's defenses: (1) transactions and other account-specific information to identify the movement of funds through VTB to the DPR; (2) VTB's monitoring of the 2013–2014 political

and social unrest in Ukraine, VTB's financing of terrorists, and VTB's compliance with laws and sanctions issued in response to the support for terrorist activities in Ukraine; and (3) VTB's policies, practices, and procedures concerning counterterrorism and anti-money laundering.  Ex. A (Disc. Req. Chart).  This information is "crucial to the litigation of [P]laintiffs' claims," and VTB is the only source through which the Schansmans can access the information.  *Strauss*, 242 F.R.D. at 212.  There is no dispute that the Schansmans' requests are also sufficiently specific under the second factor of the *Aérospatiale* test; VTB does not object to any of the requests on the basis that they are overbroad or unduly burdensome, and ████████████████████████████ ██████████████████████████.  *See* Ex. A (Disc. Req. Chart).

            **1.**      **Transactions Providing Material Support for Terrorists (RFP Nos. 1, 2, 40, 52 & 54).**

Through third-party discovery and other investigation, the Schansmans identified DPR Individuals and Fundraisers that raised funds to support the DPR or that were otherwise publicly associated with the DPR between November 21, 2013 and January 17, 2015.  *See* Dkt. 380 at 20:15–21:15; Ex. V (Am. Apps. A & B).  Plaintiffs' RFP Nos. 1, 2, 40, 52, and 54 seek documents relating to transactions to and from the DPR Individuals and Fundraisers.  *See also* Ex. A (Disc. Req. Chart).  These requests seek information critical to the core allegations in this case—namely, that VTB processed transactions for the DPR terrorist groups who openly solicited contributions to facilitate their terrorist activities.[17]

VTB does not object to these requests on grounds of overbreadth, and the Schansmans have also ensured that these requests are reasonably narrow, *i.e.*, "focused on the vital issues in this

---

[17] These requests are similar to those ordered to be produced notwithstanding foreign law objections in *Strauss v. Credit Lyonnais, S.A.*, which called for the production of, for example, "[a]ll account records maintained by, or in the custody and control of Defendant that concern [a Hamas fundraising organization], including account opening records, bank statements, wire transactions, deposit slips and all correspondence between Defendant and [the organization]."  242 F.R.D. at 205.

case," which include "whether and to what extent [VTB] knowingly provided 'material support and resources' . . . and/or 'financial services' to a terrorist organization." *Weiss*, 242 F.R.D. at 212. The Schansmans provided VTB a list of 126 specific names and organizations and 10 accounts affiliated with the DPR or LPR, as well as, for each, a description of the connection to the DPR or LPR, and citations to specific documents produced in discovery that corroborate that connection. *See* Ex. V (Am. Apps. A & B). VTB subsequently narrowed this list to exclude, for the time being, certain names that VTB claimed would unnecessarily raise concerns from the Central Bank. Dkt. 529 at 4.[18] There is no dispute that the Schansmans' requests are reasonably narrow.

While VTB has yet to produce a single transactional record, ███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████. VTB 30(b)(6) Tr. (Aug. 7, 2024) 128:9–18.

████████████████████████████████████████████████████████████████

████████████████████████████. *Id.* at 139:25–140:24;

142:2–144:14; 146:5–12; *see supra* Section B.2. If produced, these records would likely establish that VTB facilitated the transfer of funds for DPR terrorists, an essential element required to establish liability under the ATA. *Miller v. Arab Bank, PLC*, No. 118CV2192HGPK, 2023 WL 2731681, at *10 (E.D.N.Y. Mar. 31, 2023) (holding that "proof concerning the flow of money" to alleged terrorists through the bank "are crucial to Plaintiffs' ability to prosecute their case" (cleaned up)).

---

[18] To be clear, records relating to those excluded individuals and address should be produced. Those names and address include Alexander Bortnikov, Oleg Deripaska, Valery Gerasimov, Vladislav Surkov, Oleg Lebedev, and the address for the GRU.



. VTB 30(b)(6) Tr. (Aug. 7, 2024) 128:22–129:2, 135:10–17.

. *Id.* 129:17–23.

Allowing plaintiffs whose family members were killed by acts of terrorism to uncover information regarding the flow of money to and from the terrorists is precisely what Congress intended when it created civil remedies for those injured by terrorism, and in particular for those injured by financial institutions like VTB that provide material support and financial services to terrorists. *See Linde*, 463 F. Supp. 2d at 315 (concluding that the ATA embodies the "important interests of the United States" in criminalizing and creating a civil tort remedy against entities "providing . . . financial and other services to terrorist organizations").

.

### 2. VTB's Monitoring Activities (RFP Nos. 5, 13, 32, 50 & 53) and Compliance Policies (RFP Nos. 25–27, 30, 59–60).

VTB has also refused to produce thousands of documents concerning VTB's monitoring of the 2013–2014 political and social unrest in Ukraine which gave rise to terrorist activity, VTB's financing of terrorists, and VTB's compliance with laws and sanctions. These documents are

relevant to show that VTB acted with deliberate indifference to the risk that the bank was providing financial support to terrorists in Ukraine.

Documents related to VTB's monitoring and ongoing due diligence of the use of its services to fund the DPR are directly relevant to VTB's knowledge that its services were used to support terrorist activity, including its reckless indifference to the risk that such transactions were occurring.[19]  Such information is relevant and admissible to prove VTB's knowledge under Federal Rule of Evidence 404(b)(2).  *See Miller v. Arab Bank, PLC*, 2023 WL 2731681, at *7 (ordering the production of documents and explaining that "[t]o establish a defendant's liability as a principal under the ATA, a plaintiff must show that the defendant had knowledge that the entity it was supporting was a terrorist organization and engaged in terrorism or terrorist activity."); *see also* Fed. R. Civ. P. 26(b)(1).  For this reason, in *Strauss*, notwithstanding the defendant bank's foreign law objections, the court found the plaintiffs' document requests were "highly relevant and important to the claims and defenses in this action," and ordered the production of documents responsive to similar requests seeking, for example, "anti-money laundering efforts, 'Know Your Customer' procedures, or other measures Credit Lyonnais used to prevent the rendering of financial services to Terrorists and Terrorist Organizations."  242 F.R.D. at 205, 212.

VTB has in-house compliance functions that are expressly designed to identify possible terrorist financing.  *See, e.g.*, Dkt. 156 ("SAC") ¶ 385; VTB 30(b)(6) Tr. (Aug. 6, 2024) 57:4–13, 64:25–65:15, 69:13–24.  As the Schansmans plead, there have been multiple public reports regarding VTB's services being used to finance terrorism, and the Schansmans contend VTB either

---

[19] *See, e.g.*, RFP Nos. 5 & 53 (documents concerning initial and ongoing due diligence concerning the DPR); 13 (VTB's monitoring and response to the 2013–2014 political and social unrest in Ukraine); 32 (VTB's attempts to comply with the laws of the United States or foreign states concerning the provision of financial services to terrorists or other prohibited entities in the relevant geographic areas); 50 (VTB's investigation into whether the DPR continues to rely on VTB's services to raise funds for terrorist activities).

knew or, through proper operation of its compliance policies, should have known about that activity.  SAC ¶¶ 147, 385.  The Schansmans seek production of documents reflecting those policies and procedures.[20] ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████.

VTB 30(b)(6) Tr. (Aug. 6, 2024) 76:3–16.

The Schansmans also seek information related to specific terrorism risk assessments during critical time periods.  *See, e.g.*, RFP No. 27.  This information is necessary to establish the compliance functions that were in place at VTB during the relevant time, which, again, is relevant to whether VTB knew or should have known that its services were being used to finance terrorism.  *See, e.g.*, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (holding, in ATA case, that "Arab Bank cannot ignore blatant red flags and then use its deficient compliance program as a shield against liability"); *Wultz*, 942 F. Supp. 2d at 466 (holding, in ATA case, that the bank's "internal communications and communications with the Chinese government about money-laundering and terrorist financing generally are important to establishing the scienter element of plaintiffs' claim, and may also lead to the identification of other evidence relevant to this case").  No responsive documents have been produced.

---

[20] *See, e.g.*, RFP Nos. 25 (VTB's policies, procedures, programs, practices, and reviews related to the prevention of money laundering); 26 (policies and practices concerning the transfer of funds into areas at high risk for terrorist activity); 27 (policies and practices concerning investigations of the financing or terrorist or other illegal activities); 30 (policies and practices concerning conducting internet monitoring for online activity mentioning VTB); 59 (VTB's obligations or efforts to comply with the policies, practices, and standards of the FATF); 60 (VTB's policies and practices applicable to operations and employees in the Russian Federation and Ukraine concerning the use of VTB's services by politically exposed persons).

### C.    No Reasonable Alternative Means Exist To Secure The Information Requested From VTB.

Courts in the Second Circuit find that the balance "weighs in favor of disclosure" when "the information [sought in discovery] cannot be *easily obtained* through alternative means." *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010) (internal citation omitted) (finding that the evidence plaintiffs sought could not be easily obtained through Hague Convention procedures, and ordering the bank to produce the information to plaintiffs without using those procedures). Absent court compulsion, no reasonable alternative means exist to secure the information requested from VTB. *Cf. Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458, 2010 WL 808639, at *5 (S.D.N.Y. Mar. 8, 2010) (holding that plaintiffs were not required to commence an action in Malaysian courts to obtain the requested documents).

VTB's refusal to produce ███████████████████ documents after more than a year of attempts to obtain approval from the Russian government weighs heavily in favor of finding that there is no reasonable alternative to obtaining these materials via discovery. "Where Plaintiff is effectively being precluded from proceeding in the normal course of litigation, concerns about comity carry less weight." *AnywhereCommerce, Inc. v. Ingenico, Inc.*, No. 19-CV-11457-IT, 2020 WL 5947735, at *3 (D. Mass. Aug. 31, 2020), *on reconsideration*, 2021 WL 2256273 (D. Mass. June 3, 2021).

### 1.    VTB's Approval Processes Are Not Viable.

VTB previously suggested that there are two alternative mechanisms which may allow for production here. The record is now clear that approval cannot be obtained through these methods.

### i.  Non-Transactional Records.

Approval from the Ministry of Finance is clearly not an easily obtainable alternative means through which to obtain the requested documents. For nearly two years, VTB has maintained that

the Ministry of Finance is likely to approve the production of documents in this case. Dkts. 557, 562, 583, 586; Dkt. 518 at 16:12–21. That has proved to be largely untrue. To date, VTB has only produced a miniscule percentage of the documents it sent to the Ministry of Finance and has not indicated that it intends to produce any additional documents to the Schansmans. *See* VTB 30(b)(6) Tr. (Aug. 7, 2024) 204:11–205:3.

In short, there is no reasonable alternative means for the Schansman family to obtain the remaining ███████████████████████ VTB identified as responsive but that VTB is withholding for lack of authorization from the Ministry of Finance.

### ii.  Transactional Records And Suspicious Activity Reports.

VTB has also suggested that the Central Bank of Russia may be able to provide consent for VTB to disclose transactional records and suspicious activity reports to the Schansmans in this action. ██████████████████████████████████████████████████ ██████. VTB 30(b)(6) Tr. (Aug. 7, 2024) 214:17–215:2; 216:7–24. There is no reason to think that the Central Bank will ever approve VTB's request, especially given the Ministry of Finance's recent rejections. Indeed, in response to Sberbank's similar request to the Central Bank for permission to produce documents in this case—made over two years ago—the Central Bank responded that it either will not or cannot approve disclosure of similar records to the Schansmans. *See* Ex. W (SBER0033292).

The process of consulting the Central Bank that VTB proposed has not provided "an easily obtainable alternative means" for the Schansman family to obtain these records. In *In re Air Cargo Shipping Services Antitrust Litigation*, the court addressed this exact question, and ruled in favor of compelling production by defendant South African Airways (the flag carrier airline of South Africa). No. 06-MDL-1775, 2010 WL 2976220, at *2–*3 (E.D.N.Y. July 23, 2010). South African Airways opposed the motion to compel in *Air Cargo*, arguing that there was an adequate

31

alternative procedure because "approval for disclosure is possible under the blocking statute if authorized by the [South African] Ministry of Trade and Industry from whom the defendant 'has sought official guidance.'"  *Id.* at *2.  The court rejected that argument, holding "it is fair to conclude that this 'alternative' for obtaining the requested information has not proved to be viable."  *Id.*  The court relied upon the fact that the defendant's request had been pending with the Ministry for several months without a decision, the defendant's failure to make "any showing about how or under what standards the Ministry treats such requests for 'official guidance,'" and "the absence of any indication that the Ministry will soon act on the defendant's request for guidance."  *Id.*

Here, as in *Air Cargo*, there is no indication that the Central Bank will take any action in response to VTB's request, much less approve it.  VTB 30(b)(6) Tr. (Aug. 6, 2024) 92:13–24, 98:20–99:21, 104:19–23.  Just as in *Air Cargo*, the Schansmans should not be forced to wait longer before this Court rules on their motion to compel production of the crucial transaction records that go to the heart of this case.

### 2. VTB's Extensive Redactions Also Make Clear There Is No Easily Available Alternative Means.

The majority of custodial documents VTB has produced have extensive redactions.  The information that has been redacted is important to substantiating the Schansmans' claims.  *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 198–99 (E.D.N.Y. 2010).  VTB has unilaterally redacted any information that could implicate Russian blocking statutes, including all personnel names and identifying information, as well as all account numbers and customer names in transactional documents.  *See* Ex. X (SCHANSMAN002768) (███████████████████████████████

██████████████); Dkt. 551 at 2.  ████████████████████████████████

████████████████████████████████████████████████  Ex. Y

(SCHANSMAN003475) (████████████████████████). ████████████████



VTB 30(b)(6) Tr. (Aug. 7, 2024) 128:22–129:2, 129:17–130:2, 131:16–132:21, 135:4–12, 197:8–198:24. ███████████████████████████████████

. Documents that fail to "confirm an accountholder or payment beneficiary's identity or circumstantially evidence the Bank's knowledge of identity" are not a reasonable alternative means of production. *Linde*, 269 F.R.D. at 198.

The Schansmans are also entitled to discover the identities of VTB's employees and custodians whose names appear on the responsive documents so that the Schansmans can determine the relevance of those documents and pursue further information in depositions. *In re Mercedes Benz Emissions Litig.*, No. 16-cv-881, 2020 WL 487288, at *7 (D.N.J. Jan. 30, 2020) (upholding decision from special discovery master, which granted motion to compel under *Aérospatiale* because "Plaintiffs are entitled to the basic identities of individuals so that Plaintiffs can determine that relevance"). This includes "the names, positions, titles, and professional contact information of relevant current or former employees." *Id.* at *6. Redacting that information is not a sufficient reasonable alternative means of production. *See id.* at *7. The redactions VTB has made in the documents VTB has produced to date make it impossible to determine the context, senders, or recipients, of those communications.

In the past, VTB has suggested, as an alternative to redactions, that it could request permission from individuals to provide their personally identifying information in this case. Dkt. 495-1 at 4. However, it is well established that requesting consent from employees and customers "is not substantially equivalent because of the cost in time and money of attempting to obtain those consents." *United States v. Vetco Inc.*, 691 F.2d 1281, 1290 (9th Cir. 1981) (concluding that similar customer consent process was not an easily obtainable alternative means). ███

████████████████████████████████████████████████████████

████████████████████████████████████████. VTB

30(b)(6) Tr. (Aug. 6, 2024) 44:3–45:17 ████████████████████████

██████████████████████

In short, because the information the Schansmans seek "cannot be *easily obtained* through alternative means," an order compelling production of unredacted documents and information is warranted. *Milliken*, 758 F. Supp. 2d at 247 (internal citation omitted).

### D.    VTB Will Face No Undue Hardship In Complying With The Schansmans' Discovery Requests.

Under the fifth factor of the *Aérospatiale* test, VTB has failed to establish that it will face undue hardship simply because it produces documents in this case. The mere theoretical availability of criminal or other sanctions is insufficient to constitute undue hardship. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 2976220, at *2 (ordering the defendant to produce information, notwithstanding "the prospect of criminal sanctions if it violates the blocking statute"); *Gucci Am.*, 2010 WL 808639, at *6–8 (compelling production notwithstanding "the potential of criminal . . . liabilities" if production runs afoul of foreign law, noting defendant had "not submitted any authority regarding the likelihood of prosecution, conviction, or imposition of the maximum sentence or fine").

None of the laws VTB has cited in its previous filings and communications provide more than speculation about punishment if VTB complies with discovery in this litigation. Dkt. 480-7 at 2–4. VTB has previously conceded that it was unable to identify a *single case* where "conflicting Russian laws have been enforced against parties who complied with a U.S. court order or the Federal Rules of Civil Procedure." *Id.* at 4. Neither party's Russian law experts could identify such a case. *See* Butler Decl. ¶ 27; Ivanov Decl. at 11–14. Russian laws that do not explicitly prevent compliance with discovery, and that apparently have never operated to punish a Russian bank or its personnel for compliance with discovery, cannot support a finding that producing documents in this case would impose undue hardship on VTB.

In the absence of "authority regarding the likelihood of prosecution, conviction, or imposition of the maximum sentence or fine" on VTB for complying with a U.S. court order, VTB's undue hardship argument must fail. *Gucci Am., Inc.*, 2010 WL 808639, at *7 (noting that "[w]hile the penalties [for producing the documents] are not insignificant, the Court cannot conclude that the prospect of significant hardship is anything more than mere speculation"); *see also Owen v. Elastos Found.*, 343 F.R.D. 268, 288 (S.D.N.Y. 2023) ("Defendants cite no cases in which a party to U.S. litigation has been sanctioned under [Chinese privacy laws] for complying with the Federal Rules of Civil Procedure or obeying discovery orders by a U.S. court. This factor therefore weighs in favor of production.").

### E.    VTB Has Not Participated in Discovery in Good Faith.

While VTB's U.S. counsel has repeatedly professed that they are acting in good faith, that assertion alone should not deter the Court from issuing an order compelling production of the documents and information that VTB is refusing to produce. Courts routinely compel discovery from foreign banks sued under the ATA over foreign-law objections, "notwithstanding a litigant's good faith." *Weiss*, 242 F.R.D. at 56 (cleaned up); *see also Compagnie Francaise d'Assurance*

*Pour le Com. Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 31–32 (S.D.N.Y. 1984) (ordering production despite a party's "good faith, to the extent it exists").

Despite VTB's professions of good faith, VTB's conduct throughout discovery suggests otherwise. VTB has repeatedly stated that it will not produce documents even if ordered by this Court unless the Russian government authorizes it to do so, Dkt. 564 at 2–3, and VTB did not take any steps either to collect and review documents or to seek approval from the Russian government until twenty-seven months into discovery, ***after*** the Schansmans filed their Motion to Compel., Dkt. 488. *See Linde*, 269 F.R.D. at 200 (concluding defendant had not acted in good faith, in part because "defendant never intended to produce certain documents, regardless of this court's rulings on the Bank's foreign bank secrecy objections").

Moreover, VTB's steps to obtain "approval" to produce documents in this case have amounted to a labyrinthian, time-consuming, and ultimately unsuccessful process that has wasted both the Schansmans' and the Court's resources and time. *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 528 (S.D.N.Y. 1987) (distinguishing good-faith actions from a lack of "reasonable efforts to apply to the appropriate governmental authority for an exemption" to produce discovery). Further, VTB provided less than accurate information to the Court and the Schansmans about that process, including ████████████████████████████████ ████████████, representing that their submission of documents to the Ministry of Finance was substantially complete when it was far from complete, and expressing misplaced optimism as a means to achieve further delay. *See supra* Section B.1.

Throughout this process, VTB has repeatedly invoked principles of comity to argue that the Court should avoid "taking the decision away from the appropriate Russian authorities." Dkt. 564. But VTB's emphasis on comity is undermined by its own lack of respect for U.S. law.

For example, VTB has used the extensive delays in this case to further its efforts to put the funds in its U.S. correspondent bank accounts beyond reach of the Schansman family. *See supra* Section D.  VTB sued JPMorgan in a Russian court seeking to release the funds frozen in its U.S. correspondent bank account. *See* Ex. BB (Complaint, ECF No. 1, *JPMorgan Chase Bank, N.A. v. VTB Bank, P.J.S.C.*, No. 24-cv-02924 (S.D.N.Y., Apr. 18, 2024)).  When this Court enjoined VTB from proceeding with that Russian litigation, VTB promptly violated that injunction, including by seeking an anti-suit injunction against JPMorgan for pursuing the litigation in this Court, with the penalty for violation set at $439 million.  Ex. DD (Letter Motion for Conference, ECF No. 21, *JPMorgan*, No. 24-cv-02924); Exs. DD & FF (ECF Nos. 21, 64, *JPMorgan*, No. 24-cv-02924). This Court, *sua sponte*, has already sanctioned VTB $500,000 for its flagrant disregard of the anti-suit injunction, and has retained jurisdiction over VTB to impose additional sanctions if necessary. *See* Ex. EE (Order for Briefing on *Sua Sponte* Sanctions, ECF No. 53, *JPMorgan*, No. 24-cv-02924); Ex. FF (Order for VTB to Stay Russian Litigation, ECF No. 64, *JPMorgan*, No. 24-cv-02924); Ex. GG (Sanctions Order, ECF No. 67*, JPMorgan*, No. 24-cv-02924); Ex. HH (Order Granting Discontinuance, ECF No. 71, *JPMorgan*, No. 24-cv-02924).  VTB has weaponized the Russian judiciary to intimidate and silence JPMorgan into dissolving its suit in the proper forum so that VTB can proceed in its preferred forum, and VTB intentionally violated the U.S. Court's injunction.  This does not demonstrate good faith or respect for U.S. law.

VTB's executives have also flouted U.S. sanctions laws.  On February 22, 2024, the United States criminally charged VTB's Chief Executive Officer ("CEO") Andrey Kostin for money laundering and sanctions violations, including by maintaining two superyachts worth more than $135 million and a home in Aspen, Colorado.  The U.S. Attorney for the Southern District of New York accused the VTB CEO of "blatantly disregarding U.S. law" and working to "undermine"

U.S. national security.  Ex. Z (Press Release, U.S. Dep't of Justice, Sanctioned Russian Oligarch and Others Indicted for Sanctions Violations and Money Laundering (Feb. 22, 2024), https://tinyurl.com/2z87hwav).  Kostin remains the head of VTB, ████████████████████████████████████████████████████████████████████.  VTB 30(b)(6) Tr. (Aug. 6, 2024) 90:23–94:9; *see also, e.g.*, Ex. L (VTB-SCHANSMAN002766).

In short, VTB's conduct suggests it believes it need not subject itself to U.S. laws or judicial processes—the antithesis of good faith.  To the minimal extent that good faith is relevant to the comity analysis at the motion to compel stage, it weighs in favor of granting the Schansmans' Motion.

## **CONCLUSION**

For the reasons set forth above, the Schansmans' Renewed Motion to Compel should be granted.

Dated:  August 23, 2024

Respectfully submitted,

By:   /s/ Terri L. Mascherin

Terri L. Mascherin (admitted *pro hac vice*)
Jenner & Block LLP
353 N. Clark St.
Chicago, IL 60654
(312) 923-2799
tmascherin@jenner.com

Lee Wolosky
Jason P. Hipp
Susanna D. Evarts (admitted *pro hac vice*)
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1628
lwolosky@jenner.com
jhipp@jenner.com
sevarts@jenner.com

*Counsel for the Schansmans*