UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THOMAS SCHANSMAN, et al.,                          :

                        Plaintiffs,               :          OPINION AND ORDER

            -v.-                                  :
                                                             19 Civ. 2985 (ALC) (GWG)
SBERBANK OF RUSSIA PJSC, et al.,                  :

                        Defendants.               :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

Plaintiffs (the "Schansmans") brought this action under the Antiterrorism Act, 18 U.S.C.

§ 2331 et seq. (the "ATA"), against a number of financial institutions that are alleged to have

been involved in funding the terrorist activity that resulted in the death of Quinn Lucas

Schansman.  Before the Court is plaintiffs' renewed motion to compel the production of

documents from defendant VTB Bank PJSC ("VTB").[1]  For the following reasons, the motion to

compel is granted.

---

[1] Plaintiffs' Notice of Renewed Motion to Compel the Production of Documents from
VTB Bank PJSC, filed August 23, 2024 (Docket # 593); Plaintiffs' Memorandum of Law in
Support of Their Renewed Motion to Compel the Production of Documents from VTB Bank
PJSC, filed August 23, 2024 (Docket # 594) ("Mem."); Declaration of Jason P. Hipp in Support
of Plaintiffs' Renewed Motion to Compel the Production of Documents from VTB Bank PJSC,
filed August 24, 2024 (Docket # 595) ("Hipp Decl."); VTB Bank PJSC's Memoranum [sic] of
Law in Opposition to Motion to Compel, filed September 20, 2024 (Docket # 606) ("Opp.");
Declaration of Julián Alejandro Ríos in Support of Defendant VTB Bank PJSC's Memorandum
of Law in Opposition to Motion to Compel, filed September 20, 2024 (Docket # 607) ("Ríos
Decl."); Declaration of Nikolay Teterev, filed September 20, 2024 (Docket # 611) ("Teterev
Decl."); Plaintiffs' Reply Memorandum of Law in Further Support of Their Renewed Motion to
Compel the Production of Documents from VTB Bank PJSC, filed October 15, 2024 (Docket
# 615).  Unredacted versions of Docket # 594 and certain exhibits filed in Docket # 595 now
appear in unredacted form in Docket # 625.  The original docket numbers to the exhibits in
Docket # 595 are set forth in the letter filed as Docket # 601.

## I. BACKGROUND

### A. Procedural Background

The second amended complaint alleges that defendants provided material support and financing to the Donetsk People's Republic ("DPR"), which is alleged to be a terrorist group, and that the DPR was responsible for the downing of Malaysia Airlines Flight 17 ("MH17") on July 17, 2014, which killed 298 passengers including Quinn Lucas Schansman. See Second Amended Complaint, filed October 5, 2020 (Docket # 156) ("SAC"), ¶¶ 1, 28. Plaintiffs are Quinn Lucas Schansman's estate and immediate family. Id. ¶ 11.

VTB "is a Russian state-owned banking institution." Id. ¶ 40. Plaintiffs allege that VTB provided "financial services to the DPR, including its fundraisers, and its affiliates and/or execut[ed] the money transfers that funded the DPR" and that these actions "constituted 'acts of international terrorism' as defined in 18 U.S.C. § 2331." Id. ¶ 401.

The defendants moved to dismiss the complaint and in September 2021, District Judge Andrew L. Carter denied the motion. See Schansman v. Sberbank of Russia PJSC, 565 F. Supp. 3d 405 (S.D.N.Y. 2021). As relevant here, Judge Carter rejected defendants' motion to dismiss for lack of personal jurisdiction, finding that "Plaintiffs have made a prima facie showing that . . . Defendants VTB Bank and Sberbank provided financial services to the DPR using New York's banking system." Id. at 414. He also rejected VTB's argument that plaintiffs' "claims are barred by the ATA's act of war exclusion," finding that the complaint sufficiently alleges that "MH17 was downed by the DPR, a terrorist group based on an ideology of Russian supremacy by creating a proto-state, Novorossiya, through the control of territory in Ukraine." Id. at 419 (citing SAC ¶ 88).

B.  Background of the Present Discovery Dispute

Early in the discovery period, plaintiffs served two sets of requests for production, dated November 29, 2021, and December 17, 2021, and one set of interrogatories, dated November 29, 2021) (the "2021 Discovery Requests").  See Plaintiffs' Request for Pre-Motion Conference on Their Proposed Motion to Compel the Production of Documents from Defendant VTB Bank PJSC, filed April 18, 2022 (Docket # 313) ("April 18, 2022, Letter").  As of April 18, 2022, VTB had not produced any documents, arguing that they were prohibited from doing so under Russian bank secrecy and confidentiality laws.  Id. at 2.  Because the "[p]arties failed to reach a consensus on the issue," plaintiffs requested "permission to file a motion to compel the production of documents from VTB."  Id. at 2, 8.  The Court granted plaintiffs' request for formal briefing on the motion to compel, see Memorandum Endorsed, filed April 19, 2022 (Docket # 315) ("April 19, 2022, Order"), an order that was later stayed after VTB's then-counsel withdrew, see Memorandum Endorsed, filed April 21, 2022 (Docket # 322).

Between February 21, 2022, and October 31, 2022, the parties "met and conferred five times regarding VTB's objections."  Plaintiffs' Memorandum of Law in Support of Their Motion to Compel the Production of Documents from VTB Bank PJSC, filed November 11, 2022 (Docket # 479) ("First Mem. to Compel"), at 6.  In the last of these meetings, VTB stated that it "will not produce anything that our clients in Russia understand to be prohibited under Russian law, even if the court orders it."  Id.

On October 31, 2022, plaintiffs again requested "permission to file a motion to compel the production of documents from VTB" because "the parties have conferred multiple times" since April 21, 2022, but were "at impasse about VTB's objections to Plaintiffs' discovery requests based upon Russian law."  Plaintiffs' Request for Pre-Motion Conference on Their

Proposed Motion to Compel the Production of Documents from Defendant VTB Bank PJSC, filed October 31, 2022 (Docket # 463), at 5; id. at 1.  In their letter, plaintiffs explained that VTB's position is that it "cannot produce any responsive documents until it secures permission from the Russian Ministry of Finance ["Ministry of Finance"] and VTB's own customers (or possibly the Central Bank of Russia ["Central Bank"])."  Id. at 3.  While VTB had "sought approval from the Ministry of Finance on December 28, 2021 and from the Central Bank . . . on February 1, 2022, . . . VTB's counsel have informed Plaintiffs that VTB has yet to receive any substantive response from either body."  Id.  The Court granted plaintiffs' request to file a formal motion.  See Memorandum Endorsed, filed November 1, 2022 (Docket # 466).

The parties subsequently briefed the motion to compel.[2]  More than three months after the motion to compel was fully briefed, VTB "indicated for the first time that it must produce the documents at issue to the . . . Ministry of Finance to approve the release and that VTB plans to do so by 'the end of June or mid-July.'"  Order, filed May 3, 2023 (Docket # 506).  On May 12, 2023, the Court noted that "[t]he delay in production has had a severe and negative impact on the progress of this case," and "direct[ed] VTB to produce the requested documents to plaintiffs no later than November 30, 2023."  Order, filed May 12, 2023 (Docket # 509), at 1.

On December 1, 2023, VTB requested "that its deadline to produce all responsive documents to Russian regulatory authorities be extended to February 15, 2024."  VTB Bank PJSC's Request for an Extension of Time for Discovery, filed December 1, 2023 (Docket # 553) ("December 1, 2023, Request for Extension of Deadline"), at 1.  Over plaintiffs' objection, the

---

[2]  See First Mem. to Compel; VTB Bank PJSC's Memorandum of Law in Support of Its Opposition to Plaintiffs' Motion to Compel the Production of Documents from VTB Bank PJSC, filed December 8, 2022 (Docket # 488); Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Compel the Production of Documents from VTB Bank PJSC, filed January 4, 2023 (Docket # 494).

Court granted the request, explaining that "[w]hile the Court is certainly concerned about the further delay in this case, it appears uncontested that VTB has made significant efforts to comply with its discovery demands and has done so under unusual circumstances."  Order, filed December 4, 2023 (Docket # 554), at 1.  At the same time, the Court ruled that by April 1, 2024, VTB must produce all responsive documents or, if approval had not been obtained by that date, regulatory approval would be deemed denied.  Id.  In April, again over plaintiffs' objection, the Court extended the deadline for production until July 31, 2024.  See Revised Scheduling Order, filed April 17, 2024 (Docket # 578), at 2; Transcript of April 10, 2024 Proceedings (Docket # 579) ("Tr. April 10, 2024"), at 11-12.

On August 5, 2024, VTB informed the Court that "contrary to its earlier informal indications, the Ministry [of Finance] . . . informed VTB (also informally) that it was no longer inclined to grant these requests. . . . There is no formal procedure by which VTB can challenge the Ministry's decision [and] VTB will not argue that Plaintiffs' Aerospatiale motion should await those decisions."  Letter re: Ministry of Finance of the Russian Federation, filed August 5, 2024 (Docket # 589).  Plaintiffs then filed the instant motion.

C.  Facts Relevant to the Instant Motion to Compel

a.  Requests for Production

Plaintiffs are moving to compel production of documents responsive to 16 requests for production, Mem. at 3; see id. at 4 nn.2-4 — all of which were served on VTB on either November 29, 2021, or December 17, 2021, see Plaintiffs' Document Requests and VTB's Objections by Category, annexed as Ex. A to Hipp Decl. (Docket # 595-1) ("Hipp Decl. Ex. A").  Plaintiffs group these document requests into three categories: "(1) transactions and other customer-specific information to identify the movement of funds through VTB benefitting the

DPR; (2) VTB's monitoring of the 2013–2014 political and social unrest in Ukraine, VTB's financing of terrorists, and VTB's compliance with laws regarding its support for terrorist activities in Ukraine; and (3) VTB's policies, practices, and procedures concerning counterterrorism and anti-money laundering efforts."  Mem. at 4 (footnotes omitted).  Some of the document requests in the first category seek information concerning "DPR Individuals and Fundraisers."  See, e.g., Hipp Decl. Ex. A at 1 (Requesting "documents concerning violence in eastern Ukraine, the . . . DPR[], or the DPR Individuals and Fundraisers").  These individuals and fundraisers are identified by name in appendices served on VTB in September 2022.  See Hipp Decl. ¶ 24; Appendices A & B (VTB Bank), dated September 7, 2022, annexed as Ex. V to Hipp Decl. (Docket # 595-22) ("September 2022 Appendices").

On April 14, 2023, VTB hired Nikolay Teterev, director of a company that provides, among other things, computer forensic consulting services (together with Teterev, the "Consultant"), to "identify, preserve and process information" responsive to the 2021 Discovery Requests.  Teterev Decl. ¶ 3; see id. ¶ 2.  Teterev categorized plaintiffs' document requests into two categories: "(a) documents concerning transactions in VTB accounts, including card payments, transfers, deposits and withdrawals made by individuals and entities identified" in the September 2022 Appendices "('transactional records'); and (b) other types of non-transactional documents, such as compliance policies, documents concerning VTB's monitoring of political and social events in Ukraine and Crimea, and documents showing the extent of VTB's business dealings in those countries ('non-transactional records')."  Id. ¶ 6.

b.  <u>VTB's Search for Responsive Records</u>

"The Consultant began searching for transactional records on July 11, 2023," which led to "27,573 unique results."  <u>Id.</u> ¶ 14.  The Consultant preserved this data and "received authority from VTB to begin reviewing the data on December 26, 2023."  <u>Id.</u> ¶ 25.

To identify "non-transactional data," the Consultant together with VTB, "participated in 23 online interviews with 33 VTB employees" between "May and September 2023."  <u>Id.</u> ¶ 8; <u>see</u> <u>id.</u> ¶ 26.  Based on these interviews and the employees' duties over the relevant period, the Consultant selected 13 employees "for further data preservation."  <u>Id.</u>  Teterev states that a subsequent search was conducted of these 13 employees' (1) physical and virtual hard drives, which yielded 5,044 GB of data; (2) Microsoft Exchange data, which yielded 38.63 GB of data; (3) Enterprise Vault Data, the email archiving system used, which yielded 234.38 GB of data; and (4) network folders, which yielded 53.62 GB of data.  <u>See id.</u> ¶¶ 27-33.  Furthermore, the Consultant searched (1) tickets from customer complaints for the names contained in the September 2022 Appendices, which yielded no responsive records; (2) internal complaints during the relevant period, which yielded no responsive records; (3) internal notes that informed employees about changes in sanctions regulations, which yielded 24 results; (4) internal audit records from two compliance investigations, one of which was conducted by the Financial Action Task Force, occurring in the relevant time period, records of which were "preserved"; and (5) "news collection," which VTB had outsourced to a third-party provider, and which yielded no responsive documents.  <u>See id.</u> ¶¶ 34-40.  In total, the Consultant preserved 5,370.63 GB of data, of which 747.57 GB were identified as "eligible for processing."  <u>Id.</u> ¶ 42.  Application of "the agreed-upon keyword searches" yielded 376,534 documents.  <u>Id.</u>  Of the 6,798 documents (18,204 documents when including families) which were identified as responsive to plaintiffs'

requests, 6,528 documents "involved references to VTB's compliance and AML procedures, or provided evidence of those procedures being implemented, . . . 51 documents were responsive to Plaintiffs' request relating to VTB's monitoring of events in Ukraine in 2013-2014, . . . 217 documents reflected VTB's business activities in Ukraine and 14 related to decisions to open or close offices in Ukraine in 2014."  Id. ¶ 45.

c. <u>VTB's Process of Obtaining Permission from Russian Regulatory Agencies</u>

As discussed further below, VTB maintains that it is "necessary" to obtain "approval[] of the Russian authorities" before complying with plaintiffs' requests.  Opp. at 25.  On January 31, 2024, VTB "produced responsive transactional records and suspicious activity reports to the Central Bank with a request to produce the documents to Plaintiffs."  VTB Bank PJSC's Additional Discovery Update, filed February 1, 2024 (Docket # 559), at 2.  As of September 20, 2024, VTB has not received a response to this request.  <u>See</u> Opp. at 30.  Thus, no transactional records have been produced to plaintiffs.  <u>See</u> <u>id.</u>

On June 22, 2023, VTB received approval from the Ministry of Finance to produce the first "tranche of documents [VTB] provided to the Ministry earlier," consisting of "approximately 62 documents, including approximately 755 pages of internal VTB policies."  Letter in Response to Court Order of May 12, 2023 (Dkt. No. 509), filed July 12, 2023 (Docket # 523), at 1.  VTB "produced these documents to [p]laintiffs" on the same day.  <u>Id.</u>

On August 22, 2023, VTB received approval from the Ministry of Finance to produce "the second tranche of documents that VTB had sought permission to produce," consisting of "approximately 177 documents, including 1900 pages."  Letter in Response to Court Order of May 12, 2023 (Dkt. No. 509), filed September 12, 2023 (Docket # 535), at 1.  VTB "produced these documents to [p]laintiffs" on the same day.  <u>Id.</u>

On March 22, 2024, VTB was "informed verbally that the Russian regulators had approved the disclosure of all documents included in the third, fourth and fifth requests." Letter Motion for Conference and Update regarding Substantial Progress in Discovery, filed March 28, 2024 (Docket # 564), at 2. Subsequently, the Ministry of Finance "formally granted VTB permission to disclose all material contained in the fourth and fifth requests for production." April 12, 2024 Discovery Update Letter, filed April 12, 2024 (Docket # 577), at 1. The fourth tranche included "199 files comprising 12,612 pages of documents responsive to Plaintiffs' requests." Letter in Response to Court Order of May 12, 2023 (Dkt. No. 509), filed November 13, 2023 (Docket # 551), at 2. The fifth tranche included "approximately 223 responsive documents (516 documents total with families) spanning approximately 96,544 pages." December 12, 2023, Discovery Update Letter, filed December 12, 2023 (Docket # 557), at 1. The fourth and fifth tranche of documents, excepting "four documents that, following VTB's supplemental review, [were] withheld for further consideration," were produced to plaintiffs on May 30, 2024. June 12, 2024 Discovery Update Letter, filed June 12, 2024 (Docket # 585) ("June 12, 2024, Letter"), at 1. Plaintiffs contend that "when the[se] documents were finally produced . . . , the production contained only 396 documents" instead of the 715 documents which plaintiffs had been expecting. Mem. at 9.

On August 1, 2024, the Ministry of Finance advised that it would be "inappropriate" to disclose the information contained in the third, sixth, and seventh tranches of documents. Letter from the Russian Ministry of Finance to VTB, dated August 1, 2024, annexed as part of the composite Exhibit J (2 of 2) to Ríos Decl. (Docket # 607-11), at *25 ("August 1, 2024, Letter from Russian Ministry of Finance"); see Opp. at 27 (stating that this letter pertained to the "third, sixth and seventh request"). The third tranche of documents "included custodian/department

information . . . , additional bank policies and procedures, sanction lists and correspondence from within VTB's Compliance department."  Fifth Monthly Discovery Update Letter, filed October 12, 2023 (Docket # 541), at 1.  VTB has not given any indication of how many documents were included in the third tranche of documents.  See id.  The sixth tranche of documents included "approximately 816 documents spanning approximately 547,914 pages."  January 12, 2023 Discovery Update Letter, filed January 12, 2024 (Docket # 558), at 1.  The seventh tranche of documents included "5,946 documents spanning 16,406 pages."  February 1, 2024, Discovery Update at 2.  As of September 2024, none of the documents from the third, sixth, and seventh tranches of documents had been produced to plaintiffs.  See Opp. at 27.

On May 22, 2024, VTB "provided its eighth production of documents to the . . . Ministry of Finance . . . includ[ing] approximately 11,000 documents."  June 12, 2024, Letter, at 1.  This request, as well as a request that the Ministry of Finance reconsider its denial of other requests, remained pending as of September 2024, see Opp. at 27-28, and the Court has not been informed that there has been any activity since then.  Thus, we find that none of these documents have been produced to plaintiffs.

Plaintiffs estimate that from the 23,449 documents identified by VTB as responsive to plaintiffs' document requests and submitted to the Ministry of Finance or the Central Bank for approval, only 635, or 3%, have been produced.  Mem. at 6.  The documents that have been produced "comprise general policies, travel receipts, and Ministry of Finance regulations, as well as heavily redacted email correspondence and other documents regarding VTB's compliance efforts not specific to the DPR."  Id. at 8.

As explained by plaintiffs, VTB has refused to produce documents with regards to "all but two of the Schansmans' document requests."  Id. at 2 n.1; id. at 17 n.14.  However, plaintiffs

are not moving to compel the production of documents in response to every request for

production.  See id. at 17 n.14.  Instead, plaintiffs "are moving to compel the production of

documents in response to the following requests for production: 1–2, 5, 13, 25–27, 30, 32, 40,

50, 52–54, 59–60."  Id.[3]

On a separate point, plaintiffs note that heavy redactions make it "very difficult . . . to

determine the relevance of many of the documents" that have been produced, id. at 8:

> Because all customer information has been redacted, it is impossible to determine
> which documents relate the individuals, entities, email addresses, domain names,
> websites, and account numbers that were used openly to raise funds to support the
> DPR or the Luhansk People's Republic ("LPR") or that were otherwise publicly
> associated with the DPR or LPR . . . . Second, the names, titles, and roles of
> VTB's employees are essential to the Schansmans' ability to determine what
> further discovery to pursue, because the Schansmans cannot discern which VTB
> personnel have first-hand knowledge of VTB's compliance procedures and
> relevant customer activity.

Id. at 8-9 n.8.  Plaintiffs argue that "[t]here is no other way for the Schansmans to obtain

discovery from VTB absent a ruling from the Court" and thus VTB "should be required to

produce all of the responsive documents in unredacted form."  Mem. at 3.

## II.  LEGAL STANDARD

VTB maintains that Russian law prohibits disclosure of the documents sought by

plaintiffs.  See Opp. at 28.  Accordingly, VTB argues that "this court should deny the motion [to

compel] in its entirety and order the parties to complete discovery to the fullest extent permitted

by both U.S. and Russian law."  Id. at 61.

As the Second Circuit noted in Linde v. Arab Bank, PLC, 706 F.3d 92 (2d Cir. 2013), "the

operation of foreign law does not deprive an American court of the power to order a party subject

---

[3]  It is unclear whether there is any relationship between the order in which the tranches
of documents were provided to the Russian regulators for approval and the numbering of
plaintiffs' requests for production.

to its jurisdiction to produce evidence even though the act of production may violate that law."
Id. at 109 (alteration marks omitted) (citing Société Nationale Industrielle Aérospatiale v. U.S.
Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 544 n.29 (1987) ("Aérospatiale") (in turn citing
Société Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers, 357
U.S. 197, 204-06 (1958)).  Thus, "it is beyond dispute that the Federal Rules of Civil Procedure
provide the court with authority to issue discovery orders requiring the disclosure of information
protected by foreign bank secrecy laws."  Linde v. Arab Bank, PLC, 463 F. Supp. 2d 310, 314
(E.D.N.Y. 2006), aff'd, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007) (citations omitted).
However, "[e]xercising that authority is a matter of discretion," id., and the decision whether to
exercise that discretion should consider and weigh principles of "international comity," see
Aérospatiale, 482 U.S. at 543-44.

Thus, "[w]hen a lawsuit requires discovery of materials located in a foreign nation," a
"two-step process" is "trigger[ed]," In re Terrorist Attacks on Sept. 11, 2001, 2021 WL 5449825,
at *10 (S.D.N.Y. Nov. 22, 2021) (citation omitted).  "First, a court must determine if there is
actually a conflict between the discovery sought and foreign law."  Id.  Where, as here, "the
alleged obstacle to production is foreign law, the burden of proving what that law is and
demonstrating why it impedes production falls on the party resisting discovery."  Laydon v.
Mizuho Bank, Ltd., 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (quoting S.E.C. v. Gibraltar Glob.
Sec., Inc., 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015)); see In re Terrorist Attacks on
Sept. 11, 2001, 2021 WL 5449825, at *10 (placing the burden of proof on the party resisting
discovery in the context of a motion to compel).  "In order to meet that burden, the party
resisting discovery must provide the Court with information of sufficient particularity and
specificity to allow the Court to determine whether the discovery sought is indeed prohibited by

foreign law." Laydon, 183 F. Supp. 3d at 413 (quoting Alfadda v. Fenn, 149 F.R.D. 28, 34

(S.D.N.Y. 1993)).  Additionally, the Federal Rules of Civil Procedure provide that

> [i]n determining foreign law, the court may consider any relevant material or
> source, including testimony, whether or not submitted by a party or admissible
> under the Federal Rules of Evidence.  The court's determination must be treated
> as a ruling on a question of law.

Fed. R. Civ. P. 44.1.

At step two, if foreign law "is found to conflict with domestic law, 'courts perform a

comity analysis to determine the weight to be given to the foreign jurisdiction's law.'" Laydon,

183 F. Supp. 3d at 413 (quoting Tiffany (NJ) LLC v. Andrew, 276 F.R.D. 143, 151 (S.D.N.Y.

2011), aff'd, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011)).  To this end, the Second Circuit

applies the five-factor comity analysis of § 442 of the RESTATEMENT (THIRD) OF FOREIGN

RELATIONS LAW OF THE UNITED STATES (AM. L. INST. 1987) (the "Restatement").  See Linde,

706 F.3d at 111 ("In general, the careful application of Restatement § 442 will faithfully adhere

to the principles of international comity.").  The five factors are:

> [i] the importance to the . . . litigation of the documents or other information
> requested; [ii] the degree of specificity of the request; [iii] whether the
> information originated in the United States; [iv] the availability of alternative
> means of securing the information; and [v] the extent to which noncompliance
> with the request would undermine important interests of the United States, or
> compliance with the request would undermine important interests of the state
> where the information is located.

Linde, 706 F.3d at 98-99 (quoting Restatement § 442(1)(c)) (modifications in original).[4]

District courts in this Circuit have also considered "[vi] the hardship of compliance on the

party or witness from whom discovery is sought; and [vii] the good faith of the party resisting

---

[4]  Because these factors were cited by the Supreme Court in Aérospatiale, 482 U.S. at 544
n.28, they are sometimes referred to as the "Aérospatiale factors."

discovery." <u>Wultz v. Bank of China Ltd.</u>, 910 F. Supp. 2d 548, 553 (S.D.N.Y. 2012) (quoting

<u>Strauss v. Credit Lyonnais, S.A.</u>, 249 F.R.D. 429, 438-39 (E.D.N.Y. 2008)).  However, in 2013,

the Second Circuit clarified that these factors are considered only "when deciding whether to

impose sanctions"; that is, they are not among the factors considered when deciding "whether to

issue a production order for information located abroad."  <u>Linde</u>, 706 F.3d at 110; <u>id.</u> at 109.

Because we are not deciding any issue relating to sanctions today, we do not consider questions

of hardship or good faith.

III.  <u>APPLICABILITY OF THE ACT OF STATE DOCTRINE</u>

     Before addressing the conflict and comity analyses, we consider a threshold issue raised

by VTB: that these analyses do not apply at all because of the "act of state doctrine."

     VTB argues that because VTB presented the documents it found "to the appropriate

government regulators, and those regulators have approved four requests, rejected three requests,

and are yet to rule on three requests, the <u>Aérospatiale</u> analysis is no longer relevant."  Opp. at 3

(footnote omitted).  Instead, VTB argues, "the act of state doctrine" governs.  <u>Id.</u>

     The Second Circuit has described the act of state doctrine as follows:

> The act-of-state doctrine itself flows from a broad avoidance principle: courts
> should refrain from judging the validity of a foreign state's sovereign acts.  It is
> built around separation of powers concerns relating to foreign affairs and reflects
> "'the strong sense of the Judicial Branch that its engagement in the task of passing
> on the validity of foreign acts of state may hinder' the conduct of foreign affairs."
> <u>W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l</u>, 493 U.S. 400, 404 (1990)
> [("<u>Kirkpatrick</u>")] (quoting <u>Banco Nacional de Cuba v. Sabbatino</u>, 376 U.S. 398,
> 423 (1964)).  To avoid intruding on matters better left to another branch, the act-
> of-state doctrine supplies a rule of decision on the merits: courts must accept as
> valid the acts of foreign sovereigns taken within their own jurisdictions.  <u>See</u>
> <u>Celestin v. Caribbean Air Mail, Inc.</u>, 30 F.4th 133, 140 (2d Cir. 2022).
>
> Act-of-state issues arise only "when the outcome of the case turns upon . . . the
> effect of official action by a foreign sovereign."  <u>Kirkpatrick</u>, 493 U.S. at 406.  So,
> "when that question is not in the case, neither is the act of state doctrine."  <u>Id.</u>

Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A., 106 F.4th 263, 269 (2d Cir. 2024) (per curiam) (alteration marks omitted). The Second Circuit has also held that the doctrine is not a "bar on liability based on compliance with foreign laws. Rather, the act of state doctrine is a 'rule of decision' for the merits: It compels federal and state courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'" Celestin, 30 F.4th at 138 (quoting Kirkpatrick, 493 U.S. at 406).

The doctrine does not apply here, however, because "[n]othing in the present suit requires the Court to declare invalid . . . the official act of a foreign sovereign," and thus "the factual predicate for application of the act of state doctrine does not exist." Kirkpatrick, 493 U.S. at 405 (citation omitted). Courts in this Circuit have routinely held that the act of state doctrine is not implicated in a discovery dispute in which the resisting party points to a conflicting foreign obligation. See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2010 WL 3420517, at *5 n.10 (E.D.N.Y. Aug. 27, 2010) ("The act of state doctrine is inapposite because the plaintiffs do not ask the court to pass on the validity of any of the EU's acts. Rather, they ask the court to resolve a conflict between a valid European law and United States law.").

VTB argues that this case is different because at issue is not merely a dispute about interpretation of laws; rather it is a dispute about the actions already taken by the Ministry of Finance: namely, its refusals to approve the release of certain information. See Opp. at 33-35. Thus, VTB contends, "the validity of an act of a foreign government" is at issue. Id. at 33. We reject this argument. While the Court's comity analysis considers, in part, the requirements of Russian law, it does not follow that "the outcome of the case turns upon—the effect of official action by a foreign sovereign." Kirkpatrick, 493 U.S. at 406. To the contrary: the Restatement specifically contemplates that "a court . . . may . . . make findings of fact adverse to a party that

has failed to comply with the order for production" when an "order of a court or other authority of the" foreign state prohibits disclosure of the information at issue. See Restatement § 442(2)(c); id. § 442(2). More specifically — as detailed below — our analysis of the Aérospatiale factors does not in any way call into question whether the Russian regulators' refusal to approve the release of the document was "valid." Celestin, 30 F.4th at 138. To the contrary, we assume that the Russian regulators exercised their authority in accordance with Russian law when they blocked release of the documents. See Section IV.A below.

VTB argues that because some of the discovery requests are still pending, the Court's issuance of an order "compelling VTB to produce the remaining documents . . . would be in effect a judicial first strike that would disrupt the Russian government's process," warranting application of the act of state doctrine. Opp. at 36; see id. at 37. Again, while a disruption of the Russian government's process is perhaps validly considered as part of the comity analysis, it does not change the fact that U.S. courts have the "power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate" a foreign country's law. Aérospatiale, 482 U.S. at 544 n.29 (citation omitted).

Even though the act of state doctrine is not implicated in this motion to compel, the concerns raised by VTB are relevant to the fifth Restatement factor and thus will be considered as part of the comity analysis. See Linde, 706 F.3d at 99 (quoting Restatement § 442(1)(c)) (considering "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located").

IV.  DISCUSSION

Having determined that the act of state doctrine does not apply, we turn next to the first

question of the two-step analysis: whether there is in fact a conflict between Russian law and VTB's discovery obligations under U.S. law.  See In re Terrorist Attacks on Sept. 11, 2001, 2021 WL 5449825, at *10.

A.  Does Russian law prevent the production of the records?

VTB makes no real challenge to the notion that, barring Russian law, it would be required to produce the materials sought by plaintiffs as a matter of U.S. law governing discovery.[5] Instead, it maintains that Russian law requires it to obtain permission from the Ministry of Finance to produce documents relating to its activities, a category covering plaintiffs' requests 1-11, 13-45, and 51-60; permission from the Federal Financial Monitoring Service of the Russian Federation ("Rosfinmonitoring" or "RosFinMonitoring") to disclose bank secret information, a category covering plaintiffs' requests 1-4, 6, 7, 9, 37, 40-43, and 52-54; and permission from Rosfinmonitoring to disclose personal data information, a category covering plaintiffs' requests 1, 12, 13, 33, and 52.  See Opp. at 28-31.[6]  Thus permission from either the Ministry of Finance or Rosfinmonitoring is needed to produce any of the documents which plaintiffs are seeking. Compare Mem. at 17 n.14, with Opp. at 28-31.[7]

_____

[5]  VTB does challenge the relevance of the materials, but only with regard to one of the Restatement factors.  See Section IV.B.1 below.

[6]  VTB refers interchangeably to both Rosfinmonitoring and the Central Bank.  VTB explains that "under Russian law, VTB cannot submit a request directly to RosFinMonitoring. Rather, VTB must submit its request to the [Central Bank], which in turn communicates with RosFinMonitoring."  Opp. at 30 (citations omitted).

[7]  Plaintiffs' request for production 50 is not mentioned in VTB's memorandum of law. One of VTB's Russian law experts states that he "did not assess the information that could be provided in response to the requests 46 to 50, given that these requests are vague.  If that information concerns VTB's activities, VTB will need a permission by the Ministry of Finance in order to provide such information to the US Court."  Declaration of Russian Law Expert, Oleg M. Ivanov, filed December 8, 2022 (Docket # 489-2) ("Ivanov Decl."), at 15.  Thus, we assume that VTB opposes plaintiffs' request for production 50 on the ground that it is covered by the

VTB offers the declarations of two Russian law experts, Professor Oleg Ivanov ("Ivanov") and Drew Holiner ("Holiner") (together, "VTB's Russian law experts"), in support. See Ivanov Decl.; Declaration of Drew Patrick Holiner, filed September 20, 2024 (Docket # 609) ("Holiner Decl."). In response, plaintiffs offer the declaration of their own Russian law expert, William Butler. See Declaration of William Elliott Butler, filed January 4, 2023 (Docket # 495-6) ("Butler Decl.").[8]

We explore the scope of Russian law as relevant to each of the document categories.

1. Requests covering information relating to VTB's activities

VTB maintains that "Paragraph 1 of Decree No. 1285 mandates that a designated executive body of the Russian government provide prior approval before organizations on a 'List of Strategic Enterprises' may provide 'information relating to their activities.'" Opp. at 28 (quoting Holiner Decl. ¶ 20; Ivanov Decl. at 4). "VTB is included in the List of Strategic Enterprises by the Russian President Decree dated 12.05.2016 No. 223," Ivanov Decl. at 4, and the Ministry of Finance "is the executive authority designated by the Russian Government for the purpose of granting to VTB the relevant prior consent required under Decree No. 1285," Holiner Decl. ¶ 21 (citing to "Resolution of the Government of the Russian Federation date October 5, 2012, No. 1017 'On measures to implement the Decree of the President of the Russian Federation of September 11, 2012, N 1285', Annex, Item 7."). None of this is disputed by plaintiffs. See Mem. at 18-19; Butler Decl. ¶ 7 ("Ivanov . . . is correct in identifying VTB as a

_____

requirement to obtain permission from the Ministry of Finance to produce documents relating to its activities.

[8] Plaintiffs' brief cites William Butler's earlier declaration, see Mem. at 19 (citing to Declaration of William Elliott Butler, filed March 23, 2022 (Docket # 305)). This declaration, however, does not appear to contain the proposition for which plaintiffs cite it. We therefore assume that plaintiffs meant to cite Butler's January 4, 2023, declaration (Docket # 495-6).

'strategic enterprise.'"). Thus, the scope of Decree No. 1285 hinges on the reach of "information

relating to their activities." VTB's expert, Professor Ivanov, asserts that the

> content of the 'information related to their activities' referred to in . . . Decree No.
> 1285[(1)(a)] until and unless further clarified by the relevant Russian authorities,
> is broad. In my view, the phrase 'information related to their activities' should be
> interpreted in a manner consistent with the Banking Law definition of banking. In
> accordance with Article 5 of the Banking Law, banking means the performance of
> banking operations (including opening and maintenance of bank accounts,
> transferring funds to client accounts). Data on compliance procedures as well as
> internal communications regarding banking operations should also be interpreted
> as falling within the information related to banks' activities.

Ivanov Decl. at 5. VTB's other expert, Holiner, provides further context, explaining that the

phrase, "information '<u>concerning their activities</u>'" — which appears to be an alternative

translation of the aforementioned phrase — "is not defined in Russian law, and there is no

published court practice or guidance on its interpretation." Holiner Decl. ¶ 20 & n.4.

> In response, plaintiffs argue that

> [w]hile the Schansmans do not dispute that some information requested may be
> subject to Russian laws, VTB takes an impermissibly broad view of the
> documents and information actually subject to conflicting Russian law. For
> example, . . . VTB's expert defines information related to VTB's activities as
> broadly as possible to include not only information about VTB's "activities," but
> also the much broader category of information about VTB's "operations"—a
> conclusion that is not supported by the plain language of the Decree or by Russian
> canons of statutory interpretation.

Mem. at 18-19; <u>see</u> Butler Decl. ¶ 8. However, neither plaintiffs, nor their expert, explain how

the difference between "activities" and "operations" changes the scope of Decree No. 1285.

In any case, the Court finds that the exceptionally broad phrase "information related to

their activities" covers plaintiffs' requests for production, regardless of whether they pertain to

VTB's "activities" or VTB's "operations" — a distinction lost on the Court. For instance,

plaintiffs' request for production numbered 40 covers "[a]ll documents concerning Your business

relationship with Konstantin Malofeev." Hipp Decl. Ex. A at 2. Information about a business

relationship is clearly information about an activity or operation of VTB and is thus covered by
Decree No. 1285.  The Court comes to a similar conclusion with regard to all requests for
production on which plaintiffs are moving to compel, that is, requests 1 (excepting "[a]ll
documents concerning violence in eastern Ukraine [and] the Donetsk People's Republic," Hipp
Decl. Ex. A at 1, which does not ask for information on VTB's activities or operations), 2, 5, 13,
25-27, 30, 32, 40, 50, 52-54, and 59-60.  See Mem. at 17 n.14.

Thus, the Court finds that production of plaintiffs' requests number 1 (other than the
excepted category just described), 2, 5, 13, 25-27, 30, 32, 40, 50, 52-54, and 59-60 are indeed
prohibited by Decree No. 1285.

Plaintiffs argue that VTB failed to demonstrate that its discovery obligations conflict with
any specific Russian law, noting the requirement that VTB meet its burden with "particularity
and specificity."  Mem. at 18 (internal quotation marks omitted).  But VTB has identified a
particular Russian law that explicitly covers the present circumstances through its broad
language.

Lastly, while it is VTB's "burden to prove that [Russian] law 'actually bars' the
production, not [plaintiffs'] burden to prove the converse," id., neither plaintiffs, nor plaintiffs'
Russian law expert, have offered the Court an alternate interpretation of Decree No. 1285.

Thus, the Court finds that a conflict exists between Decree No. 1285 and defendant's
obligation to produce information responsive to plaintiffs' discovery requests.

2.   Requests covering bank secret information

VTB maintains that it "must obtain permission from . . . RosFinMonitoring to disclose
bank secret information."  Opp. at 29.

20

Article 4.1(1) of the Law on Countersanctions (also referred to as "Federal Law No. 127" in some of the briefings, see, e.g., Butler Decl. ¶ 9), which was enacted by amendment on May 1, 2022, provides that

> A credit organization is prohibited to provide the competent authorities of foreign states (including judicial authorities) with the information requested by such authorities about customers and transactions made by them, customer representatives, beneficiaries and beneficial owners, except in cases provided for by this Federal Law and the Federal Law of June 28, 2014, N 173-FZ.

Holiner Decl. ¶ 26. "Under Russian law, the definition of 'credit organization' includes banks (Article 1 of the Federal Law on Banks and Banking Activity)." Id. ¶ 27 n.10. There are "two exceptions to this prohibition under the Law on Countersanctions": one relates to foreign tax laws, an exception not germane to this litigation, and the other allows the "provision of information . . . with the permission of . . . Rosfinmonitoring." Ivanov Decl. at 6. "However, there is no application procedure to request such permission." Holiner Decl. ¶ 27. Instead, a credit organization, upon request from the competent authority of a foreign state

> must send notice of the request to the Central Bank . . . . [which] then, in turn, forwards the notice to Rosfinmonitoring . . . . If Rosfinmonitoring determines that the information may be disclosed, it informs the Central Bank . . . which in turn informs the credit organization . . . . The law imposes no requirement or time frame on Rosfinmonitoring for granting or even responding to the notice. If no permission is given, the prohibition remains. If permission is granted, however, the credit organization may disclose the information to the competent authorities of the foreign state, and such disclosure will not constitute a breach of bank secrecy or personal data protection law.

Id.

Additionally, the Russian bank secrecy legislative scheme creates a parallel regime for slightly different information. "Article 857 of the Russian Civil Code" requires that "a bank must guarantee the secrecy of the bank account and bank deposit, account transactions and information about the client." Ivanov Decl. at 6. "Article 26 of the Banking Law" subjects an

even broader scope of information to protection: "information about transactions, about accounts and deposits of clients and correspondents, as well as other information established by the credit institution, unless it contradicts federal law." Id. at 6-7. The information covered by Article 857 of the Russian Civil Code and Article 26 of the Banking Law "may be provided only (without client authorization) to clients themselves or to their representatives, as well as submitted to credit bureaus." Id. at 7. However, the exception of Article 4.1 of the Law on Countersanctions applies to bank secrets as well. Thus,

> upon receipt of the appropriate permission from Rosfinmonitoring (through the [Central Bank]), the provision by a credit institution to the competent authority of a foreign state (including judicial bodies) of the information requested by them is not a violation of bank secrecy, and it is not necessary to obtain a separate client's consent to the provision of such information.

Id.

VTB argues that "[h]ere, plaintiffs have requested information that unquestionably constitutes" client information or "bank secrets." Opp. at 30 (mentioning plaintiffs' requests 1-4, 6, 7, 9, 37, 40-43, 52-55, 57, and 58). Plaintiffs are moving to compel on only six of the requests that VTB alleges constitute bank secrets: 1-2, 40, and 52-54. See Mem. at 17 n.14.

Because VTB is a bank, it falls under the mandate of Article 4.1(1) of the Law on Countersanctions, Article 857 of the Russian Civil Code, and Article 26 of the Banking Law. See Holiner Decl. ¶ 26 n.10; Ivanov Decl. at 5-7.

Furthermore, all three statutes cover information about customers and customer transactions. See Holiner Decl. ¶ 26 (Article 4.1(1) of the Law on Countersanctions covers "the information requested by such authorities about customers and transactions made by them"); Ivanov Decl. at 6 (Article 857 of the Russian Civil Code covers "account transactions and information about the client"); id. at 6-7 (Article 26 of the Banking Law covers "information

about transactions" and "about accounts").  Plaintiffs' requests for production numbered 1, 2, 40, and 52-54 seek in whole or in part information about customers and customer transactions.  For instance, plaintiffs' request numbered 2 covers "all documents concerning any Transactions involving an account listed" in the September 2022 Appendices.  Hipp Decl. Ex. A at 1-2.

Thus, the Court finds that documents responsive to plaintiffs' discovery requests 1, 2, 40, and 52-54 are indeed covered by Russian bank secrecy laws.  As a result, VTB is prohibited by Russian law from producing information covered by these categories unless permission is given.  See Holiner Decl. ¶ 27 ("If no permission is given, the prohibition remains."); Ivanov Decl. at 6-7.

Butler argues that "Federal Law No. 127 does not refer to 'permission,' 'approval,' or 'authorization' on the part of Rosfinmonitoring."  Butler Decl. ¶ 9.  Butler suggests that VTB is wrong to argue that Russian law includes an exception to the prohibition of disclosing bank secret information.  Id. ("No examples are known to me where the relevant Russian authorities have allowed for the possibility of information being provided upon request of a foreign competent agency or court pursuant to Federal Law 127.").  While this may be true, it does not aid plaintiffs' argument: VTB's burden is to prove a conflict between Russian law and VTB's discovery obligations.  Such a conflict exists whether Federal Law No. 127 allows for Rosfinmonitoring to give permission for a particular production or not.

Lastly, while it is "not [plaintiffs'] burden to prove the converse," EFG Bank AG v. AXA Equitable Life Ins., 2018 WL 1918627 (S.D.N.Y. Apr. 20, 2018), at *2, the Court notes that plaintiffs have not offered the Court an alternate interpretation of the Russian bank secrecy legislative scheme.

23

3.  <u>Requests covering personal data information</u>

VTB maintains that it must obtain permission from Rosfinmonitoring to disclose personal data under "Russian law regarding personal data." Opp. at 31. VTB argues that plaintiffs' requests for production numbered "1, 12, 13, 33, and 52 request personal data." <u>Id.</u> Of those, plaintiffs move to compel production only as to requests for production 1, 13, and 52. <u>See</u> Mem. at 17 n.14.

VTB's Russian law experts point to the Personal Data Law, enshrined as Federal Law of July 27, 2006, No. 152-FZ. <u>See</u> Holiner Decl. ¶ 32; Ivanov Decl. at 2, 7-8 (referring to it as the Law on Personal Data). According to Holiner,

> [T]he Federal Law of July 27, 2006, No. 152-FZ . . . requires that a person who processes personal data . . . is required to maintain the confidentiality of personal data and not disclose it to third persons without the consent of the person to whom that data relates.

Holiner Decl. ¶ 32. Holiner goes on to point to "[o]ne potentially relevant exception": "the processing of personal data in connection with a person's participation in constitutional, civil, administrative, criminal, or commercial court proceedings (Article 6(1)(3) of the Personal Data Law)." <u>Id.</u> ¶ 33. However, VTB's Russian law experts maintain that "this exception is generally understood to relate only to proceedings in the Russian courts." <u>Id.</u>; <u>see</u> Ivanov Decl. at 8 ("This rule applies to the processing of personal data only in connection with the participation of the person in legal proceedings in Russian courts."). In support, Holiner cites a single academic article and acknowledges that "[s]ince the above source is only an academic commentary, and I have not identified any published court practice or official guidance applying this provision in the context of foreign court proceedings, I cannot entirely exclude the possibility that the Russian courts might interpret the exception differently." Holiner Decl. ¶ 34; <u>see id.</u> ¶ 33. VTB's Russian law experts go on to state that information covered by Russian personal data protection

law can still be disclosed if Rosfinmonitoring grants permission "under the procedure envisaged at Article 4.1 of the Law on Countersanctions." Id. ¶ 40; Ivanov Decl. at 9 ("Thus, in order to provide a US court with client information containing personal data of its clients, their representatives or beneficiaries, VTB needs to obtain permission from Rosfinmonitoring.").

VTB has not met its burden of proving that "the discovery sought is indeed prohibited by foreign law." Laydon, 183 F. Supp. 3d at 413 (quoting Alfadda, 149 F.R.D. at 34). Regardless of whether VTB's Russian law experts claim that the exception for civil court proceedings contained in Article 6(1)(3) is purportedly "generally understood" to only cover proceedings in Russian courts, Holiner Decl. ¶ 33, the articulation of the exception by VTB's Russian law expert plainly covers the current proceeding. Additionally, Holiner explicitly acknowledged that he had "not identified any published court practice or official guidance" in support of the sole academic article he points to. Id. ¶ 34. VTB's Russian law experts' speculation that the exception articulated in Article 6(1)(3) does not cover the current proceedings is not enough to meet its burden.

Thus, these circumstances parallel the situation encountered in EFG Bank AG. In that case, upon determining that Swiss law was unclear on whether the discovery at issue was unlawful, the court noted that the party resisting discovery had failed to "identify a single case in" favor of its position, and highlighted the fact that the party's "own expert on Swiss law concedes that no court has held that production by a party in the circumstances presented here violates" the pertinent Swiss law. 2018 WL 1918627, at *2. The court concluded that the "mere 'risk' that [the Swiss law] might be applied is insufficient to carry" the burden of the party resisting discovery. Id. (citation omitted)

Thus, the Court finds that the Personal Data Law does not bar VTB from producing documents in response to plaintiffs' requests for production numbered 1, 13, and 52.

4.  Conclusion

The Court concludes that Decree No. 1285 prohibits production of information responsive to plaintiffs' discovery requests 1 (with the exception previously mentioned), 2, 5, 13, 25-27, 30, 32, 40, 50, 52-54, and 59-60, absent Rosfinmonitoring's permission, which has not been granted.  Additionally, Article 4.1(1) of the Law on Countersanctions, Article 857 of the Russian Civil Code, and Article 26 of the Banking Law prohibit production of information responsive to plaintiffs' discovery requests 1, 2, 40, and 52-54, absent Rosfinmonitoring's permission, which has not been granted.

Having found that a conflict between Russian law and VTB's discovery obligations under U.S. law exists, we proceed to the comity analysis.

B.  Comity Analysis

As previously noted, we consider five factors in deciding whether to issue an order directing production of information located abroad:

> [i] the importance to the . . . litigation of the documents or other information requested; [ii] the degree of specificity of the request; [iii] whether the information originated in the United States; [iv] the availability of alternative means of securing the information; and [v] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Linde, 706 F.3d at 98-99 (quoting Restatement § 442(1)(c)) (modifications in original).  We address each factor next.

1.   Importance of the documents or other information requested to the litigation

Courts in the Second Circuit have assessed the importance of the requested production by

examining whether the requested production is relevant to plaintiffs' claims. See Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199, 211 (E.D.N.Y. 2007); Reino De Espana v. Am. Bureau of Shipping, 2005 WL 1813017, at *7 (S.D.N.Y. Aug. 1, 2005); see also Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992) ("Where the evidence is directly relevant, . . . we have found this factor to weigh in favor of disclosure.") (citation omitted). The information plaintiffs seek may be divided into two categories: (1) information regarding transactions providing material support for DPR individuals and fundraisers (document requests 1, 2, 40, 52, and 54) and (2) information regarding VTB's monitoring activities (document requests 5, 13, 32, 50, and 53), and compliance policies (document requests 25-27, 30, and 59-60). See Mem. at 25, 27.

Plaintiffs bring claims under 18 U.S.C. § 2331, which requires plaintiffs to show that actions of VTB constitute a violation of the criminal provisions of 18 U.S.C. §§ 2339A and 2339C. See SAC ¶¶ 401, 402, 412. To succeed on these claims, plaintiffs must prove, among other elements, (1) that VTB "provide[d] material support or resources or conceal[ed] or disguise[d] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out," various predicate crimes relating to international terrorism, § 2339A(a); and (2) that VTB "directly or indirectly, unlawfully and willfully provide[d] or collect[ed] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" acts relating to terrorism, § 2339C(a)(1). "Material support or resources" is defined as "any property, tangible or intangible, or service, including . . . financial services." § 2339A(b)(1).

Both of the requested categories of information are relevant to plaintiffs' claims: Information regarding transactions providing support to DPR individuals and fundraisers is

relevant to whether VTB processed transactions for the organization responsible for the downing of MH17, a terrorist act. Information regarding "VTB's monitoring of the 2013–2014 political and social unrest in Ukraine which gave rise to terrorist activity, VTB's financing of terrorists, and VTB's compliance with laws and sanctions," Mem. at 27, is relevant to whether VTB acted "knowing[ly]," § 2339A(a), or with "knowledge," § 2339C(a)(1).

VTB argues that the "requested documents are not important to this litigation because VTB has strong defenses on the merits that are independent of the contents of the documents that are the subject of the motion to compel." Opp. at 43. Specifically, VTB argues that (1) "[p]laintiffs' injuries are subject to the ATA's Act of War Exception" because "the crash occurred in connection with an 'international armed conflict' between Ukraine and a proxy of Russia," (2) the "Court lacks jurisdiction and the requested documents will not support jurisdiction," as reflected in third-party discovery, and (3) the Supreme Court's decision in Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023) "will mandate dismissal of this action absent evidence that VTB took affirmative and intentional actions to bring about the MH-17 disaster (which plaintiffs do not even allege)." Id. at 47, 48, 51.

We reject these arguments. First, the scope of discovery includes "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The standard normally does not require the evaluation of the merits of the case. More to the point, Judge Carter has already considered, and rejected, each of VTB's arguments. Under the law of the case doctrine, "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991) (citation omitted). Here, Judge Carter rejected VTB's arguments that the Court lacked personal jurisdiction and that plaintiffs' "claims are barred by the ATA's act of war

exclusion," when he denied VTB's motion to dismiss.  Schansman, 565 F. Supp. 3d at 414, 419.

Subsequently, Judge Carter denied VTB's motion for reconsideration of the Court's denial of

VTB's motion to dismiss, Order, filed September 16, 2022 (Docket # 435), at 1, and denied

VTB's motion to "certify for interlocutory appeal" the Court's order denying VTB's motion to

dismiss, Opinion & Order, filed March 28, 2024 (Docket # 563) ("March 28, 2024 Opinion &

Order"), at 1, 9.  Judge Carter has also already twice denied VTB's request for a pre-motion

conference to brief the effect of Twitter, Inc., 598 U.S. 471 on the litigation, see Order, filed June

22, 2023 (Docket # 520), at 1; March 28, 2024 Opinion & Order, at 2, explaining that "the best

time for the Court to consider" the argument regarding Twitter, Inc., "is on a motion for summary

judgment after discovery, when there may or may not be evidence of VTB knowingly providing

substantial assistance to the perpetrators of the downing of Flight MH17," Transcript of Status

Conference Hearing Before the Honorable Andrew L. Carter, Jr., dated June 21, 2023 (Docket

# 518), at 19:2-6.  Thus, at this stage, the Court will not reassess the merits of plaintiffs' claims in

deciding whether the discovery sought is "important" to the litigation.[9]

Because the discovery sought is "both relevant and crucial to the litigation of plaintiffs'

claims," Strauss, 242 F.R.D. at 212, the first factor of the Restatement comity analysis favors

compelling VTB to produce the responsive information to plaintiffs' requests for production.

---

[9] We do not address the question of whether the merits of plaintiffs' claims could be
relevant if and when plaintiffs seek a sanction under Fed. R. Civ. P. 37 based on VTB's failure to
comply with an order to produce documents.

2.   The degree of specificity of the request

In assessing this factor, courts in this Circuit have asked whether the party resisting discovery has been asked "to produce a specific, discrete source of information."  Milliken & Co. v. Bank of China, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010) (citations omitted).  Here, plaintiffs' requested discovery has a high degree of specificity.

As to plaintiffs' requests for production of information regarding transactions providing material support for DPR individuals and fundraisers, each of the document requests in this category seeks transactions of a discrete list of 136 individuals and entities, see Hipp Decl. Ex. A at 1-2 (citing September 2022 Appendices), which "[t]hrough third-party discovery and other investigation" were "identified" to have "raised funds to support the DPR or that were otherwise publicly associated with the DPR," Mem. at 25.  Because plaintiffs' claims hinge on whether VTB provided financial services to DPR individuals and entities, see § 2339A(a), these requests for production, even though they may require VTB to produce "every document in VTB's possession that references any of them over a two-year period," Opp. at 45, are sufficiently specific.

As to information on "VTB's monitoring of the 2013–2014 political and social unrest in Ukraine which gave rise to terrorist activity, VTB's financing of terrorists, and VTB's compliance with laws and sanctions," these production requests are narrowly focused to elicit production of information that may show whether VTB knew "that its services were used to support terrorist activity," or was recklessly indifferent to such risk.  Mem. at 27, 28.  Thus, they too are sufficiently specific.

Strauss came to a similar conclusion when faced with a request for "[a]ll documents concerning Credit Lyonnais's anti-money laundering efforts, 'Know Your Customer' procedures,

or other measures Credit Lyonnais used to prevent the rendering of financial services to Terrorists and Terrorist Organizations" and documents "related to . . . departments and procedures for account opening, security, customer accounts, compliance, internal audits, bank secrecy and terror financing designations or warnings." Strauss, 242 F.R.D. at 205-06 (alteration marks omitted). The court in Strauss concluded that "the requested discovery is relevant, vital and narrowly tailored to the litigation." Id. at 212. The requests to VTB are not broader than the requests at issue in Strauss.

VTB argues that the document requests are "broad and hopelessly vague." Opp. at 45. But the categorizations of the document requests which VTB points to are much less specific than the actual 16 requests on which plaintiffs are moving to compel. See Mem. at 4 & nn.2-4, 17 n.14.

Because plaintiffs "have established that their discovery demands are specifically tailored to their claims," Strauss, 242 F.R.D. at 212, the second factor of the Restatement comity analysis favors compelling VTB to produce the responsive information to plaintiffs' requests for production.

### 3. Whether the information originated in the United States

The information that plaintiffs seek is located in Russia. Thus, "[t]he overseas location of this information weighs in favor of" VTB. Tiffany (NJ) LLC, 276 F.R.D. at 152.

### 4. The availability of alternative means of securing the information

"If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law." Reino De Espana, 2005 WL 1813017, at *9 (quoting Richmark Corp., 959 F.2d at 1475) (alteration marks omitted). "Conversely, 'if the information cannot be easily obtained through alternative means, this factor is said to counterbalance the

previous factor—the location of the documents and information—and weighs in favor of disclosure.'" <u>Milliken & Co.</u>, 758 F. Supp. 2d at 247 (quoting <u>Gucci Am., Inc. v. Curveal Fashion</u>, 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010)) (emphasis omitted).

       Plaintiffs argue that they have no other source for the documents they seek from VTB given that approval has not been given to release them.  Mem. at 30-31.  VTB has no response to this argument other than to suggest that plaintiffs should be satisfied with the production made by VTB's correspondent bank, Deutsche Bank.  <u>See</u> Opp. at 53-54.  The Court rejects this argument because it does not deny the fact that the responsive materials <u>located in Russia</u> are not available from any other source.  Because "plaintiffs lack sufficient alternative means for obtaining their requested materials," this "factor weighs in favor of granting plaintiffs' motion to compel."  <u>Wultz</u>, 910 F. Supp. 2d at 558.

       5.   <u>The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the Russian Federation</u>

       "The fifth factor—the balancing of national interests—is the most important, as it directly addresses the relations between sovereign nations."  <u>Laydon</u>, 183 F. Supp. 3d at 422 (quoting <u>Gibraltar Glob. Sec., Inc.</u>, 2015 WL 1514746, at *5); <u>accord</u> <u>Chevron Corp. v. Donziger</u>, 296 F.R.D. 168, 206 (S.D.N.Y. 2013) ("Courts consider this the most important factor in the comity analysis.").

       We begin by discussing the degree to which noncompliance would undermine the interests of the United States.  "As an initial matter, 'it has been repeatedly recognized that the United States has an "obvious interest" in having its own procedural rules applied to discovery.'"  <u>Laydon</u>, 183 F. Supp. 3d at 423 (quoting <u>Tansey v. Cochlear Ltd.</u>, 2014 WL 4676588, at *4 (E.D.N.Y. Sept. 18, 2014)).  This "interest is more pronounced when the evidence at issue is

vital to the litigation." Tansey, 2014 WL 4676588, at *4 (citing Reino De Espana, 2005 WL 1813017, at *4).

Additionally, "the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts.'" Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 46 (E.D.N.Y. 2007) (quoting Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523-24 (S.D.N.Y. 1987)). "When that interest is combined with the United States's goals of combating terrorism, it is elevated 'to nearly its highest point.'" Weiss, 242 F.R.D. at 46 (quoting Dammarell v. Islamic Republic of Iran, 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005)). Specifically, the "legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and a task force, reveal this country's profound and compelling interest in combating terrorism at every level." Weiss, 242 F.R.D. at 46. This includes an interest in "disrupting the financial underpinnings of terrorist networks." Id. Permitting Russian regulators to allow Russian banks to opt out of their discovery obligations in American civil suits would contravene this key purpose of the ATA. Thus, noncompliance with the document requests would severely undermine important interests of the United States.

VTB argues that plaintiffs may be "conflating their own interests in litigation with those of the country as a whole." Opp. at 59. Thus, it argues that requests "by private parties, particularly private plaintiffs, should be scrutinized more carefully than requests initiated by the United States government." Id. at 58 (citing Restatement § 442 Reporters' Note 9). But in analyzing this factor, the law does not direct a court to consider the plaintiffs' interests. Instead, a court scrutinizes the degree to which noncompliance would undermine the interests of the United States. The fact that there are private parties as plaintiffs in this case is hardly unusual

given that Aérospatiale, Linde, and virtually every other case applying the comity analysis arose in the context of a suit filed by private plaintiffs.

We turn next to the degree to which compliance with the request would undermine important interests of the Russian Federation.  When determining the interests of the foreign state, the Restatement authors advise that a court should look to, among other things,

> expressions of interest by the foreign state, as contrasted with expressions by the parties; to the significance of disclosure in the regulation by the foreign state of the activity in question; and to indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought.

Restatement § 442 cmt. c.

First and foremost, the Russian Federation shares the interest of the United States in combatting terrorism.  As detailed by plaintiffs, Mem. at 23, the Russian Federation is a party to the United Nations' International Convention for the Suppression of the Financing of Terrorism.  See G.A. Res. 54/109 (Dec. 9, 1999) (ratified by the Russian Federation on November 27, 2002).  The Convention specifically provides that "States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy."  Id. art. 12, ¶ 2.  While the present case does not involve mutual legal assistance, the Russian Federation's commitment to suppressing the financing of terrorism, even when in direct conflict with bank secrecy, underscores Russia's substantial interest in VTB's compliance with a discovery request aimed at discovering financial support for terrorism.

Additionally, the Russian Federation, represented by Rosfinmonitoring, was a member of the Financial Action Task Force (FATF) until its suspension in February 2023.  See Russian Federation, FATF, https://www.fatf-gafi.org/en/countries/detail/Russian-Federation.html (last visited February 21, 2025).  While it was apparently suspended in February 2023, its joining

reflects an "expression of interest" in participating in the group's activities at one time, including

at the time of the events at issue in this lawsuit.  Restatement § 442 cmt. c.  As detailed in

Strauss, the Financial Action Task Force recommends that their members

> rapidly, constructively and effectively provide the widest possible range of mutual
> legal assistance in relation to money laundering and terrorist financing
> investigations, prosecutions, and related proceedings.  In particular, countries
> should . . . [n]ot refuse to execute a request for mutual legal assistance on the
> grounds that laws require financial institutions to maintain secrecy or
> confidentiality.

242 F.R.D. at 217 (citation omitted) (alteration marks and ellipses in original).  Thus, in joining

the Financial Action Task Force, the Russian Federation "demonstrated its common national

interests with the United States in thwarting terrorist financing."  Id.

In response, VTB argues that Russia has a "'substantial' interest in bank secrecy and

'commercial privacy inside and outside' the country," as evidenced by the fact that "the Russian

government protects bank secrecy with criminal penalties."  Opp. at 56 (quoting Minpeco, S.A.,

116 F.R.D. at 524).  But where foreign bank secrecy laws conflict with international

commitments to combatting terrorism, courts have found that while "maintaining bank secrecy is

an important interest of the foreign jurisdictions where the discovery sought here resides . . . that

interest must yield to the interests of combating terrorism and compensating its victims."  Linde,

463 F. Supp. 2d at 315; see Strauss, 249 F.R.D. at 452-53.

Additionally, both of the "Bank Secrecy laws," Opp. at 56, Decree No. 1285 and Federal

Law No. 127-FZ, which VTB alleges prevent it from producing the disputed documents, see id.

at 28-31, are so-called blocking statutes, in which states have "little interest," In re Vivendi

Universal, S.A. Sec. Litig., 2006 WL 3378115, at *3 (S.D.N.Y. Nov. 16, 2006) ("France has little

interest in the enforcement of its Blocking statute.").  A blocking statute is a foreign statute

which was "never expected nor intended to be enforced against [the foreign sovereign's] subjects

but was intended rather to provide them with tactical weapons and bargaining chips in foreign

courts." Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.,

105 F.R.D. 16, 30 (S.D.N.Y. 1984) (citation omitted). The intention of the laws relied on is

reflected in their full titles. The full title of Decree No. 1285 is "On Measures to Protect the

Interests of the Russian Federation in the Course of Foreign Economic Activities Performed by

Russian Legal Entities" and the full title of Federal Law No. 127-FZ is "On Measures of

Influence on (Counteraction to) Unfriendly Actions of the United States of America and Other

Foreign States." See Ivanov Decl. at 2. The references to "Protect[ing] the Interests of the

Russian Federation in the Course of Foreign Economic Activities" and the "Unfriendly Actions

of the United States of America" show that these statutes were "never expected nor intended to

be enforced against" Russia but rather were intended to provide Russia with "tactical weapons

and bargaining chips in foreign courts." Compagnie Francaise d'Assurance Pour le Com.

Exterieur, 105 F.R.D. at 30 (citation omitted). These blocking statutes "need not be given the

same deference by courts of the United States as substantive rules of law at variance with the law

of the United States." Aérospatiale, 482 U.S. at 544 n.29 (quoting RESTATEMENT (THIRD) OF

FOREIGN RELATIONS LAW OF THE UNITED STATES § 437 Reporters' Note 5 (AM. L. INST.,

Tentative Draft No. 7, 1986)).

        VTB argues that "the United States [has an] interest in respecting [Russia's] laws

regarding banking regulation and data privacy." Opp. at 56. This is undoubtedly true.

However, this interest is outweighed by the interest of the United States in combatting terrorism,

as has been demonstrated in numerous cases in which a country's interest in enforcing its own

bank secrecy laws has been outweighed by the need for discovery in an ATA case. See Weiss,

242 F.R.D. at 51; Strauss, 249 F.R.D. at 443; Linde, 706 F.3d at 112 ("[W]e find no clear abuse

of discretion in the District Court's conclusion that the interests of other sovereigns in enforcing

bank secrecy laws are outweighed by the need to impede terrorism financing as embodied in the

tort remedies provided by U.S. civil law and the stated commitments of the foreign nations.").

VTB further argues that "conflicts with foreign regulatory schemes . . . . create the

potential for disrupting . . . the separation of powers within the United States, where the

Executive Branch is 'the sole organ of the federal government in the field of international

relations.'"  Opp. at 57-58 (quoting United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304,

320 (1936)).  But as Aérospatiale recognized, the operation of foreign law "do[es] not deprive an

American court of the power to order a party subject to its jurisdiction to produce evidence even

though the act of production may violate that [law]."  482 U.S. at 544 n.29; accord Intel Corp. v.

Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004) ("Section 1782 is the product of

congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in

gathering evidence for use in foreign tribunals.").

Additionally, we have considered the position of the Russian Federation in response to

the present litigation.  See Strauss, 249 F.R.D. at 448-49 (considering letters from the French

Ministry in response to the litigation).  An August 1, 2024, letter from the Deputy Minister of

Finance of the Russian Federation states that the Ministry "advise[s] that disclosure of the

information" contained in the third, sixth, and seventh tranches of documents "would be

inappropriate."  August 1, 2024, Letter from Russian Ministry of Finance; see Opp. at 27 (stating

that this letter pertained to the "third, sixth and seventh request").  Nonetheless, because the

interests of the Russian Federation in bank secrecy, as expressed in the two Russian blocking

statutes, pales in comparison to the interest of the Russian Federation in combatting terrorism,

ordering VTB "to provide plaintiffs with discovery would not undermine the important interests

of the state where the information is located, but rather, enforce them."  Strauss, 249 F.R.D. at

454 (citations and internal quotation marks omitted).

Therefore, having considered both the interests of the United States and of the Russian

Federation, the Court concludes that both the interests of the United States and of the Russian

Federation are best realized by VTB producing the information responsive to plaintiffs'

discovery requests.

      6.  Summary

A review of the comity factors shows that the only factor that favors VTB is the location

of the documents at issue.  While VTB argues that "whether the requested information originated

in the United States is a key Aérospatiale factor," Opp. at 53, case law does not support this

proposition, see generally Laydon, 183 F. Supp. 3d at 427 (production ordered where only the

location of the documents favored the party resisting discovery).

VTB also suggests that the Court await the conclusion of the approval process.  Opp. at

36-37.  However, the Court is not aware that any further production has occurred since this

suggestion was made on September 20, 2024, more than five months ago.  Thus, the Court

concludes that waiting longer is unlikely to result in production.  The possibility of further

production must also be viewed in light of the fact that the Ministry of Finance has only

approved 3% of the total number of responsive documents, see Mem. at 10, and the Central Bank

has approved 0% of the total number of responsive documents, see Opp. at 30.

Moreover, the delay up until now alone strongly favors adjudicating the motion based on

the present record without further delay.  As described above, plaintiffs requested the documents

in November and December 2021.  They first sought to move to compel production in April

2022.  After delays resulting from VTB obtaining new counsel, plaintiffs filed their first motion

to compel on November 11, 2022 — more than two years ago.  Since that time, VTB has sought

multiple extensions to complete the approval process.  In the end, plaintiffs have waited more

than three years for the production of these critical documents.  It would be unjust to require

plaintiffs to wait any longer.

Accordingly, because the comity factors so strongly favor ordering production of the

documents, we order VTB to produce information responsive to plaintiffs' discovery requests 1,

2, 5, 13, 25-27, 30, 32, 40, 50, 52-54, and 59-60 forthwith.  This includes the production in

unredacted form of documents previously produced with redactions.

V.   <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' motion to compel (Docket # 593) is granted.  The

Court orders VTB to produce information responsive to plaintiffs' discovery requests 1, 2, 5, 13,

25-27, 30, 32, 40, 50, 52-54, and 59-60 within 21 days of the filing of this Opinion and Order.

SO ORDERED.

Dated:  February 27, 2025
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge